**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>APACHE CORPORATION, JOHN J. CHRISTMANN IV, TIMOTHY J. SULLIVAN, STEPHEN J. RINEY, and STEVEN KEENAN,<br><br>　　　　　　　Defendants. | Case No. 4:21-cv-00575<br><br>District Judge George C. Hanks, Jr.<br><br>Magistrate Judge Andrew M. Edison<br><br>CLASS ACTION |
| BRIAN SCHWEGEL, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>APACHE CORPORATION, JOHN J. CHRISTMANN IV, TIMOTHY J. SULLIVAN, STEPHEN J. RINEY, and STEVEN KEENAN,<br><br>　　　　　　　Defendants. | Case No. 4:21-cv-00722<br><br>District Judge Keith P. Ellison<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF PLYMOUTH COUNTY RETIREMENT SYSTEM AND THE TRUSTEES OF THE TEAMSTERS UNION NO. 142 PENSION FUND MOTION FOR CONSOLIDATION AND APPOINTMENT AS LEAD PLAINTIFF AND IN OPPOSITION TO THE COMPETING MOTIONS**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

     A.   Issues to be Decided and Standard of Review ............................................. 1

     B.   Summary of Argument .................................................................................. 2

II.  ARGUMENT ..................................................................................................... 5

     A.   Ellis Fails to Satisfy the PSLRA's and Rule 23's Prerequisites
          for Appointment .......................................................................................... 6

          1.   Ellis Is Disqualified as a "Net Seller" and a "Net Gainer"
               Who Profited from the Fraud ................................................................6

          2.   Ellis's Numerous In-and-Out Transactions and Purchases
               After the Fraud Was Fully Revealed Render Him Atypical
               and Subject to Unique Defenses ..........................................................12

     B.   Chiou Also Fails to Satisfy the PSLRA and Rule 23's
          Prerequisites for Appointment .................................................................. 15

          1.   Nearly All of Chiou's Losses Arise from Options Trading and
               Forced "Assignments" of Stock at Preset, Non-Market Prices .........16

          2.   Chiou's Status as an Options Trader Renders Him Unfit to
               Serve as Lead Plaintiff for a Class of Common Stock
               Investors ..............................................................................................17

     C.   The Pension Funds Are the "Most Adequate Plaintiff" and
          Should Be Appointed as the Lead Plaintiff ................................................ 22

III. CONCLUSION .................................................................................................. 24

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Andrada v. Atherogenics, Inc.*,
  No. 05-cv-00061, 2005 WL 912359 (S.D.N.Y, Apr. 19, 2005) .................................. 21

*Applestein v. Medivation Inc.*,
  No. 10-cv-00998, 2010 WL 3749406 (N.D. Cal. Sept. 20, 2010) ............................... 14

*Batter v. Hecla Mining Co.*,
  No. 19-cv-4883, 2020 WL 1444934 (S.D.N.Y. Mar. 25, 2020) .................................. 19

*Born v. Quad/Graphics, Inc.*,
  No. 19-cv-10376, 2020 WL 994427 (S.D.N.Y. Mar. 2, 2020) ............................... 3, 8, 9

*Cal. Public Employees' Ret. Sys. v. ANZ Sec., Inc.*,
  137 S. Ct. 2042 (2017) ....................................................................................... 11

*Cambria Cty. Emps. Ret. Sys. v. Venator Materials plc*,
  No. 19-cv-3464, 2019 WL 5328877 (S.D. Tex. Oct. 21, 2019) ......................... 6, 22, 23

*Cook v. Allergan plc*,
  No. 18-cv-12089, 2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019) ........................... 19, 20

*Deering v. Galena Biopharma, Inc.*,
  No. 14-cv-00367, 2014 WL 4954398 (D. Or. Oct. 3, 2014) ...................................... 3, 9

*Di Scala v. ProShares Ultra Bloomberg Crude Oil*,
  No. 20-cv-5865, 2020 WL 7698321 (S.D.N.Y. Dec. 28, 2020) ........................... *passim*

*Doshi v. Gen. Cable*,
  No. 17-cv-025, 2017 WL 5178673 (E.D. Ky. Nov. 7, 2017) ...................................... 9, 10

*Faris v. Longtop Fin. Techs. Ltd.*,
  No. 11-cv-3658, 2011 WL 4597553 (S.D.N.Y. Oct. 4, 2011) ...................................... 22

*George v. China Auto. Sys., Inc.*,
  No. 11-cv-7533, 2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................................... 15

*Gordon v. Sonar Capital Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015) ........................................................................ 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ........................................................................................ 12, 13

*In re Atlantic Power Corp. Sec. Litig.*,
No. 13-cv-10537, 2014 WL 12628589 (D. Mass. Mar. 31, 2014) ........................... 8, 18

*In re Bausch & Lomb Inc. Sec. Litig.*,
244 F.R.D. 169 (W.D.N.Y. 2007) ................................................................................ 9

*In re BP plc Sec. Litig.*,
758 F. Supp. 2d 428 (S.D. Tex. 2010) .................................................................... 10, 24

*In re Cardinal Health, Inc. Sec. Litig.*,
226 F.R.D. 298 (S.D. Ohio 2005) ........................................................................... 7, 11

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) ...................................................................................... 5

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ....................................................................................... 5

*In re Comdisco Sec. Litig.*,
150 F. Supp. 2d 943 (N.D. Ill. 2001) ........................................................................ 10

*In re Elan Corp. Sec. Litig.*,
No. 08-cv-08761, 2009 WL 1321167 (S.D.N.Y. May 11, 2009) ................................. 20

*In re Hebron Tech., Co., Ltd. Sec. Litig.*,
20-cv-4420, 2020 WL 5548856 (S.D.N.Y. Sept. 16, 2020) .................................... 11, 21

*In re IMAX Sec. Litig.*,
272 F.R.D. 138 (S.D.N.Y. 2010) ............................................................................... 21

*In re IMAX Sec. Litig.*,
No. 06-cv-6128, 2009 WL 1905033 (S.D.N.Y. June 29, 2009) ................................. 22

*In re Kosmos Energy Ltd. Sec. Litig.*,
No. 12-cv-373-B, 2012 WL 6199318 (N.D. Tex. Nov. 1, 2012) ................................. 24

*In re Netflix, Inc., Sec. Litig.*,
No. 12-cv-0225, 2012 WL 1496171 (N.D. Cal. Apr. 27, 2012) ............................. 10, 19

iii

*Jaffe Pension Plan v. Household Int'l, Inc.*,
    756 F. Supp. 2d 928 (N.D. Ill. 2010) ........................................................................ 11

*Jurkowski v. Molycorp, Inc.*,
    No. 13-cv-5697, 2014 WL 12792750 (S.D.N.Y. Apr. 2, 2014) .................................... 19

*Kakkar v. Bellicum Pharma., Inc.*,
    No. 18-cv-00338, 2019 WL 1367653 (S.D. Tex. Mar. 26, 2019) ................................ 23

*Marcus v. J.C. Penney Co.*,
    No. 13-cv-736, 2014 WL 11394911 (E.D. Tex. Feb. 28, 2014) ......................... 5, 13, 14

*Reinschmidt v. Zillow, Inc.*,
    No. 12-cv-2084, 2013 WL 1092129 (W.D. Wash. Mar. 14, 2013) .............................. 14

*Rocco v. Nam Tai Elecs., Inc.*,
    245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................................... 15

*Schaffer v. Horizon Pharma plc*,
    No. 16-cv-1763, 2016 WL 3566238 (S.D.N.Y. June 27, 2016) ................................... 19

*Shaffer v. Digital Generation, Inc.*,
    No. 13-cv-1684-N, 2013 WL 12430537 (N.D. Tex. Sept. 19, 2013) .............. 5, 6, 14, 22

*Tsirekidze v. Syntax-Brillian Corp.*,
    No. 07-cv-2204, 2008 WL 942273 (D. Ariz. Apr. 7, 2008) ........................................ 14

*Wolf v. Frank*,
    477 F.2d 467 (5th Cir. 1973) .................................................................................... 11

**STATUTES**

15 U.S.C. § 78u-4(a)(3) ..................................................................................... 1, 2, 5

**RULES**

Fed. R. Civ. P. 42(a) ................................................................................................... 1

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 104-369 (1995) ............................................................................ 24

## I.   INTRODUCTION

Plymouth County and Teamsters 142 (collectively, the "Pension Funds") have timely filed a motion, pursuant to Section 21D(a)(3) of the Exchange Act, 15 U.S.C. § 78u-4(a)(3), as amended by the PSLRA, requesting that the Court: (1) consolidate the above-captioned, related actions; (2) appoint the Pension Funds as Lead Plaintiff for the Class; and (3) approve their selection of Kessler Topaz and Saxena White as Lead Counsel for the Class and Ajamie as Liaison Counsel for the Class.[1]   ECF No. 13.   This is the Pension Funds' brief in opposition to the competing motions filed by Terry Ellis ("Ellis") (ECF No. 12) and Shang Chu Chiou, on behalf of himself and the Chiou Family Trust (collectively, "Chiou") (ECF No. 11).

### A.   Issues to be Decided and Standard of Review

(1) Whether consolidation is appropriate under Rule 42(a) because the above-captioned actions "involve a common question of law and or fact[.]"   *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii).[2]

(2) Whether the Pension Funds should be appointed as Lead Plaintiff because the Pension Funds are the movant asserting the largest financial interest

---

[1] Unless otherwise noted: (1) all capitalized but undefined terms have the meanings ascribed in the Pension Funds' opening brief (ECF No. 13); (2) all emphasis is added and all internal quotations and citations are omitted; and (3) all references to "ECF No. __" are to docket entries in *Plymouth County Retirement System v. Apache Corp.*, No. 4:21-cv-00575 (S.D. Tex.).

[2] The above-captioned actions are based on similar facts and involve the same subject matter and the same legal claims.   All three movants agree that consolidation of these related actions is appropriate.   *See* ECF Nos. 11 at 7-8, 12 at 8-10, 13 at 7.   Accordingly, the above-captioned actions should be consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.   *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii).

that *also* makes a threshold showing of typicality and adequacy under Rule 23 *and* is not subject to unique defenses. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii) (requiring the court appoint as lead plaintiff the movant with the largest financial interest in the action that also satisfies Rule 23(a)'s adequacy and typicality requirements).

(3) Whether the Pension Funds' selection of Kessler Topaz and Saxena White as Lead Counsel for the Class and Ajamie as Liaison Counsel for the Class should be approved. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v) (providing the lead plaintiff with authority to select lead counsel subject to the court's approval).

## B.    Summary of Argument

The PSLRA provides that the "court shall adopt a presumption that the most adequate plaintiff" is the movant that: (1) "has the largest financial interest in the relief sought by the class"; and (2) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Of the three movants before the Court, only the Pension Funds satisfy both of these requirements.

While the two competing movants, Ellis and Chiou, claim larger losses than the Pension Funds, their motions are beset by fatal defects that prevent a finding of adequacy and typicality under Rule 23.

*First*, Ellis is disqualified from serving as Lead Plaintiff because Ellis is both a "net seller" and "net gainer" who profited from the fraud. As demonstrated by his submissions to the Court, Ellis *sold* 950 more shares than he purchased during the Class Period and

2

made nearly $300,000 in *profits* from these transactions at fraud-inflated prices.  Courts throughout the nation consistently hold that movants such as Ellis who are *both* net sellers *and* net gainers—even if claiming a sizable loss under LIFO or another method—are "*effectively disqualifie[d]*" from serving as lead plaintiff.  *See Born v. Quad/Graphics, Inc.*, No. 19-cv-10376, 2020 WL 994427, at *2 (S.D.N.Y. Mar. 2, 2020) (collecting cases); *Deering v. Galena Biopharma, Inc.*, No. 14-cv-00367, 2014 WL 4954398, at *11 (D. Or. Oct. 3, 2014) ("[C]ourts around the country consistently have rejected applications for lead plaintiff made by net sellers and net gainers . . . .").

While his status as a net seller and net gainer alone disqualifies Ellis as Lead Plaintiff, Ellis engaged in a pattern of highly unusual trading, which also precludes his appointment.  Indeed, while Apache stock traded at prices artificially inflated by Defendants' fraudulent misrepresentations and omissions, Ellis engaged in a trading frenzy—purchasing and selling out of his entire position *a dozen times* in a three-month period—including numerous matching purchases and sales on the same day (or within a span of a couple of days).  Ellis reaped more than $700,000 in profits from these serial liquidations, all of which occurred at inflated prices *before* any alleged disclosure of the fraud.  Curiously, Ellis stopped trading in Apache shares for more than three years, before suddenly *buying* Apache shares two days *after* the end of the Class Period when the fraud had been *fully* disclosed.  Thus, in addition to being a "net seller" and "net gainer," Ellis's highly unusual trading pattern renders Ellis atypical and subject to unique defenses, most notably, Defendants' inevitable assertion that Ellis did not rely on their alleged misstatements.

3

***Second***, as an options trader whose losses are overwhelmingly from the sale of puts, Chiou is likewise disqualified.  As Chiou himself recognizes, the defined class in this case is limited to purchasers of "**common stock**."  ECF No. 11 at 2.  Yet more than 93% of Choiu's claimed losses were incurred by the Chiou Family Trust, which traded ***exclusively*** in options by ***selling*** put contracts.  When these options were exercised by Chiou's counterparties (the put buyers), Chiou was simply "assigned" the underlying stock—that he did not want—but was contractually obligated to "purchase" at ***preset*** prices that were outside of the day's trading range and negotiated at some prior date ***without*** regard to reliance on the integrity of Apache's market price.  *See* ECF No. 11-3 at n.2.  Receiving stock via forced contractual assignment, rather than through open-market purchases, renders Chiou atypical, subject to unique defenses, and an unfit representative for a Class of common stock investors.  *See Di Scala v. ProShares Ultra Bloomberg Crude Oil*, No. 20-cv-5865, 2020 WL 7698321, at *4 (S.D.N.Y. Dec. 28, 2020) (refusing to appoint movant with the largest financial interest because 82 percent of his losses related to the sale of put options, which "raises issues of his typicality and adequacy").

Given Ellis's and Chiou's disqualifying deficiencies, the Pension Funds are not only the ***ideal lead plaintiff*** envisioned by Congress when enacting the PSLRA, but the sole movants before the Court capable of meeting the PSLRA's criteria for appointment as Lead Plaintiff.  Here, the Pension Funds assert a combined loss of $782,594 and, unlike Ellis and Chiou, readily satisfy Rule 23's typicality and adequacy requirements.  As a cohesive pair of sophisticated institutional investors collectively managing more than $1.7 billion in assets and with a demonstrated commitment to working together to prosecute the Class's

claims, there can be no doubt surrounding the Pension Funds' ability and commitment to zealously represent the Class.  Moreover, the Pension Funds already have proven their ability to protect the Class through Plymouth County's extensive pre-suit investigation, preparation, and filing of the instant action, and their oversight of counsel's ongoing investigation, which has resulted in, *inter alia*, interviews with multiple percipient witnesses and discussions with industry and financial experts.  For all these reasons, the Pension Funds are the movant "most capable of adequately representing the interests of class members" and should be appointed Lead Plaintiff.  15 U.S.C. § 78u-4(a)(3)(B)(i).

## II.    ARGUMENT

The PSLRA provides a sequential process for evaluating competing lead plaintiff motions and appointing a lead plaintiff and approving its selection of counsel.

The "threshold determination" is identifying whether the movant with the largest financial interest *also* satisfies Rule 23's adequacy and typicality requirements.  *Shaffer v. Digital Generation, Inc*., No. 13-cv-1684-N, 2013 WL 12430537, at *1-2 (N.D. Tex. Sept. 19, 2013).  Simply claiming "[t]he largest financial interest factor is not the stopping point in the presumptive lead plaintiff analysis" as "[t]he proposed lead plaintiff must also meet the typicality and adequacy requirements of Rule 23."  *Marcus v. J.C. Penney Co.*, No. 13-cv-736, 2014 WL 11394911, at *7 (E.D. Tex. Feb. 28, 2014).  Accordingly, if the movant "with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23."  *In re Cavanaugh*, 306 F.3d 726, 729-32 (9th Cir. 2002); *see also In re Cendant Corp.*

5

*Litig.*, 264 F.3d 201, 267 (3d Cir. 2001) ("If (for *any* reason) the court determines that the movant with the largest losses cannot make a threshold showing of typicality or adequacy, then the court should . . . disqualify that movant from serving as lead plaintiff."); *Digital Generation*, 2013 WL 12430537, at *2 ("If a competing plaintiff successfully rebuts the presumption, the court then applies the presumption to the plaintiff with the next largest financial interest in the litigation . . . who can make a prima facie showing under Rule 23's adequacy and typicality requirements.").

### A. Ellis Fails to Satisfy the PSLRA's and Rule 23's Prerequisites for Appointment

Ellis is not entitled to the "most adequate plaintiff" presumption regardless of his claimed loss because: (1) his transactions in Apache stock during the Class Period generated a significant *profit* as a result of the alleged artificial inflation; and (2) his trading pattern demonstrates an *absence* of reliance on Apache's alleged misstatements.

### 1. Ellis Is Disqualified as a "Net Seller" and a "Net Gainer" Who Profited from the Fraud

In assessing financial interest, courts in this District and throughout the country consider four financial interest metrics, including net shares sold and net expenditures. *See Cambria Cty. Emps. Ret. Sys. v. Venator Materials plc*, No. 19-cv-3464, 2019 WL 5328877, at *3 (S.D. Tex. Oct. 21, 2019) (Rosenthal, C.J.) (describing financial interest factors); *see also* ECF No. 12 at 12-13 (Ellis's brief listing net shares sold and net expenditures as factors courts use to assess financial interest). Consideration of those factors makes clear that Ellis's claimed losses are illusory and obscure the *profit* he received from his sales of Apache stock during the Class Period at fraud-inflated prices.

*See In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 303 (S.D. Ohio 2005) (endorsing four-factor approach because it "provides courts with additional information" that "reveals whether plaintiffs actually profited during the Class Period from the inflated stock prices").  Ellis is the prototypical "net seller" and "net gainer" who is routinely disqualified by courts across the United States.  *See infra* at 9-10.

Ellis's very first transaction in Apache stock during the Class Period was the sale of 58,500 shares that he purchased at fair market value prior to Defendants' misrepresentations during the Class Period.  ECF 12-3 at 3.  Specifically, the day after the start of the Class Period—when Apache shares were trading near their Class-Period high as a result of Defendants' fraudulent representations regarding the "Alpine High play and its large inventory of repeatable, high-value drilling opportunities"—Ellis sold 58,500 shares for proceeds of $3.4 million.[3]  *Id.*; *see* ECF No. 1 at ¶ 30.  Ellis then proceeded, through numerous transactions, to purchase *and* quickly sell 649,188 shares of Apache stock—nearly 92 percent of his total purchases during the Class Period—at artificially inflated prices *before* the first alleged corrective disclosure on April 23, 2019.  ECF 12-3 at 3.  He profited from each of these in-and-out transactions.  *Id.*

By virtue of his substantial transactions, Ellis is both a *net seller* and a *net gainer*.  Indeed, Ellis admits (ECF No. 12 at 13) that he sold 950 more shares of Apache stock than he purchased during the Class Period, making him a net seller.  However, in an attempt to

---

[3] Ellis's profits on this transaction are ignored under a LIFO analysis because there are no corresponding purchases during the Class Period to which that sale can be matched (*i.e.*, the corresponding purchases occurred prior to the Class Period).  *See* ECF No. 12-3 at 3.

hide his status as a net gainer, Ellis misleadingly states (ECF No. 12 at 13) that he "expended $299,413.79 in net funds" purchasing Apache stock.[4]  This is false.  As is evident from Ellis's certification (ECF No. 12-3 at 3) and as provided below, Ellis actually *received* $299,416 more proceeds from sales of Apache stock than he expended on purchases during the Class Period:

**Summary of Ellis's Class-Period Transactions**

| Shares Purchased | Shares Sold | Net Shares Sold ("Net Seller") |
|---|---|---|
| 707,488 | 708,438 | **950** |

| Cost of Shares Purchased | Proceeds from Shares Sold | Net Gains from Shares Sold ("Net Gainer") |
|---|---|---|
| $44,971,093 | $45,270,509 | **$299,416** |

Thus, Ellis benefitted from Defendants' fraud by selling 950 more shares at artificially inflated prices than he bought.  Ellis's receipt of nearly $300,000 in net profits from these transactions renders him a net seller *and* a net gainer.  As a net seller and net gainer, Ellis is disqualified from serving as Lead Plaintiff.  *See Quad/Graphics*, 2020 WL 994427, at *2 (rejecting "net gainer" and underscoring that the court is "exceedingly concerned" about appointing such an investor as a lead plaintiff).

---

[4] Notably, Ellis is the only movant that did not include a loss calculation with his motion, the absence of which further serves to conceal the nearly $300,000 gain on his Class Period transactions.  Ellis's failure to "provide specificity regarding [his] loss amount" "bespeaks a less than full commitment to transparency in providing the court with information that it ultimately would require to make its decision."  *In re Atlantic Power Corp. Sec. Litig.*, No. 13-cv-10537, 2014 WL 12628589, at *1, n.1 (D. Mass. Mar. 31, 2014).

Analyzing movants' net sales and net gains during the class period enables courts to assess whether a movant is exposed to arguments that he actually "benefitted from the artificially inflated prices complained of in [the] lawsuit." *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173 (W.D.N.Y. 2007); *see also Doshi v. Gen. Cable*, No. 17-cv-025, 2017 WL 5178673, at *3 (E.D. Ky. Nov. 7, 2017) ("The purpose[] of isolating the calculation of net sales and net gains ***to the [c]lass [p]eriod*** is to determine whether a party potentially benefitted from the fraud" by selling shares acquired "at fair market value" prior to the class period at "fraudulently inflated prices."). Even if such a movant claims to have sold investments during the class period for a lower price than paid to purchase them at fair market value before the class period—which Ellis cannot claim—the fact remains that the movant's "loss was less than it would have been had the [securities] been trading at fair market value" during the class period. *Bausch & Lomb*, 244 F.R.D. at 173.

Appreciating the importance of the net shares and net expenditures factors, courts across the country have uniformly concluded that movants who are both net sellers and net gainers ***must be disqualified*** from serving as lead plaintiff due to concerns that they profited from the fraud and thus will be unable to establish damages. *See Quad/Graphics, Inc.*, 2020 WL 994427, at *2 (collecting cases finding that net seller/net gainer status "***effectively disqualifies***" a movant); *Galena Biopharma, Inc.*, 2014 WL 4954398, at *11 ("[C]ourts . . . ***consistently have rejected*** applications for lead plaintiff made by net sellers and net gainers, recognizing the difficulty of proving damages at trial."); *Bausch & Lomb*, 244 F.R.D. at 173 ("Courts have consistently rejected applications for lead plaintiff status

9

made by 'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices.").

Regardless of whether or not Ellis is able to establish that he was damaged by the fraud, consistent with the PSLRA's requirement to appoint a lead plaintiff who does not expose the class to litigation sideshows, courts "regularly" reject net sellers and net gainers—like Ellis—recognizing they "may be subject to unique defenses because they may have benefitted by selling pre-Class Period shares at allegedly inflated prices during the Class Period." *Gen. Cable*, 2017 WL 5178673, at \*3; *see also In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 945-46 (N.D. Ill. 2001) (concluding that a net gainer "is totally out of the running for designation as lead plaintiff" and rejecting a proposed lead plaintiff with a $300,000 net gain); *In re Netflix, Inc., Sec. Litig.*, No. 12-cv-0225, 2012 WL 1496171, at \*5 (N.D. Cal. Apr. 27, 2012) (explaining that competing movants need only show "a degree of likelihood that a unique defense might play a significant role at trial"); *In re BP plc Sec. Litig.*, 758 F. Supp. 2d 428, 435 (S.D. Tex. 2010) (explaining that a prospective lead plaintiff cannot be "subject to unique defenses that render such plaintiff incapable of adequately representing the class"). Accordingly, Ellis is "exactly the type of net gainer held by the above authorities to be an inadequate lead plaintiff." *Gen. Cable*, 2017 WL 5178673, at \*3.

Ellis cannot avoid disqualification by claiming that he suffered losses under LIFO or any other analysis. Losses are irrelevant because Ellis's status as a net seller and net gainer goes directly to his ability to satisfy the requirements of Rule 23. *See Gen. Cable*, 2017 WL 5178673, at \*3-4 (analyzing net seller/net gainer issues after assessing financial

10

interest, as part of analysis of movant's ability to satisfy the requirements of Rule 23).  For example, at class certification, Defendants would almost certainly argue that Ellis cannot claim any damage when his fraud-related profits are "netted" against his fraud-related losses.  *See Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 935 (N.D. Ill. 2010) (concluding that "plaintiffs' losses [must] be netted against their profits attributable to the same fraud" and *citing Wolf v. Frank*, 477 F.2d 467, 478-79 (5th Cir. 1973)).[5]  Ellis's potential need to address the netting issue, which is critical to him—yet irrelevant to other movants—is disqualifying.  *See Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 205 (S.D.N.Y. 2015) (rejecting a net gainer as an inappropriate class representative because the issue of netting gains against losses would be paramount for him, unlike for the rest of the class); *Cardinal Health*, 226 F.R.D. at 308 ("courts ***usually reject*** these so-called net gainers as lead plaintiffs, opting instead for net losers that will have less trouble proving damages"); *In re Hebron Tech., Co., Ltd. Sec. Litig.*, No. 20-cv-4420, 2020 WL 5548856, at *7 (S.D.N.Y. Sept. 16, 2020) (collecting cases reflecting that "a potential that the presumptively most adequate lead plaintiff will be subject to unique defenses" is sufficient to rebut the lead plaintiff presumption).

---

[5] Dismissal of the class action or denial of class certification could leave absent class members without the ability to bring individual claims if either occurs after the expiration of the statute of repose period.  *See, e.g.*, *Cal. Public Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2055 (2017) (holding that statutes of repose are not subject to equitable tolling during the pendency of class action litigation).

### 2. Ellis's Numerous In-and-Out Transactions and Purchases After the Fraud Was Fully Revealed Render Him Atypical and Subject to Unique Defenses

Ellis's status as a "net seller" and "net gainer" is not the only reason he fails to meet the PSLRA's and Rule 23's requirements. Ellis's highly unusual trading pattern also introduces unique defenses, including his ability to rely on the fraud-on-the-market presumption of reliance that serves as bedrock for the Class's claims.[6]

During the first three months of the Class Period, Ellis engaged in a frenzy of trading activity in which he repeatedly amassed and rapidly liquidated his entire position of tens of thousands of Apache shares (usually in the range of 55,000 shares)—often on the same day or within days of the corresponding purchases *and* more than two years before the first alleged corrective disclosure on April 23, 2019. Specifically, these purchases and liquidations occurred on: (1) September 15 and 16, 2016; (2) October 3, 2016; (3) October 4 and 5, 2016; (4) October 6 and October 19, 2016; (5) October 21 and November 15, 2016; (6) November 17 and 21, 2016; (7) November 22 and 23, 2016; (8) November 28 and 30, 2016; (9) December 7 and 8, 2016; (10) December 9 and 13, 2016; (11) December 14 and 15, 2016; and (12) December 16 and 19, 2016. *See* ECF No. 12-3 at 3. In total, Ellis bought (and quickly sold) nearly 650,000 shares of Apache stock—more than *92 percent* of his total purchases during the Class Period. *Id.*

---

[6] *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (noting that a securities fraud plaintiff must prove reliance upon the defendants' alleged misrepresentation or omission as an essential element of a Section 10(b) claim).



Moreover, in each of these liquidations, Ellis sold his shares at a higher price than he paid to purchase them, with an average spread of $1.14 per share. *Id.*; *see also* Declaration of David R. Kaplan in Further Support. of the Motion of Plymouth County Retirement System and the Trustees of the Teamsters Union No. 142 Pension Fund for Consolidation, Appointment as Lead Plaintiff, and Approval of Selection of Counsel, and in Opposition to the Competing Mots. ("Kaplan Decl."), Ex. A. The active trading strategy evinced by these transactions belies any reliance on Defendants' misstatements. Indeed, Ellis's flurry of trading at the beginning of the Class Period strongly suggests a day trading strategy designed to capitalize "on the market's daily volatility" and that "relies more on speculation rather than investing." *J.C. Penney Co.*, 2014 WL 11394911, at *7.

13

Ellis's unusual and speculative trading activity, including large in-and-out transactions, presents a serious risk to the Class that disqualifies him from serving as Lead Plaintiff. *See Digital Generation*, 2013 WL 12430537, at *3 (finding evidence of movant's "high volume trading activity, including buying and selling [company] stock on the same day" sufficient to "raise[] serious concerns about his typicality and his susceptibility to unique defenses" and rebut the lead plaintiff presumption). Defendants would almost certainly argue at class certification that Ellis did not rely on their alleged misstatements in making his investment decisions, and instead speculated on short-term movements in the price of Apache shares. This risk is particularly acute here. As noted above, Ellis established and completely liquidated his position on a ***dozen*** occasions before the truth about Defendants' fraud began to emerge. *See Applestein v. Medivation Inc.*, No. 10-cv-00998, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010) (rejecting movant that engaged in frequent trading and sold out of his position "as many as three times"); *J.C. Penney*, 2014 WL 11394911, at *7 (rejecting movant who bought and sold his "entire [ ] portfolio on the same or next trading day on at least ten different instances"). Ellis's repetitious selling, all at higher prices than his preceding purchases, "belies any true reliance on company reports or even on the integrity of the stock price itself." *Tsirekidze v. Syntax-Brillian Corp.*, No. 07-cv-2204, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008); *see also Reinschmidt v. Zillow, Inc.*, No. 12-cv-2084, 2013 WL 1092129, at *4 (W.D. Wash. Mar. 14, 2013) (noting that "[r]eliance on the fraud or misrepresentation is an essential element of a federal securities claim" and in-and-out transactions give rise to unique defenses).

14

Any claim Ellis might make regarding his reliance would be further belied by his resumption of trading in Apache shares—***after more than three years of inactivity***—mere days after the end of the Class Period when the fraud had been ***fully*** disclosed. *See George v. China Auto. Sys., Inc.*, No. 11-cv-7533, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013) ("A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision."); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (noting that "this Court has consistently held that a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative" and denying class certification because lead plaintiff's "post-class purchases indicate, if anything, that he was [not] relying … on the market"). There is no reason to subject the Class to the serious vulnerabilities created by Ellis's outlier trading strategy.

Accordingly, Ellis is not entitled to the "most adequate plaintiff" presumption and his motion should be denied.

## B.    Chiou Also Fails to Satisfy the PSLRA and Rule 23's Prerequisites for Appointment

With Ellis disqualified, Chiou claims the next largest loss on transactions during the Class Period. However, like Ellis, Chiou cannot satisfy Rule 23's typicality and adequacy requirements because virtually all of his losses arise as a result of his trading in put options and subsequent receipt of Apache common stock at non-market prices.

15

### 1. Nearly All of Chiou's Losses Arise from Options Trading and Forced "Assignments" of Stock at Preset, Non-Market Prices

The Class is defined as "all persons or entities that purchased or otherwise acquired Apache common stock from September 7, 2016, through March 13, 2020, inclusive." ECF No. 1 at 1-2. However, more than *93 percent* of Chiou's claimed losses were incurred as the result of his *sale* of put *options*—*i.e.*, contracts obligating Chiou to purchase Apache shares under certain circumstances, rather than open market purchases of the securities themselves. *See* ECF No. 11-3 n. 2 (acknowledging that receipt of common stock was pursuant to "option assignment[s]"). Specifically, the put options that Chiou sold "granted other investors 'the right to force [Chiou] . . . to acquire common stock at above market prices'" when the price of Apache's common stock was trading below the options' strike prices. *See ProShares*, 2020 WL 7698321, at *3 (summarizing argument and refusing to appoint options trader as lead plaintiff). Here, purchasers of Chiou's put options exercised their rights and "assigned" Chiou 27,000 shares of Apache common stock when the price of Apache stock failed to appreciate above the option strike prices. *See* ECF No. 11-3. Notably, all of these assignments occurred at prices *above* the prevailing market prices of Apache common stock and, as a result, generated hundreds of thousands of dollars in losses *unrelated* to any revelation of fraud, as provided below:

16

| Assignment Date | Shares Assigned to Chiou | Non-Market Assignment Price | Market High Price[7] | Overpayment |
|---|---|---|---|---|
| 10/20/2017 | 600 | $65.00 | $42.15 | $13,710 |
| 10/20/2017 | 2,400 | $67.50 | $42.15 | $60,840 |
| 10/20/2017 | 2,500 | $72.50 | $42.15 | $75,875 |
| 5/3/2018 | 1,000 | $65.00 | $41.53 | $23,470 |
| 10/24/2018 | 2,500 | $60.00 | $40.40 | $49,000 |
| 10/29/2018 | 5,000 | $60.00 | $37.90 | $110,500 |
| 1/18/2019 | 2,500 | $60.00 | $32.40 | $69,000 |
| 1/18/2019 | 700 | $50.00 | $32.40 | $12,320 |
| 4/18/2019 | 100 | $50.00 | $36.78 | $1,322 |
| 4/26/2019 | 1,700 | $50.00 | $33.90 | $27,370 |
| 7/19/2019 | 1,000 | $52.50 | $24.10 | $28,400 |
| 7/19/2019 | 3,700 | $50.00 | $24.10 | $95,830 |
| 7/24/2019 | 900 | $50.00 | $25.23 | $22,293 |
| 7/29/2019 | 600 | $50.00 | $23.97 | $15,618 |
| 10/21/2019 | 800 | $50.00 | $22.88 | $21,696 |
| 10/22/2019 | 1,500 | $40.00 | $23.41 | $24,885 |

Indeed, Chiou's options trading strategy resulted in Chiou incurring more than $400,000 in losses even *before* the first alleged corrective disclosure on April 23, 2019.

### 2. Chiou's Status as an Options Trader Renders Him Unfit to Serve as Lead Plaintiff for a Class of Common Stock Investors

Chiou's sale of put options and the resulting forced, above-market assignments of Apache shares at predetermined prices subject him to unique defenses that undermine his ability to prosecute the Class's claims. *See ProShares*, 2020 WL 7698321, at *4 (noting

---

[7] *See* Kaplan Decl. Ex. B.

17

that factual issues unique to an options trader "would likely threaten to become the focus of the litigation" and cause unnecessary conflict).  The unique defenses associated with Chiou's status as a seller of put options expose the class to unnecessary risks that do not accompany the appointment of the Pension Funds—who, like other Class members, purchased Apache *common stock* on the *open market*.

As an initial matter, the vast majority of Chiou's transactions are outside of the Class definition and could not have been made in reliance on the alleged fraud.  The Complaint defines the Class as investors in Apache "common stock."  ECF No. 1 at 1-2.  The Complaint describes the action as involving "a fraudulent scheme to artificially inflate the Company's stock price" on "the NASDAQ exchange."  *Id*. at 1-2, 6-7 (noting that a common question faced by all Class members is "whether the market price of Apache common stock was artificially inflated" due to Defendants' misrepresentations).  Accordingly, Chiou's *sale* of put options are not included in the Class.  *See ProShares*, 2020 WL 7698321, at *4 (questioning "whether losses arising from [the movant's] sale of put options would qualify him as member of a class").  Notably, when Chiou's forced "assignments" of Apache shares are excluded, Chiou's losses drop to only $76,793—a mere 10% of the losses suffered by the Pension Funds ($782,594).  *Compare* ECF No. 11-3 *with* ECF No. 13-5.[8]

---

[8] Compounding these issues, Chiou has not provided the Court *any* information about his underlying put option transactions—including *basic* information such as the *dates* he sold the put options.  As such, it is unclear how much Chiou profited from these put option transactions and whether he actually sold these put options—and thus, committed to acquiring Apache common stock—*prior* to the start of the Class Period.  *See Atlantic*

Further, Chiou's ability to serve as Lead Plaintiff is undermined by his need to confront a host of factual questions during the course of the litigation that are unique to options traders. *See Netflix*, 2012 WL 1496171, at *5 ("There is no requirement at this early stage to prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial."); *Batter v. Hecla Mining Co.*, No. 19-cv-4883, 2020 WL 1444934, at *7 (S.D.N.Y. Mar. 25, 2020) ("Where there is at least a **potential** that the presumptively most adequate lead plaintiff will be subject to unique defenses . . . disqualification is appropriate."); *Schaffer v. Horizon Pharma plc*, No. 16-cv-1763, 2016 WL 3566238, at *3 (S.D.N.Y. June 27, 2016) ("[M]any courts have rejected appointments of lead plaintiffs based on **potential** risks.") (emphasis in original). Most notably, there are questions as to whether Chiou, unlike the Pension Funds and other common stock purchasers, relied upon Defendants' misrepresentations and the price of Apache's common stock when he sold thousands of put options. *See Cook v. Allergan plc*, No. 18-cv-12089, 2019 WL 1510894, at *2 (S.D.N.Y. Mar. 21, 2019) (McMahon, C.J.) (noting that options investors may rely on different factors than stock purchasers such as the option's "strike price, duration, maturity, volatility, and interest rates"); *ProShares*, 2020 WL 7698321, at *4 (same).

---

*Power*, 2014 WL 12628589, at *1 (refusing to "reflexively rely on simple and arbitrary arithmetic calculations" of financial interest where movant submitted incomplete and deficient trading data). Any losses from such pre-Class Period transactions would not be linked to the alleged fraud and must be excluded from his loss calculation. *See Jurkowski v. Molycorp, Inc.*, No. 13-cv-5697, 2014 WL 12792750, at *3 (S.D.N.Y. Apr. 2, 2014) (rejecting movant who "sold put options before the class period" because "there is no link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price").

The recent decision in *ProShares* is instructive. There, the court rejected a movant —also represented by Chiou's proposed lead counsel here—who was subject to unique defenses because 82% of his losses were incurred in connection with the sale of put options and the resulting assignment of common stock at non-market prices. *ProShares*, 2020 WL 7698321, at *4. The *ProShares* court found that this unique trading pattern raised typicality and adequacy concerns under the PSLRA because such options trading presented questions regarding the movant's membership in the class (which, as the case is here, was limited to the "purchase or acquisition" and not the "sale" of securities) and also whether the options investor "was motivated by the same market incentives as class members who traded shares [of common stock] on the open market." *Id.* Ultimately, the court concluded that issues unique to the options investor "would likely threaten to become the focus of the litigation" and "are certain to" expose the class to risks throughout the litigation. *Id.* Chiou's trading activity is **virtually identical**, if not **more egregious** than, that of the options investor rejected in *ProShares*.

*ProShares* is not alone in its rejection of options investors. Another very recent decision likewise rejected a movant who suffered 60% of his losses in connection with an options trading strategy and is similarly apposite. *Allergan*, 2019 WL 1510894, at *2. As the *Allergan* court explained, such an options investor is not "typical of the average common stockholder" given that his appointment "would introduce factual issues irrelevant to stockholder class members, like strike price, duration, maturity, volatility, and interest rates, and he could subject the class to unique defenses, **causing unnecessary conflict**." *Id.* (quoting *In re Elan Corp. Sec. Litig.*, No. 08-cv-08761, 2009 WL 1321167,

20

at *2 (S.D.N.Y. May 11, 2009)); *see also Andrada v. Atherogenics, Inc.*, No. 05-cv-00061, 2005 WL 912359, at *5 (S.D.N.Y, Apr. 19, 2005) ("[F]actual issues specific to [the movant] in determining the precise value of the options—*e.g.*, the maturity, the volatility of the price of the [company's] stock, the level of short term interest rates, and the competitive structure of the market in which the options are traded—would likely 'threaten to become the focus of the litigation.'").

These concerns about the risk posed to the Class by the appointment of an investor so heavily exposed to options trading apply with equal force here.  Indeed, unique issues associated with Chiou's options trading could jeopardize the entire Class by unnecessarily exposing all Class members to the risk that Chiou will be disqualified at later stages of litigation—thereby leaving the class without a lead plaintiff and potentially requiring the Court to reopen the lead plaintiff selection process (or dismiss the litigation entirely).  *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155, 160 (S.D.N.Y. 2010) (denying class certification and reopening the lead plaintiff selection process where the previously appointed lead plaintiff was "at a minimum . . . subject to unique defenses").[9]  "[E]ven ultimately unsuccessful unique defenses may divert attention from the substance of the basic claim, and class members are entitled to be represented by someone unhindered by such distractions."  *Hebron Tech.*, 2020 WL 5548856, at *7 (rejecting movant subject to unique defenses).

---

[9] Were the action to be dismissed or class certification to be denied, absent class members could be left without recourse to pursue individual claims if the statute of repose already has expired.  *See supra* n. 5.

There is no reason to jeopardize the Class's claims "where there is another movant"—the Pension Funds—that are sophisticated institutional investors asserting a similarly large financial interest, are adequate and typical in all respects, and are not subject to any unique defenses. *Faris v. Longtop Fin. Techs. Ltd.*, No. 11-cv-3658, 2011 WL 4597553, at *8 (S.D.N.Y. Oct. 4, 2011); *see also In re IMAX Sec. Litig.*, No. 06-cv-6128, 2009 WL 1905033, at *3 (S.D.N.Y. June 29, 2009) ("There seems little reason for us to subject the class members to such a risk.").

### C.   The Pension Funds Are the "Most Adequate Plaintiff" and Should Be Appointed as the Lead Plaintiff

Because Ellis and Chiou cannot satisfy Rule 23's requirements, the Court must follow the PSLRA's sequential process and consider "the [movant] with the next largest financial interest" until it finds a plaintiff who meet all criteria for appointment under the PSLRA. *Digital Generation*, 2013 WL 12430537, at *2. The Pension Funds are the only movant that satisfies all prerequisites of the PSLRA and Rule 23.

As set forth in their loss charts (ECF No. 13-5), the Pension Funds have a strong incentive to vigorously prosecute this action, having together suffered a substantial loss of $782,594 on their purchases of Apache stock during the Class Period. They are a net purchaser of 24,081 shares of Apache stock, having held throughout the Class Period over 70% of the shares they purchased. *Id.* Moreover, the Pension Funds held Apache shares through ***each*** alleged disclosure of fraud, giving them incentive to pursue all claims in the litigation and aligning their interests with the Class. *See Venator Materials*, 2019 WL

22

5328877, at *3 (noting that typicality requires a showing that the proposed lead plaintiff's claims "have the same essential characteristics of those of the putative class").

The Pension Funds also have demonstrated that they are a cohesive pair of sophisticated institutional investors that will fairly and adequately represent the Class. For example, they have pledged to efficiently oversee the prosecution of this action. *See* ECF No. 13-3 ¶¶ 5-9, 12 (detailing, among other things, the origins of the Pension Funds' collaboration and their commitment to vigorously prosecuting this action through counsel); *see also Kakkar v. Bellicum Pharma., Inc.*, No. 18-cv-00338, 2019 WL 1367653, at *2, *4 (S.D. Tex. Mar. 26, 2019) (finding persuasive a joint declaration submitted by group members that "demonstrate[d] their plan to coordinate their efforts, oversee counsel, and diligently prosecute this litigation for the benefit of the class"). They have also retained experienced counsel to vigorously prosecute this action on behalf of the Class. *See Venator Materials*, 2019 WL 5328877, at *3 (explaining that adequacy requires a showing that proposed counsel have the competence and zeal to prosecute the action and the proposed lead plaintiff is able to take an active role in the litigation and protect the interests of absent class members).[10]

---

[10] The Pension Funds' efforts in advancing this litigation to date underscore their adequacy to serve as Lead Plaintiff. Plymouth County, through their proposed Lead Counsel, investigated and initiated this litigation after claims against Apache had lain dormant for nearly a year following the Class Period. *See* ECF No. 13-3 ¶ 4. Counsel and their in-house investigators have spent months working collaboratively to interview former employees of Apache as well as employees of competitors, vendors, and oil and gas exploration and production industry experts. Kaplan Decl. ¶ 3. This joint investigation has uncovered former employees with first-hand knowledge of the issues plaguing the Alpine High resource play and Defendants' knowledge thereof. *Id.*

Finally, as the only institutional investors before the Court, the Pension Funds are precisely the type of representative plaintiff that Congress envisioned when it enacted the lead plaintiff provisions of the PSLRA. *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733 (1995) (explaining that "increasing the role of institutional investors in class action will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions"). In evaluating competing lead plaintiff motions, courts in this Circuit frequently note Congress's preference for having institutional investors like the Pension Funds serve as lead plaintiff. *In re BP*, 758 F. Supp. 2d at 439-40 ("[T]he PSLRA expresses a strong preference for institutional investors to serve as lead plaintiffs."); *In re Kosmos Energy Ltd. Sec. Litig.*, No. 12-cv-373-B, 2012 WL 6199318, at *2 n.2 (N.D. Tex. Nov. 1, 2012) (commenting that "Congress . . . unequivocally expressed its preference for securities fraud litigation to be directed by large institutional investors" through the passage of the PSLRA).

Thus, the Pension Funds are the "most adequate plaintiff," satisfy Rule 23(a)'s adequacy and typicality requirements, and should be appointed as Lead Plaintiff.

## III.   CONCLUSION

For the foregoing reasons, the Pension Funds respectfully request that the Court enter an Order: (1) consolidating the above-captioned actions; (2) appointing the Pension Funds as Lead Plaintiff; (3) approving the Pension Funds' selection of Kessler Topaz and Saxena White as Lead Counsel for the Class and Ajamie as Liaison Counsel for the Class; and (4) denying all competing motions.

DATED:  May 17, 2021

Respectfully submitted,

**AJAMIE LLP**

*s/ John S. Edwards*
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex.  No. 30895
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Proposed Liaison Counsel for the Class*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Naumon A. Amjed
Darren J. Check
Ryan T. Degnan
Karissa J. Sauder
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
rdegnan@ktmc.com
ksauder@ktmc.com

**SAXENA WHITE P.A.**
Steven B. Singer
Rachel A. Avan
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611

25

ssinger@saxenawhite.com
ravan@saxenawhite.com

-and-

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Counsel for Plymouth County Retirement System and the Trustees of the Teamsters Union No. 142 Pension Fund and Proposed Lead Counsel for the Class*

26

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1.D
## <u>AND COURT PROCEDURES 6.C.1-2</u>

In accordance with the requirements of Local Rule 7.1.D and Court Procedures 6.C.1-2, counsel for the Pension Funds has conferred with counsel for competing movants Ellis and Chiou regarding the substance of the pending motions for consolidation of the above-captioned actions, appointment as Lead Plaintiff, and approval of selection of Counsel for the Class. ECF Nos. 11-13. Counsel for Ellis and Chiou each confirmed they would be opposing the Pension Funds' motion. In addition, counsel for Ellis stated that Ellis agreed the above-captioned, related actions should be consolidated.

DATED: May 17, 2021

*s/ John S. Edwards*
John S. Edwards

## CERTIFICATE OF SERVICE

I certify that on May 17, 2021, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

DATED:  May 17, 2021

*s/ John S. Edwards*
John S. Edwards