**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00575 |
| | District Judge George C. Hanks, Jr. |
| | Magistrate Judge Andrew M. Edison |
| | <u>CLASS ACTION</u> |
| | <u>JURY TRIAL DEMANDED</u> |

**CONSOLIDATED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 2

II.    PARTIES ...................................................................................................... 7

       A.     Plaintiffs ........................................................................................... 7

       B.     Defendants ......................................................................................... 7

III.   JURISDICTION AND VENUE ................................................................. 10

IV.    OVERVIEW OF THE FRAUD ................................................................. 11

       A.     Apache Struggled After Missing The U.S. Shale Boom, And Was
              Desperate To Find A Major North American Oil Play ........................ 11

       B.     At The Outset Of The Class Period, Apache Announces The
              "Transformational Discovery" Of A Purportedly Immense Oil Field At
              Alpine High ...................................................................................... 14

       C.     In 2012, And Again In 2014, Defendant Christmann Evaluated And
              Rejected The Alpine High Region As Having "Way Too Much Gas" And
              Lacking In Oil ................................................................................... 19

       D.     In The Run-Up To The Class Period, Apache's Senior Geologists In San
              Antonio Expressly Warned Christmann Not To Move Forward With
              Announcing Alpine High .................................................................... 23

       E.     As The Class Period Progresses, Defendants Claim Additional Testing
              And Well Data Confirm Enormous Amounts Of Oil And "Highly
              Economic Wet Gas" Across The Entire Alpine High Play .................... 27

       F.     As The Market Awaits Alpine High's Production, Apache Reiterates Its
              Claims Of "Tremendous Volumes" Of Oil And Wet Gas And Warns That
              Competitors Are Swarming The Region ............................................... 31

       G.     Apache Increasingly Touts Alpine High As A "Highly Economic Wet Gas
              Play," Doubles The Number Of Potential Drilling Locations To "5,000+,"
              And Announces New "Emerging" Oil Plays ....................................... 32

       H.     Alpine High's Production Ramp Takes Longer Than Expected, But
              Christmann Promises Alpine High Will Scale Up In 2019 And 2020,
              And Reiterates That Alpine High Will Be Profitable Even At Ultra-Low
              Energy Prices .................................................................................... 34

       I.     A Secret Internal Investigation Commenced in Mid-2019 Confirms There
              Was Never Any Factual Basis For Defendants' Claims About Alpine High
              And, Instead, Apache's Data Directly Undermined Defendants' Assertions ....... 37

i

V.    THE TRUTH EMERGES, FORCING APACHE TO CEASE ALL FURTHER DEVELOPMENT AT ALPINE HIGH, TAKE A $3 BILLION WRITE DOWN, AND SLASH ITS DIVIDEND BY 90% .................................................................. 43

VI.   IN TRUTH, ALPINE HIGH WAS NEVER A VIABLE OIL OR WET GAS PLAY .............................................................................................................. 47

      A.    Lead Plaintiffs' Forensic Analysis And Former Employee Accounts Confirm That Alpine High Produced Miniscule Amounts Of Oil And Wet Gas, That Many Of Its "Successful" Wells Were Failures, And That The Play Was Riddled With Dry Holes .......................................................... 47

      B.    Defendants Walled Off Alpine High Data, Allowed Keenan To Operate Alpine High As A "Shadow Organization," And Silenced Any Dissent ............. 57

      C.    The San Antonio Office Secretly Manipulated Alpine High Data And Engaged In Other Desperate Measures In An Attempt To Boost Production ........................................................................................................ 69

      D.    Defendants Concealed Alpine High's Horrendous Performance From Investors By Consistently Flouting Regulatory Reporting Requirements ............ 73

VII.  DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS ........... 79

      A.    September 7, 2016 Alpine High Announcement .................................................. 79

      B.    3Q 2016 Financial Results .................................................................................. 87

      C.    February 14, 2017 Credit Suisse Energy Summit ............................................... 90

      D.    4Q 2016 and Full Year 2016 Financial Results ................................................. 93

      E.    1Q 2017 Financial Results .................................................................................. 95

      F.    2Q 2017 Financial Results .................................................................................. 99

      G.    October 9, 2017 Alpine High Update ................................................................ 100

      H.    3Q 2017 Financial Results ................................................................................ 102

      I.    4Q 2017 and Full-Year 2017 Financial Results ............................................... 103

      J.    1Q 2018 Financial Results ................................................................................ 107

      K.    2Q 2018 Financial Results ................................................................................ 108

      L.    4Q 2018 and Full-Year 2018 Financial Results ............................................... 110

      M.    1Q 2019 Financial Results ................................................................................ 111

      N.    2Q 2019 Financial Results ................................................................................ 113

VIII. ADDITIONAL SCIENTER ALLEGATIONS .............................................................. 114

IX.   LOSS CAUSATION ...................................................................................................... 124

ii

X.      CLASS ACTION ALLEGATIONS ................................................................ 130

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE ............................................ 132

XII.    NO SAFE HARBOR ........................................................................... 133

XIII.   COUNTS.................................................................................... 134

XIV.    PRAYER FOR RELIEF ....................................................................... 139

XV.     JURY TRIAL DEMAND ....................................................................... 139

**TABLE OF ABBREVIATIONS AND INDUSTRY TERMS**

| Abbreviation/Term | Definition |
|---|---|
| API Number | A unique, permanent, 10-digit numeric identifier assigned for identification purposes to a wellbore. |
| BBL | Barrel of oil. In the energy industry, a barrel is 42 U.S. gallons measured at 60 degrees Fahrenheit. |
| BCF | Billion cubic feet of gas. |
| BCF/D | Billion cubic feet of gas per day. |
| BO/D | Barrels of oil per day. |
| BOE | Barrels of oil equivalent. Because oil and natural gas production is measured in different units, to help facilitate comparisons of gas and oil, the industry standardized gas production into "equivalent barrels" of oil. One barrel of oil is generally deemed to have the same amount of energy content as 6,000 cubic feet of natural gas. |
| BTU | British Thermal Unit(s). |
| Completion | The process of making a well ready for production (or injection) after drilling operations. |
| Completion Date | The date the well is capable of producing. |
| Condensate | Any liquid hydrocarbon recovered by surface separators from natural gas. |
| Dry Gas | Natural gas that does not have a significant content of liquid hydrocarbons or water vapor. |
| Dry Hole | Any well that fails to discover oil or gas in commercial quantities. |
| GOR | Gas-oil ratio. This is calculated using the formula, cubic feet of gas divided by barrel of oil produced. |
| Hydrocarbon | An organic chemical compound of hydrogen and carbon, called petroleum. The molecular structure of hydrocarbon compounds varies from the simpler, methane (CH4), a constituent of natural gas, to the very heavy and very complex, such as octane. |
| Mcf | One thousand cubic feet of natural gas measured at standard pressure and temperature conditions (see "cubic foot of gas"). The term is commonly used to express the volume of gas produced, transmitted or consumed. |
| MBOE | Millions of barrels of oil equivalents, a measure which equalizes and combines oil and gas production. |
| MMBtu | One million British thermal units |
| MMcf | One million cubic feet |
| Tcf | One trillion cubic feet |
| NGLs | Natural Gas Liquids. Hydrocarbon liquids extracted from natural gas. |

| Abbreviation/Term | Definition |
|---|---|
| PVT | Pressure Volume Temperature.  PVT analysis is used to provide an understanding of hydrocarbon reserves. |
| RRC | The Texas Railroad Commission, the primary oil and gas industry regulator in Texas whose authority encompasses the exploration, production, and transportation of oil, NGLs, and natural gas. |
| Type Curve | A well production profile based on a decline curve calculated from the average historical production data of a group of oil or gas wells sharing similar characteristics (e.g., geology, geography, oil/gas). |
| Wellbore | A hole that is drilled to aid in the exploration and recovery of natural resources. A wellbore is the actual hole that forms the well, which can be encased by materials such as steel and cement, or left uncased. |
| Well Number | A numeric or alpha numeric designation for a well. The RRC Commission uses a very specific 6 digit well number format. |
| Wet Gas | Natural gas containing liquid hydrocarbons in solution.  Synonymous with "Rich Gas." |

Lead Plaintiffs Plymouth County Retirement Association ("Plymouth County") and the Trustees of the Teamsters Union No. 142 Pension Fund ("Teamsters 142") (collectively, "Lead Plaintiffs") bring this action under the federal securities laws, individually and on behalf of all persons or entities that purchased or otherwise acquired Apache Corporation ("Apache" or the "Company") common stock during the period from September 7, 2016 through March 13, 2020, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs are pursuing remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, *et seq.* (the "Exchange Act").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on the independent investigation of their undersigned counsel, conducted under Lead Plaintiffs' supervision. The investigation includes review and analysis of: (a) Apache's public filings with the United States Securities and Exchange Commission ("SEC"); (b) Company press releases, reports, and postings on Apache's website; (c) shareholder communications, conference calls, and investor presentations; (d) research reports concerning Apache by securities, financial, and oil and gas industry analysts; (e) news articles and media reports concerning Apache; (f) data reflecting the price of Apache's common stock; (g) interviews with dozens of former Apache employees; (h) consultation with industry and financial experts; (i) pleadings, filings, evidentiary matter, and court orders in other litigation involving Apache; and (j) additional material and data concerning Apache, the Individual Defendants (as defined below), and the global energy markets.

## I.  <u>INTRODUCTION</u>

1.      Apache is an oil exploration and production company whose single most important asset during the Class Period was an oil and gas field in the Texas panhandle called "Alpine High." For three years, Defendants touted Alpine High as a "***transformational discovery***" and "***world class resource play***" with immense production capabilities, including "conservative" estimates of over three billion barrels of oil and significant amounts of "really rich gas."[1]  Defendants supported their claims by highlighting examples of "strong well results" and "successful oil tests" that were purportedly representative of Alpine High's "2,000 to more than 3,000 future drilling locations," which would "deliver incredible value to Apache and its shareholders for many, many years to come."  Analysts and industry media lauded this "***massive shale discovery***," emphasizing that Alpine High's "compelling economics" represented Apache's "largest catalyst opportunity" for the coming years and put Apache "back in the game" after a "rough time keeping up with competitors."  Fueled by Defendants' assurances, Apache's stock price soared, reaching a Class Period high of $69.00 on December 12, 2016.  The Individual Defendants took full advantage, reaping more than $75 million in Alpine High-linked compensation during the Class Period.

2.      Unbeknownst to investors, Defendants' statements were false.  In reality, Apache's own production data and analyses of the Alpine High play ***never*** supported Defendants' public representations.  As Apache was ultimately forced to admit, Alpine High was virtually barren. Indeed, after three years of relentlessly touting Alpine High to investors, the "world class resource play" that was supposedly going to "transform" Apache produced ***less than 1%*** of the oil and gas that Defendants had represented to investors was recoverable.  Alpine High was so devoid of oil and gas that Apache was forced to cease all drilling at the field in 2020, take a ***$3 billion write***

---

[1] All emphasis in quotations is added unless otherwise noted.

***down***, and slash its dividend by a ***staggering 90%***.  When the truth regarding Defendants' fraud emerged, analysts and the nation's leading financial publications excoriated Defendants, noting that the revelations "***were in stark contrast to [Defendants'] past defense of Alpine High***," and Apache's stock price was decimated, closing at a mere $4.46 on March 17, 2020—an astonishing decline of ***93%*** from its high during the Class Period.

3.      Significantly, Lead Plaintiffs' independent investigation, which included a forensic analysis of data that Apache had intentionally misrepresented and concealed during the Class Period and interviews with dozens of former Apache employees, has confirmed that Defendants knew full well even ***before*** the Class Period began that Apache's true data concerning Alpine High never supported Defendants' public pronouncements about the economic viability of the play. Without support, and often flying in the face of Apache's own contrary analyses and production numbers, Defendants recklessly gambled on Alpine High, and lied to investors about both the quality of the resources in the play and Apache's ability to profitably extract them.

4.      ***First***, numerous former employees confirmed that Apache's CEO, Defendant Christmann, and other senior officers of the Company were explicitly warned on ***three separate occasions*** prior to the start of the Class Period that the composition of the Alpine High area made it virtually impossible for the field to ever be a commercial success.  For example, the leaders of Apache teams that conducted two thorough geologic studies of the Alpine High area in 2012 and 2014 independently corroborated that, after reviewing the data from these studies, Christmann, who at the time was Apache's North American COO, concluded that the Alpine High area was "too gassy" to ever be viable—i.e., too heavy on unprofitable "dry" gas and too light on valuable oil and "wet" gas.  Similarly, in numerous meetings, presentations and emails in the weeks and months leading up to the start of the Class Period in 2016, senior Apache geologists who were

analyzing Alpine High made crystal clear to Christmann and other Company officers that they should not make any public representations concerning Alpine High's production capabilities because Apache did not have data to back them up.  Specifically, these executives explicitly warned senior management that Apache lacked months, *if not years*, of critical testing, basic analyses and fundamental well production data necessary to support any projections for Alpine High's supposed capacity for oil and gas production—warnings that Defendants knowingly ignored when trumpeting the "transformational discovery" of Alpine High at the beginning of the Class Period.

5.      *Second*, numerous former Apache employees independently corroborated that senior management took extraordinary steps to conceal Alpine High's true, dismal results from investors, regulators and even other Apache executives.   Indeed, Defendant Christmann implemented a "*cone of silence*" in which Alpine High data was segregated from Apache's normal data storage and internal peer review practices, and only Christmann and a select few other Apache executives had access to critical Alpine High production and projections data.  In addition, Apache intentionally obscured public information about Alpine High, including in deliberately misrepresented and serially delayed regulatory documents. Compliance personnel were "*instructed*" not to file well completion reports with the State of Texas, which would have triggered an obligation to report monthly production on standardized forms in a public database. Remarkably, *in the first two years* after the announcement of Alpine High, Apache did not file *a single well completion report* for any of the *over 150* wells it drilled at Alpine High during that period, and thus avoided providing even the most basic information to the public about the performance of Alpine High wells.  Former senior Apache employees, including the former Director of Petrophysics and Chief of Staff to Apache's COO, explained that Defendants were so

4

"*worried about an objective assessment of Alpine High*" that they refused to subject Alpine High to the Company's standard internal peer reviews and risk analyses that applied to every other Apache oil or gas play, thereby "*violat[ing] every step of the scientific method*." When executives spoke out, Defendants silenced or terminated them, with over a *dozen* Vice Presidents who raised concerns about Alpine High either run-off or terminated within the first eighteen months of the project's commencement. As a result, multiple former employees confirmed that Defendants' message regarding Alpine High was clear: "*you either lined up or you are off the team*."

6.      *Third*, Apache *itself* recognized that the play was not, and had never been, economically viable, and that Defendants' wholly positive statements touting the play were not accurate. These conclusions were definitively confirmed by the results of a remarkable confidential internal review of Alpine High data—code-named "Project Neptune"—conducted more than nine months before the end of the Class Period. Specifically, in the summer of 2019, Apache executives became so concerned that the Company was concealing negative information about Alpine High that they pushed to finally subject the play's data to Apache's standard review and evaluation procedures. The team analyzed all production data from the entire life of Alpine High, and completed its review in September 2019. The findings—which were presented to Apache's senior management, including Christmann at an in-person meeting in mid-October 2019—unequivocally concluded that Defendants never had a basis for their pronouncements and projections about the purportedly economically recoverable oil and gas at Alpine High. Indeed, the actual data was abysmal, and completely contradicted Defendants' representations regarding thousands of drillable sites and copious amounts of oil and wet gas—and had been since drilling at Alpine High had begun. Moreover, the review team's formal report showed that, given the limited and poor quality of the oil and gas resources at the field, it was an extraordinarily dubious

proposition for Alpine High to *ever* be economically viable.  Accordingly, Project Neptune confirmed that Apache's own data *did not support, had never supported, and in fact contradicted* Defendants' Class Period representations to the market concerning the number and viability of Alpine High's drilling locations and the amount of oil and gas the field could yield.

7.    Although Apache never disclosed the existence or results of Project Neptune to investors, the Alpine High house of cards soon began to collapse.  In October 2019, just weeks after the results of Project Neptune were shared with Christmann and other Apache senior management, Steven Keenan, the Company's "star" geologist who was credited with discovering Alpine High as a viable play, abruptly "resigned," sending Apache shares down 5%.  Shortly thereafter, Apache announced a massive *$3 billion* write down due to Alpine High, with Defendant Christmann acknowledging that "further testing [at Alpine High] is not warranted" and that the field would "receive minimal to no funding" going forward.  Analysts and financial media explicitly criticized Defendants for their prior misrepresentations to the market concerning Alpine High, specifically highlighting that "*Christmann's comments were in stark contrast to his past defense of Alpine High*" in which he "*vehemently defend[ed] the play's prospects for about three years*."  In March 2020, the Company announced that it was forced to slash its vaunted dividend by a staggering *90%*.  Days later, with its balance sheet in tatters and facing crushing levels of debt, Apache's stock price was cut nearly in half after analysts reported that Apache had the highest debt-to-equity ratio "*among all large-cap independent oil producers*."

8.    By the end of the Class Period, Apache's stock price had declined over *93%* from its Class Period high, wiping out *$24 billion* in shareholder value.  Apache's shareholders have been significantly harmed by Defendants' fraud.  This action seeks redress on behalf of these aggrieved shareholders.

## II.    **PARTIES**

### A.    **Plaintiffs**

9.      Lead Plaintiff Plymouth County is a public pension system organized for the benefit of current and retired municipal and county employees of Plymouth County, Massachusetts.  It manages over $1.4 billion in assets and has over 10,000 participants. As set forth in Plymouth County's certification, attached as Exhibit A, Plymouth County purchased Apache common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

10.     Lead Plaintiff Teamsters 142 is a jointly trusteed Taft-Hartley benefit fund based in Gary, Indiana that provides pension and other benefits for laborers employed in the manufacturing industry and other fields throughout the state.  As of April 2021, Teamsters 142 managed approximately $528 million in assets for the benefit of thousands of active and retired participants.  As set forth in Teamsters 142's certification, attached as Exhibit B, Teamsters 142 purchased Apache common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

11.     On October 6, 2021, the Court appointed Plymouth and Teamsters 142 as Lead Plaintiffs for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  *See* ECF No. 45.

### B.    **Defendants**

12.     Defendant Apache is an oil and gas exploration and production ("E&P") company headquartered in Houston, Texas.  During the Class Period, Apache's common stock traded on the NASDAQ exchange under the symbol "APA."[2]

13.     Defendant John J. Christmann IV ("Christmann") has served as the Company's

---

[2] In 2021, after the Class Period, Apache moved to a holding company structure in which Apache became a direct, wholly-owned subsidiary of APA Corporation.

Chief Executive Officer ("CEO") and President, as well as a member of Apache's Board of Directors since January 20, 2015. Christmann previously served as the Company's Executive Vice President ("EVP") and Chief Operating Officer ("COO"), North America since January 2014. From January 2010 through December 2013, he served as region vice president, Permian Region. From January 2004 through December 2009, he served as vice president, Business Development, and from April through December 2003, he served as production manager for the Gulf Coast Region. Defendant Christmann also reviewed, approved, signed and certified each of Apache's quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K during the Class Period.

14.    Defendant Timothy J. Sullivan ("Sullivan") served as Apache's Executive Vice President – Operations Support from January 2016 through the end of the Class Period. On December 3, 2019, Sullivan informed the Company of his intention to retire, effective in the second quarter of 2020. As Executive Vice President – Operations Support, Sullivan's role was to support the CEO in operational strategy, goal setting, capital allocation, market intelligence and marketing. Previously, Sullivan served as Senior Vice President – Operations Support, from June 2015 to January 2016. Before working in Operations Support, Sullivan served as region vice president – Canada, and president of Apache Canada from January 2013 through May 2015, reservoir engineering manager for the Central region from January 1997 to January 2013, and senior reservoir engineer from 1986 through 1996.

15.    Defendant Stephen J. Riney ("Riney") has served as the Company's EVP and Chief Financial Officer ("CFO") since February 18, 2015, and March 3, 2015, respectively. Prior to joining Apache, Riney served as CFO for BP Exploration and Production from July 2012 to January 2015. Previously, he served in various management roles in finance, mergers, and acquisitions, planning and marketing at oil and gas companies BP and Amoco. Defendant Riney

reviewed, approved, signed, and certified each of Apache's quarterly and annual reports filed with the SEC on Forms 10-Q and 10-K during the Class Period.

16.    Defendants Christmann, Sullivan, and Riney, are referred to collectively as the "Individual Defendants."  During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Apache, were privy to confidential, proprietary and material adverse non-public information concerning Apache, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Apache's business.

18.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity

9

to prevent their issuance or cause them to be corrected.

19.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information about Apache's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Apache common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Apache's publicly traded common stock by disseminating materially false or misleading statements and/or concealing material adverse facts.

## III.    JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 27 of the Exchange Act (15 U.S.C. §78aa).

23.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein,

including the dissemination of materially false or misleading information, occurred in substantial part in this Judicial District, as Apache is headquartered in this District.  In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of the national securities exchange.

## IV.    OVERVIEW OF THE FRAUD

### A.    Apache Struggled After Missing The U.S. Shale Boom, And Was Desperate To Find A Major North American Oil Play

24.    Apache was founded in 1954, and over the next several decades grew to become a global oil E&P company with operations in the United States, Canada, the United Kingdom (North Sea), and Egypt.  However, as the shale oil boom took off, Apache—despite being the sixth largest U.S. oil producer—was slow to adopt critical new hydraulic fracturing ("fracking") technologies, and failed to discover or acquire new substantial oil producing acreage in North American shale regions.

25.    Hydraulic fracturing involves the high-pressure injection of "fracking fluid" into rock formations in order to create small openings in the rock, which are then held open by particles from the fracking fluid.  If oil or gas is present and accessible, this causes the oil or gas to flow from the resulting fissures into a drilled well, whereupon underground pressure causes the oil or gas to flow up the well to the surface so that it can be extracted. By the early 2010s, high oil prices, technological innovations, and new drilling techniques made fracking for oil increasingly economical for E&P companies. Between 2011-2014, U.S. oil production skyrocketed and by 2015, U.S production had effectively caught up with Russia and Saudi Arabia, propelling the United States into one of the world's leading oil producers.

26.    Consequently, leading up to the Class Period, Apache's performance and stock

price lagged significantly relative to its peers.  Between 2010 and 2014, Apache's growth stagnated, with total energy production growing by just 15% while the Company's stock price plummeted by more than 30%.  Thus, as the *Houston Chronicle* put it, once the U.S. fracking boom hit, Apache "found itself on the outside looking in."  As a result, as the *Houston Chronicle* reported on December 30, 2016, Apache's then-CEO Steve Farris "knew Apache had to get back its swagger if it was to reverse its fortunes.  It had to return to the business of risk, and it had to make a headline-grabbing find."

27.     Thus, in 2014, Apache embarked on a plan to reverse its fortunes and boost its stock price by refocusing its efforts on North America, with the intention of announcing a major U.S. shale oil play.  In furtherance of this effort, in April 2014, Apache hired Steven Keenan and appointed him as its head geologist.  In that role, Keenan was in charge of the Company's "Unconventional Resources" team, and the Company opened a corporate office for Keenan and a half dozen of his colleagues—dubbed by numerous former employees as the "Keenan Six Pack" —in San Antonio, Texas.

28.     Just after Apache announced the opening of this San Antonio office, a severe downturn hit the oil market, with U.S. oil prices declining from approximately $107/barrel in June 2014 to just $45/ barrel by January 2015.  Apache sought to weather the downturn through massive divestments of assets, selling off billions of dollars' worth of its most productive assets. Specifically, between May 2014 and August 2016, Apache sold off more than $7 billion of its producing assets, and consequently Apache's total worldwide energy production declined by at least 30%.

29.     In the wake of this fire sale, Apache was under even more pressure to announce a big North American shale discovery.  Keenan himself later admitted that he was under immense

pressure from Apache's senior management to discover a major new play, and that if he failed to do so, he would be terminated. As Keenan told the *Houston Chronicle* in December 2016, "I knew I had the lifespan of a monarch butterfly," adding that the sentiment at the Company was "[i]f we didn't find something soon, we'd just be swatted and kicked out."

30.    Accordingly, between 2014 and 2016, Apache surreptitiously acquired almost 300,000 acres in a remote area of West Texas in a desperate attempt to announce a prospective new oil play. This land was in a sub-region of the Permian Basin known as the Delaware Basin, located primarily in the Texas panhandle in Reeves County, Texas. The area—later dubbed by Defendants as "the Alpine High"—had been repeatedly drilled by competitors dating back to the 1950s without success, causing those competitors to reject the area as "a place where oilmen go to die." As a result, Apache was able to acquire extensive acreage at very low prices, approximately 1/30th or less than the price of acreage in the surrounding areas of the Permian Basin that were known to hold large quantities of oil and were proven shale plays.

31.    Significantly, Christmann was strongly incentivized to announce a major North American shale oil play by his lucrative compensation package, which largely hinged on making such an announcement. For example, according to the Company's proxy statement filed in 2017, Christmann's overall 2016 compensation amounted to $13.4 million, a substantial portion of which was directly tied to "shift[ing] the focus of Apache's portfolio to North America" and developing a significant U.S. oil play. As confirmed by the Company's own proxy statements, Christmann's compensation—which averaged over $14 million annually during the Class Period, and included lucrative annual cash bonuses that reached as high as $2.5 million—totaled a staggering ***$57 million*** by the end of the Class Period, and was largely tied to announcing and developing a major North American shale oil play and to boosting the Company's stock price.

Defendants Sullivan and Riney had similar financial incentives to announce and develop the Alpine High play under the Company's incentive compensation structure.

### B. At The Outset Of The Class Period, Apache Announces The "Transformational Discovery" Of A Purportedly Immense Oil Field At Alpine High

32.    On September 7, 2016, the first day of the Class Period, Apache announced Alpine High as a major oil discovery in Texas. Specifically, before market open, Apache issued a press release entitled "Apache Corporation Discovers Significant New Resource Play in Southern Delaware Basin." The press release declared that "after more than two years of extensive geologic and geophysical work, methodical acreage accumulation, and strategic testing and delineation drilling, the company can confirm the discovery of a significant new resource play, the 'Alpine High,'" which Defendant Christmann hailed as "an immense resource that we believe will deliver significant value for our shareholders for many years." Christmann touted the play's supposed "large inventory of repeatable, high-value drilling opportunities" and "oil-prone locations." The press release further asserted that Alpine High held an estimated "3 billion barrels of oil" and "75 trillion cubic feet (Tcf) of rich gas" in the Barnett and Woodford formations (two of the play's five geological formations) alone, as well as "significant oil potential in the shallower Pennsylvanian, Bone Springs and Wolfcamp formations." The Company also claimed that there was a huge number of economically viable drilling sites at Alpine High, stating "2,000 to more than 3,000 future drilling locations have been identified in the Woodford and Barnett formations alone."

33.    The same morning, also before market open, Apache presented at the Barclays CEO Energy-Power Conference, one of the energy industry's most important annual conferences. The focus of the Company's presentation was Alpine High, which Christmann hyped as a "world class resource play" that would not only yield enormous quantities of natural gas liquids and natural gas, but copious amounts of oil—reiterating a "conservative" estimate of "75 tcf [trillion cubic

feet] of really rich gas, over 1,300 BTU [British thermal units] and 3 billion barrels of oil."
Christmann compared Alpine High to some of the largest shale oil and gas discoveries in US
history: "I've said it's world class. This would compare it versus three – what other people would
view as world-class resources, the Woodford SCOOP, the Marcellus and the Eagle Ford."

34.    Apache bolstered its claims that the acreage held massive amounts of oil with
specific evidence purportedly derived from a series of "strong well results," including multiple
"successful oil tests."  Apache highlighted these test wells during the Barclays conference in its
presentation and in accompanying large-print graphic slides as representative of the production
Apache would be able to exploit as it drilled additional wells in those areas.  In the Woodford and
Barnett formations, Apache touted seven wells that it said had produced "strong well results" based
on the initial flow of oil and wet gas, also known as their "initial production" rates or "IP rates."
Apache portrayed this impressive early testing as just the floor, as the Company claimed it would
be able to recover much larger quantities of oil as its development of Alpine High continued
through additional testing as well as optimizing well construction, spacing, location, and depth.

35.    Christmann raved about many of these wells and the promise of "very high-quality
oil" and "very, very, rich NGLs [natural gas liquids, aka 'wet gas']" that they showed for Alpine
High.  The supposed fact that the oil and gas Apache could extract was "very high quality" and
"very rich" was critical in the value proposition of the play, as high-quality resources are far more
economical and less complicated to produce and refine than low quality resources:

> The Spanish Trail 1H, the discovery wells in the Woodford, 4,100-foot lateral, 6.5
> million, 108 barrels of oil.  I'll tell you this is a very high-quality oil. ... The follow-
> on wells, Weissmies, the Ortler, the Mont Blanc, the Cheyenne, you see the results.
> The Ortler is actually on an area where [] we knew it was on a fault because we
> wanted to test this. 1.7 million and 16 oil.  The Mont Blanc is in a little deeper
> section.  That's not a misprint, 17 million [cubic feet of gas] a day… If you look at
> -- the only thing I'll tell you is this gas is very rich.  It's 1,300 BTU gas. … [T]his
> is going to be very, very rich NGLs as well as the oil.  The Cheyenne, 6.5 million

a day, 227 oil.  We move down, the only Barnett test, the Mont Blanc 3H, 11.4 million a day, 508 oil.  You could see the NGL yield.  I'll tell you this well was a lot higher, but it cut all the chokes out.  So this I[nitial] P[roduction] is likely much higher than this.

36.     In addition to touting the putatively extraordinary volume of high-quality oil and NGLs across the Alpine High acreage, including evidently strong production from specific exemplar wells, Defendants also emphasized that it would be "highly economic" to extract and sell the resources at Alpine High *even if* oil or gas prices fell substantially.  For example, Christmann told investors, "if you look at the oil, NGLs and gas, very, very rich and tremendous economics," and claimed that this would be true even with oil as low as $40/barrel and natural gas at $2.50.  As a result, Christmann said "the rates of return" for the play "go off the charts."  Indeed, Christmann told investors that Alpine High would yield such volumes of easily extractable, high quality wet gas and oil, that Apache wouldn't even need the dry gas in order for Alpine High to be profitable—such that "you're virtually going to get the [dry] gas for free."  Christmann further told investors that "just one" landing zone in Alpine High would give "2,000 to 3,000 plus locations [at a] very low cost," and that "[w]hat's going to make this play really stand out is the quality, the thickness and the cost structure, a very, very highly economic wet gas play."

37.     Defendants also specifically sought to assuage investor concerns that Alpine High was in an area of the Delaware Basin that had previously been either overlooked or rejected by competitors as too difficult to drill and overabundant in undesirable dry gas.  To dispel such skepticism, Christmann portrayed Alpine High as a hidden jewel that had required Apache's special expertise and extensive work to uncover.  In this regard, Christmann claimed that Apache's discovery of Alpine High had resulted from the greater knowhow of its "star" geologist Keenan and Apache's "Unconventional Resources" team, which had allowed the Company to discover something other E&P companies had missed.  For example, Christmann told investors that other

E&P companies had focused on the wrong part of the Delaware Basin, as "very few wells were drilled down in Southern Reeves [County]," where Apache had found Alpine High. The reason for this, Christmann said, was that the area was "geologically complex" and thus had been misperceived by the industry as difficult to drill and high in clay content, requiring the exceptional expertise of Keenan and Apache's San Antonio team to uncover "[t]he reality":

> [T]he real answer was it is just geologically complex, and it took some unraveling and a lot of good unconventional technical work. You had to test perceptions. The perception was that this was uplifted and complex. ***The reality*** is it's a stable Paleo high, ***and it was always in the oil and wet gas window. It's not dry gas***. . . . So ***it's just a fantastic story, and it took a very unique team doing some very detailed work over a long time to uncover this prize***.

38.     Furthermore, in response to direct analyst questions, Christmann stressed that the reason competitors had not sought to drill Alpine High was that they knew "very little" about it and their "perception was wrong." For example, when a Barclays Bank analyst asked Christmann a question that "a lot of us are curious about," namely "[h]ow much do your peers know about this play?" Christmann responded, "[t]hey know very little...the perception was wrong about this area geologically. And it took some very, very strong individuals working very detailed work over a couple of years to unravel what is ***a hidden diamond in the rough***."

39.     As Defendants expected, Apache's stock price immediately rallied on the news of the "world class" Alpine High discovery, soaring 14% in the first two days after the announcement, reaching $59.33 per share on September 8, 2016—its highest price in over a year.

40.     Analysts and the financial press credited Defendants' positive statements and celebrated the discovery. Credit Suisse issued a report on September 8, 2016 headlined, "Alpine High Has Potential To Be A World Class Resource," underlining that "the economics look so compelling" and what "makes this play exciting" included "the oil and NGL content of the wet gas" and "[t]he large column of charged hydrocarbon source rock." RBC Capital Markets raised

its price target on Apache shares, stating that the "discovery appears to be a significant resource," and calling it the Company's "largest catalyst opportunity over the next couple of years."  Societe Generale's September 8, 2016 report praised the "solid geologic and petrophysical work by APA's G&G team" that "essentially flew in the face of industry convention or school of thought with respect to this part of the basin."  A September 11, 2016 *Houston Chronicle* article quoted an analyst from Wood MacKenzie hailing Apache's claim of resources totaling 15 billion barrels of oil equivalent as "certainly the boldest statement in the past year from an onshore player."

41.     The financial press, industry press, and mainstream media also praised Apache's Alpine High discovery.  For example, a September 28, 2016 *Forbes* article hailed Apache as emblematic of the "thorn that America's oil frackers have stuck in OPEC's side," and noted the ideal economics of Alpine High Defendants had touted, which would result in "a princely 30% rate of return" even at lower oil and gas prices—what *Forbes* called "***a high and extremely rare margin in the oil and gas business***."

42.     The *Houston Chronicle* similarly reported in a September 11, 2016 article that the Alpine High discovery had put Apache "***back in the game***," after prior "missed opportunities" and a "rough time keeping up with competitors." The *Houston Chronicle* reported that the discovery showed Christmann's "contrarian move" to invest in exploration and land acquisition during the oil and gas price downturn had "pa[id] off," citing the Company's impressive estimate that 13% of the resources in the field were recoverable, whereas "[t]ypically" companies recover only 6% to 12%.

43.     Furthermore, although Apache promoted Alpine High as an oil, wet gas, and dry gas play, Defendants had taken pains to emphasize the site's oil potential in particular, as investors knew oil—the highest value resource—was essential to the "world class" nature of the play, and

18

Apache's ability to economically exploit it. Accordingly, media and analyst reports on the Alpine High announcement focused primarily on the discovery of massive amounts of oil Defendants had touted. For example, the *Wall Street Journal* headlined a September 7, 2016 article "Apache Has High Hopes for New Oil-Field Discovery in Texas," *Business Insider* headlined on September 8, 2016 that "Apache discovered a giant oil field in Texas and its shares are leaping," and, most pointedly, on September 8, 2016 *CNN* ran the headline "Oil! Massive shale discovery in Texas," highlighting Apache's claims of "billions of barrels of newly-discovered shale oil." Credit Suisse similarly showed special interest in oil, reporting on October 26, 2016 that "an oil play would be a key catalyst for [Apache] shares."

> ### C. In 2012, And Again In 2014, Defendant Christmann Evaluated And Rejected The Alpine High Region As Having "Way Too Much Gas" and Lacking In Oil

44.     Apache's Keenan-led foray into Alpine High was actually the third exploration of the area Apache had performed since 2012. Unbeknownst to investors, in the few years before Apache announced Alpine High as a "transformational" and "world class" oil and wet gas play, Defendants had engaged in two wide-ranging explorations of the region. According to the former senior employees directly responsible for these explorations, Defendant Christmann himself reviewed the resulting data and outright rejected the play each time as "***too gassy***,"—i.e., too heavy on abundant and unprofitable dry gas—and telling the employees, "***why don't you find me some oil***."

45.     Specifically, in 2012 and 2014, respectively, two different Apache "New Ventures Teams" prospected the Alpine High region and determined that it was not a viable play, and presented their conclusions to Defendant Christmann, who himself rejected Alpine High based on those conclusions. CW 1 led the first team to explore the Alpine High region in approximately

2012.  CW 1 was employed by Apache for twenty-three years.[3]  When Apache opened its Midland office in 2010, she served as Apache Exploration Manager, and oversaw the New Ventures Team, which included reservoir engineers, geologists, and petrophysicists.   She remained in this role until she quit at the end of 3Q 2014.

46.    After evaluating existing wells on the 25,000-acre Madera Ranch near Balmorhea, Texas immediately adjacent to Alpine High and the source rock found there, CW 1 and her team found the "numbers were lean."  According to CW 1, who had previously scouted Alpine High itself, she and her team knew there were already "100 wells there and we knew it was all gas," and "we all knew it wasn't an oil play."  CW 1 determined the Madera Ranch land—located in southwest Reeves County—would produce a mere 20 barrels of oil per one million cubic feet of gas, a ratio far too low to be considered oil-prone.  CW 1 presented maps, logs and numbers showing these results to Defendant Christmann, along with an Apache Land Manager, a Reservoir Manager, and a Geosciences Manager.  Following the meeting, "[Christmann] decided this wasn't the play for us" and Defendant Christmann instructed CW 1 "*I don't want gas, why don't you go and find us some oil.*"

47.    In 2014, under the leadership of CW 2, Apache again explored the Alpine High region.  CW 2 was employed by Apache for several years until the summer of 2015.  In 2013, she was appointed as Manager of North American New Ventures and she reported to Defendant Christmann (then an executive in Midland).  In this position, she evaluated the Southern Delaware Basin, a section of what was later known as Alpine High, in 2013 and 2014.  CW 2 explored Alpine High in 2014 along with CW 3 and former Apache Reservoir Engineer Colin Kiernan.  CW 3 was employed by Apache from mid-2011 until late summer 2015.  She was based in the Midland office

---

[3] Former Apache employees are referred to herein as Confidential Witness ("CW __") and are referenced in the feminine form to maintain their confidentiality.

until late 2012, and then in the Houston headquarters for the rest of her employment.  CW 3 was a member of the New Ventures Team and reported to CW 2.

48.     In their 2014 exploration of Alpine High, the focus of CWs 2 and 3 was the southern portion of the Delaware Basin in western Reeves County.  CW 2 explained that Apache already had an acreage position in Alpine High that previously had been "written off" by the Company.  The results of Apache's 2014 Alpine High exploration, according to CW 2, produced "two independent pieces of data" – the rock depth and the maturity data – which confirmed that the Wolfcamp and Barnett formations in this area were mostly dry gas.

49.     Multiple former Apache employees confirm the accounts of CW 1 and CW 2, including CW 3 who was also on Apache's New Venture Team.  CW 4 saw the New Venture Team's maps of Alpine High.  CW 4 was employed by Apache as a Geologist from prior to the Class Period through 1Q 2019.  In this role, CW 4 was responsible for evaluating the Woodford formation, other than the Woodford formation in Alpine High.  She worked in the Midland office.  According to CW 4, the New Ventures Team's maps of Alpine High depicted potential areas for oil exploration in green and gas exploration in red.  Alpine High was all red.  According to CW 4, "we had that data, we had those maps and Christmann was aware as well as his Landman [then Vice President of North American Land], Tim Custer."

50.     CW 5 similarly described how Apache's New Ventures Team evaluated and rejected Alpine High in 2014.  CW 5 was employed by Apache as a Geologist from July 2012 until July 2017 and worked in the Midland office.  She quit in 2017 because she was unhappy with Apache's direction, specifically, money being thrown at Alpine High, which she described as a "dumpster fire on a sinking ship."  Regarding Apache's 2014 evaluation of Alpine High, CW 5 recalled being in the fourth-floor conference room at the Company's Midland office when the New

Venture Team presented its Alpine High findings to Defendant Christmann, to which Defendant Christmann replied, "*I don't want to see this again, this is way too much gas*."

51.     According to multiple former Apache employees, notwithstanding these uniform conclusions by the New Ventures Team rejecting an Alpine High play as too heavily weighted toward gas and lacking in oil, Keenan was still given "carte blanche" to review all of Apache's Permian exploration research, including the Alpine High data from the New Ventures Team, and reach his own (third) conclusion.  CW 4 explained that, at Christmann's request, CW 4 and others sat down with Keenan and his team and went through all the previous exploration projects that the Midland office had put together.  CW 1 recalled that when Keenan arrived, "he took all our projects, evaluated them with his staff, and started drilling wells."  According to CW 1, all of the data accumulated by the New Ventures Team for Alpine High confirmed Alpine High was "too gassy" with "not enough yield and not enough infrastructure."  CW 2's team's data corroborated CW 1's team's findings.  However, as both of these former Apache employees confirmed, Keenan deliberately avoided seeking input from the two teams that had concluded the Alpine High region was too gassy and not worth developing.  Instead, Keenan suggested that prior exploration teams had drilled a certain well wrong, landing the well 30 feet too high in the source rock.

52.     CW 6, was also involved in Keenan's review of the Company's prior explorations of Alpine Hight.  CW 6 was employed as a Reservoir Stimulation Lead at Apache from January 2012 until December 2020.  She worked in the Houston office from 2012 until July 2014, when she was reassigned to the San Antonio office and responsible for evaluating and designing stimulations.  During her tenure, CW 6 reported to several people, including CW 7 and Keenan.  CW 6 explained that Keenan put together a presentation suggesting he could find different results in a different landing zone.  She recalled "Keenan did exactly that and guess what, *the well was*

*still sh\*\**.  This went on for so long and I was waiting for something to give."

53.    According to CW 2, Keenan and his team "willfully ignored" the data accumulated by the New Ventures Team on the area that would become Alpine High and called Keenan's Alpine High foray a "*Hail Mary to the end zone*."

### D.    In The Run-Up To The Class Period, Apache's Senior Geologists In San Antonio Expressly Warned Christmann Not To Move Forward With Announcing Alpine High

54.    Strikingly, leading up to the Class Period, Defendant Christmann was expressly warned by the Company's San Antonio technical team that Apache lacked sufficient data to show that Alpine High was a viable oil and wet gas play, and expressly advised him not to announce the play in 2016.  Yet, desperate to announce a major shale play to the market, Defendants recklessly pressed forward with Alpine High.

55.    Specifically, for example, throughout 2015 and 2016, Apache's technical team in San Antonio, including an engineer and senior member of Keenan's San Antonio technical team, Chester Pieprzica ("Pieprzica"), and other team members, made regular presentations to Apache's upper management approximately every five to seven business days on the status of the development of the Alpine High play.   In multiple such presentations, the technical team specifically reported to Apache senior management, including Christmann, that, among other data, *at least nine months* of consistent production from numerous wells within the play was required to generate the threshold amount of production and well data necessary to support reliable analyses and projections about the commercial viability of Alpine High as a whole.

56.    Moreover, in addition to multiple months of production data, Pieprzica and the technical team informed Christmann and other Apache senior executives that, to support reliable play-wide projections, the Company would need numerous additional analyses of Alpine High that had not yet been done.  These fundamental analyses included: (i) drilling offset wells to provide a

basic understanding of the fracture structure around the well sites; and (ii) capturing and analyzing 3D seismic data. In 2016, the San Antonio team informed Christmann and other Apache senior management that because Apache did not have the requisite data, the Company was blind on these basic analyses. Without a bare minimum of the foregoing data, Apache could not reasonably extrapolate out to how the broader play would perform, nor reasonably project the economic viability of extracting valuable liquids from the play – oil, wet gas, condensate and NGLs— that were necessary to render Alpine High profitable and worth exploiting.

57.     In presentations and email communications in 2016, the San Antonio technical team repeatedly advised Christmann and Apache's senior management that Apache lacked fundamental testing, analyses and data necessary to support reliable projections about Alpine High. The technical team made crystal clear to senior management that the Alpine High data was so incomplete that Apache essentially had only the tip of the iceberg, and had no idea what the iceberg looked like. In other words, the technical team informed Christmann and Apache's senior management that it was in the dark—ignorant—as to vast amounts of critical information about the play.

58.     Therefore, Apache's technical team was shocked when, in late summer 2016, Christmann informed them that Apache would be announcing the Alpine High play and related projections on September 7, 2016. In response, the technical team, including Pieprzica, repeatedly advised Christmann **not** to go public with Alpine High, stressing that Apache simply did not have the basic technical data and testing necessary to support projections about the play.

59.     Significantly, Apache employees across the Company specifically questioned the timing of Apache's September 2016 announcement of Alpine High. For example, CW 5 explained that Apache "should have waited until they had proven production before announcing something

to Wall Street" and the "premature" announcement was made to inflate the Company stock price. CW 5's account was confirmed by CW 8, who worked for Apache as an outside consultant for approximately one year before being hired in December 2017 as a Production Technology Manager, a position she held until being laid off in March 2019. As a Production Technology Manager, CW 8 worked with San Antonio's Adviset system to track well production, which data was input into Spotfire software, a tool used for reporting. CW 8 reported that, based on her conversations with other Apache employees, Keenan *himself* was not ready to announce Alpine High in September 2016 because Keenan did not know what they had with Alpine High and there was no infrastructure in place, but the announcement was nevertheless made to shore up the Company stock price.

60.    CW 4 explained that Apache executives had determined they could "go to Wall Street and tell them we are drilling Permian Basin wells," and that Defendants "knew exactly" that the result would be a premium on the stock price.

61.    Similarly, many former Apache employees questioned the information Defendants provided investors in announcing the Alpine High discovery. For example, CW 9 was employed by Apache as a Drilling Engineer from before the Class Period until the middle of Q2 2019. She drilled a number of Alpine High wells, including the Redwood 1H, the Blackhawk and Ortler wells. According to CW 9, the Redwood 1P well—one of the two "Successful Oil Tests" that Defendants touted in their September 7, 2016 Alpine High announcement as demonstrating the play's massive oil prospects—produced 900 barrels of oil initially, and *then stopped producing any oil within a few days*. Defendants "labeled it as a down-hole test, to see how much production was going to come out of it, and that's when [Defendant] Christmann said 'oh yeah – this is the play we got.' That's what they based everything off of, but *we never hit much oil after that*."

This lack of oil production at Alpine High caused CW 9 to inquire with Keenan "six pack" member Navneet Behl, VP of Operations, about how the Company portrayed Alpine High to investors. CW 9 recalled that Behl responded, ***"I don't know how they made that Alpine play look like it was."*** Probed further, Behl stated, ***"We were saying to Reservoir that it was only a 7 to 8% profit on that stuff, but they made it sound like 15 to 18%."***

62.    Other former employees questioned the gas to oil ratios the Company provided to investors in September 2016 that depicted Alpine High as an oil play.  CW 10, a thirty-plus-year energy industry veteran, was employed by Apache from 2004 until August 2015 in a variety of positions, including Global Director of Petrophysics beginning in 2011, and Chief of Staff – Geosciences from 2011 to 2015, where she reported to Apache's COO Rod Eichler.  As Chief of Staff – Geosciences, she participated in several internal assessments of each of the Company's ten business units, conducted quarterly peer reviews, and participated in Rose Risk Analyses. Approximately 160 Apache employees reported to CW 10.  CW 10 specifically identified slide 25 in the Company's September 2016 investor presentation, which she explained was a chromatograph slide, as misleading.  CW 10 explained the slide was manipulated to make Alpine High appear as an oil play, when in reality it was a gas play or at best a wet gas play.  In describing the same slide, CW 2 said there was no other way to put it, Apache was being "***misleading at best***." CW 11 was employed by Apache as a Geologist from February 2011 until March 2020 and worked in Houston as part of the Apache Corporate Reservoir Engineering Group.  She and fellow Apache Geologists always wondered what the true gas chromatographs were showing because she heard that these charts had been manipulated for Alpine High to make it appear there was more oil than the data actually showed.

63.    In sum, before the Class Period began in 2016, Apache's technical experts advised

Christmann and Apache not to go public about Alpine High on three separate occasions because, as they repeatedly warned, Apache either (i) lacked the technical data and analyses necessary to make reasonable statements or projections about production from Alpine High, or its commercial viability and expected profitability; or (ii) had in fact concluded that it was "too gassy" and lacked any significant amounts of oil or wet gas. Christmann and Apache disregarded those facts, flouted the warnings, and knowingly made public representations starting on September 7, 2016, that lacked any reasonable basis.

      **E.    As The Class Period Progresses, Defendants Claim Additional Testing And Well Data Confirm Enormous Amounts Of Oil And "Highly Economic Wet Gas" Across The Entire Alpine High Play**

      64.    Despite the fact that Defendant Christmann had previously rejected Alpine High and his own San Antonio technical team had warned him against announcing the play, Defendants pressed onward with their publicity blitz promoting Alpine High as a "world class" and "transformational" resource. Throughout the remainder of 2016 and into 2017, during dozens of earnings calls, investor presentations, and press interviews, Defendants continued to promote Alpine High as an "immense resource and a transformational discovery for Apache." Defendants underscored that data from newly drilled wells confirmed Apache's initial claims about Alpine High, and also indicated that the play was even "bigger" and more "predictable" than Defendants had initially announced, not only in the Woodford and Barnett formations, but across other geologic formations and in a host of drilling locations across the Alpine High "fairway."

      65.    For example, on November 3, 2016, during the Company's 3Q 2016 earnings conference call, Defendant Sullivan assured investors that "Alpine High is becoming more predictable," claiming that "*[e]very well we've drilled has confirmed our model*," and Apache had "continue[d] to see excellent production performance across this play." And on February 14, 2017, at the Credit Suisse Annual Energy Summit, Christmann promised Apache was "still just

scratching the surface," and that additional data from the play was showing its capacity as an economic play: "[l]ike most major discoveries, ***it's getting bigger with more data***, which is a big thing and a great thing."

66.     Apache gave frequent public updates on Alpine High, and by March 2017, Apache told investors that it had "confirmed" critical aspects of Alpine High.  Specifically, at the March 27, 2017 Scotia Howard Weil 2017 Energy Conference, Christmann said Apache had "confirmed" that Alpine High was "over-pressured" – meaning that high amounts of underground pressure would make it easier to extract the oil and gas – that it was a "highly economic wet gas play" with more than 3,000 economically viable drilling locations, and that it had "excellent fully-burdened economics," i.e., that it was profitable even when factoring in all infrastructure costs, including both drilling and transport costs, as set forth on the slide below:



67.     On May 4, 2017, during the Company's first quarter 2017 earnings call, Christmann

rolled out more examples of new well test results, based on data which purportedly demonstrated that Alpine High's performance "was on par with or better than longer lateral, fully optimized wells in analogous shale resource plays, such as the SCOOP and the Marcellus," two of the most successful plays in the U.S. Consequently, Christmann portrayed Alpine High as turning out to be as good as promised, as "[t]he test wells drilled to date have proven much of what we anticipated for Alpine High."

68.     Apache also provided purported specific details and production statistics for certain of these wells, which had produced ostensibly impressive results that were supposedly representative of the overall Alpine High play. Christmann said that these data and results were only the beginning, i.e., "representative of our testing program," and that the best was yet to come. Christmann emphasized that "while we believe [these wells] are economic as drilled, the rates do not represent the capability of optimized Alpine High in development wells" and that investors could expect even better well results as the Company "optimized [well] completions." Christmann also assured investors that the productivity of the earlier Alpine High wells had continued to be strong after initial tests. For example, when asked by an analyst during the May 4, 2017 conference call to provide "color on some of the productivity post the initial test rates," Christmann responded "they look good. We're very excited about them," and further stated that as drilling had moved further up in the source rock, the liquids produced had become "more oily." Analysts were encouraged by this early data and continued to credit Defendants' statements. Credit Suisse headlined its May 4, 2017 report "Alpine High is Getting Closer," and wrote that the "signs are encouraging," and that "test data from the Alpine High play can match recent Midland wells. Yes – can match recent Midland wells," and that, while investors awaited oil production, "the wet gas

zone will deliver an economic return."[4]

69.    During the Company's August 3, 2017 earnings call, Apache continued to trot out an ever-increasing number of purportedly successful new well results, and continued to tout the oil production in particular, at Alpine High.  For example, Christmann announced results from four new appraisal wells in the oil window of the Wolfcamp and Bone Springs formations of Alpine High.  One of these (unspecified) wells, he said, had produced "an approximate 4,500-foot lateral drilled in the Wolfcamp formation, recorded a 30-day average rate in excess of 1,000 barrels of oil equivalent per day," of which 70% was reportedly oil, resulting in an impressive 37,000 barrels of oil produced in 75 days.  Asked whether the rates from this well were "in line with your type curve and what rates you're kind of looking for from the next batch of wells," Christmann responded unequivocally that these would be "very typical characteristics and very, very strong profile. And performing very, very well."  Moreover, Christmann said, he was "very confident now that we have hundreds of locations in the Wolfcamp so – that will be oil locations."

70.    However, as investors would soon discover, all of these statements were false.  In truth, many of the wells Defendants had initially touted were no longer producing any meaningful amounts of oil as of September 2016—causing Defendants to engage in a deceptive campaign in which they continuously shifted investors' focus to new and different wells that were headed down the same path as the other wells that, unbeknownst to the market, had abruptly stopped producing. As Apache's internal data from Alpine High showed (as found by Project Neptune), the *actual* quality and amount of oil could support economically viable extraction in, at most, a tiny fraction of the drilling sites Defendants touted.  Moreover, there were ***dozens*** of wells Defendants drilled

---

[4] The Midland Basin was a highly productive field Apache had drilled prior to Alpine High.  For example, in a May 2017 investor presentation, the Company described the Midland Basin as "premium drilling inventory" that produced "~77 Mboe/d, consisting of 47% oil."

across Alpine High but did ***not*** disclose to investors or regulators that had yet to produce any oil or rich gas ***at all***—in other words, their production numbers were ***zero***.  Thus, unbeknownst to investors, just as Defendant Christmann had determined in 2012 and again in 2014, Alpine High was "too gassy" and devoid of viable oil prospects—and just as Keenan's team had internally warned, there was no data to support the "hundreds" of "oil locations" Defendants were touting. In fact, the data Defendants were receiving increasingly and starkly indicated that there were not many lucrative wells at all.

### F. As The Market Awaits Alpine High's Production, Apache Reiterates Its Claims Of "Tremendous Volumes" Of Oil And Wet Gas And Warns That Competitors Are Swarming The Region

71.    On October 9, 2017, Apache provided investors with its most significant update since announcing Alpine High.  Despite Defendants' earlier statements that Alpine High was becoming "more predictable" and that the Woodford and Barnett formations in particular held an estimated "3 billion barrels of oil"—a number they had called "conservative"—Apache disclosed for the first time that it had been experiencing problems extracting oil from those formations due to deep-seated faults within the source rock and excess water production, resulting in greater costs and complexities.  During the webcast, Defendant Christmann admitted that Apache had been aware of these complexities, but claimed that the Company had "chose[n] not to share [them] due to competitive reasons."  Following the webcast update Apache's stock declined by 7%.  This incomplete, partial corrective disclosure was couched in language that comforted investors and allowed Defendants to further perpetuate the fraud.

72.    Significantly, while Defendants disclosed some challenges at Alpine High, they went to great lengths during the October 9, 2017 webcast to reassure investors about the purported long-term prospects and profitability of Alpine High.  For example, Defendant Sullivan emphasized that Apache had "just scratched the surface in exploring this resource," and Defendant

Christmann asserted that there would be "tremendous volumes" of both oil and NGLs, and that the play would be highly economical due to the "low cost" of extracting both the oil and the NGLs. Defendant Sullivan further touted the economics of the play, assuring investors that Alpine High's best wells would "generate positive returns even at 0 [dry] gas price," and promised a "recoverable oil volume [of] 130,000 barrels per well and 455 million barrels of oil for the entire project based on 3,500 wet gas locations"—enabling Apache to still recover over 13% of the promised 3 billion barrels of oil in place.

73.    Moreover, to further reassure investors that Apache had truly made a remarkable discovery at Alpine High that its competitors had somehow missed, Christmann also introduced a new story: that Apache's competitors were increasingly encroaching on Alpine High—even going so far as to display graphic maps that purported to show growing competitor activity around the play's periphery—which Christmann cited as "validation" of his prior claims. "One year ago, there was little activity in the vicinity of Alpine High outside of Apache," Christmann noted. "What a difference a year makes," he continued, explaining that competitors had purportedly swarmed the area, "validat[ing]" Defendants' claims about Alpine High.

74.    Conveniently, Christmann also claimed that this increased competitor activity justified Apache disclosing less information than it otherwise would about the play, claiming again that, due to competitor interest, "we have been very cautious with the data we have chosen to disclose publicly," and that "[w]hile we have advanced our position to a point where we can now be more forthcoming with some disclosures, we will continue to be cautious with certain aspects of Alpine High that we believe to be competitively sensitive."

G.    **Apache Increasingly Touts Alpine High As A "Highly Economic Wet Gas Play," Doubles The Number Of Potential Drilling Locations To "5,000+," And Announces New "Emerging" Oil Plays**

75.    After the October 2017 update, Defendants continued to reassure investors with

overwhelmingly bullish statements concerning Alpine High, purportedly based on data and analyses of the play that Apache had in hand.  Consistent with their statements during the October 9, 2017 presentation that investors should now think of Alpine High as "three distinct plays," Defendants doubled the number of purported economically viable drilling locations across Alpine High, from approximately 2,000 to 3,000 to over 5,000.  As for oil specifically, Apache promised that it had identified at least 500 viable drilling locations in the Wolfcamp and Bone Springs formations.

76.    Notwithstanding the centrality of oil to Defendants' initial Alpine High announcement, by October 2017, Defendants began to increasingly emphasize that Alpine High was also a "highly economic" wet gas play.  While still promising "significant oil" at Alpine High, Defendants told investors that "the wet gas play represents the largest portion of Alpine High and the majority of our current completions," and that "[t]he significant potential of the wet gas play is the underpinning of our investment in infrastructure buildout."  Defendants further assured investors that "the economics of the wet gas play…are very compelling and highly competitive," and that they already had an "in-depth understanding" of the play based on "a tremendous amount of data."

77.    Analysts credited Christmann and Apache's strong reassurances.  For example, on October 10, 2017, RBC noted that Alpine High was "developing meticulously," highlighting positive "wet gas economics," "encouraging" signs about the dry gas play, and calling the oil play "still early days."  An October 11, 2017 Raymond James report credited Apache's claims that Alpine High was "geologically analogous" to other nearby plays that "historically yielded exceptional oil and wet gas volumes," and stated that "Apache has its hands on a prolific wet gas play in its Alpine High acreage, with ~3,500 drilling locations based on 4,400-ft lateral lengths,"

and noted its low cost per well as the Company "transitions into development mode." And an October 18, 2017 Societe Generale report opined that, "[i]n the future, we believe that APA will add many more oil well site locations, and that the Street shouldn't dismiss an 'extensive and highly economic' wet gas, economic dry gas or early days of [geological and geophysical] work in the Wolfcamp & Bone Springs."

### H. Alpine High's Production Ramp Takes Longer Than Expected, But Christmann Promises Alpine High Will Scale Up In 2019 And 2020, And Reiterates That Alpine High Will Be Profitable Even At Ultra-Low Energy Prices

78.    In early 2018, Apache again announced disappointing results at Alpine High, including a longer-than-expected production ramp, but continued to assuage investor concern by presenting Alpine High in an overwhelmingly favorable light with highly compelling economics even at very low energy prices.

79.    Specifically, on February 22, 2018, Apache forecasted a longer than expected ramp up of production at Alpine High, leading to production guidance of just 40-50 Mboe/d (thousands of barrels of oil equivalent per day—a measure of total daily energy production that incorporates both oil and gas) from Alpine High, and with a lower oil mix than previously expected. Analysts were surprised by this news, with a February 22, 2018 Credit Suisse report stating that the revised forecast was "driven by disappointing Alpine High growth" that was "underwhelming" with a "rapidly declining oil mix." A February 22, 2018 Wolfe Research report similarly commented on the surprisingly low oil production at Alpine High, stating that while at "[f]irst blush the [Company's] outlook reads impressively . . . [d]igging deeper though and cracks unfold." Following the February 22, 2018, disclosures, Apache's share price fell 6%. This was the second partial, incomplete, corrective disclosure of Defendants' fraud.

80.    However, Defendants continued to emphatically reassure investors with promises

34

of a "world class resource play [at Alpine High] that will change the course of Apache." Christmann underscored that the play would "drive capital investment, and very soon, free cash flow for decades to come."  With prices low, Christmann acknowledged that "funding a wet gas play is a bit contrarian," but said it was "justified by the long-term scale and return potential even at lower gas prices."  Moreover, Christmann told investors that while early production had been lower than expected, production would still meet expectations and simply be backloaded more toward 2020: "By 2020, average daily production is expected to be between 160,000 and 180,000 BOEs a day, which represents a compound annual growth rate in excess of 150%."

81.    In direct response to analysts who raised concerns about low commodity prices, Christmann doubled down on his claim that Alpine High would be profitable even at ultra-low gas prices, insisting the Company had extensively examined downside scenarios and that the play would "really hum below $2" gas prices while continuing to tout "the oil production" in the area:

> It – the beauty of it is, is with the wet gas, you don't need the gas. . . . *[T]his thing's going to really hum below $2 on the gas side*. . . . And it's that *combination with the liquid yields and the oil production is what makes it unique*. And quite frankly that's what we know makes it differential. … [W]e've run many cases on the downside. We would not be making this type of investment on the midstream or the upstream side if we thought there was a sensitivity that was close to anything that would come into making it not work under *very, very low gas and NGL and oil prices*.

82.    Analysts continued to credit Defendants' favorable statements.  On February 22, 2018 Natalliance Securities reported that "Permian Oil Growth Guidance in 2018 is Likely Conservative."  Societe Generale wrote that market disappointment with Alpine High likely represented underestimation of the play, which was what made Apache an "investment opportunity."  Societe Generale also reported that "APA's gas exposure" was only "an issue for investors who still aren't familiar with the Alpine High," crediting Apache's claims that the gas in Alpine High "will be cheap to produce," and therefore highly profitable.  Societe Generale credited

Christmann's representations that competitors were increasingly encroaching upon Alpine High, noting that "we like the fact that the industry is now drilling in APA's Alpine High neighborhood, with some 170 competitor wells planned nearby.  We consider that a positive."

83.    Throughout the rest of 2018 and into 2019, Defendants continued to relentlessly promote Alpine High as a transformative discovery for Apache, while consistently waving off doubts about the play's oil or wet gas potential and profitability.  For example, during an investor call Apache held on May 3, 2018, Defendant Christmann stated—in direct response to an analyst question about "whether or not [Apache would] see more of a shift to oil"—that the Company had "plan[ned] conservatively with Alpine High," such that "it will get more oily as time progresses." Defendants further reiterated the numbers they had touted at the outset of the Class Period in Apache's August 8, 2018 earnings call, claiming that Alpine High was on a "tremendous growth path" due to its "estimated resource in place of 75 Tcf of gas and 3 billion barrels of oil in just 2 of the 5 proven hydrocarbon-bearing formations."  Similarly on September 21, 2018, Defendant Christmann claimed in a *Bloomberg TV* interview that "[t]here is a very large wet gas play [at Alpine High] and there will be a lot of rich gas but there will also be a lot of oil," and that "[w]e've proven there's oil."

84.    As late as May 2019, Defendants continued to make positive, purportedly data-driven statements about Alpine High, and to assert that investors who questioned Alpine High did not understand the economics of the "liquids" (i.e., valuable wet gas, oil, NGLs) play.  On the Company's May 2, 2019 first quarter 2019 earnings call, Defendants continued to claim that Apache was "poised to deliver attractive oil growth in a substantial cash flow uplift at Alpine High in the second half of the year," and further asserted in a *Bloomberg* article published a few days later that "our view of 3 billion [barrels] of associated oil in place in just the Woodford and Barnett

36

[formations] remains unchanged."  Further, on May 15, 2019, *Bloomberg* published a story quoting an Apache spokesperson as stating that "***[i]nvestors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High.***"  Indeed, as late as August 1, 2019, Defendant Christmann unequivocally asserted during the Company's second quarter earnings call that Alpine High was "a large resource as we've proven" with "tremendous rich-gas potential."

    **I.**    **A Secret Internal Investigation Commenced in Mid-2019 Confirms There Was Never Any Factual Basis For Defendants' Claims About Alpine High And, Instead, Apache's Data Directly Undermined Defendants' Assertions**

    85.    Remarkably, at the same time Defendants were claiming investors simply "d[id] not yet have an appreciation" for Alpine High, internally, unknown to investors, Apache senior executives were growing increasingly skeptical of the Company's public claims, and finally forced the Company to subject them to a robust review.  As detailed below (*see* §VI-B), with Christmann's blessing, since 2016, Keenan and his San Antonio team had sequestered all Alpine High data away from normal databases and review processes at Apache, and concealed it from all but a select few senior executives, including Christmann.  But by approximately June 2019, senior leaders within Apache became so concerned about whether Defendants' outsized public claims about Alpine High had any factual basis that Christmann relented, and permitted a secret internal investigation—dubbed "Project Neptune"—to examine in-depth the data, analyses, and assumptions underlying those claims.  That investigation, which was concluded in September 2019, hastened the end of the Alpine High sham.  Apache's data unequivocally showed that from the very beginning, Defendants never had support for their public claims and projections about Alpine High.  Indeed, the data that Christmann and Keenan kept hidden was squarely at odds with Defendants' public statements about the economic viability of the play.  Following the internal

investigation, Keenan abruptly "resigned."

86.     Specifically, in 2019, actual top-line production from Alpine High continued to disappoint, as reflected in Apache internal reports shared with the Board of Directors and senior leaders.  In a meeting of the Board of Directors in the summer of 2019, Keenan and members of his San Antonio team presented a supposed evaluation and review of the problem, and attributed it to various transient issues.  Apache professionals outside of Keenan's team who reviewed the presentation, however, found it implausible.

87.     As a result, Project Neptune, an independent internal technical review of Alpine High data, was commenced.  The review of Alpine High data at the heart of Project Neptune was to be kept to a core group, and secret from the rest of the Company, given its sensitivity and importance to Apache.  Its code name allowed its participants to keep it obscured.  Christmann was directly informed of the review, and this time, acquiesced to Alpine High data being shared more broadly within the Company.

88.     The Project Neptune team requested data from the San Antonio team, specifically, Rate Transient Analysis ("RTA") data for the Alpine High wells.  At a high level, the RTA data they requested included all of the technical parameters and metrics that had been used to capture and assess well structure, flows and performance over the entire history of each well.  It reflected not only geological and production metrics, but also data on the composition and quality of the oil and NGLs the wells tapped, which were critical to understanding the quality of the gas and liquids at the play—and hence, the economics of extracting and processing them.  RTA data was routinely used by Apache in its standard well and site evaluation practices for purposes of both quantifying and valuing the actual output of wells, and also for creating projections of future production and econometric analyses of the economic viability of wells, pads and sites, under different conditions.

89.     Many former employees support this account.  CW 6 explained that after Keenan's team started to fall out of favor, some Alpine High production data started for the first time to be analyzed by other Apache employees.  For example, according to CW 6, an Apache team managed by Manager of Subsurface Integration, Lucas Martin, conducted an RTA evaluation focused on the deliverability of Alpine High rate reserves, which measured the amounts of resources that remained available at Alpine High based on the current rate of production.

90.     More specifically, Reservoir Lead, Braden Bowie, conducted the RTA, which involved analysis of Alpine High production data and pressure data on a well-by-well basis.  Some of the data had been captured by the San Antonio team using its own custom tools.  CW 12 was employed by Apache from 2010 until she was laid off in January 2020.  During the Class Period until her departure, she served as Vice President of Resource Development for the Permian Basin. Before the Class Period, she served as a Reservoir Engineering Manager, on a team with Reservoir Engineering Manager Pieprzica.  As described by CW 12, a Vice President on the Apache Software Tool Revitalization Team, the San Antonio office had employed a "self-built tool for production decline analysis" which was used to analyze pressure and production flow rates to estimate the reserve potential and production performance for Alpine High wells.  CW 12 found it "odd" San Antonio had built their own tool, as Apache had available licenses for the Company-wide RTA software.  CW 12 inquired about the tool with Pieprzica, but he never provided a demonstration.

91.     The San Antonio team received the detailed request for data in the summer of 2019. With Christmann now no longer shielding it, Keenan's team shared the Alpine High data.  As a result, in late summer 2019, the review team obtained, compiled and analyzed the entire RTA data set for all of the Alpine High wells ever drilled.  The team took the standard analyses that Apache used as a matter of course when analyzing well performance, projections and economic viability

in all of its other wells, and applied them to the Alpine High data.

92.     The comprehensive Alpine High RTA data that the San Antonio team provided spanned the life of each Apache well in the play.  It included data from all time periods post-drilling, not just cumulative or current data.  In other words, if a well was first drilled and began producing in 2016, the RTA data included information from the inception of the well and each time period thereafter, up though the present.  Apache could thus use RTA data to analyze what a well was producing currently and create projections based on current and recent performance, but also to analyze performance at any given point in the well's existence, or to analyze historical performance in prior periods.

93.     The Project Neptune team completed its analysis of the full Alpine High RTA data, applying Apache's customary internal analytical tools, by September 2019.  The findings of this secret technical review were stark and unequivocal.  The Company's data showed that the vast majority of Apache's Alpine High wells had ***never*** performed or produced anything like the Company had represented to the market.  Instead, the current, recent and historical production and performance were far worse than what Apache and Defendants had told investors.

94.     Just as importantly, the Company's data did not support, and had never supported, Apache's repeated public projections about Alpine High's performance and ability to economically support hundreds or thousands of additional gas and oil wells in the future.  Instead, the review team's standard analysis of the RTA data showed that, given the poor quality of the oil and gas resources at the site, extracting NGLs and recovering oil from Alpine High in an economically viable fashion was an extraordinarily dubious proposition, and had been since drilling began.  The economic viability went from remote to nonexistent if even moderately challenging oil and NGL pricing assumptions were applied.

95.     In key findings, Project Neptune determined that Apache's internal data showed that the oil and wet gas resources at Alpine High were low-quality.  More valuable than dry gas, oil, condensate and NGLs were the resources Apache needed to be able to produce in order to make Alpine High viable and profitable.  But Apache's historical and current data reviewed by Project Neptune showed that the condensate potential of virtually all wells at the site was typically just 20%-25% of what Apache had represented to the market in terms of overall well recovery and projections.  Additionally, PVT (pressure volume temperature) lab tests on NGLs from the Alpine High wells showed that ethane comprised nearly 60% of the NGL barrel—meaning that the composition of hydrocarbon constituents that could be produced from the wells was far less economic than Apache was portraying to the market.  The data also showed that the total "Estimated Ultimate Recovery" ("EUR") for the more than one hundred wells Apache had drilled by that time typically amounted to around 25% of the well development scenarios Defendants had repeated to the market from 2017 to 2019.

96.     Project Neptune's review concluded that (i) Apache's data did not support and had never supported public type curves and other representations the Company had touted as support for Defendants' representations about play-wide "well economics" and the value of Alpine High (instead, the quality of the wells and oil and gas Apache had drilled was far worse than what Defendants had represented); (ii) only if several highly favorable assumptions were applied could even some of the Alpine High wells be minimally economically viable; and (iii) the substantial majority of the Alpine High wells were not and had never been economically viable, even with the beneficial assumptions.

97.     Specifically, Project Neptune found that, of the supposed thousands of economic drilling locations Apache had repeatedly touted, the vast majority were never economically viable,

while the remainder could only theoretically be viable if both aggressive oil, gas and NGL prices and virtually infeasible changes to Apache's fixed operating costs and commercial terms were assumed. This majority of Apache's Alpine High locations that Project Neptune found to have been non-economic all along included: (i) *all* of the thousands of potential monocline (i.e., oil and gas) locations Apache had touted; (ii) *nine in ten* of the hundreds of potential oil locations Apache had touted; and (iii) nearly *half* of the hundreds of potential gas (dry and wet) locations Apache had touted.

98.    Further, the Project Neptune team explicitly noted that Apache's actual data from Alpine High had at all times differed from (i.e., fallen short of) primary phase type curves Apache had published, which purported to show data-driven projections for the economic viability of the play—and were also at odds with the Company's public assertions that Alpine High was "on track" to realize those projections.

99.    In sum, the Company's secret internal investigation demonstrated unequivocally that Alpine High did not produce, and had never produced, the oil and wet gas that Apache had touted as the economic linchpin of the play. The Company's own data from throughout the life of Alpine High did not support, and had never supported, Defendants' repeated representations to the market about thousands of economic drilling locations, 75 trillion cubic feet of rich gas and 3 billion barrels of oil that were in place at Alpine High. Instead, Apache's data directly undermined Defendants' assertions.

100.    The Project Neptune team prepared a formal presentation on the data, the review and its findings in September-October 2019. The team provided the presentation, including all of the foregoing conclusions, to Apache's senior management, including Christmann, as part of an in-person meeting with Christmann, in mid-October 2019.

101.    Significantly, Defendants have never publicly disclosed the existence or findings of Project Neptune.  Reinforcing the key findings of Project Neptune, including that Apache's own data did not support, and had never supported, Defendants' overwhelmingly positive representations about Alpine High to investors, throughout Lead Plaintiffs' investigation, one former employee after another expressed a need to hold Defendants accountable.  CW 4 stated that "*these guys are crooks, and they need to go down for it, just like the Enron guys.*"  CW 7, a Director of Exploration and Production Technology, emphasized the "*shareholders are investigating something that needs to be investigated*."  CW 7 was employed by Apache from June 2010 until September 2018.  From June 2015 through September 2018, she served as Director, Exploration and Production Technology – Geoscience.  In this role, she managed a staff of 30 scientists ranging from petrophysics, geology, petroleum systems and geophysics.  During her tenure, she reported to executives one level below CEO, including Defendant Sullivan, Voytovich, Senior Vice President of Operations Grady Ables, and Senior Vice President of Operations W. Mark Meyer.  CW 7 has a PhD in Geology and has worked in the energy industry for 25 years.  CW 6 explained, "*internally, we were all originally shocked to hear them say that this was an oil play*" and that Apache is a "*crooked company*" and "*somebody needs to go to jail*."  CW 5 even quit working for Apache in 2017 because it was apparent to her that Alpine High "*was a dumpster fire on a sinking ship*."

## V.    THE TRUTH EMERGES, FORCING APACHE TO CEASE ALL FURTHER DEVELOPMENT AT ALPINE HIGH, TAKE A $3 BILLION WRITE DOWN, AND SLASH ITS DIVIDEND BY 90%

102.    The truth about Alpine High began to fully emerge in October 2019.  Specifically, shortly after the Project Neptune findings were presented in-person to Christmann and other Apache senior management in mid-October 2019, media reports surfaced on October 25, 2019 that

Keenan had "resigned." Apache's stock price immediately plummeted, falling as much as 11% for the biggest intraday drop since January 2016.

103. Analysts and the mainstream media easily linked Keenan's departure to Alpine High troubles. For example, in reporting on Keenan's departure, on October 25, 2019 analysts at Credit Suisse described how Keenan "oversaw the discovery of the Alpine High play, which has been an economic disappointment for investors" and that since announcing the discovery at the start of the Class Period, "[Apache's] shares have underperformed global [exploration and production companies] by >30%, likely a cause for Mr. Keenan's resignation." Noting that "the outcome of results from Alpine High have not met high expectations," RBC Capital Markets likewise reported on October 25, 2019 that "Keenan was a major part to the team that discovered the Alpine High play" and his resignation "caused stock weakness." *Bloomberg* put it bluntly, issuing an article on October 27, 2019 that was titled "Apache Executive's Departure Sparks Worst Rout Since 2016." The next day, *Bloomberg* issued another article linking Keenan's departure to the Alpine High play and continued decline in Apache's stock price, reporting that "[t]he geologist credited with the Alpine High resigned last week, sending shares and bonds plummeting."

104. Days later, during the Company's third quarter 2019 earnings call held on October 31, 2019, Defendant Christmann revealed that drilling activity at Alpine High had been reduced to just two rigs, several well completions had been deferred into 2020, and, "[t]his lower activity set, combined with decreased production outlook on one our multi-well pads, has resulted in an approximately 5% reduction in our fourth quarter Alpine High guidance."

105. On January 9, 2020, Reuters reported that Apache was forced to shutter the Alpine High San Antonio headquarters. According to Reuters, this would result in a loss of over 270 jobs and, together with an associated Company-wide reorganization, represent a 10% to 15% reduction

44

in Apache's global workforce.

106.     On February 26, 2020, Apache issued a press release announcing fourth quarter and full-year 2019 results, reporting a $3 billion impairment for Alpine High, a staggering amount that more than wiped out the Company's profits for the prior two years, and resulted in the Company reporting a loss of $3 billion during the fourth quarter and $3.6 billion for the full-year 2019.  The Company further announced that, as of the end of 2019, "there were no rigs drilling at Alpine High."

107.     Leading media outlets specifically highlighted how the massive $3 billion write down and cessation of all further exploration at Alpine High was "***in stark contrast***" with Defendants' statements during the Class Period "***vehemently defending the play's prospects for about three years***."  *Bloomberg*, for example, issued a scathing article on February 27, 2020, titled "Apache Calls It Quits on Alpine High After $3 Billion Write down," which stated:

> Apache Corp. is officially calling it quits on a highly publicized but disappointing shale discovery in West Texas after ***vehemently defending the play's prospects for about three years***. The Houston-based company posted a roughly $3 billion write down on its Alpine High project, a find from 2016 that fizzled when it turned out to hold more natural gas than oil…   The discovery was announced in September 2016 to much fanfare and claims the field held 3 billion barrels of crude and 75 trillion cubic feet of gas. . . .   ***Until recently, Apache executives defended the Alpine High, saying in May that investors didn't yet "have an appreciation for the potential cash flow generation from the liquids play at Alpine High."***

108.     The same day, February 27, 2020, the Company held its fourth quarter earnings webcast.  At the outset, Defendant Christmann acknowledged that 2019 was a year full of "challenges," the "most significant" being "Alpine High."  Christmann explained the Company was throwing in the towel on any further development of Alpine High, stating that "further testing is not warranted at this time" and Apache "dropped the remainder of our drilling rigs in the fourth quarter and chose to defer some previously planned completions."  Where analysts previously viewed the capital allocation Apache was committing to Alpine High as a reason for optimism,

45

Defendant Christmann highlighted the Alpine High failure, explaining that in "terms of capital allocation, Alpine High will receive minimal to no funding."

109.    After the webcast, *Bloomberg* updated its article from the prior evening, emphasizing that Christmann's comments during the earnings call "***were in stark contrast to his past defense of the Alpine High***," and noted that only two years ago, Christmann "***told analysts that the play would 'really hum' even with gas prices at $2***." Yet, when gas prices reached the level at which Christmann had assured investor Alpine High would "really hum," Apache shuttered all drilling operations and put an immediate stop to virtually all future funding.

110.    The Alpine High debacle left Apache in an incredibly weakened state and highly susceptible to a market downturn. As a result, just weeks later, on March 12, 2020, the Company announced that it was forced to slash its vaunted dividend by a staggering ***90%,*** "from $0.25 to $0.025." The announcement resulted in the price of Apache common stock falling an additional 6%, to close at $7.76 per share on March 12, 2020.

111.    The full extent of Defendants' fraud was revealed on March 16, 2020, when *Seeking Alpha* published an article pre-market describing how Alpine High had left Apache hobbled and particularly challenged amongst its E&P peers. The *Seeking Alpha* article noted that the Company was "In A Tough Spot" with $8 billion of debt, which "***translates into a lofty debt-to-equity ratio of almost 250% - the highest among all large-cap independent oil producers***."

112.    In response to this news, Apache's stock price fell $3.61 per share over two trading days, or approximately 45%, to close at $4.46 per share on March 17, 2020.

113.    As the market fully digested the impact of the Alpine High boondoggle on the Company's financial condition and future prospects, and the extent of Defendants' misrepresentations, the price of Apache stock dropped from a Class Period High of $69.00 on

December 12, 2016, to close at just $4.46 per share on March 17, 2020, erasing over $24 billion in shareholder value.

## VI. IN TRUTH, ALPINE HIGH WAS NEVER A VIABLE OIL OR WET GAS PLAY

114.    As set forth in detail above in §§ IV-C and IV-D, Defendants knew or recklessly disregarded that from before the start of the Class Period, they lacked an adequate factual basis to claim they had discovered a "transformational" and "world class" oil and wet gas play.  In reality, not only had Defendant Christmann himself *twice* rejected the Alpine High region as "too gassy," but the very San Antonio technical team brought in to delineate the play expressly warned Christmann that he should not go forward with announcing Alpine High in September 2016 because the data did not support it.  Indeed, as described further above, eventually, Defendants could no longer maintain their scheme, and in 2019 the secret internal investigation, Project Neptune, confirmed that Defendants' public claims about Alpine High had been utterly baseless.

115.    As set forth in this Section, Lead Plaintiffs' investigation and the reports of knowledgeable former employees only further confirms that Defendants lacked any basis whatsoever for their claims of massive amounts of economically recoverable oil and wet gas at Alpine High.  Moreover, Lead Plaintiffs' investigation has shown that, in order to prevent both investors and even Apache's own senior employees from discovering the truth, Defendants engaged in a far-reaching scheme to conceal the true data underlying Alpine High, walling the data off within the Company, eschewing all normal internal review processes, and limiting visibility to the Individual Defendants and a handful of select employees in the San Antonio office.

### A. Lead Plaintiffs' Forensic Analysis And Former Employee Accounts Confirm That Alpine High Produced Miniscule Amounts Of Oil And Wet Gas, That Many Of Its "Successful" Wells Were Failures, And That The Play Was Riddled With Dry Holes

116.    Alpine High never produced quantities of oil and gas remotely close to what

Defendants claimed that it would.  As confirmed by Lead Plaintiffs' forensic analysis of production data from across Alpine High, which is based upon information that Defendants concealed, misrepresented and obscured during the Class Period, and which was not publicly available at the times of Defendants' alleged misrepresentations, the total amount of oil produced by Apache across the *entire* Alpine High field during the entire Class Period amounted to approximately *2.9 million barrels*—a miniscule *0.8%* of the *455 million barrels* total that Defendants represented that they conservatively expected to recover from the Woodford and Barnett formations *alone*.  As for oil production in the Woodford and Barnett, the total production over the Class Period was even lower—less than *1.8 million* barrels, representing only about *0.4%* of the total amount of oil Defendants told investors that they conservatively expected to recover from just those two formations.  Even worse, the Wolfcamp formation, which Defendants touted as an "emerging oil play" with at least 500 economic drilling locations, produced just 1.1 million barrels of oil from the formation during the Class Period, and the Bone Springs formation produced almost nothing— just 2,500 barrels of oil during the Class Period.

117.    Defendants' representations regarding wet gas production were no more accurate or realistic than their oil representations.  In fact, while Defendants told investors throughout the Class Period that there were 75 trillion cubic feet of "really rich [wet] gas" in the Barnett and Woodford formations, Alpine High never even produced a tiny fraction of this amount. Throughout the Class Period, the total amount of *all* gas produced by Apache across the entire Alpine High play – inclusive of *both* "wet gas" and "dry gas" – amounted to a mere *0.3 Tcf,* just *0.4%* of the amount of wet gas Defendants said was in those formations

118.    As Apache desperately drilled its way across Alpine High during the Class Period, Defendants touted the "strong" and "successful" results they were purportedly seeing from newly

48

drilled oil and gas wells, insisting these wells were "confirming" their estimates of massive amounts of recoverable oil and gas at Alpine High. Indeed, in their announcement of Alpine High on September 7, 2016, Defendants presented bold, graphic slides touting seven different "Strong Well Results" and two different "Successful Oil Tests." Throughout the Class Period, Defendants made a practice of taking what were by far their most successful wells and touting them as representative examples of the entire play that "confirmed" Apache's outsized estimates. During the Company's 3Q 2016 earnings conference call, Defendant Sullivan went so far as to assure investors that ***"[e]very well we've drilled has confirmed our model***," and Apache had "***continue[d] to see excellent production performance across this play***." With production still ramping up, it was these purported well results that Defendants put forward to confirm Alpine High's promise to analysts and investors.

119.    Strikingly, however, even many of these "strong" and "successful" wells would turn out to be duds soon after—***or even before***—they were touted. This is corroborated by the report of CW 13. CW 13 was employed by Apache as a Control Center Supervisor in the San Antonio office from 2017 until shortly before the end of the Class Period in 2020, where she was responsible for overseeing the transport of fluids from Alpine High. CW 13 reported to several people, including Vice President of Operations Behl, who was one of the "Keenan six-pack." As confirmed by CW 13, Apache would open wells at Alpine High, only to find that the wells would stop producing or drop off shortly thereafter. Apache was then forced to devote resources to "work over" the well in an effort to get back to the initial flow rate. In other words, many of the very wells Apache said "confirmed" its bold claims about Alpine High ***did exactly the opposite***.

120.    Moreover, in a pattern repeated throughout the Class Period, Defendants often touted initial production statistics from a "successful well test," when its production ***already had***

*plummeted*.[5]  This is corroborated by the report of CW 14, who worked as a Systems Engineer for Apache in Houston for several years before the Class Period, and then as an Alpine High Completions Engineer in San Antonio from March 2017 until Q1 2020, in which role she oversaw design execution of wells at Alpine High.  CW 14 specifically recalled that she had noticed that "*what they showed at Barclays [the Alpine High announcement] was not consistent with production results at the time*," and that at least some of the wells highlighted were already "*bone dry*" and producing almost 100% gas by the time they were highlighted.

121.    CW 4, a former Apache geologist who had evaluated parts of the Woodford formation outside of Alpine High, described Defendants' practice of highlighting "successful" wells as a "*big game*," a "*Ponzi scheme*," and "*all arm waving*."  Rather than admit wells were not productive, she said, the Company just kept drilling and announcing new wells, while failing to disclose that the wells it had previously touted to investors had turned out to be busts.  As CW 4 put it: "*[e]verything started getting bigger, the number of wells kept going up, but the quality of the wells was going down*."  This left CW 4 with the distinct impression that "*every time Christmann opened his mouth it was all of kind of a bluff*."

122.    Lead Plaintiffs' forensic analysis only confirms these accounts, and identified examples of purportedly representative "successful" wells whose production had already *plunged* by the time they were featured in investor slides.  For example, Defendants' September 7, 2016 announcement of Alpine High included a large print, graphic slide announcing two "Successful Oil Tests" at wells known as the Redwood 1P and the Mont Blanc 2H.  The slide reported the

---

[5] Plaintiffs were only able to confirm this through a forensic analysis of well completion data, lease-level and well-level production reports, acreage maps, plats, permits, completion reports, test data filings, and a variety of other data, much of which was not publicly available at the time Defendants made their misrepresentations, which Plaintiffs accumulated, processed, and analyzed from painstaking searches of multiple regulatory and third-party databases.  Indeed, as discussed in Section VI-D below, Defendants engaged in a scheme to deliberately obfuscate production data that investors otherwise would have been able to access in public databases of regulatory filings.

Mont Blanc 2H's 24-hour initial production ("IP") rate as an impressive 854 barrels of oil per day, and provided a similarly impressive rate of 700 barrels per day for the Redwood 1P.  Moreover, Christmann highlighted during his presentation that the Redwood 1P "flowed for over five days" during drilling, and that its production was "flat for over ten days"—i.e., produced at a consistent rate for that entire time period, a critical criterion for determining the production potential of a well, because in order for a well to be "successful" it must continue to produce at a high rate.  An analyst report from MUFG Securities specifically highlighted these two wells as evidence that Alpine High really was a "world class resource."

123.    In reality, however, Defendants' statements about these wells were blatantly false. Data assembled by Lead Plaintiffs—including critical information that Apache concealed, obscured, and misrepresented during the Class Period, and submitted years-late in piecemeal regulatory filings—shows that, by August 2016, shortly before the September 2016 Barclays presentation, oil production at the Mont Blanc 2H was just 398 barrels a day—a decline of more than 53%—and was averaging no more than 206 barrels per day by September 2016, *a decline of more than 75%*.  And the Redwood 1P was even worse—following its initial test period reported at the Barclays conference, the well *never produced any further oil*.  Indeed, this is corroborated by CW 9, the drilling engineer who drilled the Redwood 1P well, who said that it produced 900 barrels of oil initially, and then stopped producing *any* oil within a few days.

124.    The Barclays presentation also included wells known as the Weissmies 1H and the Ortler 1H among a handful of examples of "strong well results."  Yet, as shown through Lead Plaintiffs' *post hoc* forensic analysis, each of these wells had *already seen production plummet by the time of the Alpine High announcement*, again rendering Defendants' statements materially false or misleading when made.  Specifically, the Weissmies 1H was drilled in May 2016 and first

produced in June 2016. While Defendants' investor slides presented on September 7, 2016 touted this well's "strong" initial production rate of 281 barrels of oil per day, undisclosed to investors, for the rest of June it averaged less than half of that—a mere 113 barrels per day. And by August 2016—the month before the well was touted as "strong," its oil production rate had fallen to a miniscule 54 barrels a day. By November 2016, its oil production had fallen to *zero*, where it stayed for five straight months, and never again produced significant quantities of oil. The Weissmies 1H's gas production fared no better—while Defendants' September 7, 2016 investor presentation touted its seemingly impressive initial production rate of 7.1 million cubic feet of natural gas per day, by August 2016, the month before the Alpine High announcement, it had fallen to averaging under 3 million cubic feet per day, and by November 2016 fell to *zero*.

125.    Similarly, the Ortler 1H was first drilled in May 2016 and started producing in June 2016. Defendants' September 7, 2016 investor presentation touted Ortler 1H's "strong well result" with an initial production rate of 1.75 million cubic feet of gas per day. Yet, what investors could not know was that, by August 2016—the month before the Alpine High announcement—the Ortler 1H was averaging less than half that amount, just 774,000 cubic feet of gas per day. Mere months later, its production fell off a cliff, and by January 2017, the Ortler 1H was producing ***no oil and no gas whatsoever***. Tellingly, with no better wells to highlight, Defendants continued to use the same misleading initial production figures from the Weissmies 1H and Ortler 1H even as late as February 2017, by which time ***both wells had stopped producing any oil or gas for several months straight***.

126.    Further, Defendants' multiple investor presentations in May 2017 devoted an entire slide to a single new well called the Blackhawk 5H, which, they said, had the "Highest Oil Yield To Date in Barnett," purportedly evidencing the growing strength of the oil play, with a 24-hour

initial production rate of 742 barrels per day. However, the Blackhawk 5H's oil production had already fallen sharply throughout April 2017, averaging just 147 barrels per day, and had *fallen to zero by the time Defendants touted its "oil yield" in May 2017*. Similarly, Defendants' May 2017 presentations devoted another entire slide to a well called the Chinook 101AH which had the "[h]ighest oil yield to date for a Woodford target," with a 24-hour initial oil production rate of 620 barrels per day. However, by April 2017, the Chinook 101AH was averaging just 194 barrels of oil per day, and, like the Blackhawk 5H, *was producing no oil by the time Defendants touted it in May 2017*.

127. Moreover, Lead Plaintiffs' *post-hoc* forensic reconstruction of all wells drilled across Alpine High based on data Apache had previously concealed, obscured, and misrepresented during the Class Period only demonstrates that Defendants' drilling was anything but "successful" and in no way "confirmed" their outsized claims. Indeed, by November 2016, when Apache claimed that "every well we've drilled has confirmed our model," Apache had drilled *a dozen dry holes—wells that produced no oil or gas whatsoever—comprising the majority of wells drilled until that date*. As CW accounts corroborate, seven of Defendants' dozen dry holes through November 2016 failed to produce any oil or gas despite being stimulated with millions of pounds of fracking fluid each, evidencing that Apache was desperately attempting to squeeze a viable oil and gas play out of unproductive land. As such, the only thing Apache's drilling ever "confirmed" was that Alpine High was anemic as an oil and wet gas play, and an economic black hole.

128. In total, corroborating the conclusions of Project Neptune, of the roughly 248 wells Apache completed at Alpine High through January 2020, when all new drilling was completely shut down due to Alpine High's abysmal performance, *67 wells—27% of all wells drilled—were dry, i.e., produced no oil or gas whatsoever*. This was a virtually unheard-of failure rate for a

Texas shale play, where dry holes are rare.  More than half of those dry holes (or 14% of all wells drilled) produced ***nothing*** in spite of being stimulated with millions of pounds each of fracking fluid—meaning that, far from "economical," Apache was effectively pouring money into the ground and getting nothing back out.  Apache's staggering failure rate was multiples higher than any of its competitors in the region, and was extraordinarily high for a North American shale play. In comparison, according to Lead Plaintiffs' forensic analysis, when Keenan was drilling the successful Eagle Ford play (in the Gulf Coast Basin in East Texas) while he worked at Apache competitor, Enron Oil & Gas ("EOG"), the failure rate for stimulated wells was ***less than 1%.***

129.    Throughout the Class Period, Defendants also touted the "highly economic wet gas play" at Alpine High, assuring investors that its wet gas wells would easily be profitable and would "really hum" even at historically low commodity prices.  By October 9, 2017, Defendants claimed to have identified 3,500 economic drilling locations in its wet gas play.  Yet, corroborating the conclusions of Project Neptune, Lead Plaintiffs' forensic analysis reveals that the assumptions underlying these claims had no basis in reality.

130.    Specifically, critical to Defendants' bold claims about this "highly economic" play was the amount of oil and/or wet gas recoverable from each well it drilled.  Because each well cost millions of dollars to drill and operate, the total amount of oil and/or wet gas expected to be recovered over the life of each well— the "Estimated Ultimate Recovery" ("EUR")—had to be sufficient to justify the cost of drilling and maintaining the well and bringing the oil or gas to market.

131.    Defendants' investor presentations repeatedly described a "typical well" on which its assumptions about Alpine High's wet gas play were based.  For example, in the Alpine High wet gas play, Defendants publicly claimed a "typical well" would produce ***at least*** 9 billion cubic

feet of gas equivalent (BCFE) in total hydrocarbons over its lifetime, and that the range for a "typical well" was anywhere from 9 billion to 15 billion BCFE. At this "typical" production level, Defendants assured investors, Alpine High's wet gas wells would be profitable, and a significant number of "upper range" wells would be even more highly profitable, producing so much wet gas that "the rates of return [would] go off the charts."

132. In reality, Apache never came anywhere close to meeting these curves before completely shutting down further drilling at Alpine High at the end of the Class Period. Indeed, corroborating the conclusions of Apache's own internal Project Neptune analysis, Lead Plaintiffs' forensic, *post-hoc* analysis of Apache data reveals that a staggering *70%* of the wet gas wells Defendants drilled throughout Alpine High were never on track to produce even the ***minimum*** amount needed to be a profitable "typical well," i.e., produced less than 9 BCFE of hydrocarbons. As shown on the below type curve graph, the median well at Alpine High fell far below the production needed to be "economical" according to Apache's numbers, and far below the "upper range" numbers that would be required to be highly profitable.



133.    By mid-2018, the failure of Alpine High to produce any significant numbers of "highly economic" wells had created intense friction within the Company.  CW 15, a former Apache Performance Drilling Expert from September 2017 to May 2020 who worked at the San Antonio office on Alpine High from September 2017 to September 2018, witnessed this intense friction firsthand.  According to CW 15, the disparity between Apache's public claims about Alpine High and what Defendants knew became so stark that, during the Company's "tense" second quarter review meeting in July 2018, Defendant Riney stood up in front of dozens of people including Keenan and Defendant Christmann, and bluntly asked "***When are we going to start producing economic wells***?"

**B.    Defendants Walled Off Alpine High Data, Allowed Keenan To Operate
Alpine High As A "Shadow Organization," And Silenced Any Dissent**

134.    Throughout the Class Period, Defendants engaged in a variety of tactics to conceal
Alpine High's poor performance and remarkably weak prospects from internal scrutiny.  Before
and throughout the Class Period, as described by a former Production Technology Manager at the
San Antonio office, Defendants dropped a "cone of silence" over Alpine High, walling off critical
data from internal review, including the longstanding company practice of peer review.  As a result,
employees at all levels of Apache questioned Defendants' public and internal representations
regarding Alpine High.  But Defendants made clear – "you either line up or you're off the team."
In other words, anyone within Apache that questioned Defendants on Alpine High were terminated
or "run off."  In furtherance of these tactics, Christmann required Keenan to report all matters of
importance concerning Alpine High directly to Christmann, who, circumventing established
Company practices and procedures, dictated who else at the Company could access Alpine High
data, and what types of review and analyses they could perform.

135.    Specifically, Christmann allowed the Alpine High data to be segregated from
Apache's normal data storage, analysis and internal review practices, which were applicable to all
of Apache's other sites, and instead, kept apart in San Antonio.  Christmann determined that
Keenan and the San Antonio team would operate outside the standard processes and reporting and
review practices applicable to the other units of the Company.  Christmann decided, through at
least early 2019, that senior executive oversight of Keenan and the Alpine High play would come
only from Christmann himself.

136.    CW 6 confirmed that Apache executive management was "absolutely aware" and
"in total agreement" with the Alpine High secrecy, stating in no uncertain terms, "the best way for
people to hide fraud is to hide the information."  CW 12, an Apache Vice President, placed

responsibility for the Alpine High secrecy directly on Defendant Christmann – "Absolutely, the only way you get away with it is that it came from the most senior levels to allow them to work that way at Alpine High – It is the CEO's responsibility."  CW 8 recounted that while Alpine High production data was available to Defendants Christmann and Sullivan, there was a "concerted effort" to keep Alpine High data a secret from others within the organization, and she was specifically "instructed" to not share production data with anyone outside of San Antonio.

137.    The internal secrecy of Alpine High began almost immediately after Keenan's arrival at Alpine High and Christmann's promotion to CEO.  CW 16, a long-term Apache employee, reported that once Keenan started drilling Alpine High, "*Alpine became a black box pretty quickly*."  CW 16 was employed by Apache for over 15 years, through Q4 2014.  Between July 2012 and November 2014, she worked in the Midland office as an Exploitation Manager. CW 7, the Apache Director, Exploration and Production Technology, reported that Keenan did a masterful job keeping Alpine High seismic data within his inner circle.  Christmann empowered the San Antonio office to operate largely as a clandestine operation throughout the Class Period. CW 6 reported, "*that was their M.O. from the beginning, keeping everything secret so they could keep the deal going as long as possible*."

138.    According to CW 5, "there was no physical connection between the San Antonio office network and the rest of Apache.  There was no way to tell what they had on their drives." CW 6 explained that Keenan went so far as to have the Company's IT department restrict access to the Alpine High data to certain individuals, greatly reducing the possibility of peer review of the Alpine High data.  For example, the Alpine High WellView system, which according to CW 17, tracked time, money and equipment usage on a well-by-well basis through drilling, completions and failure reporting, was available "only to those that are necessary," as determined

at the CEO level.  CW 17 was employed by Apache as an Operations Applications Analyst in the Midland office from before the Class Period until March 2020, in which role she was responsible for, among other things, compiling daily reports from the Apache WellView system, and failure reporting.  CW 17 had access to view WellView data from any area of Apache's Permian region except Alpine High.

139.    CW 14, a Completions Engineer at Alpine High, similarly reported that the San Antonio Reservoir Engineering Group did not permit review by "anyone outside" the Group and operated as a "shadow organization."   The San Antonio Reservoir Engineering Group used software called Aries for reservoir and reserve analysis.  That Group, led by Chester Pieprzica, was responsible for reservoir modeling, production forecasting, well testing, well drilling, economic modeling and PVT analysis of reservoir fluids.  Engineers in the Group played a central role in the Alpine High field development planning, and generating reserves estimates for use in financial and regulatory reporting.  The Aries data was vital to CW 14 as a Completions Engineer, as that data would provide, among other things, an assessment of well spacing on a given pad. However, the Reservoir Engineering Group was instructed not to share the Aries inputs with anyone else.  As a result, CW 14 would only be provided with a screenshot of the Aries data, rather than giving her access to the system and underlying data.  According to CW 14, Keenan was "very intentional" in maintaining the reservoir data secret and there was "pressure from above" to not provide the data.

140.    Likewise, CW 11, a Geologist in the Corporate Reservoir Engineering ("CRE") Group in Houston, which was responsible for handling the Apache reserves and reports to the SEC, described how the San Antonio office was extremely secretive with their reservoir numbers coming out of Alpine High, stating the office was "not willing to expose this data to people outside

of their region." She added that "San Antonio were the problem kids that did not want to give access to the numbers," noting that if the CRE group wanted Alpine High reservoir data, they "***had to go to the executive level to demand those numbers***." CW 7 expressed shock that, as one of the Company's highest-ranking geologists, she did not have access to the reserve reporting from Alpine High.

141.   Still other employees in San Antonio described how Apache withheld crucial Alpine High data necessary for their job performance. Noting that, "even in the same office, there were silos," CW 8 explained that San Antonio Reservoir Engineering Group and Geologists operated under a "***cone of silence***" and that the Reservoir Engineering Group maintained reservoir data as "***top secret***." Such information was integral to CW 8, a production engineer who required well data in order to maximize well production. Nevertheless, the Reservoir Engineering Group withheld from CW 8 crucial PVT (Pressure Volume Temperature) data, which her group needed to forecast NGL production. As a result, CW 8's production team was forced to work backwards, which, as described below, led CW 8 to discover Apache had been inflating type curves (explained above) for Alpine High. CW 8 repeatedly complained to her supervisors about her inability to gather this data, and the supervisors reported the disputes to Keenan. According to CW 8, Keenan "six pack" member Navneet Behl ultimately quit because he grew tired of fighting battles over the sharing of data.

142.   The "cone of silence" at Alpine High became tighter as the Class Period progressed. CW 18 was in the small circle of employees that initially had access to Alpine High production data, and for a time participated in an hour-long Daily Operational Meeting at 7:15 a.m. each day that included Keenan and his inner circle. CW 18 was employed by Apache as a Senior Drilling Engineer from August 2014 until March 2020. She originally worked in the Houston office, but

was reassigned to San Antonio where she was responsible for drilling new wells at Alpine High. During these daily meetings, the San Antonio Region Operations Manager, Greg McDaniel, provided detailed metrics on the prior day's production. CW 18 explained that "some of the production was falling short" and "[a]ny numbers that I ever heard from production were not very good." By 2018, Alpine High production data was no longer discussed in these daily meetings – "production was then kept quiet." The Daily Operational Meeting continued, but focused only on drilling and completions, not production.

143.    Former Apache employees rejected the notion that the internal secrecy surrounding Alpine High data was justified by concerns about competitors. For example, CW 4 emphatically rejected this purported justification for maintaining the secrecy of Alpine High data, stating it was "complete bull." She explained the secrecy continued long after the Company had already leased all of the acreage required in the Alpine High play. She noted "they had the entire place all leased up. There was no chance for competition, or need for secrecy."

144.    The secrecy in which Christmann shrouded Keenan's San Antonio office and its Alpine High data was completely antithetical to Apache's established practices and procedures. In internally walling-off Alpine High data, Christmann circumvented numerous standard procedures at Apache and industrywide for evaluating any new play.

145.    *First*, Defendants refused to subject Alpine High to a "Rose Risk Analysis." Apache, like most E&P companies, used a Rose Risk Analysis (named after Professor Peter R. Rose, who defined the analysis) early in the exploration process to determine the probability of success of a given project. CW 10 confirmed that, under established Company policies, any exploration play at Apache was supposed to go through a Rose Risk Analysis. During his tenure as the Chief of Staff to former Apache Chief Operating Officer Rod Eichler, CW 10 confirmed

that she was involved in many Rose Risk Analyses.  CW 10 stated this "was always the process" and it typically began internally "whenever an asset team formulated an idea and they were looking for money."  For example, when an asset team such as the San Antonio office needed money to acquire acreage for a play, the asset team would submit a Rose Risk Analysis, which involved the asset team providing test, seismic and fluid data.  CW 10 confirmed that she never saw a Rose Risk Analysis conducted on Alpine High, because Apache executives "were worried about an objective assessment."[6]  CW 10 stated that Rose Risk Analyses were normally performed regardless of any external confidentiality concerns about an exploration play, such that a desire to shield Alpine High from competitors would not have been a reason not to perform such an analysis.  As a scientist, CW 10 argued that the failure to subject Alpine High to the Rose Risk Analysis "*violated every step of the scientific method*."

146.  *Second*, Defendants refused to allow Alpine High to be subjected to customary peer review processes that all other oil and gas plays were required to be subjected to in the normal course of Apache's operations.  Specifically, as part of standard Company practice, after the Rose Review Analysis of a play, all exploration plays were subjected to internal peer review processes. Numerous former employees confirm this was a critical Company practice.

147.  For example, CW 10 reported that the approximately ten Apache business units from around the world each participated in a quarterly "peer review."  The "peer review" consisted of the business unit executive, including development and exploration executives, presenting on all assets and financial information for the project for review by the other business units.  The peer review process was intended to allow people within the Company to provide a "risk assessment"

---

[6] Although CW 10 left Apache in 2015, before the Alpine High play was announced, she explained that the play should have already been subject to a Rose Risk Analysis because the Company had already leased 182,000 acres by the second half of 2015.  Indeed, according to CW 10, the Rose Risk Analysis should have begun even before Apache started acquiring the acreage.

of each project. When a given peer review was complete, executives provided a green, yellow or red light on the project. CW 10 recalled how, as a Vice President of Midland office prior to the Class Period, Defendant Christmann himself hosted a number of peer reviews of Midland operations. According to CW 4, Apache regional offices *other* than San Antonio remained subject to peer reviews throughout the Class Period, but San Antonio *did not*.

148.    CW 6 confirmed that a peer review of Alpine High "*never happened*," as did CW 8. CW 6 elaborated that Keenan "refused to do any peer review or put their work before a group," but instead "*went directly to the CEO and the Board of Directors*." According to CW 16, Keenan told Defendant Christmann that there was nobody in the Company that was qualified to peer review Keenan, and, as a result, CW 16 recounted, Keenan was the only executive at Apache that could withhold data and not get fired. CW 6 reported that Keenan threatened to quit if anyone within Apache conducted a peer review of his work. Accordingly, Defendants Sullivan and Christmann "made that call," that Alpine High would not be subject to peer review.

149.    CW 10 confirmed that senior Apache executives, including the CEO and COO, routinely attended the Rose Risk Analysis and peer review meetings. CW 10 described the lack of internal review of Alpine High as unethical, noting how she and her staff had "no ability to provide objective, responsible, technical input on what they [meaning the San Antonio office] were doing. That environment led to a huge miscalculation about Alpine High, what it really was versus how it was represented."

150.    Third, after Keenan's arrival, Defendants abandoned other basic and fundamental information sharing and oversight practices for Alpine High. For example, CW 11 explained that his team of geological modelers in the Corporate Reservoir Engineering group would typically work on any asset within the Company. The geologic models CW 11's team created went to

reservoir engineers to run flow simulations to predict flow capacity and movement of fluids in a reservoir. As with a multitude of other former employees, CW 11's team was "not able to look at Alpine High's data at all or do any type of study on it."

151.   CW 10—Apache's former Chief of Staff to the COO—said that even she was denied access to Alpine High data, and emphasized that the Alpine High secrecy "was completely counter to how [Apache] operated." CW 5 similarly explained that "everything they did from day one [of the opening of the San Antonio office] was completely off-limits to anyone else in the Company." Other than Alpine High, according to CW 5, Apache "was very much open – there was a trust there." As a result, the lockdown of the Alpine High data "*was a poison to the culture of Apache*."

152.   Further, Keenan's San Antonio team was accorded special treatment in regular internal meetings. For example, in quarterly business review meetings of Apache's management from 2016 to early 2019, Christmann routinely allowed Keenan and the San Antonio team to make presentations about Alpine High that included less information than the presentations of the other units. Where other units provided technically-vetted, data-intensive reports, Keenan's presentations were superficial, and did not include substantial supporting data. In one instance, in a July 2018 quarterly business review meeting, leaders of Apache's various corporate and regional divisions gathered, and presented results and projections regarding their respective business units. Keenan's presentation regarding Alpine High conspicuously did not provide the data or support that was supplied, as a rule, in the reports concerning other business units. Certain Apache executives pressed Keenan in the meeting to substantiate and explain the assertions in his presentation, but he resisted and declined to do so. Christmann sat by during this exchange, and did not require Keenan to share the information and support that the other executives had pressed

for, and that all other business units had provided.  Christmann thus blessed a reporting and data-sharing structure at Apache in which Alpine High data was accessible only to himself, Keenan, and Keenan's team, but was not subjected to the same peer review and vetting that data from all other parts of Apache underwent.

153.     The lack of internal transparency led employees to try to scrutinize every aspect of Alpine High, including the science employed and Defendants' bold public statements.  This began even before the Class Period.  For example, CW 7, the former Director of Exploration and Production Technology, explained that Defendant Christmann gave Keenan permission to use outdated seismic testing technology at Alpine High.  CW 7 "had some world class seismic acquisition guys on my team, and they could have gotten better data [at Alpine High] had they talked to my guys about it."  "But Keenan was allowed to shoot seismic the way he wanted."  CW 5, a Geologist, illuminated this point, explaining that, when acquiring seismic data for Alpine High, Keenan insisted upon 24-fold for imaging quality.  But that had not been the standard for a decade, as the true standard was 256-fold.  In other words, Keenan could have had 10 times better data for the same or less money.  These former employees suspected Keenan insisted upon lower quality technology so he could fudge the data.  CW 6, the Reservoir Stimulation Lead, confirmed Keenan refused the service of Houston seismic team because Keenan did not want any outside review of his work.

154.     Other employees questioned the models used by Keenan.  CW 4 was a geologist responsible for the Woodford formation outside of Alpine High.  She explained that "the Woodford does not have storage, it's all clay, it's too small,"—i.e., it did not have the kind of porous rock that would hold oil, whereas a good oil play "should have rock like a sponge."  CW 4 summed up

what investors only found out too late, Alpine High was "***smaller than any other shale resource play out there***."

155.    Even high-ranking employees questioned Alpine High and brought their concerns to Keenan.  For example, CW 7—a PhD geophysicist and petrophysicist with 25 years of experience in the energy industry, and a senior director who reported directly to several of CEO Christmann's direct reports—"felt there were a lot of technical issues at Alpine High" and was "***convinced that the [Alpine High reserves] data was distorted.***"  According to CW 7, Apache executives "were trying to make Christmann aware of these things.  I had heard that there were some pretty fierce arguments on the 14th floor"—the home of Apache C-level executive's offices.

156.    Employees, such as CW 11, the Geologist in the CRE Group, reported that "it was always a question of what was going on Alpine High.  ***No one could understand why we were spending so much money on the play***."

157.    CW 13, the San Antonio Control Center Supervisor, described how the Company was having trouble producing enough rich gas to meet its NGL minimum volume commitments— i.e., agreements to furnish a certain amount of NGLs in exchange for access to takeaway infrastructure—delivering only about 50% of what the Company had committed to provide.  In no uncertain terms, CW 13 stated bluntly, "***I don't think that people were really reporting what was really happening operationally***."  For example, CW 13 reported that the monthly "field projection" for Alpine High total production was 500 MMBTU (million British Thermal Units), but Apache "never got close," instead most months producing "at best" 350 MMBTU.

158.    According to CW 19, by early 2018, at the latest, it was obvious to everyone at Alpine High that the play did not have as much oil as the Company projected to investors. According to CW 19, who was employed by Apache as a Drilling Supervisor in the San Antonio

office from July 2015 until April 2020, drilled over 30 wells at Alpine High, and worked on well sites including Redwood, Blackhawk and Mont Blanc, "[Y]ou could tell from the equipment on the pads." For example, CW 19 highlighted how when she arrived, the rigs at Alpine High did not have any large tank batteries, which are tanks used to hold oil. Based on her experience in Alpine High, CW 19 recalled "*I never had an oil kick, but always had a gas kick*."

159.   As high-ranking Apache executives "raised questions" about Alpine High, rather than address the questions and subject the play to scrutiny, Defendants simply eliminated any resistance. This led to an exodus of Apache employees, both before and during the Class Period. According to CW 10, the Chief of Staff to the COO, in the 18-month period following Keenan's arrival, "*over a dozen Vice Presidents*" that "raised concerns" about Alpine High were either *fired* or asked to take an *early retirement*. CW 6 recounted that Keenan's arrival led to "*very talented people leaving the Company in droves.*"

160.   One notable example was the firing of Executive Vice President and Chief Operating Officer, International Tom Voytovich in November 2015. In mid-2015, Voytovich was building a case against Alpine High. According to CW 7, Voytovich saw "the inside scoop" on Alpine High and was very frustrated. CW 6 was questioned as part of the Voytovich Alpine High review. Weeks later, during the Annual Technical Forum at the Houstonian hotel, Voytovich foreshadowed his termination, telling CW 5 "there were going to be some changes." As confirmed by multiple former Apache employees, Voytovich was fired for confronting Defendants about Alpine High. CW 5 explained that in October 2015, Voytovich "called out Keenan" on Alpine High. CW 20 said that Voytovich was "one of the first people to warn [Defendant] Christmann about Alpine [High]." CW 20 was employed by Apache for over 20 years as a Geologist in the Midland office, serving through 2019. CW 6 explained in simple terms, "*Tom started looking*

*into it and just like everyone, he simply disappeared*."

161.    Indeed, 2015 saw incredible turnover within the ranks of Apache executive management.  In the words of CW 6, Apache "***systematically … got rid of everyone***" who dared question Keenan.  CW 6 described this turnover as "***carnage***," and pointed to two specific examples: former Apache Vice President of Operations Tom Hallman being "***run off***" in 2015 for inquiring about Alpine High, and former Apache Executive Vice President, Chief Technology Officer Mike Bahorich being pushed out in 2015 over a "***conflict of power***" with Keenan.

162.    Defendants continued their intolerance of any dissent regarding Alpine High throughout the Class Period.  As CW 20 described, people who voiced objections "***were told, you're either on the bus or you're off this bus***," and Defendants followed through with their threats.  CW 7, the Director of Exploration and Production Technology, recounted that she and two other high-ranking employees had each tried to confront Keenan over Alpine High, and that CW 7 faced retaliation and ultimately termination for doing so.  Specifically, during the Class Period, CW 7 (Director of Exploration and Production Technology), Senior Petrophysical Advisor Don Kilgore, and Vice President of Engineering Technical Services Lucian Wray each separately confronted Keenan over the assumptions Keenan employed at Alpine High.  CW 7 reported her relationship with Keenan turned "***pretty ugly***" after attempting to gather Alpine High information.  By 2017, CW 7 and Kilgore tried to talk sense to Keenan and other executives about the Alpine High petrophysics.

163.    CW 21, a petrophysicist, confirmed the meeting between Keenan, CW 7 and Kilgore took place in 2017.  CW 21 was employed by Apache from June 2017 until March 2020 as a petrophysicist in the San Antonio office, where her office was next to Keenan's. CW 21 reported that Kilgore told Keenan he was "***spending money at Alpine High like a drunken fucking***

*sailor and that we were drawing a lot of water*."  Kilgore relayed these conversations to CW 21, but said that Keenan didn't want to listen.  Following these confrontations, CW 7 was prohibited from stepping foot in the San Antonio office, and in September 2018, Defendant Christmann and Keenan fired CW 7.

164.    Wray, who CW 20 explained was responsible for getting answers from Alpine High, similarly faced retaliation for questioning Alpine High.  According to CW 20, within thirty minutes of confronting Keenan, Wray was chewed out in Defendant Christmann's office.  CW 7 and Wray were eventually pushed out of Apache the same day in September 2018.  The silencing of dissent reached every corner of Apache, and employees at all levels understood they were not to question Alpine High.  CW 10 explained "*that was the culture – you either line up or you are off the team*."

### C.    The San Antonio Office Secretly Manipulated Alpine High Data And Engaged In Other Desperate Measures In An Attempt To Boost Production

165.    Despite the internal secrecy surrounding Alpine High operations, Apache employees gradually began to discover the truth, including that the Company went to great lengths to manipulate Alpine High production results in order to give the appearance of a successful oil and wet gas operation.

166.    The internal questioning of Alpine High data, as well as the data obfuscation and manipulation, continued throughout the Class Period.  For example, CW 13, who was tasked with ensuring well production, pipeline and market delivery optimization for Alpine High, stated that the San Antonio office had a big scramble before Apache earnings calls, that the results presented to investors were "*absolutely*" doctored up and that when the Company provided Alpine High results, it was a case of "*here's the results, but they weren't [the real results]*."

167.    Defendants' scheme included obfuscating data from the Apache Corporate

Reservoir Engineering group.  CW 20, a long time Apache geologist, stated that the San Antonio office was not giving accurate data to the Apache CRE team.  Based on her conversations with members of the Apache CRE group, including current Apache Reservoir Technician Melissa Radke, CW 20 made clear that the San Antonio group was not only "obstructing the gathering of any information regarding well performance or reserves for Alpine High," but was also "covering up some stuff."

168.    Former engineers from the Company's San Antonio office have confirmed that Apache in fact deliberately inflated its "typical well" assumptions and type curves beyond any justifiable reality, averring that a handful of select employees in San Antonio's Reservoir Engineer Group, who answered only to Keenan and Christmann, were engaging in pervasive data manipulation.

169.    CW 14, who worked as a completions engineer in the San Antonio office beginning in March 2017, detailed how the San Antonio office systematically inflated the Alpine High type curves so that Apache could make bold and unsupported claims about Alpine High.  Specifically, a significant part of CW 14's role was to provide detailed well-level production data and future production estimates, once a well was completed, to the Reservoir Engineering Group within the San Antonio office, which was in turn tasked with creating type curves for Alpine High.  However, CW 14 recalled that the Reservoir Engineering Group would simply adjust the data upwards without clear justification, such that, she said, "*overnight*" the type curve "*shifted up by 30%*," in what she described as an across-the-board practice of "*enhancement*" of the completions data she and her colleagues provided to the group.  This not only led to unrealistic assumptions about the amount wells would produce, but about how "economical" the wells would be as a result.  CW 14 questioned where these "enhancements" were coming from, but said that Keenan and his group

70

kept their data inputs "close to the chest," refusing to share them with anyone other than Apache senior leadership.

170.    CW 14 recalled that the type curves at Alpine High were so blatantly and systematically inflated that even Alpine High's best performing wells could not come close to matching the type curve—which was supposed to merely represent typical production; as CW 14 put it, the "type curve would be better than the best performing wells."  For example, in an area of Alpine High known as Redwood, CW 14 recalled that there were two well pads, each with 12 wells, or a total of 24 wells.  Yet the type curve created for Redwood was "better than all 24 wells [actually] performed."  According to CW 14, it was thus clear to her that "across the board" at Alpine High, production estimates were "***fudged upwards***."  Consequently, CW 14 specifically recalled reviewing Defendants' September 7, 2016 investor presentation announcing Alpine High and realizing that "***what they showed at Barclays was not consistent with the production results at the time***."

171.    CW 8, who worked as a production engineer in the San Antonio office, similarly realized that the Alpine High type curves were inflated.  As a production engineer, CW 8 was expected to make sure that actual production from wells matched the Company's type curves, but said that she and other production engineers "were seeing that we couldn't hit (the type curves) most of the time," and that "it was rare" when one of the wells "performed up to the type curve." CW 8 explained that her team attempted to get the type curve data from the San Antonio Reservoir Engineering team in order to understand where these seemingly unrealistic assumptions were coming from, but were denied access to the data.  CW 8 said that the San Antonio team was "***absolutely***" inflating the type curves.

172.    As the Class Period wore on, and Defendants could not meet their brazenly

manipulated production targets, Defendants became increasingly desperate to boost production at any cost. One especially desperate measure was a $100 million scheme known as "Project Phoenix," which involved attempting to produce oil by injecting NGLs into the ground at the Company's Blackfoot well pad. CW 22, an engineering technician who worked on Alpine High, reported that, immediately after the Company completed the Blackfoot well development in 2018, the well pad was performing poorly. CW 22 was employed by Apache as an Engineering Technician II from February 2017 until March 2020. She was based in the San Antonio office and worked on the Alpine High water management team. According to CW 22, Keenan "immediately saw that the production at the Blackfoot lease was not as expected and did not have the gains that they expected with the cubed development." By mid-2018, Apache implemented "Project Phoenix," which was designed to improve production in certain reservoirs and wells at Blackfoot. Despite "Project Phoenix" coming with an extraordinary $100 million price tag, CW 22 described the entire project as closely guarded, considered "hush hush," and that permission was needed before anyone in the San Antonio office could access the Project Phoenix database. CW 22 stated, "this was a case where only those who needed to know could get access to the information" and she estimated that only 10-15% of Apache employees in the San Antonio office were even aware of Project Phoenix.[7]

173.    CW 13 was familiar with Project Phoenix, which she described as an enhanced oil recovery project. She explained the project involved injecting NGL into a well at a high rate of

---

[7] For example, despite being a production specialist for San Antonio responsible for Alpine High well optimization – which would normally make Project Phoenix directly within her purview – CW 8 only heard about the project. CW 8 explained that Reservoir Group Manager Pieprzica was in charge of Project Phoenix, and the project required a production engineer. Pieprzica asked a production engineer within CW 8's group to work on Project Phoenix, but mandated that the production engineer sign a Non-Disclosure Agreement. CW 8 was stunned by this request, stating that he wouldn't let that happen, and as a result, Pieprzica was forced to employ a completions engineer in the role of production engineer on Project Phoenix. CW 8 did not have access to the secretive Project Phoenix.

pressure to aggravate the shale, in hopes it would produce oil.  The Alpine High production superintendent complained to CW 13 that Project Phoenix was not successful and losing money because Apache was not even able to recover the NGL injected into the well.  Due to the high cost of Project Phoenix, the Individual Defendants were likely aware of the project.

174.    CW 14, a Completions Engineer working in the field at Alpine High, similarly described Project Phoenix as a speculative process involving injecting NGLs ***back*** into the reservoir, through a completed well, in an effort to increase the well's productivity.  Emphasizing the classified nature of Project Phoenix, CW 14 explained the Company employed guards 24 hours a day / 7 days a week at the Blackfoot well-site, and had set up gates and LNG tanks around the well pads to block the view of where the NGLs was being re-injected.

### D.      Defendants Concealed Alpine High's Horrendous Performance From Investors By Consistently Flouting Regulatory Reporting Requirements

175.    Throughout the Class Period, Apache persistently flouted regulatory reporting requirements governing well permitting, completion, and production in order to hide the truth from investors about Alpine High.  Apache's deficient, chronically late (often by years) reporting for Alpine High was widespread, systemic, and pervasive, and resulted in dozens of warnings from the State of Texas.

176.    The RRC is the primary oil and gas industry regulator in Texas, with regulatory authority encompassing the exploration, production, and transportation of oil, natural gas liquids, and natural gas.  The RRC's rules provide a comprehensive regulatory framework for, *inter alia*, the issuance of drilling permits for oil and gas wells in Texas; the collection and maintenance of well completion and production reports, well maps, and other RRC required forms; field inspections, testing programs and monitoring industry activities in the field; and the enforcement of RRC rules.

177.    Apache, like any other E&P company operating in Texas, was required to file a well completion report within 90 days of a well's completion.  Upon completion, Apache was required to classify the well initially as either an oil well (reported on Form W-2) or a completed gas well (reported on Form G-1).  Second, Apache was required to report monthly production from the well, with oil production reported in barrels (BBLs) and gas is reported in thousand cubic feet (MCF).  For classification purposes, RRC rules required Apache to classify a well as an oil well if its Gas/Oil Ratio (GOR) ratio was 3,000 cf/bbl or less, and a gas well if its GOR was above 3,000 cf/bbl.  For both types of wells, reporting is inclusive of NGLs or other wet gas components, which RRC rules do not require operators to separately break out.

178.    The initial classification of a well as an "oil" well or a "gas" well dictates how an operator reports production with the RRC.  If a well is classified as an oil well, it is assigned to an existing lease number and its production statistics are *combined with all other wells* on the lease number, i.e., a separate report is not required for each oil well.  Accordingly, the RRC's reporting rules do not allow the public to verify the performance of individual oil wells. In contrast, RRC rules require operators to report production for each individual "gas" well using assigned wellbore numbers, i.e., the well's name.

179.    Operators are, in extremely limited situations, permitted to file a separate type of monthly production report known as "pending reports."  Specifically, RRC rules allow operators to file production on pending reports only if the lease on which the oil well is located has not yet been assigned an official RRC lease/ID number.  These so-called "pending reports" are maintained by the RRC in a separate database, and locating such reports is extremely difficult for members of the public.  However, once an RRC lease/ID number had been assigned, RRC rules require an operator to cease filing pending reports and contact the RRC to alert its Production Audit team of

the need to move the production report from pending to accepted with a newly assigned ID. Similarly, for a gas well, once the well is completed, RRC rules require an operator to cease filing pending reports and contact the RRC to inform it of the need to move the production report from pending to accepted with a newly assigned wellbore number.

180.    Apache flagrantly violated and exploited each of these rules (and many more) as part of its scheme to conceal Alpine High's poor performance and prospects from regulators and investors.  Consequently, during the Class Period, Apache received at least 65 "severance" letters—notices of non-compliance—from the RRC relating to deficient reporting for operations at Alpine High.  First, Apache failed to timely report dozens of wells that had been completed at various locations across Alpine High.  Apache hid these "ghost wells" by drilling wells to which it did not assign a lease number and for which it did not file a completion report with the RRC.  Significantly, for nearly the first *two years* of the Class Period, Apache did not report a *single completion report* for any of the over 150 wells it completed during that period to the RRC.

181.    By failing to report dozens of completed wells in violation of regulatory requirements, Apache was able to hide dozens of dry holes and weak performing wells.  Examples For example, the Redwood 1P, which was not associated with its API number in any of Apache's reports to the RRC, and was reported under a lease with two different names.  Because Apache did not file a completion report for the Redwood 1P well with the RRC until October 2018—more than two years after its actual completion date—its production was left on pending reports well into 2018.

182.    Similarly, Apache left the Mont Blanc 2H—one of the two "Successful Oil Tests" announced at the Barclays Conference in September 2016—on a "pending report" for nearly two years.  Lead Plaintiffs' forensic analysis revealed that by June 2017, the "successful" Mont Blanc

2H (renamed the 401AH) had produced a total of 36,928 barrels of oil and 137,305 mcf of gas – an absolutely disastrous first 12 months' performance indicating neither oil nor gas production were economic.

183.     Apache also deliberately misclassified numerous "gas" wells as "oil" wells, which allowed the Company to commingle production for all such wells on a given lease, deliberately obscuring the performance of individual wells.  For example, Apache initially granted Mont Blanc 3H a five digit "oil lease number," but then changed it to a six digit "gas lease number."  The same misclassification issue permeated the Mont Blanc pad, since Apache initially reported all Mont Blanc wells as "oil" wells under oil leases and commingling their production (which, if disaggregated, would have showed production below Apache's "low-end" total on a per-well basis), and then subsequently either reclassified these wells as "gas" wells or left them on oil leases but reported *zero* oil production.

184.     Former Apache employees confirmed the Company's pervasive failure to comply with basic RRC reporting requirements.  For example, CW 23 was employed by Apache from July 2017 until March 2019 as a Senior Oil and Gas Regulatory Analyst stationed in San Antonio.  She was responsible for Alpine High regulatory reporting, including submitting Alpine High completion reports to the RRC, and reported to Regulatory Supervisor, Belinda Wolf.  Prior to joining Apache, CW 23, Ms. Wolf, and their colleague James Roger Arbuckle, all worked at the RRC.  CW 23 described how her team had "a lot of problems" getting timely, complete, and accurate data from Alpine High's production team.  As a result, CW 23's team was unable to timely file completion reports to the RRC—an issue she characterized as a "*huge problem*."  CW 23 attributed this "huge problem" to the withholding of information by Alpine High's Reservoir group, which, as corroborated by other former employees, was siloed from the rest of the Company

and required executive management's approval to release data from the San Antonio office to CW 23's regulatory compliance team. According to CW 23, "***The regulatory team was at the mercy of the executives to be given data for regulatory filings. It was known and clear that we were lacking data and information***."

185.    CW 24 was employed by Apache from late 2016 until Q1 2020 as a Regulatory Technician. She worked in San Antonio and was responsible for, among other things, filing drilling permits and completion reports with the RRC. CW 24 reported to Regulatory Manager Randy Early and later Region Health, Safety, Environmental and Regulatory Manager, Marcus Bruton. CW 24 similarly described how she was "instructed" not to file anything with the RRC until told to do so. Consequently, CW 24 did not file any completion reports for Alpine High until approximately mid-2018, and even then she had difficulty accessing data necessary to file completion reports.

186.    In addition to not getting timely and accurate well completion data, CW 23 described how it was always a challenge for the regulatory team to get production data for Alpine High. She stated that Randy Earley, Apache's former Regulatory Manager in San Antonio, who reported to VP of Operations Navneet Behl, was repeatedly stymied from getting production data from Alpine High's reservoir engineers. According to CW 23, "It was an ongoing cycle where we could not get the information" and as a result of the lack of production data from the Reservoir Group, the Regulatory Team "***couldn't connect the dots***." CW 23 recalled that her boss would talk to the Reservoir Group about the lack of data, "***but we never got a concrete response***."

187.    CW 23 described how the regulatory team was forced to pull data from several different places and data was often missing, including critical information concerning gas/oil ratios which, as discussed above, directly impacted how production data was reported to the RRC. CW

23 commented that "[s]ome of the data we received was questionable" and pointed to the gas/oil ratio specifically as "*a huge point of contention*." CW 23 confirmed that "*some of the wells were labeled as oil when the ratio was showing that they were gas wells*." CW 23 described a variety of factors indicating that wells labelled as oil by Alpine High's production team were, in fact, gas wells. For example, CW 23 stated that the production team's interpretation of first flow was, in certain circumstances, diametrically opposed to that of the regulatory team. In this regard, CW 23 commented that her boss, who "had 30 years of experience" in the industry, met with the production team and provided them with evidence that their first flow dates were incorrect.

188.    After years of providing a dramatically false impression of Alpine High in its public statements to investors, beginning about August 2018 and continuing through the end of the Class Period, Apache began filing *some* long-overdue completion reports. In addition, Apache began reclassifying (or newly classifying) dozens of wells that the Company previously reported as "oil" wells to "gas" wells. For example, on August 21, 2018, Apache was ordered by the RRC to reclassify four wells as gas wells—all of which had been highlighted at the Barclays conference as "strong" or "successful" oil wells—due to overproduction of gas beyond allowable levels, reflecting the shell game of misleading, improper, and severely delayed filings Apache made during the Class Period, which left investors hopelessly unable to glean even basic information about Apache's production at Alpine High. The public—just like the professionals at Apache who were kept from Apache's Alpine High data—was thus entirely dependent on Defendants' own announcements and statements in order to learn information about production, drilling activities and progress at Alpine High.

189.    In sum, Apache's systematic flouting of basic RRC reporting requirements prevented investors from conducting due diligence using public sources, and was a key part of

Defendants' ability to perpetuate their fraud.

## VII.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS

190.    Throughout the Class Period, Defendants issued numerous materially false or misleading statements of fact regarding Alpine High in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  These misstatements created in the market an unrealistically positive assessment of Apache's prospects at Alpine High and, consequently, of its business prospects as a whole, thus artificially inflating the Company's stock price.

### A.    September 7, 2016 Alpine High Announcement

191.    On September 7, 2016, Apache issued a press release before market open entitled, "Apache Corporation Discovers Significant New Resource Play in Southern Delaware Basin."  In the press release, Apache announced that "after more than two years of extensive geologic and geophysical work, methodical acreage accumulation, and strategic testing and delineation drilling, the company can confirm the discovery of a significant new resource play, the 'Alpine High.'" The press release touted Alpine High as an immense oil and wet gas field, holding an estimated "3 billion barrels of oil" and "75 trillion cubic feet (Tcf) of rich gas" in the Barnett and Woodford formations alone, as well as "significant oil potential in the shallower Pennsylvanian, Bone Springs and Wolfcamp formations."  The Company claimed a huge number of profitable future drilling sites, stating "2,000 to more than 3,000 future drilling locations have been identified in the Woodford and Barnett formations alone."  Defendant Christmann hailed the Alpine High discovery as "an immense resource that we believe will deliver significant value for our shareholders for many years."  Christmann further proclaimed that "[w]e are incredibly excited about the Alpine High play and its large inventory of repeatable, high-value drilling opportunities."

192.    On September 7, 2016, Apache also presented at the Barclays CEO Energy-Power

Conference (the "Barclays Conference"), during which Defendants touted Alpine High as a "world-class resource play." Defendant Christmann again underscored that, for just two of Alpine High's five formations, the "conservative" estimates for the field's resources were massive, stating: "The estimated resource in place for the Barnett and Woodford only, and this is a conservative number, is 75 Tcf of really rich gas, over 1,300 BTU and 3 billion barrels of oil." Christmann then compared Alpine High to some of the largest and most profitable shale plays in U.S. history: "I've said it's world class. This would compare it versus three – what other people would view as world-class resources, the Woodford SCOOP, the Marcellus, and the Eagle Ford… It stacks up as well as anything." Christmann stated that even "just one landing zone" (i.e., layer of rock) would "give you 2,000 to 3,000 plus [drilling] locations."

193. Apache also repeated similar claims in slides accompanying the Barclays presentation, including an "Alpine High Key Highlights" slide that touted "Estimated resource in place (Barnett and Woodford only): 75 Tcf of rich gas (~1,300 BTU) and 3 billion barrels of oil," "2,000-3,000+ Locations," and "low cost, highly economic locations in the wet gas play."

194. During the Barclays Conference, Christmann further asserted that in addition to oil, Alpine High was a "highly economic" wet gas play as well, which would differentiate the play from its competition: "What's going to make this play really stand out is the quality, the thickness and the cost structure, a very, very highly economic wet gas play." Furthermore, Christmann represented to investors that the play would produce highly profitable results in oil and wet gas even at very low commodity prices. Indeed, Christmann explained that, after factoring all possible costs ("fully burdened" economics), "the rates of return…go off the charts"—and that even at $40/barrel oil and $2.50 gas, "the returns are still significantly high," which "just gets back to how prolific [Alpine High] is." Christmann stated that these "tremendous economics" made for a play

where there was a "very wet gas resource where you virtually get the [dry] gas for free."

195.    The statements in ¶¶ 191-94 were materially false or misleading when made. *First*, as alleged further above at §IV-C, by the time of these statements, Apache had already *twice concluded* that Alpine High did *not* contain meaningful quantities of economically recoverable oil (let alone billions of barrels), and that it was primarily an uneconomical *dry* gas play as opposed to more valuable "rich" (wet) gas.  Indeed, the respective leaders of two different Apache exploration teams who had each undertaken two separate, extensive explorations in the Alpine High region in 2012 and 2014 independently concluded that Alpine High was "all gas," "wasn't an oil play," "too gassy," and with "not enough yield," and *Defendant Christmann himself rejected the play* as "too gassy."  Further, as alleged in §IV-D, in the subsequent runup to the announcement of Alpine High during 2015 and 2016, Keenan's team repeatedly and expressly warned Christmann a *third time* that Apache lacked the data to back up his planned announcement, and would need at least nine more months of data.  Moreover, as alleged further above at §IV-I, Defendants' 2019 Project Neptune review of Alpine High confirmed that Alpine High's data had showed *from the outset* that essentially all of the wells drilled since 2016 severely underperformed Apache's publicly announced descriptions, such that only a *small fraction* of the thousands of drilling locations Apache publicly hyped were even *theoretically* viable, and even then only if highly unlikely pricing and contractual scenarios were assumed.

196.    *Second*, as alleged further above at § VI-A, Lead Plaintiffs' forensic analysis shows that, during the entire Class Period, the total amount of oil produced by Apache across the entire Alpine High play (i.e., in all five of its formations) amounted to only approximately 2.9 million barrels—i.e., less than *1%* of the 3 billion barrels of oil that Defendants told investors were "in place" in the Woodford and Barnett formations alone, and produced less than 1.8 million barrels

81

of oil over the entire Class Period, about **0.4%** of the amount Defendants told investors that they "conservative[ly]" expected to recover from those two formations. Indeed, Lead Plaintiffs' forensic analysis shows that **over one quarter** of the total wells Defendants were drilling at Alpine High were "dry holes" (unproductive wells)—an extraordinarily high and almost unheard-of rate for any successful oil or wet gas play.

197.    Defendant Christmann further told investors during the Barclays conference that Alpine High's reservoirs were "predictable" and "consisten[t]" across the entire play—in other words, that investors should expect that Alpine High's early, yet misrepresented, well results would be predictive of the play's overall results.  Specifically, Christmann said that Alpine High had "reservoir consistency, continuity, which is going to lead to very repeatable and predictable drilling results and targets."

198.    The statements in ¶ 197 were materially false or misleading when made for the reasons further set forth at ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic (or "repeatable and predictable") drilling locations.

199.    To assuage investors that Alpine High was indeed viable even though many of Apache's competitors had written off the area as commercially unviable, Christmann insisted that Apache had uncovered the play through intensive, "complex" and proprietary technical work:

> [I]t is just geologically complex, and it took some unraveling and a lot of good unconventional technical work. You had to test perceptions. The perception was that this was uplifted and complex. The reality is it's a stable Paleo high, <u>and it was always in the oil and wet gas window. It's not dry gas</u>. . . .  <u>So it's just a fantastic story, and it took a very unique team doing some very detailed work over a long time to uncover this prize</u>.

200.    Similarly, in response to an analyst question asking, "How much do your peers know about this play," Christmann further insisted that Apache's "very detailed work" had enabled the Company to discover a "hidden diamond in the rough" that competitors had simply missed and knew "very little" about, stating that competitors "<u>know very little…the perception was wrong about this area geologically. And it took some very, very strong individuals working very detailed work over a couple of years to unravel what is a hidden diamond in the rough</u>."  Apache also made similar statements in an accompanying slide titled "Apache's Differentiated View" which claimed that the "Perception" in the industry was that Alpine High was "Dry Gas," whereas the "Reality" was "Wet Gas & Oil."

201.    The statements in ¶¶ 199-200 were materially false or misleading, including for the reasons set forth at ¶¶ 195-96.  In reality, rather than Defendants' "unique team" and extensive technical work revealing that Apache was a "prize" or a "hidden diamond in the rough," the exact opposite was true.  Specifically, by the time of these statements, the respective leaders of two different Apache exploration teams who had undertaken two separate, extensive explorations of the Alpine High region <u>each</u> confirmed that they had independently concluded Alpine High was "all gas," "wasn't an oil play," "too gassy," and with "not enough yield," and ***Defendant Christmann himself rejected the play*** as "too gassy."  Similarly, in the months leading up to the

announcement of Alpine High during 2015 and 2016, Keenan's "unique team" repeatedly and expressly warned Christmann that Apache lacked the data to back up his planned announcement, and would need at least nine more months of data to determine whether Alpine High was economically viable. Moreover, Defendants' 2019 Project Neptune review of Alpine High confirmed that Alpine High's data had showed *from the outset* that essentially all of the wells drilled since 2016 severely underperformed Apache's publicly announced descriptions, and that as a result it was an extraordinarily dubious proposition for Alpine High to ever be economically viable.

202.    Apache's September 7, 2016 Barclays presentation also highlighted purported "Strong Well Results" and "Successful Oil Tests" from Alpine High that Defendants claimed proved their claims about the Woodford and Barnett formations. Included on the "Strong Well Results" slide was the Weissmies 1H, for which Apache cited 24-hour initial production ("IP") rates of 281 barrels of oil per day and 7.1 million cubic feet of gas, and the Ortler 1H, for which Apache reported 24-hour IP rates of 1.7 million cubic feet of gas. The "Successful Oil Tests" slide feature two wells: the Mont Blanc 2H, for which the slide reported an IP rate of 854 barrels of oil per day, and the Redwood 1P, for which the slide reported a rate of 700 barrels of oil per day. Moreover, Christmann highlighted during his presentation that the Redwood 1P "flowed for over five days" during drilling, and that its production was "flat for over ten days"—i.e., produced at a consistent rate for that entire time period.

203.    Defendants' statements in ¶ 202 were materially false or misleading when made. *First*, as alleged further above at ¶¶ 124-25, rather than exemplars of "Strong Well Results" in the Woodford and Barnett formations, by the time of the September 2016 Barclays presentation, the Weissmies 1H's production had immediately declined to less than half of its initial production,

averaging 113 barrels per day of oil for the rest of June, and by August 2016—the month before Defendants touted the well as "strong"—it had fallen to a miniscule 54 barrels a day. The Weissmies 1H's gas production had similarly already sharply fallen off by more than half of its initial production by this time, dropping from 7.1 million cubic feet to just 3 million per day by August 2016. Similarly, by August 2016, the Ortler 1H had begun to average just 774,000 cubic feet of gas per day, less than half of the 1.7 million cubic feet Defendants had touted. *Second*, as alleged further above at ¶¶ 122-23, rather than being an exemplar of a "Successful Oil Test[]," by August 2016, production at the Mont Blanc 2H had already declined by ***more than 53%*** to just 398 barrels per day, and was averaging no more than 206 barrels per day by September 2016, ***a decline of more than 75%***. And the Redwood 1P was even worse—following its initial test period reported at the Barclays conference, the well ***never produced any further oil***. Indeed, CW 9, the drilling engineer who drilled the Redwood 1P well, said that it produced 900 barrels of oil initially, and then stopped producing any oil within a few days. CW 4 described Apache's highlighting of initial successful well results as tantamount to a "Ponzi scheme." And as CW 14 stated: "[W]hat [Apache] shared at Barclays was not consistent with production results at the time," because a number of the wells Defendants highlighted during the conference as high producers were in truth "bone dry."

204.    On September 21, 2016, Apache gave a presentation at the Johnson Rice Energy Conference, during which it presented slides substantially identical to the "Alpine High Key Highlights" and "Apache's Differentiated View" slides described above at ¶¶ 193 and 200. These statements were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed

quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

205.    Additionally, the September 21, 2016 Johnson Rice Energy Conference presentation contained slides identical to those in the September 7, 2016 Barclays presentation concerning the "Successful Oil Tests"—the Redwood 1P and Mont Blanc 2H—and "Strong Well Results" including the Weissmies 1H and Ortler 1H, as described at ¶ 202.  These statements were materially false or misleading when made for reasons identical to those alleged at ¶ 203, namely, that the production of these wells had already plummeted by the time Defendants touted them.

206.    On September 28, 2016, *Forbes* published an article titled "Apache Corp. Represents The Thorn That America's Oil Frackers Have Stuck In The Side Of OPEC."  The article noted that "Christmann says the field, which they named Alpine High, contains some of the cheapest oil and gas to produce not just in the U.S., but in the world, economic to drill at prices as low as $40 a barrel," and quoted Christmann as saying that "Alpine High will be very difficult to compete with on an economic basis."

207.    Defendants' statements in ¶ 206 were materially false or misleading when made for the reasons alleged in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a

small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

### B.    3Q 2016 Financial Results

208.    On November 3, 2016, Apache held an investor conference call to discuss the Company's third quarter 2016 earnings.  During the call, Christmann highlighted that Alpine High was "an immense resource and a transformational discovery for Apache" that would "drive incremental growth and returns for years to come," and that "[t]he Alpine High is an immense resource and a transformation discovery for Apache."  Christmann provided investors with a detailed explanation of the "5 distinct target formations" that comprised Alpine High, stating "all of which, we believe, will be highly economic."  In reference to the Bone Springs and Wolfcamp formations, Defendants stated that "[t]wo early tests have demonstrated that these formations are oil-productive and offer significant potential at Alpine High."  Christmann also hyped Alpine High's other formations to investors, stating that "Underlying the Bone Springs and Wolfcamp and unique to the Alpine High is a true resource play in the Pennsylvanian Barnett and Woodford formations," which he characterized as "a world-class source rock sequence, up to 1,500 feet thick across our acreage position," adding that, "[b]ased on our appraisal program to date, we anticipate this will become a very large resource play with attractive rates of return and breakeven economics."

209.    Defendant Sullivan made similar statements and went even further, stating that "[a]s expected in a resource play, Alpine High is becoming more predictable. Every well we've drilled has confirmed our model. . . .  We continue to see excellent production performance across this play."

210.    Defendants' statements in ¶¶ 208-09 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

211.    *Moreover*, while Defendants claimed during the November 3, 2016 call that they would find massive amounts of additional oil in the play's other three formations, Lead Plaintiffs' forensic analysis found that over the entire Class Period, Apache produced only approximately 1.1 million barrels of oil from the Wolfcamp formation, 2,500 barrels of oil from the Bone Spring formation, and zero barrels of oil from the Pennsylvanian formation—miniscule amounts that did not come close to supporting any claim of profitability.

212.    On November 18, 2016, Apache gave an investor presentation at the Bank of America/Merrill Lynch Global Energy Conference, and presented slides substantially identical to

the "Alpine High Key Highlights" and "Apache's Differentiated View" slides described above at ¶¶ 193 and 200. Apache's presentation also repeated the "Strong Well Results" and "Successful Oil Tests" slides described in ¶ 202, including the same initial production statistics regarding the wells therein, which included the Mont Blanc 2H, Redwood 1P, Weissmies 1H and Ortler 1H.

213.    Defendants' statements in ¶ 212 on the "Alpine High Key Highlights" and "Apache's Differentiated View" slides were materially false or misleading for the same reasons described in ¶¶ 195-96 and 201. Defendants' statements in the "Strong Well Results" and "Successful Oil Tests" slides were materially false or misleading for the same reasons described in ¶ 203, namely, that these wells' production rates had already plummeted within a short time of their touted "initial production" rates. Moreover, Lead Plaintiffs' forensic analysis based upon information misrepresented, concealed, and obscured by Defendants during the Class Period reveals that, by the time of the November 18, 2016 presentation, the Weissmies 1H's oil and gas production had fallen off to *zero*, and the Ortler 1H's oil and gas production had fallen to insignificant amounts, producing a mere 84 barrels of oil for the entire month of October 2016, thus directly contradicting Defendants' representations to investors.

214.    On January 5, 2017, Apache published a company presentation titled "January Investor Presentation." The presentation contained the same materially false or misleading statements the Defendants made during the September 7, 2016 presentation for the Barclays CEO Energy-Power conference, contained in the "Alpine High Key Highlights," and "Apache's Differentiated View" slides as alleged above at ¶¶ 193 and 200. Apache's January 5, 2017 presentation also made substantially identical claims to those alleged above in ¶ 202 regarding the initial production rates of four previously reported wells: the Redwood 1P, Mont Blanc 2H, Weissmies 1H, and Ortler 1H.

215.    Defendants' statements in ¶ 214 on the "Alpine High Key Highlights" and "Apache's Differentiated View" slides were materially false or misleading when made for the same reasons alleged above in ¶¶ 195-96 and 201.    Additionally, Defendants' statements concerning the Weissmies 1H and Ortler 1H were materially false or misleading when made for the same reasons alleged above in ¶ 203, namely, that these wells' production rates had already plummeted within a short time of their touted "initial production" rates.

### C.    February 14, 2017 Credit Suisse Energy Summit

216.    On February 14, 2017, Apache gave a presentation at the Credit Suisse Energy Summit.  During the conference, Defendant Christmann asserted that the Company had "proven" and "confirmed" that Alpine High was flush with wet gas and oil:

> So what have we confirmed? We have a very extensive play fairway, 60 miles. We have 5 geologic formations, each with multiple targets across a 5,000-foot column. We've now proven that we have a segregated hydrocarbon column anywhere from dry gas to oil and we have it across this whole area. So all we have to do is put the rock in the right window and you're going to get anywhere from dry gas to wet gas to oil."

217.    Christmann again "confirmed" that Alpine High was "a highly economic wet gas play," and concluded his prepared remarks by emphasizing: "Alpine High is just an enormous hydrocarbon system. And we're still just scratching the surface as we work through this. Like most major discoveries, it's getting bigger with more data, which is a big thing and a great thing. We have a highly economic wet gas play … now confirmed across the 55-mile fairway."

218.    Defendants' statements in ¶¶ 216-17 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly

warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations. In reality, Alpine High was <u>never</u> "confirmed," "validated," or "proven" as a "highly economical" oil or wet gas play, nor did Apache have any "incremental data" that showed the play was "getting larger." To the contrary, the only thing that was "confirmed" was that Alpine High was a non-viable dry gas play that would never be commercially successful.

219.    During the Summit, an analyst asked Christmann to provide "just a bit of color on when you expect [Alpine High] to hit free cash flow, et cetera?" In response, Christmann reiterated that the play would be economic and prolific in short order: "The nice thing about this … it doesn't take long with the economics on these wells for them to turn. <u>And what I've said in the past is we're not talking hundreds of millions of cubic feet a day, but we're talking multiple B[illion]s ultimately as you move into the future years</u>," adding that "<u>we'll get there quickly</u>."

220.    Analysts also sought assurances that Alpine High was really an oil play, and one asked "I think the market wants to see this as an oil play … talk through how much data you think you're going to need before you can talk about maybe some—" Before the analyst could finish his question, Christmann responded, "<u>[w]ell, you're going to have a gigantic wet gas field here, okay? We've proven that</u>," and further added, "<u>we will get to the oil and we believe there is a lot there, because it's in the system. We validated it. We have a proven column and it's in the right window</u>."

221.    Defendants' statements in ¶¶ 219-20 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations. Moreover, Lead Plaintiffs' forensic analysis based upon information concealed, misrepresented and obscured by Defendants during the Class Period further confirmed that, during the entire Class Period, the total amount of oil produced by Apache across the entire Alpine High play (i.e., in all five of its formations) amounted to only approximately 2.9 million barrels—i.e., less than *1%* of the 3 billion barrels of oil in place that Defendants told investors were "in place" in the Woodford and Barnett formations alone. Indeed, Lead Plaintiffs' forensic analysis shows that *over one quarter* of the total wells Defendants were drilling at Alpine High were "dry holes" (unproductive wells)—an extraordinarily high and almost unheard-of rate for any successful oil or wet gas play.

222.    Apache's slide presentation at the Credit Suisse Energy Summit also repeated the Company's prior claims regarding the initial production statistics at four previously disclosed wells: the Weissmies 1H, the Ortler 1H, the Mont Blanc 2H, and the Redwood 1P, as described further at ¶ 202. These statements were materially false or misleading for the same reasons alleged

above in ¶ 203, namely, that these wells' production rates had already plummeted within a short time of their touted "initial production" rates.

**D.    4Q 2016 and Full Year 2016 Financial Results**

223.    On February 23, 2017, Apache issued a press release, which was filed with the SEC on Form 8-K, announcing the Company's fourth quarter 2016 and full-year 2016 financial results. Christmann was quoted in the press release stating: "We [] discovered and announced the Alpine High, a sizeable new resource play in the Delaware Basin, which brings significant drilling inventory and puts Apache in one of the most exciting and competitive positions in the industry."

224.    The same day, Defendants held an investor conference call to discuss the Company's financial performance in the fourth quarter 2016 and full year 2016. During the call, in response to analysts' inquiries about "ultimate volumes over time" at Alpine High, Defendant Christmann again emphasized the massive resource volumes Defendants touted for Alpine High, stating: "we're not talking hundreds of millions of cubic feet of gas here a day, we're talking multiple Bcfs, a very rich gas, wet gas, NGLs, and we think there's going to be also a lot of oil to go with it." Christmann further highlighted that Alpine High contained "3,000 confirmed locations" for wet gas, stating: "we gave you some location counts at Barclays. We've come back now and said we've got a minimum of 3,000 confirmed locations in the wet gas window," emphasizing that "location count has increased significantly since last September." Significantly, Christmann reaffirmed that "even in the lower commodity price environment, this play is going to be very economic."

225.    Also on February 23, 2017, Apache filed its 2016 Form 10-K with the SEC. The 2016 Form 10-K similarly claimed that Defendants now expected even more drilling locations at Alpine High than previously announced, stating, "Apache now believes the drilling locations at Alpine High will exceed the 2,000 to 3,000 previously announced."

226.    Defendants' statements in ¶¶ 223-25 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

227.    On March 27, 2017 Apache presented at the Scotia Howard Weil 2017 Energy Conference.  During the Conference, Apache presented a slide titled "What We Have Confirmed At Alpine High" which stated that Apache had "confirmed" that Alpine High was a "highly economic wet gas play with more than 3,000 locations," and that it had "excellent fully-burdened economics," i.e., that it was profitable even when factoring in all infrastructure costs, including both drilling and transport costs.

228.    Defendants' statements in ¶ 227 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High

announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

E.    **1Q 2017 Financial Results**

229.    On May 4, 2017, Apache issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's first quarter 2017 financial results. Christmann is quoted in the press release as stating: "At Alpine High, testing and delineation have continued with strong results that reinforce our confidence in this world-class resource play."

230.    Also on May 4, 2017, Apache held an investor conference call to discuss the Company's first quarter 2017 financial performance. During the call, Christmann reiterated claims that test wells had "proven" Apache's understanding of Alpine High as a "massive hydrocarbon resource," stating:

> [t]he performance of our first batch of test wells at Alpine High was on par with or better than longer-lateral, fully optimized wells in analogous shale resource plays, such as the SCOOP and the Marcellus. … Since our original announcement, we have continued to delineate the play. The test wells drilled to date have proven much of what we anticipated for Alpine High.

231.    Christmann further asserted that "our progress since the initial announcement, 8 months ago, has been exceptional. To date, we have confirmed a highly economic wet gas play with a minimum of 3,000 locations. The economics of the wet gas portion of Alpine High are greatly enhanced by its oil content and the high-quality NGLs demonstrated in many of our test wells to date." Christmann also reiterated that the test wells he had previously announced had only "confirmed" his bold claims: "When we announced Alpine High, we released data on nine test wells. The results of these wells, coupled with the geologic and reservoir evaluation work

completed at that time, confirmed a world-class resource with an estimated 75 Tcf of gas and 3 billion barrels of oil in place in the Woodford and Barnett formations alone."

232.     Defendant Sullivan similarly touted the results from test wells at Alpine, stating "The result[s] we see in our test wells at Alpine High continue to give us confidence that this will be one of the lowest cost wet gas plays in North America."

233.     Defendants' statements in ¶¶ 229-32 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

234.     Moreover, contrary to Defendants' claims that "[t]he results of [their initial test] wells, coupled with the geologic and reservoir evaluation work completed at that time" had "confirmed" their claims about the recoverable oil and gas at Alpine High, several of those initial test wells had already *plummeted* in production by the time Defendants touted them, including the Redwood 1P, Mont Blanc 2H, Weissmies 1H, and Ortler 1H, as set forth further at ¶ 203.

235.     During the 1Q 2017 earnings call, Apache also reported findings from three new wells, two of which were the Chinook 101AH and Blackhawk 5H.  Christmann said that the

Chinook 101AH and Blackhawk 5H had "achieved <u>higher 24-hour oil I[nitial] P[roduction] [rates]</u> <u>and higher oil cuts than any of the wells drilled,</u>" and stated that this "<u>further validates our geologic</u> <u>and thermal maturity models, which predicted that the source rock would produce more oil and</u> <u>higher BTU gas at shallower depths.</u>"  Defendant Sullivan similarly touted these wells, stating that the Chinook 101AH well had "produced at a peak 24-hour rate of approximately . . . 620 barrels of oil," calling it "an excellent result."  Sullivan further highlighted that the Blackhawk 5H had "produced at a peak 24-hour rate of 742 barrels of oil."

236.    Also on May 4, 2017, Apache released investor presentation slides to accompany its conference call.  In the presentation, Apache devoted an entire slide to the Blackhawk 5H, which purportedly had the "Highest Oil Yield To Date in Barnett" with a 24-hour initial production rate of 742 barrels per day, and another slide to the Chinook 101AH, which purportedly had the "[h]ighest oil yield to date for a Woodford target," with 24-hour initial oil production rate of 620 barrels per day.

237.    Defendants' statements in ¶¶ 235-36 about the Blackhawk 5H and Chinook 101AH wells were materially false or misleading when made.  As alleged above in ¶ 126, by the time Defendants made these statements, the Blackhawk 5H's oil production had already fallen sharply throughout April 2017, averaging just 147 barrels per month, and had fallen to *zero* by the time Defendants touted its "oil yield" in May 2017.  Similarly, by April 2017, the Chinook 101AH was averaging just 194 barrels of oil per day, and was producing *no oil* by the time Defendants touted it in May 2017.

238.    On May 5, 2017, Apache filed its Form 10-Q for the first quarter of 2017 ("1Q 2017 10-Q").  The 1Q 2017 10-Q reiterated Defendants' claims about the Blackhawk 5H and Chinook 101AH wells alleged above at ¶¶ 235-36, and represented that the "drilling test results at Alpine

High continue to validate the low-cost, wet gas value of the play." Defendants' statements about the Blackhawk 5H and Chinook 101AH were materially false or misleading when made for the same reasons alleged above in ¶ 237, and Defendants' statements about "drilling test results" continuing to "validate" the economics of the wet gas play were materially false or misleading for the same reasons alleged at ¶¶ 195-96.

239.    On May 11, 2017, Apache held its Annual Shareholder Meeting. During the meeting, Defendant Christmann highlighted Apache's "significant discovery at Alpine High," stating: "It's a field that will deliver incredible value to Apache and its shareholders for many, many years to come." Christmann further stated that "Alpine High brings to us decades of inventory. It puts Apache in one of the most exciting and competitive positions in the industry. Since our announcement last September, we have continued testing and delineation. We continue to see strong results that reinforce our confidence in this world-class resource play." Apache's accompanying slides also again touted "> 3,000 drilling locations" in the Alpine High.

240.    Defendants' statements in ¶ 239 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about

the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

241.    On May 15, 2017, Apache presented at an investor conference sponsored by Societe Generale.  The presentation included slides identical to the ones alleged above at ¶ 236 concerning production statistics for the Chinook 101AH and Blackhawk 5H.  Defendants also repeated the slides alleged above in ¶ 236 concerning wells including the Chinook 101AH and Blackhawk 5H in a May 23, 2017 presentation at the UBS Global Oil and Gas Conference.

242.    Defendants' statements described in ¶ 241 concerning the Chinook 101AH and Blackhawk 5H were materially false or misleading when made for the reasons alleged above at ¶ 237, namely, that the oil production of these wells had already plummeted by the time Defendants touted them.

**F.    2Q 2017 Financial Results**

243.    On August 3, 2017, Apache issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's second quarter 2017 financial results.  The press release noted that Apache had "[c]ompleted its first appraisal wells in the oil window of the Wolfcamp formation at Alpine High, <u>providing further confirmation of an oil play and supporting hundreds of additional drilling locations</u>."

244.    On August 3, 2017, Apache also held an investor conference call to discuss its performance for the second quarter of 2017.  During the call, Defendant Christmann highlighted Alpine High, stating "<u>we continue to be very confident in our more than 3,000 wet gas well location count, which remains highly economic at current or even lower prices</u>."  During the call, Christmann also touted "<u>hundreds of locations in the Wolfcamp so that will be oil locations</u>."

245.    Defendants' statements in ¶¶ 243-44 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not

even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

246.    Moreover, while Defendants specifically touted the Wolfcamp formation as having "hundreds" of oil locations, as alleged above in ¶ 116, Lead Plaintiffs' forensic analysis shows that Apache produced only approximately 1.1 million barrels of oil from the Wolfcamp formation—a meager amount that did not come close to supporting Defendants' claims. Moreover, when oil and gas prices did go "lower" in 2019 and 2020, contrary to its claims that the play would remain "highly economic," Apache was forced to shut down all further drilling and take a multi-billion-dollar write down, as alleged in § V.

**G.    October 9, 2017 Alpine High Update**

247.    On October 9, 2017, Apache posted a pre-recorded update call and web presentation to provide investors with the Company's outlook for 2017 and 2018 and an update of the Company's progress at Alpine High. During the call, Defendant Christmann highlighted the economic prospects at Alpine High, stating: "We have an extremely large wet gas play with over 3,500 highly economic locations," adding that "The economics of this play are driven by the low cost and the tremendous volumes of oil and NGLs."

248.    Defendant Sullivan similarly stated that the Alpine High was "three separate hydrocarbon plays: an extremely large and highly economic wet gas play, a smaller but also

economically compelling dry gas play, and an emerging oil play." Sullivan also specifically claimed that there were "455 million barrels" of recoverable oil across the entire Alpine High play: "The weighted average typical Alpine High wet gas well is estimated to produce 13.3 Bcfe of hydrocarbons, of which 6% is oil. The recoverable oil volume is 130,000 barrels per well and 455 million barrels of oil for the entire project based on 3,500 wet gas locations. This would yield a 13.4 [%] recovery factor on the 3 billion barrels of stated original oil in place." Sullivan also again touted Alpine High's numerous oil drilling locations, stating that, in the Wolfcamp and Bone Springs formations, "[Apache] can safely say that we have at least 500 economic [oil] well locations at this time." Additionally, the slides accompanying the call repeatedly touted a newly increased "Current Location Count of 5,000+."

249. Defendants' statements in ¶¶ 247-48 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations (let alone the newly *increased* count of more than 5,000 locations that Defendants now claimed). Moreover, while Defendants specifically touted their purported hundreds of oil locations in the

Wolfcamp and Bone Springs formations in particular, as alleged above in ¶ 116, Lead Plaintiffs'
forensic analysis shows that Apache produced only approximately 1.1 million barrels of oil from
the Wolfcamp formation, and a mere 2,500 barrels of oil from the Bone Springs formations—
meager amounts that did not come close to supporting the numbers Defendants were touting.
Indeed, rather than having hundreds of viable oil drilling locations across those formations, as
Lead Plaintiffs' forensic analysis confirmed, in truth, Alpine High consisted of an unprecedented
number of "dry holes" that produced *no* reported oil or gas whatsoever—indeed, these "dry holes"
amounted to *over one quarter* of the total wells across the play.

250.    On the October 9, 2017 call, Defendants also introduced new highly specific claims
about the economics of a "typical well" in the "wet gas play" at Alpine High, and how highly
profitable this "typical well" (which it also called a "midrange well") would be, as these wells
would produce anywhere from 9 BCFE to 15 BCFE of hydrocarbons, including substantial
amounts of both wet gas and oil.

251.    Apache's "typical well" claims were materially false or misleading when made. As
shown by Lead Plaintiffs' forensic analysis (as alleged above at ¶¶ 129-33) based upon information
intentionally obscured by Defendants during the Class Period, a whopping 70% of all wells drilled
at Alpine High fell below the *low end* of what a "typical well" at Alpine High was supposed to
produce.

**H.    3Q 2017 Financial Results**

252.    On November 2, 2017, Apache held an investor conference call to discuss the
Company's financial performance for the third quarter 2017.  During the call, a securities analyst
asked "how far out do you see it when Alpine High [] become[s] self-sustaining?"  In response,
Defendant Christmann insisted that it would be "less than two years" before cash flow at the play
would be equal to or exceed costs: "if we just take a single rig at Alpine High, it's less than 2 years

before it's self-funding…And that's fully burdened with infrastructure and midstream spend."

253.    Defendants' statements in ¶ 252 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High (let alone for their claim that rigs at Alpine High could become "self-funding" within two years at "fully burdened" economics with all costs included), nor for their claims of thousands of economic drilling locations.

## I.    4Q 2017 and Full-Year 2017 Financial Results

254.    On February 22, 2018, Apache held an investor conference call to discuss the Company's financial performance for the fourth quarter and full-year 2017.  During the call, Defendant Christmann reiterated his bold claims about Alpine High and its transformational nature for Apache, stating: "[A]t Alpine High, we are building out a world-class resource play that will change the course of Apache.  The expanse of the opportunity in terms of acreage and hydrocarbon column will drive capital investment, and very soon, free cash flow for decades to come."  Christmann touted Apache's expected near future production and growth rate at Alpine High, stating that "[b]y 2020, average daily production is expected to be between 160,000 and 180,000 BOEs a day, which represents a compound annual growth rate in excess of 150%."

255.   Defendants' statements in ¶ 254 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High (let alone "free cash flow for decades to come"), nor for their claims of thousands of economic drilling locations.

256.   In light of flagging oil and gas prices at the time, during the February 22, 2018 earnings call Defendants again reassured investors that Alpine High would be profitable and successful even at extremely low commodity prices.  For example, Christmann stated that "[i]n the context of today's commodity price, we acknowledge that funding a wet gas play is a bit contrarian, but it is justified by the long-term scale and return potential even at lower gas prices." Similarly, in response to an analyst question seeking further reassurances as to whether Apache had "looked at …some of the downside cases" involving low gas prices, Defendant Christmann unequivocally assured investors that there was nothing to worry about, because Alpine High "is going to really hum below $2 [prices] on the gas side."  Christmann further assured investors that Apache's planned infrastructure spending at Alpine High was evidence that the Company stood behind its claims about the play: "we've run many cases on the downside.  We would not be

104

making this type of investment on the midstream or the upstream side if we thought there was a sensitivity that was close to anything that would come into making it not work under very, very low gas and NGL and oil prices."

257.    The statements in ¶ 256 were materially false or misleading when made, including for the reasons alleged in ¶¶ 195-96.  As Defendants knew from the outset, and as confirmed by both Project Neptune and Lead Plaintiffs' forensic analysis, Alpine High was never "justified by the long-term scale and return potential even at lower gas prices"—the opposite was true.  Indeed, Defendants' own 2019 Project Neptune investigation of Alpine High confirmed that Alpine High's data had showed *from the outset* that essentially all of the wells drilled since 2016 severely underperformed Apache's publicly announced descriptions, and that as a result it was an extraordinarily dubious proposition for Alpine High to ever be economically viable under *any* energy pricing scenarios.  This was confirmed by Lead Plaintiffs' forensic analysis, which shows, as alleged above in ¶¶ 116-17, that during the entire Class Period, the total amount of oil produced across the entire Alpine High field amounted to less than *1%* of the 3 billion barrels of oil in place that Defendants told investors were "in place" in the Woodford and Barnett formations alone.  Similarly, during the entire Class Period, the total amount of gas produced by Apache across Alpine High—inclusive of both "wet gas" and "dry gas"—amounted to a mere 0.3 Tcf of the 75 Tcf (or a mere *0.4%*) of the "really rich gas" that Defendants told investors was in place at the Barnett and Woodford formations alone.  Lead Plaintiffs' forensic analysis further shows that *over one quarter* of the total wells Defendants were drilling at Alpine High were "dry holes" (unproductive wells)—an extraordinarily high and almost unheard-of rate for any successful oil or wet gas play.  Thus, while Defendants claimed Alpine High would thrive under "very, very low" commodity prices, the Company in fact shut down all new oil and gas exploration at the site in

early 2020 just when those same prices were reached.

258.    On February 23, 2018, Apache filed with the SEC its 2017 annual report on Form 10-K ("2017 Form 10-K").  The 2017 Form 10-K touted Alpine High, stating that "Apache has identified over 3,500 economic drilling locations in a wet gas play and over 1,000 locations in a dry gas play at Alpine High. The Company is also working to delineate an emerging oil play at Alpine High, with at least 500 locations already identified."  The Form 10-K also stated that "Combined with multi-well pad drilling and revenue uplift expected from oil and NGLs present in the wet gas play, Alpine High is anticipated to generate strong cash margins and a competitive recycle ratio [a measure of profitability per unit of oil or gas] when compared to other Permian operations."

259.    On February 26, 2018 at the DUG Executive Conference, Apache again touted its purported "5,000+ locations identified to date," "highly economic wet gas play," and "proven oil upside" at Alpine High.  An identical statement was also made in the Company's March/April Investor Presentation on March 26, 2018.

260.    Defendants' statements in ¶¶ 258-59 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019

Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

      **J.     1Q 2018 Financial Results**

     261.    On May 3, 2018, Apache held an investor conference call to discuss the Company's financial performance in the first quarter of 2018.  In light of Apache's ongoing claims about Alpine High's massive oil potential, a securities analyst asked Christmann to give more specifics on when the oil play at Alpine High might finally materialize, asking, "as you kind of think through the three-year plan, just trying to get a sense of whether or not you start to see more of a shift to oil.  Is that more of a 2019 move at Alpine High? Or is it more 2020? What can you sort of say about the way you progress the development in terms of phase?"  In response, Christmann assured the analyst that "<u>there's a lot of proven oil, we've shown that</u>."

     262.    During the call, Christmann not only reiterated Apache's impressive claim of 5,000+ identified drilling locations in Alpine High, but suggested Alpine High's location count would only grow further.  Specifically, Christmann stated that "in terms of drilling inventory, <u>recall that we increased our risked location count to more than 5,000 locations at our October webcast update,</u>" and noted that "[a]t the time, we characterized this as a conservative view" based on assumptions of "6 landing zones" and widely spaced wells.  Christmann then stated that assumptions had been updated and would afford even more locations, stating, that the Company now had "confirmed hydrocarbon production from 11 distinct landing zones," and had seen good results from spacing wells closer together.  As such, Christmann told investors that, "<u>we are confident that as field delineation and development progresses, the risk[ed] location count [i.e., number of economic well sites] will increase substantially over the next several years</u>."

     263.    On May 30, 2018 at the 34th Annual Bernstein Strategic Decisions Conference, Apache again reiterated that it had "<u>5,000+ locations identified to date,</u>" a "highly economic wet

gas play," and "proven oil upside," at Alpine High. Apache made an identical statement in the Company's June 5, 2018, June Marketing presentation

264.    Defendants' statements in ¶¶ 261-63 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations (let alone that location count would "increase substantially" over Apache's already grossly inflated claim of 5,000+ locations).

### K.    2Q 2018 Financial Results

265.    On August 2, 2018, Apache held an investor conference call to discuss the Company's performance for the second quarter of 2018.  During the call, Christmann again reiterated Apache's claims of more than 5,000 viable drilling locations identified at Alpine High: "in terms of drilling inventory, <u>our location count today stands at more than 5,000 wells</u>," and further told investors that this count would only increase, stating that "[l]anding zone and spacing tests thus far have <u>confirmed that this inventory count is conservative</u>, based on original assumptions."

266.    On August 8, 2018, Apache held a conference call with investors and analysts.

During the call, Christmann also assured investors that "Alpine High is on a tremendous growth path," and reaffirmed Defendants' claims, made from the outset of the Class Period, that the play contained an "estimated resource in place of 75 Tcf of gas and 3 billion barrels of oil in just 2 of the 5 proven hydrocarbon-bearing formations," and "more than 5,000 identified drilling locations."

267.    On September 21, 2018, Defendant Christmann gave an interview on "Bloomberg Commodities Edge" a show on Bloomberg TV.  During the interview, Christmann discussed the Alpine High, stating "[t]here is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil," and that, "[w]e've proven there's oil … a lot of rich gas."

268.    Defendants' statements in ¶¶ 265-67 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations (let alone their claim that their "confirmed" inventory of 5,000+ locations was a "conservative" estimate).

269.    Moreover, as alleged above in § VI-A, as shown under Lead Plaintiff's forensic analysis, the true production data from Alpine High's test wells—which Defendants concealed

from the public—had made clear that Defendants had never "proven" that there was "a lot of oil" or "a lot of rich gas." Rather, the opposite was true, as this data had in fact only confirmed that Apache's purported "successful" wells often plummeted in production shortly after being completed, and that Alpine High contained an unprecedented number of "dry holes" that produced *no* oil or gas whatsoever, amounting to over *one quarter* of the total wells at Alpine High.

L.    **4Q 2018 and Full-Year 2018 Financial Results**

270.    On February 28, 2019, Apache filed its Annual report on Form 10-K for the full year 2018. The 2018 Form 10-K reiterated past claims about Alpine High location counts, stating that "Apache has identified over 3,500 economic drilling locations in a wet gas play and over 1,000 locations in a dry gas play at Alpine High." Additionally, the 2018 10-K highlighted the purported 96% "success rate" Apache had experienced in drilling wells at Alpine High (meaning purportedly only 4% of wells had failed to produce meaningful quantities of oil or gas):

> During 2018, Apache drilled 100 wells at Alpine High with a 96 percent success rate, including many concept test wells drilled to verify its understanding of the play. Using data collected from strategic testing and delineation drilling, the Company is now optimizing wells drilled in Alpine High and focusing on economic rich gas development in 2019

271.    Defendants' statements in ¶ 270 were materially false or misleading for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune

investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

272.     Moreover, Defendants' statement in ¶ 270 concerning the Alpine High well "success rate" was materially false or misleading when made.  In reality, as Lead Plaintiffs determined through their forensic analysis, ***Defendants' 2018 well failure rate was, at a minimum, five times as high as claimed, i.e., at least 20%***.  Specifically, Lead Plaintiffs' investigation identified at least 19 wells drilled at Alpine High during 2018 that apparently produced ***no oil or gas whatsoever***.

### M.     1Q 2019 Financial Results

273.     On May 2, 2019, Apache issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's first quarter 2019 financial results.  In spite of having just "temporarily" deferred gas production at Alpine High, in the press release, Christmann now promised that Alpine High would be significantly increasing the Company's profitability in the near future, stating:  "<u>In the Permian, we are poised to deliver attractive oil growth and a substantial cash flow uplift at Alpine High in the second half of the year***.***</u>"

274.     Also on May 2, 2019, Apache held an investor conference call to discuss the Company's performance for the first quarter of 2019.  During the call, Defendant Christmann claimed that Apache was having success by spacing its wells further out on certain well pads, meaning fewer wells per pad.  Based on these claims, an analyst asked whether drilling fewer wells per pad would change either the number of locations or the type curve for Apache's wells.  In response, Christmann assured that Apache's drilling location count not only would not be reduced, but would likely *increase*, stating that "the last location count we put out was fall of '17, I think, October of '17.  And <u>we're still in a position where location count would go up</u> given the assumptions we've got in place," and adding "<u>we're very confident in those numbers.  And you're</u>

seeing strong performance."

275.    On May 15, 2019, *Bloomberg* published a story titled, "Apache bets big on Permian gas liquids."  An Apache corporate spokesperson was quoted in the article as stating "Investors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High," and that "[e]valuation of the oil play at Alpine High will continue to evolve, but our view of 3 billion bbl of associated oil in place in just the Woodford and Barnett remains unchanged."

276.    Defendants' statements in ¶¶ 273-75 were materially false or misleading when made for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

277.    Indeed, by the time Defendants made the above statements, poor production from Alpine High wells and a lack of economic drilling locations had made abundantly clear that Alpine High would ***never*** deliver "attractive oil growth," or a "substantial cash flow uplift," let alone in the second half of that year—in fact, a mere three months later, Apache would announce that its daily energy production for Alpine High during the second quarter of 2019 had been an anemic 49,000 BOE per day—far below its previous guidance of 85-90,000 BOE per day.

N.    **2Q 2019 Financial Results**

278.    On August 1, 2019, Apache issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter of 2019. The press release noted that Alpine High's production had been disappointing, purportedly due to "delays" in bringing wells online, but assured investors that this was a temporary situation and things would soon improve.  Specifically, Defendant Christmann was quoted as saying:  "We will catch up in the second half of 2019 and exit the year with oil production on plan and with strong momentum heading into 2020."

279.    Also on August 1, 2019, Apache held an investor conference call to discuss the Company's performance for the second quarter of 2019.  During the call, Defendant Christmann continued to tout Alpine High, stating "we like the asset.  It's a large resource as we've proven. There is tremendous rich-gas potential."

280.    Defendants' statements in ¶¶ 278-79 were materially false or misleading for the reasons alleged above in ¶¶ 195-96, including because: (i) Apache's extensive prior explorations of the Alpine High region had confirmed it was primarily a dry gas play and did not even contain a small fraction of the claimed quantities of economically recoverable oil and wet gas, leading Christmann to reject it twice, and leading Apache's San Antonio team to expressly warn Christmann that there was insufficient data to back up his planned Alpine High announcement; (ii) Alpine High's miniscule oil and wet gas production and extraordinarily high rate of "dry holes" throughout the Class Period only further confirmed that Alpine High never had even a tiny fraction of the recoverable oil and wet gas Defendants claimed; and (iii) Apache's 2019 Project Neptune investigation confirmed that Defendants never had any basis for their claims about the "economics" of Alpine High, nor for their claims of thousands of economic drilling locations.

281.    Moreover, by the time Defendants made the above statements, Apache had already

launched Project Neptune, an internal investigation that, based on Alpine High's complete data from inception, confirmed that Defendants lacked any scientific or factual basis for their highly positive statements about Alpine High's recoverable oil and wet gas and the field's purportedly favorable economics.  Indeed, by this time, consistently poor production from Alpine High wells had made abundantly clear that the reason oil volumes "trailed guidance" was not "timing delays," but rather that Alpine High was never a viable oil play and never had the potential to produce even a small fraction of the oil or wet gas Defendants publicly claimed to investors was recoverable. For the same reasons, by this time, Defendants knew that it was not possible that they would "catch up in the second half of 2019 and exit the year with oil production on plan and with strong momentum heading into 2020."  Tellingly, as a result of Apache's Project Neptune investigation and the utter failure of Alpine High, Apache would force Keenan out of the Company a mere few months later, and would entirely shut down all further drilling of the play within six months.

## VIII.   <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

282.   ***Apache Evaluated The Alpine High Region Multiple Times Between 2012-2014 And Christmann Determined It Was Not A Profitable Play And Rejected It.***  As alleged above in § IV-C, between 2012 and 2014, Apache conducted extensive geologic testing and accumulated unambiguous data demonstrating the Alpine High region was not a viable oil play.  As CW 1, who was involved in the reviews, stated simply, "the rocks don't lie" and "the numbers were lean." Multiple former employees described how Defendant Christmann, on two separate occasions, after receiving and reviewing the Alpine High region data following comprehensive exploration by the Company, rejected an Alpine High play because it lacked economically recoverable oil and wet gas.  As stated by CW 1, a 20+-year Apache veteran, with respect to the adjacent Madera Ranch area, "the decision was made by Christmann that the area was too gassy, not enough yield and not enough infrastructure.  There was not enough upside to pursue this."  After the first exploration,

Christmann instructed the Exploration Manager, "I don't want gas, why don't you go find us some oil." Multiple former employees recall hearing Christmann emphatically rejecting the play after receiving the results of the second exploration. For example, CW 5 was in the room following a New Ventures Group Alpine High presentation and recalled Christmann stating, "I don't want to see this again, this is way too much gas."

283.    In addition, former Apache employees separately confirmed that they provided all of the Company's prior Alpine High data to Keenan prior to the Class Period. For example, CW 2, who led the Apache New Ventures team, stated that she gave Keenan a fully populated Alpine High geographic project, including maps and thermal maturity data. Two prior Apache teams had gathered extensive geologic data demonstrating that Alpine High was not an oil play and presented it to Keenan and his "Unconventional Resources" team. CW 2 concluded that Keenan and his "six pack" "willfully ignored" all of this data because they were under "a lot of pressure" to make an oil find and Alpine High was a "Hail Mary pass to the end zone." That both Keenan and Christmann were fully aware of data showing Alpine High to be "too gassy" and not viable as an oil or wet gas play further supports a strong inference of scienter.

284.    ***Apache Reorganized Its Entire Worldwide Operations To Focus On Alpine High.*** Before and during the Class Period, Apache made Alpine High the center of the Company's entire growth strategy, and reorganized its global operations to focus on the play. In 2014, Apache opened separate headquarters for Alpine High in San Antonio, and created an "Unconventional Resources" team headed by Keenan and hired from a competitor company, EOG, to focus almost exclusively on Alpine High. Apache further reorganized its operations into "super-regions" in 2015 consisting of the Houston region (i.e., home of the Company's corporate headquarters), the Permian region, and the International and Offshore Region, with the Permian region subdivided

so that Alpine High had a dedicated territory in the Delaware Basin. Defendants also made Alpine High the center of Apache's capital spending strategy, with more than *40%* of its planned capital expenditures during the Class Period – over *$1.1 billion* in total – allocated to Alpine High.

285.    *Keenan and His Technical Team Evaluated Alpine High A Third Time Before The Class Period And Specifically Warned Christmann There Was Insufficient Data To Support The Play And Not To Go Public With It.* As alleged further above at §IV-D, before the Class Period began in 2016, Keenan and his team of technical experts advised Christmann and Apache that Apache lacked the technical data and analyses necessary to make reasonable statements or projections about production from Alpine High, or its commercial viability and expected profitability. In 2015 and 2016, Keenan and his technical team that included Chester Pieprzica made regular presentations – every five to seven days – to Apache senior management, including Defendant Christmann, on the status of Alpine High. By 2016, presentations and email communications to Apache senior management made crystal clear that Apache lacked fundamental testing, analyses and data necessary to reasonably project Alpine High performance or economic viability. Defendant Christmann was specifically informed that the Alpine High technical team needed many more months of consistent production in order to conduct any reliable analysis and that other fundamental analyses, such as drilling offset wells and capturing 3D seismic data, had also not yet been completed. Without this basic information, Apache was blind as to how any broader Alpine High play would perform. Nor could Apache reasonably project the economic viability of extracting valuable oil or NGLs that were necessary to render Alpine High profitable and worth exploiting. Christmann and Apache disregarded those facts, ignored this third set of warnings, and knowingly made public representations starting on September 7, 2016, that lacked a reasonable basis.

286.    *A Secret Internal Investigation Of Alpine High In 2019 Concluded That Apache's Internal Data Directly Contradicted Defendants' Class Period Statements.*  As alleged above, in the summer of 2019, amid growing internal friction among high-level Apache executives and after Keenan made a presentation to the Company's Board of Directors blaming disappointing Alpine High production on transient issues, a confidential internal investigation, Project Neptune, was conducted of all relevant Alpine High data.  This comprehensive analysis of the entire data history of every single Alpine High well concluded that: (i) the vast majority of Alpine High wells never performed or produced anywhere close to the manner in which they were presented to investors; (ii) from the outset, Alpine High produced only limited quantities of poor quality of oil and gas; and (iii) any price pressure destroyed the economic viability of Alpine High.  These findings were presented to Apache's senior management during an in-person meeting that Christmann attended in mid-October 2019, and led to Keenan's abrupt "resignation."  Project Neptune – which has still not been disclosed to shareholders – further supports a strong inference of Defendants' scienter.

287.    *Apache Departed From Standard Company Practices And Procedures By Concealing Alpine High Data From Other Offices, Preventing Peer Review, Other Internal Analyses, And Silencing Dissent.*  The Individual Defendants departed from standard Company practices and procedures by walling-off from internal Company review a variety of testing, production, and projections data utilized by Keenan and others at Alpine High's San Antonio office to evaluate Alpine High's prospects and performance.  Describing the decision to silo Alpine High, CW 6 reported that Defendants Christmann and Sullivan "were absolutely aware of it and in total agreement with it.  They aided and abetted [it]."  CW 7 stated simply, "Keenan was Christmann's guy."  When Alpine High did not produce as promised, rather than admit defeat, according to CW

4, Apache "continued to double down by spending billions on infrastructure and drilling more and more wells*."* Unlike every other Apache regional office or project, Defendants chose to operate Alpine High as a "shadow organization" and hide the lackluster Alpine High production data from internal scrutiny. Numerous former Apache employees described how, with the Individual Defendants' blessing, Alpine High production and reservoir data was secretly maintained within the Company, and complained that this "cone of silence" prevented them from doing their jobs. Former employees described how the clandestine Alpine High data raised red flags internally and led to several internal confrontations – with "some pretty fierce arguments on the 14th floor (Apache's C-Suite offices)."

288. For example, numerous former employees point to Apache's decision to not permit peer reviews of Alpine High data as indicative that, throughout the Class Period, the Individual Defendants knew exactly what they had with Alpine High and were "worried about an objective analysis." This decision "was outside the normal process" of Apache and "completely counter to how [Apache] operated" for years. Even though Defendant Christmann himself had been subject to peer review as a Vice President in charge of the Midland office, and the peer review process continued throughout the Class Period for every other Apache operating region, Keenan threatened to quit if Alpine High was subjected to peer review. Former employees also describe a variety of other standard internal processes and procedures that were deliberately circumvented with regard to Alpine High, such as the "Rose Risk Analysis," a standard analysis performed by most E&P companies early in an exploration process to determine the probability of success of a given project, prior to receiving any funding. CW 10, the former Global Director of Petrophysics and Chief of Staff to the COO, confirmed that, under established Company policies, any exploration play at Apache was supposed to go through a Rose Risk Analysis, which involved an analysis of

testing, seismic and fluid data.  CW 10, who was involved in numerous Rose Risk Analyses while at Apache, confirmed that she did not see any Rose Risk Analysis performed on Alpine High, which "violated every step of the scientific method."  The Individual Defendants' decision to circumvent standard Company policies and procedures applicable to any potential oil or gas play, thus preventing an objecting analysis of Alpine High, reinforces a strong inference of scienter.

289.    Moreover, Defendants repeatedly forced out senior employees who dissented or raised questions about Alpine High, including over a ***dozen*** Vice Presidents who raised concerns about Alpine High and were thus either run-off or terminated within the first 18 months of the project's commencement.  CW 6 recalled that Apache "***systematically … got rid of everyone***" who dared question Keenan about Alpine High.  CW 21, recalled that, after CW 7 confronted Keenan about Alpine High in 2017, CW 7 was prohibited from stepping foot in the San Antonio office, and in September 2018, Defendant Christmann fired CW 7.  Numerous former employees confirmed that there was a pervasive sense that employees were afraid to challenge Alpine High. As CW 10 explained, "that was the culture – you either line up or you are off the team."

290.    ***The Individual Defendants Had Access To And Received Regular Reports Concerning Alpine High.***  Numerous former employees confirm that throughout the Class Period, the Individual Defendants received regular reports and updates on Alpine High.  These former employees describe in detail how Keenan was "intimately aware" of production, drilling and completions at Alpine High through Daily Operations Meetings and Weekly Production Meetings. Keenan, in turn, routinely updated Defendants Christmann and Sullivan regarding Alpine High throughout the Class Period during both Quarterly Review Meetings in San Antonio as well as during Keenan's monthly trips to Apache's corporate headquarters in Houston.  Demonstrating their scienter, Defendants Riney and Christmann closely tracked the status of each Alpine High

119

well.  CW 15 stated that, during the Company's second quarter 2018 Quarterly Review meeting in July 2018, Defendant Riney confronted Keenan in front of approximately 100 Apache employees, including Defendant Christmann, stating "***when are we going to start drilling economic wells***." Numerous former employees further report Defendant Christmann had access to abundant software and other reporting tools tracking Alpine High performance, often in real-time.  These tools included Aries, which tracked individual well performance, Adviset, which tracked well production, WellView, which provided "down the hole views" of daily drillings and construction, and IMS reports, which tracking capital spending in order to evaluate programs.  CW 13 confirmed, yet another system, Signet, measured well head production data in real-time.

291.    ***The Individual Defendants Made Highly Specific Statements About Alpine High, Including Individual Wells, Drilling Locations, And Geologic Formations.***  Over the course of the Class Period, Apache featured Alpine High heavily in more than 60 investor presentations, as well as myriad press releases, SEC filings, earnings conference calls, and interviews with major press outlets such as *Bloomberg*, the *Wall Street Journal*, *Forbes*, and the *Houston Chronicle*. Christmann and the Individual Defendants spoke extensively about Alpine High in every single one of the Company's earnings calls and other investor calls and presentations throughout the Class Period.  The Individual Defendants' voluminous Class Period statements about Alpine High included highly specific representations concerning the Alpine High play, including (i) the putatively precise amounts of oil, wet gas, and dry gas produced by individual wells; (ii) the geology of the Southern Delaware Basin and the amount and quality of oil, wet gas, and dry gas estimated to be in place in each of Alpine High's five geologic formations; (iii) the purported economics and likely profitability of various aspects of the play, such as the net present value of individual wells based on their costs and estimated lifetime production; (iv) the number of

purported economic drilling locations across the Alpine High acreage, including in specific regions, as well as the spacing of individual wells on various well pads; and (v) the Company's progress in "delineating" the play and "optimizing" production based on the foregoing, and numerous additional, data points.

292.    The Individual Defendants were repeatedly asked specific questions about Alpine High by analysts, and gave highly specific answers in response.  For example, when a Barclays Bank analyst asked Christmann at the Company's September 2016 Alpine High announcement "[h]ow much do your peers know about this play?"  Christmann responded, "[t]hey know very little…the perception was wrong about this area geologically.  And it took some very, very strong individuals working very detailed work over a couple of years to unravel what is a hidden diamond in the rough."

293.    And when in May 2018 an analyst asked Christmann to give more specifics on when the oil play at Alpine High might finally materialize, asking, "as you kind of think through the three-year plan, just trying to get a sense of whether or not you start to see more of a shift to oil.  Is that more of a 2019 move at Alpine High? Or is it more 2020?  What can you sort of say about the way you progress the development in terms of phase?"  Christmann specifically assured the analyst that "there's a lot of proven oil, we've shown that," and explained, "we've said all along that we plan conservatively with Alpine High. And it will get more oily as time progresses. And you'll see more from us."

294.    ***Apache Consistently Flouted Regulatory Reporting Requirements To Obfuscate Alpine High's Poor Performance From Investors.***  To conceal Alpine High's poor performance and prospects, Defendants engaged in a scheme to obfuscate Alpine High well completion and production data in Apache's reporting to the RRC.  This scheme included the failure to report

dozens of completed wells, widespread use of hard-to-find "pending reports" to report production for uncompleted wells that had, in fact, been completed, misclassification of gas wells as oil wells by reporting false gas/oil ratios, and repeatedly changing the names given to wells (including names different than in their public presentations to investors).  Former employees responsible for regulatory filings averred that they were either instructed to not make required regulatory filings or were denied the data necessary to make them, and instructed that if they wanted the data, they would need clearance from executives in Houston.  Indeed, in the first two years after Defendants announced the Alpine High "discovery," Apache did not file a single well completion report with the RRC for any of the over 150 wells drilled at Alpine High during that period.  Defendants' systematic use of these tactics—confirmed by both former employees and by a forensic analysis of public databases—further supports a strong inference of scienter.

295. ***The Individual Defendants Were Motivated To Commit The Alpine High Fraud.*** The Individual Defendants were strongly incentivized to commit the fraud, reaping more than $92 million in compensation during the Class Period—the vast majority of which was incentive-based and tied to "goals" that largely related either directly or indirectly to Alpine High.  Under the compensation structures in place for the Individual Defendants during the Class Period, approximately 85% of their total combined compensation, or $78 million—including $50.1 million for Christmann alone—was tied to personal and corporate performance goals that were largely linked, directly or indirectly, to Alpine High, as set forth below:



296.   For example, in 2016, the year Alpine High was announced, 40% of the Individual Defendants' performance-based compensation was tied to qualitative "Strategic Goals."  These goals were set by the Company "to continue to shift the focus of Apache's portfolio to North America."   According to Apache's 2017 Proxy Statement, these strategic goals included "[a]chieve exploration success by finding and validating a commercial discovery with future development potential of 100 MBOE," (i.e., Alpine High), and "[c]onsolidate, build, and expand our quality of prospects, which will deliver high rates of return on a fully burdened economic basis" (again seemingly referring to Alpine High), and were achieved through the "announce[ment] of Alpine High discovery," and "identified 4.9 Billion BOE of risked inventory, of which 3.2 Billion BOE is economic at $50 per barrel flat pricing," again referring to Alpine High.

297.    Similarly, in 2017, strategic goals from which compensation was derived included "[f]ormulate a robust development model for Alpine High to optimize long-term project economics while addressing product variation throughout the play, which requires: progressing geographic and stratigraphic delineation phase to an advanced stage identifying the areal extent of individual target intervals, conducting strategic testing to design pad and batch development operations, addressing leasehold retention requirements, and defining marketing alternatives," as well as "Return Permian Basin oil production to a growth trajectory" (which Apache aimed to do via Alpine High).

298.    Apache again claimed it met these goals by achieving specific targets at Alpine High, resulting in millions of dollars in incentive compensation to the Individual Defendants. 2018 "strategic goals" similarly included highly specific Alpine High-related goals, as well as goals relating to replacing production with production from "exploration and development adds"—the primary example of which was Alpine High.

299.    Additionally, throughout the Class Period, a significant part of the Individual Defendants' compensation was based on Apache's stock price return compared to peer companies, further strongly incentivizing Defendants to inflate the Company's stock price by hyping Alpine High.

## IX.    <u>LOSS CAUSATION</u>

300.    During the Class Period, shares of Apache's publicly traded common stock traded on the NASDAQ.  The market for shares of Apache common stock was open, well-developed and efficient at all relevant times.

301.    Throughout the Class Period, Defendants' materially false or misleading statements alleged above in § VI created and/or maintained artificial inflation in the price of Apache common stock.  Defendants engaged in a scheme to deceive the market, and a course of conduct that

124

operated as a fraud or deceit on Class Period purchasers of Apache common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. When the facts misrepresented and concealed by Defendants' prior materially false or misleading statements gradually became apparent to the market, the price of Apache common stock fell precipitously, as the prior artificial inflation created and/or maintained by Defendants' materially false or misleading statements dissipated. As a result of their purchases of Apache common stock during the Class Period, Lead Plaintiffs and other Class members suffered economic loss, i.e., damages, under federal securities laws.

302.    By issuing materially false or misleading statements, Defendants presented a misleading picture of Apache's business. Defendants' materially false or misleading statements caused Apache's common stock to trade at artificially inflated levels throughout the Class Period. Indeed, Apache's common stock reached an intra-day Class Period high of $69.00 on December 12, 2016 before losing 93% of its value to close at $4.46 per share at the end of the Class Period, wiping out approximately $24 billion in market capitalization.

303.    The artificial inflation created and/or maintained by Defendants' alleged misrepresentations and omissions was removed from the price of Apache common stock in direct response to information made public in the corrective disclosures alleged in this Section, through which facts that partially corrected Defendants' prior misrepresentations and omissions of material fact were revealed.

304.    On October 9, 2017, after market close, Apache hosted a webcast to provide the Company's first "detailed review of the [] progress we are making at Alpine High" since announcing the "discovery" on September 7, 2016. Apache spent approximately 52 minutes of the 70-minute webcast discussing Alpine High, and revealed for the first time that it was

experiencing significant problems extracting oil from the Woodford and Barnett formations within Alpine High.  As a result, the Company announced that it would refocus its oil drilling efforts to areas further south along the Alpine High's "extensive play fairway," where purportedly large quantities of oil existed in deeper formations.  Defendant Sullivan further emphasized during the webcast that this new 5,000 location total comprised "three separate hydrocarbon plays: an extremely large and highly economic wet gas play, a smaller but also economically compelling dry gas play, and an emerging oil play."  The foregoing statement revealed that the Alpine High play was more weighted toward wet gas and dry gas, and that the much more profitable and desirable oil play Defendants had touted was merely "emerging."

305.    As a direct result of the October 9, 2017 partial corrective disclosure revealing Alpine High's significant oil production problems, Apache's stock price declined by more than 7% in a single day, falling from a close of $45.85 per share on October 9, 2017 to close at just $42.46 per share on October 10, 2017.

306.    Analysts easily linked the October 9, 2017 disclosures with the drop in Apache stock price.  For example, Evercore issued a report on October 10, 2017, stating, the Company's update "may disappoint those who had hoped for a big 'reveal'" regarding Alpine High." Raymond James analysts reported on October 11, 2017 that the Company provided "long-anticipated granularity on … Alpine High," but that "picture isn't [] clear on the oil side."  Societe General reported on October 18, 2017, that in the wake of the "update on the Alpine High project… the stock sold off about 10%."

307.    On February 22, 2018, Apache issued a pre-market press release announcing the Company's earnings for the fourth quarter and full year of 2017.  The Company also announced disappointing 2018 production growth guidance of just 448-469 MBOE/D, with only 40-50

MBOE/D coming from Alpine High.  Moreover, the Company reported a lackluster production outlook and longer-than-expected ramp up for Alpine High of only 85-100 MBOE/D for 2019 and only 160-180 MBOE/D for 2020.  During the related conference call with investors and analysts that Apache conducted later that same day, Apache disclosed a disappointing gas/oil mix at Alpine High of oil 7% oil, reporting: "In terms of production mix, fourth quarter 2017 volumes at Alpine High were comprised of 83% gas, 10% NGLs and 7% oil."

308.    As a direct result of the February 22, 2018 partial corrective disclosure regarding lower than expected BOE production guidance for Alpine High, coupled with an increasingly unfavorable Alpine High gas/oil ratio and prolonged production time frame, Apache's stock price plummeted to its lowest point in nearly 15 years, falling from $37.20 per share on February 21, 2018 to close at $34.85 per share on February 22, 2018, a decline of more than 6%.

309.    Analysts associated the Company's February 22, 2018 disclosures with the decline in the price of Apache stock.  Wolfe Research slashed its Apache price target by nearly 25% because the "updated outlook provided today raised more questions than answers for the Alpine High."  The Motley Fool summed up investor reaction, succinctly stating that "the market was dismayed by Apache's production outlook," which sent the price of Company shares "to its lowest point in almost 15 years."  Analysts at Societe General connected the decline in Apache stock price to the Company's disclosures, reporting Apache stock "sold off 6% on the day earnings were announced in response to short term production growth projections" at Alpine High.

310.    On April 23, 2019, Apache issues a press release before the market opened announcing the "Temporary Deferral of Alpine High Natural Gas Production."  The press release revealed that the deferral began in late March 2019, and "represented approximately 250 million cubic feet (MMcf) per day of gross gas production."

311.    As a direct result of the April 23, 2019 partial corrective disclosure that the Company was scaling back natural gas production efforts, Apache's stock price fell $0.66 per share, from a close of $37.09 per share on April 22, 2019, to close at $36.43 per share on April 23, 2019.  Apache shares continued to decline over the next three trading days, closing at $33.06 per share on April 26, 2019—for a four-day decline of $4.03 per share, or nearly 11%.

312.    Financial media and securities analysts noted the deferral introduced greater risk and delay at Alpine High.  Bloomberg, for example, published an article before the markets opened on April 23, 2019 reporting that the gas production deferral was "another blow to the Apache project."  In a "flashnote" issued on April 23, 2019, analysts at Macquarie noted that the deferral "confirms incremental risk is present in the back-half '19 ramp" and "places downside risk to our production estimates."

313.    On October 25, 2019, media reports revealed that Keenan had abruptly "resigned." The revelation of Keenan's abrupt departure sent Apache stock price plunging, with shares trading as low as $20.57 on October 25, 2019, an intra-day drop of approximately 11.5%, before rebounding to close the day at $22.07 per share, or decline of approximately 5% from the prior day's closing price.

314.    Analysts and the mainstream media easily connected news of Keenan's departure to the Alpine High debacle.  For example, in reporting on Keenan's departure, analysts at Credit Suisse described how Keenan "oversaw the discovery of the Alpine High play, which has been an economic disappointment for investors" and that since announcing the discovery at the start of the Class Period, "[Apache's] shares have underperformed global [exploration and production companies] by >30%, likely a cause for Mr. Keenan's resignation."    Noting that "the outcome of results from Alpine High have not met high expectations," RBC Capital Markets likewise reported

that "Keenan was a major part to the team that discovered the Alpine High play" and his resignation "caused stock weakness." Bloomberg issued an article on October 25, 1019, titled "Apache Executive's Departure Sparks Worst Rout Since 2016," stating that "shares fell as much as 11% on Friday for the biggest intraday drop since January 2016."

315. On March 16, 2020, a *Seeking Alpha* article published before the market opened revealed that, in the wake of an oil price crash, enormous spending, and lack of production from Alpine High, Apache was particularly challenged amongst its E&P peers. The article, titled "The Oil Price Crash Puts Apache Corporation In A Tough Spot," described how Apache was, carrying "the highest debt-to-equity ratio among large-cap independent E&Ps," and noted that "[t]he company doesn't have a strong balance sheet" and its "financial health isn't great." The article further emphasized the Company's "weak balance sheet marked by high levels of debt" of over $8 billion in 2019, "which translates into a lofty debt-to-equity ratio of almost 250% - the highest among all large-cap independent oil producers." That same day, Susquehanna Financial Group downgraded Apache shares, highlighting a lack of "balance sheet flexibility" and noting Apache's "net leverage exceeding 3.0x by the end of 2021."

316. As a direct result of the March 16, 2020 partial corrective disclosure revealing that Apache's failed Alpine High foray severely constrained its financial position relative to its competitors, Apache's stock price fell $3.61 per share over two trading days, or approximately 45%, from a close of $8.07 per share on March 13, 2020, to close at $4.46 per share on March 17, 2020.

317. The drastic and continuing decline of Apache's stock price was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss

suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

318.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members.  Had Defendants disclosed complete, accurate, and truthful information during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired Apache common stock at the artificially inflated prices that they paid.  It was also entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Apache common stock and that the ultimate disclosure of this information would cause the price of Apache common stock to decline.

319.    The economic loss, i.e., damages, suffered by Lead Plaintiffs and other Class members directly resulted from Defendants' materially false or misleading statements, which created or maintained artificial inflation in the price of Apache common stock.  When the truth was revealed in the disclosures made on October 9, 2017, February 22, 2018, April 23, 2019, October 25, 2019, and March 16, 2020, the price of Apache common declined substantially as the market absorbed this information, causing Lead Plaintiffs and other Class members to suffer economic losses

## X.    CLASS ACTION ALLEGATIONS

320.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and a class consisting of all other persons and entities who purchased or otherwise acquired Apache common stock between September 7, 2016 through March 13, 2020, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of Apache, members of their immediate families and

their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

321.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Throughout the Class Period, Apache's common stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "APA."  Millions of Apache shares were traded publicly during the Class Period on the NASDAQ.  As of March 13, 2020, Apache had approximately 377 million shares of common stock outstanding.  Record owners and the other members of the Class may be identified from records maintained by Apache and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

322.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

323.    Lead Plaintiffs will fairly and adequately protect the interests of the other members of the Class, and have retained counsel competent and experienced in prosecuting class actions and securities litigation.

324.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)   whether Defendants participated in and pursued the common course of conduct complained of herein;

c)   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Apache;

d)   whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Apache;

e)   whether the market price of Apache common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)   the extent to which the members of the Class have sustained damages and the proper measure of damages.

325.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE

326.   At all relevant times, the market for Apache common stock was efficient for the following reasons, among others:

327.   Apache common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

328.   As a public company, Apache filed periodic reports with the SEC and the NASDAQ;

329.   Apache was followed by numerous securities analysts employed by major firms

who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

330. Apache regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

331. As a result of the foregoing, the market for Apache common stock reasonably promptly digested current information regarding Apache from all publicly available sources and reflected such information in the price of Apache common stock. Purchasers of Apache common stock during the Class Period suffered similar injury through their purchases of Apache common stock at artificially inflated prices, and a presumption of reliance applies.

332. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Apache's business operations and financial performance — information that Defendants were obligated to disclose during the Class Period but did not — positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## XII. <u>NO SAFE HARBOR</u>

333. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in

this Complaint.  The statements alleged to be materially false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

334.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Apache who knew that the statement was false when made.

## XIII.   COUNTS

### COUNT I
### For Violations Of Section 10(b) Of The Exchange Act
### And SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

335.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

336.    This Count is asserted on behalf of all members of the Class against Defendants Apache, Christmann, Riney, and Sullivan for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

337.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly and recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and

other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale securities.  Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein (ii) artificially inflate and maintain the market price of Apache securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Apache common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

338.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, teleconferences with analysts and investors, and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for Apache securities.  Such reports, filings, releases and statements were materially false or misleading in that they failed to disclose material adverse information and misrepresented the truth about Apache's operations, finances and business prospects, including without limitation as regards to Alpine High.

339.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

340.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Apache common stock during the Class Period.

341.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Apache common stock, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Apache's business and operations; (ii) artificially inflate and maintain the market price of Apache common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

342.    Defendants Apache, Christmann, Riney, and Sullivan are liable for all materially false or misleading statements made during the Class Period, as alleged above in § VII.

343.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness.

The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of Apache stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

344.   Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Apache common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the Class would not have purchased Apache common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

345.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Apache common stock during the Class Period.

### COUNT II
### For Violations Of Section 20(a) Of The Exchange Act
### (Against The Individual Defendants)

346.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

347.   This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

348.   Defendants Christmann, Riney, and Sullivan were and acted as controlling persons of Apache within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Defendants Christmann, Riney, and Sullivan had the power to influence and control, and did

actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are materially false or misleading.  Each of Defendants Christmann, Riney, and Sullivan was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

349.    As senior corporate officers and/or directors of the Company, and as more fully described above, Defendants Christmann, Riney, and Sullivan had direct involvement in the day-to-day operations of the Company.  Defendants Christmann and Riney signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Apache during the Class Period.  As a result of the foregoing, Defendants Christmann, Riney, and Sullivan as a group, and individually, were controlling persons of Apache within the meaning of Section 20(a) of the Exchange Act.

350.    As set forth above, Apache violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.

351.    By virtue of their controlling positions of Apache and as a result of their own aforementioned conduct, Defendants Christmann, Riney, and Sullivan are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Apache is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Apache common stock.  Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

352.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)    Awarding such other relief as this Court deems appropriate.

## XV.    JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 17, 2021                    Respectfully Submitted,

                                         **AJAMIE LLP**

                                         */s/ Thomas R. Ajamie*_____
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice*)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Michelle M. Newcomer (admitted *pro hac vice*)
Daniel B. Rotko (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jwhitman@ktmc.com
jdancona@ktmc.com
mnewcomer@ktmc.com
drotko@ktmc.som

**SAXENA WHITE P.A.**
David R. Kaplan (admitted *pro hac vice*)
Wolfram T. Worms (admitted *pro hac vice*)
Hani Farah (admitted *pro hac vice*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

140

dkaplan@saxenawhite.com
wworms@saxenawhite.com
hfarah@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

-and-

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Co- Lead Counsel for Lead Plaintiffs*

141

## **CERTIFICATE OF SERVICE**

I certify that on December 17, 2021, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie