# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00575 |
| | District Judge George C. Hanks, Jr. |
| | Magistrate Judge Andrew M. Edison |
| | <u>CLASS ACTION</u> |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
## <u>PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................. 1

II. NATURE AND STAGE OF PROCEEDINGS ........................................ 7

III. STATEMENT OF ISSUES TO BE RULED UPON ................................ 8

IV. STATEMENT OF FACTS ................................................................ 8

    A. Before the Class Period, Apache Missed Out on the U.S. Fracking Boom, and Its Stock Price and Performance Languished Versus Peers ................................................................................ 8

    B. Desperate for a Shale Oil Strike, Apache Brings on Steven Keenan as Head Geologist, Provides Him Apache's Recent Analyses of the Alpine High Region, and Pressures Him to "Find Something" ................... 8

    C. In 2016, Keenan's Team Warns Senior Management That Apache Lacks Crucial Data Needed to Reasonably Project Alpine High's Prospects ............................................................................. 10

    D. Flouting Internal Warnings and Lacking Supporting Data, Defendants Announce Alpine High as a "World Class," Highly Economic Play ...................................................................... 11

    E. Apache Employees Immediately Recognize That Defendants' Public Representations About Alpine High Do Not Match Reality ...................... 13

    F. Defendants Repeatedly "Confirm" Alpine High's Vast, High-Quality Oil and Gas Holdings and Thousands of Economic Drilling Locations, While Downplaying Any Negative Developments ................... 14

    G. In Truth, Alpine High's Performance and Data Never Supported Defendants' Public Claims ...................................................... 17

    H. Finally, a Full Internal Review of Apache's Alpine High Historical Data Confirms That It Had Never Been a Viable Shale Play, and the Truth is Soon Revealed to the Market ......................................... 20

V. STANDARD OF REVIEW ............................................................. 24

VI. ARGUMENT AND AUTHORITIES ................................................ 24

    A. The Complaint Adequately Pleads Actionable Misstatements ................... 24

        1. Legal Standards .............................................................. 24

        2. Defendants' Class Period Misstatements Misrepresented and Concealed Material Adverse Facts ...................................... 25

i

3.    The Complaint's Particularized CW Allegations Demonstrate That the CWs Possess the Information Attributed to Them ............ 30

B.    The Safe Harbor Does Not Protect Any Misstatement ................................ 33

1.    The Safe Harbor Is Unavailable for Statements and Omissions of Present or Historical Fact ............................................ 34

2.    Any Cautionary Statements Were Not Meaningful ......................... 37

3.    Defendants Knew That Any Forward-Looking Statement Was False or Misleading ......................................................... 41

C.    No Misstatement is an Inactionable Opinion ............................................. 41

1.    Defendants Incorrectly Claim That Nearly Every Misstatement is a Statement of Opinion ........................................ 42

2.    Defendants' Material Omissions Render Any Opinion Statement Actionable ........................................................ 43

D.    The Complaint Adequately Pleads Scienter ............................................... 48

1.    After Refocusing Apache's Entire Global Operations on Alpine High, Defendants Disregarded the Pre-Announcement Warnings and Went Public with the "Hail Mary" Play ................... 49

2.    Defendants' Regular Receipt of Reports and Access to Alpine High Data Contradicting Their Statements Support Scienter .......... 53

3.    Defendants' Deliberate Concealment of Alpine High Data Supports Scienter ........................................................ 54

4.    Project Neptune and Plaintiffs' Forensic Analyses Support Scienter ........................................................ 55

5.    Christmann's Prior Rejections of an Alpine High Play Reinforce the Strong Scienter Inference ........................................ 57

6.    Defendants' Repeated Statements Touting Alpine High and Detailed Responses to Analyst Inquiries Support Scienter ............. 59

7.    Plaintiffs' Extensive CW Allegations Reinforce Scienter ............... 59

8.    Many Additional Facts Bolster the Scienter Inference ................... 60

9.    Defendants Fail to Proffer a More Compelling Inference .............. 62

E.      The Complaint Adequately Pleads Section 20(a) Claims ............................ 65

VII.   CONCLUSION ................................................................................................. 65

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
  291 F.3d 336 (5th Cir. 2002) ................................................................. 50, 51

*Abramson v. NewLink Genetics Corp.,*
  965 F.3d 165 (2d Cir. 2020) ............................................................. 45, 46, 48

*Alaska Elec. Pension Fund v. Asar,*
  768 F. App'x 175 (5th Cir. 2019) ................................................................. 56

*In re Apple Inc. Sec. Litig.,*
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ......................................... 63, 65

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 24

*Asher v. Baxter Int'l Inc.,*
  377 F.3d 727 (7th Cir. 2004) ................................................................. 39, 40

*In re Baker Hughes Sec. Litig.,*
  136 F. Supp. 2d 630 (S.D. Tex. 2001) .......................................................... 63

*Barrie v. Intervoice-Brite, Inc.,*
  397 F.3d 249 (5th Cir. 2005) ....................................................... 24, 61, 62

*In re BP p.l.c. Sec. Litig.,*
  843 F. Supp. 2d 712 (S.D. Tex. 2012) .......................................................... 59

*In re BP p.l.c. Sec. Litig.,*
  2014 WL 2112823 (S.D. Tex. May 20, 2014) ............................................... 65

*In re BP p.l.c. Sec. Litig.,*
  2016 WL 3090779 (S.D. Tex. May 31, 2016) ............................................... 45

*Brody v. Zix Corp.,*
  2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ................................. 31, 53, 59

*Budde v. Glob. Power Equip. Grp., Inc.,*
  2018 WL 4623108 (N.D. Tex. Sept. 26, 2018) ............................................. 52

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.,*
  2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ......................................*passim*

iv

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ........................................................37, 38, 58, 61

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................................ 52

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ............................................................. 24, 32

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
504 F. Supp. 2d 151 (N.D. Tex. 2007) ........................................................................... 63

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ................................................................................... 43, 46

*Edwards v. McDermott Int'l., Inc.*,
2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) ....................................................*passim*

*In re Electronic Data Sys. Corp. Sec. & "ERISA" Litig.*,
298 F. Supp. 2d 544 (E.D. Tex. 2004) .............................................................. 50, 56, 57

*Emps.' Ret. Sys. of Gov't of Virgin Is. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ........................................................................................... 59

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 ....................................................................................................... 29

*In re Everyware Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016) .......................................................................... 47

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
466 F.3d 1 (1st Cir. 2006) .............................................................................................. 58

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
2004 WL 5278716 (E.D. Tex. June 16, 2004) .......................................... 48, 49, 53, 60

*Fresno Cnty. Ret. Ass'n. v. Comscore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...................................................................... 38, 39

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ...............................................................*passim*

*Haack v. Max Internet Commc'ns, Inc.*,
2002 WL 511514 (N.D. Tex. Apr. 2, 2002) .................................................................. 26

*Hall v. Rent-a-Center, Inc.*,
2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ................................................... 40, 50, 60

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ................................................................................ 39, 40

*Holzwasser v. Staktek Holdings, Inc.*,
2006 WL 897746 (W.D. Tex. Mar. 30, 2006) ................................................................ 58

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................................................... 39

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ........................................................................... 37, 59, 60

*In re Intuitive Surg. Sec. Litig.*,
2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .............................................................. 43

*Irvin v. S. Snow Mfg., Inc.*,
517 App'x 229 (5th Cir. 2013) ................................................................................... 34

*KB Partners I, L.P. v. Barbier*,
907 F. Supp. 2d 826 (W.D. Tex. 2012) ....................................................................... 60

*In re Key Energy Servs., Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) ........................................................................ 52

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................*passim*

*Magruder v. Halliburton Co.*,
359 F. Supp. 3d 452 (N.D. Tex. 2018) ....................................................................... 63

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) .................................................................................. 7, 64

*Marcus v. J.C. Penney Co., Inc.*,
2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) .............................................................. 53

*Melder v. Morris*,
27 F.3d 1097 (5th Cir. 1994) ..................................................................................... 63

*McDermid v. Innovio Pharms., Inc.*,
520 F. Supp. 3d 652 (E.D. Pa. 2021) .......................................................................... 37

*McNamara v. Bre-X Minerals Ltd.*,
   197 F. Supp. 2d 622 (E.D. Tex. 2001) .......................................................................... 25, 35

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................................................... 39

*Nathanson v. Zonagen, Inc.*,
   267 F.3d 400 (5th Cir. 2001) ............................................................................................. 49

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)................................................................................ 60

*In re OCA Inc. Sec. Litig.*,
   2006 WL 3747560 (E.D. La. Dec. 14, 2006)...................................................................... 52

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................................*passim*

*Pearlstein v. Blackberry Ltd.*,
   2021 WL 4131646 (S.D.N.Y. Sept. 10, 2021)................................................................... 47

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) ............................................................................................. 61

*In re Pretium Res. Inc. Sec. Litig.*,
   2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)...................................................................... 48

*In re QuantumScape Sec. Class Action Litig.*,
   2022 WL 137729 (N.D. Cal. Jan. 14, 2022)................................................................ 29, 57

*Ramirez v. Exxon Mobil Corp.*
   334 F. Supp. 3d 832 (N.D. Tex. 2018) .............................................................................. 34

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)...............................................................*passim*

*Schleicher v. Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007) ............................................................................... 54

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................................. 59

*Shen v. Exela Techs., Inc.*,
   2022 WL 198402 (N.D. Tex. Jan. 21, 2022) ..................................................................... 62

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)..................................................................................63

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................43

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021).....................................................................65

*Slayton v. Am. Ex. Co.*,
604 F.3d 758 (2d Cir. 2010)....................................................................................40

*Smith v. Reg'l Transit Auth.*,
756 F.3d 340 (5th Cir. 2014) ..................................................................................24

*Smith ex rel. Zion Oil & Gas, Inc. v. Carrillo,*
2019 WL 6328033 (D. Del. Nov. 26, 2019) ...........................................................60

*Sousa v. Sonus Networks, Inc.*,
261 F. Supp. 3d 112 (D. Mass. 2017) .....................................................................47

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ..........................................................................*passim*

*Stone v. Life Partners Hldgs., Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014).........................................................25, 30, 35

*In re Supreme Indus., Inc. Sec. Litig.*,
2018 WL 2364931 (N.D. Ind. May 23, 2018) .........................................................60

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...........................................................................................49, 58

*Tran v. XBiotech Inc.*,
2016 WL 5408382 (W.D. Tex. Sept. 23, 2016)........................................................63

*In re Venator Materials PLC Sec. Litig.*,
547 F. Supp. 3d 624 (S.D. Tex. 2021) ...............................................................50, 53

*Wilson v. LSB Indus., Inc.*,
2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ......................................................45, 46

*Wu Winfred Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. May 8, 2017) ......................................................52

**Statutes**

15 U.S.C. § 78u-4(b) ............................................................................ 24, 25

15 U.S.C. § 78u-5(c)................................................................................ 37

Lead Plaintiffs Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (together, "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. 71) (the "Motion").[1]

## I.   <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

In the years leading up to the Class Period, Apache was mired in a prolonged financial slump. Since 2010, its competitors in the energy exploration and production ("E&P") industry had capitalized on advances in hydraulic fracturing ("fracking") technology to exploit huge underground resources in Texas, Pennsylvania, and elsewhere, reaping windfalls for their investors. But not Apache. Apache did not make a single notable discovery during the fracking boom, and its stock price languished. As the *Houston Chronicle* put it, Apache "found itself on the outside looking in," and management knew that to "reverse its fortunes," Apache "had to make a headline-grabbing find."

To that end, at the start of the Class Period on September 7, 2016, Apache announced a transformational discovery that would purportedly drive shareholder value for years: an enormous new oil and gas play in West Texas called the "Alpine High." Defendants touted Alpine High to the market as a "world class resource play" that, under Apache's "conservative" models, held over 3 billion barrels of oil and 75 trillion cubic feet ("Tcf") of valuable, condensate-rich "wet gas" in just two of its five shale formations.

---

[1] Unless otherwise noted: (i) capitalized terms have the same meanings as in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (Dkt. 65) ("Complaint"); (ii) citations to "¶" are to paragraphs in the Complaint; (iii) citations to "DX" are to the exhibits (Dkts. 71-6 – 71-9) to the Declaration of Amy Pharr Hefley – Motion to Dismiss (Dkt. 71-5); (iv) citations to "PX" are to exhibits to the accompanying Declaration of Thomas R. Ajamie; (v) all emphasis is added; and (vi) internal citations and quotations are omitted.

Apache asserted that years of rigorous testing and analysis had "confirmed" and "proven" that Alpine High held extremely high-quality oil and gas; that multiple "successful" test wells showed the play was "prolific" in terms of productivity and ease of extraction; and that there were at least 2,000-3,000 drilling locations across the play. Given its "immense" resources, "large inventory of repeatable, high-value drilling opportunities" and numerous "oil-prone locations," Defendants represented that Alpine High would be "highly economic" despite needing infrastructure, even at rock-bottom oil and gas prices.

Defendants' statements had their intended effect: national media, industry journals and sophisticated market analysts embraced Defendants' claims. *Business Insider* reported that "Apache discovered a giant oil field in Texas," *CNN* ran the headline "Oil! Massive shale discovery in Texas," and the *Houston Chronicle* exclaimed that Apache was "back in the game." Analysts remarked on Alpine High's "compelling economics," identifying it as the "largest catalyst" for Apache share price growth. After the Alpine High announcement, Apache's stock price soared nearly 14% in just two days.

Defendants repeated their bold representations about Alpine High throughout the Class Period, enlarging on some claims (e.g., the drilling sites count grew to roughly 5,000), and downplaying any production setbacks as nothing that would alter Apache's models demonstrating the "tremendous" economics of the play. Analysts, in turn, credited Defendants' assertions that Alpine High was a "prolific" and "highly economic" discovery.

As investors would ultimately learn, Defendants' representations about Alpine High were ***baseless***. In the months before announcing Alpine High, the Apache technical team analyzing the region repeatedly warned Christmann and other senior managers that Apache

lacked crucial data it needed to support claims about the play's economic viability, and that *it should not announce the purported discovery*. Former employee (confidential witness, or "CW") accounts reveal that: (i) the team analyzing the region could *not* confirm Alpine High's resources in 2016; (ii) Apache's announcement of the play's purported production capabilities was "*premature*"; and (iii) Apache *lacked* the data to back up its bold assertions. CWs also confirm that the 2016 exploration marked the *third time* since 2012 that Apache had come up empty in prospecting Alpine High. Apache's two prior explorations had found nothing—as Christmann had put it, "too much gas" and not enough oil to be viable. Disregarding this litany of internal warnings and adverse facts, and desperate to announce a major find that would lift Apache's stock price, Defendants pushed ahead and unveiled their "discovery" of Alpine High.

During the Class Period, Alpine High's performance never materialized, and in fact, grew worse. Undeterred, Defendants continued to mislead investors while taking extreme measures to conceal the play's data. For example, Christmann and Sullivan bypassed normal Apache procedures and *precluded* Alpine High performance data from standard peer review processes. Instead, they had the Alpine High technical team report data and results from the play *only* to them and their cadre. Defendants also purged managers who questioned the play, and flouted Texas regulatory filing requirements. Defendants even highlighted purportedly "successful" test wells that had in fact stopped producing *any oil at all* as indicative of the play's strong performance. Employees privy to Alpine High results describe that they contradicted Defendants' representations, including metrics that were *half* what Defendants highlighted to investors, or worse. Plaintiffs' forensic analyses

3

of Alpine High bear this out, including the play's myriad "*dry*" non-economic wells. Indeed, by the time Apache shuttered Alpine High in January 2020, more than ***one-quarter*** of its wells had produced no oil or gas ***whatsoever***, an unheard-of failure rate.

In mid-2019, under mounting pressure from Apache managers, Christmann finally relented and allowed the tightly guarded Alpine High data to be reviewed in-house under the very industry-standard analyses he had prevented for years. This remarkable 2019 review by Apache professionals of well-by-well play data ***from inception***—internally dubbed "Project Neptune"—confirmed that, contrary to Defendants' public statements, Alpine High held low-quality oil and gas, and nowhere near the number of potentially commercially viable drilling sites Defendants had touted. Project Neptune also confirmed that Alpine High's actual production and projections fell far short of the models ("type curves") Apache had publicly claimed. In short, the play had ***never*** supported Defendants' public representations. These damning results were presented to Christmann and other senior managers in October 2019, and Defendants' fraud quickly unraveled. Within two weeks, Steven Keenan, the head of the Alpine High team, "resigned." Three months later, Apache abandoned Alpine High, thereafter recording a ***$3 billion*** impairment on the play, and slashing its dividend by ***90%***. *Bloomberg* reported that Defendants' disclosures stood "in stark contrast" to what they had "vehemently" claimed about the play.

In truth, after more than three years of trumpeting Alpine High as a "world class resource play" that would "transform" Apache, Alpine High was nowhere near commercially viable (and never had been), and had produced virtually no oil or gas at all. In total, the entire play yielded:

4

- *less than 1%* of the oil and gas that Defendants had represented to investors was recoverable;

- *2.9 million barrels* of oil—a miniscule *0.8%* of the *455 million barrels* total that Defendants had represented they *conservatively* expected to recover from just two of Alpine High's five formations *alone*; and

- *0.3 Tcf* of *both* "wet gas" and "dry gas"—just *0.4%* of the 75 Tcf of "really rich [wet] gas" Defendants had told investors throughout the Class Period was within just two formations.

Alpine High had been a debacle. As the true facts were revealed, Apache's stock price suffered steep declines that collectively wiped out *$24 billion* in shareholder value.

In the face of these devastating facts, Defendants raise meritless challenges to the Complaint's falsity and scienter allegations. With regard to falsity, Defendants ignore that they made scores of overwhelmingly positive statements about Apache's single most important project during the Class Period, highlighting Alpine High's "immense," "prolific," and "highly economic" oil and gas reserves. As confirmed by the accounts of 24 former employees, the Project Neptune internal review, Plaintiffs' comprehensive forensic analyses, and Defendants' own admissions at the end of the Class Period, their relentless representations about Alpine High were *lies*: Alpine High was virtually barren of economically-accessible oil or gas.

Defendants, nevertheless, insist that Plaintiffs take the challenged statements (the "Misstatements") out of context, and that virtually *all* were either forward-looking projections or "opinions." These arguments disregard Defendants' actual words—concrete statements about what Apache had supposedly "confirmed" about the attributes of Alpine High through the Company's own analyses—which misrepresented and concealed present

5

facts and lacked a reasonable basis when made. To the extent any of the Misstatements were forward-looking, Defendants made them with actual knowledge that they were false or misleading and fail to identify adequate cautionary language that could bring such statements within the PSLRA safe harbor. Defendants' Misstatements also were not inactionable opinions, as they concerned hard numbers, based on purported scientific data and test results, and furthermore, because they concealed material adverse facts.

With regard to scienter, Defendants ignore that they were directly informed from the very start of the Class Period that their Misstatements lacked a reasonable basis and were not supported by Apache's own data. Defendants also gloss over their deceptive measures to hide Alpine High data and block it from standard internal or external review, and the myriad former employee reports of dismal performance across the play. Defendants, tellingly, do not deny the results of Project Neptune, which confirmed that Apache's data had actually contradicted Defendants' public representations about Alpine High *all along*. Such extraordinary facts are more than sufficient to plead scienter.

Seeking to sidestep these compelling facts, Defendants contend Plaintiffs allege an implausible, "economically backwards," theory of fraud where Defendants knowingly sank $3 billion into an obviously doomed venture. This strawman argument mischaracterizes Plaintiffs' actual theory: that desperate to announce a major "discovery," Defendants rushed Alpine High to market without adequate scientific data or other reasonable support, disregarding explicit warnings from senior employees that Defendants did not have a basis to make the claims they were making—and then doubled down on their baseless assertions throughout the Class Period, recklessly gambling that Alpine High

6

would someday yield positive results. To be sure, this is a ***classic*** form of securities fraud. *See, e.g.*, *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, at 685-86 (5th Cir. 2014) (reversing dismissal of securities fraud action and noting that, under "pressure," defendants may have been motivated to "substantiate the allegedly irresponsible statements they had made previously"); *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (making unfounded assertions akin to "embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing").

In contesting both falsity and scienter, Defendants also challenge the adequacy of Plaintiffs' CW-based allegations. But these allegations, sourced from two dozen former Apache employees with firsthand knowledge of underlying events, are credible, as they detail each individual's position, responsibilities, tenure, and the basis for their knowledge. These independent accounts are uniformly consistent, draw from business units and offices across the Company, and include facts provided by individuals with direct responsibilities related to Alpine High, including those who interacted personally with Christmann—and are further corroborated by external events, Apache's eventual admissions, and Plaintiffs' forensic analyses.

Plaintiffs respectfully submit that the Court should deny the Motion.

## II.    <u>NATURE AND STAGE OF PROCEEDINGS</u>

On December 17, 2021, Plaintiffs filed the Complaint alleging Defendants' violations of §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. Dkt. 65. On February 15, 2022, Defendants filed the Motion and supporting materials. Dkt. 71 (1-10).

## III.   STATEMENT OF ISSUES TO BE RULED UPON

1.      Whether the Complaint adequately pleads materially false or misleading statements and scienter for Plaintiffs' claims under § 10(b) of the Exchange Act.

2.      Whether the Complaint states control person claims under § 20(a) of the Exchange Act against the Individual Defendants.

## IV.   STATEMENT OF FACTS

### A.   Before the Class Period, Apache Missed Out on the U.S. Fracking Boom, and Its Stock Price and Performance Languished Versus Peers

Founded in 1954, Apache is a global E&P company based in Houston. ¶¶ 1, 12, 24. In the early 2010s, Apache was the sixth-largest oil producer in the U.S., but lagged financially relative to competitors due to its late adoption of fracking, a means of oil and gas production from underground shale formations that had recently become commercially feasible. ¶¶ 24-26. Thus, as other domestic E&P companies earned massive profits by fracking to open shale oil and gas resources across North America, Apache missed out, lost ground to its competitors, and its stock price fell more than *30%* from 2010 to 2014. *Id.* Reporting on Apache's declining status in this period, the *Houston Chronicle* wrote on December 30, 2016, that Apache had "found itself on the outside looking in" of the U.S. shale oil boom, and that Apache "had to return to the business of risk, and . . . make a headline-grabbing find." ¶ 26.

### B.   Desperate for a Shale Oil Strike, Apache Brings on Steven Keenan as Head Geologist, Provides Him Apache's Recent Analyses of the Alpine High Region, and Pressures Him to "Find Something"

In April 2014, pursuing a "headline-grabbing find," Apache hired industry veteran Steven Keenan, who had been credited with identifying the "world class" Eagle Ford play

8

in South Texas, along with a six-member team dubbed the "Keenan Six Pack." ¶ 27.

Apache management set up Keenan and his team in their own offices in San Antonio, apart

from Apache's existing Houston and Midland offices. *Id.* This gave them unprecedented

autonomy—but also put them under considerable pressure. ¶¶ 12, 27. As Keenan put it, if

"we didn't find something soon, we'd just be swatted and kicked out." ¶ 29.

Keenan focused on a remote area in West Texas where Apache already had acreage

it had named "Alpine High." ¶¶ 30, 48, 51. He did so even though Apache's New Ventures

Team (consisting of geologists, petrophysicists, reservoir engineers, and other specialists)

had already prospected the area in 2012 and 2014, both times turning up nothing. ¶¶ 44-

49. CW 1, who oversaw the New Ventures Team as Exploration Manager through late

2014, reports, "***we all knew [Alpine High] wasn't an oil play***." ¶¶ 45-46. CW 1 led an

analysis of the Alpine High area in 2012 that found minimal amounts of oil; reviewing the

results, Christmann (then Apache's North American COO) dismissively responded, "***I

don't want gas . . . find us some oil***." *Id*. CW 2, then Apache's Manager of North American

New Ventures who reported to Christmann, led an exploration of Alpine High in 2013-14,

with New Ventures Team member CW 3 and others, which confirmed the area held mostly

dry gas.[2] ¶¶ 47-49. In a meeting attended by Apache geologist CW 5, the New Ventures

Team presented the results of its 2014 analysis to Christmann, who responded, "***I don't

want to see this again, this is way too much gas***." ¶ 50.[3] This was true despite very high

---

[2] "Dry Gas" is the lowest value natural gas, with minimal hydrocarbon content. "NGL" are hydrocarbon liquids extracted from natural gas. Natural gas bearing NGL in solution is referred to as "Wet Gas" or "Rich Gas." Relatedly, "condensates" are liquid hydrocarbons recovered by surface separators from natural gas. *See* Complaint at iv-v.

[3] Similarly, according to CW 1, all of the data Apache's scientists had amassed confirmed that Alpine High was economically non-viable: "too gassy" with "not enough yield" and lacking infrastructure. ¶ 51.

prevailing commodity prices. ¶¶ 25, 28.

After their arrival in 2014, Keenan and his team were handed all of Apache's Alpine High data. ¶ 51. Under intense pressure from senior management to "find something," Keenan "willfully ignored" this information and avoided discussing Alpine High's prospects with the prior exploration teams. ¶¶ 29, 51-53. Instead, he suggested they had improperly analyzed Alpine High, and that he could obtain better results by drilling differently. ¶¶ 51-52. But CW 5 reports that Keenan used outdated methods, namely, 24-fold seismic imaging, rather than superior 256-fold imaging that was readily available in-house. CW 7, Director, E&P Technology – Geoscience (2015-2018), confirms that Christmann permitted Keenan "to shoot seismic the way he wanted." ¶¶ 101, 153. CW 2 described Apache's disregard of its data and industry-standard techniques at Alpine High as a "Hail Mary to the end zone." ¶ 53.

Meanwhile, desperate to join the U.S. shale boom, Apache acquired an additional 300,000 acres in the Alpine High area from 2014 to 2016. ¶ 30. Apache did so even as the price of oil sank from $107/barrel in June 2014 to $45/barrel in January 2015. ¶ 28. Notably, Christmann, Apache's CEO after January 2015, was incentivized to "shift the focus of Apache's portfolio to North America," as a substantial portion of his 2016 compensation was tied to opening a major U.S. oil play. ¶¶ 13-14, 31, 295-99. Sullivan, Apache's EVP – Operations, enjoyed similar financial incentives. *Id.*

    **C.**    **In 2016, Keenan's Team Warns Senior Management That Apache Lacks Crucial Data Needed to Reasonably Project Alpine High's Prospects**

Despite intense pressure from Christmann, Keenan and his team did not develop sufficient data to conclude that Alpine High was the headline-grabbing discovery Apache needed. In presentations in 2015 and 2016, Keenan's team told Christmann and other Apache senior executives that Apache did not have the data and results it needed to support reasonable projections about the play's commercial viability. ¶¶ 55-57, 285. Keenan's team reported that Apache lacked at least nine months of consistent production data, and that fundamental analyses had not been performed (including tests to provide 3D seismic data and geologic data from offset wells), which were needed for reliable projections. ¶¶ 55-57. In 2016 emails and presentations, ***Keenan's team told Christmann and others that, without such data, Apache could not reasonably project production or whether Apache could economically extract oil or valuable wet gas from Alpine High***. *Id.*

Notwithstanding this clearly identified lack of supporting data, in late summer 2016, Christmann informed Keenan's team that Apache would announce Alpine High and related projections in September 2016 at the Barclays CEO Energy-Power Conference, a leading industry gathering. ¶¶ 33, 58. Chester Pieprzica (Keenan's lieutenant) and Keenan's team emphatically responded that Apache should ***not*** announce Alpine High at that time because it lacked the necessary data. ¶ 58. Similarly, CW 8 reports that Keenan was not ready to publicize Alpine High in September 2016 because he did not yet know what it held. ¶ 59.

> **D.  Flouting Internal Warnings and Lacking Supporting Data, Defendants Announce Alpine High as a "World Class," Highly Economic Play**

On September 7, 2016, in a press release and at the Barclays conference, Defendants disregarded Keenan's team's explicit warnings and publicly announced Alpine High as "a

world class resource play" and "an immense resource" that would drive "significant value for . . . shareholders." ¶¶ 32-38, 191-203. Despite lacking supporting data, Defendants proclaimed the Company "can **confirm** the discovery" based upon "extensive geologic and geophysical work, methodical acreage accumulation, and strategic testing and delineation drilling." ¶¶ 32, 37, 191, 199. Defendants represented Alpine High in no uncertain terms as a game-changing U.S. shale oil discovery.

Defendants trumpeted Alpine High's attributes, purportedly backed by years of testing and data. ¶¶ 34-35, 191, 199-200. For example, Defendants touted Alpine High's:

- vast amounts of valuable resources: "conservative[ly]," around 3 billion barrels of oil and 75 trillion cubic feet of rich gas in just two of its five formations (the Woodford and Barnett). ¶¶ 32-33, 191-93;

- "large inventory of repeatable, high-value drilling opportunities," and "2,000 to more than 3,000 future drilling locations…identified in the Woodford and Barnett formations alone." ¶¶ 32, 36, 192-93, 197 ("reservoir consistency, continuity . . . is going to lead to very repeatable and predictable drilling results and targets");

- premium quality resources: "very high-quality oil," "very rich" gas, "very, very, rich NGLs," "very, very highly economic wet gas play" ¶¶ 35, 194; and

- "prolific" initial well productivity levels, in successful oil tests Apache had run to generate field data. ¶ 194; *see also* ¶ 35 ("not a misprint, 17 million [cubic feet of gas] a day"). Defendants touted these early results as exemplifying what Alpine High would ultimately yield. ¶¶ 34-35.

Defendants claimed the combination of high-quality oil and gas and geological attributes made Alpine High "really stand out" as a play with "low cost, highly economic locations." ¶¶ 36, 193-94. Defendants emphasized that, after it was "fully burdened" with production, refining, and transportation (i.e., infrastructure) costs, Alpine High production still featured "tremendous economics," even at very low oil and natural gas prices. ¶¶ 36, 194.

In the two following trading days, Apache's stock price rose *14%*, to close on September 8, 2016, at $59.33 per share, its highest price in over a year. ¶ 39. Financial press reports linked the increase to Defendants' announcement. ¶ 43 (*Business Insider* on September 8, 2016: "Apache discovered a giant oil field in Texas and its shares are leaping"). Analysts also accepted Defendants' representations. Credit Suisse reported that "the economics look so compelling," and noted "the oil and NGL content of the wet gas." Societe Generale praised Apache's "geologic and petrophysical work," and RBC Capital Markets raised its Apache price target. ¶ 40. Even national media joined in, with *CNN* reporting on Apache's claims of "billions of barrels of newly-discovered shale oil," and *Forbes* celebrating the supposed economics and "30% rate of return" Alpine High offered, even at lower oil and gas prices. ¶¶ 41, 43.

Christmann's rush to announce Alpine High had its intended effect. In an article on September 11, 2016, the *Houston Chronicle* noted that, after having a "rough time keeping up with competitors," the discovery had put Apache "***back in the game***." ¶ 42.

E.    **Apache Employees Immediately Recognize That Defendants' Public Representations About Alpine High Do Not Match Reality**

Although Defendants blocked Alpine High data from internal or external review (*see infra* IV.G), beyond Keenan's team, other Apache employees recognized that Defendants' September 7, 2016 public representations lacked factual support. ¶¶ 58-61. For example, CW 5 confirms that the announcement was "premature" and unsupported by proven production. ¶ 59. Similarly, CW 9—an Apache Drilling Engineer through mid-2019 who participated in drilling certain wells that Defendants publicly touted—reports

13

that actual production from the "successful" test wells was extremely poor, including the Redwood IP well, which had stopped producing any oil at all by the time Defendants highlighted it at the Barclays conference. ¶¶ 61, 123. Indeed, CW 9 discussed Defendants' portrayal of Alpine High in 2016 with Keenan Six Pack member Navneet Behl, Apache's VP of Operations in San Antonio, and Behl declared: "I don't know how they made that Alpine play look like it was" and that Apache had "made it sound like" the potential "profit" for Alpine High was *twice* what the San Antonio team had stated. ¶ 61.[4]

Just as Apache did not have data supporting Defendants' public representations about Alpine High in September 2016, over the months and years to come, its data would *never* match Defendants' statements extolling the play's resources and commercial viability. ¶¶ 85-101. As detailed further below (*see infra* § IV.H), when Christmann finally allowed Alpine High data to be internally analyzed in 2019 under Apache's normal review standards, its low-value resources and poor productivity since inception were obvious.

**F.    Defendants Repeatedly "Confirm" Alpine High's Vast, High-Quality Oil and Gas Holdings and Thousands of Economic Drilling Locations, While Downplaying Any Negative Developments**

Undeterred by the lack of supporting data, throughout the Class Period, Defendants repeatedly hyped the attributes and commercial viability of Alpine High, building on their initial representations at the Barclays conference, and repeatedly assuring investors that actual data and results confirmed their claims. For example:

---

[4] CW 14, an Alpine High Completions Engineer, later reviewed Defendants' September 7, 2016 presentation and similarly found it "was not consistent with the production results at the time," ¶¶ 120, 170, and CWs with extensive knowledge of Apache's prior studies of the area (CWs 2, 10, 11) likewise confirmed that Apache's September 7, 2016 investor slide presentation misleadingly and inaccurately portrayed Alpine High as an oil-prone area. ¶ 62.

14

- On November 3, 2016, Sullivan stated during Apache's 3Q16 earnings call, "*[e]very well we've drilled has confirmed our model*" and "*[w]e continue to see excellent production performance across this play*" ¶¶ 65, 208-09;

- On February 14, 2017, Christmann stated at the Credit Suisse Energy Summit that Apache had "confirmed" Alpine High was "highly economic," "[w]e validated it" and "*it's getting bigger with more data*" ¶¶ 65, 216-20; and

- On May 4, 2017, Christmann stated during Apache's 1Q17 earnings call that, "[t]o date, *we have confirmed a highly economic wet gas play with a minimum of 3,000 locations*," and that "*test wells drilled to date have proven much of what we anticipated for Alpine High*" ¶¶ 67, 230-31.

Defendants also repeated that test well data Apache had partially disclosed were "representative of our testing program," that recently drilled test wells "further validate[d]" Apache's models of oil and rich gas at shallow depths, and that Apache had seen continued "good" productivity from wells after initial tests. ¶¶ 67-68, 231-32, 235 (May 4, 2017); 69, 243-44 (similar representations on August 3, 2017). Defendants also reiterated and amplified their representations extolling the huge volume of oil and gas at Alpine High,[5] its thousands of viable drilling locations,[6] and the superior quality of its oil and gas.[7] Defendants repeatedly impressed upon investors that Alpine High would be highly profitable even if commodity prices fell significantly.[8] Major securities analysts continued

---

[5] *See e.g.* ¶¶ 219 (February 14, 2017: "we're not talking hundreds of millions of cubic feet a day, but we're talking multiple B[illion]s ultimately as you move into future years" and "we'll get there quickly"); 231 (May 4, 2017: "[we] confirmed … an estimated 75 Tcf of gas and 3 billion barrels of oil in place in the Woodford and Barnett formations alone"); 239 (May 11, 2017: "Alpine High brings to us decades of inventory").

[6] *See e.g.* ¶¶ 224 (February 23, 2017: "we've got a minimum of 3,000 confirmed locations" and the "location count has increased significantly since last September"), 244 (August 3, 2017: emphasizing "hundreds of locations in the Wolfcamp" formation that held highly valuable oil).

[7] *See e.g.* ¶¶ 224 (February 23, 2017: Alpine High contains "a very rich gas, wet gas, NGLs"); 231 (May 4, 2017: "[t]he economics … are greatly enhanced by its oil content and the high-quality NGLs demonstrated").

[8] *See e.g.* ¶¶ 224 (February 23, 2017: "even in the lower commodity price environment, this play is going to be very economic"); 232 (May 4, 2017: "this will be one of the lowest cost wet gas plays in North America"); 244 (August 3, 2017: Alpine High locations remain "highly economic at current or even lower prices").

15

to credit Defendants' representations. ¶ 68.

On October 9, 2017, Defendants made the first public disclosure of any difficulty in Apache's development of Alpine High, noting challenges extracting oil from the Woodford and Barnett areas due to purported geological complexities. ¶ 71. Christmann admitted Apache had been aware of the issue but had opted for "competitive reasons" "not to share" it. *Id*. These disclosures caused Apache's stock price to fall by 7%. ¶¶ 71, 304-06.

Significantly, Defendants downplayed this development as a mere hiccup that did not diminish the overall "highly economic" quality of the play, including the "low cost" of extracting "tremendous volumes" of "recoverable" oil and gas, and offered new, ***increased*** estimates of "3,500 wet gas locations" and "5,000+" total "Current Location[s]." ¶¶ 72, 247-48. This included ***500*** viable oil drilling locations Defendants could "safely say" were present at just the play's Wolfcamp and Bone Springs formations. ¶¶ 75, 248. Christmann also maintained that Alpine High wells would "generate positive returns even" at low gas prices. ¶ 72. Analysts again credited Defendants' assertions, with an October 11, 2017 Raymond James report stating: "Apache has its hands on a prolific wet gas play . . . with ~3,500 drilling locations," and a Societe Generale report remarking, "we believe that APA will add many more oil well site locations." ¶ 77.

On February 22, 2018, Apache revealed that the ramp-up to Alpine High production would take longer than previously stated, reducing near-term production guidance and the projected oil mix, causing Apache's stock price to fall by 6%. ¶¶ 79, 307-09. But the same day, Defendants reassured that Alpine High would "very soon" deliver "free cash flow for decades" and compound annual growth rates of 150%. ¶¶ 80, 254. Christmann also re-

16

emphasized that Apache's analyses showed Alpine High's value even at low commodity prices, stating: "***We would not be making this type of investment on the midstream or upstream side if we thought there was a sensitivity … that would … mak[e] it not work under very, very low gas and NGL and oil prices***." ¶¶ 81, 256 ("[T]his thing's going to ***really hum under $2*** on the gas side"). Analysts again credited these statements. ¶ 82.

While Apache's April 23, 2019, disclosure of a "Temporary Deferral" of Alpine High natural gas production led to a significant stock price decline, Defendants issued a press release on May 2, 2019, reassuring that "we are poised to deliver attractive oil growth and a substantial cash flow uplift at Alpine High in the second half of the year." ¶¶ 273-74, 310-12. As late as August 1, 2019, Defendants represented that Alpine High "will catch up in the second half of 2019 and exit the year with oil production on plan." ¶ 278.

### G. In Truth, Alpine High's Performance and Data Never Supported Defendants' Public Claims

Throughout the Class Period, the actual Alpine High data contradicted Defendants' public representations about the play, and Defendants took extreme measures to uphold the deception by shielding that data from internal or external scrutiny.

*First*, Christmann deliberately exempted Apache's Alpine High data and the work of Keenan and his team from Apache's ordinary business and scientific review processes. ¶¶ 135-64. Christmann required that reports on the play from the San Antonio Reservoir Engineering Group led by Keenan and his lieutenant, Pieprzica, come straight to him, and limited access to data from Alpine High to himself, Sullivan and a select few others in

17

senior management.[9] ¶¶ 55, 134-36, 139. These direct updates to the CEO and a handful of his cohorts occurred via frequent emails and presentations made approximately every 5-7 business days. ¶¶ 55-57, 134, 290. Production data became even more restricted as the Class Period wore on. ¶ 142.[10]

In dropping a "cone of silence" over Alpine High that lasted until mid-2019, Defendants also exempted play data from Apache and industry-standard validation and verification by Company scientists. ¶¶ 141, 144-52. For example, Apache did not subject Alpine High to a Rose Risk Analysis—a threshold review of test, seismic, and fluid data before any major resource investment—which "violated every step of the scientific method." ¶¶ 62, 145 (quoting CW 10, Apache's former Global Director of Petrophysics). Defendants also exempted Alpine High data from a variety of other normal peer review processes applied to Apache's other E&P projects. ¶¶ 146-49. Keenan and his team were permitted to make superficial presentations that disclosed little to no data in quarterly peer reviews from 2016-2019—and Christmann did not require more even when other Apache executives directly questioned Keenan on the basis for his assertions. ¶ 152. CW 6, who

---

[9] ¶¶ 138 (limited access to WellView system data on drilling, completions, and failures at Alpine High), 139 (Aries system data restricted), 140 (clearance from executive level needed for Alpine High reservoir data), 141 (employees denied data needed for job functions).

[10] Multiple CWs confirm that Alpine High data was treated as "top secret" and was not subjected to normal access or review by Apache professionals. CW 6—an Apache Reservoir Stimulation Lead through 2020, including at San Antonio, reporting to Keenan—states that Keenan kept Alpine High data secret "from the beginning," changing IT settings to restrict normal access, with the blessing of Apache senior executives. ¶¶ 52, 136-38. CW 11—an Apache geologist in the Corporate Reservoir Engineering Group based in Houston for over nine years—was denied access to Alpine High data. ¶¶ 141, 150. Even in the San Antonio office, few except Keenan's technical team (the Reservoir Engineering Group) could access it. See ¶¶ 120, 139. Apache's top scientists also could not access the data. CW 10—who served as Apache's Global Director of Petrophysics and Chief of Staff to the COO with a staff of approximately 160 through mid-2015—reports that "from day one" the data of Keenan's team was "off-limits to anyone else in the Company" other than Christmann. ¶¶ 62, 151. CW 7, who oversaw 30 scientists, was shocked that as a high-ranking Apache geologist, she was not permitted to see Alpine High reserve data. ¶¶ 101, 137, 140.

18

reported directly to Keenan, confirms that Christmann and Sullivan "made that call" to exclude Alpine High from Apache's normal review processes. ¶ 148.

*Second*, many well-placed employees from different offices and with different responsibilities refuted the accuracy of the Alpine High numbers Defendants disclosed. *See, e.g.*, ¶¶ 155 (senior petrophysicist CW 7 "convinced that the data was distorted"), 167 (Apache geologist CW 20 stating the San Antonio team was "obstructing the gathering of any information regarding well performance or reserves for Alpine High"). Former San Antonio employees who worked with Keenan's team at Alpine High saw discrepancies first-hand. CW 13, a San Antonio Control Center Supervisor responsible for Alpine High production optimization from 2017-2020, reports that the play's field production ***never*** reached its monthly projections, and the results presented publicly were "absolutely" not accurate. ¶¶ 119, 157, 166.[11] CW 8, a production engineer in San Antonio from December 2017 to March 2019 responsible for comparing actual production to Apache's type curves, similarly states that Alpine High's published type curves were "absolutely" inflated, and it was "rare" when ***any*** well performed up to them. ¶¶ 59, 171. CW 14, a completions engineer in San Antonio starting in March 2017, corroborates CW 8, stating that Alpine High's type curves were "better than the best performing wells." ¶¶ 169-70. CW 14 also stated she provided Alpine High well production data and projections to the Reservoir Engineering Group, which "shifted" the actual data "up by 30%" ("overnight"), inflating

---

[11] *See also* ¶ 158 (CW 19—a San Antonio Drilling Supervisor throughout the Class Period who drilled over 30 Alpine High wells—states that the play was not producing, and had no oil storage tanks).

the economic appeal of the wells. *Id*.[12]

Meanwhile, Defendants terminated "over a dozen Vice Presidents" and other employees who raised concerns about Alpine High. ¶¶ 159-60 (CWs 5, 6, 7, and 20 reporting termination of EVP and COO, International), 161 (CW 6 noting terminations of VP of Operations, and EVP and Chief Technology Officer), 162 (CW 7 reporting termination of VP of Engineering Technical Services). As CW 10 described, "***the culture [was] you either line up or you are off the team.***" ¶ 164; *see also* ¶ 162 (CW 20 stating people who voiced objections "were told, you're either on the bus or you're off this bus").

*Third*, Defendants obscured Alpine High data and results from outside review by consistently flouting Texas regulatory filing requirements. For example, Apache failed to file a single mandatory completion report for the 150 wells it completed in the first two years of the Class Period. ¶¶ 176-80. By also filing certain Alpine High wells on "pending" rather than completed reports, and misclassifying gas-producing wells as oil wells, Apache for years was able to mask unfavorable production data that was supposed to be presented in regulatory filings. ¶¶ 181-83. CWs confirm that Apache's "huge problem" filing appropriate regulatory reports resulted from a lack of needed data from Keenan's San Antonio Reservoir Engineering Group. ¶¶ 184-87.

> **H.   Finally, a Full Internal Review of Apache's Alpine High Historical Data Confirms That It Had Never Been a Viable Shale Play, and the Truth is Soon Revealed to the Market**

---

[12] Consistent with these reports of under-performance, CWs 22 (an engineering technician at San Antonio), 13, and 14 describe "Project Phoenix," a closely guarded, ***$100 million*** 2018 project to try to stimulate production at the poorly performing Blackfoot wells. ¶¶ 172-74.

By mid-2019, senior Apache executives, concerned that Alpine High may be underperforming, forced Christmann to allow a secret internal review of the play's data. ¶¶ 85-87.[13] This technical review was kept to a small group and code-named "Project Neptune." ¶ 87. In the summer of 2019, Keenan's San Antonio team provided the Project Neptune team with Rate Transient Analysis ("RTA") data and other information covering the lifespan of ***every well drilled at the play from inception to the present***. ¶¶ 88, 91-92; *see also* ¶ 89 (CW 6 describing well-by-well RTA analysis using San Antonio data). The Project Neptune team input the Alpine High data into Apache's standard analyses and models for measuring productivity, resource quality and reserve size, and projecting economic viability. ¶¶ 88, 91-93.

The results were devastating. They showed ***weak performance and poor-quality resources since the inception of Alpine High***, and ***dismal projections*** based on the data. ¶ 95. The oil and gas at Alpine High were low quality, with: (i) condensate content of the gas at most wells just ***one fifth to one quarter*** of what Defendants had publicly represented; (ii) standard PVT lab tests on NGLs from Alpine High showing ***nearly 60% ethane***, rendering them far less-economic to process than Defendants' claimed; and (iii) "Estimated Ultimate Recovery" (EUR) for the 100+ Apache wells at Alpine High of ***around one quarter*** of the recovery scenarios Defendants had publicly asserted. *Id.*

The data and analyses also directly contradicted Defendants' claims of thousands of economic drilling sites. ¶¶ 94, 96-97. They instead showed that ***most*** of the locations

---

[13] This account is consistent with CW 11's report that Apache's Corporate Reservoir Engineering group "had to go to the executive level to demand" Alpine High data. ¶ 140.

21

Defendants had publicly trumpeted were *never* viable, while the rest could be *only* when improbably assuming high commodity prices and deep reductions to Apache's fixed costs and commercial terms. ¶ 97. Specifically, Project Neptune's analysis *confirmed* that: (i) *none* of the thousands of potential monocline oil and gas locations could be economically viable; (ii) just *10%* of the hundreds of potential oil locations could be economically viable; and (iii) only around *half* of the potential gas-only locations could be economically viable, even with aggressive assumptions. *Id*. Project Neptune also found that Apache's data had consistently fallen short of the primary phase type curves, or projections, that Defendants publicly represented. ¶ 98. In sum, Apache's long-hidden actual data substantially *contradicted* Defendants' claims about Alpine High's commercial viability.

While the underlying data was accessible and reported to Christmann all along, the Project Neptune team prepared a presentation of its key findings and delivered it in-person to Christmann and others in senior management in October 2019. ¶¶ 85, 100, 136, 152, 290. Tellingly, Apache never publicly disclosed the existence or results of Project Neptune. However, the fallout was swift: (i) in late October 2019, Keenan abruptly resigned, sending Apache's stock price tumbling roughly 11%; (ii) days later, Defendants disclosed significantly "lower activity" and production at Alpine High; (iii) on January 9, 2020, news broke that Apache had closed its San Antonio offices; and (iv) on February 26, 2020, Apache reported a $3 billion impairment for Alpine High. ¶¶ 102-06. *Bloomberg* reported that the results came "in *stark contrast*" to Defendants' "*vehement*[]" defenses of the play since 2016. ¶¶ 107, 109.

22

Plaintiffs' forensic analyses of production data from across Alpine High, based upon information Defendants concealed, misrepresented, and obscured during the Class Period, corroborate the core conclusion of Project Neptune: Defendants' claims about Alpine High were baseless. ¶¶ 116-33. After three years of relentlessly touting Alpine High to investors as the "world class resource play" that was going to "transform" Apache, the play produced *less than 1%* of the oil and gas that Defendants had told investors was recoverable.

Specifically, the total amount of oil Apache produced across Alpine High during the Class Period amounted to only about 2.9 million barrels, a miniscule 0.8% of the 455 million barrels that Defendants had "conservative[ly]" claimed they would recover from the Woodford and Barnett formations *alone*. ¶ 116. Oil production in Woodford and Barnett amounted to less than 1.8 million barrels, or about 0.4% of the total amount of oil Defendants claimed. *Id*. The Wolfcamp formation—which Defendants flagged as an "emerging oil play" with at least 500 economic drilling locations—produced just 1.1 million barrels of oil. *Id*. And the Bone Springs formation produced almost nothing. *Id*. Wet gas production was also abysmal. ¶ 117. Throughout the Class Period, the total amount of all gas—"wet" and "dry"—produced across Alpine High amounted to a mere 0.3 Tcf, just 0.4% of the 75 Tcf of "really rich [wet] gas" Defendants told investors was in the Barnett and Woodford formations alone. *Id*.

As Apache drilled its way across Alpine High hoping its claims would pan out, Defendants championed the "strong" and "successful" results and insisted newly drilled wells were "confirming" their estimates of massive amounts of recoverable oil and gas. ¶ 118. In truth, however, most of the wells that Defendants held out as exemplars of the

23

"world class resource" were duds. ¶ 119. In a pattern repeated throughout the Class Period, Defendants hyped initial production statistics from a "successful well test" in investor slides when its production already had plunged—at times, such wells were bone dry. ¶¶ 119-26. In total, *27%* of all wells drilled at Alpine High produced *no oil or gas whatsoever,* a virtually unheard-of failure rate for a Texas shale play. ¶ 128.

## V.    STANDARD OF REVIEW

"Motions to dismiss under Rule 12(b)(6) are viewed with disfavor" and "rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). A complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). On a Rule 12(b)(6) motion, the Court does not resolve disputed fact issues. *See Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014). Rather, the "complaint must be liberally construed in favor of the plaintiff, and all facts pleaded . . . taken as true." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *2 (S.D. Tex. Jan. 19, 2016).

## VI.    ARGUMENT AND AUTHORITIES

### A.    The Complaint Adequately Pleads Actionable Misstatements

#### 1.    Legal Standards

Plaintiffs' allegations satisfy Rule 9(b), as they "specify the statements contended to be fraudulent . . . the speaker . . . when and where the statements were made, and . . . why the statements were fraudulent." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 255-56 (5th Cir. 2005). The PSLRA, which further requires falsity allegations based upon information and belief to specify "all facts on which that belief is formed" (15 U.S.C.

24

§ 78u-4(b)(1)(B)), "was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value . . . must be routinely dismissed on Rule 9(b) and 12(b)(6) motions." *Edwards v. McDermott Int'l., Inc.*, 2021 WL 1421609, at *8 (S.D. Tex. Apr. 13, 2021). For material omissions, "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248; *see also McNamara v. Bre-X Minerals Ltd.*, 197 F. Supp. 2d 622, 687 (E.D. Tex. 2001) (a "defendant may not deal in half-truths"). Therefore, "the Fifth Circuit instructs . . . that under Rule 10b–5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Stone v. Life Partners Hldgs., Inc.*, 26 F. Supp. 3d 575, 595 (W.D. Tex. 2014).

### 2.      Defendants' Class Period Misstatements Misrepresented and Concealed Material Adverse Facts

As explained above, Alpine High was Apache's most important E&P project and was critical to the Company's success. Defendants unveiled the play with extraordinary fanfare, promoting it as "an immense resource" that would "drive incremental growth and returns for years to come." ¶¶ 191, 208. Thereafter, at every opportunity—including in more than 60 investor presentations, dozens of earnings calls and SEC filings, and repeated media interviews—Defendants spoke in highly specific and overwhelmingly favorable terms about Alpine High. Among other things, they claimed it had vast holdings of "high-quality oil" and "really rich gas," including more than 3 billion barrels of oil and 75 Tcf of rich gas in just two of its five shale formations. Defendants also emphasized that "every

well we've drilled has confirmed our model." ¶¶ 127, 209.

The Complaint alleges a wealth of particularized facts known to Defendants during the Class Period that—when properly considered in the aggregate—demonstrate that each Misstatement was materially false or misleading when made. *See, e.g.*, *Haack v. Max Internet Commc'ns, Inc.*, 2002 WL 511514, at \*5 (N.D. Tex. Apr. 2, 2002) ("[t]he flaw in [d]efendants' argument is that it seeks to isolate an element of the circumstances alleged . . . rather than to consider them in their totality") (ellipsis in original).[14]

*First*, repeatedly before the start of the Class Period, Keenan's technical team in San Antonio—which generated and maintained Apache's Alpine High data—specifically informed Christmann and other members of Apache senior management that they lacked sufficient and reliable data to publicly announce the play, and that they would need at least nine more months of consistent well production and many additional analyses to support a reliable assessment of Alpine High's commercial viability (collectively, the "**Pre-Announcement Warnings**"). ¶¶ 54-60, 63. Without this critical and industry-standard testing, Defendants could not substantiate Alpine High's viability, such that even Keenan was not ready to announce Alpine High. ¶¶ 57-59. Many CWs describe the Alpine High announcement as misleading. ¶¶ 58-63; *see also* pp. 10-11, 13-14. Thus, Defendants' statements touting Alpine High in and after September 2016 lacked a reasonable basis and were not supported by Apache's own data.[15]

---

[14] Shifting the focus from the Complaint's well-pled allegations, Defendants highlight certain unchallenged representations. MTD at 15-16. This distractive effort does not undermine the Complaint's actual allegations of falsity.

[15] Even prior to these warnings, in the four years preceding Defendants' September 7, 2016 announcement of Alpine High, two different Apache New Ventures Teams prospected Alpine High and presented their detailed analyses to Christmann, who rejected the play each time as "too gassy," lacking in oil, and not commercially viable (the "**Prior**

*Second*, after September 2016, Apache's data ***never*** supported Defendants' public statements hyping Alpine High's attributes, performance, and commercial viability. ¶ 94. This was confirmed by Project Neptune, which in mid-2019 finally accessed the Alpine High data—including RTA data covering each well from inception through the present— that Christmann had sequestered for years (collectively, the "**Historical Play Data**"). ¶¶ 6, 85-101. After applying the standard analyses that Apache regularly used when assessing performance, projections, and economic viability in all of its other plays, Project Neptune confirmed that Alpine High was and had always been a failure. ¶¶ 88-93. Specifically, from the beginning of the Class Period: (i) the condensate potential of most Alpine High wells was typically just 20%-25% of what Apache had claimed (¶ 95); (ii) the total EUR for the 100+ wells Apache had drilled was only approximately 25% of the well development scenarios Defendants had shared from 2017 to 2019 (*id.*); and (iii) Apache's data had never supported Defendants' repeated representations of thousands of economic drilling locations and 75 trillion cubic feet of rich gas and 3 billion barrels of oil in place at Alpine High (¶ 99). Instead, only a small fraction of the play's locations could even possibly approach commercial viability, but only when assuming extremely aggressive and unlikely conditions. ¶¶ 94-97. Thus, Defendants' Misstatements *after* announcing Alpine High conflicted with the hidden contemporaneous facts and lacked any reasonable support.

*Third*, enabling this situation, Christmann deliberately shielded critical Alpine High

---

Rejections"). ¶¶ 44-50. Among other things, rock depth and maturity data in 2014 confirmed that the Wolfcamp and Barnett formations (addressed in many Misstatements) were mostly dry gas, and maps generated during the 2014 exploration depicted the play as all gas. ¶¶ 48-50.

27

data from the rest of the Company for years, excluding the supposedly "immense resource and transformational discovery" from Apache's standard peer review practices (collectively, the "**Prevented Peer Review**"). ¶¶ 64, 134-64. Rather than permitting teams of Apache employees to review, analyze, and test Alpine High data, Christmann directed that such data and reports go directly to him, and he controlled who else (including Sullivan) saw them. ¶¶ 134-36. The very few employees with access to Alpine High data were specifically instructed not to share it with anyone outside San Antonio, computer access to the data was severely restricted, and requests for play data had to be made at the executive level. ¶¶ 136-38, 140.

Christmann knew his unprecedented sequestration of Alpine High data stymied any "objective assessment." ¶ 145. This meant that the information underlying the Misstatements was not subject to, among other things:  (i) any Rose Risk Analysis, as was applied to all other exploration plays at Apache—the absence of which "violated every step of the scientific method" (*id.*); (ii) internal peer review that all other Apache oil and gas plays were subject to during the Class Period (¶¶ 146-49); and (iii) other standard testing, including NGL production forecasting and flow simulations (¶¶ 141, 150). Because an objective assessment of Alpine High "never happened," Defendants deliberately misled investors about Alpine High, "what it really was versus how it was represented." ¶¶ 148-49, 170; *see also* ¶¶ 155-58, 168-71;[16] *see also* pp. 17-19.[17]

---

[16] Apache employees who questioned Alpine High were serially fired or forced out. ¶¶ 159-64; *see also* pp. 20, 61.

[17] Defendants concede that they excluded Alpine High data from standard internal processes and peer review, but claim this was due to "competitive concerns." MTD at 51-52. This contention is nonsensical and, at best, raises a fact issue, particularly when considering that Christmann disregarded the Pre-Announcement Warnings so he could *publicly* announce the play in 2016, after which Defendants made repeated *public* statements touting the play—hardly

*Fourth*, corroborating the conclusions of Project Neptune, Plaintiffs' independent investigation, which included forensic analyses of data that Apache intentionally mispresented, obfuscated, and concealed during the Class Period, found that Alpine High never produced quantities of oil and gas remotely close to what Defendants claimed (collectively, the "**Forensic Analyses**"). ¶¶ 116-33. In stark contrast to Defendants' public claims that Alpine High was a "world class resource play" with immense production capabilities—including "conservative" estimates of over 3 billion barrels of oil and significant amounts of "really rich gas"—Alpine High's overall production was paltry. ¶ 116. In consultation with an industry expert,[18] Plaintiffs present detailed allegations demonstrating, among other things, that: (i) Defendants consistently concealed that *27%* of the wells drilled across the play through January 2020 were dry—a staggering failure rate, particularly compared to the less than 1% failure rate at Eagle Ford, to which Christmann baselessly compared Alpine High (¶¶ 127-28, 192); and (ii) production from many of the individual wells that Defendants touted in their public statements as "strong" or "successful" had dropped considerably or evaporated by the time Defendants spoke (¶¶ 118-20, 122-26).[19] CW accounts confirm that Defendants grossly exaggerated well

---

an effort to stifle competition. *See also* ¶ 143 (CW 4 rejecting as "complete bull" the notion that Alpine High data was kept secret for competitive reasons).

[18] Defendants wrongly claim that the Forensic Analyses should be discredited because the Complaint does not identify the assisting industry expert. *See, e.g.*, *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 & 491 n.13 (W.D. Pa. 2020) (falsity adequately alleged against fracking company based on conclusions of forensic analysis performed by unidentified "oil and gas industry expert"); *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *9 (N.D. Cal. Jan. 14, 2022) (falsity adequately alleged based on, *inter alia*, unidentified experts and former employees).

[19] Defendants' argument that they *subsequently* gave "update[s]" on production for some of these wells is unavailing, as Defendants ignore that production had *already* fallen off *at the time Defendants touted the wells to investors*, rendering the statements false or misleading when made. MTD at 17 n.7. Additionally, Defendants' "update[s]" were opaque and incomplete. For example, the Weissmeiss 1H well, which Defendants described in September 2016 as having a "strong" initial production rate of 281 barrels of oil per day, had in fact already seen several months of

29

production levels. ¶¶ 166-74.

In light of the foregoing, and the other facts discussed herein and detailed in the Complaint, Plaintiffs have adequately alleged the material adverse facts known to Defendants at the time they spoke publicly that rendered the Misstatements materially false or misleading. *See, e.g.*, *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at *12 (S.D. Tex. Apr. 14, 2021) (sustaining fraud claims where "[p]laintiffs, relying on the accounts of two production engineers, allege" that defendants "clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates"); *Edwards*, 2021 WL 1421609, at *9 (sustaining fraud claims based upon omissions where "[d]efendants did not so much as mention those internal forecasts"); *Life Partners*, 26 F. Supp. 3d at 586 (fraud claims adequately alleged where "[p]laintiffs describe in detail [defendant's] departure from the industry standard").[20]

### 3. The Complaint's Particularized CW Allegations Demonstrate That the CWs Possess the Information Attributed to Them

Plaintiffs' allegations based upon the detailed and consistent facts that the CWs furnished are reliable and amply support the falsity (and scienter) elements of Plaintiffs' claims. The Complaint describes each CW with "sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at

---

steadily declining production by the time Defendants first highlighted it, with production falling to just 54 barrels a day by August 2016. ¶ 124. Yet, Defendants' purported "update[]" on this well contained only statistics on gas production, not oil production. *See* DX 7 at 14.

[20] These detailed allegations lay bare Defendants' suggestion that Plaintiffs do not specify what renders misleading their claim of "two years of extensive geological and geophysical work" when announcing Alpine High. MTD at 16.

*11 (S.D. Tex. Mar. 27, 2019). More specifically, it pleads each of the following details for each CW, enabling the Court to accord maximum weight to the facts that each CW provided: (i) the CW's job description; (ii) the CW's responsibilities; (iii) the CW's employment dates; and (iv) how the CW learned the information alleged. *See, e.g. Brody v. Zix Corp.*, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006) (the foregoing details adequately demonstrate that CWs "would possess the information pleaded").

Courts routinely credit CW-based allegations when, as here, such details about the basis for the CW's knowledge are pled. *See, e.g.*, *Spitzberg*, 758 F.3d at 691 (allegations based on CW's report reliable and provided an adequate factual basis to support claims). This Court recently sustained securities fraud claims based, in part, on facts that CWs provided. *See Edwards*, 2021 WL 1421609, at *9 (denying motion to dismiss after crediting CW allegations); *Camelot*, 2021 WL 1416025, at *12 (same). Plaintiffs provide adequate detail for the Court to reach the same conclusion here.[21] To take a few examples:

- **CW 1** was a 23-year Apache veteran, through 3Q14. She was an Exploration Manager in Apache's Midland office, overseeing the New Ventures Team, which included reservoir engineers, petrophysicists, and geologists. She led the exploration of the Alpine High region in 2012, following which CW 1 presented analytical maps, logs, and results to Christmann. ¶¶ 45-46, 51, 282;

- **CW 7** was employed by Apache from June 2010 until September 2018. After June 2015, she was Director, E&P Technology – Geoscience, managing a staff of 30 scientists engaged in petrophysics, geology, petroleum systems, and geophysics. She reported to executives one level below the CEO, including Sullivan and COO, International Tom Voytovich, and discussed Alpine High petrophysics with Keenan. ¶¶ 101, 155, 162; *see also* ¶¶ 160,

---

[21] Without support, Defendants claim "many" of the CWs are "disgruntled former employees" MTD at 5. Defendants do not contend that the Complaint fails to plead the details that courts find sufficient to credit CW allegations.

163-64, 287 (describing Christmann's interactions with Keenan and communications regarding the status of Alpine High);

- **CW 10** was employed by Apache from 2004 until August 2015 in various positions, including Global Director of Petrophysics beginning in 2011, and Chief of Staff – Geosciences from 2011 to 2015, where approximately 160 Apache employees reported to her and she reported to then-COO Rod Eichler. CW 10 confirmed that, under established Company policies, any exploration play at Apache was supposed to go through a Rose Risk Analysis and that senior Apache executives, including the CEO and COO, routinely attended the Rose Risk Analysis and other peer review meetings. ¶¶ 62, 145, 149; *see also id.* ¶¶ 151, 159, 164, 288 (describing lack of internal reviews of Alpine High and employee turnover);

- **CW 15** was employed by Apache as a Performance Drilling Expert from September 2017 to May 2020. She worked at the San Antonio office, focused on Alpine High through September 2018. CW 15 was present during a 2Q18 review meeting in July 2018 where Defendant Riney stood up in front of dozens of people including Keenan and Christmann, and asked "***When are we going to start producing economic wells***?" ¶¶ 133, 290; and

- **CW 24** was employed by Apache from late 2016 until 1Q20 as a Regulatory Technician. She worked in San Antonio, reported to Regulatory Manager Randy Early and later Region Health, Safety, Environmental and Regulatory Manager, Marcus Bruton, and was responsible for, among other things, filing drilling permits and completion reports with the RRC, but was instructed not to submit such filings until told to do so. ¶ 185; *see also id.* (describing the frequency of filing completion reports for Alpine High and inability to access the necessary data to file the reports).[22]

Given such detail, there is no basis to discount the facts the CWs provide. *See, e.g.*, *Cobalt*, 2016 WL 215476, at *3 (because the "basis for [CWs'] knowledge is set forth in the [c]omplaint" the allegations "based on knowledge obtained from these witnesses ***will not be discounted***"); *Edwards*, 2021 WL 1421609, at *5-6 (referencing facts provided by

---

[22] For each other CW, the Complaint also provides adequate details:  CW 2 (¶¶ 47-48, 51, 53); CW 3 (¶ 47-49); CW 4 (¶¶ 49, 51, 60, 101, 121); CW 5 (¶¶ 50, 101, 138); CW 6 (¶¶ 52, 101, 137-38); CW 8 (¶¶ 59, 141, 148, 171); CW 9 (¶ 61); CW 11 (¶¶ 62, 140, 150); CW 12 (¶¶ 90, 136); CW 13 (¶¶ 119, 166); CW 14 (¶¶ 120, 139, 169); CW 16 (¶ 137); CW 17 (¶ 138); CW 18 (¶ 142); CW 19 (¶ 158); CW 20 (¶ 160); CW 21 (¶ 163; CW 22 (¶ 172); and CW 23 (¶ 184).

32

certain of 24 CWs in denying motion to dismiss); *Camelot*, 2021 WL 1416025, at \*7 (denying motion to dismiss relying, in part, on facts CWs provided that company's drilling techniques "departed from industry standards"); *see also infra* § VI.D.7.

### B.　The Safe Harbor Does Not Protect Any Misstatement

The PSLRA safe harbor can render a statement inactionable only when it is a "forward-looking" statement that is "identified as . . . forward-looking" and is: (i) accompanied by "meaningful cautionary statements"; or (ii) "the plaintiff fails to [plead] that the forward-looking statement" was made with actual knowledge that it was false or misleading. *Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u-5(c)(1)(A-B).

Here, Defendants broadly contend that "the vast majority" of the Misstatements "qualify as forward-looking" (MTD at 19), but fail to support this position. Instead, they point to two putative forward-looking statement examples in a footnote, while referring the Court and Plaintiffs to a 42-page single-spaced "Appendix A" (Dkt. 71-1) to ferret out the remainder of Defendants' position. *Id*. at 19 n.8. Appendix A only muddies the waters, as "Forward-Looking Statement" is repeatedly pasted in a column adjacent to lengthy block quotes that do not appear in the Complaint. Nowhere in any of the quoted language in Appendix A (or anywhere else) do Defendants endeavor to explain: (i) what statement or portion of a statement they believe is forward-looking; or (ii) what putative cautionary statement they believe applies to any particular Misstatement. This gambit fails, as it prevents the Court from conducting the required analysis. *See, e.g.*, *Lormand*, 565 F.3d at 245 (district court "erroneously neglected to address how each . . . statement (or portions of those statements) is specifically and meaningfully protected by the safe harbor" because

33

"[e]ach statement that benefits from the safe harbor must be addressed individually");

*Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 850 (N.D. Tex. 2018) ("Courts cannot

apply a blanket safe harbor for all forward-looking statements but must determine how a

statement is specifically and meaningfully protected by the safe harbor.").

If the Court is inclined to labor through Defendants' improper argument, it can

readily conclude that none of the Misstatements finds shelter in the safe harbor.[23]

### 1.    The Safe Harbor Is Unavailable for Statements and Omissions of Present or Historical Fact

Defendants label as "Forward-Looking" many statements of historical or present

fact that are ineligible for the safe harbor. For example, none of the following

Misstatements is forward-looking, and Defendants provide no support for the "Forward-

Looking" label they affix to any of these statements in Appendix A:[24]

- (i) "the company *can confirm the discovery of a significant new resource play*, the Alpine High"; (ii) "2,000 to more than 3,000 future drilling locations have *been identified* in the Woodford and Barnett formations alone; and (iii) "excited about the *Alpine High play and its large inventory* of repeatable, high-value drilling opportunities") (¶191);

- "[I]t was *always* in the oil and wet gas window. *It's not dry gas*." (¶ 199);

- "We *continue to see strong results that reinforce* our confidence in this world-class resource play." (¶ 239);

- "The economics of this play *are driven* by the low cost and *the tremendous volumes of oil and NGLs*." (¶ 247);

---

[23] The law, however, protects the Court and Plaintiffs from assuming the burden that Defendants' threadbare arguments impose. *See, e.g.*, *Irvin v. S. Snow Mfg., Inc.*, 517 App'x 229, 231 (5th Cir. 2013) (arguments not raised clearly and developed adequately in opening brief are waived).

[24] For completeness, PX A is a copy of Appendix A to which Plaintiffs added a column titled "Plaintiffs' Response" that contains Plaintiffs' brief response to the labels Defendants pasted into their "Reasons Not Actionable" column.

- As to the Wolfcamp and Bone Springs locations, "[Apache] can safely say that *we have at least 500 economic well locations at this time*" (¶ 248);

- "*[T]here's a lot of proven oil, we've shown that.*" (¶ 261); and

- (i) "Apache *has identified* over 3,500 economic drilling locations in a wet gas play and over 1,000 locations in a dry gas play at Alpine High"; and (ii) "[d]uring 2018, *Apache drilled 100 wells at Alpine High with a 96 percent success rate*") (¶ 270).

These and other Misstatements of present and/or historical fact are not forward-looking and are materially false or misleading for the reasons stated at pp. 25-30. *See, e.g.*, *Life Partners*, 26 F. Supp. 3d at 597 ("statements about the present strength of the company and of its product" not forward-looking).[25]

Moreover, to the extent that some of the Misstatements contained forward-looking elements, many of them also incorporated present factual assertions, rendering the safe harbor inapplicable. *See, e.g.*, *Spitzberg*, 758 F.3d at 691 ("a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present"); *Rougier*, 2019 WL 6111516, at *10 ("A forward-looking statement, for instance, whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor"). For example, as reflected in the Complaint and PX A, each of the following Misstatements explicitly tied any forward-looking portion to materially false or misleading statements of present or historical fact and are therefore, at best, "mixed" statements:

- (i) "What's going to make this play really stand out is the quality, the thickness and the cost structure, *a very, very highly economic wet gas play*"; (ii) "*you've got reservoir consistency, continuity*, which is going to lead to

---

[25] The Complaint does not challenge "accurate historical data," as Defendants' present/historical fact statements omitted material information. *See McNamara*, 197 F. Supp. 2d at 687 (a "defendant may not deal in half-truths").

35

very repeatable and predictable drilling results and targets"; and (iii) a "very wet gas resource. Where you virtually get the gas for free." (¶¶ 194, 197);

- "**we brought forth a transformational discovery at Alpine High** that will drive incremental growth and returns for years to come." (¶ 208);

- "we will get to the oil and we believe there is a lot there, because **it's in the system. We validated it. We have a proven column and it's in the right window**. (¶ 220);

- "**the field development program is not constrained by the need for extensive water handling infrastructure**. As a result, "even in the lower commodity price environment, this play is going to be very economic." (¶ 224); and

- "**we've run many cases on the downside**. We would not be making this type of investment on the midstream or the upstream side if we thought there was a sensitivity that was close to anything that would come into making it not work under very, very low gas and NGL and oil prices" (¶ 256).

Each of these Misstatements (and the others indicated on PX A) was materially false or misleading when made because Defendants misrepresented and concealed material adverse facts, as confirmed by: (i) the Pre-Announcement Warnings, through which Keenan's team responsible for exploring and developing Alpine High repeatedly advised Defendants that they had no basis to announce the play (¶¶ 54-60, 63); (ii) the Prevented Peer Review, through which Defendants concealed material facts about Alpine High from internal scrutiny by exempting it from Apache and industry standard peer and business vetting processes (¶¶ 134-64); and (iii) the confidential internal Project Neptune review of the Historical Play Data, which showed that Defendants never had reasonable support for the Misstatements—to the contrary, the data refuted their claims about Alpine High's resources and commercial viability (¶¶ 85-101).[26] *See also* pp. 25-30. Accordingly, there

---

[26] The numerous dry wells and other adverse facts affecting the play's viability (¶¶ 116-33), and the Prior Rejections made because Alpine High was "too gassy" (¶¶ 44-53), also rendered the Misstatements materially false or misleading.

is no safe harbor protection. *See, e.g.*, *Rougier*, 2019 WL 6111516, at \*10 (denying safe harbor for projections that omitted current adverse facts); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) (present fact statements "justify[ing] the financial projections" actionable); *McDermid v. Innovio Pharms., Inc.*, 520 F. Supp. 3d 652, 666 (E.D. Pa. 2021) (safe harbor does not apply to omissions of present fact).

## 2.      Any Cautionary Statements Were Not Meaningful

Defendants are also not entitled to safe harbor protection for any forward-looking Misstatement because none of the putative warnings to which Defendants point (MTD at 20) was a "meaningful cautionary statement[]." 15 U.S.C. § 78u-5(c)(1)(A)(i). Initially, Defendants claim that "these statements" (without identifying any) enter the safe harbor based upon the vague caution that "a number of risks and uncertainties . . . could cause our actual results, performance, and financial conditions to differ materially from our expectations." MTD at 20.[27] This imprecise disclaimer is meaningless boilerplate. *See, e.g.*, *Lormand*, 565 F.3d at 244-45 (warning addressing factors that "could cause actual results to be materially different" is "boilerplate and not meaningfully cautionary").[28]

Defendants' suggestion that the following statements from two of Apache's Forms 10-K contained meaningful cautionary language likewise fails:

---

[27] Many of the Misstatements Defendants label as "Forward-Looking" were oral statements (*see, e.g.*, ¶¶ 192, 194) for which the PSLRA requires cautionary language to: (i) accompany the particular oral forward-looking statement; and (ii) identify the forward-looking statement as, in fact, forward-looking. *See* 15 U.S.C. § 78u-5(c)(1)(A). Defendants cannot make the required showing. MTD at 20 (claiming only that they "framed these statements with adequate cautionary language").

[28] The lone case Defendants cite to suggest that their cautionary statements were meaningful is in accord. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 454 (S.D. Tex. 2016) ("[t]he case law is clear that . . . boilerplate warnings won't do; cautions must be tailored to the risks that accompany the particular projections").

37

- risks posed by "[c]rude oil and natural gas price volatility, including the recent decline in prices for oil and natural gas," which Defendants stated "***could adversely affect***" Apache (DX 30 at 14) (emphasis in original);

- risks regarding "the availability of pipeline capacity and infrastructure," which Defendants stated "***could adversely affect***" the Company (*id.*) (emphasis in original);

- that "exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons," which followed and was modified by Defendants' statement that "***[f]uture drilling activities . . . could have an adverse affect on our future results***" (*id.* at 18); and

- "the risk that [Apache] ***will not*** encounter commercially productive oil or gas reservoirs" or that Apache ***may not*** "***realize an adequate return on the wells that we drill***" (DX 4 at 18) (second emphasis in original).

*First*, for a cautionary statement to be meaningful, it must provide a "substantive company-specific warning[] based on a realistic description of the ***risks applicable to the particular circumstances***" addressed in the statement. *Lormand*, 565 F.3d at 245; *see also id.* at 247 (cautionary statements not meaningful where they were not "specific, concrete explanations that clearly identified and quantified" the risks). However, while *every* Misstatement addressed Alpine High, *none* of the warnings Defendants cite mentions the play at all. In fact, ***Apache used the same Form 10-K warnings before announcing the purportedly "transformational discovery***." ¶ 208.[29] These vague and oft-repeated warnings applicable to any E&P company were not meaningful cautions tailored to "the particular circumstances." *Lormand*, 565 F.3d at 245; *see also Fresno Cnty. Emps.' Ret. Ass'n. v. Comscore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) ("the relevant

---

[29] *See* PX B, Apache 2014 Form 10-K at 18, and PX C, Apache 2015 Form 10-K at 16 (containing same "cautionary language" Defendants cite in the first two bullets of MTD at 20); PX B at 22 & PX C at 20-21 (containing same "cautionary language" Defendants cite in the third and fourth bullets of MTD at 20). These warnings plainly were not "tailored to a particular company's status at a particular time." *Carlton*, 184 F. Supp. 3d at 454.

cautionary language must be prominent and specific, and must directly address exactly the risk that . . . was not disclosed"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) ("cautionary statement must discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'").[30]

*Second*, "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021). Here, the Complaint sufficiently details that each of the risks to Alpine High that Defendants claim they warned of ***already existed*** at the start of the Class Period. ¶¶ 44-60, 63, 85-101, 116-64; *see also infra* § VI.D.1). This provides an independent basis to conclude that Defendants' purported cautions were not meaningful. *See, e.g.*, *Lormand*, 565 F.3d at 247 (warnings not meaningful in light of "clearly present danger that was materializing"); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015) (cautionary language inadequate when risk warned-of had arisen); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004) (warning that "impl[ies] that no such problems were on the horizon even if a precipice was in sight" not meaningful).

*Third*, Defendants' warnings pertaining to oil and gas price volatility and infrastructure availability were not meaningful given Defendants' consistent Class Period statements denying that such risks existed. *See, e.g.*, ¶¶ 194 (even at low commodity prices

---

[30] For "mixed" statements containing both present/historical and forward-looking components, "virtually no cautionary language short of an outright admission would be sufficient to qualify the forward-looking portions" for the safe harbor. *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1022-23 (N.D. Cal. 2020).

and "fully burdened" economics, "rates of return . . . go off the charts" and celebrating Alpine High's "tremendous economics"); 247 ("The economics of this play are driven by the low cost and tremendous volumes of oil and NGLs."); 256 (amid decreasing prices, assuring that "[i]n the context of today's commodity price" Alpine High "is going to really hum below $2 on the gas side"). Cautionary language is not meaningful when Defendants make repeated and specific statements denying the risk referenced in the warning. *See, e.g.*, *Hall v. Rent-a-Center, Inc.*, 2017 WL 6398742, at *19 (E.D. Tex. Oct. 19, 2017), R. & R. adopted, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017).

*Fourth*, Defendants' putative cautionary statements were not meaningful because they "remained unchanged despite a significant change in circumstances of material importance to an investor." *Harman*, 791 F.3d at 107 (collecting cases); *see also Slayton v. Am. Ex. Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("[t]he consistency of defendants' language over time despite [changing circumstances] belies any contention that the cautionary language was tailored"). Here, the first page of Defendants' brief portrays Alpine High as resulting from Apache's view that "***[t]he world had changed***" and it "***needed to reset***." MTD at 1. As demonstrated above at 38 n.29, however, the putative warnings in Apache's 2016 and 2017 Forms 10-K to which Defendants point (MTD at 20) were ***identical*** to those in the Company's 2014 and 2015 Forms 10-K—issued well before Apache touted Alpine High as a "transformational discovery." This stale language is not meaningful. *See, e.g.*, *Asher*, 377 F.3d at 734 (putative cautionary language inadequate, in part, because it "remained fixed even as the risks changed").

40

###### 3. Defendants Knew That Any Forward-Looking Statement Was False or Misleading

Assuming that any alleged Misstatement can be viewed as forward-looking, the safe harbor also does not apply because any such statement was made with actual knowledge that it was false or misleading. *See, e.g.*, *Lormand*, 565 F.3d at 244 ("[b]ecause the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor is inapplicable"). *See infra* § VI.D.

#### C. No Misstatement is an Inactionable Opinion

As this Court has observed, opinion statements can be actionable "since the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead." *Edwards*, 2021 WL 1421609, at *8. Opinion statements are actionable when plaintiffs "call into question the issuer's basis for offering the opinion." *Id*. (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). Under *Omnicare*, "whether a statement is misleading depends on the perspective of a reasonable investor" (*id*. at 186), who "expects" that an expressed opinion "***fairly aligns with the information in the issuer's possession at the time***." *Id*. at 188-89. "[I]f the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Id*. at 188. Here, any Misstatement that is fairly viewed as an opinion is actionable because each: (i) "omit[ted] material facts about the [Defendants'] inquiry into or knowledge"; and (ii) the omitted facts "conflict[ed] with what a reasonable investor would take from the statement." *Id.* at 189.[31]

---

[31] *See also Omnicare*, 575 U.S. at 192 ("literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another").

### 1. Defendants Incorrectly Claim That Nearly Every Misstatement is a Statement of Opinion

Without support, Defendants suggest that "[t]he vast majority of the [Misstatements] qualify as opinions." MTD at 21. Defendants flag only a few purported examples in a footnote, while referring the Court and the parties to Appendix A to sleuth out Defendants' arguments. *Id*. at 21 n.9. Consulting Appendix A reveals only the lone word "Opinion" pasted repeatedly next to lengthy block quotes that are not in the Complaint—all without indicating which statement (or portion thereof) Defendants contend is an opinion. Defendants' generalized arguments are meritless.

*First*, *Omnicare* instructs that "[a] fact is a thing done or existing or an actual happening." 575 U.S. at 183. Under this guidance, many Misstatements that Defendants claim are opinions were instead hard representations of putative fact that were not couched in any qualifying language. *See, e.g.*, ¶¶ 191 ("the company can confirm the discovery of a significant new resource play, the Alpine High"); 199 (Alpine High "was always in the oil and wet gas window. It's not dry gas"); 209 ("[e]very well we've drilled has confirmed our model"); 224 ("even in the lower price commodity environment, this play is going to be very economic"); 247 ("The economics of this play are driven by the low cost and the tremendous volumes of oil and NGLs"); 267 ("[t]here is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil").[32]

Each of the foregoing statements (and the others indicated on PX A) was a

---

[32] *See also* ¶¶ 191 ("2,000 to more than 3,000 future drilling locations have been identified in the Woodford and Barnett formations"); *id*. (Alpine High possesses a "large inventory of repeatable, high-value drilling opportunities"); 209 ("We continue to see excellent production performance across this play."); 243 (heralding wells as "providing further confirmation of an oil play and supporting hundreds of additional drilling locations").

"determinative, verifiable statement" of material fact. *See Omnicare*, 575 U.S. at 184; *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 4 (1st Cir. 2021) (claims that product "improves our performance" and "makes us really competitive" are actionable fact statements); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11-12 (S.D.N.Y. Nov. 26, 2018) (representations that credit portfolio was "strong," "very healthy," "very stringently managed," and "highly disciplined" are actionable fact statements). The Court, therefore, need not review any of these Misstatements under *Omnicare*; each is actionable based upon Defendants' knowing misrepresentation or omission of the contemporaneous adverse facts discussed above at pp. 25-30.

*Second*, to the extent that some Misstatements contain opinion-like language, Defendants' position that any statement "couched . . . in subjective language" is an inactionable opinion statement (MTD at 21), is contrary to the law, including *Omnicare*. *See Omnicare*, 575 U.S. at 193 ("'we believe' or 'we think.' . . . can preface nearly any conclusion, and the resulting statements, as we have shown, remaining perfectly capable of misleading investors"). Unsurprisingly, courts frequently hold that "we think," or "we believe" statements are actionable. *See, e.g.*, *In re Intuitive Surg. Sec. Litig.*, 2017 WL 4355072, at *2-3 (N.D. Cal. Sept. 29, 2017) (statements prefaced with "[w]e believe" actionable based upon material omissions). Defendants have failed to demonstrate how any Misstatement "couched . . . in subjective language" is not actionable.

### 2. Defendants' Material Omissions Render Any Opinion Statement Actionable

Any Misstatement deemed an opinion is also actionable because it did not "fairly

align[] with the information in the issuer's possession at the time" and the omitted facts "conflict[ed] with what a reasonable investor would take from the statement." *Omnicare*, 575 U.S. at 189. Particularly applicable here, the Supreme Court instructs that: (i) "a ***reasonable investor generally considers the specificity of an opinion statement*** in making inferences about its basis"; and (ii) "[a]ll else equal, a reasonable person would think that a more detailed investigation lay behind" a more specific statement. *Id*. at 190 n.8.

Defendants repeatedly made highly specific and authoritative Alpine High estimates, including about its volumes of recoverable oil and gas, drilling locations, and commercial viability. *See, e.g.*, ¶¶ 191 (representing "75 trillion cubic feet (Tcf) of rich gas" and "3 billion barrels of oil" in the Woodford and Barnett locations alone); 248 ("The recoverable oil volume is 130,000 barrels per well and 455 million barrels of oil for the entire project, based on 3,500 wet gas locations" yielding "a 13.4 [%] recovery factor on the 3 billion barrels of the stated original oil in place."); 256 ("[i]n the context of today's commodity price" Alpine High "is going to really hum below $2 on the gas side").

Under *Omnicare*, each of these Misstatements (and the others indicated on PX A) is actionable because Defendants concealed material adverse facts, including that: (i) Keenan's team responsible for exploring and developing Alpine High issued the Pre-Announcement Warnings, repeatedly urging Defendants that the play's data did not support a public announcement (¶¶ 54-60, 63); (ii) Alpine High data was exempt from Apache and industry standard peer and business review processes, and the Prevented Peer Review enabled Defendants to conceal Alpine High's dismal performance and prospects (¶¶ 134-64); and (iii) Defendants *never* had reasonable support for the Misstatements, as

44

the confidential internal Project Neptune review of the Historical Play Data revealed that

the data refuted Defendants' claims (¶¶ 85-101).[33] *See also* pp. 25-30. The specificity of

Defendants' estimates and the certainty with which Defendants conveyed them only

heightened the importance of the omitted information to a reasonable investor. *See, e.g.,*

*Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) (reversing

dismissal of opinion statements, noting "the specificity of the representation and the

authority with which it was made, could lead a reasonable person [to] think that a more

detailed investigation lay behind" it) (alteration in original); *Wilson v. LSB Indus., Inc.*,

2017 WL 7052046, at *2 (S.D.N.Y. Mar. 2, 2017) (same).[34]

For example, by omitting the material facts that Defendants blocked Alpine High

data from being vetted under the standard review processes that were otherwise applied

Company-wide, Defendants' specific estimates and projections "conflict[ed] with what a

reasonable investor would take from the statement." *Omnicare*, 575 U.S. at 189. As this

Court has recognized, projections "based on [undisclosed] departures from industry

standards" can mislead investors. *Camelot*, 2021 WL 1416025, at *7, *12; *see also In re*

*BP*, 2016 WL 3090779, at *11 (sustaining flow rate opinion statements at summary

judgment where defendants omitted facts pertaining to methodology). The absence of any

peer review of Defendants' Alpine High projections and estimates rendered their specific

statements materially misleading. *See Omnicare*, 575 U.S. at 188 (statement, "[w]e believe

---

[33] In addition, the Forensic Analyses confirm Alpine High's poor output (¶¶ 116-33), and Defendants rejected Alpine High in 2012 and 2014, each time concluding that it was "too gassy" (¶¶ 44-53).

[34] Defendants' authorities agree. *See In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *13 (S.D. Tex. May 31, 2016) (sustaining opinion statement "provided [to] investors with a specific estimate and . . . some degree of certainty").

our conduct is lawful" misleadingly incomplete if made without consulting a lawyer).[35]

Demonstrating how Defendants' persistent refusal to subject Alpine High's data to standard peer and industry review processes enabled and perpetuated their Misstatements, once Project Neptune subjected Alpine High's well-by-well RTA data from inception to Apache's customary internal analyses, it was immediately clear that Apache's internal data did not support, and had never supported, Defendants' repeated public projections about the play's performance and ability to economically support hundreds or thousands of additional gas and oil wells. ¶ 94; *see also* ¶¶ 88-93, 99; *see, e.g.*, *NewLink*, 965 F.3d at 175 (opinion statement materially misleading when it "implies facts or the absence of contrary facts"). Defendants' deliberate disregard of the Pre-Announcement Warnings further rendered any opinion-based misstatement materially misleading. *See, e.g.*, *Carbonite*, 22 F.4th at 5 (reversing dismissal of opinion statement based, in part, on employees stating internally pre-launch that "the product was not ready"); *Wilson*, 2017 WL 7052046, at *2 (sustaining opinion statements because when "defendants publicly announced detailed estimates, they had simply not done the . . . work necessary").[36]

Defendants' arguments that any opinion statements are not adequately alleged to be misleading by omission are wrong. *First*, Defendants ignore many of the Complaint's core

---

[35] Citing *Omnicare*, Defendants claim that "only" a "fail[ure] to conduct any investigation" or relying on "mere intuition" can support a lack of "meaningful . . . inquiry." MTD at 24. This is a fabrication. In *Omnicare*, "mere intuition" was posed as one example of an inadequate inquiry, as the Court's language makes clear. *See* 575 U.S. at 188 (investor expects opinion to "rest on some meaningful legal inquiry—*rather than, say, on mere intuition*"). And, the Court drew its example of another form of inadequate inquiry, "*for example*, the fact that the speaker failed to conduct any investigation," from the Restatement (Second) of Torts. *Id*. at 191.

[36] Given the weight of Defendants' material omissions, Plaintiff plainly does not challenge any opinion Misstatement "simply because [it] allegedly turned out to be wrong." MTD at 21-22.

falsity allegations that clearly comprise more than a "divergence of views" or "some fact cutting the other way." MTD at 25-26. Rather, at Christmann's direction, Alpine High data was deliberately concealed from all but a select few at Apache, uniquely exempting the play's data from the Company's standard review practices. ¶¶ 134-64. Despite this, the San Antonio technical team—among the handpicked few with access to Alpine High numbers—repeatedly warned senior management that Apache lacked sufficient data and that additional testing was required before making any public announcement. ¶¶ 54-60, 63. Project Neptune, applying the very peer validation from which Christmann deliberately sheltered the play's data, confirmed that none of Defendants' opinion-based Misstatements ever "fairly align[ed] with the information in [Apache's] possession at the time," which the Forensic Analyses also bear out. *Omnicare*, 575 U.S. at 189; *see also Pearlstein v. Blackberry Ltd.*, 2021 WL 4131646, at *4 (S.D.N.Y. Sept. 10, 2021) (adjudicating *Daubert* motions and holding that on the "*Omnicare* issue," the jury could hear evidence that "executives were seeking ways to avoid employing a certain accounting method").[37]

*Second*, Defendants' argument that supposedly "robust cautionary language" prevented any opinion Misstatement from misleading a reasonable investor falls flat. MTD at 26-27. In support, Defendants' point to the same non-specific cautionary statements that fail to inoculate any forward-looking Misstatement. MTD at 26 (citing MTD at 20). These

---

[37] Although the Complaint contains allegations from CWs who uniformly reported that Defendants' Alpine High projections were inaccurate (*see, e.g.*, ¶¶ 53, 59-62, 101, 120-21, 136-37, 143, 153-58, 166-74, 184-87), it alleges a wealth of other facts discussed at pp. 25-30. Defendants ignore these additional facts when citing inapposite cases where the plaintiffs *relied primarily upon* employees' disagreement with the stated opinions. MTD at 26 (bullets). Moreover, in *In re Everyware Global, Inc. Securities Litigation*, 175 F. Supp. 3d 837, 853 (S.D. Ohio 2016), only one CW expressed disagreement with the opinion at issue; and the court in *Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 119 (D. Mass. 2017), determined that the challenged opinion statement was, instead, non-actionable "puffery."

stale and imprecise warnings were meaningless. *See* pp. 37-40.

Finally, Defendants' reliance on *In re Pretium Resources Inc. Securities Litigation*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020), overlooks the vast difference in the facts Plaintiffs have alleged compared to those in *Pretium*, where the plaintiffs merely *surmised* that the excavation of waste rock exceeding the mine plan's estimate called into question defendants' belief in the viability of the entire mine plan. 2020 WL 953609, at *2. That theory failed in *Pretium* because the statements there "were not affirmations of categorical confidence in all aspects of the mine plan." *Id*. at *5. Here, in contrast, Plaintiffs adequately allege that any opinion Misstatement was misleading based upon Defendants' omission of specific facts about Alpine High discussed above at pp. 25-30. Given the specificity of the Misstatements and the myriad facts pled in the Complaint demonstrating that each was misleading, the Second Circuit's more recent decision in *NewLink* makes clear that the Complaint should be sustained. *See NewLink*, 965 F.3d at 178 ("A jury could conclude that the sheer volume of competing facts required [defendant] either to speak less confidently . . . or to disclose the existence of" the omitted facts).

### D.      The Complaint Adequately Pleads Scienter

Scienter is the "intent to deceive, manipulate or defraud" or "severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Edwards*, 2021 WL 1421609, at *7. Scienter may be pled through "allegations of circumstantial evidence of conscious misbehavior or recklessness." *In re Fleming Cos. Inc. Sec. & Derivative Litig*., 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004) ("there will rarely be direct evidence of intent

48

to defraud"); *see also Nathanson v. Zonagen, Inc.*, 267 F.3d 400, 410 (5th Cir. 2001) (there is not "any question" circumstantial evidence can support a strong inference of scienter).

Courts must analyze all of the Complaint's scienter allegations "holistically," and may not "scrutinize" individual allegations "in isolation." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23, 326 (2007). The inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Lormand*, 565 F.3d at 251. Rather, it need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Spitzberg*, 758 F.3d at 684. A "tie favors the plaintiff." *Id*. at 686. The requisite holistic review of the facts alleged in the Complaint confirms that Plaintiffs' allegations raise a strong inference of scienter.

### 1. After Refocusing Apache's Entire Global Operations on Alpine High, Defendants Disregarded the Pre-Announcement Warnings and Went Public with the "Hail Mary" Play

Scienter is well-pled by Plaintiffs' allegations that, desperate to reverse Apache's flagging performance and announce a major U.S. shale oil play, Defendants ignored two earlier studies that Christmann evaluated showing the region was "too gassy" for commercial viability, and refocused Apache's ***entire global operations*** around Alpine High. To this end, Apache purchased 300,000 acres in the Permian Basin, hired veteran geologist Keenan, provided him a team of industry veterans and his own headquarters in San Antonio, and allocated over $1 billion of capital to the play's development. ¶¶ 30, 284. But Keenan's team had little success, and revealed as much to Defendants in emails and regular meetings and presentations, every 5-7 business days throughout 2015-2016, during

49

which it explicitly called out the need for more, and consistent, data prior to announcing any major discovery. ¶¶ 55-57. Christmann and other senior officers blatantly disregarded the Pre-Announcement Warnings from Keenan's team and announced Alpine High on September 7, 2016, without sufficient facts or data to back up their claims. ¶¶ 54-60, 63.

These facts amply support scienter. *See Spitzberg*, 758 F.3d at 684 (scienter adequately pled for statements of reserve estimates where necessary geological testing was not yet done); *Hall*, 2017 WL 6398742, at *28 (scienter adequately pled from defendants' disregard of information demonstrating that product was not ready). Given the critical "importance" of Alpine High to Apache it "defies reason and common sense to believe that [Defendants] would have been unaware of the [production] capacity and status." *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 664-65 (S.D. Tex. 2021); *see also In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig.* ("*EDS*"), 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004) (allegations that contract was the largest in EDS's key line of business and fourth most significant event in its history supported scienter).

Defendants' attempt to discredit these allegations as "unsourced" (MTD at 37-38) fails. The Complaint pleads the regular and specific meetings or conversations involving Defendants with sufficient particularity to satisfy the requirements for pleading scienter—as Defendants' own authority confirms. *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002) (CWs need not be named where other facts support their reliability). Indeed, in *ABC Arbitrage*, the Fifth Circuit held that allegations of "Monthly Management Reports" prepared by the controller's office of the company's subsidiaries, transmitted to defendants after month's-end, and which "concern[ed] the Telecom sector

at each of its subsidiaries" and "compared actual results to budgeted numbers," were sufficient to infer defendants' knowledge that the company experienced a dramatic and continuing decline in its profitability. *Id*. at 345 (alteration in original).[38]

Here, the Complaint contains even *more detailed* allegations of reports, oral communications and presentations provided *directly* to Christmann and other members of Apache senior management. Specifically, Plaintiffs plead: (i) who prepared the reports on Alpine High—the San Antonio technical team under Keenan and Pieprzica; (ii) how often the reports were provided—every 5-7 business days; and (iii) the content of the presentations—well data on the status of Alpine High development—and, in 2016, warnings that substantial additional data were needed. ¶¶ 55-56, 285. Plaintiffs also plead *specific conversations* where Christmann was advised not to go public, and provide corroborating details such as the date (late summer 2016), who was involved (Pieprzica and the San Antonio technical team, and Christmann), and what prompted the discussions (Christmann stating Apache intended to publicly announce Alpine High). ¶ 58.

The inference that Defendants knowingly disregarded the Pre-Announcement Warnings is supported by numerous CWs who questioned the accuracy of the Alpine High data and Defendants' statements. For example, CW 5 described the September 2016 announcement as "*premature*," stating Apache "should have waited until they had *proven production* before announcing" it. ¶ 59. CW 8 recalled conversations where he learned that

---

[38] The Court also held that "unsourced" allegations that a "top executive" of the company's subsidiary informed a company executive of the issue supported scienter, given allegations approximating the timing of the conversation, the name and title of the executive so informed, and the general subjects discussed. *See Tchuruk,* 291 F.3d at 357.

51

Keenan was not ready to announce Alpine High in September 2016 because even *he* did not know what they had at Alpine High. *Id*. CW 9 recounts that Keenan Six Pack member Navneet Behl, stated, "I don't know how they made that Alpine play look like it was." ¶ 61. And CW 14 stated that "what [Defendants] showed at [the Alpine High announcement] was not consistent with production results at the time, and at least some of the wells highlighted were already "bone dry." ¶ 120; *see also* ¶¶ 59-62 (identifying multiple other CWs who questioned Alpine High presentation).

These detailed and consistent accounts are not insignificant differences of opinion or hearsay, as Defendants claim. MTD at 38-39. Rather, they are credible and specific facts that contradict Defendants' statements and are corroborated by Project Neptune, which showed that Defendants' assertions about Alpine High were baseless. *See Anadarko*, 514 F. Supp. 3d at 956 (allegations that "others at Anadarko believed the statements about [oil play] were incorrect" supported inference of scienter); *see also Budde v. Glob. Power Equip. Grp., Inc.*, 2018 WL 4623108, at *4 (N.D. Tex. Sept. 26, 2018) ("CWs are often reporting hearsay, but that does not automatically disqualify [their] statement from consideration in the scienter calculus . . . because the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence.") (alteration in original).[39]

---

[39] Defendants' cases suggesting otherwise (MTD at 38-39) are inapposite. *In re Key Energy Services, Inc. Securities Litigation*, supports scienter here because Plaintiffs plead the "specific details" of the basis for CW 5's so-called opinions found lacking there. 166 F. Supp. 3d 822, 869 (S.D. Tex. 2016). *City of Austin Police Retirement System v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) is distinguishable because unlike in that case, Plaintiffs allege that numerous concerns were voiced internally about Alpine High, resulting in the termination of dozens of employees. And, unlike the speculative CW allegations in *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 578 (W.D. Tex. May 8, 2017), CW 8's *personal knowledge* of Alpine High data from her own work with San Antonio's Adviset system corroborates her recollections of conversations with other San Antonio employees about Keenan not wanting to announce the Alpine High play. Nothing more is required. *See In re OCA Inc. Sec. Litig.*, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (crediting CW's allegations, "based on discussions with colleagues").

### 2. Defendants' Regular Receipt of Reports and Access to Alpine High Data Contradicting Their Statements Support Scienter

The scienter inference is reinforced by the corroborative accounts of numerous CWs (6, 8, 12, 13, 15), who confirm that Alpine High production data was regularly available to Christmann and Sullivan, and that Keenan routinely updated them on Alpine High at Quarterly Review Meetings in San Antonio, monthly trips to Apache's headquarters in Houston, and in reports every 5-7 business days. ¶¶ 136, 290. Christmann was one of the few who had access to reporting tools tracking Alpine High performance in real-time, including Aries, which tracked individual well performance, Adviset, which tracked well production, WellView, which provided "down the hole views" of daily drillings and construction, and IMS reports, which tracked capital spending. ¶ 290.

Defendants' regular receipt of and access to drilling, testing, geological and well data showing Alpine High's underperformance supports scienter. *See, e.g.*, *Venator*, 547 F. Supp. 3d at 663 (allegations defendants received weekly progress reports and attended weekly meetings to discuss progress supported scienter); *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *6 (E.D. Tex. Sept. 29, 2015) (defendants' awareness of facts undermining statements through discussions at monthly meetings and regular review contributed to scienter); *Zix*, 2006 WL 2739352, at *5 (scienter inferred from CW allegations that defendants regularly received tracking reports from internal systems indicating statements were misleading); *In re Fleming*, 2004 WL 5278716, at *28-34 (CW allegations that defendants received weekly reports and attended weekly meetings where performance data was discussed supported scienter).

### 3.　Defendants' Deliberate Concealment of Alpine High Data Supports Scienter

Scienter is also readily inferred from Defendants' extensive efforts to conceal Alpine High data from investors, regulators, and the vast majority of Apache employees during the Class Period—which were concerted measures of deception to perpetuate the fraud. *First*, numerous CWs describe how Defendants put a "cone of silence" over Alpine High, allowing Keenan to run it as a "shadow organization" and keep its data segregated from the normal storage, analysis and internal review practices that applied to Apache's other sites. ¶¶ 134-52. The Prevented Peer Review (¶¶ 134-64) uniquely exempted Alpine High data from Apache and industry standard scrutiny, and Christmann and Sullivan "made that call" (¶¶ 146-48, 288), which also required employees "to go to the executive level and demand" necessary information (¶¶ 136, 138-41, 151, 171-72). Defendants also allowed Keenan to present superficial data for Alpine High at quarterly review meetings, while other units had to provide detailed reports. ¶ 152. These persistent and deliberately orchestrated efforts to hide Alpine High's data from internal and external assessment raise a strong scienter inference. *See Anadarko*, 514 F. Supp. 3d at 956 (allegations that defendant "abruptly cancelled" a scheduled presentation because he "did not want the truth about the uncertainty in size and value of the resource to get out" supported scienter); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007) (departure from internal policies supports scienter) (collecting cases).

*Second*, many CWs independently confirm that Apache manipulated Alpine High data to conceal its poor performance. These efforts included: (i) "distort[ing]" reserve data

and inflating "typical well" assumptions and type curves beyond any justifiable reality, sometimes "shift[ing] [them] up by 30%" "overnight," with the blessing of Christmann and Keenan (¶¶ 129-33, 154-55, 168-71, 251); (ii) manipulating chromatograph data in published slides to make Alpine High appear as an oil play (¶ 62); (iii) reporting results that "weren't [the real results]" (¶ 166); (iv) not "reporting what was really happening operationally" (¶ 157); and (v) taking extraordinary measures in an attempt to extract oil and gas from dry holes, including stimulating them with millions of pounds of fracking fluid, to no avail (¶ 127-28). *See Camelot*, 2021 WL 1416025, at \*12 (allegations defendants "used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates" supported scienter); *Anadarko*, 514 F. Supp. 3d at 955 (allegations defendant supported manipulation of well data supported scienter).

*Third*, Defendants prevented Apache employees from making required regulatory filings of well completion reports for ***two years*** after announcing Alpine High, including by instructing employees to report production for completed wells in "pending reports" designed for *un*completed wells. Defendants further concealed Alpine High's dismal production by misclassifying gas wells as oil wells, manipulating gas/oil ratios, and changing well names. ¶¶ 179-88, 294. These detailed allegations further support scienter.

### 4. Project Neptune and Plaintiffs' Forensic Analyses Support Scienter

Plaintiffs' allegations based upon Project Neptune, the Historical Play Data, and the Forensic Analyses powerfully support scienter. These facts confirm that before and throughout the Class Period, production was not as portrayed to investors, and the few

resources produced were low-quality. ¶¶ 93-95, 98, 286; *see also Spitzberg*, 758 F.3d at 684 (scienter inferred for statements about "indications of oil" and "strong inflows of hydrocarbons" where CWs alleged no oil was found in test drilling). Defendants' arguments to the contrary (MTD at 40-41) are meritless.

*EDS* is instructive. There, the court rejected Defendants' arguments that scienter could not be inferred from an investigation. *EDS*, 298 F. Supp. 2d at 558. In so holding it stated, "Defendants misunderstand that all of these documents tend to show that there were in fact problems with the . . . [c]ontract, and nothing more. When coupled with allegations that Defendants knew of those problems . . . and thereafter misrepresented the . . . [c]ontracts' status, the documents do support an inference of scienter." *Id*. at 559. Likewise, here, Project Neptune analyzed Alpine High data from *all* time periods post-drilling—the very data Christmann and Sullivan hoarded and deliberately foreclosed from peer review. When finally subjected to the Company's standard analyses, the Alpine High data confirmed that the play was nonviable all along, and that Defendants' contemporaneous Misstatements lacked any reasonable basis. ¶¶ 85-101. As in *EDS*, "when coupled with allegations that Defendants" were presented with this data at the time of their statements, Project Neptune "support[s] an inference of scienter." 298 F. Supp. 2d at 559.[40]

The same is true of Plaintiffs' Forensic Analyses, which corroborate the conclusions of Project Neptune and the accounts of at least three well-placed CWs that many wells Defendants highlighted as "strong" and "successful" had seen production plummet, or

---

[40] Defendants' reliance on *Alaska Electrical Pension Fund v. Asar*, 768 F. App'x 175, 186 (5th Cir. 2019) (MTD at 41) is misplaced, as the court refused to infer scienter from an audit committee report as "group pleading of scienter."

cease, by the time Defendants touted them, and that 27% of all wells drilled at Alpine High were dry. ¶¶ 116-33. Plaintiffs' Forensic Analyses further detail Alpine High's abysmal performance of over the entire Class Period, including how oil and gas production across the play was less than *1%* of the amounts Defendants claimed this "world class resource" held. *See supra* § IV.H; *see also Quantumscape*, 2022 WL 137729, at *17 (scienter adequately alleged where "the individual defendants personally reported facts about the company that are alleged to be completely at odds with reality"). When paired with Plaintiffs' extensive allegations that this data was presented and available to Defendants contemporaneously throughout the Class Period, the Forensic Analyses strengthen the scienter inference. *See EDS*, 298 F. Supp. 2d at 559.

### 5. Christmann's Prior Rejections of an Alpine High Play Reinforce the Strong Scienter Inference

The Complaint also pleads detailed CW-based allegations (CWs 1, 2, 3, 4, 5) of: (i) two failed Alpine High explorations that Christmann commissioned in 2012 and 2014; and (ii) how he personally rejected the play as nonviable each time after reviewing the results. ¶¶ 44-51, 282. Coupled with details of explicit warnings in 2016 that Apache lacked the requisite data to support Alpine High's unveiling, the Prior Rejections strengthen the scienter inference. *See Anadarko*, 514 F. Supp. 3d at 955-56 (scienter inferred where scientist presented evidence company was exaggerating project to defendants, who "ignored [these] significant red flags").

Defendants' assertion that these allegations "must be heavily discounted" for lack of particularity (MTD at 36, 42-43) ignores (as explained above at pp. 30-33) that these

57

CWs: (i) had personal knowledge of the facts provided and were in positions to know the information they allege; (ii) either ***personally provided*** the study results described ***directly*** to Christmann (CW 1), or were present when the data was provided to him (CW 5); and (iii) furnished detailed facts recounting the 2012 and 2014 studies and Christmann's resulting rejections of Alpine High. ¶¶ 44-50; *see also Anadarko*, 514 F. Supp. 3d at 956 ("the inference of scienter is at least as strong as the inference that [defendant] simply chose not to believe [the company's scientists] and others who studied the [oil field] project").

In positing that the Prior Rejections do not support scienter because Christmann "changed his mind," Defendants cite only statements Plaintiffs allege are ***false or misleading***. *See* MTD at 36 (citing ¶¶ 199-201). Accepting Defendants' unsupported factual contention would require the Court to reject Plaintiffs' allegations and credit the Misstatements as true, which is improper. *See Tellabs*, 551 U.S. at 326-27 (courts must "constantly assum[e] the plaintiff's allegations to be true"); *Holzwasser v. Staktek Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006) ("the strong-inference pleading standard does not license the Court to resolve disputed facts").[41]

Also unavailing is Defendants' argument that the allegations of CWs 1-3 should be disregarded because they left Apache prior to the start of the Class Period (MTD at 43). *See, e.g.*, *Edwards,* 2021 WL 1421609, at *9 (denying motion to dismiss complaint that relied on allegations of six CWs who left the company prior to the start of the class period);

---

[41] For this reason, *Carlton*, 184 F. Supp. 3d at 476-77, involving actual evidence of intervening data undermining scienter, and *Ezra Charitable Trust v. Tyco International, Ltd*., 466 F.3d 1, 13 (1st Cir. 2006), involving a restatement, are distinguishable.

*Zix*, 2006 WL 2739352, at *5 (crediting pre-class period CW facts).[42]

### 6. Defendants' Repeated Statements Touting Alpine High and Detailed Responses to Analyst Inquiries Support Scienter

Defendants' repeated statements to investors touting Alpine High's prospects and constant updates on its performance, in over 60 investor presentations and in myriad press releases, SEC filings and media interviews during the Class Period, further support scienter. *See, e.g., In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 784 & 784 n.37 (S.D. Tex. 2012) (fact that defendants "made numerous and frequent statements" about BP's safety progress and oil spill estimates supported scienter). Additionally, Defendants provided detailed responses to specific analyst questions about individual wells, well pads, drilling locations, and distinct geologic formations throughout the Class Period. When juxtaposed against the fact that Alpine High produced ***less than 1% of what Defendants told investors was recoverable***, Defendants' own statements support a strong inference of their knowledge of the true facts about the topics on which they spoke. ¶¶ 291-93. *See Avaya*, 564 F.3d at 270 ("[g]iven the specificity and repetition of the analysts' questions," defendant's responses, along with his position, raise a strong inference of scienter).

### 7. Plaintiffs' Extensive CW Allegations Reinforce Scienter

The sheer number of CWs independently corroborating Plaintiffs' allegations further supports scienter. *See generally Edwards*, 2021 WL 1421609 (sustaining claims

---

[42] *Accord Emps.' Ret. Sys. of Gov't of Virgin Is. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (CW allegations of pre-class period statements to senior managers supported scienter); *Avaya*, 564 F.3d at 249 n.13 ("pre-class data could be used to confirm what a defendant should have known during the class period"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[p]re-class data" was "relevant . . . to establish that at the start of the class period, defendants had a basis for knowing" their statements were false).

based upon facts from 24 CWs); *KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 831 n.2 (W.D. Tex. 2012) ("corroborating allegations" of CWs "make the inference of scienter . . . more compelling"); *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at \*9 (N.D. Ind. May 23, 2018) ("large number of confidential witnesses" supported scienter).[43]

Defendants ask the Court to exclude Plaintiffs' CW allegations from the scienter analysis because (with several exceptions Defendants concede) *some* CWs do not recount personal interactions with the Defendants. MTD at 43, 47-48. But courts routinely reject the notion that CWs can support scienter *only* when they had direct communications with a defendant. *See Spitzberg*, 758 F.3d at 682, 684-685 (crediting allegations by CW who worked for non-party business partner of company and had no interactions with defendants); *Avaya*, 564 F.3d at 268-269 (*Tellabs* does not require plaintiff to "point to any particular . . . conversation that would have informed [defendant] of unusual discounting"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) (plaintiff need not allege contact between CWs and defendants).

### 8.    Many Additional Facts Bolster the Scienter Inference

The Complaint identifies additional facts that further support a strong inference of scienter. *First*, Keenan's abrupt "resignation" after years of hidden abysmal performance, and in the wake of Project Neptune's devastating findings, supports a strong inference of scienter. *See Hall*, 2017 WL 6398742, at \*34 (forced resignations, among other allegations, supported scienter); *Fleming*, 2004 WL 5278716, at \*34 (resignations supported scienter).

---

[43] *Smith ex rel. Zion Oil & Gas, Inc. v. Carrillo*—a non-PSLRA case that does not discuss CWs—does not hold that allegations from a large number of CWs should be discounted as excess "verbiage," as Defendants imply (MTD at 42). 2019 WL 6328033, at \*6 n.4 (D. Del. Nov. 26, 2019) (criticizing excessive pleading on defendants' backgrounds).

60

The scienter inference is further supported by Defendants' termination of more than a dozen Vice Presidents and other senior employees who questioned Alpine High. ¶ 289; *see also Carlton*, 184 F. Supp. 3d at 483 ("The severity of that recklessness is supported by [defendant's] pattern of firing employees who came forward with concerns that his statements were misleading, or pressuring those employees to resign").

*Second*, a strong inference of scienter is supported by the fact that three years after announcing Alpine High, Apache took a massive ***$3 billion write-down***, ceased all drilling in the area, and conceded that "***further testing is not warranted at this time***." ¶¶ 106, 108; *see also Camelot*, 2021 WL 1416025, at *11 ($3.1 billion write-down—representing 80% of merger value—supported scienter); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("it is not unwarranted to infer that when a company's big deal collapses so fast, something was amiss at the outset").

*Third*, though not required, allegations of motive may "meaningfully enhance the strength of the inference of scienter." *Spitzberg*, 758 F.3d at 685 ("a strong inference of severe recklessness does not depend on such an enhancement in the present case"); *see also Barrie*, 397 F.3d at 264 ("allegations of knowledge and severe recklessness must be considered in conjunction with the defendants' bonuses . . ."). Plaintiffs sufficiently plead Defendants' personal motivations to misrepresent Alpine High's data and prospects—to reap ***more than $92 million*** in Class Period compensation. *See* ¶¶ 295-98. Significantly, 85%, or $78 million, of Defendants' Class Period compensation was tied to performance goals linked to announcing Alpine High and achieving related targets. Apache admits that Christmann's compensation was directly tied to "shifting the focus of Apache's portfolio

61

to North America" and developing a significant U.S. oil play. ¶ 31. He earned a staggering $57 million during the Class Period, including cash bonuses as high as $2.5 million. *Id.* A large part of Defendants' compensation was also based on Apache's stock price compared to its peers, further incentivizing Defendants to inflate Apache's stock price by hyping the play. ¶ 299. These are sufficient personal motives to infer scienter. *See Barrie*, 397 F.3d at 261, 264 (bonuses tied to achieving company's targeted revenues and earnings sufficient motive for revenue recognition fraud); *Edwards*, 2021 WL 1421609, at *9 (allegations defendants "received bonuses and increases in their base pay" supported scienter).[44]

When considered holistically, as they must be, Plaintiffs' allegations raise a strong inference of scienter. *See Shen v. Exela Techs., Inc.*, 2022 WL 198402, *7-8 (N.D. Tex. Jan. 21, 2022) (held "as a whole" plaintiffs' adequately pled scienter).

### 9.      Defendants Fail to Proffer a More Compelling Inference

Defendants suggest a lone competing inference of non-fraudulent intent, arguing it would "make no sense" and "defies economic reason" for Apache to spend $3 billion on exploration and development of the play if they ***knew*** Alpine High would fail. MTD at 28-31. Far from compelling, the competing inference Defendants offer is a self-serving distortion of Plaintiffs' allegations. The Complaint alleges in detail that Defendants knew their statements touting Alpine High lacked any reasonable basis, and thus were at least severely reckless—not that Defendants knew Alpine High was destined to fail. ¶¶ 2-4. The most compelling inference that the facts raise, when viewed holistically, is precisely what

---

[44] Defendants' assertion that their trading histories negate scienter (MTD at 34-35) also fails, as Plaintiffs do not allege motive on that basis.

Plaintiffs allege and media outlets confirm: Defendants went "all in" on Alpine High, knowingly overpromised—gambling that they would figure something out, even though the Company's extensive explorations repeatedly failed to produce scientific support for their bold claims—and under-delivered, with Alpine High producing a *de minimis* amount of the oil and gas that Defendants told investors it held. In other words, while Defendants "may have thought that there was a chance that the situat[ion] . . . would right itself"—i.e., that Apache would eventually drill its way to Alpine High viability—they knowingly misrepresented facts in a "gamble" that "bad news . . . will be overtaken by good news." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 n.12 (N.D. Cal. Nov. 4, 2020). But that "hope" "does not justify misleading investors." *Id.*[45] Indeed, the Fifth Circuit has rejected this very argument. *See Spitzberg*, 758 F.3d at 685-86 ("illogic" counter-narrative "fails to resolve any questions" concerning scienter).[46]

The Court's analysis in *Spitzberg* applies here, as that case also concerned misrepresentations and omissions about the prospects of an oil discovery. The Fifth Circuit summarized the district court's scienter holding as:

> [The defendants'] decision "to spend another $5 million for more testing of the well" would "not make sense" if Defendants-Appellees consciously believed that no oil or gas could be found in the CPO 4 Block. In other words, the district court could not accept that Defendants-Appellees' small company would waste

---

[45] This case does not involve the "misguided optimism" or "mismanagement" held inactionable in *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) and *Tran v. XBiotech Inc.*, 2016 WL 5408382, at *9 (W.D. Tex. Sept. 23, 2016). *See* MTD at 31.

[46] The cases Defendants cite from within this Circuit as rejecting "economically upside-down theories" (MTD at 29) are inapplicable and long pre-date *Spitzberg—Melder v. Morris*, 27 F.3d 1097, 1104 n.10 (5th Cir. 1994), *In re Baker Hughes Securities Litigation*, 136 F. Supp. 2d 630, 644 (S.D. Tex. 2001), *aff'd* 292 F.3d 424 (5th Cir. 2002), and *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 157, 166 (N.D. Tex. 2007)—or fail to acknowledge this precedent —*Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 470 (N.D. Tex. 2018)—and were decided on their unique facts.

such considerable monetary resources in this way on what Plaintiffs-Appellants have characterized as "a desperate 'Hail Mary' decision."

*Id*. In reversing, the Fifth Circuit held that "Defendants-Appellees' subjective beliefs about the ultimate potential for the [play]" are "irrelevant" to whether their statements regarding geological testing and indications of oil were severely reckless. *Id*. It further held there was an alternative, *fraudulent*, explanation for why the defendants would continue to spend millions of dollars testing wells—they "may have ***felt the need to substantiate the allegedly irresponsible statements they had made previously***" and combat public scrutiny. *Id*. (citing *Tellabs*, 513 F.3d at 710 (7th Cir. 2008) analogizing corporate decisions of this kind to "embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing").

Similarly, here, the Complaint pleads that Defendants rushed to announce Alpine High to get "back in the game" after "missed opportunities" and having a "rough time keeping up with competitors" (¶ 42), without adequate supporting data (CWs 5, 8) (¶ 59), and followed up with a consistent string of misleading statements during the Class Period while conducting their "Hail Mary" search for commercially viable oil and gas (CW 2) (¶¶ 53, 283). *See Spitzberg*, 758 F.3d at 685-86 (pressure to substantiate misstatements may explain "Hail Mary" business decision).

Likewise, the fact that Apache repurchased its stock during the Class Period "is not dispositive" of scienter. *Apple*, 2020 WL 6482014, at *12 (rejecting argument that it "does not make sense" that defendant would commit fraud at the same time company repurchased stock); *see also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146

64

(S.D.N.Y. 2021) (rejecting argument that corporate scienter is negated by stock buybacks). Rather, Apache's stock buybacks "enrich[ed] [Defendants] . . . in a way that is entirely consistent with scienter," by propping up its stock price during the Class Period, and because their compensation was tied, in part, to Apache's stock return versus its peers (¶ 299). *Apple*, 2020 WL 6482014, at *13.[47]

### E.      The Complaint Adequately Pleads Section 20(a) Claims

To state control person claims under § 20(a) of the Exchange Act, Plaintiffs must allege: "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant[s]." *Camelot*, 2021 WL 1416025, at *10. As set forth above in §§ VI.A-C, the Complaint adequately alleges a primary violation. Because Defendants do not challenge Plaintiffs' allegations that Christmann, Sullivan, and Riney were controlling persons of Apache, the Complaint's § 20(a) claims should be sustained.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, the Complaint adequately alleges claims under the Exchange Act, and "Plaintiffs have established an entitlement to discovery." *Camelot*, 2021 WL 1416025, at *12. The Motion should be denied in its entirety.[48]

Dated: April 22, 2022                              Respectfully submitted,

                                                   **AJAMIE LLP**

                                                   *s/ Thomas R. Ajamie*

---

[47] Defendants' cases are inapposite (MTD at 30), as those courts assessed scienter *premised* on motive allegations. *See Goldman*, 545 F. Supp. 3d at 146 (distinguishing such cases). "Such logic is inapplicable here, where [p]laintiff pleads scienter based on conscious misbehavior or recklessness." *Id.*

[48] If the Court grants any part of the Motion, Plaintiffs respectfully request leave to amend to cure the perceived deficiencies. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *15 (S.D. Tex. May 20, 2014) ("Rule 15(a) declares that leave to amend shall be freely given when justice so requires; this mandate is to be heeded.").

Thomas R. Ajamie
Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice*)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Michelle M. Newcomer (admitted *pro hac vice*)
Daniel B. Rotko (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jwhitman@ktmc.com
jdancona@ktmc.com
mnewcomer@ktmc.com
drotko@ktmc.com

**SAXENA WHITE P.A.**
David R. Kaplan (admitted *pro hac vice*)
Wolfram T. Worms (admitted *pro hac vice*)
Hani Farah (admitted *pro hac vice*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

66

dkaplan@saxenawhite.com
wworms@saxenawhite.com
hfarah@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

-and-

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Co- Lead Counsel for Lead Plaintiffs*

67

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 22, 2022, I caused a true and correct copy of the foregoing to be electrically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Thomas R. Ajamie*
Thomas R. Ajamie