**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Civil Action No. 4:21-cv-00575 |
|  | District Judge George C. Hanks, Jr. |
|  | Magistrate Judge Andrew M. Edison |
|  | <u>CLASS ACTION</u> |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
<u>PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT</u>**

TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Argument and Authorities .................................................................................. 2

    I.    The Opposition fails to identify an actionably false or misleading
    statement. ................................................................................................. 2

        A.    The Opposition cannot articulate with particularity how or why
            the Challenged Statements were false or misleading when made. .... 2

        B.    The Opposition cannot sidestep the PSLRA's Safe Harbor. ............. 6

        C.    *Omnicare* remains too high a hurdle for the challenged opinions. .... 8

            1.    The Opposition cannot avoid the *Omnicare* framework
                entirely. ................................................................................. 8

            2.    The Opposition cannot satisfy any *Omnicare* prong. ............. 9

    II.    The Opposition fails to piece together the requisite strong inference of
    scienter. ................................................................................................. 12

        A.    The Opposition tries fruitlessly to retool the CCAC's scienter
            theory and salvage its implausibility. ................................................ 12

        B.    The Opposition barely bothers to defend the CCAC's motive
            allegations, let alone grapple with the scienter-negating indicia at
            hand. .................................................................................................. 16

        C.    Falling back on cases like *Spitzberg* and its "severe recklessness"
            theory gets the Opposition nowhere. ................................................ 18

        D.    The Opposition fails to identify a cogent, compelling inference of
            scienter with its kitchen-sink circumstantial allegations. ................. 20

            1.    The Opposition's centerpiece scienter allegations—
                "warnings" from San Antonio, "Project Neptune," and
                "forensic analysis"—remain inadequately sourced and
                deficient in any event. .......................................................... 20

            2.    The Opposition fails to spin alleged pre-Class Period
                "rejections" of Alpine High into a contemporaneous
                inference of scienter. ............................................................ 25

3.      The Opposition fails to tie scienter-creating contrary facts to the individual Defendants—whether through CWs or otherwise. ...........................................................................27

4.      The Opposition's supposed "additional facts" do not lend themselves to an inference of scienter. .................................30

III.    The Section 20(a) claims necessarily fail without a cognizable primary claim. ...........................................................................................35

Conclusion ...........................................................................................................35

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) ....................................................................... 20, 21, 22, 23

*Abrams v. Baker Hughes, Inc.*,
  292 F.3d 424 (5th Cir. 2002) ....................................................................... 29

*Abramson v. Newlink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)......................................................................... 12

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
  915 F.3d 975 (5th Cir. 2019) ....................................................................... 19, 26

*Alaska Electrical Pension Fund v. Asar*,
  768 F. App'x 175 (5th Cir. 2019) ................................................................ 24

*Barrie v. Intervoice-Brite*,
  397 F.3d 249 (5th Cir. 2005) ....................................................................... 17

*Baum v. Harman Int'l Indus., Inc.*,
  408 F. Supp. 3d 70 (D. Conn. 2019)............................................................ 11

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) ....................................................... 28

*Brody v. Zix*,
  2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)............................................ 26, 30

*Budde v. Glob. Power Equip. Grp., Inc.*,
  2018 WL 4623108 (N.D. Tex. Sept. 26, 2018)............................................ 28

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*
  2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) .............................................. 5, 11, 33

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ......................................................... 7, 27, 34

*City of Omaha v. CBS Corp.*,
  2011 WL 2119734 (S.D.N.Y. May 24, 2011),
  *aff'd*, 679 F.3d 64 (2d Cir. 2012) ............................................................... 35

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) .............................................................. 32

*City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)............................................................. 19, 35

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*,
655 F. Supp. 2d 262 (S.D.N.Y. 2009)........................................................ 35

*In re Pretium Resources Inc. Securities Litigation*,
2020 WL 953609, at *5 (S.D.N.Y. Feb. 17, 2020)...................................... 12

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Cir. 2021) ..................................................................... 10

*Constr. Workers Pension Fund—Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
114 F. Supp. 3d 633 (N.D. Ill. 2015) ........................................................ 28

*Edwards v. McDermott Int'l, Inc.*
2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) ............................... 5, 17, 26, 27

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Entm't Corp.*,
524 F. Supp. 3d 501 (N.D. Tex. 2021) ................................................. 6, 35

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
147 F. Supp. 3d 493 (E.D. La. 2015),
*aff'd*, 854 F.3d 741 (5th Cir. 2017)............................................................ 5

*Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*,
2014 WL 6638793 (E.D. La. Nov. 21, 2014) .......................................... 20

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)........................................................ 18

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*
514 F. Supp. 3d 942 (S.D. Tex. 2021) ...................................... 24, 26, 32, 33

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ............................................................. 3, 19

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020),
*aff'd*, 847 F. App'x 35 (2d Cir. 2021)........................................................ 7

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)........................................................................ 14

*Hall v. Rent-A-Ctr., Inc.*,
  2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ............................................. 24

*Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*,
  2005 WL 736217 (S.D.N.Y. Mar. 30, 2005),
  *aff'd*, 159 F. App'x 317 (2d Cir. 2005)...................................................... 13

*Heck v. Orion Grp. Holdings, Inc.*,
  468 F. Supp. 3d 828 (S.D. Tex. 2020) ........................................................ 35

*In re Alamosa Holdings, Inc. Sec. Litig.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .......................................................... 3

*In re Apple Comp., Inc., Sec. Litig.*,
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ...................................................... 28

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................ 16, 18

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010)........................................................ 34

*In re BP p.l.c. Sec. Litig.*,
  2016 WL 3090779 (S.D. Tex. May 31, 2016)........................................... 9, 11

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................................ 31

*In re Capstead Mortg. Corp. Sec. Litig.*,
  258 F. Supp. 2d 533 (N.D. Tex. 2003) .......................................................... 1

*In re CenturyLink, Inc.*,
  2015 WL 500476 (W.D. La. Feb. 3, 2015).................................................. 20

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ............................................. 34

*In re Dynagas LNG Partners LP Sec. Litig.*,
  504 F. Supp. 3d 289 (S.D.N.Y. 2020)......................................................... 8, 9

*In re Egalet Corp. Sec. Litig.*,
  340 F. Supp. 3d 479 (E.D. Pa. 2018) ............................................................ 8

*In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig. ("EDS")*,
  298 F. Supp. 2d 544 (E.D. Tex. 2004) ........................................................... 24, 25, 32

*In re EQT Corp. Sec. Litig.*,
  504 F. Supp. 3d 474 (W.D. Pa. 2020) .................................................................. 23

*In re EveryWare Glob., Inc. Sec. Litig.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd*, 849 F.3d 325 (6th Cir.
  2017) ..................................................................................................................... 10

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*
  2004 WL 5278716 (E.D. Tex. June 16, 2004) .................................................. 29, 30

*In re Gen. Elec. Sec. Litig.*,
  2020 WL 2306434 (S.D.N.Y. May 7, 2020),
  *aff'd*, 844 F. App'x 385 (2d Cir. 2021) ............................................................... 35

*In re Intuitive Surg. Sec. Litig.*,
  2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ...................................................... 9

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................... 18

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. Oct. 12, 2011) ....................................................... 28

*In re OCA Inc. Securities*
  Litigation, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ...................................... 28

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) ................................................................................. 10

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
  245 F. Supp. 3d 870 (S.D. Tex. 2017),
  *aff'd on other grounds*, 777 F. App'x 726 (5th Cir. 2019) ................................. 10, 31

*In re QuantumScape Sec. Class Action Litig.*,
  2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ......................................................... 23

*In re TETRA Techs., Inc. Sec. Litig.*,
  2009 WL 6325540 (S.D. Tex. July 9, 2009) .......................................................... 33

*In re Venator Materials PLC Sec. Litig.*,
  547 F. Supp. 3d 624 (S.D. Tex. 2021) ................................................................. 30, 32

97135602                                                    vi

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ........................................................... 17, 20, 36

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).................................................................. 27

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. 2017) ................................................. 18

*Karpov v. Insight Enters., Inc.*,
    2010 WL 4867634 (D. Ariz. Nov. 16, 2010)........................................ 28

*KB Partners I, L.P. v. Barbier*,
    907 F.Supp.2d 826 (W.D. Tex. 2012)................................................. 28

*Knurr v. Orbital ATK Inc.*
    276 F. Supp. 3d 527 (E.D. Va. 2017) .................................................. 9

*Kurtzman v. Compaq Computer Corp.*,
    2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)................................ 34, 35

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012),
    *aff'd*, 783 F.3d 383 (2d Cir. 2015) ...................................................... 35

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) .............................................................. 14

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ............................................................... 6

*Mahoney v. Found. Med., Inc.*,
    342 F. Supp. 3d 206 (D. Mass. 2018) .................................................. 6

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .............................................................. 16

*Marcus v. J.C. Penney Co., Inc.*,
    2015 WL 5766870 (E.D. Tex. Sept. 29, 2015)..................................... 30

*Municipal Employees' Retirement System of Michigan v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) .......................................................... 14, 16

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ............................................................... 8

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018)................................................................... 27

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018)........................................................................... 6

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................................ 8, 9, 11

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ................................................................................. 20, 22

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) ......................................................................................... 35

*Ramirez v. Exxon Mobil Corp.*,
   334 F. Supp. 3d 832 (N.D. Tex. 2018) ......................................................................... 18

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ......................................................................................... 16

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir. 1994) ............................................................................................. 4

*Schleicher v. Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007) ........................................................................... 32

*Schulze v. Hallmark Fin. Servs., Inc.*,
   2021 WL 3190529 (N.D. Tex. July 28, 2021)............................................................... 29

*Sgarlata v. PayPal Holdings, Inc.*,
   409 F. Supp. 3d 846 (N.D. Cal. 2019),
   *aff'd*, 831 F. App'x 366 (9th Cir. 2020)....................................................................... 23

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
   545 F. Supp. 3d 120 (S.D.N.Y. 2021)........................................................................... 18

*Southland Sec. Corp v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ............................................................................... 7, 27, 36

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ..................................................................... 15, 18, 19, 28

*Stockman v. Flotek Indus., Inc.*,
   2010 WL 3785586 (S.D. Tex. Sept. 29, 2010) .......................................................... 6, 29

*Stone v. Life Partners Holdings, Inc.*
26 F. Supp. 3d 575, 586, 589 (W.D. Tex. 2014)......................................................... 5

*Tabor v. Bodisen Biotech, Inc.*,
579 F. Supp. 2d 438 (S.D.N.Y.2008)....................................................................... 3

*Tellabs Inc. v Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................................ 15

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)............................................................................ 10, 12

*Tyler v. Liz Claiborne, Inc.*,
814 F. Supp. 2d 323 (S.D.N.Y. 2011)...................................................................31

*W. Wash. Laborers-Emp'rs Pension Tr. v. Panera Bread Co.*,
697 F. Supp. 2d 1081 (E.D. Mo. 2010).................................................................. 7

*Wilson v. Bernstock*,
195 F. Supp. 2d 619 (D.N.J. 2002) ......................................................................18

*Wilson v. LSB Indus., Inc.*,
2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ........................................................ 9, 10

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...............................................................................29

**STATUTES**

15 U.S.C.A. § 78u-5(c)(1)(B)................................................................................ 8

15 U.S.C. § 78u-5(i)(1)........................................................................................ 7

15 U.S.C. § 78u-5(c)(2) .......................................................................................7

97135602

ix

**INTRODUCTION**[1]

Plaintiff's Opposition ("Opposition" or "Opp.") tries to deflect from the core pleading defects described in Defendants' Motion to Dismiss ("Motion" or "MTD"), both by inundating the Court with a smattering of disjointed allegations and CW accounts and by backing away from the CCAC's facially implausible scienter narrative that Defendants knew Alpine High was destined to fail. But the PSLRA does not tolerate a "shotgun approach in which Plaintiffs attempt to overwhelm the court with conclusory, speculative and esoteric allegations," *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 565 (N.D. Tex. 2003); instead, Plaintiff must identify with specificity the adequately sourced *facts* upon which falsity and defendant-specific scienter allegations cogently rest. And Plaintiff cannot escape dismissal by pretending the CCAC pleaded a different scienter theory, especially when the Opposition's new theory itself fails.

Rather than tackling the recent Fifth Circuit authority cited in the Motion, the Opposition frequently ignores it or gives it only a passing nod, choosing instead to create strawmen. The Opposition declares, for example, that Defendants "tellingly, do not deny the results of Project Neptune," and then touts that and other supposedly "extraordinary facts" as if they preclude dismissal. Opp. 6. Yet as Plaintiff is well aware, Defendants' "concession" is anything but—the procedural reality is that Defendants cannot "deny" such allegations at the motion-to-dismiss stage with evidence, no matter how egregiously false they are (and, to be clear, the allegations about Project Neptune and Christmann's being

---

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted. All abbreviations are as they appear in Defendants' Motion to Dismiss.

"warned" by San Antonio not to go public with Alpine High projections are just some of the most egregiously false ones in the CCAC).[2]

By crowning itself the victor of that and other non-existent battles, the Opposition ignores the dismissal gauntlet at hand. Unlike in most every other kind of case, dismissals in securities cases are commonplace, not rare. *Contra* Opp. 24; *see Securities Class Action Filings: 2021 Year in Review*, CORNERSTONE at 18 (43% of securities complaints filed between 1997 to 2021 were dismissed, including 54% of those filed in 2017–18 and 48% of those filed in 2019).[3] And this case illustrates why that is so. A complaint that (a) simply labels various statements as false and misleading without articulating *how* or *why*, (b) lobs accusations of wrongdoing without ever connecting them to the individual defendants, (c) pulls purportedly factual allegations out of thin air without a corroborating source, and (d) proposes an economically irrational theory of wrongdoing, might well survive dismissal in an ordinary case. But the CCAC, which does all those things and more, cannot meet the particularized requirements of the PSLRA. This Court should dismiss with prejudice.

## ARGUMENT AND AUTHORITIES

**I.     The Opposition fails to identify an actionably false or misleading statement.**

**A.     The Opposition cannot articulate with particularity how or why the Challenged Statements were false or misleading when made.**

The Opposition evades the critical PSLRA requirements that a complaint must, with

---

[2] What instead Defendants can do, and have done, is demonstrate that the allegations themselves (1) are inadequately sourced, (2) are unconnected to an individual defendant and thus not probative of scienter, and (3) only exacerbate the CCAC's nonsensical theory. MTD 27–55.

[3] https://www.cornerstone.com/wp-content/uploads/2022/02/Securities-Class-Action-Filings-2021-Year-in-Review.pdf.

97135602                                   2

particularity, (a) specify "*each statement* alleged to have been misleading," and (b) "explain the reason or reasons *why* the statement is misleading." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003) (emphases added). The Opposition opts instead for an impressionistic discussion of Defendants' statements with few references to actual factual representations. Opp. 25–30. Courts reject that manner of pleading. *See, e.g.*, *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 857–58 (N.D. Tex. 2005) (rejecting § 10(b) complaint when "Plaintiffs have left it to the Court to guess which statements are false and misleading and why each statement is false and misleading"); *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 452–53 (S.D.N.Y.2008) ("generalized explanations of how the statements were false or misleading are not sufficient").

The reason for this tactic is that the CCAC, in all its rhetorical bombast, never alleges *how* or *why* the various factual assertions were false when made. MTD 15–16 (collecting examples, from geophysical work, to IP rates, to supposedly "fudged" figures, to presentation slides). The Opposition responds with a remarkable footnote concession calling Defendants' argument a "distractive effort," Opp. 26 n.14, when it was the *CCAC itself* (and its CWs) that brought these purported factual representations into play. *See* MTD 16 (discussing allegations contained at CCAC ¶¶ 62, 169–71, 191). And the Opposition promptly illustrates this defect by scattering references to factual statements that, once again, lack the requisite particularity of how or why they were false when made, including:

- That "[m]any CWs describe the Alpine High announcement as misleading," without identifying with particularity which statements and why. Opp. 26.

- That "most Alpine High wells w[ere] typically just 20%-25% of what Apache had claimed," without specifying where or when Apache made any such

conflicting claims. *Id.* at 27.

- That "Defendants grossly exaggerated well production levels," without specifying where or how they did so. *Id.* at 29–30.

- That Defendants misrepresented that they had "run many cases on the downside," without alleging that Apache did not, in fact, do just that. *Id.* at 36.

This hollow-soundbite approach to pleading falsity does not satisfy the PSLRA's demand for particularized allegations as to "why" "each statement" was false or misleading.

Nor does the Opposition even bother *mentioning*—much less grappling with—the setting in which Apache's delineation-minded exploration efforts and statements occurred, despite the Motion's laying out that critical context at length. MTD 16–19; *see, e.g.*, *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994) ("statements must be analyzed in context"). Only by ignoring that inconvenient backdrop and focusing on the ultimately disappointing commercial production of Alpine High can the Opposition so blithely declare that Defendants' statements discussing "strong results," "successful well test[s]," or that "every well we've drilled has confirmed our model" were false when made. Opp. 23, 25–26, 34. Tasked with articulating why and how Apache's tests were not, in fact, successful and geological-model-confirming in the *delineation* context for which they were designed, the Opposition has nothing to say.

Meanwhile, the Opposition's defense of a fraudulent concealment theory leans heavily on the defective, unsourced San Antonio "warnings" and Project Neptune allegations, *infra* 20. But it also reprises the notion that Apache's disclosure of historical IP rates for wells was misleading in light of intervening production declines, Opp. 29–30 & n.19, while also conceding that it "does not challenge accurate historical data," *id.* at 35

97135602                                4

n.25. That just puts the CCAC on all fours with the complaint in *Bulmahn*, which also alleged that "production" from a particular well "had declined significantly by" the time a defendant twice "reiterated" the historical production from the well's "most recent report." *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 518 (E.D. La. 2015), *aff'd*, 854 F.3d 741 (5th Cir. 2017). The court rejected that theory because the defendant "merely restated a [true] historical fact" and made clear that he was not referencing "current production numbers." *Id.* at 519. The same is true here.

Likewise, the Opposition makes no headway with its inapposite cases. *Camelot Event Driven Fund v. Alta Mesa Res., Inc.* involved a company that "clandestinely" used non-standard drilling techniques designed to "temporarily *inflate* production" in the short term, while "undermin[ing] the long-term viability of [the] wells." 2021 WL 1416025, at *7, *12 (S.D. Tex. Apr. 14, 2021) (emphasis added). Apache, on the other hand, forthrightly disclosed that it was taking a slow-and-steady delineation approach to Alpine High that, by design, would *not* "blow everybody away with the[] production rates." MTD 17. Nor are there particularized allegations, as in *Edwards v. McDermott International, Inc.*, that Defendants omitted "internal forecasts" that directly contradicted their projections. 2021 WL 1421609, at *4–6 (S.D. Tex. Apr. 13, 2021). And, finally, the "departure from the industry standard" was actionable in *Stone v. Life Partners Holdings, Inc.* solely because the company "misrepresented that it used both in-house and outside experts, including medical doctors and published actuarial data." 26 F. Supp. 3d 575, 586, 589 (W.D. Tex. 2014). Apache's explicitly "unconventional" and "contrarian" approach to Alpine High conveyed no such adherence to supposed "industry standards," internal or

97135602                                                    5

otherwise. MTD 3–5.

### B.      The Opposition cannot sidestep the PSLRA's safe harbor.

The Opposition faults the Motion for not containing a separate sub-analysis for each of the dozens of granular forward-looking statements. Opp. 33–34. But *Lormand* did not forbid a category-by-category analysis of forward-looking statements with respect to tailored cautionary language; it forbade district courts from granting *blanket* protection based on *only* boilerplate or generic language. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009); *see also, e.g.*, *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Entm't Corp.*, 524 F. Supp. 3d 501, 530–31 (N.D. Tex. 2021) (post-*Lormand* decision applying the safe harbor to a category of statements accompanied by meaningful cautionary language); *Stockman v. Flotek Indus., Inc.*, 2010 WL 3785586, at *14, *23 (S.D. Tex. Sept. 29, 2010) (same as to "four categories" of forward-looking statements). Nor can the Opposition credibly contest the propriety of using an appendix to collect and delineate the non-actionability of voluminous challenged statements—defendants and courts routinely do just that.[4] In the modern age of 150-plus page securities complaints and finite page limits for motions to dismiss, a contrary rule would render the safe harbor meaningless for plaintiffs willing to copy and paste wide swaths of challenged statements.

The Opposition next incorrectly argues that the forward-looking statements fall outside the safe harbor. Opp. 34–35. But that confuses "an expression of present belief in

---

[4] *E.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 582 (S.D.N.Y. 2018) (district court opinion attaching an appendix collecting 70 challenged statements); *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 212 (D. Mass. 2018) ("reference table cataloguing the misstatements and omissions alleged in the Amended Complaint and explaining why they are not actionable under Rule 10b–5" was "helpful to the Court").

a forward-looking statement" with "a present fact"; the two are not the same. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 390 (S.D.N.Y. 2020) (conflating those two things "would work an end-run around the PSLRA's safe harbor provision"), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). Under that rubric and the text of the safe harbor, the statements addressing economic drilling locations and recoverable volumes of hydrocarbons are forward-looking projections of performance, even if phrased in terms of present belief. 15 U.S.C. § 78u-5(i)(1). And any embedded factual statements are insufficiently alleged to be false for reasons discussed above and in the Motion. *Supra* 2–5, MTD 15–19.

Next, the Opposition baselessly attempts to paint the risk disclosures as boilerplate, but, tellingly, it never contests that those risks were *precisely* the ones that begot the ultimately disappointing results at Alpine High.[5] Opp. 38–39. There is no requirement, *contra* Opp. 37–38, that a company granulate meaningful disclosures into project-specific risks. *See W. Wash. Laborers-Emp'rs Pension Tr. v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1091–92 (E.D. Mo. 2010) (safe harbor did not require defendants to refer to future products by name). Nor does it matter that this cautionary language predated the announcement of Alpine High, as "courts have found language meaningfully cautionary even when the statements repeated earlier disclosures." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 490 (S.D. Tex. 2016) ("[T]he case law does not prohibit using similar warnings from past years that continue to apply or reject that use as 'boilerplate.'"); *In re Egalet*

---

[5] The Opposition incorrectly argues that Defendants' oral statements were not sufficiently accompanied by cautionary language.  Opp. 37 n.27. Each such statement was prefaced by a reference to risk factors located elsewhere. *See* Ex. 42 (compiling those references). Incorporation by reference of cautionary language is entirely permissible under the PSLRA's safe harbor. See 15 U.S.C. § 78u-5(c)(2) (oral forward-looking statements can reference "readily available written document[s]"); *Southland Sec. Corp v. INSpire Ins. Sols., Inc.*, 365 F.3d  353, 372 (5th Cir. 2004) (same).

*Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 504 (E.D. Pa. 2018) (applying safe harbor based on cautionary language predating the class period).

Finally, the Opposition's argument (at 39) that the risk had already begun to materialize trips over the CCAC's failure to tie those supposed contemporaneous risks to the Individual Defendants' "actual knowledge." MTD 27–55. That "actual knowledge" requirement, 15 U.S.C.A. § 78u-5(c)(1)(B), makes the Opposition's pivot to a recklessness theory, *infra* 18–20, all the more problematic. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 409 (5th Cir. 2001) (explaining that Congress specified actual knowledge, not mere recklessness, as the substantive state of mind in the safe harbor provision).

### C.      *Omnicare* remains too high a hurdle for the challenged opinions.

#### 1.      The Opposition cannot avoid the *Omnicare* framework.

The Opposition attempts to evade the Supreme Court's framework for opinion statements in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), suggesting that the lack of qualifying language for some statements makes them "verifiable statements of material fact." Opp. 42. Opinion statements require no such magic language. *See In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 315 (S.D.N.Y. 2020) ("[T]he inclusion or exclusion of such language is never dispositive; the statements must be analyzed in context."). Rather, those statements—*e.g.*, "this play is going to be very economic" and "there is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil," Opp. 42—all indicate the kind of subjective "personal judgment" that renders such "[e]stimates and projections" subject to *Omnicare*, even if "unadorned with … express language" like "feel"

or "believe." *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *8 (S.D. Tex. May 31, 2016).[6]

"[T]he context makes clear" that these statements "reference[] what Defendants expected to transpire in the *future*." *Dynagas LNG*, 504 F. Supp. 3d at 317. This is especially true given that Defendants made these predictions amidst constant pronouncements that Apache was still delineating the play. Put simply, the CCAC must surmount *Omnicare*, which remains "no small task." 575 U.S. at 194.[7]

### 2. The Opposition cannot satisfy any *Omnicare* prong.

Consistent with its effort to refine the CCAC's economically irrational inference of fraud, *infra* 12–16, the Opposition does not bother addressing *Omnicare*'s subjective disbelief prong. MTD 22. Nor does it grapple with *Omnicare*'s embedded-facts prong, save for referring to a few (partially) fact-based statements without ever explaining how or why they were false when made. *Supra* 3–5; MTD 23. Instead, the Opposition hangs it hat entirely on an omission theory, Opp. 43–48, but it fails to meet that high hurdle.

*i.* On the inquiry front, if Defendants "fabricat[ed]" that *Omnicare* requires a "total lack of inquiry," as the Opposition alleges, Opp. 46 n.35, then so did the court in *Knurr v. Orbital ATK Inc.*, which interpreted *Omnicare* precisely the same way. *See* 276 F. Supp. 3d 527, 538 (E.D. Va. 2017) ("these examples [from *Omnicare*] require either a

---

[6] *See also Dynagas* 504 F.Supp.3d at 316–317 (treating as opinion: "I think the maintaining this [distribution] we've already achieved that with our previous distribution realignment, I mean, if you look at our cash flows, they're supported, the distribution is supported by our current cash flow profile *for quite a long time*."); *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) (deeming "cost and schedule estimates" opinions).

[7] Nor did Defendants ever suggest, *contra* Opp. 43, that the *mere* fact that a statement was caveated in opinion language sufficed to make it non-actionable. Rather, the caveats simply confirm that such statements are subject to *Omnicare*, which the Opposition's cited cases only emphasize. *See, e.g., In re Intuitive Surg. Sec. Litig.*, 2017 WL 4355072, at *2–3 (N.D. Cal. Sept. 29, 2017) ("[w]e believe" statements were "within the second category of *Omnicare* statements").

97135602                                    9

total lack of inquiry or actual knowledge of contrary facts"). The Opposition ignores both *Knurr* and *Frankfurt-Trust*, which together demonstrate that alleged criticism of the relative sufficiency of diligence does not constitute a viable *Omnicare* claim under the inquiry sub-prong. MTD 24–25 (citing *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 228 (S.D.N.Y. 2018)). The Opposition's cases are not to the contrary. *See Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) (no "meaningful inquiry" under *Omnicare* when "defendants did not do much analysis at all"); *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 5, 8 (1st Cir. 2021) (finding cognizable *Omnicare* claim when defendant referred to "then-existing status of a product" as "super strong," despite the product having had "not one successful" test).[8]

    *ii.*    The Opposition fails to shoehorn the CCAC into *Omnicare*'s "contrary facts" sub-prong. Initially, the Opposition does not dispute that this theory requires "*known* facts" that contradict a stated opinion, *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 905 (S.D. Tex. 2017) (emphasis added), *aff'd on other grounds*, 777 F. App'x 726 (5th Cir. 2019), which makes the Opposition's backtracking towards a recklessness theory (*infra* 18–20) fatal. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470, 472 (6th Cir. 2014) (while "recklessness" ordinarily suffices, "[w]hen an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff

---

[8] Nor does the supposed "specificity" of some of the challenged opinion statements render them immune from dismissal under *Omnicare*. *Contra* Opp. 45; *see, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (rejecting *Omnicare* claim for statement projecting specific "90% likelihood" of achieving a milestone); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 844 (S.D. Ohio 2016) (same as to claim involving specific financial projections of $457 million in annual revenue and $61.1 million in adjusted EBITDA), *aff'd*, 849 F.3d 325 (6th Cir. 2017).

must additionally plead facts showing that the statement was made with knowledge of its falsity"); *see* MTD 35–48 (discussing CCAC's failure to connect San Antonio "warnings," "Project Neptune," and other allegations to the Individual Defendants).

On the substance, the Opposition focuses largely on the alleged internal segregation of Alpine High data and purported deviation from Apache's ordinary protocols, as if the mere existence of those allegations pushes the CCAC across the *Omnicare* threshold. Opp. 45. But the cases it cites stand for no such rule. *See Camelot*, 2021 WL 1416025, at *7 (not an *Omnicare* case and, in any event, did not merely involve "departures from industry standards," but rather "undisclosed drilling techniques" designed to *artificially inflate* production); *BP*, 2016 WL 3090779, at *12–13 (did not involve merely "omitted facts pertaining to methodology," Opp. 45, but rather "unique factual contours" where defendant "knew" the methodology was "highly unreliable" and produced a "high degree of uncertainty"). Moreover, on this point—and on the *Omnicare* question more broadly—the Opposition pays no heed to the publicly disclosed unconventional, *delineation* context in which Defendants' predictions played out. MTD 7, 26–27 (discussing that context); *Omnicare*, 575 U.S. at 190 ("whether an omission makes an expression of opinion misleading always depends on context").[9] That failure to articulate *why* the supposedly omitted facts rendered *these* context-laded disclosures misleading is a critical shortcoming. *See Tongue v. Sanofi*, 816 F.3d 199, 211–12 (2d Cir. 2016) (opinion was not a misleading

---

[9] At most, the Opposition harkens back to its safe harbor discussion in critiquing Apache's "robust cautionary language." Opp. 47. That effort fails for reasons discussed above, *supra* 7–8, but just as importantly, a "boilerplate language" argument "does not apply to plaintiff's claim that defendants omitted a material fact, which ... is governed by *Omnicare* rather than the body of law regarding forward-looking statements." *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 82, n.3 (D. Conn. 2019).

"assurance of success" when read "in light of all [the] surrounding text, including hedges, disclaimers, and apparently conflicting information") (alteration in original).

Finally, the Opposition waves away *In re Pretium Resources Inc. Securities Litigation* (and a host of other on-point cases involving allegedly conflicting internal data or projections). Opp. 47 n.37, 48. But, in trying to reconfigure its scienter theory, the Opposition only ends up making this case *more* like *Pretium*. *Compare* 2020 WL 953609, at *5 (S.D.N.Y. Feb. 17, 2020) (rejecting *Omnicare* claim where no conflicting facts demonstrated project was "obviously doomed at the time of Defendants' disclosures"), *with* Opp. 6 (*denying* that Alpine High was "obviously doomed"). And finally, the case the Opposition touts as more analogous bears no resemblance to the CCAC. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) (defendant falsely represented that "no 'major' studies showed survival rates in excess of 20 months," when, in fact, "half" of all "major" studies "showed survival rates ranging from 25 months to 43 months").

## II. The Opposition fails to piece together the requisite strong inference of scienter.

### A. The Opposition tries fruitlessly to retool the CCAC's scienter theory and salvage its implausibility.

Confronted with the facial implausibility of the CCAC's core thesis, MTD 28–31, the Opposition backtracks. Opp. 62–64. Gone is the "***Ponzi scheme***" and "***Enron***" rhetoric trumpeted in the CCAC, now replaced by the more-innocuous-sounding theory that "Defendants knew their statements touting Alpine High lacked any reasonable basis, and thus were at least severely reckless—not that Defendants knew Alpine High was destined to fail." Opp. 62. That revisionist theory cannot be squared with the CCAC itself, would

be implausible in any event, and finds no support in the lead case the Opposition cites.

1.    The Motion did not pull from thin air the implausible narrative that Defendants funneled billions of dollars into a play they allegedly "*knew* from the outset ... was *never justified* by the long-term scale and return potential even at lower gas prices"— it came right from the CCAC. CCAC ¶ 257 (emphasis modified). Other examples abound:

- "Defendants knew exactly what they had with Alpine High." *Id.* ¶ 288.

- "Defendant knew full well even before the Class Period began that Apache's true data concerning Alpine High never supported Defendants' public pronouncements about the economic viability of the play." *Id.* ¶ 3.

- Christmann allegedly believed in 2012 and 2014—and purportedly still believed at the time of announcing Alpine High in 2016—that the region was "too gassy and devoid of viable oil prospects." *Id.* ¶ 70.

"Knowing" that Alpine High was "never justified" in terms of economic return and that the supposedly "true data" proved as much is, with no exaggeration, knowing that it was doomed to fail. The Opposition cannot so easily toss aside that implausible theory of the CCAC's own making. *See Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, 2005 WL 736217, at *3 n.3 (S.D.N.Y. Mar. 30, 2005) (noting plaintiff's effort to "recharacteriz[e]" implausible scienter allegations), *aff'd*, 159 F. App'x 317 (2d Cir. 2005). Nor can it come up with a single case supporting the economic-self-sabotage inference that courts have so frequently rejected. *See* MTD 30 (collecting numerous cases within the Fifth Circuit).

2.    Even as semantically reconfigured, a theory that Defendants "knew" the projected commercial viability for Alpine High "lacked any reasonable basis" (and yet poured billions of dollars into it) is not the facially plausible inference the Opposition tries to make it. Opp. 62. That is because *blindly* sinking billions into a venture is akin to, as the

Third Circuit described it, "a suicide mission." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 244 (3d Cir. 2004) (rejecting implausible inference that defendant voluntarily pushed through an acquisition despite allegedly knowing that "its due diligence had been materially obstructed"). Feeding resources into the teeth of a known, significant risk of failure makes equally little economic sense (without a cognizable motive to otherwise rationalize it, *infra* 16–18). That is precisely what the Fifth Circuit recently held in *Municipal Employees' Retirement System of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424 (5th Cir. 2019), where the complaint asserted that executives "knew Pier 1 had significant markdown *risk*" and excess inventory and yet failed to disclose that "looming *risk*," while "ordering more inventory." *Id.* at 430, 436 (emphases added). Without a colorable motive, the court rejected that implausible theory as failing to "explain[] why Pier 1 executives kept ordering more inventory when they supposedly knew deep down that they would not be able to sell it." *Id.* at 436. The CCAC presents that same implausibility. MTD 28–31.

3. The Opposition relegates the Motion's case law on this point to a footnote, offering no meaningful distinctions and implying that those cases did not survive the Fifth Circuit's 2014 decision in *Spitzberg*. Opp. 63 n.46. That is plainly wrong. The Fifth Circuit has—since *Spitzberg*—readily denounced economically irrational scienter theories. *E.g.*, *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016) (rejecting theory as "neither 'compelling' nor 'cogent'" when it assumed defendants engaged in economically "counterproductive" conduct); *Pier 1*, 935 F.3d at 436 (similar). *Spitzberg* did not, and could not, upend the core principle that only

97135602                                    14

"reasonable," "cogent" inferences may survive dismissal. *Tellabs Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007).

Nor is *Spitzberg* itself analogous to this case. Besides the different substance of the severely reckless *Spitzberg* statements (discussed *infra* 19), the "reckless gamble" scienter theory the Opposition tries to derive from *Spitzberg* suffers from a critical chronological distinction. Opp. 63. The company in *Spitzberg* made several stark misstatements about its production efforts in Colombia, including that it had hit "strong inflow[s]" of both "gas and oil" from a certain well, when in fact it had produced *no* such inflows of oil during drilling. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 681 (5th Cir. 2014). Only *after* the company received significant public criticism of its "unrealistically audacious" statements about its Colombian oil prospects, and at "roughly the same time" as receiving an SEC notice of investigation into those statements, did the company spend $5 million on a second test well. *Id.* at 682. Against that temporal backdrop and "pressure from the media and regulators," the court found plausible that the company "may have felt the need to substantiate the allegedly irresponsible statements they had previously made." *Id.* at 686.

The CCAC's timeline tells a different story: that Defendants supposedly knew— since 2012 and the purported "prior rejections" of Alpine High—that the play was non-viable, yet voluntarily embarked on a capital-intensive effort to delineate it. CCAC ¶¶ 128, 281. And then, when the supposedly "true data" confirmed Alpine High's non-viability, Defendants voluntarily *announced*—and proceeded to pour billions more into—the play, all without a cognizable motive for doing so. *Id.* ¶ 3; *infra* 16–18. That is neither the company-scrambling-to-justify-an-unearthed-lie situation in *Spitzberg*, nor the company-

97135602                                       15

concealing-bad-news-thrust-upon-it scenario in the Opposition's other cases.[10] It is the paradigmatic volitional self-destruction theory that courts soundly reject. MTD 28–31.

> ### B.   The Opposition barely bothers to defend the CCAC's motive allegations, let alone grapple with the scienter-negating indicia at hand.

Despite conceding that the CCAC's scienter theory is not "*premised* on motive allegations," Opp. 65 n.47, the Opposition tries to defend exactly those allegations. First, it points to something that has nothing to do with the requisite personal, "concrete benefits" that the Fifth Circuit demands for a cognizable motive, *Pier 1*, 935 F.3d at 430–31, namely, that Apache purportedly "rushed" the Alpine High announcement because Defendants were "desperate to announce a major find that would lift Apache's stock price." Opp. 3, 64. The Fifth Circuit has rejected such a ubiquitous "motive to artificially inflate the stock price" when, as here, the complaint lacks any "allegations that defendants sold their … shares." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003).

Next, the Opposition makes the astounding claim that "$78 million[] of Defendants' Class Period compensation was tied to performance goals linked to announcing Alpine High and achieving related targets." Opp. 61.[11] But the Opposition does not even try to square that embellishment with the Motion or Appendix B, which tediously demonstrated just how slim a portion of the Individual Defendants' total compensation actually related,

---

[10] *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 (N.D. Cal. Nov. 4, 2020) (Apple CEO disregarded "macroeconomic factors in China" that posed a risk to Apple's existing business in China); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 706–07, 709–10 (7th Cir. 2008) (fiber optics company touted strong, continuing demand  for its 10-plus-year-old "flagship product" and the successor to that product, while concealing that "the bursting of the fiber-optics bubble" had been well underway, resulting in the market for the flagship product "evaporating," and the company having shipped "not a single" one of the successor products).

[11] Even the CCAC knew better than to so unabashedly overstate this allegation. CCAC ¶ 295 ("$78 million—including $50.1 million for Christmann alone—was tied to personal and corporate performance goals that were *largely* linked, directly or *indirectly*, to Alpine High") (emphases added).

if at all, to Alpine High. MTD 34 & App'x B. Only by flouting that "reality"—and the dearth of other cognizable motive allegations—can the Opposition even try to compare the CCAC to cases in which more disproportionate incentive compensation could play a role in the broader scienter fabric when coupled with other cogent motive allegations. *See Barrie v. Intervoice-Brite*, 397 F.3d 249 (5th Cir. 2005) (combination of a bonus 175% greater than defendants' base salary *and* bona fide insider trading allegations); *Edwards*, 2021 WL 1421609, at \*9 (combination of bonuses and pay raises that were 75% of defendants' base salary, plus "suspicious" insider trading allegations, an SEC investigation, and a host of other circumstantial allegations and CW accounts directly linked to the individual defendants). A more honest examination reveals that the incentive compensation at issue here was proportionally *less* than the 65%-of-base-salary bonus *rejected* by the Fifth Circuit in *Shaw Group* as "hardly extraordinary." *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008) (distinguishing *Barrie*); *Shaw Grp.*, No. 04-1685 (E.D. La. Nov. 3, 2015), ECF 137 ¶ 2.[12]

Finally, the Opposition has no comeback to the classic, scienter-negating facts of the Individual Defendants' net purchases of stock and Apache's repurchases of more than $300 million of stock during the Class Period. MTD 30, 34–35. It protests that the Individual Defendants' trading histories do not negate scienter because the CCAC did not call attention to that fact or "allege motive on that basis." Opp. 62 n.44. That look-the-other-way response goes nowhere. *See Wilson v. Bernstock*, 195 F. Supp. 2d 619, 638

---

[12] Even as compared to their Class Period base salaries, the Individual Defendants' Alpine-High related compensation constituted, at most, 45% (for Christmann) and 36% (for Sullivan and Riney). MTD App'x B.

(D.N.J. 2002) (stock retention "significantly undermine[d]" a motive theory that was not based on any insider-trading allegations); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (same). The same is true of the Opposition's attempt to ditch Chief Judge Rosenthal's observation—echoed elsewhere in this Circuit—that a "company's stock repurchase program rebuts a finding of scienter," *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017); *accord Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 854 (N.D. Tex. 2018), in favor of out-of-circuit decisions that are glaring outliers even in their own jurisdictions. Opp. 64–65.[13]

### C. Falling back on cases like *Spitzberg* and its "severe recklessness" theory gets the Opposition nowhere.

The Opposition does not move the needle by trying (more than ten times) to liken this case to *Spitzberg*. Apart from being a poor analogy for the inference-weighing in this case, *supra* 15, *Spitzberg* also illustrates the sort of egregious representations that meet the high standard for "severe recklessness":

> ***those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care***, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

758 F.3d at 684 (emphases added); *see* Opp. 48 (citing part of this standard but omitting the bolded portion). In *Spitzberg*, those misrepresentations included both the statement touting oil inflows when in fact *no* oil had flowed, along with a statement touting more

---

[13] *See Apple*, 2020 WL 6482014, at *13 (acknowledging that "several courts in this District have found stock buy-backs to undermine scienter"); *compare Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (discounting the importance of share repurchases), *with Frankfurt-Tr.*, 336 F. Supp. 3d at 225 (collecting cases demonstrating that "substantial share repurchases tend to negate a finding of scienter").

"recoverable reserves" than "all of Colombia"—with "reserves" being a term of art that conveyed a certain level of production or testing—when in fact "*no* such production or geological testing had yet occurred." 758 F.3d at 681, 684 (emphasis added). Not only were those statements "obviously misleading" in their own right, but the complaint well pleaded the defendants' knowledge of contradictory information given that they were two of the company's *three total* employees, allowing the court to impute defendants' "knowledge of the details of [the company's] internal affairs." *Id.* at 684–85 & n.13.

The CCAC identifies nothing resembling those stark misrepresentations of contemporaneous facts; instead, it attacks Apache's predictive, evaluative approach on Alpine High as purportedly made without a "reasonable basis" given some alleged internally conflicting opinions. But severe recklessness cannot result from internal differences of opinions. *See City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014) (holding UBS was not reckless in relying on its mortgage-related asset portfolio's AAA rating in the face of "uncertainty and disagreement, within UBS and in the market at large" about the valuation of mortgage-related assets). Nor does it plead that Apache was akin to the three-person company in *Spitzberg* such that a court could simply intuit—even without particularized allegations—that the defendants were aware of contrary facts. *See Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 984 (5th Cir. 2019) (rejecting scienter when defendant presented "demonstrably false" well data, absent allegations that defendant "had reason to know" of the error); *Goldstein*, 340 F.3d at 251 (rejecting severe recklessness theory despite $768 million write-off and allegation that defendant was a "hands-on" CEO).

97135602

19

This Court should thus do as courts—including the Fifth Circuit itself—have done when faced with similar attempts to force the square peg of *Spitzberg* into the round hole of an ordinary § 10(b) case: distinguish *Spitzberg* as the outlier it plainly is. *See, e.g.*, *Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (distinguishing plaintiff's analogy to *Spitzberg* in a case involving "valuations [that] were far from certain"); *Firefighters Pension & Relief Fund of City of New Orleans v. Bulmahn*, 2014 WL 6638793, at *12 (E.D. La. Nov. 21, 2014) (summarizing *Spitzberg*'s egregious facts and distinguishing it in a case with a 60-person company); *In re CenturyLink, Inc.*, 2015 WL 500476, at *6 (W.D. La. Feb. 3, 2015) (distinguishing *Spitzberg* and clarifying that courts must still "look to the individual[] [defendant's] state of mind").

**D.     The Opposition fails to identify a cogent, compelling inference of scienter with its kitchen-sink circumstantial allegations.**

**1.     The Opposition's centerpiece scienter allegations—"warnings" from San Antonio, "Project Neptune," and "forensic analysis"— remain unsourced and deficient in any event.**

*i.     These allegations suffer from threshold infirmities under the PSLRA.*

The Motion explained that, without an identifiable source as a factual predicate, the CCAC's allegations about "warnings" from San Antonio and "Project Neptune" must be disregarded under the PSLRA. MTD 37–40; *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002) (plaintiff lacking personal knowledge must plead source of allegations: "documentary evidence," "personal sources," or both); *Shaw*, 537 F.3d at 538 (disregarding scienter allegation because complaint "offer[ed] no source, documentary or personal," for it).   Likewise for the CCAC's "forensic analysis" allegations, which say

*nothing* about the purported expert(s) who conducted the "forensic analysis," their qualifications, how they performed their analysis, and the specific documents from which their numbers were derived. MTD 40.

***Warnings from San Antonio.*** To justify its unsourced allegations, the Opposition cites *ABC Arbitrage* for the proposition that "CWs need not be named where other facts support their reliability." Opp. 50. True enough, but the CCAC *does not identify a CW* as the source for its "warnings" allegations. *See* CCAC ¶¶ 55–58 (identifying no CW as a source); Opp. 51–52 (citing CWs 5, 8, 9, and 14, none of whom even purports to describe warnings transmitted to the Individual Defendants). In fact, it identifies no source at all.

The Opposition also attempts to make the CCAC's "pre-announcement warnings" allegations sound more particularized than they really are. *Compare, e.g.*, Opp. 51 ("Plaintiffs also plead ***specific conversations*** where Christmann was advised not to go public, and provide corroborating details," citing CCAC ¶ 58), *with* CCAC ¶¶ 57–58 (pleading that "in late summer 2016," "the technical team, including Pieprzica, repeatedly advised Christmann not to go public," with no allegation of who specifically "advised" Christmann, what the "warnings" actually said, where these warnings took place and via what medium, or the allegations' source) (emphasis omitted). By contrast, in the *ABC Arbitrage* conversation, Opp. 51 n.38, the court credited allegations that an executive flew to Paris in July 1998 and reported losses directly to the company's Director of Marketing because "[t]his executive … is described with sufficient particularity" and the allegations suggested "this executive was himself Plaintiffs' source for this information," 291 F.3d at 357, yet nonetheless affirmed the dismissal. *Id.* at 362. Here, the CCAC does not identify

97135602

21

the speaker of the alleged warnings with "sufficient" (or any) particularity, much less indicate that this unidentified speaker is "himself Plaintiffs' source." CCAC ¶ 58.

The Opposition also compares allegations that Christmann received warnings in various "presentations and email communications in 2016," CCAC ¶ 57, to reports credited in *ABC Arbitrage* (ignoring several allegations that *ABC Arbitrage* rejected because "no source is provided, documentary or personal," 291 F.3d at 358). The comparison does not hold up. The "Monthly Management Reports" credited in *ABC Arbitrage* were standard executive reports sent to the defendants "comparing actual results to budgeted numbers" for the month—fundamental, black and white (or red) company performance results. 291 F.3d at 357. The CCAC's allegations, by contrast, merely state a conclusion (that Christmann received "warnings that substantial additional data were needed") and slap the label of "presentations and email communications in 2016" on that conclusion. CCAC ¶ 57; Opp. 51. Which presentations and email communications, when, and what specifically did the purported warnings say? Such unparticularized, self-serving allegations fail the PSLRA's source and corroborative detail requirement. *ABC Arbitrage*, 291 F.3d at 354; *Owens*, 789 F.3d at 542 & n.13 (rejecting allegations that individual defendants "attended [certain meetings] … in which potential MBS write-downs were discussed" because the complaint did "not plead with particularity the dates of the ALCO meetings or the substance of the conversations, alleging only that they began in the fourth quarter of 2007 and continued into 2008").

***Project Neptune.*** The Opposition trumpets the "Project Neptune" allegations repeatedly and taunts Defendants' inability to "deny" the truth of those allegations at this

procedural juncture, Opp. 6, but never confronts Defendants' point that the allegations are entirely unsourced. MTD 39–40. In a CCAC with 24 CWs, the failure of even one to step in and corroborate these out-of-thin-air allegations is a telling reminder of *why* they must be completely disregarded under the PSLRA. *ABC Arbitrage*, 291 F.3d at 354.[14]

**Forensic analysis.** The Opposition says Defendants object "because the Complaint does not identify the assisting industry expert," Opp. 29 n.18, but the defects in the forensic analysis allegations are actually much broader: the CCAC provides no description of the purported expert's qualifications, sources, or methods *at all*. Such purported expert analysis, shrouded in complete secrecy, cannot satisfy the basic pleading requirements for expert allegations: reliability and personal knowledge. *See Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 860 (N.D. Cal. 2019) (expert allegations "must be described with sufficient particularity to establish [the expert's] reliability and personal knowledge"), *aff'd*, 831 F. App'x 366 (9th Cir. 2020). The Opposition never engages with this case law, and its cited cases do not say such unsupported allegations could contribute to a "strong inference" of scienter. Opp. 29.[15]

          **ii.**       **These allegations fail to demonstrate scienter in any event.**

Even if these allegations were cognizable under the PSLRA (they are not), they still

---

[14] The Opposition cites CW 6, Opp. 21, but CW 6 merely alleges that an Apache team did an RTA evaluation focused on Alpine High rate reserves. CCAC ¶ 89. CW 6 does not allege to have seen the results of Project Neptune, heard the results of Project Neptune, or even claimed that this RTA evaluation was part of Project Neptune. *Id.*

[15] *See In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *9 (N.D. Cal. Jan. 14, 2022) (court credited, for falsity and loss causation purposes, two articles containing "expert" analysis, one that identified expert along with his credentials, and another the court found sufficiently described the experts and former employees and treated them as sufficiently identified CWs); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 491 n.13 (W.D. Pa. 2020) (passing *see also* reference to plaintiffs' calculations made in consultation with expert to suggest defendants' statements were present, controvertible facts and not forward-looking projections).

97135602                                    23

would not show scienter.

*"Warnings" from San Antonio.* A view among certain Apache employees that more diligence was required does not add to an inference of scienter. MTD 39. The Opposition cites *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, but it did not involve employees who merely "believed the statements about [an oil play] were incorrect," Opp. 52; it involved employees who communicated their beliefs—with supporting data—to the defendants (including one who personally directed data manipulation), Executive Committee members, and the SEC with particularly pleaded letters and presentations. 514 F. Supp. 3d 942, 948–49, 953 (S.D. Tex. 2021); *see also Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *28 (E.D. Tex. Oct. 19, 2017) (CWs described "persistent and pervasive problems" plaguing new technology program when defendants announced it was ready for pilot testing and rollout, and detailed how defendants were made aware of this "contrary" information).

*Project Neptune.* An after-the-fact, retrospective analysis does not show Defendants' prior, contemporaneous scienter (especially where, as here, the purported analysis did not concern anyone's state of mind). MTD 40–41. The Fifth Circuit so held in *Alaska Electrical Pension Fund v. Asar*, 768 F. App'x 175, 185–86 (5th Cir. 2019), and the Opposition does not confront that holding. Opp. 56 n.40 (noting only that *Asar* also found impermissible "group pleading"). The Opposition further cites *In re Elec. Data Sys. Corp. Sec. & "ERISA" Litig. ("EDS")*, 298 F. Supp. 2d 544, 558 (E.D. Tex. 2004), for the unremarkable proposition that investigations can, under some circumstances, be offered to "show that there were in fact problems" with a business endeavor "and nothing more."

97135602                                          24

Opp. 56. But even assuming the Project Neptune allegations were properly pleaded, Project Neptune purportedly uncovered problems by subjecting data to a particular hindsight analysis, which far from demonstrates what facts were readily apparent to the Individual Defendants in real time as delineation unfolded. More fundamentally, *EDS* held that an investigation showing "there were in fact problems" would be probative of scienter only "[w]hen coupled with allegations that Defendants knew of those problems with [the project] and thereafter misrepresented [the project's] status." *Id.* at 559. The Motion exhaustively detailed why the CCAC's allegations contain no such link, MTD 40–41, and the Opposition fails to join issue on that point.

*Forensic analysis.* The Opposition does not attempt to counter Defendants' point that the purported forensic analysis fails to demonstrate that Defendants' well-data disclosures were false or misleading and does not link the supposedly contrary data to a speaking defendant. MTD 15–19, 41. The Opposition instead touts the small fraction of minerals actually produced from Alpine High during the Class Period relative to estimates of the field size, Opp. 56–57—an odd argument given that Apache always anticipated that producing the play's minerals would require decades. *E.g.*, CCAC ¶ 239.

### 2. The Opposition fails to spin alleged pre-Class Period "rejections" of Alpine High into a contemporaneous inference of scienter.

The CCAC's "prior Alpine High rejections" allegations are an uncomfortable fit for the Opposition's reconfigured scienter theory. The Opposition finds itself pushing back on the notion that Christmann changed his mind on Alpine High's viability (*i.e.*, asserting that Christmann *still believed* that the play was non-viable in 2016), while simultaneously

disclaiming any suggestion that Christmann (or the other Defendants) believed that Alpine High was doomed to fail. *Compare* Opp. 57-58, *with id.* at 60. The Opposition's inability to keep its own scienter theories straight is a telling indictment of their cogency.

In any event, the Opposition cannot so casually discard a core element of the CCAC's own narrative—the 2014 hiring of Keenan and San Antonio's unconventional geological testing—by declaring everything "false or misleading." Opp. 58. For while the Opposition critiques the outcome of that analysis as producing insufficient data, it readily embraces that Keenan's team did, in fact, engage in an overtly perception-testing analysis. *See* Opp. 10 (detailing allegations that Keenan rejected prior Alpine High analysis and suggested "that he could obtain better results by drilling differently"); *id.* (describing Keenan's having used purportedly unconventional seismic imaging techniques).

None of the Opposition's cases (at 58–59) on this point (a) confronted that sort of intervening analysis or (b) sought to plead scienter without the requisite ties to the individual defendants' contemporaneous awareness of contrary facts "at the time" of the challenged statements.[16] *Flotek*, 915 F.3d at 985. *Carlton*, however, involved just that scenario, which is why its rejection of CW accounts that, like those here, involved data "antedating" both the "challenged statements" *and* intervening information remains a compelling strike against the CCAC's "prior rejections" theory. 184 F. Supp. 3d at 476.

---

[16] *See Anadarko*, 514 F. Supp. 3d at 948–49, 957 (defendants "continued to overstate" resource viability upon being presented with contrary "undeniable evidence" and internal audit findings, coupled with cogent insider trading allegations); *Edwards*, 2021 WL 1421609, at *9 (CW accounts contemporaneously linked individual defendants to the "true cost estimates," among other scienter allegations); *Brody v. Zix*, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006) (contemporaneous reports and data contradicting defendants statements, coupled with insider sales of 80-plus percent of defendants' stock).

### 3.    The Opposition fails to tie scienter-creating contrary facts to the individual Defendants—whether through CWs or otherwise.

#### i.    *The Opposition fails to remedy the deficient CW accounts.*

The Motion methodically walked through the CW allegations, explaining why each and every one did not contribute to the Individual Defendants' scienter. MTD 43–47. The Opposition responds not by defending the *substance* of its CW allegations, but by battling the strawman of their purported qualifications. Opp. 31–33. The problem, however, was that the CWs (with the exception of those recounting the patently non-probative "prior rejection" allegations, discussed *supra* 25–26) failed to *link* their allegations to the Individual Defendants. MTD 43–45. That basis for discounting was not manufactured, as the Opposition seems to suggest, but lifted directly from the Fifth Circuit's decision in *Pier 1*—a case the Opposition never even mentions. 925 F.3d at 435; *see also Southland*, 365 F.3d at 382 (rejecting "overly vague identification of [a] meeting [because] it contain[ed] no information suggesting such knowledge on the part of any identified individual").

The Opposition's predictable resort to out-of-circuit authority on this point is unavailing,[17] especially since its in-circuit authority either (a) actually involved a cogent link between the CW and the individual defendant,[18] or (b) is *Spitzberg*, in which the

---

[17] *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (involving a severe recklessness theory based on "consistent denials of unusual discounting" to "specific analyst queries"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) ("It is not enough that the witness was involved in the [relevant] trial in some capacity; Plaintiffs must allege whether that witness *actually communicated* with management or [*perceived*] management's reaction to the patient enrollment figures.") (emphases added & second alteration in original), *aff'd in part, vacated in part*, 965 F.3d 165 (2d Cir. 2020).

[18] *See, e.g. Edwards*, 2021 WL 1421609, at *6 ("The Cameron cost manager stated that Defendants Dickson and Spence specifically knew the numbers because they came on site to Cameron, and [the Cameron cost manager] went over the true cost estimates with Spence."); *KB Partners I, L.P. v. Barbier*, 907 F.Supp.2d 826, 831 (W.D. Tex. 2012) ("[C]orroborating allegations … make the inference of scienter in this case more compelling," including frequent conversations and meetings involving individual defendants regarding specific stability-testing issues standing in the way of FDA approval.).

defendants' actual knowledge did not derive from the CWs (that were employees of defendants' business partner in the Colombian wells), but instead was imputed from the extraordinary circumstance of the company containing only three people. 758 F.3d at 685 n.13. Nor can the Opposition simply declare that the sheer number of CWs makes up for whatever deficiencies their accounts otherwise have. *Compare* Opp. 59, *with Karpov v. Insight Enters., Inc.*, 2010 WL 4867634, at *6–7, *10 (D. Ariz. Nov. 16, 2010) (dismissing complaint sourced with allegations from 31 CWs).[19]

The CCAC also tries to spin hearsay CW accounts (*e.g.*, CWs 7, 8, 11) as conveying "credible and specific facts." Opp. 52. But none of the Opposition's cases premised a cogent link to a defendant's knowledge on such speculation or regurgitated rumors. *See In re OCA Inc. Securities* Litigation, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (involving direct allegations of insider knowledge sourced from three CWs within a "small company"); *Budde v. Glob. Power Equip. Grp., Inc.*, 2018 WL 4623108, at *7 (N.D. Tex. Sept. 26, 2018) (dismissing § 10(b) claim lacking allegations that the defendants "knew that they were publishing materially false information or were severely reckless in publishing such information"). At best, these cases support the straightforward proposition that "a hearsay statement, while not *automatically* precluded from consideration to support allegations of scienter, may indicate that a confidential witness's report is not sufficiently reliable, plausible, or coherent" to satisfy the PSLRA. *Schulze v. Hallmark Fin. Servs.,*

---

[19] *See also, e.g. In re Apple Comp., Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1017, 1028 (N.D. Cal. 2002) (dismissing complaint sourced with allegations from 22 confidential witnesses); *Constr. Workers Pension Fund—Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 653, 663 (N.D. Ill. 2015) (same as to 21 CWs); *In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *6, *11 (N.D. Cal. Oct. 12, 2011) (same as to 17 CWs); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1109–10 (N.D. Cal. 2009) (same as to 17 CWs).

*Inc.*, 2021 WL 3190529, at \*5 n.41 (N.D. Tex. July 28, 2021) (emphasis added) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009)). Far from "detailed and consistent accounts" supporting an inference of scienter, none of the CCAC's hearsay statements "establishes the witnesses' personal knowledge or reliability by recounting the particulars of the alleged transgressions" and should be disregarded. *Zucco*, 552 F.3d at 998; *see, e.g.*, CCAC ¶ 59 (failing to even identify the "other Apache employees" from whom the rumor that "Keenan himself was not ready to announce Alpine High" originated); *Stockman*, 2010 WL 3785586, at \*19 (rejecting hearsay CW accounts).

Finally, the Motion laid out the CWs' abject failure to draw *any* meaningful connection to Sullivan or Riney. MTD 47–48. The Opposition offers nothing in response to those points and, indeed, barely mentions Sullivan or Riney at all.

### ii.     *The Opposition's reliance on unidentified meetings, reports, and "access" to data is unavailing.*

The complaint must allege *what* was said in *which* report or meeting that a defendant received or attended that showed that what the defendant said or was about to say was false. *See, e.g.*, *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 431–32 (5th Cir. 2002) (allegations that defendants received "daily, weekly and monthly financial reports that apprized them of the company's true financial status" were inadequate). The Opposition can point to nothing in the CCAC satisfying that specificity requirement. Opp. 53 (citing CCAC ¶ 290).

The Opposition's cases do not obviate this specificity requirement. In *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, for instance, the court emphasized and applied Fifth Circuit authority requiring corroborating detail about internal reports, crediting allegations because

97135602                                    29

CWs had personally prepared reports at the request of defendants, knew their contents, and delivered them to defendants, and in other instances, CWs had seen reports prepared by others that were sent to defendants and "knew the contents of the reports." 2004 WL 5278716, at *29–31 (E.D. Tex. June 16, 2004). Here, no CW claims to have prepared the purported reports, seen specific reports, or delivered them, and none can otherwise specify their contents, much less *why* any given report informed the Individual Defendants that what they said or were about to say was false. The Opposition's cases, moreover, involved more concrete allegations strongly bolstering the scienter inference. *Brody v. Zix*, 2006 WL 2739352, at *1–2, *7 (N.D. Tex. Sept. 26, 2006) (defendants unloaded 85.7%, 80.8%, and 86.2% of their company stock, respectively, in 6 months before corrective disclosure); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 655–57 (S.D. Tex. 2021) (defendants represented that key factory destroyed by fire was in process of being rebuilt when "rebuild never even really began," and company allegedly feigned restored capacity by shipping material manufactured elsewhere to factory for mere "finishing"); *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *5–6 (E.D. Tex. Sept. 29, 2015) (defendants later admitted knowledge of facts undermining their statements).

### 4. The Opposition's supposed "additional facts" do not lend themselves to an inference of scienter.

#### i. *Imputation through "specific statements."*

Skipping right past the case law in the Motion (at 49), the Opposition cites *BP* for the broad proposition that Defendants' (really, Christmann's) "repeated statements" regarding Alpine High must mean they had scienter as to those statements. Opp. 59 (citing

97135602                                30

*In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012)). But *BP*'s "holding" was actually "quite narrow," involving the "exceptional circumstance" in which repeated statements "show[ed] specific knowledge of a narrow and measurable aspect of [a critical] program so as to give the impression that [the speaking executive] is closely tracking the company's progress on that aspect." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d at 925 (distinguishing *BP*). The Opposition does not—because it cannot— identify any statement indicating that the speaker was "focus[ed] … like a laser" on any granular information that would give rise to scienter here. *BP*, 843 F. Supp. 2d at 783.

### ii.      *Quasi-core operations theory.*

A core operations or "special circumstances" theory is so clearly unsuitable here, MTD 50–51, that the Opposition does not mention the theory by name or address the applicable Fifth Circuit law. It instead alleges scienter based on the "critical importance of Alpine High," Opp. 50, but that is just a core operations theory under a different label.[20] Not only does Fifth Circuit law rule out applying such a theory here, MTD 50–51 (citing, *e.g.*, *Flotek*, 915 F.3d at 985–86; *Neiman*, 854 F.3d at 750), but more fundamentally, the CCAC fails to allege *how* the information Defendants supposedly would have learned would have informed them that what they said or were about to say was false. The cases the Opposition cites for its "critical importance" allegations, by contrast, identified what the contrary information was and found sufficient allegations of how it was presented to

---

[20] Apache's healthy post-Alpine High operations belie the Opposition's rhetoric about the purportedly singular importance of the play within Apache's large global portfolio. *See Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 344 (S.D.N.Y. 2011) (rejecting conclusory core operations allegation that certain "business was essential to [company's] corporate survival" when "indeed history has shown it is not").

97135602                                                                              31

defendants. *EDS*, 298 F. Supp. 2d at 557–59; *Venator*, 547 F. Supp. 3d at 664.

### iii. "Cone of Silence," "Manipulated" Data, RRC Filings, and Employee Departures.

The Opposition doubles down on Defendants' alleged "concerted measures of deception to perpetuate the fraud." Opp. 54. Along the way, it ignores (1) the internal dynamics in which Keenan's analysis played out that contextualize those allegations, and (2) the case law requiring that such data-segregation allegations contain *facts* showing the defendants' fraudulent intent—rather than just supposition. MTD 51–53 (collecting cases). The Opposition then promptly demonstrates what those missing facts look like by citing *Anadarko*. *See* 514 F. Supp. 3d at 948–49, 951 (alleging that defendants themselves oversaw "manipulat[ion] [of] the data" to "hide known faults" and "concealed ... the true maps" and canceled a presentation that was going to reveal the "truth," all in the context of a particularized "whistleblower complaint" by employee threatening to go to the SEC).[21]

The Opposition then devolves into another embellishment of the CCAC, recounting its various (deficient in their own right, MTD 16, 44, 46) allegations of "manipulat[ed]" data or presentation slides and declaring that these supposed distortions occurred "with the blessing of Christmann and Keenan." Opp. 55. The CCAC simply does not say that. *See* CCAC ¶ 168 (alleging "a handful of select employees in San Antonio's Reservoir Engineer Group, who answered only to Keenan and Christmann, were engaging in pervasive data

---

[21] The Opposition also cites *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007), for the broad proposition that "departure from internal policies supports scienter." Opp. 54. But *Schleicher* just recounted the unremarkable rule that a "[v]iolation of GAAP and/or a company's own accounting policies" can factor into an otherwise compelling inference of accounting fraud. 529 F. Supp. 2d at 971. Such allegations are only probative of scienter when "coupled with evidence that the violations or irregularities were the result of the defendant's *fraudulent intent* to mislead investors." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir. 2001) (emphasis added).

manipulation"). With no link between these manipulation allegations and the Individual Defendants, the Opposition's cases become readily distinguishable. *Compare Camelot*, 2021 WL 1416025, at \*8 (CEO-defendant specifically "ordered his team" to identify wells for manipulative inflationary techniques), *and Anadarko*, 514 F. Supp. 3d at 955 (individual defendant "insisted" that scientists "conceal maps revealing the existence of faulting and instead use false maps" that "had been manipulated"), *with In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at \*32 (S.D. Tex. July 9, 2009) (rejecting CW allegation that did "not allege that any of the individual Defendants had knowledge of these purported forecast manipulations").

The Opposition briefly reprises the CCAC's allegations regarding the delays in Apache's Railroad Commission reporting, Opp. 55, without bothering to explain how Apache's affirmative *disclosure* of well production data in investor presentations or to the Texas Comptroller is the least bit consistent with an inference of fraud. MTD 54.[22] And the Opposition continues to play fast and loose with the content of the CCAC by repeating that "*Defendants* prevented Apache employees from making required regulatory filings" and "*Defendants* … misclassif[ied] gas wells as oil wells," when the CCAC draws no such connection between those allegations and the Individual Defendants. *Compare* Opp. 55 (emphases added), *with* CCAC ¶¶ 183, 185.

Finally, the Opposition offers a one-sentence defense of the CCAC's "silenced any dissent" allegations, ignoring Defendants' case law, MTD 52–53, and citing only *Carlton*,

---

[22] *Compare* Opp. 29 n.19 (taking issue only with Apache's investor update on the Weissmeis 1H well as relaying only gas production), *with* MTD Ex. 40 (public Texas Comptroller data on Weissmeis 1H crude oil production).

which involved a "pattern of firing employees who came forward with concerns that [defendant's] statements were misleading." 184 F. Supp. 3d at 483. That sort of retribution against *whistleblowers*—as opposed to the departures of those who simply disagreed with the strategic wisdom of Alpine High—is not pleaded in the CCAC.

### iv.   *Keenan's resignation.*

In this Circuit, "resignations have little implication on the scienter analysis," as "there are many reasons not related to fraud why people resign." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724-25 (W.D. Tex. 2010) (first quote); *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *10 (S.D. Tex. Mar. 30, 2002) (second quote). The Opposition nevertheless cites *non-defendant* Keenan's October 2019 resignation as somehow probative of the Individual Defendants' scienter. Opp. 60; *but see In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *29 (S.D.N.Y. May 10, 2012) (resignation of someone who was "not a named defendant ... creates no inference of scienter on the part of any of the named defendants"). Yet the Opposition cites no facts—just speculation—tying that resignation to Project Neptune or some inference of fraud. MTD 11. Courts routinely reject scienter inferences predicated on resignations that occur in the midst of bad news such as the publicly disclosed, disappointing results in the Alpine High play that Keenan had spearheaded.[23]

---

[23] *See, e.g., Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 858–59 (S.D. Tex. 2020) (no scienter despite CFO resignation "the same day as [company's] announcement of a significant revenue shortfall"); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Entm't Corp.*, 524 F. Supp. 3d 501, 537 (N.D. Tex. 2021) (no scienter based on "vague and circumstantial allegations which fail to adequately link the departures to the alleged fraud," where complaint "plead simply that [defendants] departed after the disclosure of bad news"); *Kurtzman*, 2002 WL 32442832, at *10 (no scienter despite officer resignations after disclosures contrary to previous "stellar reports").

97135602                                34

### v.      *Magnitude of Apache's write-down.*

The write-down's size likewise does nothing to vault the CCAC over its scienter hurdle. Courts routinely dismiss complaints for failing to adequately plead scienter even where companies took impairments several orders of magnitude beyond Apache's. *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*, 655 F. Supp. 2d 262, 266, 269–70 (S.D.N.Y. 2009) (no scienter despite $40–49 billion impairment); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 178 (2d Cir. 2014) (same for $48-billion write-down).[24] Nor does the timing of Apache's multi-year investment and delineation of Alpine High bear the slightest resemblance to *Plotkin*, cited at Opp. 61, in which a struggling company announced a $25-million annual purchase agreement (roughly 79 times company's prior year revenue) with two supposedly "significant international companies" that were actually new, tiny, and related, and the deal collapsed "quicky and spectacularly" mere *months* after its announcement. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 694, 697-98 (5th Cir. 2005).

## III.     The Section 20(a) claims necessarily fail without a cognizable primary claim.

Because the Opposition fails to salvage the CCAC's § 10(b) claims, the CCAC's § 20(a) claims must also fail. *E.g., Shaw*, 537 F.3d at 545; *Southland*, 365 F.3d at 383.

### CONCLUSION

The Court should dismiss the CCAC with prejudice.

---

[24] *See also, e.g.*, *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *15 (S.D.N.Y. May 7, 2020), aff'd, 844 F. App'x 385 (2d Cir. 2021) (no scienter for $22 billion write-down); *City of Omaha v. CBS Corp.*, 2011 WL 2119734, at *6 (S.D.N.Y. May 24, 2011) (same for $14 billion write-down), *aff'd*, 679 F.3d 64 (2d Cir. 2012) *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 337 (S.D.N.Y. 2012) (same for $12.55 billion-dollar impairment), *aff'd*, 783 F.3d 383 (2d Cir. 2015).

97135602            35

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*
    David D. Sterling
      Attorney-In-Charge
    State Bar No. 19170000
    Federal I.D. No. 07079
    Amy Pharr Hefley
    State Bar No. 24046046
    Anthony J. Lucisano
    State Bar No. 24102118
    Federal I.D. No. 3369146
    C. Frank Mace
    State Bar No. 24110609
    Federal I.D. No. 3385915
    910 Louisiana Street
    Houston, Texas 77002
    (713) 229-1946
    (713) 229-7946 (Fax)
    david.sterling@bakerbotts.com
    amy.hefley@bakerbotts.com
    anthony.lucisano@bakerbotts.com
    frank.mace@bakerbotts.com

ATTORNEYS FOR DEFENDANTS
APACHE CORPORATION, JOHN J.
CHRISTMANN IV, TIMOTHY J. SULLIVAN,
STEPHEN J. RINEY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 9th day of June, 2022.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley

97135602

36