United States District Court
Southern District of Texas
**ENTERED**
September 15, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| | § | |
| IN RE APACHE CORP. SECURITIES | § | CIVIL ACTION NO. 4:21-cv-00575 |
| LITIGATION | § | |
| | § | |
| | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me is Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("Motion to Dismiss"). *See* Dkt. 71. Having reviewed the motion, the response, the reply, the pleadings, and the applicable law, I recommend that the Motion to Dismiss be **DENIED**.

## BACKGROUND

This is a securities class action lawsuit brought by Lead Plaintiffs Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (collectively, "Lead Plaintiffs"), individually and on behalf of those purchasers of the common stock of Apache Corporation ("Apache") during the period from September 7, 2016 through March 13, 2020 (the "Class Period"). The defendants are Apache, an exploration and production company headquartered in the Houston area, and three of its top executives: (1) John J. Christmann IV ("Christmann"), Apache's President and Chief Executive Officer; (2) Timothy J. Sullivan ("Sullivan"), Apache's former Executive Vice President – Operations Support; and (3) Stephen J. Riney ("Riney"), Apache's Executive Vice President and Chief Financial Officer. I will refer to Christmann, Sullivan, and Riney, collectively, as the "Individual Defendants." Lead Plaintiffs bring claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission.

Lead Plaintiffs' live pleading is the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Consolidated Class Action Complaint"). *See* Dkt. 65. In this 148-page pleading, Plaintiffs allege a massive fraud centering

on an oil and gas field in the Texas panhandle. The origins of this fraud, according to Lead Plaintiffs, began in the early 2010s when Apache endured a prolonged financial slump. As its competitors in the exploration and production industry capitalized on advances in hydraulic fracturing, Apache allegedly did not make a single notable discovery during the fracking boom. As a direct result, the company's stock price languished. Plaintiffs cite a Houston Chronicle article, which observed that Apache "found itself on the outside looking in," and management "knew Apache had to get back its swagger if it was to reverse its fortunes. It had to return to the business of risk, and it had to make a headline-grabbing find." *Id.* at 18.

In an effort to make such a headline-grabbing find, Apache focused on a remote area of West Texas in Reeves County, dubbed "Alpine High." On September 7, 2016, the first day of the Class Period, Apache announced Alpine High as a major oil discovery in Texas. As alleged by Plaintiffs,

> For three years, Defendants touted Alpine High as a "transformational discovery" and "world class resource play" with immense production capabilities, including "conservative" estimates of over three billion barrels of oil and significant amounts of "really rich gas." Defendants supported their claims by highlighting examples of "strong well results" and "successful oil tests" that were purportedly representative of Alpine High's "2,000 to more than 3,000 future drilling locations," which would "deliver incredible value to Apache and its shareholders for many, many years to come." Analysts and industry media lauded this "massive shale discovery," emphasizing that Alpine High's "compelling economics" represented Apache's "largest catalyst opportunity" for the coming years and put Apache "back in the game" after a "rough time keeping up with competitors." Fueled by Defendants' assurances, Apache's stock price soared, reaching a Class Period high of $69.00 on December 12, 2016. The Individual Defendants took full advantage, reaping more than $75 million in Alpine High-linked compensation during the Class Period.
> 
> . . . Unbeknownst to investors, Defendants' statements were false. In reality, Apache's own production data and analyses of the Alpine High play never supported Defendants' public representations. As Apache was ultimately forced to admit, Alpine High was virtually barren.

> Indeed, after three years of relentlessly touting Alpine High to investors, the "world class resource play" that was supposedly going to "transform" Apache produced less than 1% of the oil and gas that Defendants had represented to investors was recoverable. Alpine High was so devoid of oil and gas that Apache was forced to cease all drilling at the field in 2020, take a $3 billion write down, and slash its dividend by a staggering 90%. When the truth regarding Defendants' fraud emerged, analysts and the nation's leading financial publications excoriated Defendants, noting that the revelations "were in stark contrast to [Defendants'] past defense of Alpine High," and Apache's stock price was decimated, closing at a mere $4.46 on March 17, 2020—an astonishing decline of 93% from its high during the Class Period.

*Id.* at 8-9 (cleaned up).

This is not, Lead Plaintiffs insist, a situation in which a prospect turned out to be poor performing much to the surprise of those involved in the project. Instead, Lead Plaintiffs paint a sinister picture, claiming that Defendants touted the economic viability of Alpine High knowing full well that such statements were false. Based, in part, on statements from 24 confidential witnesses, the Consolidated Class Action Complaint asserts that Defendants lacked crucial data they needed to support impressive claims about Alpine High's production capabilities. Even worse, Lead Plaintiffs contend that the data behind the play actually indicated that Alpine High was not commercially viable. Lead Plaintiffs maintain that Defendants nonetheless went ahead and widely broadcast overwhelmingly positive statements about this high-profile project.

Defendants have moved to dismiss the Consolidated Class Action Complaint for failure to plead (i) an actionable false or misleading statement; or (ii) scienter with particularity as required by Federal Rule of Civil Procedure 9(b) and the Private Securities Reform Litigation Act ("PSLRA").

## LEGAL FRAMEWORK

Rule 12(b)(6) authorizes dismissal of a complaint when the plaintiff has failed to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

3

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* At this initial pleading stage, I am required to accept as true all well-pleaded factual allegations in the Consolidated Class Action Complaint. *See Twombly*, 550 U.S. at 555–56.

Rule 9(b) requires parties claiming fraud to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The allegations must include "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quotation omitted).

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R § 240.10b–5(b). "A § 10b–5 claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled 'with particularity' and . . . the requirements of the [PSLRA]." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

Enacted by Congress in 1995, the PSLRA has "twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To accomplish this goal, the PSLRA contains "[e]xacting pleading

4

requirements." *Id.* at 313. Under the PSLRA's heightened pleading requirements, a plaintiff seeking to state a § 10(b) and Rule 10b–5 claim must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quotation omitted).

The scienter, or state of mind element of a § 10(b) and Rule 10b–5 claim, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Scienter is satisfied by a showing of severe recklessness, *i.e.*, an extreme departure from the standards of ordinary care." *Sec. & Exch. Comm'n v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459 (5th Cir. 2022) (quotation omitted). To allege scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

Section 20(a) of the Exchange Act provides for joint and several liability for "controlling persons" who are found to have induced violations of the Exchange Act. 15 U.S.C. § 78t(a). "To impute liability to [the Individual Defendants]—the alleged 'control persons' of [Apache] under § 20(a) of the Securities Exchange Act—the investors ha[ve] to show a 'primary violation' under § 10(b): If the § 10(b) claim is inadequate, then so is the § 20(a) claim." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019).

## ANALYSIS

A. **Lead Plaintiffs Adequately Plead Actionable Misrepresentations**

Defendants first argue that the Consolidated Class Action Complaint contains no well-pleaded allegations of an affirmative misrepresentation or omission. I disagree.

5

At the outset, I note that there is no dispute that Apache and the Individual Defendants made many optimistic statements during the Class Period about the commercial viability of Alpine Heights.[1] For illustrative purposes, I note that Defendants promoted Alpine High as "an immense resource and a transformational discovery for Apache" that would "drive incremental growth and returns for years to come." Dkt. 65 at 93; *see also id.* at 86 ("I've said it's world class. This would compare it versus three – what other people would view as world-class resources, the Woodford SCOOP, the Marcellus, and the Eagle Ford . . . It stacks up as well as anything."); *id.* at 109 ("[W]e are building out a world-class resource play that will change the course of Apache."); *id.* at 115 ("There is a very large wet gas play and there will be a lot of rich gas but there will also be a lot of oil."); *id.* at 118 ("Investors do not yet have an appreciation for the potential cash flow generation from the liquids play at Alpine High.").

As Defendants correctly note, "'the standard for misrepresentation in this [omission] context is whether the information disclosed, *understood as a whole*, would mislead a reasonable potential investor.'" Dkt. 71 at 27 (quoting *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 824 (S.D. Tex. 2017)). At this early pleading stage, it is my responsibility to determine whether the totality of allegations indicate that representations made by Defendants concerning the commercial viability of Alpine High were materially false or misleading when made. To help me make this determination, Lead Plaintiffs emphasize that the Consolidated Class Action Complaint does not make naked assertions of falsity. Instead, Lead Plaintiffs allege, in great detail, that Defendants were fully aware that there was no reliable data to support the wildly enthusiastic

---

[1] The Consolidated Class Action Complaint describes the alleged misstatements in great detail. For convenience, Defendants put together an Appendix identifying in one, easy-to-use chart, each alleged misrepresentation made by Defendants. *See* Dkt. 71-1. For completeness, Lead Plaintiffs have copied Defendants' Appendix A and added a column titled "Plaintiffs' Response" that contains Lead Plaintiffs' brief response to Defendants' arguments for why the alleged misstatements are not actionable. *See* Dkt. 74-2.

claims for Alpine High. By way of example, Lead Plaintiffs allege that Steven Keenan, the lead geologist Apache had tapped to discover the next big find, repeatedly told senior management in 2016 that the company did not have the data to announce the play, and would need at least nine more months of consistent production from numerous wells within the play to properly assess the commercial viability of Alpine High. Despite these warnings, Lead Plaintiffs contend, Apache made a grand announcement on September 7, 2016, hyping Alpine High's attributes, performance, and commercial viability. If the Consolidated Class Action Complaint is to be believed, Apache senior management had no reason to make such rosy statements to the market concerning this new shale play. Possibly even more alarming is the lawsuit's accusation that, in mid-2019, Apache commenced an independent internal technical review of Alpine High. That review, named "Project Neptune," reportedly concluded "that the vast majority of Apache's Alpine High wells had ***never*** performed or produced anything like the Company had represented to the market." Dkt. 65 at 46. "Instead, the current, recent, and historical production and performance were far worse than what Apache and Defendants had told investors." *Id*. Lead Plaintiffs also allege that Apache's top executive, Christmann, deliberately shielded critical Alpine High data from the rest of the company for years, thus precluding standard peer review practices from occurring.

      Over my career, both as a lawyer and as a judge, I have had the opportunity to review a vast number of securities class action lawsuits. Despite their usual length, many of those filings are cut-and-paste jobs that unquestionably fail to properly allege a false or misleading statement. This is not one of those complaints. The Consolidated Class Action Complaint provides a detailed discussion of the alleged misrepresentations at issue and explains the reasons why Defendants allegedly knew at the time they spoke publicly that those statements were materially false. *See id.* at 85-130. For that reason, I conclude that Lead Plaintiffs have sufficiently alleged that Defendants made materially false or misleading

7

statements, a necessary prerequisite to stating a § 10(b) and Rule 10b–5 claim. *See Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 4:19-CV-957, 2021 WL 1416025, at *12 (S.D. Tex. Apr. 14, 2021) (sustaining fraud claims at the motion to dismiss stage where plaintiffs relied "on the accounts of two production engineers, [to] allege that [defendants] clandestinely used unconventional and unsustainable drilling methods to inflate reserve and earnings estimates").

## B. The PSLRA's Safe Harbor Provision Does Not Protect Defendants' Alleged Misstatements

Defendants contend that many of the alleged misstatements contained in the Consolidated Class Action Complaint constitute forward-looking statements protected by the PSLRA's safe harbor provision. The PSLRA's safe harbor provides, in relevant part, that a forward-looking statement is not actionable if (1) the statement is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (2) if "the plaintiff fails to [plead] that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A–B).

Defendants assert that the "vast majority" of the Consolidated Class Action Complaint's alleged misstatements are forward-looking statements that fall within the PSLRA's safe harbor. Dkt. 71 at 29. In my view, Defendants are overreaching. Even a cursory review of the alleged misstatements (conveniently listed on the dueling Appendixes provided by the parties) indicates that many are statements of current or historical fact, which are not protected by the PSLRA's safe harbor. *See In re BP p.l.c. Sec. Litig.*, 852 F. Supp. 2d 767, 799–800 (S.D. Tex. 2012) ("[T]he challenged statements are presented as a representation of [the defendant's] past achievements . . . and are not forward-looking."); *In re TETRA Techs., Inc. Sec. Litig.*, No. 4:08-CV-0965, 2009 WL 6325540, at *32 (S.D. Tex. July 9, 2009) ("[A] statement of historical fact cannot be protected by the safe harbor."). To the extent some of the alleged misstatements contain forward-looking elements, many of

them incorporate factual assertions, rendering the safe harbor inapplicable. *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." (quotation omitted)); *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-2399, 2019 WL 6111516, at *10 (S.D. Tex. Mar. 27, 2019) ("A forward-looking statement . . . whose falsity consists of a lie about a present fact is not protected by the PSLRA's safe harbor provision.").

Even if all the alleged misstatements can, nonetheless, be construed as forward-looking, I still do not believe the safe harbor provides a panacea for Defendants. Because the Consolidated Class Action Complaint alleges that the Defendants knew that their statements were misleading at the time they were made, the key question becomes whether those statements were accompanied by meaningful cautionary language. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016) ("Even if the plaintiffs show actual knowledge, the safe harbor may still apply if the statement . . . is identified as forward looking and is accompanied by meaningful cautionary language."). And what is meant by the phrase "meaningful cautionary language"? The Fifth Circuit has explained that "formulaic" and "generic" disclaimers cannot protect forward-looking statements because "Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244–45 (5th Cir. 2009); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (The safe harbor would not protect "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

9

Here, the language Defendants primarily rely on for the safe harbor to apply provides that any company statements were subject to "a number of risks and uncertainties which could cause our actual results, performance, and financial condition to differ materially from our expectations." Dkt. 71 at 30. Defendants' generic use of terms such as "risks" and "uncertainties" fails to provide substantive, company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, as the Fifth Circuit requires. Indeed, the Fifth Circuit in *Lormand* expressly rejected similar cautionary-disclaimer language, refusing to apply the safe harbor when the company's disclaimer stated: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Lormand*, 565 F.3d at 245. As for the more specific warnings that Defendants point to, like warning of "the risk that Apache will not encounter commercially productive oil and gas reservoirs" (Dkt. 71 at 30), these warnings are insufficient because "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015). Accepting Lead Plaintiffs' allegations as true, at the start of the Class Period, Defendants had *years* of data indicating that Apache would not encounter commercially productive oil and gas reservoirs. Accordingly, far more specific warnings were required to bring Apache's statements within the safe harbor. I thus conclude that Defendants' cautionary statements are not meaningful. The result is that the PSLRA's safe harbor provision does not apply.

### C. Lead Plaintiffs Adequately Plead Actionable Misleading Statements of Opinion

Defendants next argue that the "vast majority" of alleged misstatements identified in the Consolidated Class Action Complaint qualify as non-actionable opinions. Dkt. 71 at 31. Because § 10(b) liability follows only from an "untrue statement" or "omi[ssion]" of "material fact," 15 U.S.C. § 78u-4(b)(1)(A–B),

Defendants note that statements of opinion are not actionable under federal securities laws simply because they allegedly "turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). That is true, but "certain opinion statements can be actionable as well, since 'the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.'" *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019) (quoting *Lormand*, 565 F.3d at 248); *see also Omnicare*, 575 U.S. at 193 ("[T]he phrases 'we believe' or 'we think' . . . can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors"). The Supreme Court's *Omnicare* opinion "clarifies how a trial court should evaluate whether a plaintiff has alleged an actionably misleading statement of opinion." *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. CV H-21-2045, --- F. Supp. 3d ---, 2022 WL 3227584, at *9 (S.D. Tex. Aug. 10, 2022). Under *Omnicare*, opinion statements are actionable if the speaker did not sincerely hold that opinion, or if the plaintiffs allege that "(i) the speaker 'omit[ted] material facts about the issuer's inquiry into or knowledge concerning a statement of opinion,' and (ii) 'those facts conflict with what a reasonable investor would take from the statement itself.'" *In re BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (quoting *Omnicare*, 575 U.S. at 189).

      As an initial matter, I am not convinced, as Defendants claim, that the "vast majority of the [alleged misstatements] qualify as opinions." Dkt. 71 at 31. But even if I assume that virtually all the alleged misstatements are opinions, those opinions are actionable under Supreme Court precedent. As Lead Plaintiffs point out, "Defendants repeatedly made highly specific and authoritative Alpine High estimates, including about its volumes of recoverable oil and gas, drilling locations, and commercial viability." Dkt. 74 at 54. Under *Omnicare*, each of these alleged misstatements is actionable because Defendants purportedly concealed material

facts, including that (i) the Apache geologists responsible for exploring and developing Alpine High did not believe the data supported the company's grandiose predictions; (ii) top Apache management blocked Alpine High data from being vetted under the standard peer review processes that were otherwise utilized at Apache; and (iii) the underlying data never supported the sky-high estimates offered by Apache senior management. In short, Lead Plaintiffs have sufficiently alleged that Defendants omitted material factual information that would render their statements misleading to a reasonable investor under the *Omnicare* rubric. At this juncture, I conclude that Lead Plaintiffs' alleged misrepresentations, even those based on opinions, survive to see another day.

**D.     Lead Plaintiffs Adequately Plead Scienter**

As a final matter, Defendants maintain that the Consolidated Class Action Complaint fails to establish a strong inference of scienter, as required by the PSLRA. To allege scienter under the PSLRA, the plaintiff must plead, with particularity, facts giving rise to a strong inference of either an "intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12. Because "there will rarely be direct evidence of intent to defraud," *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, No. 503-MD-1530, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004), a plaintiff may allege scienter "by pleading facts giving rise to a strong inference of recklessness or conscious misconduct." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 410 (5th Cir. 2001). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015) (quoting *Tellabs*, 551 U.S. at 326); s*ee also Lormand*, 565 F.3d at 251 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). A district court must also consider

12

"plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. "Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter," but allegations of motive and opportunity, without more, will *not* fulfill the pleading requirements of the PSLRA. *Owens*, 789 F.3d at 540 (quotation omitted).

Turning to the inference of scienter in this case, I concede that this is a close call. A very close call. As I examined the scienter issue, I went back and forth as to whether Lead Plaintiffs' scienter allegations pass muster. In the end, I rely heavily on the Fifth Circuit's instruction that "where there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss." *Spitzberg*, 758 F.3d at 686 (quoting *Lormand*, 565 F.3d at 254).

Lead Plaintiffs claim that they have adequately alleged a strong inference of scienter through a detailed recitation of the purported fraud in the Consolidated Class Action Complaint. In a nutshell, Lead Plaintiffs contend that Defendants, desperate to reverse Apache's slumping performance and announce a major U.S. shale play, initially touted Alpine High as a huge prospect although such statements lacked any reasonable basis. According to Lead Plaintiffs, extensive geologic testing Apache conducted between 2012 and 2014 indicated that Alpine High was not a viable oil play. Then, near the start of the Class Period, a team of technical experts who had reevaluated the asset purportedly advised Apache senior management that the company lacked the technical data and analyses to make reasonable statements or projections about future production from Alpine High. Apache management disregarded these explicit warnings and moved forward with a major public announcement and glowing reports on how Alpine High would drive shareholder value for years to come. As alleged, the summer of 2019 witnessed growing friction among high-level Apache management as the company had still not escaped from the doldrums. The company launched an internal investigation of Alpine High, which concluded that: "(1) the vast majority of Alpine

13

High wells never performed or produced anywhere close to the manner in which they were presented to investors; (ii) from the outset, Alpine High produced only limited quantities of poor quality of oil and gas; and (iii) any price pressure destroyed the economic viability of Alpine High." Dkt. 65 at 123. Nonetheless, Lead Plaintiffs assert, Defendants failed to come clean and acknowledge the project's severe limitations. Instead, Defendants stuck to their guns, defended the economic viability of Alpine High, and moved forward with the project on a wing and a prayer.

For purposes of determining "whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter," the Fifth Circuit holds that it is "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. In this case, Lead Plaintiffs' scienter allegations are based, in part, on statements from a bevy of confidential witnesses, many of whom confirm that the Individual Defendants received regular reports and updates on Alpine High, making the Individual Defendants fully aware of the play's limitations. In particular, the live pleading alleges that "Keenan was 'intimately aware' of production, drilling and completions at Alpine High through Daily Operations Meetings and Weekly Production Meetings," and he "routinely updated Defendants Christmann and Sullivan regarding Alpine High throughout the Class Period during both Quarterly Review Meetings in San Antonio as well as during Kennan's monthly trips to Apache's corporate headquarters in Houston." Dkt. 65 at 125. Riney also allegedly "closely tracked the status of each Alpine High well," *id.* at 125-16, and attended meetings at which Alpine High's production woes were openly discussed. *See id.* at 62. Despite this alleged knowledge, the Individual Defendants—through numerous investor presentations, press releases, earnings calls, and press interviews—made repeated statements promoting Alpine High's

performance and profitability. These statements were, according to Lead Plaintiffs, materially misleading.

Defendants argue that Lead Plaintiffs' scienter theory—"that Defendants 'knew' Alpine High would never be an economic play and they 'lacked any scientific or factual basis' for their statements, concealed the truth from investors, and yet continued to 'pour[] money into the ground' to the tune of *more than $3 billion*"—is nonsensical. Dkt. 71 at 39 (quoting Dkt. 65 at 60, 120). It is, Defendants contend, wholly illogical and irrational for Apache and its senior management to promote a play they knew, all along, would fail miserably. This argument goes a bit too far. While it certainly would not have been in the company's best interest to stick by a strategy doomed from the start, the Consolidated Class Action Complaint's allegations are not wholly illogical. With Apache stock languishing and senior management convinced that only a major announcement could put the company back on track, Defendants supposedly went "all in" on Alpine High, "gambling that they would figure something out, even though the Company's extensive explorations repeatedly failed to produce scientific support for their bold claims." Dkt. 74 at 73. To this end, after Apache announced the Alpine High play, the company "desperately drilled its way across Alpine High during the Class period," hoping to stumble across highly economic wells. Dkt. 65 at 54. The Consolidated Class Action Complaint quotes one confidential witness as stating that Apache geologists "'willfully ignored' [data demonstrating that Alpine High lacked economically recoverable resources] because they were under 'a lot of pressure' to make an oil find and Alpine High was a 'Hail Mary pass to the end zone.'" *Id.* at 121. As Judge Richard Posner once explained:

> The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). While the course of conduct allegedly pursued by Defendants might not have been a wise one, it was rational (though reckless).[2] Considering the totality of Lead Plaintiffs' allegations, the inference that Defendants acted recklessly is at least as compelling as any alternative inference.

To bolster their scienter allegations, Lead Plaintiffs advance a number of additional arguments. First, Lead Plaintiffs claim that the resignation in October 2018 of Keenan, Apache's lead technical advisor on the Alpine High play, favors an inference of scienter. Second, Lead Plaintiffs argue that a strong inference of scienter is supported by Apache's announcement in February 2020 that it took a massive $3 billion write-down and ceased all further exploration in Alpine High. Third, Lead Plaintiffs maintain that scienter is enhanced by the Individual Defendants' compensation structures, which strongly incentivized the executives to inflate Apache's stock price by hyping Alpine High. Even if I completely discount these additional scienter allegations, I still think Lead Plaintiffs have done enough at the pleading stage to establish a strong inference of scienter.

Viewing Lead Plaintiffs' allegations as true and evaluating the facts as a whole, I conclude that Consolidated Class Action Complaint's allegations are sufficient to support a strong inference of scienter by Defendants. *See, e.g.*, *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021) ("[I]f a plaintiff can show that a defendant received and had actual knowledge that statements to investors were materially misleading, such facts would give rise to a strong inference of scienter."); *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 853 (N.D. Tex. 2018) (holding that defendants' access to contradictory information provided "more than mere conclusory allegations that Defendants . . . must have

---

[2] I must admit that I am puzzled by Lead Plaintiffs' assertion in their response that the Consolidated Class Action Complaint does **not** allege that "Defendants knew Alpine High was destined to fail." Dkt. 74 at 72. That is exactly what the lawsuit alleges. *See, e.g.*, Dkt. 65 at 111 ("As Defendants knew from the outset, . . . Alpine High was never justified by the long-term scale and return potential even at lower gas prices." (cleaned up)).

had knowledge" of the information); *Singh v. 21Vianet Grp., Inc*, No. 2:14-cv-00894, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (a strong inference of scienter may arise when defendants knew facts or had access to information suggesting that their public statements were not accurate (quotation omitted); *Brody v. Zix Corp.*, No. 3:04-CV-1931, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (finding it reasonable to assume defendants had actual knowledge of material misstatements because they regularly received reports showing the statements were false). I thus recommend that the Motion to Dismiss be denied on the grounds that Lead Plaintiffs failed to adequately plead scienter.

## CONCLUSION

For the reasons explained above, I recommend that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. 71) be **DENIED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 15th day of September 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE