# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00575<br><br>District Judge George C. Hanks, Jr.<br><br>Magistrate Judge Andrew M. Edison<br><br><u>CLASS ACTION</u> |

## LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL AND <u>SUPPORTING MEMORANDUM OF LAW</u>

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................. 1

II.    STATEMENT OF ISSUES TO BE RULED UPON ............................................. 5

III.   NATURE AND STAGE OF PROCEEDINGS ..................................................... 5

IV.   STATEMENT OF FACTS ................................................................................. 6

V.    STANDARD OF REVIEW ............................................................................... 9

VI.   ARGUMENT AND AUTHORITIES ................................................................. 9

      A.    The Proposed Class Satisfies Rule 23(a)'s Requirements .......................... 9

           1.    The Proposed Class is So Numerous that Joinder is Impractical ...................................................................................... 10

           2.    The Proposed Class Shares Common Questions of Law and Fact ............................................................................................. 10

           3.    Lead Plaintiffs' Claims Are Typical of the Proposed Class ............ 11

           4.    Lead Plaintiffs Are Adequate Class Representatives ...................... 12

      B.    The Action Satisfies Rule 23(b)(3)'s Requirements .................................. 14

           1.    Common Questions of Law and Fact Predominate ........................ 14

           2.    *Basic's* Presumption of Reliance Applies ...................................... 15

                a.    Apache Common Stock Was Listed and Traded on Presumptively Efficient Markets ......................................... 16

                b.    The Market for Apache Common Stock Satisfies All *Cammer* Market Efficiency Factors ..................................... 17

                c.    The Market for Apache Common Stock Also Satisfies All *Krogman* and Other Market Efficiency Factors ............. 21

           3.    Damages Can Be Calculated Through a Common Methodology ................................................................................ 23

      C.    Class Treatment is Superior to Other Methods of Adjudication ................ 24

      D.    Proposed Class Counsel Satisfy Rule 23(g) .............................................. 25

VII.  CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997).................................................................................... 9, 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013).................................................................................... 9, 15

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)......................................................................................... 15

*Buettgen v. Harless*,
 2011 WL 1938130 (N.D. Tex. May 19, 2011) ........................................... 18

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989).............................................17, 18, 19, 20

*Carpenters Pen. Tr. Fund of St. Louis v. Barclays PLC*,
 310 F.R.D. 69 (S.D.N.Y. 2015).................................................................... 19

*City of Pontiac Gen. Employees' Ret. Sys. v. Dell Inc.*,
 2018 WL 1558571 (W.D. Tex. Mar. 29, 2018) ................................... 12, 21

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*,
 2015 WL 5097883 (D.N.J. Aug. 31, 2015) ................................................ 20

*Erica P. John Fund, Inc. v. Halliburton*, *Co.*,
 563 U.S. 804 (2011)......................................................................................... 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 268 (2014).................................................................................. 15, 16

*In re Allergan PLC Sec. Litig.*,
 2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)............................................. 23

*In re Anadarko Petroleum Corp. Sec. Litig.*,
 2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) ................................... *passim*

*In re Banc of California Sec. Litig.*,
 326 F.R.D. 640 (C.D. Cal. 2018) ................................................................ 21

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
 2017 WL 2608243 (S.D. Tex. June 15, 2017) ........................................... 11

*In re Dynegy, Inc. Sec. Litig.*,
    226 F.R.D. 263 (S.D. Tex. 2005) ........................................................... 9, 11

*In re Reliant Sec. Litig.*,
    2005 WL 8152605 (S.D. Tex. Feb. 23, 2005) ........................................... 10

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ....................................... 17, 20

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001)........................................................ 17, 22

*Lehocky v. Tidel Techs., Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004) .................................................... *passim*

*Marcus v. J.C. Penney Co., Inc.*,
    2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ...............................12, 18, 19

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................................................ 23

*Pelletier v. Endo Int'l PLC*,
    338 F.R.D. 446 (E.D. Pa. 2021) ............................................................... 21

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal. 2015) ............................................................. 23

*Prause v. TechnipFMC, PLC*,
    2020 WL 3549686 (S.D. Tex. Mar. 11, 2020)...............................10, 12, 24

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019).................................................10, 15, 24

*Rougier v. Applied Optoelectronics, Inc.*,
    2019 WL 6111303 (S.D. Tex. Nov. 13, 2019).................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................... 3

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005)..................................................................... 17

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).................................................................. 16, 20

**RULES**

FED. R. CIV. P. 23 .................................................................................... *passim*

**SECONDARY SOURCES**

H.R. Conf. Rep. No. 104-369 (1995) ........................................................ 4, 12

Lead Plaintiffs, Plymouth County Retirement Association ("Plymouth County") and the Trustees of the Teamsters Union No. 142 Pension Fund ("Teamsters 142") (together, "Lead Plaintiffs" or "Plaintiffs"), respectfully move for entry of an Order in the above-captioned action (the "Action"): (1) certifying the Class (as defined below) pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Rules"); (2) appointing Lead Plaintiffs as Class Representatives; and (3) appointing Saxena White P.A. ("Saxena White") and Kessler Topaz Meltzer & Check, LLP ("KTMC") as Class Counsel, and Ajamie LLP ("Ajamie LLP") as Liaison Class Counsel.[1]

## I.   <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

This is a securities fraud class action against Apache, an energy exploration and production ("E&P") company, and three of its top executives.  Throughout the Class Period, Defendants made materially false or misleading statements to investors about the Company's purported discovery of a major oil and gas play in the Texas panhandle, dubbed "Alpine High."  For over three years, Defendants consistently touted Alpine High to investors as a "transformational discovery," a "world class resource play," and a "tremendous" asset that provided Apache with immense production capabilities to reverse the Company's sluggish financial performance and languishing stock price.  Defendants also repeatedly told investors that, even under Apache's "conservative" models, Alpine

---

[1] Unless otherwise noted: (1) capitalized terms have the same meanings as in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint," Dkt. 65); (2) citations to "¶" are to paragraphs in the Complaint; (3) citations to "Ex." are to exhibits to the accompanying Declaration of Thomas R. Ajamie ("Ajamie Decl."); (4) "Nye ¶" references are to paragraphs in the accompanying Expert Report of Zachary Nye, Ph.D. (the "Nye Report," Ex. A); and (5) all emphasis is added and internal citations and quotations are omitted.  A proposed form of Order also is submitted herewith.

High held over three billion barrels of oil and significant amounts of "really rich gas." Defendants further represented that years of rigorous testing and analysis had "confirmed" and "proven" that Alpine High held extremely high-quality oil and gas, and that multiple "successful" test wells showed the play was "prolific."  Defendants supported their claims by highlighting examples of "strong well results" and "successful oil tests" that were purportedly representative of Alpine High's "2,000 to more than 3,000 future drilling locations" in just two of its geologic formations, which would "deliver incredible value to Apache and its shareholders for many, many years to come."  The market credited Defendants' statements, and Apache's stock price soared.

As investors would ultimately learn, however, Defendants' representations were baseless.  In truth, Alpine High was not commercially viable, and Apache's own data never supported Defendants' public representations during the Class Period.  As Defendants were forced to admit, this purported "transformational discovery" was virtually barren, producing less than 1% of the oil and gas that Defendants represented was recoverable.  As the truth about Alpine High was gradually revealed through a series of corrective disclosures, Apache's stock price fell 93% from its Class Period high of $69.00 per share, to less than $4.50 per share at the end of the Class Period.  Plaintiffs now seek to certify a class pursuant to Rules 23(a) and 23(b)(3) on behalf of themselves and all other persons or entities who purchased or otherwise acquired Apache common stock from September 7,

2016, through March 13, 2020, inclusive (the "Class Period"), and were damaged thereby (the "Class").[2]

The Supreme Court has repeatedly recognized the importance of class actions in redressing violations of the federal securities laws. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)."). Courts in this District have underscored that securities fraud claims are particularly well-suited for class treatment. *See, e.g.*, *In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *8 (S.D. Tex. Sept. 28, 2022) (collecting cases); *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 504 (S.D. Tex. 2004) ("Rule 23 . . . should be construed liberally to permit class actions, especially in the context of securities fraud suits[.]"). This case is no exception, and the Class satisfies all of Rule 23's requirements.

*First*, Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy are easily met here. Numerosity is satisfied because the proposed Class is estimated to consist of thousands of shareholders, joinder of whom would be impracticable. Moreover, the Action presents many common questions of law and fact, including as to Defendants' misrepresentations and omissions, materiality, scienter, and damages, thereby

---

[2] Excluded from the Class are Defendants, the officers and directors of Apache, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. ¶ 320.

satisfying commonality.  Plaintiffs' claims are also typical of other Class members' claims, as all Class members were injured by the same wrongful conduct.  Finally, Plaintiffs are adequate class representatives.  Plymouth County and Teamsters 142 are the type of sophisticated institutional investors that Congress sought to lead securities class actions when it enacted the PSLRA, and each Plaintiff has demonstrated its commitment to prosecuting this Action in the Class's best interests.  *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733.  Moreover, Plaintiffs have selected Saxena White and KTMC as Class Counsel—both of which are highly experienced and possess extensive track records of successfully prosecuting securities class actions.

*Second*, the Class also satisfies Rule 23(b)(3)'s requirements.  Courts evaluating class certification in a securities fraud action routinely find predominance is met where, as here, Defendants engaged in a common course of conduct, the securities traded in an efficient market, and damages can be calculated on a class-wide basis.  Here, Plaintiffs submit the Expert Report of Zachary Nye, Ph.D., which demonstrates that: (1) the market for Apache common stock satisfies each factor that courts typically consider when evaluating market efficiency; and (2) damages in this Action can be calculated on a class-wide basis pursuant to a well-established damages methodology.  Additionally, proceeding as a class action is superior to other available methods for fairly and efficiently adjudicating Class members' claims.

*Third*, Plaintiffs' counsel are qualified to serve as Class Counsel under Rules 23(a)(4) and (g).  Saxena White and KTMC have substantial experience prosecuting securities fraud class actions like this one, have devoted extensive time and resources to

prosecuting this Action, and are dedicated to protecting the interests of the putative Class.

Plaintiffs respectfully submit that their motion should be granted in its entirety.

## II. STATEMENT OF ISSUES TO BE RULED UPON

1. Whether to certify the proposed Class pursuant to Rules 23(a) and 23(b)(3);

2. Whether to appoint Lead Plaintiffs as Class Representatives; and

3. Whether to appoint Saxena White and KTMC as Class Counsel and Ajamie LLP as Liaison Class Counsel pursuant to Rule 23(g).

## III. NATURE AND STAGE OF PROCEEDINGS

This Action was filed on February 23, 2021. Dkt. 1. On October 6, 2021, the Court appointed Plymouth County and Teamsters 142 as Lead Plaintiffs, Saxena White and KTMC as Lead Counsel, and Ajamie LLP as Liaison Counsel. Dkt. 45. In so doing, the Court concluded that Plaintiffs met the typicality and adequacy requirements of Rule 23. *See id.* at 5, 9 ("[Plaintiffs] are committed to pursuing this litigation on behalf of the class, willing to supervise lead counsel, and able to commit the resources necessary to seek the best possible recovery.").

On December 17, 2021, Plaintiffs filed the operative Complaint (Dkt. 65) alleging that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Defendants subsequently filed a motion to dismiss the Complaint. Dkt. 71. On September 15, 2022, Magistrate Judge Andrew M. Edison issued a Memorandum and Recommendation ("Recommendation," Dkt. 76), concluding that Plaintiffs adequately pled falsity and scienter and recommending that the Court deny Defendants' motion to dismiss in its entirety. *Id.* The Court adopted the Recommendation

in full on November 29, 2022.  Dkt. 81.

Plaintiffs have diligently prosecuted the Class's claims in the Action by, *inter alia*: (1) filing the initial complaint (Dkt. 1, filed by Plymouth County); (2) filing the extensively researched 148-page Complaint as well as motions for consolidation of related actions, appointment as Lead Plaintiffs, and class certification; (3) monitoring and directing the progress of the litigation, including by communicating with proposed Class Counsel about various aspects of the Action; (4) reviewing and approving Court filings; (5) successfully opposing Defendants' motion to dismiss twice—once before Magistrate Judge Edison and a second time before Judge Hanks; (6) participating in and/or supervising the preparation of numerous key documents, including the parties' joint Rule 26(f) report, Plaintiffs' initial disclosures, Plaintiffs' first sets of document requests and interrogatories to Defendants, document production subpoenas to non-parties, and Plaintiffs' responses and objections to Defendants' first sets of document requests and interrogatories; (7) seeking responsive documents from Defendants and multiple non-parties; (8) responding to Defendants' discovery requests and searching for and producing responsive documents; and (9) engaging and soliciting guidance from industry consultants and financial experts.

## IV.   **STATEMENT OF FACTS**

Apache is an E&P company based in Houston.  ¶ 12.  In the early 2010s, Apache was the sixth-largest oil producer in the U.S. but, as competitors earned massive profits through fracking, Apache missed out on the fracking boom and lost ground.  Consequently, its stock price fell more than 30% from 2010 to 2014.  ¶¶ 24-26.  As the *Houston Chronicle*

stated on December 30, 2016, Apache "found itself on the outside looking in" and "had to make a headline-grabbing find" to "reverse its fortunes." ¶ 26.

Seeking such a major shale discovery, Apache focused on a remote area of West Texas, dubbed the "Alpine High." ¶ 30. Apache did so even though the Company had already prospected the area in 2012 and 2014 and rejected the play both times as "too gassy" and devoid of any significant amounts of oil. ¶¶ 44-51, 114, 201, 282-83. Under intense pressure from the investment community to make a successful shale oil discovery, Apache ignored its prior explorations as well as additional data demonstrating that Alpine High was not economically viable and moved forward with the play, which a former Apache employee described as a "Hail Mary to the end zone." ¶¶ 51-54, 283.

On September 7, 2016, the first day of the Class Period, Apache announced its purported discovery of a "Significant New Resource Play" at Alpine High. Defendants touted its immense production capabilities, including "conservative" estimates of over three billion barrels of oil and significant amounts of "really rich gas," as well as "2,000 to more than 3,000 future drilling locations" in just two of Alpine High's five geological formations. ¶¶ 32, 33, 64, 71. Defendants supported their claims by highlighting a series of "strong well results" including multiple "successful oil tests" purportedly representative of Alpine High's overall capabilities that would "deliver significant value to our shareholders for many years." ¶¶ 32, 34, 239. Analysts and industry media praised this "massive shale discovery," emphasizing that Alpine High's "compelling economics" put Apache "back in the game." ¶¶ 42-43. Fueled by Defendants' statements, Apache's stock price rose, reaching a Class Period high of $69.00 on December 12, 2016. ¶ 302. The

Individual Defendants took full advantage, reaping more than $75 million in Alpine High-linked compensation during the Class Period.  ¶¶ 295-99.

Defendants' statements touting Alpine High throughout the Class Period were materially false or misleading.  In truth, as a confidential internal executive level review—codenamed Project Neptune, and presented to the Company's Board of Directors—would ultimately confirm, Apache had lacked the data to back up its public representations about Alpine High from the outset.  ¶¶ 58-61, 85-101.  Yet, instead of disclosing the truth, Defendants actively concealed Alpine High's poor performance from both internal and external scrutiny, manipulated Alpine High data, and continued to make false or misleading statements to investors.  ¶¶ 134-89.

Defendants' fraud was revealed to investors through a series of partial corrective disclosures that caused the price of Alpine stock to fall precipitously.  These disclosures included, *inter alia*, repeated announcements of disappointing oil and wet gas production at Alpine High, higher-than-expected costs and longer-than-expected ramp-up at Alpine High, and the abrupt "resignation" of the Apache executive who was credited with the "transformational discovery."  Alpine High was so barren of economic oil or gas that Apache was forced to shutter all drilling operations there in 2020, take a massive $3 billion write down, and slash its dividend by a staggering 90%.  ¶¶ 106, 108, 110.  When the truth about Defendants' fraud emerged, the media and securities analysts excoriated Defendants, noting that the revelations "were in stark contrast to [Defendants'] past defense of Alpine High."  Apache's stock price collapsed, closing at $4.46 per share on March 17, 2020—*a decline of 93%* from its $68 per share Class Period high.  ¶¶ 107, 113, 302.

8

## V.    <u>STANDARD OF REVIEW</u>

Plaintiffs "bear[] the burden of showing that the proposed class satisfies the requirements of Rule 23." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at \*4 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019).  In resolving Plaintiffs' motion, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 268 (S.D. Tex. 2005).  While the Rule 23 analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," merits questions may be considered "only to the extent[] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage").  For the reasons described below, Rule 23 is met here.

## VI.    <u>ARGUMENT AND AUTHORITIES</u>

### A.    The Proposed Class Satisfies Rule 23(a)'s Requirements

The Supreme Court has recognized that class actions are particularly appropriate in securities fraud cases.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Courts in this District agree that "Rule 23 is a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity." *Lehocky*, 220 F.R.D. at 504.  Thus, "[i]n securities fraud cases . . . when a court is in doubt as to

whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *In re Reliant Sec. Litig.*, 2005 WL 8152605, at *3 (S.D. Tex. Feb. 23, 2005).

### 1.    The Proposed Class Is So Numerous That Joinder Is Impractical

Numerosity is satisfied where the members of a proposed class are "so numerous that joinder . . . is impracticable." Fed. R. Civ. P. 23(a)(1).   Numerosity is generally assumed in securities class actions involving nationally traded securities, given the magnitude and geographical dispersion of the putative class.  *See Anadarko*, 2022 WL 4544235, at *3.   During the Class Period, Apache common stock traded on the Nasdaq, NYSE, and Chicago Stock Exchange ("CHX"), and had between 375.4 and 382.5 million shares outstanding with an average weekly trading volume of over 21.5 million shares.  *See* Nye ¶¶ 14, 22-27, 30; *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (numerosity satisfied based on over 50 million shares outstanding with an average weekly trading volume of 2.7 million shares).  Accordingly, numerosity is satisfied.

### 2.    The Proposed Class Shares Common Questions of Law and Fact

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."   "To meet this requirement, a plaintiff need only identify a single common contention, the resolution of which will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke." *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *3 (S.D. Tex. Mar. 11, 2020) (alteration in original).  Consequently, the presence of "some plaintiffs having different claims or claims that require some individualized analysis does not defeat commonality." *Dynegy*, 226 F.R.D. at 269.

Here, numerous questions of law and fact are common among Plaintiffs and the proposed Class, including whether: (1) Defendants violated the federal securities laws; (2) Defendants misrepresented or omitted material facts; (3) Defendants acted with scienter; (4) Defendants' material misstatements caused Class members to suffer compensable loss; (5) Class members have sustained damages, and the proper measure of damages; and (6) the Individual Defendants were control persons of Apache.  These are quintessential common questions.  *See, e.g.*, *Anadarko*, 2022 WL 4544235, at *3 ("Whether Defendants made false and misleading statements, what effect those statements had on its stock price, what damages (if any) were sustained . . . are all common questions[.]"); *Rougier*, 2019 WL 6111303, at *6 (similar).  Commonality is thus satisfied.

### 3.    Lead Plaintiffs' Claims Are Typical of the Proposed Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  The test for typicality is "not demanding," and is "satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other members' claims and are based on the same legal theory." *Lehocky*, 220 F.R.D. at 500; *see also In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017) (similar).

Here, Plaintiffs and all other putative Class members purchased Apache common stock during the Class Period and assert the same Section 10(b) claims, based on the same misstatements and omissions by Defendants, and the same Section 20(a) claims.  Plaintiffs and the Class thus share the same claims, legal theories, and evidence.  *See Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at *3 (E.D. Tex. Aug. 29, 2016) (typicality found

where plaintiff's and the class's "claims both arise from the same alleged misconduct by Defendants: knowingly or recklessly making material misrepresentations or omissions that artificially inflated the value of [the company's] securities."), *report and recommendation adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017).  Nor are Plaintiffs subject to any "unique defenses" that threaten to become the focus of the litigation.  *See City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2018 WL 1558571, at *3 (W.D. Tex. Mar. 29, 2018).

### 4.    Lead Plaintiffs Are Adequate Class Representatives

Rule 23(a)(4) requires that the proposed class representatives "will fairly and adequately protect the interests of the class."  Determining adequacy requires the Court to consider three factors:  (1) "the zeal and competence of the representative[s'] counsel"; (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees"; and (3) "the risk of conflicts of interest between the named plaintiffs and the class they seek to represent."  *Prause*, 2020 WL 3549686, at *4 (alterations in original).  Each of these factors shows that adequacy is met here.

*First*, as institutional investors who suffered substantial financial losses as a result of Defendants' misconduct, Plaintiffs are precisely the kind of investors Congress intended to lead securities class actions when enacting the PSLRA.  *See* H.R. Conf. Rep. No. 104-369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733; *see also Anadarko*, 2022 WL 4544235, at *4 ("[I]nstitutional investors are the preferred named plaintiffs in securities fraud litigation[.]").  Indeed, Plaintiffs are actively prosecuting this Action in the interests of the proposed Class, including by receiving frequent case status updates from counsel,

reviewing and approving drafts of all pleadings and briefs before they are filed, and participating in discovery, including collecting, reviewing, and producing relevant documents, and providing verified interrogatory responses. *See Lehocky*, 220 F.R.D. at 502-03 (adequacy established where plaintiffs were committed to the action, reviewed court papers, and understood the complaint).

*Second*, Plaintiffs' interests are identical to, and therefore directly aligned with, the interests of other putative Class members. Each of the claims alleged in the Complaint is based on the same economic injuries caused by the same course of conduct and events, and Plaintiffs seek to maximize the recovery for the Class. *See Anadarko*, 2022 WL 4544235, at *4 (plaintiffs' interests were "aligned with other class members, as all seek to maximize recovery stemming from the alleged misconduct by Anadarko and its executives"); *Lehocky*, 220 F.R.D. at 502-03 (since plaintiffs "are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes").

*Third*, Plaintiffs have demonstrated their adequacy by selecting Saxena White and KTMC to serve as Class Counsel, each of which has extensive experience in prosecuting and resolving complex securities class actions in courts across the nation, and experienced Texas counsel, Ajamie LLP, to serve as Liaison Class Counsel. *See* Ajamie Decl., Exs. B, C, and D, respectively (Firm Resumes). These counsel are zealously prosecuting this Action on behalf of the putative Class, including by: (1) conducting an extensive investigation of the claims prior to filing the initial complaint (Dkt. 1); (2) continuing to thoroughly investigate Class members' claims in preparing Lead Plaintiffs' highly detailed

148-page Complaint; (3) successfully opposing Defendants' motion to dismiss and objections to the Recommendation; (4) consulting with industry and financial experts; and (5) conducting discovery and engaging in substantial negotiations with Defendants regarding complex discovery-related matters, including the process for collecting, reviewing, and producing electronically stored information at a global corporation with a wide variety of systems specific to the energy industry.

Thus, adequacy is satisfied.

## B.     The Action Satisfies Rule 23(b)(3)'s Requirements

This Action also satisfies the predominance requirement, which authorizes class certification where: (1) the "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1.     Common Questions of Law and Fact Predominate

Predominance under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" which, as the Supreme Court has held, "is a test readily met in certain cases alleging . . . securities [claims]." *Amchem*, 521 U.S. at 623, 625. Where common questions of law or fact outnumber those affecting only individual class members, predominance is satisfied. *See Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (emphasis in original).

Here, the elements of falsity, materiality, scienter, and loss causation all raise

exclusively common questions of law and fact that support a finding of predominance. *See id.* at 468, 475; *Erica P. John Fund, Inc. v. Halliburton, Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*"). Thus, "[i]n securities law cases, predominance often hinges upon" reliance. *EZCORP*, 330 F.R.D. at 448.

Here, common questions predominate because Plaintiffs and the Class are entitled to invoke the fraud-on-the-market presumption of reliance, rendering reliance a question common to the Class. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *EZCORP*, 330 F.R.D. at 448 ("[T]o the extent [] class members are able to invoke the presumption, reliance becomes a common question[.]").

### 2. *Basic's* Presumption of Reliance Applies

Under the fraud-on-the-market presumption, reliance on material statements and omissions is presumed where the security traded in an efficient market. *Basic*, 485 U.S. at 247. The premise underlying the doctrine is that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.… Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[.]" *Id.* at 241-42 (ellipsis in original); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 268, 270 (2014) ("[T]he market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."). As a result, "reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action." *Halliburton*, 573 U.S. at 268 (alteration in original).

Plaintiffs may invoke the presumption of reliance by showing: (1) the alleged

misrepresentations were publicly known; (2) the plaintiff traded in the stock between the making of such misrepresentations and alleged revelations of the truth; and (3) the stock at issue traded in an efficient market. *See id*. at 277-78. "[T]he Supreme Court has suggested that the burden required to establish market efficiency is not an onerous one." *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017).

Here, Plaintiffs readily establish each prerequisite to invoke the fraud-on-the-market presumption. *First*, Defendants' alleged misrepresentations and omissions were made in public statements disseminated to the market at large through SEC filings, during Company earnings calls and investor presentations, and in mainstream media news articles. *E.g.*, ¶¶ 190-281. *Second*, Plaintiffs purchased Apache common stock between the making of the alleged misrepresentations and the alleged revelations, in whole or in part, of Defendants' fraudulent conduct. *See* Dkt. 65-1, 65-2. *Third*, as set forth below and in the Nye Report, Apache common stock traded in an efficient market during the Class Period.

### a.   Apache Common Stock Was Listed and Traded on Presumptively Efficient Markets

During the Class Period, Apache common stock actively traded on the Nasdaq, NYSE, and CHX, all of which are well-developed, automated, and highly efficient markets. *See* ¶¶ 300, 321, 327; Nye ¶¶ 14, 22-27. The listing of a security on a major exchange such as the Nasdaq, NYSE, or CHX strongly weighs in favor of a finding of market efficiency and supports invoking the presumption of reliance. *See, e.g.*, *Anadarko*, 2022 WL 4544235, at *6 (listing on NYSE "alone is indicia of market efficiency"); *Rougier*, 2019 WL 6111303, at *11 ("Most courts agree that" listing on Nasdaq "is a good indicator that

the stock trades in an efficient market.").

### b. The Market for Apache Common Stock Satisfies All *Cammer* Market Efficiency Factors

In addition to listings on major securities exchanges, when analyzing market efficiency, courts in the Fifth Circuit and nationwide routinely consider the "Cammer factors" set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) ("*Cammer*"), and the "Krogman factors" set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) ("*Krogman*").  *See Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) ("[the *Cammer* and *Krogman* factors] have been used by many courts throughout the country and within this circuit" to determine market efficiency).  The *Cammer* factors are: (1) weekly trading volume; (2) amount of securities analyst coverage; (3) existence of market makers and arbitrageurs; (4) eligibility of the company to file a Form S-3 registration statement with the SEC; and (5) demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the security's prices. *Cammer*, 711 F. Supp. at 1286-87.  The first four *Cammer* factors "examine *indirect* indicia of market efficiency," while the fifth factor exxamines direct evidence.  *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *7 (E.D.N.Y. Jan. 11, 2022) (emphasis in original), *report and recommendation adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022).  No single factor is essential or dispositive.  *See Cammer*, 711 F. Supp. at 1287.

<u>*Cammer* Factor 1: Average Weekly Trading Volume</u>.  A high average trading volume tends to show market efficiency because it suggests "significant investor interest in the company" and, in turn, a "likelihood that many investors are executing trades on the

basis of newly available or disseminated corporate information." *Id.* at 1286. "Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one" and "one percent would justify a substantial presumption." *Id.*; *see also Lehocky*, 220 F.R.D. at 508 (similar).

During the Class Period, Apache common stock had an average weekly trading volume of 5.7% of outstanding shares—roughly 21.5 million shares. *See* Nye ¶ 30. Apache's Class Period trading volume thus far exceeds the 1%-2% *Cammer* threshold, supporting a finding of market efficiency. Nye ¶¶ 30, 31 & Ex. 4.

*Cammer* Factor 2: Analyst Coverage.  Significant analyst coverage is another indicator of an efficient market, as it shows that new information about Apache was being disseminated to investors. *See Cammer*, 711 F. Supp. at 1286. Here, during the Class Period, 53 firms, including major firms such as UBS, Credit Suisse, J.P. Morgan, and Barclays issued more than 1,200 analyst reports. Nye ¶ 34 & Ex. 5. The widespread securities analyst coverage of Apache further supports that Apache stock traded in an efficient market. *Buettgen v. Harless*, 2011 WL 1938130, at *7 (N.D. Tex. May 19, 2011) (finding coverage "by UBS, Credit Suisse, J.P. Morgan, and Merrill Lynch, among other analysts" supported market efficiency); *Marcus*, 2016 WL 8604331, at *7 (coverage of 25 analysts more than sufficient to support market efficiency).

*Cammer* Factor 3: Existence of Market Makers.  Market makers "are firms that make a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at publicly-quoted prices." *Rougier*, 2019 WL 6111303, at *12. Here, there

were more than 170 active market makers for Apache common stock during the Class Period, which strongly supports market efficiency.  *See* Nye ¶¶ 39-41; *see also Rougier*, 2019 WL 6111303, at *12 (finding market efficiency where company had at least nine active market makers and many other less active ones); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) ("[A]nywhere between six and twenty market makers is sufficient to support a finding of market efficiency.").

    *Cammer* Factor 4: Eligibility to File SEC Form S-3.  "[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285.  This is because the filing of Form S-3 "*is predicated on the [SEC's] belief that the market operates efficiently for [qualifying] companies, i.e., that the disclosure in Exchange Act reports and other communications by the [company] such as press releases, has already been disseminated and accounted for by the market.*"  *Id.* at 1284 (emphasis in original).  Here, during the Class Period, Apache filed Forms S-3, and met the eligibility criteria for filing a Form S-3, which supports market efficiency.  *See* Nye ¶¶ 52-53; *see also Rougier*, 2019 WL 6111303, at *12 (filing of Form S-3s "support[ed] a finding of market efficiency"); *Marcus*, 2016 WL 8604331, at *9 (S-3 eligibility supported "a finding of market efficiency").

    *Cammer* Factor 5: Price Reaction to New Information.  Evidence that the price of a security regularly reacts to unexpected corporate events or the issuance of financial releases containing new and value-relevant information about the issuer is strong evidence of an efficient market.  *See Cammer*, 711 F. Supp. at 1287.  While earlier caselaw emphasized the importance of this factor, more recent decisions hold that direct, empirical evidence of

19

efficiency is not required where, as here, indirect evidence of market efficiency is strong. *See Waggoner*, 875 F.3d at 99 (affirming that district court was not required to assess direct evidence of efficiency where there was strong indirect evidence of efficiency). "[I]f the first four *Cammer* factors and the three *Krogman* factors are satisfied, the Court need not consider—and a plaintiff need not submit—evidence supporting *Cammer* factor 5[.]" *Vale*, 2022 WL 122593, at *8.

Notwithstanding, Apache common stock satisfies the fifth *Cammer* factor.  Here, Dr. Nye conducted an event study and a series of statistical analyses to determine whether Apache securities reacted to new, Company-specific information.  *See* Nye ¶¶ 54-60. Dr. Nye's event study analysis, which is consistent with those regularly accepted by courts evaluating *Cammer* factor five, establishes that there was a consistent and strong cause-and-effect relationship between the disclosure of new, material unexpected information and Apache's stock price during the Class Period, further supporting market efficiency.  *Id.* & Exs. 11, 12; *see also Rougier*, 2019 WL 6111303, at *15 ("Event studies are commonly used in securities fraud class actions."); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) ("[T]here is no dispute that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by *Cammer*.).

Among other things, Dr. Nye analyzed the relationship between Apache common stock returns, after controlling for market and industry factors, on days when Apache issued quarterly or year-end financial results and/or guidance ("event dates") versus trading days with no such news ("non-event dates").  Nye ¶¶ 54-60. He concluded that "Apache's

20

common stock price typically reacted more strongly on event dates than on non-event dates" based on his finding that there was a statistically significant price reaction at the 95% confidence level or greater on 64% of the event dates, 12 times as many statistically significant dates as would be expected from a randomly selected sample of 14 trading days. Nye ¶ 58.  Thus, he found that "Apache's common stock price reflected the information disclosed to the market, and promptly responded to the disclosure of new, material unexpected information," thus demonstrating "a strong cause-and-effect relationship existed between the information disclosed on the event dates and resulting stock price movements."  Nye ¶¶ 59, 60 & Ex. 12.  Numerous courts, including in the Fifth Circuit, have accepted similar analyses by Dr. Nye as supporting market efficiency in complex securities class actions such as this Action.  *See, e.g.*, *Dell Inc.*, 2018 WL 1558571 (granting class certification where Nye served as expert);  *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 456, 471 (E.D. Pa. 2021) (same); *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 650 (C.D. Cal. 2018) ("The Court finds Nye's event study sufficient to show a causal relationship between unexpected corporate events or financial releases and the price reaction of [the company] stock, which . . . favors a finding of market efficiency.").

      **c.**     **The Market for Apache Common Stock Also Satisfies All *Krogman* and Other Market Efficiency Factors**

The *Krogman* factors are: (1) market capitalization; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float").  *See Krogman*, 202 F.R.D. at 474.  Each of these factors also supports a finding of market efficiency.

*First*, "[m]arket capitalization, calculated as the number of shares multiplied by the

prevailing share price, may be an indicator of market efficiency." *Krogman*, 202 F.R.D. at 478.  During the Class Period, Apache's market capitalization ranged from a high of $25.55 billion in December 2016 to a low of $2.93 billion in March 2020.  Nye ¶ 61 & Ex. 13.  At the start of the Class Period, Apache's market capitalization was greater than 87.5% and 97.5% of NYSE-listed and Nasdaq-listed stocks, respectively. *Id.* ¶ 62.  Courts routinely find that companies with far lower market capitalization levels support market efficiency. *See, e.g.*, *Rougier*, 2019 WL 6111303, at *13 (finding market efficiency where company's market capitalization "averaged over $1.0 billion").

*Second*, a narrow bid-ask spread (i.e., a small difference between the prices at which investors are willing to buy shares and current stockholders are willing to sell shares) indicates an efficient market. *See Krogman*, 202 F.R.D. at 478.  During the Class Period, Apache's average bid-ask spread was narrow at $0.01 per share, or roughly 0.03% of its average closing price, supporting market efficiency. *See* Nye ¶¶ 47-48, 63; *Rougier*, 2019 WL 6111303, at *13 ("0.04% average daily bid-ask spread" supports market efficiency).

*Third*, when evaluating efficiency, "courts also consider the percentage of shares held by the public, rather than insiders" with a large "float," further supporting market efficiency. *Krogman*, 202 F.R.D. at 478.  Here, during the Class Period, 99.8% of all Apache shares were held by non-insiders (*see* Nye ¶ 64)—a level courts routinely find sufficient. *See, e.g.*, *Rougier*, 2019 WL 6111303, at *14 ("large float" of 95.8% to 96.7% supported market efficiency); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (float of 57% to 69% supported market efficiency).

*Finally*, in addition to the *Cammer* and *Krogman* factors, market efficiency is

supported by the robust institutional ownership of Apache stock, with institutional investors holding 90% of the float. Nye ¶ 46 & Ex. 9 (811 to 1,128 institutions held Apache stock during the Class Period); *see Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356-57 (C.D. Cal. 2015) (collecting cases from across the nation finding that a "large number of institutional investors holding a company's stock" supports efficiency and noting "the vast majority . . . involved companies with average institutional holdings" of just 70%).

For these reasons, the Nye Report shows that the market for Apache common stock was efficient throughout the Class Period. Thus, the *Basic* presumption of reliance applies; common issues will predominate; and the Action can and should proceed as a class action.

### 3. Damages Can Be Calculated Through a Common Methodology

The calculation of damages also is a common question capable of resolution on a class-wide basis and "needn't be exact" at the class-certification stage. *Anadarko*, 2022 WL 4544235, at *6-7. As explained by Dr. Nye, damages can be calculated in this matter on a class-wide basis using a common methodology. Nye ¶¶ 65-70. Specifically, Plaintiffs intend to calculate damages and economic loss through the "out-of-pocket" methodology and employ an event study. *See*, *e.g.*, *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *15 (S.D.N.Y. Sept. 8, 2021) ("The methodology that Nye describes, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the class members."); *Rougier*, 2019 WL 6111303, at *15 ("[C]ourts recognize event studies . . . as an accepted method for determining artificial inflation and out-of-pocket damages in suits involving fraud on the market liability."); *EZCORP*, 330 F.R.D. at 451 (event study and "out-of-pocket" methodology were "consistent with the proposed

theory of liability").  Thus, damages can be calculated on a class-wide basis.

### C.    Class Treatment is Superior to Other Methods of Adjudication

Rule 23(b)(3) requires that the Court determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) provides four factors to guide this analysis:

> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)    the likely difficulties in managing a class action.

These factors show that a class action is the superior method for litigating this case.

*First*, the proposed Class consists of thousands of investors who are geographically dispersed and whose individual damages are likely small enough to render individual litigation prohibitively expensive. *See Prause*, 2020 WL 3549686, at *7 (class certification granted where "[t]he costs . . . of individual litigation would prove prohibitive for potential class members"). *Second*, concentrating the litigation in this forum is desirable to avoid wasting judicial resources by potentially litigating separate actions based on the same operative facts and to eliminate the possibility of inconsistent rulings across different jurisdictions. *Finally*, there will be no difficulties in managing this case as a class action. Federal securities class actions are routinely certified and raise no unusual manageability issues. *See, e.g.*, *Anadarko*, 2022 WL 4544235, at *8 ("Courts have routinely found that plaintiffs in securities litigation meet the superiority requirement.").

### D.      Proposed Class Counsel Satisfy Rule 23(g)

Rule 23(g)(1)(A) provides that "a court that certifies a class must appoint class counsel.   In appointing class counsel, the court:

> (A)   must consider:
>
>> (i)    the work counsel has done in identifying or investigating potential claims in the action;
>>
>> (ii)   counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>>
>> (iii)  counsel's knowledge of the applicable law; and
>>
>> (iv)   the resources that counsel will commit to representing the class[.]

Saxena White and KTMC have extensive experience litigating securities class actions and have demonstrated their willingness to commit substantial resources to prosecuting this Action.   For these reasons, and as further discussed in Section VI.A.4 above, Saxena White and KTMC should be appointed to serve as Class Counsel.   Ajamie LLP has extensive experience litigating securities class actions in Texas, has assisted in prosecuting the Action, and should be appointed as Liaison Class Counsel.

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this Action as a class action; (2) appoint Lead Plaintiffs as Class Representatives; and (3) appoint Saxena White and KTMC as Class Counsel and Ajamie LLP as Liaison Class Counsel.

Dated: April 7, 2023

Respectfully submitted,

**AJAMIE LLP**

*/s/ Thomas R. Ajamie*

Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

Gregory M. Castaldo (admitted *pro hac vice*)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Michelle M. Newcomer (admitted *pro hac vice*)
Richard A. Russo (admitted *pro hac vice*)
Daniel B. Rotko (admitted *pro hac vice*)
Austin W. Manning (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jwhitman@ktmc.com
jdancona@ktmc.com
mnewcomer@ktmc.com
rrusso@ktmc.com
drotko@ktmc.com
amanning@ktmc.com

26

**SAXENA WHITE P.A.**
David R. Kaplan (admitted *pro hac vice*)
Wolfram T. Worms (admitted *pro hac vice*)
Hani Farah (admitted *pro hac vice*)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
wworms@saxenawhite.com
hfarah@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
Sara DiLeo (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com
sdileo@saxenawhite.com

-and-

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Co- Lead Counsel for Lead Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on April 7, 2023, I caused a true and correct copy of the foregoing to be electrically filed with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ Thomas R. Ajamie*
Thomas R. Ajamie