# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Civil Action No. 4:21-cv-00575 |
|  | District Judge George C. Hanks, Jr. |
|  | Magistrate Judge Andrew M. Edison |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION  FOR CLASS CERTIFICATION AND APPOINTMENT
## OF CLASS REPRESENTATIVES AND CLASS COUNSEL

# TABLE OF CONTENTS

Table of Contents............................................................................................................i

Table of Authorities.......................................................................................................ii

Statement of Nature and Stage of Proceedings ...................................................... 1

Statement of the Issue and Standard of Review .................................................... 1

Introduction and Summary of the Argument........................................................... 1

Argument ......................................................................................................................... 3

    I.    Rule 23 establishes a demanding standard for class certification. ............... 3

    II.    Individual issues concerning each Class member's reliance will predominate after February 22, 2018. ........................................................... 4

        A.    Plaintiffs may demonstrate the reliance element class-wide through the rebuttable fraud-on-the-market presumption. ................. 4

        B.    The presumption can be rebutted by showing a lack of price impact ..................................................................................................... 5

        C.    Defendants have rebutted the presumption after February 22, 2018. ......................................................................................................... 11

            1.    The alleged misrepresentations caused no front-end price impact. ......................................................................................... 11

            2.    The alleged corrective disclosures show no evidence of price impact. ......................................................................................... 14

                a.    April 23, 2019 Press Release ..................................... 15

                b.    October 25, 2019 Keenan Resignation ...................... 19

                c.    March 16, 2020 *Seeking Alpha* Post .......................... 20

            3.    Apache's stock movements during the period had nothing to do with any changed perception of the Alpine High play's quality, but rather were driven primarily by fluctuating oil and gas prices. ............................................... 23

Conclusion ……………………………………………………….………………25

## TABLE OF AUTHORITIES

Page(s)

CASES

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................... 3, 4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ............................................................................................... 4

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
  597 F.3d 330, 336 (5th Cir. 2010) ........................................................................ 8

*Ark. Pub. Emps.' Ret. Sys. v. Bristol-Meyers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) .......................................................................... 12, 17

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ....................................................... 4, 5, 10, 16, 21, 24

*Catogas v. Cyberonics, Inc.*,
  292 F. App'x 311 (5th Cir. 2008) ...................................................................... 18

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................ 3

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  718 F.3d 423 (5th Cir. 2013) ......................................................................... 8, 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ....................................................................................... 5, 6, 26

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ................................................................ 10, 16

*Ferris v. Wynn Resorts Ltd.*,
  2023 WL 2337364 (D. Nev. Mar. 1, 2023) ...................................................... 8

*Gene & Gene LLC v. BioPay LLC*,
  541 F.3d 318 (5th Cir. 2008) ........................................................................... 3, 4

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  141 S. Ct. 1951 (2021) ......................................................... 1, 5, 6, 7, 10, 11, 18

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ......................................................................... 8, 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ...................................................................... 4, 5, 6, 26

*Heck v. Orion Grp. Holdings, Inc.*,
468 F. Supp. 3d 828 (S.D. Tex. 2020) ........................................................ 20

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ........................................................................ 6

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ................................................................ 10

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ............................................... 9

*In re EQT Corp. Sec. Litig.*,
2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ....................................... 10, 11

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................... 22

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ......................................... 9, 10

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ................................................................ 10

*In re Odyssey Healthcare, Inc. Sec. Litig.*,
424 F. Supp. 2d 880 (N.D. Tex. 2005) ........................................................ 20

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).................................................... 9, 17, 20, 22

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
2017 WL 2062985 (S.D.N.Y. May 15, 2017) ............................................... 6

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)......................................................................................... 4

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) .................................................................. 18

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) .......................................................... 8, 19, 25

*Rooney v. EZCORP, Inc.*,
 330 F.R.D. 439 (W.D. Tex. 2019) ............................................................................. 11

*Waggoner v. Barclays PLC*,
 875 F.3d 79 (2d Cir. 2017) ........................................................................................ 7

*Zheng v. Pingtan Marine Enter. Ltd.*,
 379 F. Supp. 3d 164 (E.D.N.Y. 2019) ..................................................................... 22

**Other Authorities**

Fed. R. Civ. P. 23(a) ....................................................................................... 3, 4

Scott DiSavino, *Explainer: Why Are U.S. Natural Gas Prices in Texas
 Below Zero?*, Reuters, Apr. 9, 2019 .......................................................................... 17

Defendants file this Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel [ECF 101] ("Motion").

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 on behalf of all who purchased or otherwise acquired Apache common stock from September 7, 2016 through March 13, 2020 (the "Class").

## STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

Plaintiffs' Motion should be denied as to the period after February 22, 2018 because Defendants have rebutted the presumption of class-wide reliance by demonstrating a lack of price impact as to all 15 alleged misrepresentations after that date (all but one of which had no price reaction whatsoever, and the remaining one of which reacted for reasons untethered to Plaintiffs' allegations of misrepresentation), and as to all three alleged corrective disclosures after that date.[1] "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs allege that Apache, its CEO John Christmann, its CFO Stephen Riney, and its former EVP of Operations Timothy Sullivan misrepresented the prospects of a hydrocarbon play known as Alpine High in an area of the Permian Basin previously written

---

[1] Unless otherwise noted, internal quotation marks, citations, and footnotes from quoted material have been omitted, and emphases and alterations are as they appear in the original sources.

off as nonviable. After years of detailed geological and geophysical work by leading geologist Steve Keenan and his team, Apache announced the Alpine High project and embarked on a meticulous process of further delineating the play and confirming its geological models. Ultimately, Apache encountered substantial and unforeseen economic headwinds, including record-low natural gas prices, that caused Apache to stop production efforts. As is so often the case when a company expresses its optimism for a project only to in hindsight reach disappointing results, this Rule 10b-5 suit followed.

Plaintiffs' Motion to certify a class to recover for shareholders' alleged losses should be denied in part, as no class can be certified after February 22, 2018. Both Plaintiffs' and Defendants' experts agree that there was no statistically significant stock price increase on 12 of the 13 trading days following the alleged misrepresentations, and for the one trading date with a statistically significant price increase, all sources attribute it to greater-than-expected earnings and production results, not to any alleged misrepresentation. Thus, there was no "front-end" price impact.

Likewise, there was no "back-end" price impact. The three alleged corrective disclosures after February 22, 2018 do not demonstrate any price impact. For one, the price reaction lacked statistical significance; for another, there is no reliable finding of statistical significance given the failure to account for soaring market volatility at the time (the chaotic early days of COVID); and for none was the supposedly "corrective" information corrective at all. The absence of price impact is fatal to class certification.

2

ARGUMENT

## I.     Rule 23 establishes a demanding standard for class certification.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). It is available only if a party "affirmatively demonstrate[s] his compliance with Rule 23." *Id.* A party seeking to certify a class must "prove … *in fact*" that Rule 23's four prerequisites of numerosity, commonality, typicality, and adequacy are met. *Id.*; FED. R. CIV. P. 23(a). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 569 U.S. at 33-34.

"[P]arties seeking class certification [also] must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs assert that class certification is appropriate only under Rule 23(b)(3), which allows for a class to be certified only if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b)(3).

To decide whether Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement, "a court … consider[s] how a trial on the merits would be conducted if a class were certified." *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008). This "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class,

3

a process that ultimately prevents the class from degenerating into a series of individual trials." *Id.* Notably, Rule 23(b)(3)'s predominance requirement, "though redolent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods.*, 521 U.S. at 623-24).

## II.    Individual issues concerning each Class member's reliance will predominate after February 22, 2018.

### A.    Plaintiffs may demonstrate the reliance element class-wide through the rebuttable fraud-on-the-market presumption.

One of the elements a plaintiff must prove to prevail on a Rule 10b-5 claim is "reliance upon the misrepresentation or omission." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 267 (2014) (quoting *Amgen*, 568 U.S. at 461). The Supreme Court has recognized, however, that "'[r]equiring proof of individualized reliance' from every securities fraud plaintiff 'effectively would … prevent … [plaintiffs] from proceeding with a class action' in Rule 10b-5 suits" because "'individual [reliance] issues then would … overwhelm[] the common ones,' making certification under Rule 23(b)(3) inappropriate." *Id.* at 268 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)).

In *Basic*, the Supreme Court addressed this otherwise insurmountable roadblock to

class certification for Rule 10b-5 claims by holding that plaintiffs may "in certain circumstances satisfy the reliance element by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Id*. That is what Plaintiffs seek to do here, through *Basic's* "fraud-on-the-market presumption." Mot 15-23.

The fraud-on-the-market theory posits that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations," and thus "reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 246-47. "To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs*, 141 S. Ct. at 1958.

### B.   The presumption can be rebutted by showing a lack of price impact.

Importantly, "*Basic* emphasized that the presumption of reliance was rebuttable rather than conclusive," *Halliburton II*, 573 U.S. at 269, and "'made clear that the presumption was just that, and could be rebutted by appropriate evidence.'" *Id.* at 279 (quoting *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 811 (2011)). Specifically, "'[a]ny showing that severs the link between the alleged misrepresentation and … the price received (or paid) by the plaintiff … will be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'" *Halliburton II*, 573 U.S. at 281 (quoting *Basic*, 485 U.S. at 248). While at the class certification stage defendants bear the burden

of persuasion to rebut the presumption of reliance, the Supreme Court has "emphasize[d]" that the fact that it is defendants who bear this burden "should rarely be outcome determinative." *Goldman Sachs*, 141 S. Ct. at 1958. "Although the defendant bears the burden of persuasion, the allocation of the burden is unlikely to make much difference on the ground…. The district court's task is simply to assess all the evidence of price impact— direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 1963.

*Basic*'s "fundamental premise" is "that a misrepresentation 'was reflected in the market price at the time of [the] transaction'—that it had price impact." *Halliburton II*, 573 U.S. at 283 (quoting *Halliburton I*, 563 U.S. at 813). "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapses." *Id* at 278. Price impact is thus "an essential precondition for any Rule 10b-5 class action." *Id.* at 282.

One way a defendant can rebut the presumption is with direct "evidence of no 'front-end' price impact"—meaning when an alleged misrepresentation was made, it "had no discernable impact on [the] stock price." *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 779, 782 (8th Cir. 2016); *see also Halliburton II*, 573 U.S. at 279-80 (presumption rebuttable with "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017) (noting that a "defendant may rebut the presumption with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns ('front-end price impact')").

Another way a defendant can rebut the presumption is with evidence of no "back-

end" price impact—meaning there was no decrease in price following a claimed corrective disclosure. "Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman Sachs*, 141 S. Ct. at 1961. That is the tack Plaintiffs take here. *See* CAC ¶ 319; Nye Rpt. ¶ 67 ("Price inflation may be measured on a Class-wide basis by analyzing the change in a security's price caused by one or more corrective disclosures."). Defendants can disprove such back-end price impact with "any showing that severs the link between the alleged misrepresentation and … the price received (or paid) by the plaintiff," *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 (2d Cir. 2017).

***"Mismatch" and correctiveness.*** The "final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs*, 141 S. Ct. at 1961. In other words, price impact is "front-end price inflation"—the notion that statements caused stock-price inflation at the time they were made. *Id.* A back-end decline *may* imply front-end price inflation, but for it to do so, the contents of the alleged misrepresentation and the alleged corrective disclosure must match. Accordingly, courts must scrutinize the "contents" of the alleged misrepresentations and alleged corrective disclosures for a "mismatch" at the class certification stage. *Id.*

To "match" an alleged misrepresentation, an alleged corrective disclosure must be corrective of the alleged misrepresentation. Indeed, a corrective disclosure is, by definition,

"a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014); *see also Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton 5th Cir.")*, 718 F.3d 423, 434 (5th Cir. 2013) (price impact shown by "a decrease in price following a revelation of the fraud"), *vacated on other grounds*, *Halliburton II*, 573 U.S. 258 (2014). If the price decline was caused by something other than "revelation of the truth," then it does not "raise an inference that the price was actually affected by … alleged misrepresentations." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010) ("*AMSF I*"), *vacated on other grounds*, *Halliburton I*, 563 U.S. 804. Consequently, if defendants can show that a disclosure did not reveal the pertinent truth that was allegedly previously concealed or obscured by the company's fraud—but was simply negative news—there is a "mismatch" that rebuts the existence of price impact. *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004) (presumption of reliance not triggered by "evidence of any decrease in price following the release of negative information").

Courts therefore must examine the correctiveness of disclosures at the class certification stage and exclude any that do not pass price-impact muster. *See, e.g.*, *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *11 (D. Nev. Mar. 1, 2023) ("[P]laintiffs do not explain how that announcement revealed that any of the defendants' prior statements were false or misleading…. Merely because the announcement that the committee dismissed the first law firm was potentially negative information coming out in the days surrounding the other revelations does not make it a corrective disclosure. The plaintiff

class therefore may not proceed on this allegation as a corrective disclosure."); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14-17 (N.D. Cal. Dec. 22, 2016) (excluding 2 of 5 alleged corrective disclosures due to lack of correctiveness, a statistically significant price reaction, or both).

**Newness.** Courts also must assess the "newness" of alleged corrective disclosures and exclude any that provided no new information to the market. *E.g.*, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *39 (S.D.N.Y. Oct. 18, 2019) ("Reviewing this alleged corrective disclosure for 'newness,' I find that there was no new information provided by this alleged corrective disclosure…. [B]ecause there was no new information released to the market in the February 4 call, this cannot serve as a corrective disclosure."), *R&R adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (alleged corrective disclosure did not establish price impact because information "was the subject of continuing media reports" before alleged corrective disclosure date and thus did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged"). That is because in an efficient market, only "new news" can have price impact; if news that is not new did, that is proof that the market was not efficient. Ex. A ¶ 26.

**Statistical significance.** Because plaintiffs seeking to prove price impact indirectly through corrective disclosures "point to a negative disclosure about a company and an associated drop in its stock price [and] claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation," *Goldman*, 141 S. Ct. at 1961, a defendant also may rebut the presumption by showing that no "decrease in price

follow[ed]" a claimed corrective disclosure. *Halliburton 5th Cir.*, 718 F.3d at 434. In other words, if defendants demonstrate that there is no statistically significant price drop associated with a claimed corrective disclosure, then there is no price impact. *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton ND Tex.")*, 309 F.R.D. 251, 270-76, 280 (N.D. Tex. 2015) (defendants "rebutted the *Basic* presumption as to the corrective disclosure[s] on" 5 dates by showing that the alleged corrective disclosures did not cause any statistically significant price drop, and granting class certification "only with respect to [a 6th] alleged corrective disclosure"); *In re Intuitive*, 2016 WL 7425926, at *15 (excluding alleged corrective disclosures because there was no statistically significant price reaction); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (denying class certification because "there is no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant decline in the price"); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 186-87 (S.D.N.Y. 2010) (denying class certification for prices decreases that were not statistically significant), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012).[2]

---

[2] Some decisions (none controlling) have misunderstood the relevance of a lack of statistical significance. *E.g., In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at *15-16 (W.D. Pa. Aug. 11, 2022); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019). These courts reasoned as follows: statistical analysis works by determining whether the null hypothesis—here, that the stock price was unaffected by the alleged misrepresentations—can be rejected, and a failure to reject the null hypothesis (*i.e.*, lack of statistical significance) is not the same as proving the null hypothesis correct. *See EQT*, 2022 WL 3293518, at *15-16; *Rooney*, 330 F.R.D. at 450. But as the Supreme Court recently emphasized, Defendants' burden is not to prove to a scientific certainty the lack of price impact; rather, the "district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is *more likely than not* that the alleged misrepresentations had a price impact." *Goldman Sachs*, 141 S. Ct. at 1963 (emphasis added). A

### C.    Defendants have rebutted the presumption after February 22, 2018.

Plaintiffs allege 15 misstatements (on 13 trading dates) and 3 corrective disclosures after February 22, 2018, but none supports any link between an alleged misrepresentation and a price impact on Apache's stock.[3] This lack of price impact is confirmed by the analysis of Defendants' expert, Lucy Allen. *See* Ex. A. Allen's analysis (like that of Plaintiffs' expert, Dr. Nye) shows that that no statistically significant price movement occurred on 12 of the 13 trading days following the alleged misrepresentations or after 1 of the 3 alleged corrective disclosures during this period. *Id.* ¶¶ 36, 49. Her analysis also confirms that, as to the remaining alleged misrepresentation, and as to all 3 alleged corrective disclosures, the market neither changed its view of the subject matter of the alleged misrepresentation after it was made nor had a new understanding of the subject matter of any alleged misrepresentation after the alleged corrective disclosures, demonstrating they had no price impact. *Id.* ¶¶ 38-42, 46-96.

### 1.    The alleged misrepresentations caused no front-end price impact.

Plaintiffs allege that in the 15 alleged misrepresentations after February 22, 2018, like those earlier in the Class Period, Apache misrepresented the attributes and performance, and the resulting commercial prospects, of Alpine High. Compl. ¶¶ 258–80. But Allen's Report establishes that none of the 15 had front-end price impact because (1) there was no statistically significant increase on 12 of the 13 trading days following the

---

lack of statistical significance is itself compelling evidence that the misrepresentation did not have a price impact. Ex. A ¶ 31. That is why many courts have relied upon a lack of statistical significance when ruling on price impact. *See supra* Part II.B at 9.

[3] References to "after February 22, 2018," mean after the market close on February 22, 2018.

alleged misrepresentations, and (2) for the one trading date with a statistically significant price increase, all sources attributed the price increase to an EBITDAX[4] and production beat, not to the alleged misrepresentation. Ex. A ¶¶ 36-42.

First, both Nye's event study and the alternative event study tested by Allen found no statistically significant increase on 12 of the 13 trading days following the alleged misrepresentations.[5] *Id.* ¶ 36. Allen also analyzed market and analyst commentary[6] following the alleged misrepresentations after which there was no statistically significant price increase, including examining potential negative confounding news, to see if there was any evidence that any of these alleged misrepresentations could have caused an increase in Apache's stock price. *Id.* ¶ 37. She found that on these 12 dates, there was no indication that any analyst increased their price target or valuation of Apache due to the alleged misrepresentations. *Id.*

The one trading date that did have a statistically significant price increase, August 1, 2019, followed Apache's alleged misrepresentations in its 2Q19 press release (released after market hours on July 31) and conference call (during market hours on August 1). In the press release, the alleged misrepresentation is the statement: "We will catch up in the

---

[4] EBITDAX refers to earnings before interest, taxes, depreciation, amortization, and exploration expenses.

[5] The alternative event study controls for market movements with the S&P 500 Index and industry movements with the S&P Oil & Gas Exploration & Production Select Industry Index after removing the effects of the returns of Apache's stock price. Ex. A ¶ 33.

[6] *See Ark. Pub. Emps.' Ret. Sys. v. Bristol-Meyers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (approving district court's taking judicial notice of analyst reports at motion to dismiss stage and holding they were relevant to and properly considered in assessing whether market was misled in manner complaint alleged).

second half of 2019 and exit the year with oil production on plan and with strong momentum heading into 2020." Compl. ¶ 278. In the conference call, the alleged misrepresentation is the statement: "[W]e like the asset [Alpine High]. It's a large resource as we've proven. There is tremendous rich-gas potential." *Id.* ¶ 279. For these alleged misrepresentations, Allen reviewed market and analyst commentary that followed to assess whether there was any evidence that the alleged misrepresentations caused the statistically significant price increase on August 1, 2019. Ex. A ¶ 38. She found no evidence that the price increase was due to the alleged misrepresentation, but instead found that the price increase was due to positive news unrelated to the alleged misrepresentation. *Id.*

Analyst commentary indicated that the August 1 price increase was due to "solid 2Q19 results," including an "EBITDAX beat" and "production higher than guidance":

| Stephens (8/1/19) | APA announced 2Q19 results and provided 3Q19 guidance. Total production of ~455 Mboepd was ~1% above our estimate. . . . Overall, Apache posted **solid 2Q19 results** (**EBITDAX beat** & lower capex), though 3Q guide is a little noisy. Ex. B at 1 (emphasis added). |
|---|---|
| MUFG Securities Americas Inc. (8/2/19) | APA's 2Q2019 results beat on several metrics with **production higher than guidance** both domestically and internationally. Ex. C at 1 (emphasis added). |

Nye similarly acknowledged that the statistically significant price increase on August 1 was due to the beat and did not attribute it to the alleged misrepresentations:

> Given that: (i) the Company's "2Q2019 results beat on several metrics with production higher than guidance"; (ii) "[l]ike its peers, the company was hit by weak realized prices for natural gas and natural gas liquids in the quarter"; and (iii) "expectations for the [Company's] print … were relatively aligned with the challenging operational backdrop for APA," the statistically significant Company-specific stock price increase on August 1, 2019 is consistent with that expected in an efficient market.

Nye Rpt., Ex. 12 (Doc. No. 101-3) at ECF p. 621-22.

### 2.   The alleged corrective disclosures show no price impact.

Plaintiffs claim that Apache's alleged misrepresentations during the Class Period were corrected through disclosures on October 9, 2017, February 22, 2018, April 23, 2019, October 25, 2019, and March 16, 2020, resulting in the removal from the stock price of the "inflation" allegedly caused by the misrepresentations. Compl. ¶ 319; Nye Rpt. ¶¶ 66-67. But Allen's examination of the last 3 alleged corrective disclosures demonstrates a lack of price impact—due to a "mismatch," lack of statistically significant price drop, or both.

As described above, the Complaint alleges that Apache's statements were false or misleading because they misrepresented the attributes and performance, and resulting commercial prospects, of Alpine High, particularly the proportions of oil, wet gas, and dry gas in the play and the actual performance of Alpine High wells. None of the last 3 disclosures "corrected" any statement in any of the alleged misrepresentations. Instead, each—(1) the April 23, 2019 disclosure of Apache's initiation of natural gas production volume deferrals from Alpine High in response to extremely low prices at the Waha Hub; (2) the October 25, 2019 disclosure of Steve Kennan's resignation; and (3) the March 16, 2020 post on the crowd-sourced *Seeking Alpha* website regurgitating public information and disclosing nothing—exhibits a fatal mismatch with the alleged misrepresentations.

As detailed below, the analysts covering Apache certainly did not view these disclosures as corrective of any alleged misrepresentation, as no analyst connected any of them to the subjects of the alleged misrepresentations. In fact, the analysts left their estimates of Apache's Alpine High reserves essentially unchanged throughout the post-February 22, 2018 period. The analyst and news reports instead attributed Apache's issues

14

at Alpine High and elsewhere to slumping commodity prices—a topic untethered to the alleged misrepresentations.

Moreover, the analysts expected and anticipated the announced news—which is the exact opposite of what a corrective disclosure that reveals previously concealed fraud looks like. Further confirming that these alleged corrective disclosures were nonevents is that Apache's stock price did not exhibit a statistically significant decline, for any reason, on the relevant days for one of the last three disclosures. And for another of the three disclosures (on March 16, 2020), there is no reliable finding of statistical significance given the failure to account for soaring market volatility at the time.

### a.    April 23, 2019 Press Release

On April 23, 2019, before the market opened, Apache issued a press release stating:

> Apache Corporation (NYSE, Nasdaq: APA) today announced that it initiated natural gas production volume deferrals from its Alpine High play in late March, in response to extremely low prices at Waha Hub. Current deferrals represent approximately 250 million cubic feet (MMcf) per day of gross gas production.

Ex. D at 1. The Complaint alleges that this disclosure was corrective because it announced that Apache "was scaling back natural gas production efforts." Compl. ¶ 311. But the press release does not support an inference of price impact for three reasons: (1) there was no statistically significant decline in Apache's stock price thereafter, according to both Nye's event study model and the alternative event study model tested by Allen; (2) the market expected such news given "extremely" low regional gas prices; and (3) the disclosure did not correct any alleged misrepresentation.

First, according to Nye's event study model and the alternative event study, there

was no statistically significant stock price decline on April 23, the first trading day after the press release. Ex. A ¶ 49. Nor was there a statistically significant stock price decline on April 24, 25, or 26 according to both models. *Id.* ¶ 51. The presumption of reliance is accordingly rebutted as to this disclosure. *Halliburton ND Tex.*, 309 F.R.D. at 270-76, 280 (*Basic* presumption rebutted where alleged corrective disclosures did not cause any statistically significant price drop).

Second, the market expected the news in the April 23 press release given the extreme pricing environment at the Waha Hub, a major hub for natural gas flowing out of the Permian.[7] To determine how the market interpreted a given disclosure, courts rely on analyst reports. *See, e.g.*, *Omnicom*, 597 F.3d at 507-08 ("[S]ome analyst reports and news articles also indicated that the June 12 article did not raise any new factual issues and suggested that the market's negative reaction was due to the article's negative tone and innuendo in the Enron market."); *see also Ark. Pub. Emps.' Ret. Sys. v. Bristol-Meyers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) ("The Complaint refers to analyst reports that predicted a variety of possible PD-L1 expression thresholds higher than 5%, to argue that Bristol-Myers misled the market by describing a 5% threshold as capturing a population of strong expressors. The fact that other reports, relying on the same public information, correctly predicted Bristol-Myers's use of a 5% threshold is relevant to that argument ….").

Here, the analyst reports expressly said that such news was not unexpected:

---

[7] *See, e.g.*, Scott DiSavino, *Explainer: Why Are U.S. Natural Gas Prices in Texas Below Zero?*, REUTERS, Apr. 9, 2019, https://www.reuters.com/article/us-natgas-pipelines-flaring-explainer-idUSKCN1RL2NL (explaining that the Waha Hub is "where prices for gas in the Permian basin are set").

| Stephens (4/23/19) | APA announced that **due to extremely low prices at Waha Hub**, it has initiated natural gas volume deferrals at Alpine High. … While optically we view the release as a negative, **we do not think it is a surprise to the market** that depressed Waha pricing is hampering Alpine cash generative capabilities. Ex. E at 1 (emphasis added). |
|---|---|
| Scotiabank (4/23/19) | **Not unexpectedly**, Apache has decided to defer certain natural gas production out of its gas-heavy Alpine High position in the Permian Basin **due to extremely low WAHA hub pricing**. Ex. F at 1 (emphasis added). |
| Macquarie (4/23/19) | Given the severity of **local Permian natural gas pricing weakness**, we think the deferral of gas is **prudent and likely expected by investors**. Ex. G at 1 (emphasis added). |

This "likely expected" disclosure of a temporary deferral of Alpine High was confirmatory and not news to the market. *See, e.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) ("[T]h[e] disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price."); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) ("[C]onfirmatory information—that information already known to the market—may *not* constitute such a corrective disclosure.").

Furthermore, the Supreme Court instructs that in assessing price impact at class certification, courts should be "aided by a good dose of common sense," *Goldman Sachs*, 141 S. Ct. at 1960, and Plaintiffs' claim that the April 23 press release was a revelation of fraud rather than a widely expected reaction to a Waha Hub price that had recently gone *negative* fails the "common sense" test:



Ex. A ¶ 55. With Waha Hub natural gas spot prices crashing to more than *negative*

$4/MMBtu in March/April 2019, it is clear why Macquarie analysts opined "the deferral

of gas is prudent and likely expected by investors." Ex. G at 1.

Third, the press release was not corrective of any alleged misrepresentation. It did

not disclose any information about the proportions of oil, wet gas, and dry gas in the play

or the actual performance of Alpine High wells, and it is not "a release of information that

reveals to the market the pertinent truth that was previously concealed or obscured by the

company's fraud." *Amedisys*, 769 F.3d at 321. Nor, for that matter, did the press release

cause any analyst to change its estimates regarding Alpine High's reserves or mix of oil

and wet gas vs. dry gas. Ex. A ¶ 61. For example, Credit Suisse analysts, who continuously

estimated Alpine High's "unbooked reserves" of wet gas, dry gas, and oil, did not update

their estimates of Alpine High's unbooked reserves in the week following the April 23, 2019 disclosure.[8] *Id.* That lack of correctiveness defeats price impact.

### b.      October 25, 2019 Keenan Resignation

The Complaint does not explain how the October 25, 2019 article announcing Kennan's resignation was corrective of any alleged misrepresentation. *See* Compl. ¶¶ 313-14. The disclosure, which provided no new information about Alpine High's reserves or the performance of any Alpine High well, Ex. H, did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *Omnicom*, 597 F.3d at 511; *see also Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 861-62 (S.D. Tex. 2020) ("[A]nnouncement of [the CFO's] resignation" was not a corrective disclosure because there was no "connect[ion]" between it and "any of the alleged misrepresentations"); *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 887-88 (N.D. Tex. 2005) (resignation of company's president and CEO "in light of … operational challenges" "lack[ed] the requisite specificity to be taken as corrective of any more specific alleged misstatements").

Instead, analysts attributed the October 25, 2019 decline in Apache's stock price to concerns about Apache's Suriname exploration—not to any new news about Alpine High. Only three analyst reports on Apache were issued on October 25, Ex. A ¶ 66, and all three directly attributed Apache's stock price decline to the market's concerns about Apache's

---

[8] "Unbooked reserves" reflect the quantity of reserves in a play that are possible and probable, but not proven. Ex. A ¶ 98. When Credit Suisse updated its estimates on May 2, 2019, there was essentially no change in the estimated quantity or mix of Alpine High's unbooked reserves of wet gas, dry gas, and oil. *Id.* ¶ 61.

Suriname exploration in light of Keenan's resignation, not Alpine High:

| Credit Suisse (10/25/19) | **Timing of resignation is concerning. While Mr. Keenan's exact role in Suriname is not clear** (APA claims the resignation is not connected to the exploration prospect), **APA is underperforming peers** by >5% today given the timing of the departure of the head of Worldwide Exploration when the company is on the 31st day of drilling the **Suriname well**, i.e. is now within the expected 30-60 day spud-to-TD window. **Today's sell-off nonetheless highlights the high expectations for the well** already baked into APA's stock price [….] Ex. I at 1 (first emphasis original, later emphases added). |
|---|---|
| RBC Capital Markets (10/25/19) | We think **APA share weakness is a reaction to investor concern that the resignation is related to** the outcome of APA's Maka-1 exploration well in **Suriname**. Ex. J (emphasis added). |
| Truist Bank (10/25/19) | **Apache's stock underperformed this morning** (down ~5.5% vs. XOP up ~1%) **on investor speculation** that a SVP's resignation … is linked **to an upcoming unsuccessful Suriname** Maka-1 exploration well in Block 58. Ex. K at 1 (emphasis added). |

None linked Apache's stock price decline to any new news about Alpine High's oil and wet gas reserves or its mix. Ex. A ¶ 66; Exs. B-C, E-G, I-K. That explains why no analyst changed its reserves estimate for Alpine High following this announcement. Ex. A ¶ 73. The October 25 news was, quite simply, not corrective of any alleged misrepresentation. *See Greenberg*, 364 F.3d at 665 (*Basic* presumption not triggered by "evidence of any decrease in price following the release of negative information").

### c.   **March 16, 2020** *Seeking Alpha* **Post**

The Complaint also purports to find a corrective disclosure in a March 16, 2020 *Seeking Alpha* post. The post's opening paragraph summarized the article:

**Apache Corp.** (NASDAQ:APA) has reported a better-than-expected profit and free cash flows for the fourth quarter, but the company's earnings will likely drop substantially this year as oil plunges to just $33 a barrel. Apache Corp. was already planning to cut capital expenditures this year, and I think it will likely reduce its spending plans further in light of the latest

developments. The company doesn't have a strong balance sheet, which, I
think, could weigh on the performance of its shares in 2020.

Ex. L. The post went on to describe the recent oil price slump driven by the Russia-Saudi

Arabia oil price war and spread of the Covid pandemic, and noted that "[t]he prices of

natural gas and NGL have already been low for an extended period," which has "forced

Apache to shift capital away from the wet-gas rich Alpine High play which has been

driving the company's production growth." *Id.* It opined that Apache had a relatively high

debt load, but "has ample time to devise a plan to shore up its finances." *Id.* The Complaint

claims that the post was corrective because it "reveal[ed] that Apache's failed Alpine High

foray severely constrained its financial position relative to its competitors." Compl. ¶ 316.

But no analyst or news story even mentioned the post. Ex. A ¶ 77. Instead, the

market rightly regarded it as a blog post summarizing already public information. *Cf. In re

Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1158 (D. Or. 2015) (describing

*Seeking Alpha* is an "online investment advice website," in which users, even those

identified only by aliases, can post).

It is not clear what Plaintiffs are claiming the *Seeking Alpha* post disclosed to the

market. If anything, the post's statement that low NGL and natural gas prices had "forced

Apache to shift capital away from the wet-gas rich Alpine High play"—*contradicts*

Plaintiffs' theory of fraud, even setting aside that the theory purportedly had been revealed

already. In any event, the *Seeking Alpha* post disclosed no news about Alpine High. "What

[Plaintiffs] ha[ve] shown is a negative characterization of already-public information," and

a "negative journalistic characterization of previously disclosed facts does not constitute a

21

corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512; *see also Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019) (article that "did not reveal any undisclosed information" but instead "relied on public information and merely represented the author's opinion that [company's] 'shares are likely worthless'" was not corrective disclosure).

As for statistical significance, Nye's event study model says nothing about March 16, 2020, because it does not account for soaring market volatility stemming from the Covid pandemic and the Russia–Saudi Arabia oil price war. Ex. A ¶¶ 88-94. In fact, Nye "appears to find that on almost every day around the March 16, 2020 alleged corrective disclosure, Apache's stock had a statistically significant price reaction." *Id.* ¶ 94.

"When testing the statistical significance of the price reaction on a certain date, both Nye's event study model and the alternative event study model use an estimation period of a year before this date, thereby using the stock price volatility in the year before this date to estimate the range of normal expected daily variation in Apache's stock on this date." *Id.* But "due to the heightened market volatility, price movements of Apache's stock around March 16, 2020 were substantially different from what would be expected given the company's stock price movements in the prior year, when market volatility was much lower." *Id.* In fact, "[a]n analysis of the stock price movement of Apache and constituents of Nye's industry index, using Nye's event study model, shows that from March 12 to March 18, 2020, the majority of companies appear to have statistically significant reactions even when there is no new company-specific news." *Id.* ¶ 95.

As the Director of Investments for one of the Plaintiffs stated in March 2020, the

impact of COVID was "extremely unprecedented," and "fear was a factor" in the market movements at that time. Ex. M, Plymouth Cty. Dep. 80:17–83:15. "By not accounting for increased market volatility, both Nye's event study model and the alternative event study model appear to find statistically significant reactions around this time period even when there is no new company-specific news, demonstrating that these event study models are not applicable to the March 16, 2020 alleged corrective disclosure." Ex. A ¶ 94.

Given this lack of a reliable showing of a statistically significant price impact, and the reality that the *Seeking Alpha* post offered no news and was not even mentioned by analysts or news outlets, the *Basic* presumption does not apply to this "disclosure."

### 3. Apache's stock movements during the period had nothing to do with any changed perception of the Alpine High play's quality, but rather were driven primarily by fluctuating oil and gas prices.

Defendants' rebuttal of price impact after February 22, 2018 also is buttressed by review of that period as a whole. Most notable for price impact purposes is that the market's perception of Alpine High's oil and gas prospects was essentially unchanged during that time. Ex. A ¶¶ 97-102. No analyst changed its understanding of Alpine High's oil and wet gas reserves, as by that point everyone understood it to be a "gas play." *Id.*

This is illustrated perhaps most clearly by the Credit Suisse analyst reports, which list their estimates of the oil, wet gas, and dry gas unbooked reserves at regular intervals through the period covered by the last 3 alleged corrective disclosures. *Id.* ¶ 98. Those estimates are virtually unchanged from February 22, 2018 to July 30, 2020, *id.*, thereby demonstrating that the first 2 alleged corrective disclosures (on October 9, 2017 and February 22, 2018) fully revealed the more gassy nature of the Alpine High play to the

market and thus left nothing else to be uncovered on that score.

What, then, does explain Apache's stock movements during that time? Even a cursory look reveals that they were driven primary by falling commodity prices that affected the entire industry. *Id.* ¶¶ 103-26. That was what the analysts covering Apache's stock attributed the price movements to at the time. *Id.* ¶¶ 108-25. And it makes sense given that Apache's stock moved in virtual lockstep with the relevant oil and gas industry index:



**S&P Oil & Gas Exploration & Production Select Industry Index and Apache Stock Price**
*S&P E&P Index Pegged to Apache on February 22, 2018*

Notes and Sources:
Data from Bloomberg, L.P. Events from the Complaint. The S&P Oil & Gas Exploration & Production Select Industry Index returns exclude those of Apache.

*Id.* ¶ 104. It closely tracked the relevant oil and gas prices as well. *Id.* ¶¶ 105-19. While the declining commodities market was undoubtedly bad news for Apache, that negative development did not relate in any away to the alleged misrepresentation and therefore cannot demonstrate price impact. *AMSF I*, 597 F.3d at 336 (if price decline was caused by

24

something other than "revelation of the truth," price decline does not "raise an inference that the price was actually affected by … alleged misrepresentations").

The key fact remains that none of the three alleged corrective disclosures constituted "a release of information that reveals to the market the pertinent truth that was previously concealed," *Amedisys*, 769 F.3d at 321, a "pertinent truth" that allegedly concerned the attributes and actual performance of Alpine High and the commercial prospects of Alpine High that depended on those attributes and that actual performance. That "severs the link between the alleged misrepresentation[s] and … the price received (or paid) by the plaintiff" and "rebut[s] the presumption of reliance because the basis for finding that the fraud had been transmitted through market price [is] gone." *Halliburton II*, 573 U.S. at 279 (quoting *Halliburton I*, 563 U.S. at 811). Accordingly, those three alleged corrective disclosures do not demonstrate price impact and cannot be part of any class.

*   *   *

In sum, there was no front-end price impact from any alleged misrepresentation, nor any back-end price impact from any alleged corrective disclosure, after February 22, 2018.

## CONCLUSION

The Court should deny the Motion to the extent it seeks to certify a class as to any alleged misrepresentation or alleged corrective disclosure made after February 22, 2018.

Dated:  June 16, 2023

Respectfully submitted,

BAKER BOTTS L.L.P.

By:  */s/ David D. Sterling*
     David D. Sterling
     Attorney-In-Charge
     State Bar No. 19170000
     Federal I.D. No. 07079
     Amy Pharr Hefley
     State Bar No. 24046046
     J. Mark Little
     State Bar No. 24078869
     Federal I.D. No 1487508
     Anthony J. Lucisano
     State Bar No. 24102118
     Federal I.D. No. 3369146
     Frank Mace
     State Bar No. 24110609
     Federal I.D. No. 3385915
     910 Louisiana Street
     Houston, Texas 77002
     (713) 229-1946
     (713) 229-7946 (Fax)
     david.sterling@bakerbotts.com
     amy.hefley@bakerbotts.com
     mark.little@bakerbotts.com
     anthony.lucisano@bakerbotts.com
     frank.mace@bakerbotts.com

     John B. Lawrence
     Texas Bar No. 24055825
     S.D. Tex. No. 3124414
     2001 Ross Avenue, Suite 900
     Dallas, Texas 75201
     (214) 953-6873
     (214) 661-4873 (Fax)
     john.lawrence@bakerbotts.com

ATTORNEYS FOR DEFENDANTS APACHE CORPORATION, JOHN J. CHRISTMANN IV, TIMOTHY J. SULLIVAN, AND STEPHEN J. RINEY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF on all counsel of record on this 16th day of June, 2023.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley