## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Civil Action No. 4:21-cv-00575 |
| | District Judge George C. Hanks, Jr. |
| | Magistrate Judge Andrew M. Edison |

## DEFENDANTS' SUR-REPLY IN OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS <u>REPRESENTATIVES AND CLASS COUNSEL</u>

TABLE OF CONTENTS

Page

I.  Plaintiffs' pursuit of an unbounded class period defies both legal
    principles and common sense. ................................................................. 1

    A.  Price impact is not an all-or-nothing issue. ................................... 1

    B.  The Court must set a logical end date for the class period........................... 4

II.  Plaintiffs misstate the law governing price impact. ................................. 6

    A.  Plaintiffs' proffered constrictive framework is contrary to the law. ............. 6

    B.  Proof of a lack of statistical significance matters........................................ 7

    C.  Dr. Nye's use of multiday-reaction windows contravenes the law and
        his own theory. ........................................................................... 10

    D.  Newness is relevant because an efficient market will not react to
        information that was already known. ............................................. 12

    E.  Correctiveness must be evaluated at class certification. ............................. 13

    F.  Analyst reports are probative evidence of price impact or a
        lack thereof. ............................................................................... 15

III.  Plaintiffs fail in their efforts to resuscitate the final three alleged
     corrective disclosures. ........................................................................ 16

    A.  4/23/19 Disclosure of Natural Gas Deferrals ............................................. 16

    B.  10/25/19 Keenan Resignation ........................................................ 19

    C.  3/16/20 Seeking Alpha Post and Susquehanna Report ............................... 21

IV.  Conclusion........................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ...................................................................... 21

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023)........................................................ 8, 13, 14, 15, 16

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
2023 WL 2932485 (D. Conn. Apr. 13, 2023) ............................................... 4

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................... 5

*Castaneda v. Partida*,
430 U.S. 482 (1977) ..................................................................................... 8

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
322 F. Supp. 3d 676 (D. Md. 2018) ............................................................ 3

*Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton ND Tex.")*,
309 F.R.D. 251 (N.D. Tex. 2015) ................................................. 1, 7, 10, 16

*Ferris v. Wynn Resorts Ltd.*,
2023 WL 2337364 (D. Nev. Mar. 1, 2023) ........................................... 2, 14

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021) ................................. 6, 7, 9, 12, 13, 14, 15, 16, 18, 19

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) ...................................................................... 12

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*,
573 U.S. 258 (2014) ..................................................................................... 7

*Hazelwood Sch. Dist. v. United States*,
433 U.S. 299 (1977) ..................................................................................... 8

*In re Acadia Healthcare Co.*,
2023 WL 3620955 (6th Cir. May 23, 2023) ........................................... 3, 4

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ............................................................ 2, 8

*In re CenturyLink Sales Practices & Sec. Litig.*,
    337 F.R.D. 193 (D. Minn. 2020).................................................................4

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .............................................2

*In re Enron Corp. Secs.*,
    465 F. Supp. 2d 687 (S.D. Tex. 2006) ......................................................20

*In re Interpublic Sec. Litig.*,
    2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003) .............................................5

*In re Intuitive Surgical Sec. Litig.*,
    2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ..................................2, 12, 13

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) ................................................................8

*Monroe Cty. Emps.' Ret. Sys. v. Southern Co.*,
    332 F.R.D. 370 (N.D. Ga. 2019).................................................................4

*Prantil v. Arkema Inc.*,
    986 F.3d 570 (5th Cir. 2021) ......................................................................3

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ....................................................................15

*Ramirez v. Exxon Mobil Corp.*,
    2023 WL 5415315 (N.D. Tex. Aug. 21, 2023).................1, 5, 9, 10, 12, 13, 16, 20, 23

*Villella v. Chemical & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................20

**OTHER AUTHORITIES**

David H. Kaye & David A. Freedman, "Reference Guide on Statistics," *in Reference Manual on Scientific Evidence* 211 (3rd ed.)................................................8

I.      **Plaintiffs' pursuit of an unbounded class period defies both legal principles and common sense.**

Plaintiffs make an extraordinary claim. If taken seriously, the logical consequence of their position is that if they can demonstrate price impact for *any* alleged misrepresentation for *any* period, then that immunizes the rest of their desired class period from scrutiny and entitles them to an *unlimited* class period. That plainly is not the law. Courts routinely examine individual alleged corrective disclosures at the class certification stage and exclude those lacking the necessary connection to the alleged misrepresentations. Moreover, courts of course must set an end date for the class period. Both paths lead to the same result in this case, where the challenged disclosures fall at the end of the putative class period, because it is well established that the class period should end on the date of the last alleged corrective disclosure that revealed some hidden truth regarding the alleged misrepresentations. Accordingly, the last three alleged corrective disclosures (*i.e.*, those in the Focus Period) should be excluded from the class because they lack the necessary tether to the alleged misrepresentations.

A.      **Price impact is not an all-or-nothing issue.**

Plaintiffs' notion that a defendant must rebut *all* the alleged corrective disclosures to obtain any kind of relief on class certification cannot be squared with the examples of courts—including courts within the Fifth Circuit applying this Circuit's precedent as recently as last month—excluding only a subset of the alleged corrective disclosures at class certification. *See, e.g.*, *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at *22 (N.D. Tex. Aug. 21, 2023) (excluding 6 of 7 alleged corrective disclosures); *Erica P. John*

1

*Fund, Inc. v. Halliburton Co.* ("*Halliburton ND Tex.*"), 309 F.R.D. 251, 269-76 (N.D. Tex. 2015) (excluding 5 of 6 alleged corrective disclosures); *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *11 (D. Nev. Mar. 1, 2023) (excluding 1 of several alleged corrective disclosures); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *39 (S.D.N.Y. Oct. 18, 2019) (excluding 1 of 7 alleged corrective disclosures), *R&R adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14-17 (N.D. Cal. Dec. 22, 2016) (excluding 2 of 5 alleged corrective disclosures); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 188 (S.D.N.Y. 2010) (excluding 2 of 6 alleged corrective disclosures), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012). Either all those courts got it wrong, or Plaintiffs are overreaching in their claim that it is impermissible to challenge only a subset of the alleged corrective disclosures.

That common approach is the only approach that makes sense in this case because Defendants are challenging each of the last three alleged corrective disclosures. Unlike a situation in which a defendant may challenge one or two corrective disclosures that occurred in the middle of the proposed class period, here, Defendants can show that each of the three alleged corrective disclosures after February 22, 2018 lacks the necessary link to the alleged misrepresentations. If none of the last three corrective disclosures demonstrates price impact, that means that under Plaintiffs' own theory, the alleged misrepresentations were no longer impacting the stock price at that point. Plaintiffs cannot justify why that showing would somehow be out of bounds at class certification.

Additionally, it is undeniable that "[c]ourts should consider predominance on a claim-by-claim basis," *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 (5th Cir. 2021), and that in the securities class action context, each alleged misrepresentation is a separate claim, *see City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 682 (D. Md. 2018) ("Because the Court is required at the class certification stage to limit the proposed Class based on the alleged misrepresentations found to be actionable, the Court will at this time certify the proposed Class based on the shortened Class Period"). Accordingly, Defendants must be able to challenge the 15 alleged misrepresentations after February 22, 2018 on price-impact grounds. That challenge has two parts: no front-end price impact, and no back-end price impact. *See* Opp. 11-25. There is no real dispute that Defendants have established the former. Opp. 11-13; Ex. A (Allen Rep.) ¶¶ 35-45. To also demonstrate the latter, Defendants must sever the link between those post-February 22, 2018 alleged misrepresentations and the three alleged corrective disclosures that followed them. Thus, even if it is only for that limited purpose, Defendants must be permitted to challenge the last three alleged corrective disclosures.

As for Plaintiffs' supposed contrary authority, *see* Reply 8, the parentheticals Plaintiffs supply for two of the four cited cases are misleading. The court in *In re Acadia Healthcare Co.*, 2023 WL 3620955 (6th Cir. May 23, 2023), did not hold that failing to challenge one alleged corrective disclosure precludes challenging the others. Quite the contrary. It affirmed the district court precisely because it went on to analyze the other two alleged corrective disclosures:

> Acadia is wrong because the district court . . . still analyzed Acadia's other arguments regarding price impact for the two disclosures related to the U.S. facilities, and found that those arguments also failed. So it did not rely solely on Acadia's concession that the corrective disclosure pertaining to the U.K facilities had a price impact.

*Id.* at *2. Likewise, the court in *In re CenturyLink Sales Practices & Securities Litigation*, 337 F.R.D. 193 (D. Minn. 2020), did not rest its holding solely on the conceded statistical significance of two of the three alleged corrective disclosures. Instead, it went on to analyze the challenge to the third alleged corrective disclosure. *Id.* at 211. Both cases support Defendants, not Plaintiffs, on this point.

Plaintiffs' other two cases are wrongly decided, but in any event inapplicable. Critically, neither *Boston Retirement System v. Alexion Pharmaceuticals, Inc.*, 2023 WL 2932485 (D. Conn. Apr. 13, 2023), nor *Monroe County Employees Retirement System v. Southern Co.*, 332 F.R.D. 370 (N.D. Ga. 2019), involved a scenario where, as here, a defendant challenged separate alleged misrepresentations—for lack of both front-end and back-end price impact—and all the alleged corrective disclosures that followed them. Accordingly, even if Plaintiffs' minority rule prevailed, it would not prevent Defendants from challenging the last three alleged corrective disclosures for purposes of disproving back-end price impact for the post-February 22, 2018 alleged misrepresentations.

### B.    The Court must set a logical end date for the class period.

Another route to that same result avoids the legal intricacies regarding the nature of price impact and instead rests on the commonsense notion that the class period should end on the date of the last surviving alleged corrective disclosure. After all, the class period must end at some point, and its logical end is the date of the final disclosure allegedly

revealing the supposed hidden truth behind the alleged misrepresentations. Under Plaintiffs' own theory, past that point, anyone purchasing the stock could not claim to have been harmed by the alleged misrepresentations.

Accordingly, "[i]n the case of a securities fraud class action, courts are required to 'cut off the class period' on the date of a statement or event that 'cure[s][ ] the market.' In other words, a class period ends when the truth has been disseminated to the market." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96-97 (S.D.N.Y. 2015) (quoting *In re Interpublic Sec. Litig.*, 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003)); *see also Ramirez*, 2023 WL 5415315, at *22 ("As the end date for the class period, the Court sets October 28, 2016—the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut.").

Applied here, Plaintiffs claim five alleged corrective disclosures revealed the truth of the alleged misrepresentations. If, as Plaintiffs contend, all five alleged corrective disclosures exposed some then-unknown part of that obscured truth, then the class period should extend through them all. But if the last three alleged corrective disclosures (*i.e.*, the Focus Period corrective disclosures) did not "cure the market" by revealing new information corrective of the alleged misrepresentations—something Defendants have demonstrated here—then the class period must end on February 22, 2018, the date of the second alleged corrective disclosure.[1]

---

[1] Defendants of course do not concede that there was any alleged misrepresentation, or that any of the alleged corrective disclosures "cured" the market since there was no misrepresentation to cure. Defendants focus on the alleged corrective disclosures during the Focus Period as they are germane to the class certification issue of price impact.

Accordingly, while the parties disagree on the corrective nature (or lack thereof) of the Focus Period alleged corrective disclosures, the legal consequences of that disagreement should be plain to all. At stake is the end date of the class period, and whether Plaintiffs' class claims will seek to establish Defendants' liability over an 18-month period or a 42-month period.

## II.     Plaintiffs misstate the law governing price impact.

Plaintiffs mangle the analytical framework courts use to assess price impact and misstate the law governing several key aspects of the price-impact analysis.

### A.     Plaintiffs' proffered constrictive framework is contrary to the law.

In Plaintiffs' telling, defendants virtually cannot ever prevail at the class certification stage outside of the precise circumstances of *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021), *i.e.*, price maintenance cases with generic alleged misrepresentations. That is the only way to read Plaintiffs' one-sided set of "rules" that would ensure that the result will almost always be to certify the class. According to Plaintiffs:

- Statistical significance proves price impact, but a lack of statistical significance is not even evidence of a lack of price impact. Reply 15, 24.

- If there is no price reaction on day 1, 2, or 3, Plaintiffs can keep looking to as many days as necessary to find a statistically significant reaction. Reply 14.

- Showing that an alleged corrective disclosure was not actually corrective is an impermissible loss causation argument. Reply 18-19.

- Demonstrating that allegedly corrective information had previously been disclosed to the market, and hence was not new news, is an impermissible materiality argument. Reply 23.

The law is not so slanted. Plaintiffs are wrong on each individual point, as detailed below. *See infra* Parts II.B-F. But the bigger picture undermines Plaintiffs' position, too. The impossible burden that Plaintiffs describe is inconsistent with Defendants' right to demonstrate a lack of price impact at the class certification stage. Recognizing that "[i]n the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse," the Supreme Court has held that defendants may show at the class certification stage "that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 278, 282 (2014). *Goldman* reaffirmed that right, 141 S. Ct. at 1959, and nowhere narrowed it with the constraints Plaintiffs seek to impose. *Halliburton* and *Goldman* did not chisel slender holes matching the specific facts of those cases through which Defendants must contort if they hope to escape price impact. To the contrary, the Supreme Court instructed courts to consider "*all* probative evidence" bearing on price impact. *Id.* at 1960 (emphasis in original). Plaintiffs' pinched view of the price-impact inquiry is fundamentally inconsistent with that charge.

**B.      Proof of a lack of statistical significance matters.**

Plaintiffs incorrectly assert that a 95% confidence level is not required to find statistical significance, that a finding of statistical significance "should end the inquiry," and that a lack of statistical significance fails to demonstrate a lack of price impact. Reply 15, 24.

First, there is no question that a 95% confidence level is the scientific and legal standard. The Federal Judicial Center's *Reference Manual on Scientific Evidence* observes that "[i]n practice, statistical analysts typically use levels of 5% and 1% [*i.e.*, 95% to 99% confidence levels]," and the Supreme Court has "implicitly referred to this practice." David H. Kaye & David A. Freedman, "Reference Guide on Statistics," *in Reference Manual on Scientific Evidence* 211, 251 (3rd ed.) (citing *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977), and *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 311 n.17 (1977)); *see also, e.g.*, *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 186-87 (S.D.N.Y. 2010) (defendants demonstrated that "event study does not show a statistically significant price decrease on th[e] days [of the alleged corrective disclosures], measured at the 5% level," notwithstanding significance at 10% level), *vacated on other grounds,* 689 F.3d 229 (2d Cir. 2012); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 n.11 (S.D.N.Y. 2011) ("significant negative return at the 90% confidence level" was "below the conventional statistical measure of a 95% confidence level and therefore is not sufficient evidence of a link between the corrective disclosure and the price"). Plaintiffs have articulated no reason to depart from that standard here.

Second, a lack of statistical significance is itself compelling evidence of a lack of price impact. "[W]hen studies have a good chance of detecting a meaningful association, failure to obtain significance can be persuasive evidence that there is nothing much to be found." Kaye & Freedman, *supra*, at 254; *see also Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 86 n.5 (2d Cir. 2023) ("If the stock price movement is indistinguishable from random price fluctuations, it cannot be attributed to company-

specific information announced on the event date."). Such statistical evidence is particularly relevant here because Defendants' burden is not a heavy one. *See Goldman*, 141 S. Ct. at 1963 ("[T]he allocation of the burden is unlikely to make much difference on the ground. In most securities-fraud class actions, as in this one, the plaintiffs and defendants submit competing expert evidence on price impact…. The defendant's burden of persuasion will have bite only when the court finds the evidence in equipoise—a situation that should rarely arise."). A lack of statistical significance of course pushes the scales towards a finding of no price impact. *Ramirez*, 2023 WL 5415315, at *15, *21 (repeatedly relying on lack of statistically significant price reactions to find lack of price impact).

Third, a finding of statistical significance does not "end the inquiry." The *Ramirez* court explained why. The court credited the defendants' argument that "the price impact inquiry does not necessarily end with the finding of a statistically significant negative price reaction" because an "event study can tell us that something happened, but it can't tell us *why*." 2023 WL 5415315, at *15. "To properly attribute a stock price movement to an alleged Corrective Disclosure, . . . the Court should consider, *inter alia*, the total mix of information the market possessed prior to the disclosure" and "any additional confounding factors that might have impacted the stock price." *Id.* Applying that approach, the *Ramirez* court repeatedly found price impact disproven for alleged corrective disclosures despite statistically significant price movements. *Id.* For one alleged corrective disclosure, a "dearth of analyst commentary . . . suggest[ed] that the market likely did not consider it to be significant." *Id.* at *16. For another, the "statistically significant negative price

movement . . . was likely not attributable to the alleged corrective information" because "confounding factors likely explain the movement." *Id.* at *16-17 (citing expert's review of analyst reports ascribing negative news to other causes). For a third, the analyst report at issue "merely summarize[d]" already-public information and did not "offer any new corrective information to the market." *Id.* at *20. That analysis accords appropriate weight to statistical significance in its proper sphere while avoiding Plaintiffs' suggestion of transforming it into a super factor that trumps all others.

### C.   Dr. Nye's use of multiday-reaction windows contravenes the law and his own theory.

Plaintiffs' reliance on multiday reaction windows is equally indefensible. If Dr. Nye did not find statistical significance on day 1, he simply extended the testing window to day 2, day 3, or day 4 until Plaintiffs' desired statistical significance was achieved. Reply 14 (citing Nye Reply Rep. ¶ 23). This "method" is not only improperly results-oriented; it is also fundamentally incompatible with Plaintiffs' and Dr. Nye's repeated statements that Apache stock promptly responded to new information disclosed to the market—as a stock trading in an efficient market should. Judge Lynn explained the point:

> The Court finds that, in this case, the use of a two-day window is inappropriate to measure price impact in an efficient market. An efficient market is said to digest or impound news into the stock price in a matter of minutes; therefore, an alleged corrective disclosure released to the market at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged corrective disclosure.

*Halliburton ND Tex.*, 309 F.R.D. at 269. Here, with respect to the October 25, 2019 disclosure of Keenan's resignation, Plaintiffs assert that a 10:19 a.m. analyst report

distancing the resignation from Suriname would have removed "any Suriname-related price impact" "well before the market closed" that day. Reply 21 (citing Nye Reply Rep. ¶¶ 34, 37, 43). Dr. Nye asserts that Apache stock reacted to the news within minutes: "Apache's stock price plummeted immediately after Mr. Keenan's departure was announced at 9:44 AM, but then partially rebounded roughly 35 minutes later after RBC Capital Markets reported, at 10:19 AM," that the resignation was not related to Suriname and following Bloomberg's similar 11:21 AM newsflash. Nye Reply Rep. ¶ 37. "[T]he Company's stock price stabilized at roughly $22 per share for the remainder of the trading day." *Id.*[2] Plaintiffs cannot rely on 2-, 3-, or 4-day reaction windows to manufacture statistically significant market reactions while simultaneously claiming Apache's stock traded in an efficient market that rapidly incorporated new information into the stock price.

Dr. Nye's resort to 2-, 3, or 4-day reaction windows suffers from additional glaring defects:

- The literature Dr. Nye cites does not actually support his use of a multiday window here. Ex. N (Allen Surreply Rep.) ¶ 37.

- Dr. Nye's use of a cumulative 4-day statistical test for an event study contrasts with his methods in his first report, where he used standard 1-day statistical tests in his event study of earnings announcements. *Id.* ¶ 36. In fact, if one were to apply Dr. Nye's cumulative 4-day window approach to his market efficiency analysis, more than half of the "event" days Dr. Nye analyzed and found to be significant in his first report would no longer be significant, contradicting his finding of market efficiency. *Id.* ¶¶ 40-45.

---

[2] Plaintiffs' Motion depends on Plaintiffs' claim that Apache securities traded in an efficient market. *E.g.*, Mot. 20 (asserting that Apache stock "promptly responded to the disclosure of new, material unexpected information" (citing Nye Rep. ¶ 60)).

There is no reason to indulge this results-oriented methodology. *See, e.g.*, *Ramirez*, 2023 WL 5415315, at *14 ("In this case, a two-day window is unsuitable for measuring price impact in an efficient market," and a "two-day window could include extraneous market noise, making it more difficult to understand the effect of the alleged Corrective Disclosures"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *14 (finding "it was inappropriate to use a two-day window to calculate price impact here").

### D. Newness is relevant because an efficient market will not react to information that was already known.

A "stock's price will not change upon the release of confirmatory information, *i.e.*, information already known to the market." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004). That is because only new information can have price impact in an efficient market. *Ramirez*, 2023 WL 5415315, at *20 ("mere reiteration of already disclosed information should not influence the price of a stock traded in an efficient market").

The Supreme Court in *Goldman* squarely rejected Plaintiffs' contention here—that any argument an alleged disclosure "did not disclose any new news" is "an off-limits materiality challenge." *See* Reply 15, 23. Announcing its straightforward instruction that courts should consider "*all* probative evidence" of price impact at the class certification stage, the Supreme Court expressly headed off precisely this objection: "That is so regardless whether the evidence is also relevant to a merits question like materiality." 141 S. Ct. at 1960-61.

### E.      Correctiveness must be evaluated at class certification.

*Goldman* also rebuts Plaintiffs' assertion that correctiveness is a "premature loss causation challenge," Reply 18; correctiveness is relevant to price impact "regardless whether the evidence is also relevant to a merits question" such as loss causation. *Goldman*, 141 S. Ct. at 1960-61. In fact, the Second Circuit in *Goldman* recently explained that the level of correctiveness required for the price impact inquiry is even stronger than what is required to show loss causation. The "question here—whether there is a basis to infer that the back-end price equals front-end inflation—is a different question than loss causation, and, in light of *Goldman*, requires a *closer fit* (even if not precise) between the front- and back-end statements." *Goldman*, 77 F.4th at 99 n.11 (emphasis added).

That is why a correctiveness analysis is now an established staple of the price impact inquiry. *See, e.g.*, *Ramirez*, 2023 WL 5415315, at *19 ("Plaintiff presents no evidence that the market connected the three earnings releases to Defendants' alleged misstatements about Exxon Mobil's use of a proxy cost of carbon"); *Goldman*, 77 F.4th at 105 ("a searching review of the record leaves us with the firm conviction that there is an insufficient link between the corrective disclosures and the alleged misrepresentations"); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15-16 (excluding corrective disclosures due to lack of correctiveness). A mismatch between an alleged misrepresentation and corrective disclosure may arise from a mismatch in their respective contents, a mismatch in their levels of specificity or genericness, or any other incongruity that undercuts the inference that back-end price drop equals front-end inflation. *Ferris*, 2023 WL 2337364, at *11 (alleged corrective disclosure was "not matched to any alleged misrepresentation").

The Second Circuit's recent de-certification of a class in *Goldman* (following the Supreme Court's remand) based on a "mismatch" between the alleged misrepresentations and alleged corrective disclosures is instructive. *Goldman*, 77 F.4th at 81. The Second Circuit rejected the notion that a "match in subject matter" suffices to tie an alleged corrective disclosure to an alleged misrepresentation. *Id.* at 100-01. That conclusion directly followed from the Supreme Court's commonsense observation that the inference that "back-end price drop equals front-end inflation . . . starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1961.

The logic of the *Goldman* decisions applies with full force here. The Reply attempts to dispense with them by arguing they are limited to their particular fact pattern (*i.e.*, price maintenance cases with generic alleged misrepresentations), Reply 5-6, but neither decision is so limited. The Supreme Court explained that the inference of price impact "starts to break down when there is a mismatch between the **contents** of the misrepresentation and the corrective disclosure." *Goldman*, 141 S. Ct. at 1961 (emphasis added). "That may occur when the earlier misrepresentation is generic . . . and the later corrective disclosure is specific," *id.*, but the "contents" of an alleged misrepresentation and corrective disclosure can be mismatched regardless of whether both are generic, both are specific, or one is generic and one is specific.

In any event, this case easily fits in the *Goldman* mold because many of the alleged misrepresentations are just as generic as the ones in *Goldman*, *see, e.g.*, Reply 18 (citing alleged misrepresentations that Alpine High was "world class" and would drive

14

shareholder value for years to come). And even if Plaintiffs were correct that the alleged misrepresentations were "highly specific," Reply 6, the alleged corrective disclosures are exceedingly generic in comparison—a gas deferral following a price collapse, an executive resignation, and a blog post about the company's overall balance sheet—which results in the same "mismatch" problem. *Goldman*, 77 F.4th at 102.

Left with no real response, Plaintiffs instead trot out a straw man, claiming Defendants are insisting on a "mirror image[]" standard. Reply 8. Not so. Defendants have never claimed a corrective disclosure must be a "mirror image" of an alleged misrepresentation. Opp. 7-9 (describing the legal standard for correctiveness). They have instead argued that, as the Fifth Circuit has held, a corrective disclosure must "reveal[] to the market the pertinent truth that was previously concealed or obscured by the company's fraud," *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (cited at Opp. 7-8). Absent correctiveness, there is no basis to infer front-end price impact from a back-end price drop.

### F. Analyst reports are probative evidence of price impact or a lack thereof.

Plaintiffs also take the astounding position that analyst reports are never probative of the presence or absence of price impact. Reply 16, 22-23. Yet Plaintiffs themselves rely on analyst commentary purportedly showing price impact. *E.g.*, Reply 16. And courts frequently consider analyst commentary as competent and helpful evidence in the price impact inquiry. *E.g.*, *Halliburton ND Tex.*, 309 F.R.D. at 271-80 (considering analyst commentary as evidence of market reaction). For example, the Second Circuit in *Goldman* made clear that "market commentary can provide insight into the kind of information

investors would rely upon in making investment decisions" "and therefore can serve as indirect evidence of price impact." 77 F.4th at 104. Likewise, the *Ramirez* court reasoned that analyst commentary showed that "confounding factors likely explain" the stock price movement on a date in question and elsewhere recognized the "dearth of analyst commentary" was evidence "that the market likely did not consider [an alleged corrective disclosure] to be significant." 2023 WL 5415315, at *16-17.

III.    **Plaintiffs fail in their efforts to resuscitate the final three alleged corrective disclosures.**

Set within the proper legal framework, a straightforward analysis confirms that the last three alleged corrective disclosures (*i.e.*, those during the Focus Period) lack the necessary tether to the alleged misrepresentations throughout the Class Period and therefore do not demonstrate price impact.

A.      **4/23/19 Disclosure of Natural Gas Deferrals**

*No statistically significant price reaction.* There is no dispute that there was no statistically significant decline in Apache's stock price on Tuesday, April 23, 2019 (the day this news was announced, before the market opened), *or* on any of the next three trading days, *or* using a 2-day window that includes both the April 23 announcement date and the following trading day. Ex. N (Allen Surreply Rep.) ¶ 34. Plaintiffs claim this disclosure caused a statistically significant stock price decline by using 3- and 4-day event windows. Reply 14-15. But Dr. Nye extended the window that far only because a 1- or 2-day event window did not show any statistically signification price reaction (and under one model, there was still no statistically significant decline even using a 3-day window). Ex. N (Allen

Surreply Rep.) ¶ 34. As discussed above, such results-driven extensions of event windows in an efficient market are impermissible. *Supra* at 10-12. Using a reasonable 1-day event window, or even a 2-day event window, there undisputedly was no statistically significant price decline. That lack of statistical significance demonstrates a lack of price impact. *Supra* at 8-9.

*Market expected the disclosure.* Confronted with evidence that the market expected the deferral given the extremely low and even negative prices at the Waha Hub (Opp. 15-19; Ex. A (Allen Rep.) ¶¶ 53-58; *see* Ex. N (Allen Surreply Rep.) ¶¶ 47-50), Plaintiffs assert that the Court cannot consider this evidence because it relates to materiality. Reply 15-16. Not so, for the reasons already discussed at length above. *Supra* at 12-13.

Plaintiffs next claim that other analysts "characterized this Corrective Disclosure as unexpected, negative news." Reply 16 (citing Nye Reply Rep. ¶¶ 24-31). That, too, is incorrect. The analyst reports in the cited paragraphs of Dr. Nye's Reply Report call the deferral *negative* news for Apache, but they say nothing about whether the news was *unexpected*. For instance (emphasis added by Dr. Nye):

- Macquarie Research (4/23/2019): "**Slight Negative** - Given the severity of local Permian natural gas pricing weakness, we think the deferral of gas is prudent and **likely expected** by investors. We do, however, think the announcement **confirms incremental risk is present in the back-half '19 ramp and creates additional questions on NGL pricing/volumes**.…"

- RBC Capital Markets (4/23/2019): "Our View: We think **this is a slight negative on the margin**. The decision positively impacts cash flow in the near term but it does show the current tightness and sensitivity of the Permian gas market. APA has 500 MMcf/d of capacity on Gulf Coast Express (expected in service later this year) and additional capacity on Permian Express (expected in service in 2020) providing transport to Gulf Coast markets."

17

As Defendants have explained, negative-but-expected news does not move markets or show price impact. Opp. 17; Ex. A (Allen Rep.) ¶ 58.

Plaintiffs also claim that three analysts lowered their Alpine High production estimates after the press release, but two of the analysts termed the reduction as having "minimal" impact, and the other issued an industry report that was updating estimates for many other E&P companies and linked the Alpine High "shut-ins" to the low Waha pricing. Ex. N (Allen Surreply Rep.) ¶ 47. No analysts, including the three Dr. Nye claims lowered their production estimates, lowered their price targets of Apache after the press release, which indicates that the deferral was expected. *Id.*

*Not corrective.* Relatedly, Defendants have explained that the press release was not corrective because it did not disclose any information about the proportions of oil, wet gas, and dry gas in the play or the actual performance of Alpine High wells, nor did it reveal any untruth. Opp. 18; Ex. A (Allen Rep.) ¶¶ 59-61. Plaintiffs fail to show otherwise.

Plaintiffs instead claim that the Court cannot consider this issue because it is a loss causation argument. Reply 17-18. But that is directly contrary to the Supreme Court's clear instructions in *Goldman. Supra* at 12-13.

A rational reaction to market forces over which Apache has no control is not a corrective disclosure. Plaintiffs assert that the deferral was corrective of Christmann's statements that Alpine High would "really hum below $2 [prices] on the gas side" and would work "under very, very low gas and NGL and oil prices." Reply 18. But the answer to this charge appears in the chart on page 18 of the Opposition: Gas prices fell below what Christmann was describing, far below $2, spiking upside down into the negatives before

hovering just above $0. Opp. 18; Ex. A (Allen Rep.) ¶ 55; Ex. N (Allen Surreply Rep.) ¶ 15. Plaintiffs offer the inference that the market took the deferral as a revelation that Mr. Christmann's statements were not true. Reply 18. But the evidence shows that the market took the deferral as an expected, rational reaction to bad news: historically low commodity prices at the Waha Hub. Ex. A (Allen Rep.) ¶¶ 56-57; Ex. N (Allen Surreply Rep.) ¶¶ 47-50.

For the inference that back-end price drop equals front-end inflation to work, the alleged corrective disclosure must reveal the truth of the alleged misrepresentation *and* the stock price must decline due to the disclosure. *See Goldman*, 141 S. Ct. at 1961. Neither occurred here.

### B.      10/25/19 Keenan Resignation

Executive resignations are not corrective disclosures except in the unusual situation where the market views the news as somehow correcting what the company previously said. Opp. 19. Plaintiffs attempt to flip this reasonable principle without evidence that the market viewed Keenan's resignation as corrective of anything relating to Alpine High. Reply 19-21.

Plaintiffs assert that the statistically significant price reaction when the only "value-relevant news" was Keenan's resignation "alone" demonstrates price impact, Reply 19, but even if the price moved because of Keenan's resignation, the Court must still consider evidence of *why* the market reacted to Keenan's resignation. *Supra* at 9-10; *Ramirez*, 2023 WL 5415315, at *15-20 (considering context of each alleged disclosure and repeatedly finding price impact disproven despite statistically significant price movements).

A resignation itself is unlikely to be a corrective disclosure (unless, unlike here, the defendant represented that the executive would not resign); it is *the disclosed or presumed reason* for the resignation that could be a corrective disclosure. Plaintiffs' own analysis, and its cited authority—*Villella v. Chemical & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 52 (S.D.N.Y. 2019)—demonstrates as much. As the Reply states, the alleged corrective disclosure there was the "resignation of the Potash directors *and the rationale behind the move*," Reply 19 (emphasis added)—namely, according to a press release issued the same day as the resignations, that the resigning directors' "emphatic requests" that the company cooperate with authorities investigating corruption in Chile "had been rejected by a majority of the board." *Villella*, 333 F.R.D. at 48.[3]

Here, the analyst commentary demonstrates that "**Apache's stock underperformed [on October 25] on investor speculation that a SVP's resignation is linked to an upcoming unsuccessful Suriname** Maka-1 exploration," and that the decline was "**a reaction to investor concern that the resignation is related to the outcome of APA's Maka-1 exploration well in Suriname.**" Ex. A (Allen Rep.) ¶¶ 66-71 (quoting 10/25/19 Truist Bank report and 10/25/2019 RBC Capital Markets report); Ex. N (Allen Surreply Rep.) ¶ 55; Opp. 20. Yes, certain analysts also noted that Keenan "oversaw the

---

[3] Plaintiffs' other case simply notes that "the market may learn of possible fraud [from] a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspaper and journals, etc." *In re Enron Corp. Secs.*, 465 F. Supp. 2d 687, 724 n.47 (S.D. Tex. 2006). No party disputes that statement, but again, the key point is the disclosed or presumed reason for the resignation.

discovery of the Alpine High play, which has been an economic disappointment for investors (at least partly due to depressed natural gas and NGL prices)," Nye Reply Rep. ¶ 38 (quoting Credit Suisse report; emphasis omitted), but that is not evidence they understood the resignation to reveal anything new about Alpine High. The analyst reports are clear that the market connected that day's news of Keenan's resignation to the Suriname Maka-1 well, which had nothing to do with Alpine High. Ex. A (Allen Rep.) ¶¶ 66-71; Ex. N (Allen Surreply Rep.) ¶¶ 55-58.

Given the absence of any information, much less market-moving information, about Alpine High to be gleaned from Keenan's resignation, the more compelling, evidence-backed inference for any price movement is that the market feared the resignation was a harbinger of forthcoming bad news in Suriname; the movement had nothing to do with the alleged misrepresentations at issue in this case.[4] Ex. A (Allen Rep.) ¶¶ 66-73; Ex. N (Allen Surreply Rep.) ¶¶ 55-58.

## C.   3/16/20 *Seeking Alpha* Post and Susquehanna Report

Unable to point to anything the *Seeking Alpha* post disclosed to the market, Plaintiffs now seek to pivot to a Susquehanna analyst report issued the same day. Reply 22. But neither the Complaint, nor Plaintiffs' Motion, nor Dr. Nye's Report alleged that

---

[4] Plaintiffs repeatedly reference internal documents that Apache produced in discovery, Reply 21-22, but they are, by definition, irrelevant to the price-impact inquiry, which necessarily turns only on *public* information known to the market at the time. After all, "[o]nly information known to the market can cause a loss. For this reason, only information known to the market is relevant under the fraud-on-the-market theory of class wide reliance." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

the Susquehanna report was a corrective disclosure, and for good reason—until forced to

in the face of Defendants' evidence concerning the *Seeking Alpha* post, not even Plaintiffs

could bring themselves to argue the Susquehanna report qualifies as a corrective disclosure.

The Susquehanna report is a "Multi-Company Update" distributed by Susquehanna

Financial Group, LLP on March 16, 2020 that discusses *twenty-two* public E&P companies,

"lowering price targets across the coverage universe." Ex. O (Susquehanna Report). The

report contains little discussion of Apache, and no mention of Alpine High at all. It

describes Apache's "Downside risks" as "Commodity price volatility, Suriname

exploration results, [and] significant exposure to natural gas/NGL price." *Id*. at 29. The

"downgrade" of Apache that Plaintiffs cite to as supposedly "corrective" (Reply 22) is

described in a single paragraph discussing the downgrades of Apache, Noble Energy, Inc.,

and Occidental Petroleum Corporation to "Neutral" from "Positive," all for the same

reason:

> With a large uncertainty in the magnitude and timing of a recovery in oil
> prices, balance sheet flexibility is a main parameter in our stock selection
> process with factors such as inventory depth, capital intensity, and valuation
> still playing an important role in the calculus. Based on this parameter, we
> are downgrading APA, NBL and OXY to Neutral from Positive.

Ex. O (Susquehanna Report) at 2.

*Newness and correctiveness.* Plaintiffs do not (and cannot) identify anything new,

much less new and corrective, disclosed in the *Seeking Alpha* post or the Susquehanna

report. Reply 22. To the contrary, Plaintiffs stress that the Susquehanna report, like the

*Seeking Alpha* post, "report[ed] on Apache's stressed balance sheet and exceedingly high

net leverage," *id.*, but that demonstrates that the data and observations in both reports were

mere regurgitations of already-public balance sheet information released in routine SEC filings. Ex. A (Allen Rep.) ¶¶ 82-85; Ex. N (Allen Surreply Rep.) ¶¶ 63-64, 67-68. Susquehanna reduced its price target without even mentioning Alpine High, Nye Reply Rep. ¶ 45; Ex. O (Susquehanna Report), further demonstrating that the report reflected Apache's prospects in the midst of a pandemic and oil-price war, rather than any revelation of some prior misrepresentation about Alpine High. Notably, Susquehanna's new price target for Apache of $9.00 was more than 11.5% *higher* than the stock's then-current price of $8.07. Ex. O (Susquehanna Report) at 4.

The *Ramirez* court's treatment of a similar UBS analyst report is instructive. 2023 WL 5415315, at *20. The court found no price impact from the UBS report because it "merely summarizes parts of Exxon Mobil's third quarter earnings release and makes a recommendation based on that information; it does not offer any new corrective information to the market." *Id.* And "the mere reiteration of already disclosed information should not influence the price of a stock traded in an efficient market." *Id.*

*No reliable statistical significance.* Plaintiffs assert that statistically significant price movements "should end the inquiry." Reply 24. That is inaccurate under normal circumstances, *supra* at 9-10, and doubly so here, given the historic price swings in March 2020 as COVID-19 and an oil-price war roiled markets. Opp. 22-23. In fact, on March 16, 2020, market volatility reached an *all-time high* as measured by VIX, a commonly used volatility metric. Ex. N (Allen Surreply Rep.) ¶¶ 66, 71.

Plaintiffs claim that Allen did not analyze whether March 16, 2020 price movements were significant when controlling for increased market volatility. Reply 24. But according

to Allen's Surreply Report, using three methods to control for increased volatility, Allen found that all three result in no statistically significant price reaction following the March 16, 2020 alleged corrective disclosure. Ex. N (Allen Surreply Rep.) ¶ 74.

Dr. Nye purports to control for market volatility by using alternative control periods that are still far below the record market volatility on March 16. Ex. N (Allen Surreply Rep.) ¶¶ 72-73. The average VIX during Dr. Nye's original and five alternative control periods was 17%, 35%, 37%, 40%, 43%, and 48%. *Id.* The VIX on March 16, 2020 was 83%. *Id.* Even then, using the 48% control-period VIX with the alternative event study produces a non-statistically significant result. *Id.* Dr. Nye's purported adjustments do not fully account for the record-high market volatility on March 16, 2020, and they demonstrate that a full adjustment would yield no statistically significant price reaction. *Id.*

## IV.   Conclusion

Because Defendants have rebutted the presumption of reliance after February 22, 2018, the Court should deny the Motion to the extent it seeks to certify a class after February 22, 2018.

Dated:  September 8, 2023                    Respectfully submitted,

                                             BAKER BOTTS L.L.P.

                                             By:  */s/ David D. Sterling*
                                                  David D. Sterling
                                                  Attorney-In-Charge
                                                  State Bar No. 19170000
                                                  Federal I.D. No. 07079
                                                  Amy Pharr Hefley
                                                  State Bar No. 24046046
                                                  J. Mark Little
                                                  State Bar No. 24078869
                                                  Federal I.D. No 1487508
                                                  Anthony J. Lucisano
                                                  State Bar No. 24102118
                                                  Federal I.D. No. 3369146
                                                  Frank Mace
                                                  State Bar No. 24110609
                                                  Federal I.D. No. 3385915
                                                  910 Louisiana Street
                                                  Houston, Texas 77002
                                                  (713) 229-1946
                                                  (713) 229-7946 (Fax)
                                                  david.sterling@bakerbotts.com
                                                  amy.hefley@bakerbotts.com
                                                  mark.little@bakerbotts.com
                                                  anthony.lucisano@bakerbotts.com
                                                  frank.mace@bakerbotts.com

                                                  John B. Lawrence
                                                  Texas Bar No. 24055825
                                                  S.D. Tex. No. 3124414
                                                  2001 Ross Avenue, Suite 900
                                                  Dallas, Texas 75201
                                                  (214) 953-6873
                                                  (214) 661-4873 (Fax)
                                                  john.lawrence@bakerbotts.com

                                                  ATTORNEYS FOR DEFENDANTS APACHE
                                                  CORPORATION, JOHN J. CHRISTMANN IV,
                                                  TIMOTHY J. SULLIVAN, AND STEPHEN J.
                                                  RINEY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF on all counsel of record on this 8th day of September, 2023.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley