IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| IN RE | § | CASE NO. 4:21-CV-00575 |
| | § | HOUSTON, TX |
| APACHE CORP. SECURITIES | § | WEDNESDAY, |
| | § | DECEMBER 6, 2023 |
| | § | 9:00 AM to 5:34 PM |

CLASS CERTIFICATION HEARING

BEFORE THE HONORABLE ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PARTIES:              SEE NEXT PAGE

COURT REPORTER:              MAYRA M. MARQUEZ

COURT CLERK:                 RUBEN CASTRO

TRANSCRIPTION SERVICE BY:

Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396 ▼ www.veritext.com

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

FOR THE PLAINTIFFS:                SAXENA WHITE, P.A.
                                   David Kaplan
                                   505 Lomas Santa Fe Drive
                                   Suite 180
                                   Solana Beach, CA 92075
                                   858-987-4073

                                   KESSLER TOPAZ MELTZER &
                                   CHECK, LLP
                                   Johnston de Forest Whitman, Jr.
                                   Joshua E. D'Ancona
                                   280 King of Prussia Road
                                   Radnor, PA 19087
                                   484-270-1438

                                   AJAMIE LLP
                                   John S. "Jack" Edwards, Jr.
                                   Pennzoil Place – South Tower
                                   711 Louisiana Street, Suite 2150
                                   Houston, TX 77002
                                   713-860-1619

                                   DANIELS & TREDENNICK, LLP
                                   Douglas A. Daniels
                                   6363 Woodway Drive
                                   Suite 700
                                   Houston, TX 77057-1759
                                   713-917-0024


FOR THE DEFENDANTS:                BAKER BOTTS
                                   David Sterling
                                   Amy Pharr Hefley
                                   Sarah Eilers Coble
                                   One Shell Plaza
                                   910 Louisiana Street
                                   Houston, TX 77002
                                   713-229-1270

                                   BAKER BOTTS
                                   John B. Lawrence
                                   2001 Ross Avenue
                                   Suite 700
                                   Dallas, TX 75201
                                   214-953-6500

I N D E X

| WITNESS(ES): | DX | CX | RDX | RCX | FRDX | FRCX |
|---|---|---|---|---|---|---|
| ZACHARY NYE | | | | | | |
| By Mr. Sterling | | 36 | | 110 | | 118 |
| By Mr. Whitman | | | 102 | | 115 | |
| | | | | | 120 | |
| LUCY ALLEN | | | | | | |
| By Mr. Kaplan | | 122 | | 236 | | |
| By Mr. Lawrence | | | 223 | | | |

HOUSTON, TEXAS; WEDNESDAY, DECEMBER 6, 2023; 9:00 AM

THE COURT: Okay, good morning, everyone. This is the United States District Court for the Southern District of Texas. I'm Judge Andrew Edison presiding. We're here today on Case 4:21-cv-575, In re Apache Corporation Securities Litigation. Can I get formal introductions for the record, start with the plaintiffs, please.

MR. WHITMAN: Morning, Your Honor. Johnston Whitman from Kessler Topaz Meltzer & Check on behalf of the plaintiffs.

THE COURT: Hello, Mr. Whitman. Good to see you today.

MR. WHITMAN: Good to see you as well, Your Honor.

MR. DANCONA: Good morning, Your Honor. Joshua D'Ancona, Kessler Topaz Meltzer & Check on behalf of lead plaintiffs and the proposed class representatives.

THE COURT: Great.

MR. KAPLAN: Good morning, Your Honor. Dave Kaplan of Saxena White on behalf of lead plaintiffs.

THE COURT: Hello, Mr. Kaplan.

MR. EDWARDS: Good morning, Your Honor. Jack Edwards on behalf of the lead plaintiffs.

THE COURT: Hello, Mr. Edwards.

MR. DANIELS: Good morning, Your Honor. Doug Daniels on behalf of lead plaintiffs and proposed class representatives.

THE COURT:  Hello, Mr. Daniels.  Been a long time.

MR. DANIELS:  Has been.

THE COURT:  Anybody else on the plaintiffs' side?  Okay, on the defense side.

MR. STERLING:  Good morning, Your Honor.  David Sterling, Baker Botts, for the defendants.  And it has not been a long time.

THE COURT:  Fair enough.  Hello, Mr. Sterling.

MS. HEFLEY:  Good morning, Your Honor.  Amy Hefley with Baker Botts.

THE COURT:  Hello, Ms. Hefley.

MR. LAWRENCE:  Good morning, Your Honor.  John Lawrence, also with Baker Botts, for defendants.

THE COURT:  Hello, Mr. Lawrence as well.  Okay, did I miss anybody?  Okay.  Couple things.  One, I'm sorry to have to have to have -- to move this online.  I appreciate your accommodation.  I'm actually out of town.

My wife's having some medical tests.  The good news is that they found nothing.  The bad news is, we're trying to figure out what it is.  So, I appreciate your accommodations and I'm in a room where I will not be bothered at all today, and then fly back to Houston on the redeye tonight.  So, appreciate you all being accommodating.

Here's how I thought this hearing would proceed, and I know I issued an order on Monday thinking we'd start with

sort of a oral sur-reply, and I got Mr. Sterling's letter and thank you very much.  I had totally missed that and that is my fault, but the good news is by sending that letter Monday, I had 14 hours yesterday to read the sur-reply case law.  I'm prepared and ready.  So, no need to do that.  At least, my thought was this.

I have some questions I'd like to start off with, give you all a chance if you want to make a little opening or -- I mean, I've read everything, so -- but if there's anything else you think we add -- and then my thought is to head into the cross examination of the experts and then any final remarks.  But I'm happy, if you all want to do something differently, I'm happy to entertain that and do that.

Okay.  Fine.  Hearing none, let me start off then. The one thing that I did say I was going to give Mr. Sterling, Mr. Lawrence, Ms. Hefley an opportunity to do is sort of start off by responding, to the extent you want to, to the notice of supplemental authority and Judge Rosenthal's opinion in the Cabot case.  So, thoughts, comments?

MS. HEFLEY:  Sure.  I'm happy to take that one, Your Honor.  So, first of all, we think that any of the cases that cite the reasoning of the (indiscernible) Court's decision on statistical significance just are misunderstanding statistical significance.  That said, even Judge Rosenthal's opinion recognizes that the lack of statistical insignificance can be

some evidence of no price impact with other factors. And here, of course, we have no evidence of price impact, not only because some of the alleged corrective disclosures aren't statistically significant, but also because of the other factors which Ms. Allen has set out with respect to the alleged corrective disclosures.

Now, more broadly speaking, the Cabot decision does recognize that correctiveness is something that can be considered as class certification and then the price impact analysis, as we've argued in our brief. And otherwise, I think it's just an application of the balancing and weighing of the expert evidence that the Court had before her in that decision, so.

THE COURT: Okay. Let me ask you this. Both sides have tackled the three allegedly corrective disclosures monologue. And I guess I'm just wondering, should I be analyzing whether there's a lack of price impact from these disclosures in reverse chronological order? Meaning, let's assume, I agree for the sake of argument that defendants have proved no price impact based on the 2019 corrective disclosure. But I think that there is a price impact as to the March 16, 2020 collective disclosure.

If that's the case, aren't I still going to be certifying a class through March 16 of 2020? In other words, does it really matter? Do I need to address those 2019

corrective disclosures or should I start with the 2020 corrective disclosure?

MS. HEFLEY:  Your Honor, I'm happy to start on that one as well.  So, as you saw in the Ramirez v. Exxon decision, the Court meticulously went through each of the alleged corrective disclosures in that case.  That's the Northern District of Texas case that recently came out.  I think there were seven alleged corrective disclosures there.  The Court marched through them one by one and found that the first several did not -- I think maybe the first five were no evidence -- there was no evidence of price impact upon looking at those alleged corrective disclosures.

There was evidence of price impact with respect to the sixth, but there wasn't with respect to the last.  And so the Court made clear that all it was certifying a class of perspective was the one alleged corrective disclosure that fifth or sixth one and it cut off the class period as of that date.  So we do think you have to go through each of each of the alleged corrective disclosures.  Looking at it from the perspective of the --

THE COURT:  I don't understand that, though.  If I find, hypothetically, if I find the March 16, 2020 disclosure, there is -- and I usually say that Courts go through them all the time.  I'm just trying to think practically.  If I find from the March 16, 2020 disclosure that there's a price impact,

it doesn't matter the earlier ones, right?  The class would go to March 16, 2020.

MS. HEFLEY:  I think it still matters, though, for knowing -- so as we said in our sur-reply, each alleged misrepresentation is an independent claim that the Court is to analyze.  And so when the Court looks at -- on it misrepresentation by misrepresentation, whether there is a price impact shown with respect to the alleged misrepresentation, you do have to look at, for example, the alleged misrepresentation during the class period and determine whether the alleged corrective disclosures that we're talking about here are evidence of no price -- whether there's no price impact shown by those.

The other practical reason that matters is for the class that you're certifying, you know, which alleged misrepresentations and which alleged corrective disclosures are part of the certified class is going to matter for, you know, discovery going forward.  So, for example, the Steve Keenan alleged corrective disclosure, the announcement of his resignation.  The Court has to look at that and determine whether it is, in fact, you know, evidence of -- it shows no price impact or not when it decides whether it certifies a class and whatever decision is made on that will affect the way this case is handled going forward.

MR. D'ANCONA:  Your Honor, if I may be heard for the

plaintiffs, Joshua D'Ancona.  I believe your suggestion is correct and that's because the question today is about what is the scope of the class that Your Honor is being asked to certify.  Does it end when we say it ends on -- in March of 2020?  Does it end sometime earlier because of a failure to establish price impact on a corrective disclosure that defendants have suggested should be found here?

Wherever -- if Your Honor were to find that the final corrective disclosure is founded and does imply a price impact, you can stop your analysis there.  There are some Courts that go no further once they found a compelling presence of price impact in the dates that they study, for the reason that Your Honor suggests.  There's an efficiency there, first of all.

Second of all it's the preponderance of the evidence standard.  And when you've seen enough and you're seen enough to certify the class and find the presumption has not been rebutted for the class period, you can stop.  You don't need to go minute by minute through the class period.

And third of all, there's the fact that merits discovery on loss causation, on damages, full blown merits expert testimony on all of these issues and whether these were in fact loss causation events, that is for later.  You don't have that before you right now.  You have sort of loss causation life.

You have a few arguments that tend to overlap with

the loss causation argument that will really allow you or the jury to decide whether these corrective disclosure dates are in or out if, liability gets us to that question, but to decide them all today, even when you've answered the bottom line question of this inquiry, which is what is the class that I'm going to certify today, when does it end, is not well supported when you have the merits discovery phase, which really should properly support any analysis of loss causation and whether these corrective disclosures are in or are out and the full discovery that will go with that coming down the pike under Your Honor's schedule.

Now we do, of course, see in these cases that several of them do go corrective disclosure by corrective disclosure and evaluate them and respond to all the parties' arguments, work through them.  I think one critical difference between this case and those cases, Your Honor, is the fact that in this case, we have uncontested front-end price impact, uncontested inflation from the very start of the class period.

And that uncontested front-end price impact covers the first 18 months of the class period in which there were 26 misrepresentations that Your Honor and Judge Hanks sustained. There's no argument that there is no price impact for those 26 misstatements.  And as Your Honor, recognized in the motion to dismiss ruling, the story here that was announced on day one about this phenomenal play, highly economic under low commodity

price conditions, and so forth, that story was essentially just repeated for the rest of the next three years.

Defendants told the story on day one and they said, hey, this story is good.  This story remains intact.  Stick with us for the rest of the class period.  So, we've got 26 uncontested price impact front-end misstatements through the first 18 months, which are in sum and substance repeated in the last two years.  The defendants have kind of lopped off and tried to challenge here, but no one shows that the price impact from the first 18 months ever went away, Your Honor.

There's no proof in this record and we think this is absolutely fatal to defendant's challenge here and supports the proposal that Your Honor is suggesting about how to treat this. There is no evidence in the record from defendants, let alone from our experts, that the price impact, the price inflation that was established in the first 18 months of this class period, which again is uncontested, went away before the focus period at February 22, 2018.  All of a sudden the next day it was gone?  There's no evidence of that.

THE COURT:  So let me ask -- let me ask you -- hold on.  Hold on.  Hold on.  I understand the argument.  But in the sur-reply, that's sort of the way the sur-reply starts, right? It says, plaintiffs make an extraordinary claim.  If taken seriously, the logical consequence of their position is that if they can demonstrate price index for any alleged

misrepresentation for any period, then that immunizes the rest of their desired class period from scrutiny and entitles them to an unlimited class period.  I'm curious as to your response to that.

MR. D'ANCONA:  Right, they take the sort of extreme example and they say this can't be right and in some cases that might not be right, but on the facts and the claims here, Your Honor, what we've got is uncontested, front-end inflation -- a lot of it -- 26 misrepresentations with uncontested price impact.  There is no proof that that is ever removed from the stock price before the COVID period begins.

The only evidence and the -- and that's certainly our claim -- certainly our claim.  It was in the stock price at the beginning.  It was maintained through repeated misstatements and there were some corrective disclosures along the way that partially removed it, but it remained until the end.  There's no contrary evidence that it was ever out of the stock price before the focus period begins, and so what we've got is the situation in the Chicago Bridge case, Your Honor, which is in our reply brief.

Defendants respond to it in their sur-reply brief, and in that case, the Court found somewhat similar to actual situation.  There was actually a two-part fraud there, not this one-part fraud here with one story.  But in any event, the Court said that there were front-end misrepresentations that

were not contested for some of the -- for some of the fraud types in that case.  As to those uncontested front-end misrepresentations and the question of price impact, once that was conceded, once it was not contested that there was price impact for those statements, defendants were not entitled to try to challenge them at the back end.

The concession, the evidence, the fact of front-end price impact answered the question of price impact for those misrepresentations and the corrective disclosures that went with them and that holds here.  And that's for the very simple reason that as Goldman Sachs and the Supreme Court says, that so many of the cases say, the purpose of the backend price impact increase is to see whether front-end price impacts may be implied in the first place.

Where it's proved as it is here, where it's not contested as it is here, there's no reason to look at the back end to imply it.  So you don't go -- and this is Chicago Bridge -- you don't need to go on to look at the back end, test the back end, when you've got the front-end established.  And we have it here.  We have it established, Your Honor, and they'd be uncontested for all of the 26 misstatements in the 18 months, in the 18 months that begin this case before defendants sort of draw their focus period and begin their focus period.

And that set of misstatements is effectively repeated during the focus period.  There's no reason to think that the

price impact that existed in the first 18 months all of a sudden went away. There's no proof that it went away. They have not proved it with empirical evidence, which is what they would need to do if they ignore it. They instructed their expert to just leave it alone and not even address it.

And so that's the situation that we have from Chicago Bridge where the front-end price impact is intact. It relates to the back end and there's nothing severing that.

THE COURT: Okay.

MR. STERLING: Your Honor?

THE COURT: Mr. Sterling.

MR. STERLING: Yeah, I'm sorry, Mr. D'Ancona has been filibustering on an unrelated point. First and foremost, there is no requirement that defendants establish or prove that the front-end price impact has all been dissipated prior to a corrective disclosure or period that they're challenging. All we have to do is -- the words of the Supreme Court in Halliburton -- sever the link between the misrepresentation and the price.

And all we're doing is what the Court did in Halliburton on remand, Judge Barbara Lynn, or what the judge did in Ramirez, (indiscernible) as Ms. Hefley will explain. That's all our burden is. It is not to prove that all of the private front-end price impact has been dissipated either before the focus period or after or some other time. All we

are saying is that these corrective disclosures during this period do not demonstrate price impact on the back end; therefore, there's no front-end price impact either during the class period.

At some point in time, the inflation came out.  It couldn't come out before; it couldn't come out after.  All we're saying is that these alleged corrective disclosures are not evidence of price impact.  I'll let Ms. Hefley talk about the (indiscernible) case since we argued it.

MS. HEFLEY:  And first of all, Your Honor, I think it is worth pointing out that the alleged misrepresentations that they complain about early in the class period, so the pre-focus period misrepresentation, I think Dr. Nye says there's something like 14 percent increase in the stock price after the September announcement.  So 14 percent up.

And then I think he says that when the first alleged corrective disclosure happens and the second alleged corrective disclosure happens, so both pre-focus periods, there is something like a seven percent drop and an eight percent drop. So that's what plaintiffs are alleging before the focus period even starts.

Now, with respect to the focus period, just like in Chicago Bridge and Iron, we had alleged misrepresentations that the plaintiffs are saying are price maintenance misrepresentation, meaning they didn't cause the stock price to

go up during the focus period. Judge Sheindlin and went and looked at the corrective disclosures alleged in that case and analyzed them. So it's not like she concluded that there were some alleged misrepresentations with front-end impact and so she didn't have to do anything else for the rest of the class period. That is not what happened in Chicago Bridge and Iron.

MR. D'ANCONA: Your Honor --

MS. HEFLEY: And I think it's also -- let me --

THE COURT: Wait, hold -- wait, hold on. I'm going to give everyone an opportunity to talk, okay, so please do not interrupt. Let Ms. Hefley finish. I will give you a chance. I let you go. Please afford her the same courtesy. Ms. Hefley.

MS. HEFLEY: Thank you. So, there are three categories of alleged misrepresentations here, according to Dr. Nye, kind of how he's bucketed them. We have categories. The first category with Alpine High being a transformational and well (indiscernible) play that would drive growth and returns to the company. So, that's bucket one. Bucket two are statements about the mix of oil and wet gas and dry gas at Alpine High, so the mix or the ratio. And then bucket three relates to Alpine High being economic even at low commodity prices, specifically low gas prices.

Those are the three categories. When the Court asked earlier about the last alleged corrective disclosure and

whether you can just look and stop the analysis there if you conclude it is evidence of price impact, I think even Dr. Nye admits that last alleged corrective disclosure, which is the, Seeking Alpha blog post, has nothing to do with the mix of oil and gas at Alpine High, for example.

So, that last alleged corrective disclosure had no new information about the oil and gas mix, which is why the Court would have to look at the earlier alleged corrective disclosures.  And it -- had I done an opening this morning, I would have walked through them in that order, starting with the last one, Seeking Alpha blog post and working backwards.

Because I think a critical point that the Court must understand is that Seeking Alpha blog post, which Dr. Nye said, you know, somehow reveals something about Alpine High not being world class anymore or not driving revenue for Apache, that came roughly three weeks after Apache announced a $3 billion impairment on Alpine High.  Dr. Nye did not claim that that impairment was an alleged corrective disclosure and the reason he didn't do that is because there was no stock drop when that announcement was made.

And that's because that news was not unexpected.  Already known.  The notion that the market had no idea that, you know, Alpine High was not what the plaintiffs are claiming defendant said it was during the class period and they suddenly figured that out with something that was disclosed two weeks

later, just is not credible.

So, we think that is why you have to -- you can and should start with that last alleged corrective disclosure but work your way backwards through the three corrective disclosures we're challenging during the focus period to see why none of them are evidence that there was still any kind of impact on the price from the alleged misrepresentation, whatever the claim.

THE COURT:  Got it.  Okay.  Mr. D'Ancona.

MR. D'ANCONA:  Thank you, Your Honor, and I apologize for interrupting.  It won't happen again.  So, let me take a few points there in order.  One, Ms. Hefley pointed to the 14 percent up and then the seven percent and eight percent down on the next two corrective disclosures.  Of course, the percentages are a function of the stock price on the given day which is obvious.

If we look at the -- just the dollar movements on those days, the 14 percent up accounted for something like $7.75 of inflation.  The drops on the first two corrective disclosures, if you add them up, add up to something like $6.  So, just dollar for dollar, which is the way to look at it, there's really no argument that all of the inflation that came in at the beginning was out empirically shown by these price movements.

There's still $1 to $2 left of inflation if we're

just going on the gross numbers and of course, damages have not been analyzed yet here, Your Honor, so I'm not claiming that those are the actual damages numbers, but I'm just saying that's the right way to look at that question not this percentage proposition that was just put forward.  There was still $1 to $2 left, equated to just a dollar analysis.  So that's one point.

On the Chicago Bridge point, Judge Sheindlin, who was the special master in that case, wrote a report recommendation and Judge Schofield, the District Court judge there, they actually said that the consequence of the fact that there was uncontested front-end price impact for some of the corrective -- for some of the misrepresentations about one bucket of fraud, was clear.  It meant that price impact was proved both for the uncontested front-end statements and the misrepresentations like them and the back end corrective disclosures that related to them.

For those, the inquiry was over.  Defendants were not entitled to try to prove that the corrective disclosures that related to the misrepresentations that were not contested did not have price impact.  And that's what defendants are trying to do here.  The price impact at the front-end established that the related corrective disclosures had price impact and that was it.  So that's the -- that's both opinions in the Chicago Bridge case, the reported recommendation and the District Court

opinion, Your Honor.

We also have cases like Mattel, In re Mattel, which is in our reply brief. Defendants did not respond to it in their reply brief. We have Prudential Financial, which is, same story. And we have Acadia which is a Middle District of Tennessee case that then goes to the Sixth Circuit on a 23(f) petition. Now, these are maintenance cases.

They're not like this case where we actually have front-end price impact that's conceded, but they show an important and related point here, which is that when a Court has seen a compelling amount of price impact in the dates it examines, it can be satisfied that the presumption is warranted by a preponderance of the evidence.

So in Acadia, for example, Your Honor, the District Court found that it -- that conceded price impact around the first of three corrective disclosures was evidence that rendered the remaining two corrective disclosures and defendant's arguments that they didn't have price impact, uncompelling.

The Sixth Circuit found no error in that ruling. In Mattel, which again, defendants did not respond to, the Court also found that price impacts for the first corrective disclosure implied price impacts for the misstatements it related to and it didn't go on to review the second corrective disclosure. It had seen enough. And our facts here are even

stronger, we would submit, Your Honor, than those in Chicago Bridge and these other cases because we have this front-end inflation from the fraud.  No evidence it was out of Apache's price by the start of defendant's focus period.  It's still there and 26 misstatements where price impact is uncontested.

And second, because this case involves one claim by defendant.  It was one story that they basically repeated in sifting to the market that Alpine High, the story they told on day one, remained intact.  It was fundamentally intact and the play was coming.  That's the story they told them on day one and that's the story they told them in 2019, where we have all this uncontested front-end price impact, 26 misstatements, largely repeated, price inflation that is never shown to go away, and related backend corrective disclosures.

There's no need to look to see if the front-end inflation is replied, we -- implied.  We think that these cases show the proper course of action and are absolutely fatal to defendant's attempt to show no price impact in the back end. They can't show what happened to all the price impact that was there, uncontested in the front-end.  It never stops.  They don't get to cut this case into two pieces and act like it's two different things.  This is all one story.  This is all one claim.

THE COURT:  Okay, let me ask this.  The -- and maybe this doesn't really matter, but the Seeking Alpha corrective

disclosures, it's really Seeking Alpha and -- I'll butcher the name -- Susquehanna report.  It's really all -- it's one and the same.  I mean, I'm -- it's both of them together for the corrective disclosure.  Isn't -- from the plaintiffs' side?

MR. D'ANCONA:  Well, it certainly is, Your Honor. They both come out before the open that day.  They're very consistent with each other and the Susquehanna report -- Susquehanna is a well-known investment analysis that covers this case and many others.  The Susquehanna report is the type of information that defendants are pointing to.  It's the type of analyst report that defendants point to as relevant price impact evidence in other parts of their argument.

And it includes a downgrade and it's a downgrade of Susquehanna's judgment, an opinion of Apache and two other oil and gas companies, and a lowering of its target price from somewhere in the 30s to $9.  So, it is a piece of new information that reaches the market before open on that day and it is absolutely a part of the corrective disclosure.  It's in our complaint.

And you know, the other two pieces of information that happened on that day are a uncontested, statistically significant stock price decline at something like 100 percent confidence level, and there's no other news about the company that comes out that day, company specific news.  The defendants kind of point to some other you know, broader macroeconomic

events that are happening and of course they are, but of course, those are exactly what these regression analysts filter out and what the index comparisons in these regression analyses filter out.  So those are accounted for in the analysis that the experts do.

THE COURT:  My question was simply, do you view the Susquehanna report and Seeking Alpha as one corrective -- so, I got it.  Mr. Sterling?

MR. D'ANCONA:  Yes.

MR. STERLING:  Yeah.  Just, thank you.  Thank you, Your Honor.  A couple points.  First and foremost, it kind of begs the question of what is a collective disclosure or what can be a corrective disclosure.  The Susquehanna report does not even mention Alpine High.  Doesn't even mention it.  Doesn't say, we disagree with how much oil and gas is there or changing the oil and gas mix.  We have a different view of it.  Doesn't even mention it.  Susquehanna downgraded Apache and a number of other E&P companies simply because -- and this is explicit in the Susquehanna report -- Susquehanna's views of oil and gas prices, commodity prices going forward.  How can that be a corrective disclosure?

Similarly, the Seeking Alpha report mentions Alpine High once, only in the context of saying it is a "less gas rich play," which is the exact opposite of the (indiscernible) in this case.  The Seeking Alpha report is negative on Apache

because it talks about Apache's debt load and its debt-to-equity ratio, all of which was taken from Apache's quarterly SEC filings. And the fact that Apache had over $8 billion worth of debt was not a new revelation from the Seeking Alpha report. It was known the quarter before, the year before, two years before, from Apache's own SEC filings.

If Seeking Alpha says anything, if Seeking Alpha's revelation about the debt load of Apache moved the market, that is proof that the market for Apache stock was not efficient. So, we don't see any way in the world that whether -- they can call whatever they want, a corrective disclosure for the purposes of today.  They didn't call the Susquehanna report corrective disclosure in the complaint.

Fine.  We don't care.  There's no way in the world that either Seeking Alpha or Susquehanna can be viewed as a corrective disclosure when they don't even mention Alpine High and there's nothing in them that suggests that anything that Apache ever said about Alpine High itself was untrue at the time.

THE COURT:  Okay.  So, that actually leads me to my next question, which is, given the plaintiffs' response when we're talking about the Seeking Alpha and the Susquehanna report, plaintiffs say Seeking Alpha article and the Susquehanna report synthesized disparate information about Apache's financial condition and concluded it was in the worst

financial position relative to its peers, et cetera, et cetera. And my question is simply this. What disparate information was the Seeking Alpha article synthesizing and why is that not just merely a regurgitation of publicly available information?

MR. D'ANCONA: Well, Your Honor, I will answer this and I'm sure that our expert Dr. Nye will be asked these questions as well and can fill in even greater detail.

But I think it's clear that both the Seeking Alpha article and the Susquehanna article, the -- report that comes the same time are synthesizing information regarding the debt to equity ratio, the EBITDA, and the other factors that show that due to its leverage, due to its sort of extraordinary capital expenditures that led -- according to our theory -- to very poor outcomes at Alpine High, Apache finds itself relative to its peers in the E&P industry in a laggard position at the back of the pile, at the back of the race.

And that is actually something that the Susquehanna article does point out. I think Mr. Sterling just said it talks about oil and oil and gas price impact on the entire industry, and that's true, but it doesn't downgrade the entire industry.

It downgraded Susquehanna and maybe two other peers leaving the other roughly 20 in the same position or better. It shows that Apache, due to the way it has handled its key project, first and foremost, Alpine High, according to our

allegation, which turned out to be a robust failure over the last three years and allocated its capital expenses and leveraged itself and run up debt with nothing to show for, is not in this advantaged, competitive position that it claimed in false statements that we alleged, Your Honor, and that are sustained in this case again and again, that Alpine High was going to put it -- was going to place it in the superior position relative to its competitors because of all that it had to offer and all these commercial viability that it had and that it promised.

Here, we find the end of the story. At the end of the day, it's behind all its competitors. Alpine High has left it at the back of the pack. It is overleveraged. Its balance sheet is in tatters. It's got way more debt than its peers. And as a result, key analysts who are watching this space are downgrading it while leaving everybody else intact. So, that's the way the story fits together from our perspective and that's the information that we believe was synthesized and put out to the market in an important report from an analyst that covers the industry.

THE COURT: Okay. All right. Was that --

MR. STERLING: That was the end, Your Honor.

THE COURT: Okay.

MR. STERLING: John, if we would put the Susquehanna report up.

THE COURT:  And I'm glad you mentioned that.  By the way, I've given everyone total access so you're -- if there's anything you want to share.

MR. STERLING:  Can you expand that, John?

Your Honor, this is the Susquehanna report.  The sum and substance of Susquehanna's analysis is in the call-to-action paragraph right there.  If oil markets are likely to remain oversupplied, we're changing our 2020-2021 WTI I price assumptions, 3740 blah, blah, blah.

They're also using HH -- Henry Hub -- natural gas assumptions to approximately 2.15 to 2.50 versus (indiscernible) 2.60 which is (indiscernible) pricing, this, the lower pricing assumptions that leading to a neutral rating on Apache, Novo, and Occidental while upgrading (indiscernible) to a positive rating.  The rating changes will primarily (indiscernible).

THE COURT:  Cabot Oil.  Cabot Oil again.

MR. STERLING:  I'm sorry, yes.  That's the extent of the analysis and information.  It has nothing to do with Alpine High per se, simply the market and the prices into which Alpine High sells along with OXY, Occidental and Novo.  This is -- there's no new information about Apache or Alpine High at all in here.  It's simply, this is 100 percent driven by Susquehanna's view of forward oil and gas prices.

Similarly, the Seeking Alpha article talks about the

debt load.  The debt load came straight from the quarterly SEC filing, the 10-Qs and 10-Ks, and we can show you -- I'll show you another one.  This was covered during that year.  John, can you put up the Cowen report, Exhibit 18, from April 2019, Page 23 of this.

MR. D'ANCONA:  Just, before you move on, can we see the second page of the Susquehanna report?

THE COURT:  Hold on.  I'm going to let you make every argument you want.  Just common courtesy is let Mr. Sterling give his position.

MR. STERLING:  Load this up John.  (indiscernible). Apache's balance sheet and cash flow starting from first quarter 2018.  A is actual.  Let me get to the estimate.  So, the first quarter 2018 A, looking down, long term debt. (indiscernible) from the bottom.  The first quarter, 7.9 million.  Second quarter of 18 -- $8 million -- $8 billion, then it goes over $8 billion, stays over $8 billion.

The fact that Seeking Alpha a year later says, sacré bleu, Apache has $8.16 billion of debt, this was known by everybody in the world well over a year before that.  There was absolutely no new information there.  And then Mr. D'Ancona wanted to look at the Susquehanna report.  John, if you can put that back up.  Susquehanna report, John?  Oh, got it.

We see on the -- under highlights, so we are lowering price targets across the (indiscernible) numbers, which are now

based upon the new price assumptions.  And you can see on the rating, it's got price targets, prior and current, other than Cabot.  We looked at all those dots across the board.  Does this have anything to do with those companies' oil and gas mixes?  No.  Did it have anything to do with the recoverable reserves?  No.  This was 100 percent driven by the Susquehanna view of forward oil and gas prices.

THE COURT:  Okay.  Mr. D'Ancona, please.

MR. D'ANCONA:  There is a second page, Your Honor, to the Susquehanna report that -- that's Page 1.  Then if they could just put up Page 2, I think we'd see additional language about Apache.  I can also read it into the record, but it's in the exhibit.

THE COURT:  Well, put up -- I'm looking at it on my screen, but put it on -- if you don't mind, Mr. Lawrence --

MR. LAWRENCE:  -- back up right now.

MR. D'ANCONA:  And my point, Your Honor, is simply that there is just more.  So here we go.  Highlights.  As -- I think contrary to what we just heard from Mr. Sterling, there is additional discussion about Apache here, clearly.  They're downgrading Apache and two other companies to neutral.  This relates to balance sheet uncertainty about oil prices which would apply to the whole industry, of course, but also to balance sheet prices.

THE COURT:  But let me ask you this.  Isn't that Mr.

Sterling's entire position, that it had nothing to do with Alpine High, but just general pricing that has to do with the entire market?  I mean, in other words, yes.  It does say Apache.  It mentions Apache, but why does that make a difference?  What does that have to do with the corrective disclosure (indiscernible)?

MR. D'ANCONA:  So, to answer that question first, our position is that the complete failure at Alpine High, which the defendants had to kind of wind down and write down altogether in a matter of months at the end of 2019 and early 2020 just, you know, a month or two before this, left Apache in a very bad position in terms of its ability to deal with the debt that it had, most -- much of which came from pouring billions of dollars into Alpine High, and to look forward to capital expenditures that would carry it into the next hopefully successful play.

And the paragraph here goes on.  So, it's more than just oil and gas market conditions.  Those would affect all of these companies equally.  Who's best positioned to deal with it?  Who's burdened by debt and leverage and won't be able to make moves and take new actions and who a balance sheet that allows us to pour capital expenses into the next project that could be promising?  Apache's in the former category because of Alpine High.  This is a real book end to the story and we see it as such and further information about that, Your Honor, is

further down in that paragraph where they talk about net leverage exceeding 3X by the end of 2021, while all three companies announced activity reduction -- activity reduction there is a reference to Alpine High. That's the activity reduction that Apache had just announced. And Apache and OXY have already slashed dividend payments. Additional cutbacks may be necessary.

So, you know, we do see this as this is the aftermath of Alpine High. This is the market sort of saying the final nail in the coffin. We are downgrading this company even further because look what this mess -- look at this mess that they're in based on this complete bust, which was three years ago told us was going to carry us with strong shareholder dividend and cash flows for years to come. So that's how we see it, Your Honor.

THE COURT: Okay. Let me ask this. If you'd just take down that, Mr. Lawrence. Thank you. Just for a big picture, I mean, obviously, once the basic presumption is established, it can be reported if the defendant in this case proved by a preponderance of the evidence that the alleged misrepresentation did not affect the market price of stock.

And at the end of the day, my task, I think as (indiscernible) says, simply is to assess all the evidence of price impact and determine in my view whether it is more likely than not that the alleged price -- that the alleged

misrepresentation had a price (indiscernible), right?  That's the standard.  It's a preponderance of the evidence, a more likely than not test.  Agree on both sides?

MR. D'ANCONA:  Yes.

THE COURT:  Okay.

MS. HEFLEY:  We agree with that.  Your Honor, may I just briefly add, though, I think when the Court -- what we are focused on is whether we have severed the link, and that's the language in Halliburton II.  Have we severed the link between the alleged misrepresentation and the stock price?  And that's what we've done with our evidence during the focus period is sever whatever link there may have been before, was severed by the time of the focus period.  And so that's where we've shown that it's more likely than not there's no price impact during the focus period.

THE COURT:  Right.  Which case are you referring to?

MS. HEFLEY:  Halliburton II, Your Honor, from the Supreme Court.

THE COURT:  It's also Basic, right?  Basic says --

MS. HEFLEY:  It's --

THE COURT:  -- that severs the link between the alleged misrepresentation and either the price received or paid by the plaintiff or his decisions created upon fair market -- I mean, it's consistent in all those cases.  I understand.

MS. HEFLEY:  Exactly.

THE COURT: Got it. Okay. Anything anybody wants to say before we start with the cross examination?

MS. HEFLEY: I think the only thing I might like to do briefly, Your Honor, is put in context the Susquehanna report that we were just looking at. If we could pull up the plaintiff's complaint, just because that timeline again is so important. It's on paragraph -- so the Susquehanna report, March 16, 2020 you know, right when the fallout from COVID is beginning to be felt, as those of us in Texas who had spring break plans that year all know because we had to cancel them. That was just kind of the peak of the early news here.

In Paragraph 106 of the complaint, plaintiff characterized Apache's announcement of the impairment, if we can maybe blow that up, John. Thank you. And they say in Paragraph 106 that, you know, Apache announced the staggering amount of the impairment that wiped out the company's profit and that there were no drilling rigs at Alpine High.

And then, they go on to quote a Bloomberg article from the next day that's called "Apache called it quits on Alpine High after a $3 billion write-down." The notion that the market somehow learned something new about the situation weeks later and that Seeking Alpha blog post or the industry Susquehanna report just makes absolutely no sense. According to the plaintiff's own allegation. And again, they didn't call this one an alleged corrective disclosure because the price did

not go down in response to this news.

THE COURT: Okay. Sort of wait -- I was waiting here for something else, but --

MS. HEFLEY: That's it.

THE COURT: That's it. Okay. Short and sweet. I got it. Okay. Anything else from the plaintiff before we start the cross examination?

MR. D'ANCONA: No. Thank you, Your Honor.

THE COURT: Okay. So, let me say this. I have in front of me -- and I have, believe it or not, I have read and I must admit that I've mis-analyzed, I guess, the situation. I did not think when I suggested testimony ahead of time that I would get such lengthy testimony from both sides, but I probably should have expected that. But I've read it, so you know -- but the whole purpose of this, as I mentioned before, is in many ways, I think the real show begins with the cross examination because you sort of know what the person's going to say based on the rest of the report, on the direct examination.

But I spent the time to read it, read it. So let's start with cross examination. It seems since it is plaintiffs' motion, it seems to me -- unless you all disagree, that Dr. Nye will be the first one to go. All right.

MR. D'ANCONA: That's fine, Your Honor.

THE COURT: Dr. Nye.

DR. NYE: Good morning.

THE COURT: Sir, how are you?

DR. NYE: I'm well, Your Honor. How are you?

THE COURT: Great. Do me a favor. If you would raise your right hand. Do you swear the testimony you're going to give in this Court proceeding today is the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Okay. So, to start off, I have -- which has been filed in this case, a direct examination with reference to various exhibits. It's called the Direct Testimony of Zachary Nye, PhD. It's dated November 29, 2023. I assume you have -- well, I'm not going to assume anything. You have looked at that, reviewed that, and I want to make sure that you adopt the -- that testimony as your testimony here today, under oath, under the penalty of perjury; is that correct, sir?

THE WITNESS: Yes, it is.

THE COURT: Okay. With that said, I'll turn it over to the defendants for cross examination.

MR. STERLING: Thank you.

CROSS EXAMINATION OF ZACHARY NYE

BY MR. STERLING:

Q   Good morning, Dr. Nye

A   Good morning. How are you?

Q   Fine, thank you. Can you hear me okay?

A     I can.

Q     Great.  So, let's start with some fraud on the market basis, shall we?  Where did you go?  There you are.  Would you agree that the fraud in the market hypothesis is premised on the notion that in an efficient market, the stock price rapidly impounds new material company specific information.

A     Obviously, the key word there is rapidly.  I think that it describes -- it's described in Halliburton II that it's based on the premise that most market professionals are aware of and consider markets -- or the relevant corporate disclosures and thereby affecting price.

Q     I'm sorry.  Are you agreeing with my statements or not?  I couldn't tell from that answer.

A     Oh, it's just the nuance of how -- what is rapid, and it's -- as I described in my direct testimony, it's -- and my career.  It's not necessarily instantaneous.  Sometimes it can be very quick.  Sometimes it can be one day.  Sometimes it can take longer.  I've encountered all of those scenarios multiple times but I --

Q     Who is Eugene -- I'm sorry.  Who is Eugene Fama?  Who is Eugene Fama?

A     He's a very famous financial economist out of the University of Chicago.  I think he won the Nobel Prize a few years ago.

Q     And he's kind of a guru on official marketing hypothesis;

is he not?

A    He is.

Q    And in fact, you cite to him many times, haven't you?

A    I have.

Q    And doesn't Dr. Fama say typically in an efficient market, the market reacts within one trading day?

A    He says that's a fairly typical result.  He does not say that it reacts completely within one day, but it does react commonly within one day, especially --

Q    Right.

A    -- typical corporate announcements, like earnings, quarterly or annual earnings announcements.

Q    Yeah.  So back to some (indiscernible) market basis. Would you agree with me that under the efficient capital markets hypothesis, which predicates the (indiscernible) market theory, that only new news should affect the stock price?  Old news should not.  Would you agree with that?

A    Yes.  Generally speaking, that's true.  Just, you have to be careful about what is new and what's old and sometimes people mistake the -- what is new versus old.

Q    And in fact, if old news is moving the stocks, right, that is evidence that the market for the stock is inefficient, correct?

A    Again, in a vacuum, if you will, like -- it's true.  Like, I mean that in like a very rigorous scientific setting, it just

-- you have to be careful about what is old versus new information and -- by studying records.

Q   Right.  But if in fact, old information such as a company's debt load, which has been repeated in SEC filings is moving the market, that is evidence that the market for the stock is not efficient, correct?  All other things being equal.  Correct?

A   All else equal, if there's no -- yes, that's true if you just assume everything is all else equal, but the problem is that there's always -- there's always this built-in expectations of investors that's evolving over time.  And so (audio glitch) evolving conclusions about the impact, say, what's relevant here is the net debt -- net debt to EBITDA ratio which is basically in this case Apache's ability to pay off debt.  And yeah, there's -- we'll talk about it in Susquehanna, I'm sure, there.

Q   Let's simplify it.  If an analyst comes out and says, whoa, Apache has $8 billion worth of debt and the allegation is that's a corrective disclosure that moved the market, when in fact that $8 billion worth of debt was reported in the public filing a month, two months, three months before, that would be evidence, if in fact the revelation of the debt load in the analyst's report moves the market, that would be evidence that the market is inefficient for the stock, correct?

A   Not necessarily.  It could be, but $8 billion in debt in

one time period may be no big deal, and then a sudden shift in macroeconomic conditions might make it a very serious deal. And so that it might be something that is relevant to the company's price change on a given day down the road.

Q    But let's try my question again.  If, let's say Morgan Stanley comes out with a report that says we are downgrading Apache because of their debt load.  It's got $8 billion worth of debt, and that moves the stock down.

If in fact, that debt load was -- had been publicly reported by the company months before, that's not evidence (indiscernible).  If in fact the Morgan Stanley report moves the market because of the debt load comment, that in fact is evidence that the market for the stock is not efficient. Correct?  Because that information is publicly known well before.

A    It may be, but it's also widely known and there's many articles to the fact that analysis' discussions is not justifications of opinions.  I mean, in your hypothetical, if Morgan Stanley, if they think this is a real problem, then the analysts -- and they downgrade stock today, then that can be new  relevant information that can affect stock prices in its own right.  So, it's not necessarily true that it is inefficient if the stock price changes (indiscernible).

Q    Okay.  Let's try another term.  Corrective disclosure. You're not a lawyer, correct?

A    Correct.  Yes.

Q    But you're familiar with the term corrective disclosure as used by Courts in securities class actions, are you not?

A    I am, and I also know that it kind of varies, depending on the setting, but generally speaking, I am.

Q    Well, in your direct testimony on Page 14, you say that a corrective disclosure is anything that "relates to" an alleged misrepresentation, correct?

A    I believe so.

Q    That's called a corrective disclosure, not a relational disclosure, right?

A    No, that's what the term is.  Yeah, you're right.

Q    So, if Apache had come out and said, we think Alpine High has more oil now than we thought before, that certainly relates to an alleged misrepresentation, wouldn't it?

A    I mean, it would relate to the oil reserves or levels. Sure.

Q    But how could it possibly be a corrective disclosure? What is it correcting?

A    I don't have an opinion necessarily what's it's correcting.  My understanding is that information that's related to or causally connected to the prior misrepresentations can be evidence of (indiscernible) and I suppose the trier of fact has to determine that to be corrective.

Q    But if Apache came -- so, here we have allegations of misrepresentations about Alpine High in this case, correct?

A    Correct.

Q    So if Apache came out and said, whoa, Nelly, we think we've got more oil in Alpine High than we thought before, that would certainly relate to the misrepresentation, wouldn't it? Under your relates to test, that would relate to it, wouldn't it?

A    I don't really understand how you -- if it would or not. It seems like it might not, because the misrepresentation would be that they had less oil in the ground than stated, but if they had more, it's related to the level of oil for sure, but I'm not sure that's related to the misrepresentation.

Q    It certainly wouldn't be corrective, would it?

A    I don't know.  I'm not a lawyer.  My understanding is that's for the trier of fact to determine.  I can provide economic evidence that's hopefully helpful to that determination.

Q    Okay.  So we will look at some of our (indiscernible) in a little bit, but first, I want to talk about your analysis on market efficiency, because in your first report, you will find that based upon your analysis, the market for Apache stock during the class period was efficient.  Correct?

A    Correct.

Q    And one of the bases for your opinion was an event study

that you did to establish the cause and effect relationship between an Apache stock price and new company specific news. Correct?

A    Correct.

Q    So if we look in your first report at Exhibit 11-A.

        MR. STERLING:  John, can you pull that up?

BY MR. STERLING:

Q    Mr. Lawrence is pulling it up.  You ran a regression analysis, did you not?

A    I did.

Q    To try to control for macroeconomic effects on Apache stock as well as industry specific effects on Apache stock, correct?

A    Instead of the term macroeconomic effects, I typically use market effects.

Q    Fine.

A    But yes.  Yes.

Q    And you look at the residual terms on a daily basis to establish this, do you not?

A    Yes, I've calculated daily returns for --

Q    And to use the parlance, you were using one-day windows, correct?

A    Are we talking about 11-A?

Q    Yes.

A    No.  These are just the daily returns and the daily

regression models corresponding to those daily returns.

Q    Right.  Looking at a one-day window as opposed to a two- or three- or four- or five-day window,  You're looking at the daily return, right?

A    Yes.  I have the daily returns; however, it's very easy to accumulate for some the returns --

Q    Right.

A    Those multiday returns.

Q    Okay.  And then, if we look at 11-B -- B as in baby -- to your initial report, we see your -- there's no subzero progression analysis where you show the actual versus the predicted returns, correct?

A    Yes.

Q    And this is for every day during the class period, I believe, right?

A    Correct.

Q    And so explain to us what the chief statistic is.

A    It's basically this company specific return divided by the standard error and it gives you a sense of the size of a given return relative to the control sample.

Q    On that day, correct?

A    Correct.

Q    Okay.  And then you show the confidence level on each daily return, correct?

A    I do.

Q    And then if we look at Exhibit 12, we see the summary of your tests -- let me back up.  So, what you did -- correct me if I'm wrong -- is you looked at each day during the class period in which Apache made an earnings announcement, correct?

A    Correct.

Q    And then you looked at the residual return to see whether it was statistically significant on that date or not, correct?

A    On the impact date, which is the day that the information --

Q    Yep.

A    -- would have impacted the stock price.  This is my standard practice for establishing a cause and effect relationship under (indiscernible) factor five.

Q    Yep.  And Exhibit 12 lays out -- it's a two-page exhibit -- the results of the 13 or 14 days that you tested during the control period.  So, I mean, they're during the class period, right?

A    Correct.

Q    And you found that on nine of those days there was a statistically significant return, correct?

A    I -- you can see the --

Q    (indiscernible).

A    -- nine of these returns are statistically significant (audio glitch) this report.

Q    Yeah.  Dr. Nye, let me direct -- let me direct your

attention to Paragraph 58 of your initial report.  Blow that up.  Out of the 14 days -- I'd said 13; it was 14 days, right?  Then nine are associated with statistically significant company specific returns at or about the 95 percent confidence level, correct?

A    Correct.

Q    Then you go on to say on the next page -- John -- given that my sample contained more than 12 times as many statistically significant dates as should be expected from a randomly selected 14-day sample at or above the 95 percent confidence level, my analysis confirms that Apache's common stock typically reacted more strongly on event dates than on non-event dates.  Correct?

A    That's what it says.

           MR. STERLING:  And then, John, if you go to the next page, Paragraph 60.

BY MR. STERLING:

Q    We see kind of the punch line.  Based upon that event study, I find that Apache's common stock by (indiscernible) information selecting the information is (indiscernible) to the market and probably responded to the disclosure of new unexpected value relevant information thereby supporting my conclusion that the market for Apache common stock was (indiscernible) throughout the class period.  That was your conclusion based upon the analysis that we just looked at,

right?

A    Correct.  The stock price reacted within one day in a significant fashion on nine of the days.  The insignificant returns, though, are equally demonstrative of market efficiency because the news flow on that day is consistent with a return that isn't big enough to qualify as being significant at the 95 percent confidence level.  So I'm --

Q    Okay.

A    I've done a really long event study, carefully and correctly, discussing all the information that was revealed on these days, how it was received by the market, and detailing why that that information is consistent with the price change, be it statistically significant or not statistically significant on all (indiscernible).

Q    Okay.  So back -- I'm going to move off of your opinion on market efficiency and I'm going to move towards the alleged disclosures during the focus period, okay?

A    Okay.

        MR. STERLING:  Let's look at the first one which is the April 23, 2019 press release about the deferral of gas at Alpine High.  John, if you put up Exhibit 13 from Ms. Allen's report, I think this is --

BY MR. STERLING:

Q    So, this is the alleged corrective disclosure, is it no?

A    I believe.  Yes.

THE COURT: Hold on one second. We now have one of the problems of Zoom hearings, which is the light is coming through the window and I need to shut the shade. So, give me 10 seconds to go do that.

Okay, I apologize.

MR. STERLING: Gave me a chance to get some water, so I appreciate the break.

BY MR. STERLING:

Q so, this is the first alleged correct disclosure during the focus period, is it not?

A I believe so. I'm not familiar with the formatting here, but yeah, it looks like it probably is the right article.

Q Very clear it came out at 6:30 in the morning, correct?

A That's what the time stamp is here.

Q Before the market opened, right?

A Yeah.

Q So this is not one of those alleged corrective disclosures where we have to wonder, did it come out before the market or during the market or after the market. We know exactly when this one came out, right?

A Yeah. It's before market open, yes.

Q Okay. Now, it says very clearly that Apache -- if you scroll down a little bit there, John -- today announced that it initiated natural gas production by (indiscernible) from its Alpine High play in late March in response to extremely low

prices at Waha hub.  Do you see that?

A     Yes.

Q     And what was the Waha Hub?

A     My understanding is that's the market that's regionally or geographically located, to which they -- upon which it would sell their natural gas -- Apache would sell their natural gas.

Q     The Waha Hub price was whatever price Apache would get for its gas, right?

A     Effectively at this point, yeah, because they didn't have the pipeline built to upload it the Gulf, I think.

Q     Yeah.  So does this article say anything about the recoverable reserves at Alpine High?

A     No, it does not.

Q     Does it say anything about the mix of oil and gas at Alpine High?

A     No, it does not.

Q     Does it say anything about the ratio of what gas is dry gas at Alpine High?

A     No.  It discusses deferrals due to low prices and doesn't quantify how much of it's dry versus wet gas and how long it's going to last.

Q     Yeah.  In fact, the only thing it says about Alpine High is that we're shutting it down.  We're temporarily deferring production here because the Waha gas prices are so low, correct?

A     That's what it says, yes.

Q     How is this corrective of anything that Apache ever said?

A     Because Apache has, from the very beginning of the class period had an extremely low break even prices for its natural gas (audio glitch).  Someone's (audio glitch).

Q     Sorry.  Hold on a second.

THE COURT:  Hold on.  I didn't hear that, Dr. Nye. Start over on that answer, please.

THE WITNESS:  Yes, Your Honor.  I think it's alleged to be correct under plaintiffs' theory of liability because from the very beginning of the class period and as I repeated throughout the class period, defendants touted the extremely low break even prices for natural gas as well as less -- than 10 cents, you know, for a million for BTU or 1,000 BTU or, I'm sorry, a million cubic feet -- foot.

And also, you know, the play being so rich in wet gas, you can get the dry gas for free.  Yes, prices were low here and low prices imply lower revenues and lower profits, but it's really a degree of how unprofitable Alpine High has become, which is in contrast to those prior statements that say it would be highly economic at these very, very low gas prices.

BY MR. STERLING:

Q     Let -- before I show you something, what is your understanding of how low gas prices could go and Apache could still make money?  What did Apache say about that?

A    Well, there's -- described, they have break even less than 10 cents.

Q    Apache said that?

A    Yes.

Q    Where does Apache say that?

A    September 7th, 2016 and many analysis repeated that and then they also --

Q    (indiscernible).

A    -- getting gas for free because the other NGLs and oil made it such that there was virtually no cost of extraction for the natural gas.

Q    We'll get to that in a minute, but okay.

        MR. STERLING:  John, can you pull up the Waha price chart?  Pull it up.

BY MR. STERLING:

Q    So, Dr. Nye, we are looking at the daily Waha Hub natural gas spot price chart.  You recognize Bloomberg as being authoritative, don't you?

A    I didn't quite hear you, but they are a reputable data source.

Q    Yeah.  Okay, so let's look at the daily Waha Hub natural price -- natural gas spot price, shall we?  You see how at the start of early 2018 it was as high as -- it was over $7.  Then it dropped down to 2 and fair to say it bounced around $2 throughout most of '18.  See that?

A      I do.

Q      Okay.  Now, let's look to the righthand side of this chart.  Do you see where, starting in March of 2019, Waha prices actually went negative?  You see that?

A      Yes, that was because of temporary offloading pipeline issues that were rectified and the price bounced back up to the positive.  And it was widely discussed and understood that that's a transient phenomenon.

Q      Had the Waha price ever gone negative before?  Ever?

A      I don't know if ever it had.  Certainly not in this period.

Q      And a negative price means, in effect, you have -- you're paying the buyer to take your gas from you, correct?

A      Yes.  And it occurs in energy market, not all the time, but it's not something that never happens.  It's usually dud to supply and an offloading problem with the production chain.

Q      Can any E&P company make money selling gas at negative prices?

A      No, but it was widely reported that this would not be negative for very long because it was a temporary problem with too much gas and breakdowns in the transport pipelines at the time, and it did come back --

Q      And it --

A      -- positive and it was positive, you know, in April.  And --

Q    It was positive in April, but it was barely positive in April, correct?  It was about 25 cents an MCF, right?

A    I don't know the scale because there's just, you know, adjustment 0 to 2.  I think it's in that cents range, but it's above 10 cents most of the time.

Q    Let's step back from your econometrician position and let's just look at this from an economic and rational perspective.  Doesn't make sense for an E&P producer to defer production when prices were negative or is it 25 cents an MCF range?

A    Not necessarily, not if you think that the price is -- the negative prices are transient, which the market all believed. And there's costs.  There's significant cost that the analysis talked about of shutting down and deferring your gas production that could require quite a bit of expense to get those wells back online.  So, it is a cost benefit analysis, for sure, but plaintiffs are alleging that the company had misrepresented effectively the break-even price at which they could have highly economic gas operating.

Q    But doesn't it make sense to defer production until the gas prices recover and get higher?

A    No, again, for the reasons I stated.  If you think that, you know, shutting down has costs.  (indiscernible) sorry. Deferring gas production has significant costs.  It's not just an on/off switch.  There's an expense required to turn the

whole system back on, my take on my research.

Q    Okay.  Let's go back to your analysis in 11-B and let's see what the market did on April 23rd of 2019.

MR. STERLING:  John, I believe this is Page 15 of 21 on 11-B.

BY MR. STERLING:

Q    Okay.  Dr. Nye, we're back into your regression analysis, correct?

A    Yes.

Q    And so we see the second line on the April 23 results, right?

A    Right.

Q    and that shows that the residual return on that day was not statistically significant, correct?

A    It's not statistically significant at 90 or 95 percent confidence level.  It is a negative 1.45 percent return followed by (indiscernible).

Q    But we can -- but we can agree that the market had a full day to respond to this new information and the residual return that day was not statistically significant, correct?

A    It is not statistically significant at the 90 or 95 percent confidence level.

Q    And then, if we look at the next day, the 24th, that return was not statistically significant at the 90th or 95th percent confidence level, correct?

A    No, but the two-day return is obviously, I'm sure (indiscernible) know that.

Q    If we look at the third day, that return was not statistically significant at the 95th percentile, correct?

A    It is technically not statistically significant at the 95 percent level.  It is very close.

Q    And the fourth day was not -- and the fourth day was not statistically significant either, correct?

A    It is not.  The fourth day is not significant at the 95 percent level; the four-day return is.

Q    And during this week, April 23rd to 26th, you looked to see if there was any other new Alpine High specific news in the market and there was none, correct?

A    There was none, but there -- the inside learned of communications with Apache and various investment advisors that describe that there's a lot of discussion during this period, particularly on April 25th, regarding the uncertainty that the deferrals created with respect to 2019 and 2020 production.

Q    Well, let's just try to answer my question, okay?  Was there any new company specific news about Apache during that week?  Yes or no.

A    No.  Not that I found --

Q    Okay.  But, and there -- this news about the deferral was picked up very quickly by the market, was it not?

A    It was discussed on April 23rd and through the 23rd.

MR. STERLING:  John, let's look at the (indiscernible) report.  So -- and it's Tab 14.

BY MR. STERLING:

Q    So we saw that the Apache news came out at 6:30 in the morning on the 24th.  I'm going to show you quickly a couple of analyst reports that came out in short order following it.  You recognize this as Exhibit 14 to Ms. Allen's report of a flash note by (indiscernible) that came out on the 23rd, correct?  The same day.

A    Yes.

Q    And the (indiscernible) says, given the severity of local (indiscernible) natural gas price weakness, we think the deferral of gas is prudent and likely expected by investors.  You see that?

A    I do.  I also see the next sentence and I'll -- in which I say the announcement confirmed incremental (indiscernible).

Q    Doctor, my -- Doctor, can you just answer my question, please?

THE COURT:  Let me say this.  Please, answer the question.  Your -- the lawyers on the plaintiffs' side will have a full and fair opportunity to ask you any questions.  Please, let's answer the question.  Proceed, Mr. Sterling.

MR. STERLING:  Thank you, Your Honor.

BY MR. STERLING:

Q    So, we agreed that there was no statistically significant

price reaction of the 90 to 95th percentile on the 23rd, on the 24th, on the 25th, or on the 26th, correct?

A    No -- yes and no.  I mean, the daily returns are not; the cumulative returns are significant.

Q    So, what you did was you looked at a four-day window to find a statistically significant return, correct?

A    No, I looked at two -- one-, two-, three-, and four-day, in response to Ms. Allen's opinion that the lack of statistical significance evidences no price impact and I'm merely pointing out that had she just looked at the period that plaintiffs had alleged waas the loss inducing time period, she would have found that there was a, you know, a big significant negative reaction that proceeded (indiscernible) period.

Q    But on -- not on the reaction date itself, though, right?

A    As we discussed, the single day return on April 23rd is -- though it's a negative 1.45 percent, which in -- is not statistically significant on its own.  I'm trying to answer the question.  I -- financial economics, the theory of financial economics dictates that that residual return that I've estimated reliably and scientifically estimates the value of that disclosure on that day, so.

Q    You're still not answering my question, Dr. Nye.

A    I'm sorry.  Please repeat it.

Q    Any -- even a two-day, we know, did not produce a statistically significant return, correct?

A    I think it did.  It was -- I believe it was significant at the 92 percent level, on a two-day basis, which I consider to be statistically significant.  I know a lot of economists do and some (indiscernible).

Q    To get to a 95 percent confidence level, you have to go out three days, right?

A    To get to 95, yeah, I think it's third and fourth day of that sequence results in -- get that significance.

Q    Now, in your direct testimony, we know that you've issued opinions in approximately 62 securities cases, right?

A    Yes.

Q    You -- and you've never, ever, ever used a four-day window before, have you?

A    I don't believe -- I've certainly looked at four-day, five-day, longer returns.  I don't think I've issued opinions that say there's (indiscernible) associated with a four-day return before, but I think it just depends on the allegations and the economic evidence.  As I described -- well, I'll (indiscernible) answer the question.

Q    Again, let's just try, answer the question.  You -- it's pretty simple.  Have you ever used a four-day window before in any of those 62 cases?  Yes or no.

A    I don't think so, in my --

Q    Okay.  Have you ever seen a different expert use a four-day window in a case?  Yes or no.

A    I don't recall seeing a -- specifically a four-day return. I just want to mention that NERA does have a paper that says that they've seen five day returns before.

Q    Dr. Nye --

THE COURT:  Hold on.  Hold on.  I'm now getting angry, okay?  You've got to answer the question.  We're going to be here for three days if you don't answer the questions. These questions are all yes or no answers.

THE WITNESS:  I understand.

THE COURT:  Please answer the question.

THE WITNESS:  I will.

THE COURT:  -- ask you about some NERA report.  If Mr. D'Ancona wants to ask you about that, he'll have a chance to ask you about it.  Okay?  This is an opportunity for Mr. Sterling to ask questions, you to answer them, not for you to just pontificate on what you want to say.  I said it four times.  I don't know how else to say it again.  It's not complex.  Answer the questions that are asked, please. Proceed, Mr. Sterling.

MR. STERLING:  Thank you, Your Honor.

BY MR. STERLING:

Q    And Dr. Nye, have you ever seen a Court opinion saying it's okay or permissible under any circumstance to look at a four-day window?

A    I can't recall any.

THE COURT:  Let me ask (indiscernible) on the plaintiffs' side.  Are there any opinion, any Court opinions that you can point me to that say that I should reserve to a four-day window?

MR. D'ANCONA:  Your Honor, I think -- I'm sorry, is there a --

THE COURT:  I can hear you.

MR. D'ANCONA:  Can you hear me okay, Your Honor?

THE COURT:  Yeah.

MR. D'ANCONA:  Okay, sorry about that.

THE COURT:  I don't know about everyone else but I can hear you, so that's all that's important.

MR. D'ANCONA:  That's all that matters.  I got a technical buzz here.  So Your Honor, the Carpenters v. Barclay's case in the Southern District of New York, I think is my best answer to that question.  It talks about the common usage of multiday windows, that they're standard in statistics. It references the new article that talks about up to five-day windows, so that's a Court opinion that really embraces the idea of these multi, multiday windows.

We have the case, (indiscernible) case that Ms. Allen, defendant's expert testified in where she offered, I believe it was a three-day multiday window.  I'm not sure if it was four.  It was certainly three.  That's (indiscernible), rather, (indiscernible).  And then there are other cases.  They

are not four-day cases, so to answer your question and not go on, there are some, you know, two- and three-day cases.  And that's --

THE COURT:  My question wasn't two- or three-day cases.  My question was four-day cases.

MR. D'ANCONA:  Okay.

THE COURT:  And the answer to that is the Carpenter case, is the one that you've got for me?

MR. D'ANCONA:  Now, and I don't want to -- I don't want to get out beyond myself, Your Honor, because I don't know if there was, in fact, a four-day window applied in that case or whether I'm simply referring to the discussion of the Court about what would be permissible and what it would embrace.  So, I'm not claiming -- I don't mean to be representing that there was a four-day window in that case.  I'm not certain that there was.

THE COURT:  Okay.  Sorry.  Mr. Sterling.

MR. STERLING:  Thank you.

BY MR. STERLING:

Q    And to be clear, Dr. Nye, there are cases that say when the returns on one-day are statistically significant, you can look to the second day to see if those days are significant as well.  But that's when you can have a two-day window, right?

A    I'm sorry, what -- you said there are cases that have said that?

Q    Yeah.  You're aware of that, aren't you?

A    No, I'm not.

Q    Okay.  And then, are you aware of the Ramirez case, the recent case in the Northern District of Texas that said you can't go to the second day when the market is efficient and there was no hearing on the second day.  (indiscernible) the Ramirez opinion?

A    Is that Exxon?

Q    Yeah.

A    I have read it.  I can't -- do not remember that part.

Q    Okay.  You would not deny that, would you?

A    I (audio glitch) remember it.

Q    Okay.  And on the issue of windows, do you remember giving an expert report two years ago in the Yelp case?

A    I remember working on the Yelp case.

        MR. STERLING:  John, if you could pull up Yelp.

BY MR. STERLING:

Q    And I'll let Mr. Lawrence pull this up.  It's a copy of your expert report in the Yelp case.  Do you recognize this as your expert report in the Yelp case?

A    It appears to be, yes.

        MR. STERLING:  April 2nd, 2021.  John, can we go to Paragraph 38.  There we go.  Can you blow that up a little bit?  Thank you.  There we go.

BY MR. STERLING:

Q    It says, "I certainly do not disagree that two-day event windows can be appropriate in certain contexts.  Indeed, I've employed two-day event windows for the purposes of analyzing loss causation, damages in a few other securities litigations cases in the past.  Initially, I did consider the statistically significant the price increase on 11 (indiscernible) 2017 when performing my analysis of price (indiscernible) in this matter.  However, as" -- I'm going to -- how do you pronounce that name? Janisia?

A    Believe so.

Q    "As Dr. Janisa (indiscernible) points out, no new information was leaked in the market on May 11th and the alleged corrective disclosure occurred shortly after the market closed on May 9th.  Thus, the efficient market for Yelp stock had a full trade day to impound the allegedly corrective information by market close on May 10, 2017.  Furthermore, as shown in the following chart, the intraday evolution of Yelp stock price on May 10, '17, shows a price reaction to alleged corrective information was sudden and severe with the stock price opening at approximately the same level as the closing price."

Dah, dah, dah, dah, dah.  On to say, "It is my opinion that the use of a two-day event window is unwarranted in this particular case.  Furthermore, my analysis is entirely consistent with academic guidance from Nobel Laureate Eugene

Fama who is widely recognized as the father of modern finance, concluding that the typical result of event studies on daily data is that on average stock prices seem to adjust within a day to event announcements.  This result is so common that this work now devotes little space to market efficiency.  The fact that quick adjustment is consistent with efficiency is noted and then the studies move on to other issues."

Did I read that correctly?

A    You did.

Q    Okay.  And that was your opinion in Yelp, correct?

A    Yes, it was my opinion in Yelp based on the facts and all the evidence in the case.

MR. STERLING:  So, we looked already at a quick response from (indiscernible) to this announcement.  Let's look at the Scotia Howard Weil response, and John, it's at Tab 16.

THE COURT:  Hold on, Mr. Sterling.  I want to ask a question.

MR. STERLING:  Sure.

THE COURT:  Help me out, Dr. Nye.  If you said that you -- two-day wasn't appropriate in that case, how in the world is four-day appropriate in this case?

THE WITNESS:  If I remember correctly -- it's been a couple of years -- I think the Yelp case was a down and then a rebound.  So they're trying to use the second day to mitigate the loss, and in that case, it was just, you know, it was a

different disclosure.  It was -- the intraday analysis showed that a very quick price reaction, kind of like what we see with Keenan's resignation in October of 2019.  And I've stated this many times because this is an empirical issue, how long it takes for stock prices to reflect information.

Also, crucially in this case, I'm not opining on, that there is price impact or that you should use a two-, three-, or four-day event window.  I'm highlighting the deficiencies of Ms. Allen's work.

THE COURT:  So, do we use a four-day window?  Let me ask you that question directly.  Do you think it's appropriate, permissible, and economically sound to consider a four-day window?

THE WITNESS:  It may be.  I have fully analyzed the loss (indiscernible) here, but --

THE COURT:  So you can't offer an opinion in this case as to whether a four-day window is appropriate or not, is what you're saying, right?

THE WITNESS:  I'm not doing that at this juncture.  I have highlighted, though, if you will let me, that there is a lot of uncertainty regarding this disclosure.  There's analyst commentary from multiple analysts describing that.  There's internal memos in April -- on April 25th that describe, you know, investment advisors contacting Apache investor relations and saying there's a lot of uncertainty.

They don't believe the company statements regarding the deferral not impacting longer term production.  And so, as I highlight my direct testimony, there is an understanding amongst financial economists that difficult to interpret or complex information can cause a longer than one-day price reaction.  It doesn't happen all the time, but it can happen.

And it's a product of the competitive dynamic, how information is changing, how investors' expectations are changing, as they try to resolve that uncertainty.  And it's something to consider and Ms. Allen does not consider.  That's really my point at this stage of the case.

THE COURT:  Wait, the point is what?  Did you consider a four-day window and she didn't?

THE WITNESS:  I -- yes, I suppose so.  I'm just highlighting that it is a -- if you just go out a day or two or three or four days, it -- there's a prolonged reaction and it adds up.  It just does.  And there is a lot of commentary about the uncertainties that could explain that prolonged reaction even in a generally efficient market.  And just, if you will let me.  I'm sorry, I don't want to get --

THE COURT:  Yes.

THE WITNESS:  Professor Zama, Nobel Prize winner, he does describe markets as being efficient.  However, there's a -- he will acknowledge there's a broad literature that challenges, you know, the strict versions of market efficiency,

and he has papers that also adopt that and try to explain these phenomena that we see in securities pricing that don't always resolve in one day or even in two days.  There's finance literature that says returned can go on for a week or a month. It's not as clearcut as I think what maybe defendants are trying to -- Ms. Allen is trying to portray.  There is an empirical observation that can be made to see how long it's taking the prices to react.

In this case, it is declining consistently over time. And -- given that uncertainty.  I am not opining that we should use a four-day window necessarily.  We just haven't -- and I'm trying to provide helpful information.  That's it.

THE COURT:  Got you.  Okay.  Mr. Sterling?  Sorry --

BY MR. STERLING:

Q    And in fact, Dr. Nye, you saw Ms. Allen's rebuttal or sur-reply report in which she looked at the class period using your model and a four -- over four-day windows and determined that using four-day windows of your own test, the market for Apache stock would not be deemed deficient.  You saw that, didn't you?

A    I saw that, yes, but that's a question I (indiscernible).

Q    And did you do anything to refute that?

A    Yes.

Q    Did you study it?  Did you study the class period over four-day windows?

A    No, but her point is invalid because she didn't look at

what happened over those four-day windows.  My point is that if you're going to choose a four-day event window, you have to look at all the information disclosed in those four days and she didn't.  So, she has no basis to say that somehow that because there's insignificant or non-statistically significant returns using four-day windows on those earnings announcements, that's enough sales to market efficiency test.

There is other stuff that happens every day for these companies, right, and so you have to appreciate whether there's something good news that happens or bad news that offset the initial reaction to earnings release over the four-day window and she did not do that.

Q    And to get back to Judge Edison's question, I've got the -- we've got the press release back up.  Is it your testimony that this is complex information, using your words, which --

A    Yeah, I think it's -- there's a lot of uncertainty because they don't explain the scope and the cash --

Q    That's not my question.  Not my question.  You use the word complex information in response to Judge Edison's question.  Is it your testimony that this is complex information?

A    It's -- yes, it's complex and it says -- well, it's complex.  Sure.

Q    Okay.

A    (indiscernible), but I don't want to step on toes.

MR. STERLING: Okay, so let's go back to the analyst commentary following that. John, if you can put up the Scotia Howard Weil.

BY MR. STERLING:

Q   There was certainly uncertainty because nobody knew how long the Waha Hub gas prices would remain so extraordinarily low, correct?

A   I'm sorry, can you please repeat the question?

Q   Sure. Happy to. There was uncertainty about Apache in light of this announcement, because nobody knew how long these unprecedented, ahistorical, extraordinarily low prices at Waha would persist, right?

A   I -- that's not my understanding of what the market was thinking at that time. There were certainly negative prices, but there was also an understanding that it was a transitory problem with the offboarding mechanism to the -- offloading in ports.

Q   I'll try it again, Dr. Nye. What caused the temporary deferral of Alpine High gas, with the extraordinary -- it's the prices at Waha, right?

A   That -- yeah, that's what the company said.

Q   Right. And the prices were unprecedentedly low at the time, correct?

A   They were negative at the end of March. That was --

Q   Right.

A    -- representedly low.  Yes.

Q    And you used the term uncertainty and the uncertainty stems from the fact that nobody knew how long the unprecedentedly low prices would reign, right?

A    Well, they had already recovered in the positive territory above the break-even point by April 23rd.

Q    Let's -- can you -- let's try to answer my question.  Did you find my question complicated?  Did you not understand my question?

A    No, I think I understood your question.

Q    The uncertainty was caused by the fact that nobody knew how long the unprecedented low prices would persist, right?

A    I tried to answer.  I don't think that what analysts are talking about with respect to, you know, uncertainty. Certainly, it was low prices, for sure, but it was understood to be a transient phenomenon at the time.

Q    Okay.  That's what you knew?

A    Suppose.

Q    Okay.  Let's look at Scotia Howard Weil.  This report came out the same day as the announcement, right, to April 23rd?

A    Yes.

        MR. STERLING:  Let's go to the second page of this, Mr. Lawrence.

BY MR. STERLING:

Q    "Apache Corp.  Alpine High natural gas production deferred

due to pricing.  Not unexpectedly, Apache has decided to divert natural gas production out of its gas heavy Alpine High position in the Permian Basin due to extremely low Waha pricing."  You see that?

A    Yes.

Q    What does the phrase not unexpectedly mean?

A    It's a curious term, it -- I guess it's (indiscernible). Involves some -- they're not saying expected, but there's not unexpectedly, so maybe they -- it makes sense or -- given low prices that the company would defer gas.

Q    And then the last line of that says, "Ultimately, while the extremely low gas price environment may be somewhat transitory, we see a wide and volatile Waha differentials as a reason to avoid APA in the near term."  Correct?

A    That's what it says.  Yes.

Q    Now, in your rebuttal report, you cite both a Cowen report and a Barclay's report, do you not?

A    I believe so.

Q    Yeah.  Let's look at the Cowen report which is tab -- it's Exhibit 18 to Ms. Allen's testimony.  And this is the Cowen report that you referred to?

A    Yes, I think so.

Q    And this is dated April 26th, about three days later, right?

A    Right.

Q    And Cowen did not change its valuation of Apache, did it?

A    I -- yeah, I don't think they changed the price target.

Q    It didn't change its price target.  It didn't change its valuation.  It didn't say, oh, we think there's less, fewer recoverable reserves there or anything like that, did they?

A    I don't think it did any of those things.

          MR. STERLING:  Correct.  John, turn to Page 3 of this.

BY MR. STERLING:

Q    And this is an industry report, is it not?  An industry update?

A    I don't --

          MR. STERLING:  Can you go back to the first page?

BY MR. STERLING:

Q    Yeah, I'm sorry.  Got a little ahead of you, Dr. Nye.  It's an industry update?

A    It is.

Q    Okay.  Turn to Page 3 here.  It talks about company specific catalysts, right?

A    Yes.

Q    See that?  And here we are in April 2019, correct?

A    Correct.

Q    And the fourth catalyst under Apache, it says "Suriname exploration well on Block 58 in 2019."  Do you see that?

A    I do.

MR. STERLING:  If you turn to Page 23 of this, John, industry report.

BY MR. STERLING:

Q    Here we are in April of '19 and it's showing the Apache balance sheet and statement of cash flow, correct?

A    Correct.

Q    And clearly shows $7.9 billion in long term debt in the first quarter of 2018, $7.9 million second quarter of '18, over $8 billion in the third quarter of '18, over $8 billion in the fourth quarter of '18.  Correct?

A    Right.

Q    And these came straight off of Apache's SEC filings, right?

A    They source the company's reports, so that's a good bet.

Q    There's no history about any of this, is there?

A    No.

Q    Anybody who wanted to compute a debt to equity ratio, all you have to do is pull out an old fashioned calculator or simple (indiscernible), right?

A    It is pretty simple, indeed.

Q    Okay.  And in fact, during this week following the announcement of the temporary deferral of Alpine High at Waha, there were no analysts who changed their valuations or price targets of Apache that you're aware of, correct?

A    I think that's true.

Q    And you mentioned that there was there some -- there was an email or something a few days afterwards that suggested uncertainty about how long this would last?  It was in one of your rambling answers that I think you got kind of called to the carpet for being nonresponsive on.

A    I'm -- I --

Q    Do you remember -- do you remember saying (indiscernible). In your direct testimony, you referred to an email from a guy named Yang to the company about uncertainty, correct?

A    Yes, talking about --

Q    On Page 41 of your direct, right?

A    I can't recall the page number, but if you say so, then it's probably there.

Q    Okay.  So, let's look at another email --

        THE COURT:  Wait, wait.  What page did you say?  I'm sorry.

        MR. STERLING:  Forty-one.

        THE COURT:  Got it.  Okay.

        MS. HEFLEY:  Pull it up?

        MR. STERLING:  Pardon?

        MS. HEFLEY:  Pull it up?

        MR. STERLING:  We can pull it up, Your Honor --

        THE COURT:  No.  I've got it.

        MR. STERLING:  If you can pull up the other Yang emails.

BY MR. STERLING:

Q    So the email you cited in your direct testimony was from Andy Yang, correct?

A    Just refreshing my memory of this document.

Q    This is not the one you cited in your direct.  This is a different one from the same person.

A    That is why I couldn't recognize it.  Andy Yang, I believe, yes, was on that email that I cite in my direct.

Q    Okay.  So this is an email for Andy Yang (indiscernible), April 28th.  This was five days before the announcement of the deferral, right?

A    April 18th?

MS. HEFLEY:  Eighteenth.

BY MR. STERLING:

Q    April 18th.  And he says, "Hi, Gary and Patrick.  Just a heads up.  I'm hearing more chatter in the investment community about Alpine High gas shut-in risk."

A    It does say that.

Q    Says, there's a lot of chatter in the marketplace about this, before the announcement, right?  What does shut-in mean?

A    It -- I believe it's similar.  I don't think they're technically the same, but a shut-in and a deferral are probably used synonymously in this email, and -- but it's a risk.  It's not a certainty at this point.

Q    Can we agree, dry, that the shut-in was entirely caused by

the unprecedented low gas prices at the Waha Hub?

A    That's what the company said, yeah.

Q    And these were prices that had never been seen before, correct?

A    They are.  They were negative and -- in March.  I don't know if it was never seen before, but certainly not recently at that point in time.

Q    Okay.  Let's change gears and let's talk about the second alleged corrective disclosure during the focus period.  And this is the media coverage of the resignation of Mr. Keenan, correct?

A    Correct.

Q    This was on October 25th of 2019, I believe, right?

A    Right.

Q    Just to orient ourselves, this is the extent of it, right?

A    I can't recall if that's the extent of it, but that's the headline here, the Bloomberg flash.

Q    And the Bloomberg flash is at 9:44 in the morning, correct?

A    Correct.

Q    So the market was -- this was not pre-market open.  This was during the market but early in the trading day, correct?

A    Correct.

Q    And it says nothing about Alpine High, does it?

A    It doesn't say Alpine High in the title.  He is recognized

as the executive in charge of exploration and overseeing operations at Alpine High.

Q    Let's try again.  It says nothing about Alpine High, does it?

A    When you say about, I read it as it could be interpreted, but if you want to say that the headline has no reference to Alpine High, then you're correct.

Q    Alpine High is not mentioned here, is it?

A    No, it was not mentioned by name.

Q    And at the time, Mr. Keenan's title was actually head of worldwide exploration, right?

A    That's what the headline says, yes.

Q    Suriname is part of the world, is it not?

A    It is.

Q    Right.  And we already saw that six months beforehand, analysts were looking to Apache prospects in Suriname, the wells they'd be drilling in 2019 as a catalyst, correct?

A    As a catalyst for future growth, yes.

Q    And by this point in time, the world was already aware that Alpine High was gassier than Apache expected, correct?

A    At this point, this is wafter the company's disclosures regarding the mix of oil and gas.  Yes.

Q    You're agreeing with me, right?

A    Yeah, I think so.

Q    Okay.  So, let's talk about, again, what else is going on

at this point in time.  So by October 25, the world knows that Alpine High is gassier than Apache hoped and expected, right?  We just established that.

A    Yes.  Intertemporally, it's -- yes.  Relative to the beginning of the class period, that's true.

Q    In fact, the market knew that Alpine High was gassier than Apache hoped and expected before the focus period, right?

A    Correct.

MR. STERLING:  Okay.  So, let's talk about what else is going on at the time.  John, pull up Exhibit 32.

BY MR. STERLING:

Q    We looked a second ago at how the analysts were pointing to this well being -- to be drilled in Suriname in 2019 (indiscernible) catalyst.  This is a Wall Street Journal article from December 2nd.  I just want to point to the bottom of this.  Right there.  Analysts from Energy Investment Bank, (indiscernible) company described the company's exploratory Suriname project as "among the most anticipated wells in the world."  You see that?

A    I do.

Q    You have no reason to disagree with that, do you?

A    No.

MR. STERLING:  Let's look at what Credit Suisse was saying the exact same day of Mr. Keenan's resignation.  And John, this is tab -- Exhibit 27.

BY MR. STERLING:

Q    So here we are.  The headline, "Resignation of exploration head highlights Suriname risk to share price."  You see that?

A    I do.

Q    Okay.  And if you look at the bottom of the first bullet point it says, "More recently, Apache had ventured into Suriname where it is currently drilling one of the most highly anticipated exploration wells of the year, given close proximity to the (indiscernible) where over six (indiscernible) of oil weighted resource has been discovered to date."  You see that?

A    I do.

Q    And then the next bullet says, "Timing of resignation a concern.  While Mr. Keenan's exact role in Suriname is not clear, Apache claims the resignation is not connected to the exploration process.  Apache is under performing (indiscernible) by more than five percent today, given the timing of the departure of the head of the worldwide exploration when the company is on the 31st day of doing the Suriname well, i.e., (indiscernible) expected 30- to 60-day (indiscernible) out the window.  Today's selloff nonetheless highlights the high expectations for the well already baked into Apache's stock price.  More details below."  That was an analyst report you considered, was it not?

A    It was.  It is.

Q    Then let's look at SunTrust, which is Tab 28, also came out with a report that day.  "Apache stock underperformed this morning, down 5.5 percent on investor speculation that its senior VP's resignation is linked to an upcoming unsuccessful Suriname (indiscernible) exploration along Block 58.  We do not believe the departure is linked to result of the well and it does not appear that the well has reached target formation yet."  Do you see that?

A    Yes.

Q    Then let's look at Morgan Stanley which is Exhibit 29. This is four days later on the 29th.  It says, "Suriname, next Guyana.  We expect Apache to announce results from an exploration well in Suriname, its first on Block 58 within approximately 30 days.  Nearby in Guyana lies the most significant offshore oil discovery of the past decade. Apache's portfolio remains challenged which appears that success in Suriname could be transformative."

        MR. STERLING:  Let's look at the bottom of this. Keep scrolling down, John.

BY MR. STERLING:

Q    "What's in the stock price?"  See that?  "On October 25, Apache's (indiscernible) stock price (indiscernible) 11 percent on headlines indicating Apache's SVP of worldwide exploration had resigned, stoking concerns of its rival in Suriname.  On the same day, subsequent headlines quoting an Apache

spokesperson indicated that resignation was unrelated to Suriname.  The stock covered half of its initial decline, finishing the day down five percent.  We believe the initial 11 percent selloff highlights the sizable Suriname option value embedded in Apache stock."  No mention of Alpine High in here, is there?

A    They don't mention alpine High.

MR. STERLING:  And then finally, last one, John, Tab 31.  Credit Suisse, October 31.  This is six days after the resignation.  If you turn to Page 5 of this, John, at the bottom.  There you go -- keep going.  Figure 2.  There we go.

BY MR. STERLING:

Q    "Suriname well should reach total depth in November.  We see considerable downside risks to shares if the prospect is dry.  In late December, Apache's (indiscernible) highly interested (indiscernible) exploration, an alternative to block 58," blah, blah, blah.

"Expectations for the well are exceedingly high underscored by the sharp selloff in the stock last Friday after news broke that Apache's head of worldwide exploration had departed the company, supposedly unrelated to Suriname, though with Apache in the middle of joining the well, the timing nonetheless spooked investors."  You see that?

A    Yes.

Q    So, in all of these analyst reports following Mr. Keenan's

resignation, they keep -- they had a common theme.  This is all, the downturn in the stock is investors were spooked about Suriname, correct?

A    I don't read it that way.  I can explain why.

Q    Did any analyst say anything in this entire week about Alpine High?

A    Yeah.  They talked a lot about Alpine High in all these reports about how the (indiscernible) performed poorly and that a few of them commented that it likely was a cause for Mr. Keenan's resignation.  And what was -- what is unanimous among these analyst reports is that Keenan's resignation had nothing to do with Suriname.

Q    Every analyst we looked at attributed the decline in the stock price to concern about whether Keenan's resignation says something ominous or pretends something ominous about Suriname, correct?

        THE COURT:  So -- well, I want to hear that answer.

        THE WITNESS:  There's -- as I think I show in the intraday analysis I performed, there is a sharp selloff, as these analyst reports you just read commented on in the early morning hours of October 25th, 2019.  It did, as a matter of fact, and as acknowledged by these analysts and the company itself, recovered quite a bit after it became apparent that that Mr. Keenan's resignation was unrelated to Suriname, that they did not have any test results from the Maka 1 formation,

and that another senior vice president from Thibodeaux was the one who was in charge of exploration and drilling in Suriname and Mr. Keenan had nothing to do with it.

BY MR. STERLING:

Q    Did any of these reports say anything about that, Dr. Nye?

A    Yes.  If you look --

Q    Which ones?

A    (indiscernible).  We just read one that highlights -- all of them highlight that the company's statements that Mr. Keenan's resignation had nothing to do with Suriname.  You just read one, but the next line that you didn't read is that Faron Thibodeaux was in charge of Suriname and so -- and they also talk about how there's no results to be had in -- because they hadn't reached the target formation.

There's also the issue that some of these reports were issued in the middle of the day before the company had even announced formally that the resignation was unrelated to Suriname.  So yeah, they're seeing a big intraday price decline in the morning and it -- and they're speculating that it has to do with investor concern about Suriname.  The company rectified that issue.

They have a campaign which they send their investor relations people out and they're contacting investment banks and analysts before market even opened on this day, clarifying these issues.  So, the market responded negatively, then

rebounded once it became apparent that there was no connection to Suriname.

THE COURT: Okay, let me ask a quick question. If you could pull up -- there's a document you -- it's a Credit Suisse report you showed two minutes ago dated October 25, 2019. Docket 117-10.

Okay. So show that whole first paragraph. I guess this question goes for Mr. Sterling, I guess, as opposed to Dr. Nye. In all your questions about -- and I understand the issue about Suriname, but here's a report that in the middle says -- seems to me they're saying a likely cause of Mr. Keenan's resignation is the Alpine High play. Does that make a difference? Am I misreading that?

THE WITNESS: It doesn't make a difference at all, Your Honor. This is speculation as to why he resigned, but there's no new information about Alpine High there. Again, everybody knows by this point in time that Alpine High is gassier than expected. The expectations with respect to Apache are, at this point in time, it's all about Suriname. And the -- from the market's perspective, it's certainly ominous that Mr. Keenan's resignation takes place while we're right down smack in the middle of drilling what is one of the most -- that the Wall Street Journal quoted to (indiscernible) saying is one of the most highly anticipated wells of the year.

THE COURT: Got you. Okay. Go ahead.

MR. STERLING:  Ms. Hefley wants to say something.

MS. HEFLEY:  I just wanted to point out, Your Honor, this is very similar to the alleged corrective disclosure in ExxonMobil that the Court said did not show price impact because just because you have -- attaching reference to something does not mean that the analyst is attributing the decline to the thing that's referenced.  Here, as we saw through all those analyst reports, they're attributing the stock price movement to speculation or concern about what it may pertain for Suriname.

THE COURT:  Right.  Or put another way, your position is, hey, there's nothing new here that -- at least by this time the Alpine High play had been, as this report says, an economic disappointment for investors, that might have been the reason for Mr. Keenan's resignation, but in your version, it's not news for the market, specifically --

MS. HEFLEY:  Right.

THE COURT:  -- related to Alpine High.

MS. HEFLEY:  Right.

THE COURT:  Okay.  I understand the argument.  Okay. Sorry about interrupting.

MR. STERLING:  No need to apologize.  Okay.  Let's turn now to the last corrective disclosure (indiscernible). Let's look at what transpired between these two alleged Corrective disclosures.  John, if you pull up Paragraph 104 of

the consolidated amended complaint.

BY MR. STERLING:

Q    Just to establish the chronology here, Dr. Nye, so we just looked at Keenan's resignation on October 25th and the analysts' report that came thereafter, right?

A    That's right.

Q    Okay.  So now, we're looking at the Consolidated Amended Complaint, Paragraph 104, and that notes that "On the third quarter 2019 earnings call on Halloween 2019, Christmann revealed that drilling activity at Alpine High had been removed to just two (indiscernible).  Several well completions have been diverted to 2020 and this lower activity, second (indiscernible) decreased production outlook on our multi-well pads resulted in approximately five percent reduction in fourth quarter Alpine High (indiscernible)."  That was on Halloween of 2019, right?

A    Right.

        MR. STERLING:  Okay. Scroll down a little bit, John.

BY MR. STERLING:

Q    Then we see on January 9th of 2020, Reuters reports that Apache shuttered the Alpine High San Antonio headquarters.  Correct?

A    Correct.

Q    Reuters is a widely followed news service, right?

A    Right.

MR. STERLING:  Next paragraph, John, 106.

BY MR. STERLING:

Q    February 26th, Apache issued a press release, reports a $3 billion impairment for Alpine High.  Further announced that as of the end of 2019, there were no rigs drilling at Alpine High. Correct?

A    Correct.

MR. STERLING:  Then scroll down to 107, John.

BY MR. STERLING:

Q    And then Bloomberg on February 27th has an article that says -- entitled, "Apache calls it quits on Alpine High after $3 billion write-down," correct?

A    Correct.

Q    And I believe you told us in your deposition that by this point in time, the market knew that Alpine High was -- your words -- pretty much defunct.  Correct?

A    I did say that.

Q    What -- those were your words, right?

A    Now, these -- now, none of these things that we are looking at, that we just looked at from the consolidated amended complaint are identified as corrective disclosures in the consolidated amended complaint, are they?

A    I believe they are not.

Q    And they're not identified as such in the motion for class certification, are they?

A     They are not.

Q     And the reason for that is because the stock price went up after each of those announcements, right?

A     Yeah.  There's good reasons for that.  I document a few of them in my event studies, but you're right, they go up.

Q     So after, for example, the company announced the $3 billion write-down, the stock price didn't go down, it went up, correct?

A     It went up because they announced good news regarding Suriname.

Q     But it went up, right?

A     That's right.

Q     And so you're saying the Suriname move is what call confounding news, correct?

A     In --

Q     That's -- now if you wanted to -- you're an econometrician.  One of the things econometricians do when there's confounding news is they do tests to try to take the confounding news out.  Correct?

A     You can do that, yeah.

Q     And you didn't do that here, did you?

A     I haven't estimated damages or loss position.

Q     No, but you didn't even bother trying that here, did you?

A     I wasn't asked.  I have an opinion on market efficiency, whether it can be applied commonly in a manner consistent with

plaintiffs' theory of liability.

Q    Okay.  But we can agree that after Apache announced that or word was disclosed that San Antonio was shut down, that drilling activity had ceased, that Apache had taken a $3 billion write down, and that all operations ceased, the stock price went up after each of those disclosures.  Correct?

A    I can't recall all of them.  I know certainly that February 27th date is a significant increase in the price.

Q    Yeah.  So now, let's look at the two alleged corrective disclosures that came after all this information.  Okay?  The correct -- the consolidated amended complaint talks about the Seeking Alpha report that came out on March 15th, 2020, right?

A    Right.

Q    And Seeking Alpha is just a blog, right?  Anybody can post on Seeking Alpha, correct?

A    Yeah, I believe so.  I don't -- I haven't studied Seeking Alpha's publication requirements.

Q    They don't have authors or they don't employ anybody, right?

A    I think they do, but I -- you mean that, are the authors employees, I don't believe so.

Q    And you don't have to be a CFT or an econometrician or a financial analyst to post on Seeking Alpha, do you?

A    I don't really know, but I don't think -- I've certainly seen articles that are published by people without those

credentials.

MR. STERLING:  Okay.  So John, if you pull up the Seeking Alpha article, which is Tab 37 -- Exhibit 37.

BY MR. STERLING:

Q    This is the Seeking Alpha report, correct?

A    It looks like it, yes.

Q    It is March 16th of 2020, 3:35 a.m.  So again, no question when -- whether this came out premarket, during market, or post market, right?

A    Right.

MR. STERLING:  John, if you'll turn to the second page of this. I'm sorry, my bad.  If you keep -- these pages are not marked. It's the fourth page.  Here we are.  The top of the page -- stop right there, John.  Thanks.

BY MR. STERLING:

Q    The top of this page says, "The prices of natural gas and NGL had already been low for an extended period.  This forced Apache to shift capital away from the wet gas rich Alpine High play, which has been driving the company's production growth." Do you see that?

A    I do.

Q    Now, characterization of Alpine High as wet gas rich is directly contrary to the plaintiff's thesis in this case, is it not?

A    I don't know if that's 100 percent the case.  The --

there's certainly the mix of oil and gas issue, but there were NGLs present in the gas that was being extracted at the -- throughout the class period, so I don't know if it's necessarily correct to say that this is a wet gas rich play.

Q    That's the only reference to Alpine High anywhere in the Seeking Alpha article; is that correct?

A    I mean, they also in the next sentence say, "Apache reduced Alpine High play by $1.4 billion."

Q    Yeah.  Those are the only references to Alpine High in the article, right?

A    I can't recall right now.  It may be.

MR. STERLING:  Okay.  And if we go to the next page, John.

BY MR. STERLING:

Q    We see a language we kind of looked at a little bit before, before your -- you took the stand.  It says, "I think what puts Apache in a difficult spot is that (indiscernible). It has a weak balance sheet marked by high levels of debt which limits the company's ability to use additional bonds to fund the cash flow shortfall.  At the end of last year, Apache had $8.16 billion of debt, (indiscernible) which translates into a lofty debt to equity ratio of almost 250 percent, the highest among all large cap independent oil producers as per my calculation."  You see that?

A    Yes.

Q     The Apache debt was hardly unknown to the market, correct?

A     That's correct.  Market has an understanding of debt on the company's balance sheet.

Q     And in fact, the market knew that Apache had funded $8 billion of debt for well over a year before this Seeking Alpha report, correct?

A     Yeah.  We obviously went through that earlier.

Q     Okay.  And then what's -- the other article that came out that day was the Susquehanna report, correct?

A     Correct.

Q     The Susquehanna report is not identified in the consolidated amended complaint as a corrective disclosure, is it?

A     I don't know the answer to that.  I'm not a lawyer.  It certainly --

Q     Fair enough.

A     Yeah.  Sorry.

MR. STERLING:  Fair enough.  John, could you pull up the Susquehanna report?

BY MR. STERLING:

Q     This was a sector update, correct?

A     That's the title.

Q     And it says, "Call to action.  With oil markets likely to remain oversupplied, we are changing our 2021 WTI price assumptions to 37.40 versus 55.55 previously.  We're also

reducing Henry Hub Natural Gas assumptions to approximately (indiscernible) versus 242.60 which is roughly in line with (indiscernible) pricing.  With the lower price assumptions, we're moving to a neutral rating on Apache, Novo, and Occidental while upgrading Cabot to a positive rating.  These rating changes are primarily governed by our view of balance sheet flexibility."  Correct?

A    That's what it says.

        MR. STERLING:  And there is a little more disclosure about Apache on the next page, Joh, if we'll turn there.

BY MR. STERLING:

Q    Nowhere in the report does it say anything about Alpine High, does it?

A    I do think it references Alpine High, when it makes a discussion of the -- that Apache had already announced activity reduction, because that lists the activity reduction in Alpine High.  It also slashed its dividend payments because of Alpine High, so I don't think it's -- it's not named directly --

Q    Not --

A    That's for sure.

Q    Yeah, my question is pretty simple.  It nowhere even mentions Alpine High, does it?

A    It does not mention -- it does not mention or state the term Alpine High.

Q    Doesn't have any new information at all about Apache.

A     Yes.

Q    Any news that was not known to the market before, other than the fact that Susquehanna was downgrading it based upon that that -- Susquehanna's new assumptions about future oil and gas prices.  Does it have any other information about Apache in there?

A     Yes.

Q     Where?

A     It described clearly, I think, that -- they say, with a large uncertainty in the magnitude and timing or the recovery in oil prices, balance sheet flexibility is the main parameter in a stock selection process, and a few other things.  And then, they --

Q     What new -- how is that new information about Apache?

A     I'm going to get there.  I'm --

Q     Okay.

A     They're commenting Apache having really poor balance sheet flexibility relative to its peers, and that and that indeed, they've already announced an activity reduction and slashed the dividends, but additional cutbacks may be necessary.  I mean, that's new information.  That's the analyst's written opinion, justifying their downgrade.  As I've described, there is academic literature.  A paper that comes to mind is (indiscernible) published in 2005 in the Journal of Financial Economics that describes how these types of analyst

justifications for their opinions and ratings actions can influence prices in providing new information to the market. They also raise considerably Apache's net debt to EBITDA ratio for 2020 and 2021, such that there -- it's the highest amongst all international and diversified E&P companies in the coverage years.  And that's inconsistent with plaintiffs' allegations.

Q    The dividend cut was old news, right?  Apache had already (indiscernible), right?

A    Right.

Q    Apache's debt load is old news, right?

A    Right.

Q    The fact that they had shut down Alpine High was old news, right?

A    Well, I don't think they necessarily shut down Alpine High at this point.  They stopped drilling, but I don't think they shut down the entire operation at this point.

Q    Well, we just saw the article a few minutes ago, right?

A    We did.

Q    Okay.  One last thing.  I meant to ask you this before and I forgot.

        MR. STERLING:  If you turn, John, to the Barclay's report, Exhibit 19.

BY MR. STERLING:

Q    I apologize for not asking this before, but when you talked about the first alleged corrective disclosure about the

deferrals of gas at Alpine High -- you remember that topic generally?

A    Yes.

Q    And we saw that the Waha price has typically bounced around, plus or minus $2 during most of 2018 and into 2019?

A    Yes.

MR. STERLING:  Okay.  Scroll down a little bit, John.

BY MR. STERLING:

Q    You see there where it says at the top, they talk about how Apache (indiscernible) was initiated -- that it initiated natural gas (indiscernible) in the Alpine High operating area starting late March due to "extremely low price at the Waha Hub."  See that.  We saw that before.  Then they go on to say, "They calculate that the Alpine High break-even price is 89 cents an MCF."  You see that?

A    Yes, I do.

Q    And if you -- that's a Barclay's calculation, right?

A    That's their estimate.

Q    And then we can do 89 cents an MCF if they -- relatively speaking, it's a very low price at the Waha Hub, is it not?

A    No, it's a price.  It's lower than -- I mean, it does -- it's a cost.  It's lower than the $2, for instance, you highlighted in 2018.

Q    And then they go on to note that "This is meaningfully higher than the negative 48 cents MCF Waha (indiscernible)

during late March."  You see that?

A    I do.

Q    So this reflects that at the time, by late March, the Waha Hub price was negative 48 cents an MCF, right?

A    In late March, not April 23rd.

MR. STERLING:  Okay.  I pass the witness.  I'm sorry, Judge, you -- looks like you had a question.

THE COURT:  I do, but I was on mute.  Sorry about that.  A minute ago, Mr. Sterling was asking some questions obviously trying to suggest or indicate that there was nothing new in the Seeking Alpha post of March 16th, 2020.  And he said something to the effect that you knew that, by March 16th, 2020, that Alpine High was shut in or shut down, there was going to be no -- Alpine High not going forward.  That's true, right?  I mean, by March 16, 2020, it was publicly announced that Apache was not proceeding with the Alpine High play, right?

THE WITNESS:  Is that for me, Your Honor?

THE COURT:  Yes.  Yes.

THE WITNESS:  I -- no, I don't think it was fully shut down.  I think they stopped drilling because they were not going to expand the operations at that time.  I think Alpine High actually turned back on, I think Ms. Allen makes this point, after the class period, to produce gas and some oil.  So it's not that -- if they reduced activity --

THE COURT:  Well, it doesn't matter what -- well, I -- and I'm going back to Mr. Sterling's already pointed this out, but in the complaint, Paragraph 107 cites a February 27, 2020 article from Bloomberg that titled, "Apache calls it quits on Alpine High after $3 billion write-down," and the article states, "Apache Corp. is officially calling it quits on a highly publicized but disappointing shale discovery in West Texas."

So I don't -- I usually don't like to show my hand, but I'm just having a real hard time understanding, if that's true -- and that's the allegation in the complaint -- if that's true, that Apache was calling it quits on Alpine High and that's publicly available in February, what is there in the Seeking Alpha post that is new or that the market didn't already know?

THE WITNESS:  It's -- I believe the plaintiffs are alleging under their theory of liability that the Alpine High play and the investment in it just saddled the company with billions of debt and that's what contributed to that $8 billion in debt that we've been talking about.  And that one --

THE COURT:  But we do -- but everyone knew that, right?  I mean, in February 2020, according to Paragraph 106 of the complaint, the company reported a $3 billion impairment for Alpine High.  So I think it's clear, Alpine High was a disaster.  It didn't work.  It was -- you know, I'm just trying

to figure out what is it that the Seeking Alpha -- and I just don't understand. I'm being very frank. I don't see what's new, different in the Seeking Alpha post.

THE WITNESS: Seeking Alpha and Susquehanna, I think, are pointing out that the Alpine High disaster has put Apache in a dire financial position and it's costing, because oil and gas prices at this time are really in trouble, the allegation is that Alpine High caused this to be an issue, especially in light of what they had been touting earlier in the class period, that they would be put into -- Alpine High would but Apache into a competitive and exciting position in its industry that would generate high margins and high recycle ratios relative to its peers, not just profitability for wealth.

So it's really the culmination of the disaster and how it's now put this company in such dire financial position that it's unable to weather the storm of lower commodities prices going forward. That's my understanding of the theory.

THE COURT: Your understanding -- did you adopt that theory? I guess I'm sort of -- do you believe in that theory?

THE WITNESS: Well, I have no -- I always just assume the theory of liability. As an economist, I -- especially with respect to damages, I can tell you what happened on the dates. I can tell you what events caused decline. Whether those are the result of fraud, that's continued on plaintiffs' theory of liability and I have to assume if I'm going to say that that's

damages, which is a legal construct, that those declines are part of damages associated and causally connected with a prior misrepresentation. So I wouldn't say -- I haven't done any research on the validity of their theory. I am just -- and at this point, just trying to highlight that with respect to price impact, the complete nature of Ms. Allen's analysis --

THE COURT: Well, let me ask you this. You might not be the right person to ask it to, because I understand you're (indiscernible). I guess this is really (indiscernible) question. But I'm curious. When did the market first appreciate the belief that boy, this Alpine High was a real dead weight on Apache, it's going to really hurt their financial position?

THE WITNESS: I -- well, the plaintiffs, the corrective disclosures that alleged, I think, describe -- I've done the event study for market efficiency, so I can see a few of these days and it seems to line up very well with these. You know, they have a poor quarter because of -- they announce less reserves than they had before. This is, you know, in the pre-focus period. Then, they announce, you know, it's gassier than they expected. And then again, in the focus period, where you've got the gas deferral which is, you know, bad news. It may not have caused a statistically significant decline, but it is -- there's no way to call it good news, that caused the price to objectively decline. And then, you've got Keenan's

resignation and now the Seeking Alpha report.  But yeah, I mean, it's kind of like, it starts, I think, with that October 2017 corrective disclosure and then seems to progress over time.

THE COURT:  Okay.  Anything further, Mr. Sterling?

MR. STERLING:  No, Your Honor.

THE COURT:  Okay.  So, it's 11:30.  What do we want to do?  Do you want to do -- Mr. D'Ancona, do you want to do a redirect now?  Do you want to take a little lunch break?  Do you want to take a break and then do a redirect and then take a lunch break?  I sort of defer to the parties.

MR. WHITMAN:  Your Honor --

THE COURT:  Oh, sorry, Mr. Whitman.

MR. WHITMAN:  Yeah, so we would like to do some redirect, but I think, Your Honor's correct that now's a good time for a break, whether it's lunch or not, I'll leave to other -- I think we're fine either way.  Just need at least ten minutes for a bathroom break.

THE COURT:  Well, I need that as well.  Any idea -- and I'm not holding you to it -- any idea how long you think the redirect would be, just to be --

MR. WHITMAN:  I -- Your Honor, I'd only be guessing, but I'd estimate about half an hour.

THE COURT:  Okay.  Let's do this, then.  Let's take a ten minute break, so we will get back at 11:40 for redirect and

then my hope, just so we're all on the same page, is that we'll finish this witness and then take a lunch break, is my hope. So let's go. We'll be back in ten minutes, and we're off the record. Thank you very much.

(Recess)

THE COURT: Let's go back on the record. Mr. Whitman, are we ready to proceed with redirect?

MR. WHITMAN: Yes, Your Honor, we're ready.

THE COURT: Go ahead.

REDIRECT EXAMINATION OF ZACHARY NYE

BY MR. WHITMAN:

Q    Dr. Nye, do you recall that Mr. Sterling asked you in an efficient market whether a security price rapidly impounds information?

A    I do.

Q    And are there circumstances under which it takes -- the time with which information is incorporated into a stock price can vary?

A    Yes. I mean, I -- the academic (indiscernible) acknowledge that and I think the textbooks by Berk and DeMarzo summarizes it very well.

Q    And can you identify any circumstances under which it may take more than a single day for a security price to incorporate information in an efficient market?

A    Yeah, I mean, Berk and DeMarzo, the textbook,

(indiscernible) MBA programs describes it as when information is difficult to understand or uncertain, I think is the title of the section, if -- you now have to start dealing with individuals and how their expectations are adjusting to the uncertain information over time, and then through the trading mechanism, they convey those expectations into the market price, which is kind of the opposite side of the coin is what they describe as information that is, you know, clear ramifications to firm value that all investors can agree on, then you would see a quicker price reaction in other instances.

Both are perfectly consistent with market efficiency, I think, as the (indiscernible) Horton paper I cite describes, and Grossman and Stiglitz -- again, Joseph Stiglitz won Nobel Prize -- and then the Kyle 1985 paper.  They all described that when there's uncertainty with respect and the information disclosed it can -- there is a trading mechanism that allows it to be embedded into the price, but take time.

Q   And you recall Mr. Sterling asked you some questions about the April 23, 2019 alleged corrective disclosure?

A   Yes.

Q   And just for context, what was announced on April 23rd, 2019 by Apache?

A   The deferral of natural gas --

THE COURT:  Wait.  Hold on.  I need to go off the record for one second.  One second.

(Recess)

THE COURT:  Okay, sorry about that.  Proceed.

MR. WHITMAN:  Thank you, Your Honor.  We're back on the record?

THE COURT:  Yes, we are back on the record.

BY MR. WHITMAN:

Q    Dr. Nye, I'll repeat the question again for context.  What did Apache announce on April 23rd, 2019?

A    An indefinite deferral of gas production at Alpine High.

Q    And you were asked a question as to what if anything was uncertain within that announcement; do you recall that?

A    I do.

Q    What do you recall that was uncertain in that announcement, in your opinion?

A    I think I might have got it in before I stopped elaborating, but it was the timing, of course, was uncertain with respect to how long it would last.  There was no quantification of the cash flow impact that the deferral would have.  And it was not at all described whether it was going to be NGL more viable than dry gas, you know, how -- what is the amount of those two type of gas, how much of it is going to be deferred, which can have significant implications, company's profits doing forward.

And that, I think, is what is clear to me in those reports and the company's internal discussions with investment

advisors, the market was having a tough time reading through that deferral announcement and how it affected gas production for the full year of '19 and down the road in 2020 as well.

Q   Based upon your review of analysts' reports and news articles in this case, are you aware of whether any analyst or market participants predicted the deferral of natural gas production that Apache announced on April 23rd, 2019?

A   I don't -- no, I have not seen any evidence of any analyst or investor predicting a deferral -- not the risk, of a deferral, but the actual deferral occurring at that point in time or prior to the April 23rd announcement.

Q   After Apache announced the announced the deferral on April 23rd, 2019, did market participants seek further information regarding the detail behind the deferral?

A   They were questioning and asking -- or at least (indiscernible) describing the need for further information or clarification with respect to how this deferral impacted forward production in 2019 and '20.  And the impact, given NGL pricing, and what that meant for profitability, and then yeah, October 25th, there's the email from Mr. Yang describing investor uncertainty and questions regarding that deferral.

Q   Dr. Nye, when you just referenced October 25th, 2019 email from Mr. Yang, is that the date that you intended to reference?

A   Did I say -- April 25th.

Q   During Mr. Sterling's questioning of you, he asked whether

you could identify any academic literature supporting the use of a multi-day window specifically to measure Apache's price response following April 23rd, 2019 corrective disclosure; do you recall that?

A    Yes.

Q    And do you recall that in an answer, you began to reference a NERA paper?

A    I did.

Q    And can you tell us how that NERA paper relates to measuring the price response to the security in an efficient market over multiple days?

A    Sure.  The paper's discussing at that point in time, the common practices that they have seen in securities litigation involving the estimation or measurement of price declines, usually for the purpose of (indiscernible) damages and they describe that -- believe it's like one, three, and even five-day windows are common in -- at that time period (indiscernible).

Q    Now, I'm going to talk about the October 25th, 2019 corrective disclosure.  Do you recall what Apache announced on October 25th, 2019?

A    Mr. Keenan's resignation.

Q    And prior to the October 25th, 2019 announcement of Mr. Keenan's resignation, are you aware of whether Apache had extracted any hydrocarbons from the ground in Suriname?

A    I don't think they -- I don't know if they had, technically.  They certainly said they hadn't reached the target formation at that point.

Q    And as of October 25th, 2019, when Apache announced Mr. Keenan's resignation, was Alpine High still a significant asset for Apache?

A    Well, at that point it was.  It certainly had fallen off from where it was at the beginning of the class period when it was touted as a world class resource or an immense resource that would drive -- you know, future shareholder returns for years to come, but they had -- in October, they had been touting -- well, I think since May.  May and August, they touted the second half would be a return to form in terms of production, so they were describing a turnaround at Alpine High, and (indiscernible) that was obviously somewhat thwarted by the fact that the leader, the man who oversaw operations at Alpine High had resigned.

Q    As of October 25th, 2019, what if any connection to Alpine High did Steve Keenan have?

A    My understanding is that he was the head of the San Antonio office, described as the lead geologist, that he oversaw the company's exploration operations, the unconventional resource technology team, and operations in the Delaware Basins including Alpine High.

Q    On October 25th, 2019, certain analysts reported on Apache

stock price movement during the trading day.  Do you recall that?

A    I do.

Q    And you mentioned during your cross examination that you had prepared an intraday or conducted, I should say, an intraday analysis of Apache stock price movement on October 25th, 2019?

A    I did.

Q    And what does your intraday analysis of the Apache stock price movement on October 25th, 2019 show?

A    Well, I tried to describe it a bit earlier but it's pretty clear cut.  You've got the stock price open at 9:30, fairly flat.  Then 9:45 which is a minute after the announcement of the resignation, the stock price sinks like a rock.  It drops, I think, Morgan Stanley or whatever said it was about 11 percent decline at that point.  However, by 10:15, RBC issued a report saying, hey, we talked to Alpine High -- or sorry, Apache, and they said that Mr. Keenan's resignation had nothing to do with Suriname and I think -- they certainly said that and I can't remember whether they also said they hadn't reached the target formation.  They may have said it at that point.

    And that (indiscernible) at that point, there's a really quick rebound in the market price such that by about 11:30, which is shortly after the company itself confirmed that Mr. Keenan had -- his resignation had nothing to do with Suriname

and that they had not reached the target formation in the Maka 1 well, which means that they had no test results, it leveled off at about $22 for the rest of the day, and that -- well, you'll ask the next question.

Q    And Dr. Nye, you measured Apache's stock price movement in response to Mr. Keenan's resignation from the close -- you know, the price when the close of trading on October 24th, 2019, to the close of trading on October 25th, 2019; is that right?

A    Yes, that's correct.

Q    And what would you -- what abnormal return, if any, did you calculate for the close to close price change from October 24 to October 25 in Apache common stock?

A    I think it was on an actual basis, it was about five percent, close to close, decline, net of market and industry effect.  I can't quite remember what the amount was.  It was statistically significant at a very high level, like 99 percent under both my model and (indiscernible) model.

Q    Other than the announcement of Steve Keenan -- sorry, Steve Keenan's resignation on October 25, 2019, are you aware of whether there was any other Apache specific value relevant news released that day?

A    No, just information related to his resignation including the clarification that it had nothing to do with Suriname by 11:21 a.m.

Q    Based on your intraday analysis, in your opinion, did investor concern about Suriname cause the entirety of the statistically significant price decline in Apache common stock on October 25, 2019?

A    No, I don't think -- certainly, not the entirety.  We can see intraday the price recovers strongly once investors become aware that -- because his resignation did not have anything to do with Suriname.  They had no test results from Suriname so there would be no reason to believe that there was anything wrong with Suriname.  It would be irrational to think so and I think the market would have reflected that, given that those types of beliefs would be washed out by that true information, which is that he -- nothing related to Suriname was disclosed on this day.

MR. WHITMAN:  I pass the witness.  I have no further questions.

THE COURT:  Anything further, Mr. Sterling?

MR. STERLING:  Yeah, just a few.

RECROSS EXAMINATION OF ZACHARY NYE

BY MR. STERLING:

Q    Dr. Nye, you just mentioned the RBC clarification with respect to the Keenan resignation.

A    I did.

Q    Recall that, Dr. Nye?

MR. STERLING:  John, if you can pull that up.  And

let's mark this --

MR. LAWRENCE:  Exhibit 26.

MR. STERLING:  I'm sorry, this is Exhibit 26.

BY MR. STERLING:

Q    Dr. Nye, is this the RBC clarification that you just referred to?

A    Yes, I -- it is.

Q    It came out 10:19 a.m. on the 25th?

A    Yes.

Q    Says, "Based on our conversation with Apache as of the resignation date, the company has not reached the target objective at the Maka 1 prospect and the resignation was related to other matters."  That's all it said, right?

A    They also say that they further indicated there's a team in place and the work has been accomplished in regards to more than a dozen prospects in the Suriname region.  And it also talks about Alpine High and how Mr. Keenan was a major part of it and it's been a significant investment and (indiscernible) expectations.

Q    (indiscernible).  Dr. Nye, we looked before.  I just want to show your attention again to the Credit Suisse report that came out six days after the Keenan resignation, Exhibit 31.  We looked at it before.

MR. STERLING:  If we go to Page 5, the bottom of Page 5, John.

BY MR. STERLING:

Q   We've looked at it before.  (indiscernible) refresh your recollection, Dr. Nye.  The very bottom.  So, this is six days after the Keenan resignation and it says, "Expectations for the well are exceedingly high, underscored by the sharp selloff in the stock last Friday after news broke that Apache's head of worldwide exploration had departed the company, supposedly unrelated to Suriname, although with Apache in the middle of the drilling as well, the timing nonetheless spooked investors."

We've seen analyst reports talking about the concern and anxiety with respect to the Suriname prospect, given the timing of Mr. Keenan's resignation.  Did any analyst say, gee, Keenan's resignation spooks us as to Alpine High?  Did any analyst ever say that?

A   At least one analyst commented that his resignation was likely caused by Alpine High's poor performance.

Q   Did any analyst say anything like this one what says the resignation spooked the market about Suriname?  Did any analyst state the contrary (indiscernible) a similar comment about Alpine High?

A   (indiscernible) nobody said that Alpine High spooked investors.

Q   Did any analyst ever say, gee, Keenan's resignation makes me feel worse about Alpine High than I did before?

A    They did not use those words.

MR. STERLING:  Yeah, John, can you pull up the Yang exhibit we looked at before?  And Your Honor, just a housekeeping matter.  This is a document that I asked Dr. Nye about before, but I didn't mark the exhibit and I don't think it has been marked as an exhibit.  We can mark it as Defendant's 74.

THE COURT:  Okay.

MR. STERLING:  And this --

THE COURT:  Docket 74 and then after the hearing, if you would then just go ahead and file any additional -- both parties, if there are any additional exhibits that are offered at the hearing, just submit those so it's in the record.

(Defendant's Exhibit 74 marked for identification)

BY MR. STERLING:

Q    Then, Dr. Nye, Mr. Whitman asked you if anybody predicted that temporary deferral of gas at Alpine High and you said no, correct?

A    Correct.

Q    Now, this is the email I showed you that was a week before the announcement of deferral, right?  This is April 18th?

A    Correct.

Q    Right?  And this is from the same guy you referred to, Andy Yang, right?

A    Yes.

Q    And he's saying, "Hey, Gary and Patrick, heads up.  I'm nearing more chatter in the investment community about Alpine High's gas shut-in risk."  This was a week before, right?

A    Correct.

Q    Would you agree that there was a lot of speculation and chatter about the probability or the possibility of Alpine High getting shut in, in light of the historically low Waha gas prices?

A    No, I wouldn't agree with that.

Q    What does, "I'm hearing more chatter in the investment community about Alpine High's gas shut-in risk" mean to you?

A    That there's some chatter in the investment community, according to Andy Yang, that there's shut-in risk.  That's not, you know, a lot of chatter, necessarily.  It's certainly not anything that was talked about in the public record.  There's no evidence of -- from news reports or analyst reports that there was a prediction of shut-in, of, you know, on April 18th or prior, or after --

Q    And --

A    -- until the company actually did it.

Q    And Mr. Yang goes on to say it economically makes sense sometimes to shut in, right?

A    He does.

Q    And you would agree that when gas prices are at historically low prices, it might make economic sense to do a

temporary deferral, wouldn't you?

A    It would depend, on as a matter of economics, your break-even price and how profitable you are at that time and the cost it would take to ramp up production again after you've shut it in.  So it's a cost-benefit analysis.  It depends on the context.

Q    Exactly.  With gas prices so low, it then becomes -- can become economically prudent to shut in temporarily, correct?

A    It could be.

MR. STERLING:  I pass the witness.

THE COURT:  Anything further Mr. Whitman?

MR. WHITMAN:  Just one quick question or maybe two.

FURTHER REDIRECT EXAMINATION OF ZACHARY NYE

BY MR. WHITMAN:

Q    Dr. Nye, Mr. Sterling just asked you about a SunTrust report released on October 25, 2019, which was Allen Exhibit 28.  You recall that?

A    Yes.

Q    And among other things, you were asked whether there was any negative information about Alpine High within the SunTrust report; you recall that?

A    Yes.

Q    I don't actually have this up on the screen, but do you have Allen Exhibit 28 in front of you, Dr. Nye?

A    I don't.  I can find it pretty quickly if I'm allowed to.

Should I?

Q   Please.  And when you get there, I have a question on the first page.

A   What exhibit is it, again?

Q   It's Allen Exhibit 28.

A   I'm finding it.  Okay, they're all combined in a major -- very long PDF.  I'm trying to find -- there we go. (indiscernible).

Q   Okay, and can you look at the -- can you read into the record the first sentence of the second paragraph of the first page of exhibit -- Allen Exhibit 28, please?

A   The first sentence reads, "Apache stock under performed this morning, down five percent versus" --

Q   One moment.  I'm sorry to interrupt.  That's not -- that doesn't appear to be the first page of the SunTrust report?  Do you -- are you looking at the SunTrust report, Dr. Nye?

A   I have Allen Exhibit 28.  It's called -- the headline is "Resignation not linked to upcoming Suriname well result."

Q   Correct, and then the second paragraph on that page with the headline, can you read the first sentence of that paragraph?  The second paragraph.

A   The second paragraph says, "We anticipate Apache will soon signal a strategic shift away from Alpine High and toward higher oil cut regions such as the Midland Basis and Egypt though we are unlikely to see full 2020 (indiscernible)."

Q    And during Mr. Sterling's most recent questioning of you, he also asked you about an October 25, 2019 report by RBC.  Do you recall that?

A    I do.

Q    And in connection with his questioning as to whether any analyst remarked on anything negative about Alpine High in response to Keenan's resignation, if you look at Allen Exhibit 30 -- do you have that Dr. Nye?

A    I do.  I have it.

Q    Take a moment and read that and let us know whether there's any language within the notes, the (indiscernible) implications for Alpine High from the Keenan resignation?

A    The summary describes that the 4Q '19 guidance was lowered and Alpine High activity is being curtailed.

Q    If you look -- this is a one-page report.  If you look, Dr. Nye, the fourth full paragraph.  Can you read the second sentence of that paragraph, start with the word however, please -- into the record?

A    I honestly don't see it.  What -- where are you again?

Q    The fourth full paragraph.  Do you see a paragraph on the one page, RBC October 25 analysts report beginning with --

A    I'm on October 30th.  That -- are you in a different exhibit?  Because Exhibit 30 is the October 30th RBC report.

Q    Fair enough.  Does the October 30th RBC report give you any information whatsoever as to what caused this statistically

significant movement, downward movement in Apache's common stock price measured from the close of October 24 to the close of October 25, 2019?

A    I don't believe so, and that's certainly true with respect to the October 25th RBC report as wells, which was published at roughly 10:15 a.m. on October 25th.

MR. WHITMAN:  I have no further questions.

MR. STERLING:  Real quick, Your Honor.

FURTHER RECROSS EXAMINATION OF ZACHARY NYE

BY MR. STERLING:

Q    So Dr. Nye, you're talking about the RBC October 25th report where they say, "We anticipate Apache will soon signal a strategic shift away from Alpine High and towards the higher oil cut regions such as the Middle East and Egypt, right? SunTrust.  That was the language that Mr. Whitman just directed your attention to, right?

A    That's right.

Q    This is October 25, right?

A    Correct.

Q    But in fact, that was not a new opinion for SunTrust Robinson Humphrey, was it?

A    I can't recall at the moment, as I sit here today.

MR. STERLING:  John, if you pull up -- which exhibit is this?

MR. LAWRENCE:  Twenty.

MR. STERLING:  Exhibit 20.

BY MR. STERLING:

Q    It's a SunTrust Robinson Humphrey report dated September 23rd, a full month before.  September 23 is a little more than a month before October 25, right?

A    Correct.

MR. STERLING:  John, if you'll turn to Page 7 of this report.

BY MR. STERLING:

Q    You see where it says, "A month before with the recent weakness in gas/NGL prices and the transition to development mode in Alpine High, management has noted the need for the assets to compete for capital and we would not be surprised to see the company shift capital away from the assets, should NGL gas prices remain around current levels."  You see that?

A    I do.

Q    Same sentiment a month before October 25, right?

A    I would say they -- (indiscernible) discussed the -- they're both talking about a shift away --

Q    (indiscernible), right?

A    (indiscernible), they're talking about a shift away from Alpine High.  They use different language.

MR. STERLING:  Pass the witness.

MR. WHITMAN:  I have one last question and it follows up on this September analyst report you were just reviewing.

FURTHER REDIRECT EXAMINATION OF ZACHARY NYE

BY MR. WHITMAN:

Q    When Mr. Keenan's resignation was announced on October 25, 2019, do you have an opinion as to whether it was more likely that Apache would shift away from Alpine High following his resignation?

A    I think it's, like, consistent with the shifting away from Alpine High, given that as we know now this was not a lucrative resource.  And losing the executive who oversaw operations, exploration, and unconventional resources at Alpine High, I think is consistent with becoming the place for prospects.  So it sound like more likely, it's just that it's all part of one negative story that's playing out.  His resignation kind of one of the final steps in seeing Alpine High devolved into a worthless asset.

MR. WHITMAN:  No further questions.

THE COURT:  Mr. Sterling --

MR. STERLING:  -- Your Honor.

THE COURT:  Okay.  Thank you very much, Dr. Nye.  I appreciate your testimony here today.

Let's do this.  Let's take a lunch break.  I sort of defer to the parties. How long do you want?

MR. WHITMAN:  I'll throw out 35 minutes as a suggestion, but open to anything longer, I suppose.

MR. STERLING:  We might need more like 45, Your

Honor.

THE COURT:  Let's do this.  Say 45, that's easy, because then we just come back at one o'clock.  So let's do that.  We're off the record.  Have a good lunch.

MR. WHITMAN:  Thank you, Your Honor.

(Recess)

THE COURT:  Okay.  Let's go back on the record.  (Indiscernible) missing anyone, but -- okay.  I think we're ready to proceed with the cross examination of Lucy Allen, correct?  Nods of the head.  Okay.  Ms. Allen, do me a favor, if you would raise your right hand, please.  Do you swear that the testimony you're going to give in this Court proceeding today is the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE COURT:  Okay.  I have received, and it's been filed as Docket Entry 142-1 of this case, Class Certification Hearing Direct Testimony of Lucy P. Allen.  And my question for you is this.  Have you had an opportunity to go over that and are you willing to adopt that direct testimony as your testimony here in this Court proceeding under oath??

THE WITNESS:  Okay.

THE COURT:  Who's going to do the cross examination?

MR. KAPLAN:  Good afternoon, Your Honor.  Dave Kaplan of Saxena White.  I'll be taking through the cross examination.

THE COURT:  Okay.  Mr. Kaplan, the floor is yours.

MR. KAPLAN:  All right.

CROSS EXAMINATION OF LUCY ALLEN

BY MR. KAPLAN:

Q    Good afternoon, Ms. Allen.  Do you stand by the entirety of the opinions that you've expressed in the report and testimony that you've provided in this matter?

A    Yes.

Q    And in conducting your analysis, you have been asked to assume plaintiff's claim of market efficiency, correct?

A    That's right.

Q    And you do not dispute that the market for Apache (indiscernible) was efficient during the entire class period, correct?

A    That's correct.

Q    And you also agree that after Apache's announcement of the Alpine High discovery on the first day of class period, Apache's stock price increased for three straight days from a close of $51.67 on September 6th to a close of $59.40 on September 9th, 2016, for a total increase of approximately $7.73 there, correct?

A    I recall there is an increase.  I don't recall a specific amount.

Q    Do you recall that that increase was over $7 per share over the three days after the announcement of Alpine High?

A    I don't specifically, and I don't know if you mean -- I am recalling a percentage, but I --

Q    (indiscernible)

A    -- don't recall the --

Q    Sorry.

A    I don't recall the specific amount.  So, I recall earlier today a discussion of a 15 percent -- percentage and I think that's the like excess movement according to Dr. Nye's model, but that's my recollection.

Q    And I was going to get to the 15 percent in a moment.  Do you have any reason to dispute that Apache's stock price increase by over $7 a share over the three-day period following the announcement of Alpine High?

A    Not from my head, no, I don't.

Q    Okay. And do you have any reason to dispute that that stock price, the total stock price increase was approximately $7.73 per share?

A    No, not as I sit here.

Q    Thank you.  And as you just testified previously, do you have any reason to dispute that that increase represented approximately a 15 percent increase in the price of Apache common stock over that three-day period?

A    I think so.  Right.  I believe so.

Q    Okay, so 15 percent, to be clear?

A    I'm sorry?

Q    Fifteen percent to be clear?

A    I'm not understanding the question.

Q    I'm asking just to be clear, the stock -- you don't dispute that the stock price increase following the announcement of Alpine High was approximately 15 percent over the ensuing three-day period, correct?

A    I think that's correct, but I don't know for sure.

Q    Okay.  Do you agree that the concept of price impact in the present context, securities litigation, refers to an analysis of whether the alleged misrepresentation affected the market price of the stock when they were made?

A    Yes, I think that's correct.

Q    And is it your understanding of once plaintiff is -- plaintiffs established market efficiency, defendants bear the burden of proof and persuasion to show that there was no price impact?

A    I think the burden on price impact is on defendants and I understand the burden to be the preponderance of the evidence.

Q    In Paragraph 20 of your opening report, you state that -- and I'm going to -- I'm happy to pull this up -- but I'm going to read it into the record.  "In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways.  One, directly by analyzing the market reaction following an alleged misrepresentation, including analyzing the stock price movement and examining market and analyst commentary

following the alleged misrepresentation; or two, indirectly by analyzing the market reaction to a disclosure that is corrective of an alleged misrepresentation."  And my question to you is, do you stand by that statement?

A    I think that's correct, yes.

Q    And these methods are often referred to as front-end price impact and back end price impact, correct?

A    I don't know that I agree with that.

Q    Well, have you -- do you understand when I refer to front-end price impact, do you understand what I am referring to with that term?

A    I would say that term has been used differently and I don't think it's well defined.

Q    Is that --

A    I don't dispute your -- I don't dispute your, if you want to use those terms in the way that you've described it, but I don't think that those terms are always used in the same way.

Q    Okay.  Do you understand that front-end price impact is what you had referred to in your opening report as number one directly by analyzing the market reaction following an alleged misrepresentation?

A    I don't use that terminology, no.

Q    Okay.  I'm asking you if that's what you understand the term front-end price impact in this context to be referring to, what you have in your opening report, Paragraph 20 as number

one, the impact after an alleged misrepresentation.

A    I think I have heard people refer to it that way.  I do think those terms are not entirely clear.

Q    And have you also -- are you also familiar with Courts referring to it that way?

A    Yes, I have heard Courts us the term front-end and back end price impact.  I similarly have not found that those terms are used consistently.

Q    Okay.

A    By the (indiscernible).

Q    Thank you.  And with respect the term back end price attack, it is your understanding that Courts when using that term are referring to what in Paragraph 20 of your opening report you have at number two, "Indirectly by analyzing the market reaction to a disclosure, (indiscernible) an alleged misrepresentation"?

A    The same answer as before.  I think that some Courts may have referred to it that way.  I don't think the terms are consistently used and are clearly well defined and I myself --

Q    Okay.

A    (indiscernible).

Q    Thank you, Ms. Allen.  I just -- I'm asking a simple question.  Do you understand that Courts refer to what you describe in Paragraph 20 Item 1 of your opening report as front-end price impact and what you described in number two as

back end price impact.

A    I think sometimes Courts have used those terms in that context.

Q    Okay.  So you're aware that Court have used those terms of front-end and back end price impact in that context, correct?

A    Yes.

Q    And I'm trying to use these terms so we can simplify and streamline the discussion this afternoon.  I understand that you personally may not think those terms are how you would describe them, but that as you have just testified is how many Courts describe them.  So, I'm going to use the term front-end and back-end price impact consistent with the case law.  And if you don't understand a question of mine, just let me know or if you don't know what I'm referring to when I say front-end or back end price impact, just let me know.  Is that fair?

A    I think it's fair, but I will say that I do think those terms are not consistently used and I think it's not clear to use those terms, so I will tell you when you ask the question if I think it's not clear, but --

Q    Okay.  So --

A    I think the terms are ambiguous and I think they've been used in different ways, and I've tried to say that every time you've asked me that question.  So, I think it's easier to have a discussion not using those terms because I don't think that's --

Q    Ms. Allen, I'm not asking you what you think is easier.  I describe what you put in Paragraph 20 of your opening report Items 1 and 2 and asked if you understood Courts understood Item 1 to refer to front-end price impact and Item No. 2 to refer to back end price impact, and you testified that you not -- that you do understand Courts to refer to front-end and by back and price impacts in that manner, did you not?

A    Said sometimes they have and I think it's ambiguous, but okay.

Q    Okay.  So, do you agree that price impact in securities cases can be established by showing either front-end price impact or back end price impact?

A    Could be.  Price impact as I understand is determined with a, you know, preponderance of the evidence.  And so if there is conflicting evidence, I think you -- one could establish or have evidence of price impact by analyzing information at the front-end or the beginning of the class period as well as having evidence from how corrective information is disclosed.

Q    (indiscernible).

A    So, I think both ways can be informative regarding price impact.

Q    Okay, but the question was pretty straightforward.  Do you agree that price impact in securities cases can be established by showing either what's commonly understood as front-end price impact or by what's commonly referred to as back end price

impact, either way?

A    I think both analyses can be informative about price impact.

Q    The question is straightforward.  Do you understand that price impact can be established by showing either front-end impact or back end impact?

A    It's not --

Q    Yes or no?

A    I can't answer that with a yes or no.

Q    So, it's your testimony today that if a plaintiff in a securities case establishes front-end price impact, that that's sufficient to establish price impact?

A    I didn't understand that.

        THE COURT:  -- that question again?

BY MR. KAPLAN:

Q    The question is, so is it your understanding in -- that in securities cases, price impact can be established by showing front-end price impact?

A    I think maybe you're asking me a legal question about what is required, but you can give evidence of price impact and evidence of non-price impact by analyzing price reactions at the time the misrepresentations are made and you can also have evidence about price impact by analyzing what happens when corrective information is disclosed to the market regarding the misrepresentation.  So, both types of inquiry can be

informative and give evidence about price impact -- price impact of the alleged misrepresentations.

Q    Okay.  But in establishing -- does one seeking to (indiscernible) fraud on the market of presumption have to disprove both front-end price impact and back end price impact?

A    So, if you're asking me a legal question, I don't think I'm the right person for that.  It is -- my understanding is it's a preponderance of the evidence and I think that in -- it can be the case that inquiry when misrepresentations are made can be informative and inquiry when alleged misrepresentations are proactive can be informative.

Q    I understand that you think both can be informative, but do you agree that if positive front-end price impact is established, one cannot disprove it by demonstrating that there was no back end price impact?

A    Well, if over a period of time, the misrepresentations are no longer impacting the stock price, you could prove that for a period of time and it could be the case that misrepresentations impact the stock price in part of the class period and then they no longer impact the stock price in another part of the class period.

Q    Ms. Allen, have you conducted any economic analysis to determine whether there was artificial inflation in the price of Apache common stock during the class period?

A    I have analyzed price impact of all of --

Q    I ----

A    -- the alleged misrepresentation --

Q    I'm asking --

A    -- during the focus -- I -- during the focus period, which is --

Q    I --

THE COURT:  Hold on.  Let me just hear the answer first.  Then I can figure out if it's responsive or not, but let me hear the answer.

THE WITNESS:  So, which I think it related to that question, but not --

THE COURT:  I don't --

THE WITNESS:  That wasn't my --

THE COURT:  Let's start over --

THE WITNESS:  I think -- related --

THE COURT:  Hold on.  Time out, time out, time out, time out.  Let's just start off with -- let's readjust.  Ask the question, Mr. Kaplan.

BY MR. KAPLAN:

Q    You haven't conducted any analysis in this case to determine whether there was artificial inflation in the shares of the Apache common stock during the class period, correct?

A    Not that specific question, but the question I was asked to analyze, I think --

Q    I didn't ask --

A    -- is --

Q    I -- this is just -- just as with the cross of Dr. Nye, when I ask simple yes or no questions, I'd appreciate it if you just respond yes or no, rather than, you know, giving, you know, a soliloquy about, you know, what your personal opinions are, right?  I was asking a simple yes or no question.

THE COURT:  For what it's worth -- for what it's worth, I concur.

MR. KAPLAN:  Thank you, Your Honor.  And the first -- the initial line of questioning on front-end price impact or back end price impact, I was really just trying to get to a very simple question, as Ms. Allen's understanding whether or not in seeking to establish price impact, it is her understanding that one needs to establish both front-end price impacts and back end price impact or just to show one or the other.  And that is how -- it is a simple question I would like to -- and I'd like to ask the witness again.

BY MR. KAPLAN:

Q    Is it your understanding that one does not need to show both front-end and back end price impact?

THE COURT:  Are you asking as a legal matter?

MR. KAPLAN:  Well, I'm asking if the witness' understanding because --

THE COURT:  Okay, then -- I just want to be clear, of the law.

MR. KAPLAN:  Correct.  Correct.

THE COURT:  I'll let the witness answer.  I'm not sure why it matters what her answer is, though.  If she's right or wrong, it's a legal question, but go ahead, answer.

BY MR. KAPLAN:

Q    Well --

A    I don't know the answer to those.  I don't know legally what is the answer to the question.

MR. KAPLAN:  Well, and Your Honor, the -- I was following up on my line of inquiry when the witness answered in the affirmative, she understood that there was a 15 percent increase in the price of common stock, Apache common stock following the announcement of Alpine High.  So that would be the front-end price impact and I was asking the witness whether it's her understanding that one seeking to establish price impact would also need to show back end price impact.

BY MR. KAPLAN:

Q    So, would you agree that after the announcement of Alpine High, the defendants are alleged to have continuing -- continued to make misstatements all concerning Alpine High during the class period, including during your pre-focus period and continuing into the focus period?

A    Yes.

Q    And would you agree that many of the alleged statements in the case were confirmatory of the alleged misstatements

defendants made when announcing Alpine High?

A    Yes.

Q    And in fact, many were identical to those made during the Alpine High announcement, correct?

A    Yes.  I think a number were identical -- were identical to some of the alleged misrepresentations at the beginning of the class period; is that what you're saying?

Q    Yes, thank you.  You've answered the question.  That is what I was saying.  And would you agree that in the case of a confirmatory misstatement, one would not expect to see a change in the price of a security at issue if it is -- trades in an efficient market?

A    Yes, I'd agree with that in general.

Q    And would you also agree that in the case of an alleged omission of material fact, one would not expect to see a change in the price of a security that trades in an efficient market because the market cannot react to information that's confusing?

A    Yes.  In general, I would agree with that.

Q    And do you agree that there were confirmatory statements that occurred during your focus period?

A    Yes.

Q    And so you haven't ruled out the possibility that when the focus period began, there was price inflation remaining in Apache's stock, correct?

A    I think I have ruled out that there is inflation as alleged by plaintiffs.

Q    You --

A    So, I think I have ruled that out by my analysis.

Q    So, your -- sitting here today, is it your testimony that you've analyzed the amount of inflation in Apache common stock during the class period?

A    So, I don't directly analyze that, but by the process of what I have done, I think it does show that there isn't inflation as alleged by plaintiffs in the stock during the focus period.  I think you could come to that conclusion based on what I --

Q    Well, can you point to anywhere in any of your reports or your testimony in this case where you've given any opinion regarding the amount of inflation in Apache common stock?

A    I don't believe I have.

Q    So, you haven't offered any opinions on the amount of inflation in Apache common stock during the class period?

A    I haven't expressly offered those opinions.

            THE COURT:  Mr. Kaplan, let me ask you.  Why does this matter?  Help me --

            MR. KAPLAN:  Well, it matters because if there's clearly price impact at the beginning of the class period, a 15 percent increase in the price of common stock, then when the -- if Ms. Allen hasn't analyzed the amount of inflation in Apache

shares and offered any opinion whatsoever on that, she also cannot opine on whether that inflation was fully dissipated as of the start of her focus period.  So, the inflation would then be continuing into her focus period through the confirmatory misstatements that she's just acknowledged were made.

THE COURT:  Okay.  Got it.  Okay.

MR. KAPLAN:  I can say -- state that another way if Your Honor would like, if I wasn't clear, but I mean, that's the point.  Did front-end price impact establish 15 percent increase.  She hasn't analyzed inflation.  So, she can't say as of the start of her focus period, whether it's been fully dissipated or not.  And as a result, she can't -- and here's the question -- has there been -- I'd like to ask the witness.

BY MR. KAPLAN:

Q    Since you haven't analyzed the amount of inflation in Apache shares during the class period, you -- it's possible that inflation continued during your focus period, correct?

A    But it didn't come out during the focus period and it didn't come out right after the focus period.

Q    But would you agree --

A    And there's nothing left that plaintiffs are alleging that's no longer -- that's still in there.  So, by plaintiffs' own complaint and by my analysis that none of the inflations have come out on any of the corrective disclosures and no new inflations have come in by any of the alleged

misrepresentations during the focus period, logically, the conclusion is that no -- there is no inflation as alleged by plaintiffs in the stock price during the focus period, so that is the natural economic conclusion from the findings that I've done.

Q   But if you haven't analyzed whether the stock price that was introduced following the announcement of Alpine High was fully dissipated as of the start of the class period, wouldn't the logical conclusion be that any inflation that was remaining in the shares was continuing to impact the price of Apache stock during your focus period?

A   But it didn't come out during the focus period.  So, I've shown that there's no price decline from the misrepresentations during the focus period.  So, if it didn't come out and everything that plaintiffs allege is the truth has already come out by the end of the class period, by logic, there can't be any left.

Q   And by "any left," you're talking at the end of the class period?

A   That's right.  So, there -- the logic of what I have done along with what plaintiffs have alleged shows that there isn't inflation in the stock price during the focus period.

Q   But you've just testified that you haven't offered any opinions as to the amount of artificial inflation in Apache common stock, correct?

A    That's correct.  That's correct.

Q    Thank you.  Now, are you familiar with the Court's memorandum and recommendation in this case denying defendant's motion to dismiss?

A    At one time I was.

Q    Okay.  Are you aware that --

THE COURT:  That makes two of us.

MR. KAPLAN:  All right.

BY MR. KAPLAN:

Q    Are you aware that the Court upheld all of the alleged misstatements in the complaint?

A    I think that's right.

Q    Okay.  And are you aware that -- and then, since it's been a while, I'm going to introduce -- I'm going to bring up the Court's memorandum, share my screen so you can see.  Bear with me.  Sorry.  I think I shared the wrong screen.  Think that might be -- are you aware -- let me just ask you this.  Are you aware that the Court in its memorandum decision, the categories of misstatements that were upheld went beyond the mix of oil and gas and the amount of reserves at Alpine High?

A    Yes.

Q    And are you aware that some of the categories of misstatements that the Court upheld concerned defendant's alleged misstatements regarding the transformational discovery at Alpine High and that it was a world class resource

(indiscernible)?

A    Yes.

Q    And now, are you also aware that some of the categories of misstatements that the Court upheld where that Alpine High was immense product -- had immense production capabilities, including conservative estimates of over 3 billion barrels of oil and significant amounts of really rich gas?

A    I don't dispute that, but I don't --

Q    And are you aware that --

A    I don't know.  I don't know precisely.

Q    Okay.  And are you aware that the Court's decision also upheld statements that Apache -- that Alpine High would deliver incredible value to Apache and its shareholders for many, many years to come?

A    I recall that in the complaint.  I don't know if I recall that in the Court's decision.

Q    Okay.  Let me -- I would like to try this -- I haven't needed to use the screen share feature prior to today, so let me try it again, because perhaps I can refresh your recollection on that point.  So, here's the Court's decision. I'll scroll to the top so you can see.  And in the Court's summary of the allegations, the Court just cited the exact same statements I just mentioned, correct, at the end of the green highlighted portion, the Court mentioned the misstatements concerning Alpine High delivering incredible value to Apache

and its shareholders for many, many years to come.  You see that?

A    Yes.

Q    And I'm going to scroll down a little bit and in summarizing plaintiff's allegations, the Court referred to defendants touting the economic viability of Alpine High.  Do you see that portion?

A    Yes.

Q    And shortly below that, the Court also used the term commercially viable, describing lead plaintiff contention in this case.  Do you see that?

A    Yes.

Q    Okay.  And you understand those to be a category of alleged misstatements in this case, the commercial viability of Alpine High?

A    Not sure how you want to categorize them.  I've heard them -- I don't know which, how you want to categorize them.  I am aware that that's something that was alleged.

Q    Okay.  And I'm just referring, before I move on from the Court's decision and the categories of misstatements, this is the analysis section and the Court under lead plaintiffs adequately plead actual (indiscernible) misrepresentation.  The Court (indiscernible) statements including that Alpine High is an immense resource and a transformational discovery for Apache that would drive incremental growth and returns for years to

come. You see that statement?

A   Yes.

Q   And the reason I'm going through this line of questioning is because you've offered a "big picture" analysis in the case that the misstatements -- the alleged misstatements are limited to the relative oil and gas ratio in the case and the amount of reserves. Do you see in this sentence, this first sentence highlighted in green "an immense resource and a transformational discovery for Apache that would drive incremental growth and returns for years to come," any reference to the relative oil and gas mix or reserves?

A   No.

Q   Thank you. Has your understanding of plaintiffs' theory of the fraud changed since you issued your report -- your reports, I should say?

A   I have some -- I have seen what I think of as some changes in plaintiffs' theory.

Q   And has your big picture analysis changed as to what lead plaintiffs have alleged in this case?

A   No, but I -- the way you characterized it was not what my big picture analysis was.

Q   Okay --

A   -- it has not changed.

Q   Okay. So, you still understand that this case is limited to misrepresentations concerning the relative amounts of oil

and gas at Alpine High and the reserves; is that correct?

A    I do not understand that and I did not understand that when I issued my first report.

Q    So, does your understanding now include statements such as Alpine High being an immense resource that would drive shareholder returns for years to come?

A    I understood that when I did my initial report.  So, my understanding, that is not something that I have understood has changed in what plaintiffs are alleging.

Q    But your initial report in your big picture analysis characterizes the misstatements as limited to just the oil and gas mix and amount of reserves at Alpine High, does it not?

A    It does not.  That is not my intention.  One of the things I analyzed is the change in the mix.  The big picture analysis also addresses other issues.

Q    Okay.  Well, your reports speak for themselves, but you are now clarifying that you do understand plaintiffs' allegations in the case to go beyond just the relative amounts of oil and gas at Alpine High and the reserves -- the overall reserves, correct?

A    I don't believe I've ever said that they were only related to the mix of reserves.  So, that's not an opinion I ever offered or ever meant to offer.

Q    Okay.  So, it's your understanding that lead plaintiffs' theory of the fraud goes beyond just the amount -- the relative

amounts of oil and gas at Alpine High and the reserves?

A    That's right.

Q    Okay.  So, let's look at the back end price impact during the pre-focus period.  So, you and both -- you and Dr. Nye both agree that the corrective disclosures alleged during the pre-focus period were statistically significant, correct?

A    Yes, I believe that's correct.

Q    And I --

A    Not that the -- I'm sorry.  Not that the corrective disclosures were statistically significant, that the price reaction on those dates is statistically significant.

Q    Okay.  But you haven't offered any opinion whether those pre-focus corrective disclosures fully removed any front-end stock price inflation that was created and may have been maintained after the announcement of Alpine High, correct?

A    Correct.

Q    And so you also haven't considered whether and to what extent the first two alleged corrective disclosures removed or dissipated the positive price impact or inflation that occurred on September 7th, 8th, and 9th, 2016 after the announcement of Alpine High, correct?

A    Correct.

Q    And because you have -- you haven't conducted any examination of artificial inflation caused by the alleged misstatement during the pre-focus period nor any examination of

any artificial inflation removed from the first two alleged corrective disclosures during the pre-focus period, you're unable to provide any opinion or finding about the amount of artificial inflation in the Apache stock price as of the start of the focus period, correct?

A    I don't particularly offer that opinion.  That's correct.

Q    Okay.  I'd like to turn to -- we can turn to the back end price impact now, during your focus period and go through each of the corrective disclosure dates that we discussed this morning.  So, let's go through each of the corrective disclosures in your focus period beginning with the corrective disclosure on April 23rd, 2019.  Your -- it's your understanding that the first corrective disclosure during your focus period was on April 23rd, 2019, correct?

A    The first alleged one.  That's correct.

Q    Right.  And on this date, Apache issued a press release before market opening announcing the temporary deferral of Alpine High natural gas production, correct/

A    Yes.

Q    And the press release stated that the announced deferral began in late March 2019 and represented approximately 250 million cubic feet per day of gross gas production, correct?

A    I don't recall those numbers, but --

Q    Okay, I'll --

A    -- sounds correct.

Q   Let me share my screen again, because I'm not -- you have the benefit of seeing me do it.  So, that's the figure.  Can you see where in -- this the press release on April 23rd, 2019 from Apache that I just referred to.  And this is the disclosure with the amount of gas deferral that I just referred to.  Do you see that, indicated in highlight?

A   Yes.

        THE COURT:  Do me a favor.  You have to make that a little bigger.  My eyesight is not what it once was.

        MR. KAPLAN:  Nor is mine, unfortunately, Your Honor. Is that big enough or I can zoom in a little bit more.

        THE COURT:  That's good for me.

        MR. KAPLAN:  Okay.

BY MR. KAPLAN:

Q   So, the press -- would you agree that the press really did not provide further information about the volume of the deferral?

A   I don't recall.  I mean, I think if you scroll down, I could look, but --

Q   Sure.  And anything more than it was 250 million cubic feet of gas, the -- and the question is that that's the only information the press release provided about this temporary deferral?

A   I think that's right.

Q   Okay.  And it didn't provide any information, did it,

regarding the number or location of the wells that would be shut in, did it?

A    I don't recall that, no.

Q    Okay.  And if you'd like to read the document, you can, but that's your recollection, correct?

A    That's right.

Q    Did it provide any indication regarding how long the shut ins would last that?

A    That's right.

Q    So, it's your understanding it did not, the press release did not provide any indication as to how long this -- these shut ins would last?

A    Yes, I think that's correct.

Q    And did it provide any indication whether the shut ins would have any impact on oil or wet gas production at Alpine High?

A    I don't know.

Q    Would you like to take a minute and review the announcement and let me know if you can identify any information about any amount deferrals of oil or wet gas?

THE COURT:  Are you asking her to do that or if she wants to?

MR. KAPLAN:  Well, she said she doesn't -- Your Honor, she said she didn't know.  The document's in front of her and I'm asking her, do you see any information in the announcement regarding any amount of wet gas being deferred or oil be deferred.

THE WITNESS:  I don't see anything.  I'm not sure -- I'm not sure I'm seeing the whole thing, but I don't see anything in the part that I can see.

BY MR. KAPLAN:

Q    Okay, and are you aware that a well can produce both dry gas as well as wet gas?

A    Well, I am saying just in response to your prior question about when they would return, they do say they'll return when it's profitable to do so, which is, at least, I guess some information.

Q    Okay.  Is there a date in the press release --

A    No.

Q    -- when the deferral would end?

A    No, there's no date.

Q    Okay.  And back to my prior question.  Are you aware that a well can produce both dry gas as well as wet gas?

A    Yes.

Q    And you don't dispute that after the announcement of deferral, the raw stock price declined for four days, do you?

A    I don't understand that question.

Q    After this announcement, is it your understanding that the price of Apache common stock declined for four straight days?

A    Oh.  Yes, I think that's correct.

Q    And is it also your understanding that that stock price decline over the four-day period was approximately 11 percent?

A     I don't recall that, as I sit here, but --

Q     Okay.  You've offered an opinion that this corrective disclosure didn't correct any of the plaintiffs' alleged misrepresentations in the case, but you can't recall the amount of the stock price decline resulting from this alleged corrective disclosure?

A     I recall what Dr. Nye's event study shows that the price declined on the day of the announcement.  I don't recall what are the sum of the declines on -- what are the numbers on days two, three, and four, no.

Q     Okay.  Do you have any reason to dispute that the total value of the Apache stock declined by 11 percent over this four day period?

A     Not -- no.

Q     Is it your view that defendant's statement that deferring gas production during this period of extremely low prices rather than selling gas at a low price is not related to alleged misstatements such as Alpine High is really going to hum below $2 on the gas side?

A     I think you could argue it's related.  It's not corrective.

Q     Okay, the question was related.  So, is that a yes, that this deferral --

A     I think -- yeah, I think related is a very general term. I don't -- you know, think it's related because it's about

Alpine High and the -- it's about the company Apache.  So, in that sense, it's related.

Q    Let me bring up --

A    I don't think --

Q    Let me bring up the statement that I'm referring to, that's alleged in Paragraph 254 specifically, although it appears multiple times in the complaint.  So, in Paragraph 254, do you see where -- and it's underlined -- sorry, 256.  And I've highlighted and defendant Christmann saying Apache -- and this is four lines up from the bottom -- is really going to hum below $2 on the gas side.  Do you see that?

A    I see that.

Q    Did you understand that to be one of the alleged misrepresentations in the case that the Court upheld?

A    Yes.

Q    And if I scroll down, do you see -- before I do that, at the time of this April 23rd, 2019 disclosure, the price of gas, one below $2, correct?

A    Yes.

Q    Okay.  And by "really hum," is it your understanding that meant that Alpine High would perform well economically, even below $2?  Yes?

A    I don't know.  I think it's implies something good, but I mean --

Q    You think --

A   -- not -- yeah.

Q   Do you think "really" implies -- "really hum" implies that the company would defer all gas production?

A   I don't think the words "really hum" mean it will defer gas production.

Q   And do you think the words "really hum" imply that Alpine High would shut in wells?

A   I don't think the words "really hum" mean they'll shut in wells, no.

Q   Okay.  And do you -- I'm going to scroll down a little bit.  Do you understand the plaintiffs' allegations in this case include -- and I'm beginning with the line at the bottom of Page 104.  This is a statement by defendant Christmann, the company's CEO.

     "We've run many cases on the downside.  We would not be making this type of investment on the midstream or upstream side if we thought there was a sensitivity that was close to anything that would come into making it not work under very, very low gas NGL and oil prices."  Do you understand that to be one of the alleged misstatements in this case that the Court upheld?

A   Yes, I believe so.

Q   And would you agree that at the time of this alleged misstatement, the prices for gas was very, very low?

A   I think that the prices were very low.

Q    But you agree that Alpine High was not humming at that time, before -- and by humming --

A    (indiscernible).

Q    Performing well --

A    No.  I don't think it was performing well economically at the current prices.  '

Q    Okay.  I think I will -- I think we can -- let's go through the different reasons you offer in your report and in your direct testimony as why, notwithstanding that Alpine High was not really humming as you just testified, and the yet company still shut in wells and deferred production, is not corrective of any of the alleged misstatements in the case.

So, as your first reason, you state -- and I'm happy to pull up your direct testimony if you'd like -- "There was no statistically significant price decline on April 23rd according to both Dr. Nye's event study model as well as my alternative event study model.  In addition, there was no statistically significant price decline on any of the following three days: April 24th, 25th, or 25th."

Why don't I just pull up your direct testimony so that you can see it.  This is in Paragraph 22.

A    (indiscernible) question.  May I answer that?

Q    Well, I want to go through each of your reasons, and so the question is, you see that that was listed under Paragraph 22A as your first reason, correct?

A    But it's the reason why there's no price intact, not a reason why it's not correct.  So --

Q    Okay.

A    What this says is --

Q    Well, I --

A    -- highlight the reasons --

Q    I'll ask the question.

A    You asked --

Q    Do you see that you've listed this in your report as the first reason why this statement does not show any price impact?

A    Yes.

Q    From alleged misstatements during the class period.  So, you see that?

A    Price impact, not -- yes.  Your prior question was corrective and that was not --

Q    okay.

A    (indiscernible).

Q    On the first day of this window, April 23rd, 2019, would you agree that Apache's stock price declined 66 cents per share from the prior day's close and then over the next three trading days continued to decline for a four-day decline of over $4 a share?

A    I could look at the amounts, but I don't know them offhand.

Q    Okay.  Do you have any reason to dispute that the four-day

price decline was over $4 per share?

A    I just don't remember the number, so I guess I don't have a reason to dispute it.

Q    Okay.  Do you agree that under Dr. Nye's event study model, the combined four-day stock price decline cited in the complaint between April 23rd to 26th, 2019 is statistically significant at the 95 percent confidence level?

A    I think that's right.

Q    And do you recall that even under your own event study, the combined four-day price decline cited in the complaint April 23rd to April 26th, 2019, is statistically significant at the 94 percent confidence level, specifically, 94.33 percent?

A    I don't recall.  That sounds about right.

Q    Yet, it is your opinion that a stock price decline must be at or above the 95 percent confidence level to be evidence of price impact in securities litigation?

A    No.

Q    So it's not your opinion that a 95 percent confidence threshold is required to be evidence of price impact?

A    That's not particularly my opinion, no.

Q    So, do you believe statistically significant stock price decline at the 94 percent level could provide evidence of price impact?

A    You have to tell me what you're talking about, 94 percent. Are you talking about a standard event study that has some

objective method or are you talking about a -- you know, a cherry picked set of dates, so if you just -- you have to tell me what is your statistical test, what --

Q    I'm using your --

A    What the statistical test tells you depends on the test itself and how you've done the test.  So, if you don't have a standard method and you don't do a scientific, objective test and you just look for price drops and then add them up and then do -- and then that itself is not evidence of anything.

Q    Do you believe that --

A    So --

Q    -- your alternative event study was scientific?

A    I don't believe it is a scientific method to add up the four dates that plaintiffs have alleged in the complaint because they have alleged it in the complaint and say that that is a proper event study or a proper statistical test.  That is not a proper statistical test, nor is it a proper event study, so and event -- that's not a proper scientific inquiry.

Q    Under your event study in this case, do you agree that the combined four-day stock price decline during this period, April 23rd to 26th, is statistically significant of the 94 percent confidence level?

A    It's a confidence interval, not a confidence level; and no, I don't believe that's a proper statistical test.  So, the math is that if you cumulate the days and -- that is the

mathematical result, but it's not a proper statistical test.

Q    Is it your view that each individual day within the event window must meet a certain confidence level?

A    No.  It's my view that the standard is the five percent confidence level or a 95 percent confidence interval, that that is the standard that is used in academics and the standard that is used by the Court, but I don't say that that has to be the case.  That is a common standard.

Q    And is that the standard that you've used in your opinions in this case?

A    That is the standard that I have used in this case.  And that is the -- yes.

Q    Are you aware that you cite an article by Professors Fisch, Gelbach, and Klick titled, "The Logic and Limits of Event Studies in Securities Fraud Litigation" -- and I'll bring it up -- published in the Texas Law Review which concludes that the use of event studies in securities litigation, that it's not clear that it's appropriate, and I will take you to the exact page momentarily.  Are you aware that an article you cited said that that test is not appropriate, by three professors?

A    I am aware that there are people that have said this.

Q    And that you cited them yourself in your testimony in this case?

A    I may have.  I can't -- I don't specifically recall citing

this.

Q    Okay.  I'll show you exactly where.  So, this is at the very end of your -- the Texas Law Review article by these three law professors that you cite in your direct exam.  Says -- you see where it says, first, it's not clear that the five percent statistical significance level is appropriate in litigation.  You see that?

A    I see it.

Q    And do you understand this so be an article that you cited?

A    I -- as I said, I don't actually recall citing this and I don't remember why I'm citing it, but I don't dispute it.

Q    Okay.  And then the next sentence reads, "Second, failing to reject the null hypothesis is not the same as proving that information did not have a price effect."  Is it fair to say that that means finding that a price reaction is not statistically significant at the 95 percent confidence level is not the same as providing that the information did not have a price effect?

A    Can you repeat that?

Q    The second sentence, after it says, "First, it's not clear that the five percent significant level is appropriate in litigation."  The next sentence says, "Second, failing to reject the null hypothesis is not the same as proving that information did not have a price effect."  It's fair to say

that that means finding a price reaction is not statistically significant at the 95 percent confidence level is not the same as showing that it did not have a price impact?

A    It is not the same as proving that it did not have a price impact.

Q    Thank you.  And in examining the price impact for the April 23rd corrective disclosure, you did not analyze a four-day decline in Apache common stock, but (indiscernible) in the aggregate, as cited in the complaint, correct?

A    I analyzed each of the four days that the complaint alleged but no, I did not cumulate the days together and perform a statistical test.  Cumulating four days together, that is not a standard --

Q    Have you --

A    -- analysis.

Q    Have you cited any requirements in the academic literature that a one-day event window is the only appropriate event window to use when assessing price impact?

A    No, I have not.

Q    In fact, in the Bechtel case that was mentioned earlier today, you yourself were an expert in that case, correct?

A    That's right.

Q    And you offered an opinion on damages that utilized a multiday event window, correct?

A    Not a multiday where the individual days were not

statistically significant.

Q    Okay, but --

A    I have not -- that's the -- that is what I am objecting to here is there is no statistically significant reaction on the first day of this deferral announcement, so there's no evidence it reacted on the first day, and plaintiffs are claiming an efficient market.

Q    Okay.  (indiscernible) involving claims under Section 10(b) of the Exchange Act, the same as that in this case?

A    No, not the same.  It was not a securities class action and there was --

Q    Were the claims --

A    -- on the market.  There was no fraud on the market.

Q    I didn't ask about fraud on the market.  I'd appreciate if you'd just answer the question.  Were the claims in that case brought under Section 10(b) of the Exchange Act?

A    They were 10(b).  Yes, I think that's correct.

Q    Okay.  And did you analyze a three-day stock price reaction to calculate the plaintiffs' damages?  Yes or no.

A    Yes.

Q    And during your direct testimony, you argue that the academic literature does not support using multiday event windows when each day is not statistically significant and you just repeated that.  Just, once again, just for purpose of clarity, you haven't cited any academic literature in your

report or your testimony in this case for that proposition, correct?

A    I have cited testimony.  I think we said, so in an efficient market, it reacts very quickly.  So, the lack of a reaction on the first day is evidence that there is no price impact or no reaction or that the market is not efficient.

Q    But have you cited any academic literature saying that when using a multiday event window each day in the window must be statistically significant?

A    It doesn't particularly say that.  I don't recall.  I don't think I cited something saying that, no.

Q    Okay.  And in all your reports and testimony in this case, when you use the words statistically significant, you're referring only to at or above the 95 percent confidence level, correct?

A    The five percent confidence, the five percent statistical level.

Q    Or a 95 --

A    Ninety-five percent confidence interval.

Q    Okay.  And that's, when you use the term statistically significant in your reports in this case, you are referring to being statistically significant only at the 95 percent confidence level or interval (indiscernible), correct?  That's how you're using the term?

A    Yeah, it's a statistical level and it's just -- that's

correct.  I have -- and I think I have cited in my report that -- I mean, I think I have noted that I'm referring to it as the five percent level.

THE COURT:  Hold on.  Give me one minute.  Let's go off the record for one minute.

MR. KAPLAN:  Okay.

(Recess)

THE COURT:  Okay, sorry about that.  Please proceed, Mr. Kaplan.

MR. KAPLAN:  Thank you.

BY MR. KAPLAN:

Q    Practically speaking, for the purposes of demonstrating no price impact, what's the difference between a price response that's statistically significant at the 95 percent confidence level versus the 94.33 percent confidence level, and the 94.33 confidence level that I'm referring to is the levels of the combined three-day stock price pled in the complaint.  This is from April 23rd to the 25th under your alternative event study.  So, the question is, practically speaking for purpose of price impact, what's the difference between 95 percent and 94.33 percent?

A    Well, in the context that you've asked it, neither of those are relevant in this case, because you're talking about going out, cumulating multiple days when the first day is not significant and plaintiffs are claiming that this is an

efficient market.  So, whatever you get there, and there's no reason to go out multiple days other than plaintiffs alleged in the complaint, but plaintiffs are not experts at how to do an event study.  They're alleging what are the misstatements, not how you should statistically test them.

Q    But isn't it true that --

A    So, I don't think there's any difference, because I think that's an irrelevant statistic.  There is no reason -- there's no reason to --

MR. STERLING:  Your Honor, could she finish her answer, please, and then Mr. Kaplan can --

THE WITNESS:  There isn't a reason to be testing a cumulative reaction when the first day is not significant, not even close to being significant at any standard level.

BY MR. KAPLAN:

Q    But you have just testified that you have not cited any academic support for the notion that when analyzing multiday event windows, each individual day in the window must be statistically significant at a 95 percent confidence level.

A    You shouldn't be analyzing a multiday window.  That is what the academic literature says.  In an efficient market, it reacts very quickly.  So, there isn't a reason to analyze a multiday window, if you don't even see a reaction very quickly. If you do see a reaction very quickly on the first day, then you may argue that if there's not additional information coming

out that it could be continuing to react.

But what -- if you see no reaction on the first day, then it hasn't even started to react, so there's no reason to start looking on additional days if you don't even see the reaction to begin with.  If you're claiming it's an efficient market, it should be reacting very quickly, if not immediately, is what the academic literature says.  So, there isn't -- it would be -- it would be evidence of an inefficient market if it didn't even begin to react.  And you couldn't see the reaction until four days out.

Q    We'll get to the reason and the information disclosed in connection with the corrective disclosure and the market's response in a moment.  I just want to end this line of inquiry.  So it is -- isn't it true that the difference between a 94.33 percent confidence level and a 95 percent confidence level is just that one is slightly less likely to occur than the other?

A    Yeah, if you have some sort of -- if you have a test and you have a standard then, you know, maybe you should stick to it so you have some objective measure to begin with.  But I would agree with you that from a practical standpoint, you can argue, you know, they're not very different.  But one of the things to do when you do some sort of scientific inquiry is to cut -- to decide on your method and your test ahead of time, not look at how it's going to come out and then change your test and your statistics afterwards.  So, that's an important

part of science and statistics.

Q    In your work in this case, if a disclosure didn't meet the 95 percent confidence level, did your work stop or did you look at the nature of disclosures?

A    In my work in this matter, I not only looked at statistical significance.  I looked at how the market reacted to it.  I looked at lots of other information, and I used lots of other pieces of evidence to come to my conclusions for -- regarding price impact.

Q    And did you conduct any economic analysis concerning the cause of the stock price decline that occurred after the April 23rd disclosure?

A    So, according to Dr. Nye's event study model, there is no stock price decline but the decline is within the error of his model.  So, it can't be statistically differentiated from zero.

Q    I'm getting beyond the statistical significance now and in your reason number two, you said the market expected or previously you had used the word fully expected during your deposition, the announced defer.  So, did you conduct any economic analysis concerning the cause of the stock price decline following that April 23rd disclosure?

A    So, I don't agree that there is a decline.  So, once you control for the market and the industry, there is no abnormal return that's statistically different from zero or that's not within the error of the model of how the stock would react

given the movement in the market and the industry that day. And what I found is the lack of a decline and the lack of any reaction is consistent with the market commentary, which is that this was expected. And the -- it is also consistent with the absence of commentary that this told them something new and corrected something that they had previously thought or understood that the company had said.

So, it's not only -- so, I did analyze more than just the statistical decline or the lack of the statistical decline. I analyzed what the analysts in the market were saying and also what they were not saying, and all of that is consistent with that there is actually no price reaction to the deferral, that the deferral was expected by the market and did not impact the stock price.

Q    Prior to the deferral, did any -- are you aware of any analysts issuing reports or otherwise commentating that they expected a deferral?

A    Well, there's the analyst from the hedge fund that Dr. Nye brought up saying that, you know, brought up his emails and he said that it was expected by the market and that there were, you know, there was chatter by the market and I think people were -- yeah.

Q    Are you aware of any analyst reports issued before the April 23rd, 2019 corrective disclosure saying that they expected or fully expected to the disclosure -- the deferral?

A    I don't recall anyone saying they fully expected it. There may be some that were talking about this happening generally in the market, but I -- that, I don't recall.

Q    Okay.  And you recall any analyst issuing a report before the April 23rd, 2019 disclosure saying that a deferral -- that the deferral was expected?

A    I don't think so or I don't recall that, no.

Q    Turning to your next reason, you claim that analyst commentary is -- was expected given the drastic decline in regional gas prices.  Would you agree that multiple experts issued reports after the announcement commenting that the deferral was negative news?

A    No.  I would agree that there are two analysts that I recall.  One said that it was optically negative and another, which said something like a slight negative on the margin.  So, I -- those are the only two I recall.

Q    And those two, both men commented that the deferral was negative, correct?

A    The one where it says it's optically negative and then says something else, in my mind is saying that it's actually not negative.  It might at first appear negative, but it actually -- that might be the one that said it was prudent. And the other one did say it was something like a negative on the margin, my recollection.

Q    And would you agree that multiple experts also lowered

their earnings and production estimates in response to the announced deferral?

A   A number lowered their production estimates.  I don't know if they lowered their earnings.  They did not lower their price targets.

Q   Well, then I'll bring up two of these reports.  I believe one of which -- both of which you just mentioned.  The Barclay's report, you can see it's issued on April 28th.  You see the highlighted part where they -- the Barclay's analyst states that they're lowering their total production estimates.

THE COURT:  Again --

MR. KAPLAN:  -- forecast?

THE COURT:  I'll be honest.  You're going to have to make that big if you want me to see any of it.

MR. KAPLAN:  Do you see that?

THE COURT:  Now I can.

THE WITNESS:  Yes.

MR. KAPLAN:  Oh, I'm sorry, Your Honor.  I was asking the witness, but I'm glad you can see it.

BY MR. KAPLAN:

Q   And Ms. Allen, do you see that this Barclay's analyst is lowering its production estimate in response to the announced deferral?

A   Well, the prior sentence says the shut-ins have a minimal effect and then they're saying it's approximately two percent

lower.  So, I don't know if the -- even the full approximate two percent is due to the shut-ins, but they are lowering there.

Q    And they're also reiterating their underrating, correct?

A    That's right.

Q    And with respect to declines in earnings per shares and lowering earnings, you previously testified, you couldn't recall.  Now, does this refresh your recollection of analysts lowering, in addition to their production estimates, their earnings per share estimates following the announced deferral?

A    It does look like they're lowering them, their ETOPOSIDE estimates, yes.

Q    And for the second quarter of 2019, they're lowering their earnings per share estimate by 50 percent, Correct?

A    I don't actually see that.  So, you said the second quarter?

Q    Yes, it's where it says Q2 and then the highlighted portion 2019.

A    Oh, yeah.  Okay.  Yeah.  I see it.

Q    And that was, the 50 percent is against incentives. They're actually lowering it from 56 cents per share expected for the quarter to just five cents per share; is that correct?

A    Yes, that's what it looks like.

Q    And I'll bring up, for the sake of thoroughness, the other analyst's report that you mentioned, and this is for the

earnings -- lowering earnings, as well.  This is Cowen and I'm going to scroll to the end of the chart.

MR. KAPLAN:  And Your Honor, I will zoom in.

BY MR. KAPLAN:

Q    So here is Cowen's report dated April 25th, 2019.  Again during this event window that doctor -- that's alleged in the complaint and Dr. Nye analyzed.  And you can see this is the change in Cowen's earnings and do you see that it lowered its earnings per share estimate for 2019 by 26 percent following the deferral?

A    Yes.

Q    Okay.  In your direct testimony (indiscernible).  In your direct testimony, you stated that Dr. Nye notes that three analysts lowered their production estimates for Alpine High; however, that does not mean that the deferral was not expected or that it affected the value or prices of Apache.  And just to reiterate, the analyst that you cited in your direct testimony, they didn't lower any of their production estimates before they announced the deferral, correct?

A    The ones that -- I mean, I don't know.  They might have lowered it earlier before, but not close in time to before the deferral.

Q    And are you aware of any analyst reports before April 23rd that say we expect Apache will defer 250 million cubic feet per day in gas production?

A     No.

Q     And Apache's April 23rd, 2019 press release did not state whether deferral would be a complete deferral of all gas production at Alpine High, correct?

A     I think that's correct.

Q     And it -- the press release also did not state -- I'm sorry, strike that.  You've answered this question already.  I was going to shift (indiscernible), but you have (indiscernible).  And isn't it true that after the deferral was announced, analysts expressed uncertainty about the 250 million cubic feet per day of gross gas production that Apache announced; isn't that true, that analysts expressed uncertainty about it?

A     I think they expressed some uncertainty, yes.

Q     Okay.  And I'm going to bring up an exhibit with some comments from analysts and we're going to zoom in again.  This is Exhibit 56, Nye's direct -- Dr. Nye's direct testimony.  And so this is a report from SNL and industry media and it's dated April 23rd, the date of the announced deferral.  And did you see where it's quoting Mizuho and this is where the highlighting begins.

I'm going to zoom in.  And it states, "It seems like these production deferrals could remain ongoing until at least Gulf Coast Express starts up in October which likely puts all the EBITDA guidance at some risk."  You see that?

A     I'm sorry, I don't -- no, I don't see anything.

THE COURT:  There's nothing on --

MR. KAPLAN:  I'm sorry.  I will share my screen.  Do you see it -- and let me zoom out since I had not been sharing for a little while.  So here's the SNL article dated April 23rd, the date of the announced deferral.  I'm going to zoom in.

BY MR. KAPLAN:

Q     And do you see the statement from this Mizuho analyst that I was just referring to?

A     Yes.

Q     Okay.  And the Mizuho analyst commentary shows a lack of certainty regarding the length of the "temporary" deferral, correct?

A     Yeah, I would say that's true.

Q     And he's saying that it is -- would you agree that he's saying that the deferral seems like it could remain ongoing for at least six months?

A     Yeah, because that's mentioned in October.  You're saying from the date of this to October, six months.  But yeah, I think that's --

Q     And then the same article, quotes an analyst at Tudor Pickering Holt, and this is the next highlighted portion, stating his belief that Apache and -- by his, I mean, the Tudor Pickering analyst -- believe that Apache needs to go into

greater detail about how the deferrals will affect its production plans for the rest of 2019.  Do you see that again?

A    Yes.

Q    Okay.  And the analyst also expresses a desire in the next sentence, and this is a direct quote, for color on the volumes that were deferred thus far and also through the completion of the (indiscernible), right?

A    Yes.

Q    And do you believe it's reasonable to state that by expressing a need for greater detail and for more color on the announced deferral, that expresses uncertainty from the analyst regarding the announced deferral?

A    I think it expresses some uncertainty about some of the things that they're saying.  Yeah.  I think it expresses some uncertainty.

Q    Are you also aware that industry media specifically attributed the stock price decline that occurred after the April 23rd corrective disclosure to the deferral that you have found was expected?

THE COURT:  Say that again?

BY MR. KAPLAN:

Q    I meant, are you aware that industry media specifically attributed the stock price decline that occurred after the April 23rd corrective disclosure to the deferral?

A    Nobody did, for days two, three, and four.  I am aware

that some mentioned that the deferral was announced and mentions the stock drop on this day.

Q    This is Exhibit 58 to Nye's direct examination.  I will zoom in again.  This is an article, April 24th, by the same industry (indiscernible) SNL.  And do you see the part where it states, "Shares of Apache slid approximately two percent, 1.76 percent on above average volume after the company declares that it initiates gas production volume deferrals from Alpine High"?

A    I see that, yeah.

Q    Would you agree that this industry media is specifically attributing the decline, the reference to decline to the announcement of the deferral?

A    No.  This is a -- this report, this is a daily report, if you look at the top, and they're talking about all the stocks, energy stocks that have moved that day, and the announcement.  They're not saying it is due to that.  And this comes out daily.  They have one that comes out, you know, whatever the next two, three, and four days and they do not say that it's sliding the next day because of this.  They're saying this is announced.  These are, like, the things that moved this day.  And they say how much it moved.  So --

Q    And it says that shares of Apache Corp. slid 1.76 on above average volume after the company announced the deferral, correct?

A    That's right.  It does day that.

Q   So, it's attributing the -- it's fair to say that the article is attributing the stock price decline to the announcement of the deferral, correct?

A   No, I wouldn't say that.  I would not say it's analyzing that that is what happened because of it.  It's saying, these are things that were announced this day and these are movements.  That 1.78 percent is not a big movement.  It's the very kind of movement that Dr. Nye has said is a nothing movement.  He just testified to that earlier today.

Q   Does the article say anything --

A   (indiscernible).

Q   I'm sorry.  Please finish.

A   This is like, if you look at the top, this is saying, you know, this is what happened today, called Tuesday's energy stocks.  And then it tells you, you know, companies that had announcements and just what their movements were.

Q   I think --

A   It is true that it slid, you know, I think it's less than that, according to Dr. Nye, the 1.78.  I think his is 1.4.  But after the company, it is saying it slid that after the company declared it.  It's not, you know, it is not coming to a conclusion that it was caused by that.  And it's just mentioning announcements that happened that day and movements.  So, I mean, I would say it does, you know, imply that it could be related to that, but it hasn't done an analysis that's

caused by that. And it hasn't controlled for the industry and the market.

Q    And are you aware that other major media outlets refer to the deferral as a blow to the Alpine High project?

A    I think I do recall that.

MR. KAPLAN:  And it was Bloomberg, in fact, on April 23rd -- I apologize, Your Honor.  It looks like in the filing some of the text got a little garbled.

BY MR. KAPLAN:

Q    And this is Bloomberg reporting that the deferral was another blow to the Apache project; you see that, correct?

A    Yes.

Q    And did you consider this Bloomberg report in finding that there was no price impact on the April 23rd disclosure?

A    Yes.

Q    Okay.  You'd agree that Bloomberg is a widely read and reputable source of commentary on the market?

A    Yes.

Q    And did you conduct any examination of why Bloomberg considered the deferral "another blow" to Alpine High?

A    Well, it tells you something here.  It's saying, you know, they're deferring it because the Permian price slump -- it's very hard to read, but there's no L's and I's, so if I had all the letters, I could do a better job of telling you what they're saying.

Q    Well, you said you analyzed it.  In announcing that the deferral was another blow to Alpine High, does Bloomberg say anywhere that it was expected?

A    They might.  I -- it's very hard for me to read this, but it says after the recent plunge in the price of -- you know, made it unprofitable.  So, I think -- yeah, I cannot read this, but I did consider it and I don't think this is evidence that the price is declining because the market is learning a correction of something that somebody previously said.  So, I don't think that this is evidence of price impact.

Q    Even though it uses the term, another blow to the Apache project?

A    That's right.

Q    Okay.  Let's turn to, then, your fourth reason on this corrective disclosure and why the finding of no price impact, and you said no analyst indicated that this announcement contradicted something they previously thought or understood regarding the alleged misrepresentation.  Is your contention that there can only be price impacts if an analyst expressly states this contradicts what the company said previously or this proves that the company committed fraud?

A    No, that's not my view.

Q    Okay.  And you testified that you had explicitly analyzed the pre-focus period alleged representations pertaining the economics of Alpine High at low commodity prices and showed no

analysts repeated the alleged misstatements when made.  Do you stand by that testimony?

A    I do stand by my testimony, but I had trouble hearing what you said.

Q    I said that you had testified, you explicitly analyzed the pre-focus period alleged misstatements pertaining to the economics of Alpine High at low commodity prices and that showed no analysts repeated the alleged misstatements when made; and do you stand by that statement?

A    Yes.

Q    Okay.  Do you recall that there were various alleged misstatements when Alpine High was disclosed about the economics of the play?

A    Yes.

Q    And I'm going to introduce Nye's direct testimony, Exhibit 11, and this is a Credit Suisse report issued the day of the announcement of Alpine High.  And you see at the top where it says, "Today's presentation defines what Apache will be delivering for shareholders over the next decade or more"?

A    Yes.

Q    And do you understand this analyst report to be referring to the presentation the company gave at Barclay's conference on September 7th, 2015?

A    Yes.  I think that's -- in referring to the presentation.  Yes, I think that's correct.

Q    And you see the second portion where it says, secondly, APA (indiscernible) and oil potential in Texas with two to three thousand locations and it could support a (indiscernible) program over 20 years.   Do you see that?

A    Yes.

Q    And then I'm going to scroll down to later in the report, and this is, where it says Figure 10, Alpine High economics. That's highlighted here.  Break-even gas prices under different assumptions.  And so you see where it says under Figure 10, shows the break-even gas price for Alpine High at just 60 cents, to less than 10 cents, under different assumption?

A    Yeah.

Q    And is it your understanding that this is a reprint of a slide that was actually presented by the company at the Barclay's conference?

A    I think that's correct.  Yeah.

Q    Okay.  And do you recall that other analysts also issued a report shortly after the Alpine High announcement, also including numerous statements reporting on defendants alleged misstatements about the economics of the play?

A    No.

Q    Okay.  Well, I will introduce one -- another one, I should say.  This is Nye's direct testimony, Exhibit 15.  And this is a Credit Suisse report issued the next day, and I haven't highlighted this one, but if you read down four sentences where

the sentence begins -- where the line begins "In a lower pressure and hence lower cost environment, which in turn is why the economics look so compelling."  Does that refresh your recollection as to whether other analysts repeated the company's statements regarding the economics of the play?

A    They're not repeating the specific statements that plaintiffs are alleged are the misstatements, so.

Q    You mean verbatim.

A    `Or even in -- to me, this is not the same as saying, we are going to, you know, hum at below $2 or that at very, very low prices, it will be economic.

Q    You mean, like we saw in the previous slide?

A    That didn't say that, either.  That just repeated the -- so that's about -- that's given a certain mix of oil and gas.

Q    It's repeating the company's statements regarding the overall economic of the play, is it not?

A    No, it's repeating a slide.  I don't think they repeat the statement.  I don't think they repeat the statement the plaintiffs have alleged in the complaint, as the alleged misstatements that are economic.  I think in my direct, I might mention what they are.

Q    Well, here on Page 7, they are repeating a statement verbatim aren't there -- are they not?

A    Can you point to me where you are and make it a little bigger?

Q    Sure.  scroll up.  Again, these are literally the company's own statements from Barclay's and slide show, are they not?  And here, the analyst is collecting statements made and quoting the CEO during the conference, is it not?

A    I don't see anything like the hum or we're going below the $2 or very low -- very, very low prices.  I don't.  I don't see anything here.

Q    At the very top as well.  Let me scroll out.  The first bullet.  Do you see where they're quoting the CEO saying, "What's going to make this play really stand out is the quality, the fitness, and the cost structure.  Very, very highly economic wet gas play."

A    Yeah, that's -- that is not a -- that is not one of the specific statements, as I recall, that's alleged in the complaint.  So, the specific statements are, you know, the hum and the $2 and -- I hope I do repeat them in my direct or one of my reports.

Q    Okay, and we had just -- you recall earlier today when we went through the Court's decision and the statements that were upheld concerning the economic viability and commercial viability of the play, correct?  You recall that?

A    I do recall that.

Q    And those statements were not tethered to oil or gas mix, correct?

A    I'm not sure how to answer that question.  I think they

may have been tethered to the oil or gas mix, so they -- what the company actually said depended on what they expected of oil and gas mix.

Q    Rather than go back to the decision, I will take you -- so we get another analyst report, repeating the company's statements regarding the economics of the play.  Do you recall reading this report in issuing your decision?

A    I don't, particularly.

Q    So, do you understand Seaport Global to be an analyst, securities analyst?

A    Think that's right.

Q    Okay.  And in describing Alpine High, the company states, "APA" -- and let me -- haven't highlighted it here, so let me direct you to it.  Sorry, bear with me for a moment.  Here's the highlighted portion.  See the part where it says "APA preliminary look at Alpine High economics look encouraging at $4 oil and 2.50 gas prices.  The rates of return, before tax rates of return range from 30 percent to 250-plus percent per well, present values then clock in at 2 million to 15 million and break-even gas prices are pegged at less than zero dollar -- less than 10 cents to 50 cents per share predicated out in $40 oil prices."  Do you see that?

A    Yesh.

Q    And so this is another example of an analyst repeating the company's statement from Barkley's -- the Barclay's conference.

A    I don't -- yeah, they're repeating, I think what's on that chart and that, the 10 cents is predicated on the $40 oil prices, so I -- this is not a statement that -- I don't recall this statement being alleged in the complaint, and this is that it would be break-even, given a $40 oil price, is what I read that as.

Q    Okay.  We could -- I'm not going to go back to the complaint.  We previously went through the exact paragraphs where Christmann talks about the overall economics of the play. I'll go -- I'm going to continue with my outline.  I'm sorry, I'm going to continue with my testimony, because you --

A    I thought I was testifying.

THE COURT:  Freudian slip.

MR. KAPLAN:  Yeah, I'm sorry.

BY MR. KAPLAN:

Q    No, yeah, you made the statement in connection with this finding that you -- that you found no analysts had repeated the company's alleged misstatements in announcing Alpine High, so do you disagree that these three different analysts' reports that continued to show the more literally repeated verbatim slides that the company presented at Barclay's regarding the economics of Alpine High?

A    I don't think they are the alleged economic statements which are that they would hum and the $2 and very, very low prices.  So, what you showed me is some general statement that

it is economic and then you showed me something which again about this break-even at 10 cents, which is predicated on $40 oil prices.  And I think it's predicated on some, you know, expected mix of oil and gas coming out.  And I do not recall these statements at all being alleged in the complaint, misstatements.  I don't recall that, the slide.  I think this is coming from that same slide.  I don't recall that being an alleged misstatement in the complaint.

Q    Well, in fact, you had started in your sur-reply report in particular, not one analyst repeated the September 7, 2016, alleged misstatement, even at $40 a barrel of oil and 2.50 gas, the returns are still significantly high.  You stand by that statement in your sur-reply report after seeing these analysts' reports?

A    You know, I mean, this does look like it is saying $40 oil and 2.50 gas prices.

Q    Okay, I can bring up your sur-reply report --

A    Yeah.

Q    -- were you say --

A    Yeah.

Q    -- not one analyst represented that it's the September 7th, 2016 alleged misstatement, even at $40 a barrel oil, 2.50 gas, the returns are still significantly high.  And we've just gone through, I think three different analyst reports discussing break-even prices and the economics of Alpine High

in different pricing environments.

A    I would not -- I would not agree with the other two.  This does say something about a $40 oil and 2.50 gas prices.  I mean, it doesn't repeat the statement that they're high, but it does seem to be saying something.  I think this may be at least have some relationship to that particular statement.

Q    And the other analysts' reports literally republished slides from Barclay's presentation regarding the economic -- the purported economics of Alpine High?

A    That's right, but those are not the statements -- the slides are not the statements that plaintiffs have in their alleged complaint.  They have statements about humming.  The ones you went -- you went through them with me.  This was not one of the statements you went through with me from the complaint.

Q    You mean statements such as being highly economic even at very, very low pricing environment?  I can go through those statements --

A    This does not -- this does not say very, very economic at very, very low prices.  This says, predicated on $40 oil prices.

Q    Okay, so --

A    This is not --

Q    -- this analyst just didn't repeat verbatim Apache's alleged misstatements (indiscernible) Alpine High?

A     This doesn't say, at very low prices.  This says, predicated on $40 oil prices.

Q     Did you perform any economic analysis as to what did cause the price decline in Apache stock following the April 23rd corrective disclosure, 2019 corrective disclosure?

A     What price decline?  The price decline that according to Dr. Nye is not a significant price decline and it's of a magnitude that he would say is consistent with nothing happening?

Q     I'm asking you, did you perform any analysis as to what did cause the price decline Apache's stock price after the April 23rd, 2019 corrective disclosure?

A     I performed a lot of analysis whether Apache's stock price declined after the deferral and whether there was a decline from the alleged misstatement.  And I found that there was no decline that could be differentiated from, you know, daily variation or noise --

Q     Sorry.  Are you done with your answer?

A     So I -- there is no significant decline on this day or the day after, day after that, or the day after that.  According to Nye's event study model, not one of those days is there a decline that is statistically significant.  So, there's not a decline at -- on this day, there's not a decline at any level that anyone would consider significant.  And --

Q     So, it's your testimony that Dr. Nye did not find any

individual day in that window to be statistically significant?

A    That his own event study model and his own analysis and the claim of market efficiency shows that there is no stock price movement or decline in Apache stock that's not just explained by the market and the industry on this day.

Q    Did the E&P industry or even the broader stock market also fall by 11 percent during the four-day period?

A    They did not.

Q    So, you have no answer to the question why Apache's stock price fell during this four-day period, correct?

A    I'm not agreeing that it did fall, relative to what you would expect given the industry and the market.  And Dr. Nye's own event study analysis shows that on every single day in this four days, the movement is not different from zero.  It is what would be expected.  It is within the range that would be expected, given the movement in the industry and the market on each one of those days.

    The choice of cumulating all four days together is clearly a cherry pick thing that plaintiffs have done because they have seen that the stock price has declined over four days.  And there is no scientific validity to say, once I see four days in a row that go down, let me collect them all together and now see if that will make something significant.  That is not a valid statistical test.  It's not something that Dr. Nye has said he's ever done before.

Q    Do you have any answer to why Apache stock price fell by 11 percent over this window when the E&P industry and the broader market did not fall by a similar amount?

A    The movement over these four days, according to Dr. Nye's analysis, is completely consistent with what you would expect given what happens on each one of those days in the industry and the market.  And contrary to what he testified to, declining four days in a row is not a very, very unusual circumstance.  That is something that just by chance alone you would expect to see, and you do see that on very many days of the class period.

Q    And you previously testified that no analyst issued a report prior to the April 23rd deferral stating that they expected the deferral to occur, correct?

A    Well, there is an analyst who issued a, you know, that -- the analyst that Dr. Nye sites does say that there's chatter and they expect it.  I don't recall an analyst's report saying that.

Q    And you're referring to the -- an internal set of private communications between an analyst and the company's investor relations department; is that correct?

A    I'm referring to what that -- yes, I am referring to an internal communication.

Q    So you're not aware of any analyst report prior to the April 23rd, 2019 disclosure stating that they expected a

deferral to occur, correct?

A    I think that's right.

MR. KAPLAN:  Okay.  At this point, I'd like to move on to the second corrective disclosure in the focus period, Keenan's resignation.  I'm also happy to take a break, Your Honor, if you think it would be an appropriate time for a break.

THE COURT:  Let's take a bathroom break.  We'll resume at 3:15.  So we'll take an eight-minute break.  We're off the record.  Thank you.

(Recess)

THE COURT:  Okay.  We're back.  Mr. Kaplan, please proceed.  We're on the record.

MR. KAPLAN:  Thank you.

BY MR. KAPLAN:

Q    Turning to the second of the three alleged corrective disclosures during Ms. Allen's focus period, the chief intent doesn't demonstrate any of defendant's misstatements during the class period (indiscernible) price impact.  This is the October 25, 2019, report revealing that Mr. Keenan, Apache's then Senior Vice President of Worldwide Exploration, had resigned.  Ms. Allen, Apache's stock price declined approximately 15 -- five percent from the close of trading on October 24th to the close of trading on October 25th, correct?

A    Yes, I think that's right.

Q   And Dr. Nye found the approximate five percent stock price decline on October 25th was statistically significant at the 99.9 percent confidence level, and you found it specifically significant at the 100 percent confidence level, correct?

A   Again, it's not confidence level, because it's not how confident you are.  So, it's not the right terminology, but we both found it statistically significant above the standard five percent level.

Q   And you don't contest that the announcement of Mr. Keenan's resignation was a cause of the decline in Apache's stock price that occurred on October 25, 2019, correct?

A   Can you repeat that?  I don't what?

Q   You don't dispute that the announcement of Mr. Keenan's resignation or the cause of the decline in Apache's stock price on October 25th, 2019 --

A   I don't dispute that, correct.

Q   And in fact, you haven't identified any Apache specific information disclosed to the market on October 25, 2019, other than Mr. Keenan's resignation, correct?

A   That's right.

Q   During your direct examination, you cited as your first (indiscernible) why this disclosure had no price impact from any of the class security misrepresentation was that the market didn't learn anything new about Alpine High, and in fact, there was no news about Alpine High; is that correct?

A     That's right.

Q     You agree that Mr. Keenan was Apache's head geologist that the company publicly credited and celebrated as making the transformational discovery of Alpine High?

A     Yeah, I think that's right.

Q     And would you agree that Mr. Keenan was also the Apache executive responsible for overseeing the development of Alpine High?

A     Yes.

Q     And would you agree that Apache and defendant Christmann specifically awarded Mr. Keenan the company's president's award during a shareholder meeting for his work in discovering Alpine High?  You're aware of that?

A     I don't recall that.  I don't recall that.

Q     Okay.  I'll try and be as (indiscernible) as I can.  So, the transcript at the top of (indiscernible) May 2017 Apache Corporation Annual Shareholders Meeting.  You see that?

A     Yes.

Q     And I'll scroll to Page 6.  I've highlighted the text for everybody's reference.  See the part where it says, "The president's award is given to an outstanding employee who has demonstrated excellence through hard work, teamwork, character, innovation, leadership, and results"?  See that part?

A     Yes.  Yes.

Q     You see the part where it says, "Here at Apache, he and

his team," referring to Kenan, "have made a significant discovery at Alpine High.  It's a field that will deliver incredible value to Apache and its shareholders for many, many years to come"?  Do you see that part?

A    Yes.

Q    And do you see the part that I'm scrolling through right now immediately below where Mr. Christmann says, "Gentlemen, I'm pleased to announce my choice for this year's president's award is our Senior Regional Vice President of North American Unconventional Resources team, Mr." Steven -- "Steve Keenan"?  Do you see that?

A    Yes.

Q    Do you agree that media reports, including reports that you specifically cited, also credited Mr. Keenan as responsible for discovering Alpine High and overseeing its development?

A    Yes.  Yes.

Q    Do you recall, for example, an article in the Houston Chronicle focusing on Mr. Keenan and the discovery of Alpine High and calling him the star Apache responsible for the discovery?

A    I don't particularly, but I -- that certainly sounds right.

Q    Do you dispute Dr. Nye's statement that based on the company's repeated public association of Mr. Keenan with Alpine High and the media recognition that Mr. Keenan was the single

Apache executive most publicly connected to the Alpine High (indiscernible)?

A    I think that's right.

Q    So, as a matter of common sense given the market's close association between Keenan and Alpine High, isn't Keenan's resignation new news about Alpine High?

A    It doesn't tell you anything about the value of Alpine High, and the market didn't interpret it as telling you anything about the value of Alpine High.  I guess you could say it's, you know, it's related to Alpine High and that he is related to Alpine High.

Q    Okay.  Well, let's get into your finding that there was no news about Alpine High disclosed on October 25th.  During your direct examination, you stated that every analyst and market commentator that I found who commented on Apache's October 25th stock price decline explicitly attributed the decline to Apache's Suriname Maka Central-1 well.  Do you recall that testimony?

A    Yes.

Q    Okay.  I'm going to introduce (indiscernible) Exhibit 26. It's an RBC report issued during the first part of the trading day.  (Indiscernible) 10:15 a.m. Eastern Time, and this is cited in your report, correct?

A    Yes.

Q    And the body of the report not only linked Mr. Keenan's

resignation to Alpine High's disappointing performance but explains why any association with Suriname would be unfounded, correct?  And I'll scroll in so you can read it.

A    I don't think they say why any association would be unfounded.

Q    Do you see where in the middle of the report it states, "As of the resignation date, the company had not reached the target objective at the Maka-1 prospect and the" relation -- and the "resignation was related to other matters"?  You see that?

A    I see it.

Q    Would you agree that that is indicating that any -- that the association between the Maka-1 well and Mr. Keenan's resignation would not be factually supported because the well had not reached its target objective?

A    No, I would not agree with that.

Q    The headline of the article literally shouts, "Company Indicating Not Related to Maka-1 Outcome."  Do you see that?

A    Yes.

Q    And you see after stating in the article that the company had not reached the target objective at the Maka-1 prospect and the resignation was related to other matters, the report continues that Mr. Keenan was a major part of the team that discovered the Alpine High (indiscernible) that has been a significant investment for APA and that the outcome of the

results from Alpine High has not met high expectations?  You see that portion?

A     Yes.

Q     So, is it -- in fact, multiple other analysts' reports also cited in your report and testimony in this case also expressly disclaim any connection between Mr. Keenan's resignation and the Maka-1 well; isn't that true?

A     No.  They claim -- no.  They claim that the company claims that -- you know, it's quite qualified.  So, if you see what this analyst is saying, they're not saying there's no relation and you couldn't think that this is telling you anything about Suriname.  They're saying based on our conversations with the company, as of the resignation day the company had not reached the target objective and the resignation was related to other matters.  That's a very hedgy statement.  It's not saying, you know, this has nothing to do with Suriname.  They're saying as of the resignation date, which is not today, this is saying, you know, we talked to the company today, and as of some earlier date, they hadn't reached the target objective.  Well, it doesn't even say that they hadn't reached it as of today, and they're saying the resignation was related to other matters.  So, this is a very -- this is not saying there's no way that you could make -- you know, think that there's anything going on about Suriname or the company might know something about Suriname, and that as other analysts have said,

no news about Suriname is bad news.  So, even the later sentence, which is saying, you know, that they haven't reached the target objective is saying, like, as of some date they didn't yet have good news, which itself could be bad news.

Q   Okay.  My question -- I'm trying to be respectful.  My question was very specific.  (Indiscernible) other analyst reports that you cited in your own report an examination also issued reports denying any link between Mr. Keenan's resignation and the Maka-1 well?

A   And so, mine is -- this one does not.  You said other, and I am saying this one -- you mischaracterized this.

Q   Yes or no?  Did you cite other analyst reports in your reports in this case and your direct examination that also denied or disclaimed any connection between the resignation and the Maka-1 well?

A   This analyst doesn't deny that.  This analyst says the company said that as of the resignation date they hadn't reached it.  So, and I think the other reports, you know, have some similar language.  They say the company says this or the company claims this.

Q   So, here's another report the same day.  This is by (indiscernible).  Is this also cited in your report and direct examination?

A   Yes.  Yes, I believe so.

Q   And this is also issued during the trading day on October

25th, correct?

A    This one is after the stock rebounds, I believe, because they -- but I think it may still be during the trading day. So, the stock goes down more to begin with and then it comes back up, and by the end of the day down something like five percent.

Q    Right.  The question was that it was issued during the trading day, and it's cited in your report, correct?

A    I think it's issued during the trading day, but I'm not sure right this second how I can tell that.

Q    Okay.  At the very first bullet, it reads, "Steve Keenan resigns.  For reference, Mr. Keenan moved from EOG to APA in 2014 as Regional VP of Unconventional Resources and subsequently oversaw the discovery of the Alpine High play which has been an economic disappointment for investors."  You see that?

A    I do.

Q    And do you see in the next bullet where it says, "APA claims the resignation is not connected to the exploration prospect in Suriname"?  Do you see that?

A    I do.

Q    I'm going to turn to a third report.  Also (indiscernible) bear with me.

        THE COURT:  And let me just say this real quick. There are many criticisms of me, many which are probably very

valid.  One is that I let people go on way too long.  That --
my general view is I'm going to give everyone a full and fair
opportunity to put on any evidence that this class
certification hearing may warrant.  That said, I get it.

MR. KAPLAN:  Okay.  So, Your Honor, I hear you loud
and clear.  I -- this was the exhibit, the SunTrust exhibit,
that was previously mentioned today, but I hear you loud and
clear, and other than introducing it into the record, I will
move on.

BY MR. KAPLAN:

Q    Now, you're finding in this case that Mr. Keenan's
resignation is not connected to Alpine -- that the stock price
reaction was not connected to any new news about Alpine High,
but the Maka-1 test result is also contradicted by discovery
documents in the case; isn't that true?

A    I'm sorry.  I didn't -- you're saying my finding that the
price drop -- my finding that the price drop is due to Suriname
and not anything about Alpine High is contradicted by internal
documents?

Q    Internal --

A    Is that what --

Q    Discovery documents produced by Apache in this case.

A    I don't believe that to be the case.

Q    It was previously filed under seal, but defendant shave
indicated that they do not wish to maintain the confidentiality

Q   designation.  Have you -- this is an e-mail referenced by Mr. Nye -- Dr. Nye, introduced in this case.  Are you familiar -- have you read this e-mail before?

A   I saw that Dr. Nye had produced it.

Q   Okay.  Do you know -- do you understand these to be market participants including an analyst at Bank of America and a hedge fund representative?

A   I understand this Andy Yang is a hedge fund representative.  I don't -- I'm not sure who -- I think there's an Apache purchase on here, which is how you have the e-mail, but Gary Clark maybe.

Q   Okay.  Do you know who Gary Clark is?

A   I think maybe he's one of the investor relations people, but I'm not sure.

Q   He's a director -- Apache's Director of Investor Relations; is he not?

A   I guess I'm not sure.  I thought he was in investor relations.  I don't recall if he was the director.

Q   And you'll see at the bottom of the e-mail chain Mr. Yang, a policy advisor, communicates (indiscernible) we got was Keenan resignation October 3rd.  As of that date have not reached top of target formation.  There were no results on Suriname.  We knew nothing.  Keenan knew nothing.  Do you see that?

A   Yes.

Q   And you see that this e-mail is ultimately forwarded back to Mr. Clark, Apache's Director of Investor Relations, by Andy Yang with the message, "Getting the news out," with a smiley face?

A   Okay.

Q   You see that?

A   Yes.

Q   (Indiscernible) discovery -- this document produced by Apache in this case also disclaims any association between Mr. Keenan's resignation and any results related to the Maka-1 well in Suriname, correct?

A   This doesn't -- this is -- what I read this is someone saying, you know, the color we got was this.  Curious if you were (indiscernible).  So, this is someone saying we got this kind of color.  Do you -- you know, what do you know?

Q   And these are market participants communicating that Kennan's resignation was not related to the Maka-1 well, correct?

A   No.  This is market participants asking someone else saying do you know anything?  We got this color.  What do you know?  So, they're saying -- this is speculation.  They're saying, you know, this has happened.  What's going on?  This is saying we're worried this has something to do with Suriname.  This to me is direct evidence that they don't know what's going on, and the question is, is this bad news about Suriname.

Q    And these market participants are directly communicating with the company's Director of Investor Relations, correct?

A    I don't know if they are.  Someone -- they've included Andy Yang, who seems to, at least for this one year, communicate -- you know, chat fairly regularly with the investor relations guy, seems to have forwarded on this e-mail. I don't understand -- you know, I don't quite get -- I looked at the timing here.  So, it looks like the earliest thing says 9:12 a.m., the next one says 10:15 a.m., and the next one says 9:39 a.m.  So, I could not figure out if some of these are on a different time zone or how that would work or -- so, I don't know.  I found this a bit mysterious, at least the timing part.

Q    It might have -- Your Honor's previous suggestion, I'm going to wrap up this line of questioning and ask the witness in light of the three different analyst reports we saw, and as well as these internal discovery documents, do you continue to stand by your suggestion that investor concern over Suriname accounted for the entirety of the decline in Apache's stock price from the close of trading on October 24th to the close of October -- trading on October 25, 2019?

A    So, when you control for the -- the event that (indiscernible) controls for the market and the industry, what I am finding is that everyone is saying that the price decline is due to Suriname.  No one is saying the price decline is due to anything about Alpine High.  So, all of the evidence points

to the price decline being due to Suriname including everything you've showed me.  They are directly saying the price decline is from speculation about Suriname.

Q    And you stand by that opinion, notwithstanding three different analyst reports stating that the resignation does not appear to have any relationship with the Suriname, including articles where the headline itself says that the resignation is not related to Suriname?  And I can put those back up for you.  And you continue to stand by your opinion?

A    Yes.  The only confirms the opinion.  The fact that they're saying that shows there is a connection.  They're saying it's moving because of Suriname and the color we're getting is that, you know, as of the day of the resignation, the company had not yet hit target.  You know, the fact that that's all anyone's talking about is that it's due to Suriname.  It's not evidence that it's not due to Suriname.  It may be that he didn't resign.  It may be that his resignation had nothing to do with Suriname.  The question is why is the price moving, and everything indicates that the price movement is about Suriname.  Nothing indicates that the price movement is about Alpine High.

Q    Are you aware that during the middle of the trading day, Apache issued a statement to the market that Mr. Keenan's resignation had nothing to do with Suriname?

A    Yes, and that is further evidence that the company

(indiscernible) reacting.

Q    I -- it's a yes or no question.  Again --

A    Yes.

Q    -- yes or no question.

A    Yes, I am aware of that.  Yes.

Q    Thank you.  And you agree that the stock price closed down five percent from the close of trading on October 24th to the close of trading on October 25th, correct?

A    About that, yes.

Q    And you agree that under Dr. Nye's event study analysis and your own event study analysis that stock price decline was specifically significant?

A    Yes.

Q    Thank you.

MR. KAPLAN:  Your Honor, I think we can move on to the third corrective disclosure at this point.  I want to be sensitive to the Court's time, so I will be --

THE COURT:  To be clear, I'm giving everyone as much time as they want.  I just -- the party's got to decide if they think they've already covered a point or belaboring the point. I give it the first time, but that's --

MR. KAPLAN:  Yeah, I --

THE COURT:  There -- we have no -- I just want to make sure we're clear.  We're not on time constraints on the rest of this direct examination -- or I should say the cross-

Page 202

examination or any redirect examination that is to come, but please proceed.

MR. KAPLAN:   Thank you.

BY MR. KAPLAN:

Q    Turning to the third corrective disclosure in your focus area, Ms. Allen, that was on March 16, 2020, correct?

A    Yes.

Q    And you claim in your direct examination that you did not understand and still do not understand the complaint to be alleging the Susquehanna report to be part of the third corrective -- this third corrective disclosure; is that correct?

A    I do not see the complaint as alleging it as a corrective disclosure.

Q    Are you -- I'd like to introduce Nye Exhibit 27, which is the complaint.  Do you agree that in the loss causation section of this complaint in the exact same paragraph, and I'll let you see it, where the Seeking Alpha report is identified, the Susquehanna report is identified in the exact same paragraph, 315?  Do you see that?

A    I see it.

Q    And do you also see that this section of the complaint is titled (indiscernible)?  You see that?

A    Yes.

Q    And do you understand that this section of the complaint

goes through each of the corrective disclosures in the case one by one?

A    Well, there's like a truth emerges section that --

Q    I'm not talking about the truth emerges section.  Please just answer the question.  Are you aware that the loss causation section of the complaint goes through each of the alleged corrective disclosures one by one?

A    I -- it may.

Q    And do you agree that Paragraph 315 concerns the third -- the last corrective disclosure alleged in the case?  Is that what this -- do you agree that that's what this paragraph concerns?

A    Yes.

Q    And are you aware that this exact same paragraph of the complaint is cited in your report for this third corrective disclosure?  Are you aware of that?

A    Yes.

Q    And that's in your opening report, correct?

A    Yes.

Q    And I -- and let's turn to the Susquehanna report and take a look at that again.  And the Susquehanna report covers 22 different companies in the sector, correct?

A    Somehow I thought it was 21, but maybe it was 22.

Q    And is it correct that only three of those 21 or 22 companies were downgraded by the Susquehanna report?

A    Downgraded in terms of a rating.  So, prices were downgraded.  The price targets were downgraded for all of them except for one.

Q    And in fact, for Apache, the ratings downgrade -- I mean, the price target downgrade was from $35 per share to just $9 per share, correct?

A    Yes.

Q    And would you agree that in issuing that downgrade, Susquehanna specifically referenced the lack of balance sheet flexibility for Apache and the two other companies of the 22 that it downgrades?

A    I'm -- I didn't understand that.  They mentioned the balance sheet flexibility.  I didn't hear the beginning part.

Q    Doesn't -- don't they mention balance sheet flexibility as the main parameter in their stock selection process in describing the downgrade?

A    They have the words it's the main parameter (indiscernible) stock selection process with -- yes.

Q    So, it says that in the report, correct?  That's their main parameter?

A    It says it in the report.

Q    And it also says --

A    It says -- it --

Q    (Indiscernible) answer --

A    Did you say a main parameter or the main parameter?

Q    I said a main parameter in their stock selection process?

A    Okay.

Q    And do you agree that the report also states in explaining the downgrade of Apache that additional cutbacks may be necessary?

A    I think in explaining the downgrade they say that it is due to the declining prices.  So, this isn't really explaining it, but I do agree that they say additional cutbacks may be necessary.

Q    And that's notwithstanding -- and I'm reading the same sentence where additional cutbacks is highlighted that Apache has already announced activity reduction and slashed dividend payments, additional cut -- it says additional cutbacks may also be necessary, correct?

A    It -- yes, it says for all three dependent on the price trajectory.

Q    Thank you.  The Susquehanna report also includes calculations of Apache relative to certain of the 22 peer (indiscernible) peer companies, correct?

A    Yes.

Q    And that's what we're looking at right now, correct?

A    Yes.

Q    And among the international diversified (indiscernible) listed at the very top, Apache has the highest net debt to EBITDA ratio of all the companies listed for 2020 expected and

for 2021 expected, correct?

A    Yes.

Q    Would you agree that this -- had these --

A    Of those four.  Is that what you're saying?

Q    Correct, of the international (indiscernible) peers listed that Susquehanna is comparing Apache to, Apache had the highest net debit to -- net debt to EBITDA ratio of any of those companies, correct?

A    Yes, I wouldn't agree.  I wouldn't say this is a chart comparing Apache to other companies.  This is a chart of all of the companies and their coverage, and they're giving the numbers.  It's not a particular comparison of Apache to others.  You can make the comparison, but that is not the purpose of this report.

Q    Are you aware of any other comparison prior to issuing of this report comparing Apache's net debt to EBITDA ratio for 2020 and 2021 against these other (indiscernible) peer companies?

A    They're not making a comparison.  They're not issuing an Apache-specific report.  They're doing an industry report and they're showing all of the companies that they cover in this universe, their debt to EBITDA ratio.  I don't know.  If there are other industry reports, I would imagine they, too, would show (indiscernible) this is not something that I've looked at at all, but --

Q    So, you're not aware of any other analyst reports issued prior to the Susquehanna report that has this comparison?

A    Most industry reports would list the companies within the industry and list a series of metrics like this.  I -- off the top of my head, I can't recite some, but --

Q    But you're not aware of any -- you're not aware of any analyst report issued prior to the Susquehanna report showing that Apache has the highest net debt to EBITDA ratio amongst (indiscernible) international diversified (indiscernible) peers, correct?

A    Not that I could recite, no.

Q    The stock price decline that occurred after the March 16th alleged corrective disclosure that's pled in the complaint, the two-day disclosure that's pled in the complaint is statistically significant as to 100 percent and 99 percent confidence levels under your and Dr. Nye's original event study analysis, correct?

A    It's statistically significant at a high level, but.

Q    Have you conducted any economic analyses --

A    I mean -- I'm sorry.  Can I just repeat -- it's statistically significant if you don't do anything and don't adjust for the high volatility on the day or don't make any adjustment and just read -- as you just read off without making any adjustments, the physical significance level is very high.

Q    To be clear (indiscernible) about your and Dr. Nye's

original event study analysis.  Do you agree that under your and Dr. Nye's original event study analysis, the two-day stock price decline that you observed after the March 16th corrective disclosure was statistically significant at the 99 percent confidence level under your original event study and at the 100 percent confidence level under Dr. Nye's original event study?

A     So, the difference in our event study is we have two different -- slightly different regressions where we control for the -- a different --

Q     Again, it's a yes or a no question.  I --

A     It's not.  It's not.  I'm trying to --

Q     -- (indiscernible) respectfully (indiscernible) --

A     I'm trying to answer.

THE COURT:  Hold on, hold on, hold on.  I don't think that's a yes or no question.  So, let's have a full answer, please.

THE WITNESS:  So, my -- the alternative or my event study model controls for the industry differently, and it runs the regression and has a different abnormal return.  The statistical significance would depend on what you -- how you control for it.  I would not agree that it is a -- it is statistically significant, or we have a proper test of statistical significance, because the regressions that we are both running without -- when I'm just adjusting his model or just using a control period before this date where the

volatility is much lower than the market volatility is around this time.  So, this is a crazy day.  This is the biggest volatility day, you know, ever according to the (indiscernible).  So, stock prices are going crazy and they're particularly going crazy in this industry.  So, without doing any kind of adjustments, if you just run the models and punch out the statistical significant numbers, I do agree that both his model and my model mathematically give a strongly significant number.  I don't agree that that's a proper test of the statistical significance of the movement on this day because it's a period and a day with enormous volatility, and the statistical significance is a test of whether the movement on that day is different than what you would expect given the normal movement, but it is not a day where the control period controls properly for the normal movement, because it's a crazy day.

Q   I will ask the question one more time, then I'm going to move on.  Under the original event study analysis that you and Dr. Nye performed, without controlling for any COVID-related volatility, the two-day stock drop that occurred after March 15th was statistically significant at 100 percent under Dr. Nye's initial event study at the 100 percent confidence level under Dr. Nye's initial event study at the 99 percent confidence level under your study, correct?

A   So, it's not a confidence level.  It's not how confident

you are.  So, I'm not agreeing with that terminology every time you say it.  I'm not going to agree with that.  But yes, it is statistically significant at a -- if you don't make any adjustments at a very high level above the, you know, smaller than a five percent, so within a one percent or a 99 percent confidence interval.

Q    The stock price decline that occurred over these two days was a 40 percent stock price decline, correct?

A    That sounds about right.  It's a lot.  It's a big decline.

Q    Mr. Nye did in fact analyze that big decline using a methodology that your own colleagues at NERA listed in the paper as one used to control for volatility, correct?

A    He attempted to do that.  He did not do one that was consistent with what my colleague said in the (indiscernible).

Q    And it's your opinion that because he didn't -- under the first methodology listed by your colleague, he didn't fully adjust for the volatility that occurred on March 16th; is that correct?

A    Yes.  He moved the control period so it's closer and it is a control period that has higher volatility than the original period, but it's still not nearly as high as the volatility actually is on the day in question.

Q    And using the methodology proposed by your colleagues at NERA, the first methodology, Mr. Nye ran control periods -- five different control periods, correct?  A six month, a five

month, a four month, a three month, and a two-month control period, correct?

A    I think that's right.

Q    And do you see on the screen share -- oh, I'm sorry.  I (indiscernible).  I'm going to put Dr. Nye's event results. This is your own direct examination (indiscernible) correct?

THE COURT:  I'm not sure what you're referring to.

MR. KAPLAN:  The --

THE COURT:  (Indiscernible) on the screen, on the screen.

MR. KAPLAN:  I'm scrolling down.  Give me one minute.

BY MR. KAPLAN:

Q    So, this is Figure 11-D in your direct examination, Ms. Allen, correct?

A    I don't see it yet.

Q    Is it not sharing?

MAN 1:  You're still sharing the labs.  You're still sharing your (indiscernible).

MR. KAPLAN:  Okay.  Thank you.

BY MR. KAPLAN:

Q    You see that?

A    Yes.

Q    So, Figure 11-D, this is from your direct examination testimony in this hearing, correct?

A    Correct.

Q     And this is the table showing the results of Dr. Nye's use of a methodology proposed by your colleagues at NERA in their paper to control for periods of increased market volatility, correct?

A     Attempted use of a methodology, but yes.

Q     Okay.  And your table shows that, in addition to the one-year control period utilized in Mr. Nye's -- Dr. Nye's original event study, he also ran five different control periods ranging from two months to six months; is that correct?

A     Yes.

Q     And under four of these five control periods, Dr. Nye found the decline was statistically -- the stock price decline was statistically significant at the 99 percent confidence level.  And I know you don't love that terminology, but it's a 99 percent confidence level as shown in Figure 11-D of your direct examination, correct?

A     Yes.  He found it significant for -- yes.

Q     And that would be the periods ranged -- the three-month control period, the four-month control period, the five-month control period, and the six-month control period.  All of those control periods he found were statistically -- the stock price declined following the March 16th corrective disclosure was statistically significant at the 99 percent confidence level, correct, as illustrated in Figure 11-D?

A     So, it's not at the 99 for the --

Q    I didn't ask you about (indiscernible).  I'm -- for the period -- listen to the question, please.

A    Okay.

Q    For the first -- in addition to the one-year period in his initial event study, do you agree that for each of the four periods listed ranging from three months, four months, five months, and six months, Dr. Nye found under your NERA -- under this -- the methodology proposed by your colleagues that the stock price decline following the March 15th disclosure was specifically significant at or above the 99 percent confidence level?

A    He finds that for his own model when he attempts to use the method described in the NERA paper.

Q    And under your alternative model that's listed next to Dr. Nye's, for the first three of those windows, the four-month, the five-month, and the six-month, this shows that the confidence level resulting from that correct -- the confidence level associated with that stock price decline is also above the 99 percent level, correct?

A    Yes.

Q    And under Dr. Nye's analysis, again using the first methodology proposed by your colleagues at NERA in their paper, under the two-month window -- control window, he found statistical significance at a confidence level in excess of 95 percent, correct?

A    For his own model using the shorter period he finds --
when he attempts to use the model, he finds it is significant
above the 95 percent level.

Q    And this is a two-month control period listed at the
bottom, correct?

A    That's right.

Q    Let me ask you, is it -- okay, I'm sorry.

         THE COURT:  Hold on (indiscernible).  Okay.  So, what
you say in your report is that if Dr. Nye had properly followed
the methodology in the paper that he relies that he would find
that there's no statistically significant reaction to the March
16, 2020 alleged corrective disclosure, but specifically, and
I'm looking at your supplemental report on Page 40, Paragraph
74, which is right below the same chart that you see on the
screen, you say contrary to the method Dr. Nye applies, the
other three volatility adjust methods do actually control for
the market volatility on the alleged corrective disclosure day
itself, thus more accurately controlling for the dramatic spike
in market volatility on the alleged corrective disclosure date.
And then you say applying any of these three other methods
results in no statistically significant price reaction
following the March 16, 2020, alleged corrective disclosure.
And maybe this is a silly question, but I'm just trying to
understand, did you do that actual -- test the data?  I mean,
is there -- did you apply those three methods that were

mentioned to make that determination?

THE WITNESS:  Yes, I did all those three methods, correct.  I just followed them exactly, did those methods.  And so, what Dr. Nye is -- he is moving the control period.  So, it is closer to the date in question, but the date in question has enormously high volatility, and you can see from the table that we have up here that as he gets closer to it, so as he goes from six months down to two months, the volatility over the period that he's measuring starts to get higher and closer to the 83 percent than it is on the date in question.

So, his original period was 17.  He has a -- then he moves it and has a six-month period that's 35, and then it goes up to 37 to 40 to 43.  So, it does get closer, but the volatility is still, like, you know, half of what it is on 03/16, and you can see that each time the volatility in his control period actually gets bigger, his statistical significance goes down.

So, if you look at Column 5 or Column 6, those are the statistical significance, and for it to be significant at the five percent level, you have to have a number for the 95 percent, if you want to think of it that way.  You have to have a number that's less than five percent -- that's less than five percent, and you can see it just keeps getting bigger.

And by his last model, the shortest period where the volatility is closer to on 03/16 but still much, much lower, it

is with the alternative model.  It is no longer significant at the five percent level because it's 5.3 percent, and you can just -- you can see how it's progressively getting less significant, so.

THE COURT:  Let me rephrase it.

THE WITNESS:  Yes.

THE COURT:  When it says alternative model, what are you referring to?

THE WITNESS:  Yeah.  So, the difference between the Nye model and the alternative model is I, in my first report, had an alternative model to Nye's where I use a different industry index.

So, he has a -- he has an industry index which has a smaller number of peer companies.  I have a bigger industry index, and it doesn't make a whole lot of difference.  I would say that mine does a better job of controlling that -- you know, it -- the statistics show that it moves more with Apache stock price than the one that he uses, but it's not a huge difference.

So, I really don't, you know, dispute the one that he's doing.  I think mine is slightly better, but that is the only difference between the Nye model and the alternative model is that I'm using a different industry index to control for movements and the peers, and it just has more companies in it, and it does move a little bit more with Apache stock price in

general.

So, I think it has a -- it has a better fit, but it doesn't make an enormous difference, and it doesn't make really any difference to any of my conclusions overall about price impact. So, really, the two different models, I don't think make -- I don't think it makes any difference to anything Nye is saying either, so.

THE COURT: Okay. Sorry. Mr. Kaplan?

BY MR. KAPLAN:

Q    Yeah. And just to be clear, under your model that you just referenced statistical significance, under the shortest period listed in this chart, the two-month period, the price decline is still statistically significant at the 94.7 percent confidence level under that shortest period listed, correct?

A    That's right. So, it wouldn't -- it would be below the typical standard, but it's close.

Q    And of the methodologies identified in the NERA publication by your colleagues, do you agree that the methodology that Dr. Nye utilized, or as you say attempted to utilize, is a standard approach utilized in securities litigation for controlling for periods of heightened volatility?

A    I would say it's a fairly standard approach, yes, to move to a -- yes, I would say it's -- it has been, you know, maybe during the credit crisis is when people started doing it, when

things were a little bit different then.

Q    And you previously stated as -- in response to the Court's questions that you did provide the other methodologies listed in the NERA paper.  Did you ever provide the mathematical results or calculations of your tests under any of those models in connection with your opinions in this litigation?

A    Sure.  I turned over all the -- I turned over all my analysis.

Q    Your reports in this case and your direct examination in this case do not indicate the result for calculations of your tests, correct?  It --

A    It doesn't give all the numbers for all the tests.  It says that they were not statistically significant.  No, but the tests are sort of -- no, I did not include all the details of them.

Q    Okay.  And Dr. Nye did perform those other tests as well, correct?

A    I don't know if he did.  He asked -- he did not -- he referenced the NERA paper and attempted to try only one model.  I -- since he brought up the paper, I used all the other approaches that were mentioned in that paper.

Q    And (indiscernible) is the very first approach listed in the NERA paper, correct?

A    Yes, it is the simplest approach.

Q    And in applying this approach, Dr. Nye -- would you agree

that Dr. Nye was not trying to establish pricing impact, which is defendant's burden?  He was simply trying to demonstrate the fallacy of your assertion that the event study methodology is incapable of controlling or changing market and industrywide volatility dynamics, correct?

A    No, I would -- it's my understanding he was responding to my report on price impact.  So, I would imagine that -- he was responding to my report on price impact, so I don't agree with what you said he was doing.

Q    Isn't that the whole point of the NERA paper to present methodologies that are capable of controlling for periods of increased market volatility?

A    The NERA paper suggests methods of what to do in periods of increased market volatility.  I will say it was done before COVID.  It was done quite a while ago, so not anticipating the kind of thing that -- sort of crazy thing that happened, you know, particularly around these few days and actually on this particular day.

Q    Do you have any idea -- oh, I'm sorry.

A    No, go ahead.  Sorry.

Q    Do you have any idea why Apache stock price fell -- the 40 percent stock price decline here following the third corrective disclosure?  Do you have any idea why that stock -- Apache stock price fell by more than both the broader market as well as the (indiscernible) industry index?

A    Well, so lots of -- so, the -- you know, on average, half the companies will go up and half the companies will go down relative to what you expect.  So, asking why something went up or down on a given day when just random movements -- you expect every stock to either -- to randomly either go up or down on any single day regardless of anything happening.  So, to sort of say, well, it's so surprising, why did it go down more than you would expect because of the industry and the market?  Half of the stocks in general do go up and half of them do go down.  Whether they go up or down an amount that's unusual and statistically significant is why you do the statistics.  This was a day when lots of stocks were going way up and lots of stocks were going way down.  All of their movements were more dramatic than typical.  So, you can't take the movement itself and say does this really tell me something.  You have to control for the fact that it's crazy and everyone's going different directions and going bigger amounts in different directions than they typically do.  So, that's the question. The stocks cannot stay the same.  They all move around on every day, and the question from a statistical standpoint, is this movement due to something or is this just -- can this just be explained by the industry and market on this day, and the industry on this market and this day were going all over the place?  So, it looks like almost all the stock couldn't be explained by the industry and market on this day.  They all

look crazy.  So, you know that's not a good test, because if everyone is crazy, then obviously controlling for the movement of them doesn't tell you anything.

Q    So, you have no idea why Apache's 40 percent stock price decline over this two-day period was more than the (indiscernible) industry index and the broader market?  You have no explanation?

A    Yes, I do.  I think it's because this was a crazy day at the beginning of COVID, and it was even crazier if you were in this industry, because oil prices were going crazy and were dropping dramatically, and there's a lot of uncertainty about everything that's going on, so the movements were much more dramatic.  And I think the company's movements were dramatic. There was nothing specific about Apache that happened on this day.  There was just craziness in the market and stocks went, you know -- their normal daily variation that we would call nothing is suddenly much bigger in different directions.

Q    And when you say nothing specific about Apache during -- that occurred on this day, you're excluding the Susquehanna report, correct?

A    The Susquehanna report is not an Apache-specific report. It's an industry report.  There's not one analyst that issues an Apache-specific report on this day.  There's not one analyst that says that the stock price is dropping on this day because of Seeking Alpha or because of the Susquehanna report.  If

there was actually news about Apache on this day with a 40 percent drop, if something was happening that was Apache-specific, you would expect -- there are many analysts following this company, which is one of the reasons that Dr. Nye finds it to be an efficient market.  Not one of them issues a report on Apache.  There's not one analyst following this company that has a company-specific report on this day.  So, with a 40 percent stock price drop, to not issue any report saying something came out tells you that this day is not because there's actually news about Apache.  It's a crazy day and stocks are going all over the place.  If something moves the stock 40 percent, and for not one analyst to issue a report saying, you know, this happened and -- a 40 percent drop is a lot.

Q    So, it's your opinion, your economic opinion, that this was just a crazy day?

A    It was a crazy day.  It's not just my opinion.  Yeah, I don't know if you remember the day.  It was a crazy day.  I'm sure we all thought it was a crazy day, and the stock went crazy.  It's the highest volatility that this index, which is the standard we use, index of market volatility, was its highest value ever, highest reported value ever on this exact day.

Q    And once again, the test that Dr. Nye utilized to control for market volatility is the very first test identified in the

paper published by your colleague at NERA, correct?

A    That's right.  And it says, as Dr. Nye agrees it says, you use a control period that's representative, and this will show you it's not representative.

Q    Okay.

A    It's not anything like the 83 percent volatility.  He's only controlling for --

Q    You've answered my question.  Thank you.

MR. KAPLAN:  Your Honor, I'm done with the witness.

THE COURT:  Okay.  Any redirect?

MR. LAWRENCE:  Yes, Your Honor.

THE COURT:  Go ahead.  If we could just take down the share the screening (sic) function?  Thank you.  I'm just curious, did Mr. Sterline and Ms. Hefley leave?

MR. LAWRENCE:  He'll prove in a second if he hasn't left.

THE COURT:  Okay.  I just --

MR. LAWRENCE:  There he is.

THE COURT:  (Indiscernible).  Go ahead.

MR. LAWRENCE:  If he leaves, I'll let you know.  How about that?  I'm watching him.

REDIRECT EXAMINATION OF LUCY ALLEN

BY MR. LAWRENCE:

Q    Good afternoon, Ms. Allen.  I'm going to ask you some questions about issues you were asked questions about on your

cross-examination just now.  Do you recall earlier this afternoon being asked questions about whether you have ruled out that when the focus period began, there was inflation remaining in Apache stock and you responded (indiscernible) along the lines of I have ruled that out as alleged by plaintiffs?

A     Yes.

Q     What did you mean by that?

A     Well, plaintiffs are alleging that the -- you know, there's certain misrepresentations and there are certain things that were actually true, and by the end of the class period, so by well before the end of the class period, Alpine High is already defunct.  The Bloomberg article is saying, you know -- I mean, the complaint has alleged all these bad things have already happened.  And so, there's nothing left that plaintiffs are alleging -- there's no truth that plaintiffs are alleging about the misrepresentations that hasn't already come out by the end of the (indiscernible).  It's already -- all the bad news about Alpine High according to plaintiffs and everything is already out there.  The plaintiff's own story, if you go through -- and particularly if you look at the day and what plaintiffs are saying with the whole $3 billion (indiscernible), there's really nothing left about all the things that plaintiffs are saying that the market misunderstood about what -- at the beginning of the (indiscernible) that pts

-- that Apache was supposedly alleging.  So, there's nothing left according to plaintiff's story, and I have shown that during the focus period, there is no stock price drop from anything corrective of the alleged misrepresentation, and there's nobody -- you know, there's no statistically significant price drop that can be tied to something corrective of the alleged misrepresentation.  There's nobody saying that now we understand something different about Alpine High relative to what they had been previously saying.  There's nobody saying -- so, it's not only what they're actually saying about why the stock is dropping.  It's their failure to say anything that's consistent with what plaintiffs are alleging.  So, for example, they are not ever saying the Keenan resignation.  They're not saying we're learning something new about Alpine High that we didn't know before.  They're not saying at the deferral we can't believe they're deferring.  We were -- understood that it was going to be economic at very, very low prices, and this sounds -- you know, this makes no sense to us that they're deferring.  Instead, they're saying this deferral seems expected.  It's prudent.  It's -- you know, one of them is even saying it's cash flow positive.  So, it's -- the lack of a statistical price decline is the commentary of about why the stock is declining, and that's the absence of any commentary or anything that's consistent with plaintiff's actual allegations that the price is dropping because they've

learned something new about Alpine High.  They have learned that, you know, prices have gone down dramatically, but they previously learned that Alpine High (indiscernible) they expected.  And when gas prices in the Waha Hub over the very, very specific Permian Basin where Alpine High is, there are all these problems and the prices have just gone, you know, lower than they've ever gone before, they're thinking, yeah, it's too bad that this has happened, but you know, deferring and shutting down is the right thing to do.

Q    Let's talk about the first corrective exposure during the focus period, the April 23, 2019, announcement of a deferral. Do you recall being asked questions regarding the four consecutive days of stock price declines following that announcement?

A    Yes.

Q    Is it unusual for a company like Apache to have four consecutive days of stock price declines?

A    Well, empirically it was not unusual.  So, just looking at Dr. Nye's exhibit and looking at the -- you know, how many days during the class period were part of a four-day decline and -- I created an exhibit that highlighted that, and I counted up the percent, and no, it's not unusual.

Q    That's an exhibit to your direct testimony?

A    I believe so or an appendix or something.

Q    You were asked questions about a case in which you did use

multi-day windows, you know, previous assignments
(indiscernible).  Do you recall that?

A    Yes.

Q    Was your decision to use a multi-day window in the
(indiscernible) case inconsistent with your decision or your
belief that one is not appropriate here?

A    No, it is not.  It's entirely consistent.

Q    Can you explain to use why in the (indiscernible) case you
used a multi-day window?

A    Sure.  Well, one, my standard is when an efficient market
-- when it's an efficient market or there's a claim of an
efficient market, which is the case here, is that the stock
price should react quickly.  And so, one day -- the first day
is a relevant day.  I would only look beyond the first day if
it did react significantly on the first day and it -- then I
would look to the second day, and if it continues to react on
the second day having reacted significantly on the first day,
then if it's not other news being announced, then that would be
the only condition that I would expand the event as the market
is showing that it's continuing to react.  That is what
happened in the (indiscernible) case.  The first day was
statistically significant and the second day was statistically
significant, and continued the reaction I think to a third day
that was also statistically significant, but that was also not
a case -- that was not a securities (indiscernible).  There was

no fraud on the market claim and there was no claim of an efficient market. So, it wasn't the case where there was a claim or any necessity that it react quickly. But regardless, it was statistically significant on the first day, so I did continue the reaction, and that is my standard approach and that is the standard approach of my colleagues at NERA, and that is the standard approach of other experts.

Q    Can you explain more about why that's the standard approach or why that's appropriate to only move to the second day if the first day shows a reaction? Why is that consistent with the economic theory that's underlying your opinion?

A    Well, the claim of an efficient market, as I think we saw earlier today, as, you know, Fama, who's the sort of guru of the efficient market says himself, in an efficient market, you expect the price to react very quickly, if not immediately is what actually the textbooks will say, and the academic literature is clear that the market does react very quickly. So, it finds that, you know, not only does it begin to react very quickly, but the majority of the reaction typically happens -- you know, I think an earnings announcement study is showing that the majority of the reaction happens within the first 10 minutes or something. So, if it were not even reacting in a way that you could differentiate using the (indiscernible) study on the first day and you had to go out multiple days to even find a reaction, then you're clearly not

-- that would be contrary to the efficient market.  There would be -- you could be making all this money over this time period.  So, if you knew it was going to, you know, drop 10 percent four days out, well, you know, get me in there right now.  I'm going to make all this money immediately.  The whole point of the efficient market is that the minute information becomes public, everyone's trading right on it and the gains from trade, you know, go away very quickly.  So, there isn't any arbitrage.  If it takes four days for someone to understand like a deferral and it really does cause a -- I don't remember what they were saying, an 11 percent drop, that's a whole lot of time to be making a whole lot of money off of information.  That makes absolutely no sense.  That would be completely contrary to an efficient market.

Q    Do you recall also being asked questions regarding (indiscernible) around the 95 percent confidence level versus the 90 percent confidence level, what you use in various cases?

A    Yeah.  I mean, the standard of the academic literature and the standard in the courts is the 95 percent of the five percent.  You know, I have seen some courts look at the 10 percent level and I have seen some experts do that.  I have never seen anyone do, you know, a 30 percent or a 70 percent if you want to talk about it in the other direction.

Q    So, in this case, does using a 90 percent versus a 95 percent confidence interval impact your opinions about whether

or not the stock decline on April 23rd was a significant decline?

A   No, it makes absolutely no difference.  It has nothing to do with it, the five versus 10 or 90 versus 95.  It is the first day, which is the day of the announcement, and it has a full day to react as Dr. Nye said in the -- oh, my gosh, in the other case that he worked on.  There would be no reason when you have a full day to go beyond that.  This had a full day and nowhere near any significance level that anyone would report or consider different than the normal movement.  So, it's all within the error of the model, within the normal movement of the stocks.

Q   You were shown in connection with the April 23, 2019, disclosure some analyst reports indicating that analysts lowered either the production estimates or their earnings per share in the days following those announcements.  Do you recall that?

A   Yes.

Q   Does an analyst lowering its production estimate for earnings per share, is that inconsistent with your opinion?

A   No, absolutely not.

Q   Why not?

A   Well, they're not changing their price targets.  They're not saying -- they're saying that this is expected.  So, they're saying given these very low prices, it makes sense and

-- to reduce production, and there -- and it also makes sense, you know, given the very low prices and the earnings per share you're just going to make in general as prices go down, the actual amount that you make per share is going to go down, which is independent of the alleged misrepresentations.

Q    Did any analysts at this time lower their estimates on the reserves at Alpine High?

A    No.

Q    How do you know that?

A    Because not one analyst said that, and the one that did report it didn't change it.

Q    Got it.  You were asked some questions also about -- do you remember your big picture analysis?

A    Yes.

Q    But what is your big picture analysis -- what was it designed to show?

A    Well, yeah, so, I had originally divided I think it was my first report up into let me look at every single alleged misrepresentation during the focus period and then let me look at every corrective disclosure during the focus period, and then in addition, I did another -- I sort of thought about it differently.  I sort of stepped back and said let me look at the -- you know, the big -- or look at the period overall.  And plaintiffs had been alleging that the stock price declined, I don't know, 92 percent or something like that over this period

and were saying it was due to the correction of the alleged misrepresentations regarding Alpine High.  So, one of the things that I did is say, no, that really doesn't make sense. If you look at this overall, Apache stock price is moving similarly to peer companies over this time period.  It's just not the case that this, you know, 92 percent or whatever it was overall decline is due to Alpine High-specific announcements or corrections of the alleged misrepresentations.  Another thing that I did, which I call part of this big picture analysis, is just to see over the time period how were the analysts' expectations of the -- so, one of the categories of allegations is that the mix of -- the reserves was worse than what the company had led them to believe to begin with.  And so, I looked whether that changed over the whole focus period.  So, what I called the big picture analysis or things that look over rather than looking at each day by day, let me look at things over the whole time period, which was to rebut the general claim or the claim that was repeated multiple times by plaintiffs that the, you know, 92 percent decline in Apache stock price is due to corrections of the alleged misrepresentations.

Q    So, were there analysts that estimated Apache's Alpine High reserves from the start to the finish (indiscernible)?

A    Yes, and they do not -- and they showed no change to that. And then there was also a mention of others that there was a

change. Even if they didn't report it, they -- I also looked to see whether any of them reported that their evaluations of things were different because they now have a new understanding. So, they may not have been reporting it every time they issued a report, but if they thought there was something important, I looked to see whether they (indiscernible) they had come up with anything different about the (indiscernible) and I found nothing. So, I found that they were -- the ones that were reporting it were consistently saying the same numbers and that there was nobody saying now we're -- now we think it's something different.

Q    Moving on to the second focus period corrective disclosure, the October 25, 2019, news of Mr. Keenan's resignation. Do you recall being shown some analyst reports from that day and the following days that discuss Mr. Keenan's role at Alpine High or Alpine High's historic operations?

A    Yes.

Q    Are those discussions in those analyst reports of Mr. Keenan's role at Alpine High or (indiscernible) Alpine High in any way inconsistent with your opinion that the revelation of Mr. Keenan's resignation (indiscernible)? If I have too many negatives in that, I can --

A    Yeah, so it's (indiscernible) so much whether it's corrective as I think what I'm really saying is that there's no price impact from the alleged misrepresentations or that the

price drop is dropping not because of anything corrective. No, so what they're saying about Mr. Keenan -- it is true that Mr. Keenan was very related to Alpine High and was known as the godfather of Alpine High, but that is not new news. So, the fact that he's related to Alpine High, at this point in time the market wasn't concerned about Alpine High. Alpine High already didn't look of great interest. What they're really interested in is Suriname, and it's right at the -- like the beginning of the first time when they could be expecting some results on Suriname. So, it's a big bet in the market of what's going on with Suriname, and so, you know, in explaining who he is, he is very related to Alpine High, but the market is dropping not because they're finding out he's -- something new about Alpine High or that he had anything to do with Alpine High. They already knew all that. They're thinking this might tell us something about Suriname, or at least this seems like the absence of good news about Suriname, which is (indiscernible).

Q    Did you see any evidence that any of the company-specific decline in Apache stock that day was (indiscernible)?

A    Not one analyst, market commentary, anyone could I find say the stock price was due to anything about Alpine High. Everyone commented on the reason for the stock price decline -- said that it was due to Suriname, speculation about Suriname.

Q    Is that only including the reports that came out before

Apache told some analysts that Keenan's resignation was not related to Suriname?

A    No, it includes the ones that came out after that.  It includes ones talking about the day.  It includes ones a few days later.  It includes like a Wall Street Journal article that's months later looking back on the time period saying that the price decline at that day was due to Suriname.

MR. LAWRENCE:  Pass the witness.

THE COURT:  Okay.  Mr. Kaplan, anything further?

MR. KAPLAN:  Your Honor, can we take a short break?

THE COURT:  Sure.  Let's take a five-minute break, and then I'll tell you my plan is as soon as this witness's testimony is concluded, obviously I've heard a lot of testimony, I've got a lot of briefing, but I'm happy to entertain if there's any final thoughts that anyone has for a couple of minutes.  We'll do that.

So, let's take a five-minute break.  So, it is 4:44.  So, we'll make it six minutes.  We'll start at 4:50 on the dot.  Off the record.  Thank you.

(Recess)

THE COURT:  Back on the record.  Mr. Kaplan?

MR. D'ANCONA:  I believe it's me, Your Honor.  Josh --

THE COURT:  There he is.

MR. D'ANCONA:  Thank you.  Just a few closing remarks

if we might?

THE COURT:  Okay.  I just want to make sure.  So, nothing further with this witness?

MR. D'ANCONA:  Dave, did I get in front of you?  I'm sorry.

THE COURT:  Is there anything else with Ms. Allen?  That's what I'm trying to figure out.

MR. KAPLAN:  Yeah, I -- just one quick -- couple of quick questions.

THE COURT:  Sure.

RECROSS-EXAMINATION OF LUCY ALLEN

BY MR. KAPLAN:

Q   So, Ms. Allen, you testified that nothing corrective came out of -- no corrective information was revealed relating to plaintiff's allegations in the complaint during the entire focus period running from February 23, 2018, to March 13, 2020, correct?

A   No, I don't think I said that.  I said there's no price impact.  There's no decline from anything that is corrective or allegedly corrective.

Q   And you -- share my screen -- and that's based on your view.  This is Paragraph 87-B of your direct examination.  I'm talking about the plaintiff's claim in this case is that the corrective information about Alpine High was -- again, it was too heavy on an unprofitable dry gas and too light on valuable

oil and wet gas, correct?

A    That's one of the claims.

Q    And you also agree that during the corrective that plaintiff's claims in this case include numerous additional categories of misstatements, correct?

A    Yes.

Q    And that those statements also include that Alpine High was a transformational discovery at a world class place with immense production capabilities that would deliver incredible value to Apache and its shareholders for many, many years to come, correct?

A    Yes.  Yes.

Q    And it's your view that nothing related to those statements occurred during any of the corrective disclosures in the focus period between February 23, 2018, and March 13, 2020, correct?

A    I don't think I said that.  No.  I'm saying there's no price impact.  There's no price decline from any of the alleged misrepresentations.  I'm not saying there's nothing related.  So, for example, the date when there's the $3 billion write-down and they call it quits on Alpine High, I would say that is related to plaintiff's allegations.  There is no price decline.  There's no -- there's not even a price decline alleged by plaintiffs on that date.

Q    Would you say that the announcement of Mr. Keenan's

resignation, the Alpine -- the Apache executive most publicly associated with the Alpine High discovery was not related to statements that Alpine High was an immense production -- had immense production capabilities and it would -- that would deliver incredible value to Apache and its shareholders for many, many years to come?

A    I'm not saying the resignation is not related to the claims.  I'm saying the price decline is not related to the claims.  The price decline is not related to Alpine High.  The price decline is related to expectations about Suriname.

Q    And in formulating your belief that there is no crisis impact from -- during this entire focus period based on any of the alleged misrepresentations in this case, did you also consider any discovery documents including documents produced by Apache (indiscernible)?

A    Only in response to what appeared to be the cherry-picked documents the Dr. Nye looked at.  So, the standard way to see how the market is reacting is to look at public information.  What, you know, one guy writes to Apache saying, you know, it'd be helpful to have more information is not a standard way of deciding that -- you know, that therefore you should do a four-day price correction because one guy says something.  So, in response to Dr. Nye's claim that that justifies the four-day reaction, I did look at some internal documents that were turned over to see what else this Andrew -- Andy Yang also

said, and that's where I found that he also said that, you know, that the market was anticipating or talking about or chatting about or expecting before the deferral shut it.

Q   And did you also look at any other discovery documents provided by Apache -- produced by Apache in this litigation in connection with the big picture analysis that we just heard about during the redirect?

A   I don't think I did for my own analysis.  I think I did it if someone had referenced it.  I don't recall.

Q   And your big picture analysis asserts that Apache's stock price moved in line with the (indiscernible) industry during the focus period, correct?

A   That's right.

Q   And that includes the corrective disclosure dates, correct?

A   Overall, the big picture analysis is looking at -- looking overall at the whole focus period.  So, again, that was in response to plaintiff's claim that it was dropping, you know, over 90 percent because of corrections of alleged misrepresentations regarding Alpine High, and I'm saying no, over this whole time period.  It's actually dropping quite consistent with the industry and specific peers.

Q   And your claim that Apache's stock price was -- during the focus period was entirely driven by industry factors, is that contradicted by an internal presentation to Apache's Board of

Directors referenced in Dr. Nye's reply report and discussed in his direct examination titled Five-Year Look-Back on APA Performance with a Primary Focus on Alpine High?  And this is the -- I'm sharing my screen right now.  Are you familiar with this document?

A    I've seen the document.  I did not say that the entire price movement was entirely due to industry factors.  I said contrary to plaintiff's claim that it was dropping over 90 percent, it's consistent with what's going on in the industry. I don't say every movement on every day is entirely consistent because I do say that the movements -- the Keenan -- there is a drop on the Keenan resignation, and I do think that drop is due to the market's, you know, fear about bad news about Suriname.

Q    And do you agree that the company's five-year look-back presentation covered the majority of the class period in this action?

A    I think this was done before the last alleged corrective disclosure, so it does not include the --

Q    The question was does it cover the majority of the class period alleged in the class action?

A    I think it does except I recall it doesn't have the -- doesn't go as far as the last (indiscernible).  That's my recollection.

Q    Okay.  And I'm scrolling down, and this is the slide that's included in Dr. Nye's direct examination.  I'm sorry.

I'm trying to zoom in so everybody can see it.

THE COURT: And you recall which exhibit number this is? I'm sorry? Remind me which exhibit number it is, please.

THE WITNESS: 11.

MR. KAPLAN: It is -- I would have to take off the screen share to tell you that. It's 11-A. I'm sorry. That's Tab -- it's -- here, I'll scroll through the (indiscernible). I believe it's (indiscernible) filed under seal. (Indiscernible).

BY MR. KAPLAN:

Q    And in this -- you agree that this five-year presentation determined not only did Apache's stock price not track the (indiscernible) industry during your entire focus period but that Alpine High specifically was a driver of Apache's stock price performance, both positive and negative, during the majority of the class period? That was the conclusion of the internal company analysis, correct? The slide that I'm showing you right here on Page 15 is -- shows Apache performance relative to its (indiscernible) peers, correct?

A    Yes.

Q    And this internal board presentation determined, and I'm waiting for my computer to load (indiscernible), that in fact Apache -- Alpine High specifically probably resulted in, and I'm reading the last line of this slide, in 6 to $8 of value impact on Apache's share price during the class period, and

that's referring to a stock price decline, correct?

A    That came out during 2017 with any remaining -- yeah.  I mean, they say -- yeah.

Q    Doesn't this internal board analysis contradict your claim that Apache's stock price moved in line with its E&P competitors during the class suit?

A    I don't say during the class suit.  I say during --

Q    (Indiscernible) Suriname.

A    I say during the focus period.  So, no, I think this is consistent.

Q    And it concluded this internal presentation determining a range of value lost.  This repeats what was said on the prior slide that over the period 2015 to 2020, Alpine High specifically -- this is the board presentation -- equated 6 to $8 in per-share loss; isn't that correct?

A    It says equates to 6 to $8 per share.

Q    These figures might be too small for everybody to read, but are you aware that the five-year look-back performance with primary focus on Alpine High, this board's presentation further concluded that when excluding a positive price impact that Apache determined was attributable to the discovery in Suriname, the average annual returns to shareholders were negative 16 percent on an absolute basis and negative nine percent relative to Apache's self-identified peer group?  Is that something you considered in your big picture analysis?

A    I don't think I considered this document when I first did my big picture analysis because this is something that I think Dr. Nye turned over.  I typically do not look at internal documents.  I analyze what the market -- the market analysis of public information.  I did review it afterwards.  I don't think it's at all inconsistent with my analysis.  I think that if you -- and I mean, I can explain to you why I think it's not inconsistent, but you didn't ask me.

Q    And this presents the company -- this board presentation presents the company's own view of the impact of Alpine High on Apache's stock price during the period in question, correct?

A    No, it's not during the period in question.  So, the period in my question is the focus period.  This is a period that starts before the focus period, and it does not go as long as the focus period.  So, it isn't an analysis over the period in question.

Q    The question -- isn't that directly contradicted by the slide that I'm sharing right now, which shows that it does cover the focus period and in fact runs all the way through the end of 2020 -- I mean, 2019 up until the beginning of 2020 and showing that Apache's stock price performance during that time did not track (indiscernible)?

A    So, it -- you said isn't this on the period in question, and it's like, no, it includes a period before the period in question and it doesn't include the period after the period in

question.  And it's -- you know, the period, it's saying generally flat with peers, right, during the middle period, and then it's saying it's going down relative to gas prices, which is exactly the same thing that I'm saying is that it went down with gas prices and not in a -- what the market is saying.

Q    But in this slide --

A    Mm-hmm.  And then the first decline is Alpine High (indiscernible) gas instead of oil drives investor concern. So, this is about the mix.  So, the focus period starts I think at the period where it's flat with peers.

Q    This slide includes your focus period, correct?

A    It doesn't include the whole focus period.  I've said this multiple times now.  It starts before the focus period, and it doesn't go to the end of the focus period.

Q    But it includes your focus period, correct?  Yes or no?

A    No.

Q    It does not include your focus period?  That's your testimony?  It runs through the end of (indiscernible) doesn't include your focus period?

THE COURT:  Hold on.  Hold on a minute.  This is now becoming absurd.  So, let's -- the answer is no.  Let's move on.  Move on.

MR. KAPLAN:  Okay.  Thank you, Your Honor.  I'm finishing with the witness.

THE COURT:  Okay.  Anything further from --

MR. LAWRENCE:  No, Your Honor.

THE COURT:  Okay.  If we could -- okay.  Well, now you are formally excused from the witness stand, so quick.

THE WITNESS:  Thank you.

THE COURT:  Quick, leave.  I'm kidding, of course. Okay.  Any final thoughts from either side?  I guess let me start with the plaintiffs since it is your motion.

MR. D'ANCONA:  Yes.  Thank you, Your Honor.

THE COURT:  By the way, before you go, I shouldn't say -- it isn't -- I can unquestionably say, which I don't usually say at these hearings, but I'm unquestionably going to at least at a bare minimum grant the motion in part, right?  I mean, there's no question there's going to be a class certified up to a point.  The question is where is that end point.  So, why does it go through to the end on the plaintiff's side?

MR. D'ANCONA:  Your Honor, I appreciate that very much.  You just allowed me to cut out the first 60 seconds of what I was planning to say.  So, you beat me to the punch. Thank you for that.

Your Honor, defendants obviously do not dispute that Apache stock traded in an efficient manner for the entire class period.  They don't dispute that we have satisfied the presumption, at least to invoke the presumption, the basic presumption of reliance in the first instance, and they don't dispute that there's price impact here for the first 18 months

of the class period.

And so, as you said, the only question is whether the full alleged length of the class period should be upheld or something shorter as defendants have asked for.  While defendants tried to shorten it by attacking the final three corrective disclosures in this case, the evidence of price impact under relevant case law for the whole class period here is compelling.

And really, while we believe the evidence supports us on the three corrective disclosures, going toe-to-toe with defendants on those, all of this technical analysis of disclosure language and analysts and news reports and intraday stock price movements are effectively really beside the point, and let me just explain why for a minute.

First, we have demonstrated front-end price inflation and it's not competitive, but we've demonstrated it and it's not typical in securities cases.  There's nothing like that in Ramirez v. Exxon and these other maintenance back-end cases that defendants focus on, but we have it here, and it's incredibly important for the decision Your Honor is being asked to make.

This large amount of inflation is shown by evidence. We have empirical analysis demonstrating a 14 to 15 percent stock price increase after the announcement of Alpine High at the start of the class period.

The second really key point here is they don't contest the existence of price impact for the first 18 months of the class period.  That's 26 misrepresentations all about Alpine High and its attributes and its two corrective disclosures.  All is uncontested price impact.  It also includes all the front-end actual positive inflation from the start that I just mentioned.

And the third key is that the substance of those 26 misstatements with uncontested price impact, that's repeated throughout the class period.  That's repeated throughout the focus period.

Now, Ms. Allen just testified, Your Honor, that she does not opine that all of that uncontested inflation from the pre-focus period had been dissipated from the stock price by the time of the focus period.  She said she can't prove that it came out during the focus period, and she thinks it didn't, but she can't prove that it was dissipated and did not exist at the start and during the focus period.  She did no empirical analysis to measure the front-end inflation that existed or to show that it was all dissipated from the stock price during the focus period, and under the case law, and this is Chicago Bridge, Your Honor, that is game over.

They may think these corrective disclosures are weak and that they should be eliminated at summary judgment on a full record of loss causation and damages, full-blown merits

expert reports, full discovery.  They'll have that opportunity, but they cannot sever the link under (indiscernible) by looking at these back-end corrective disclosures and ignoring the front-end price impact on the misrepresentations that they relate to.  They can't do it.  For price impact purposes, once you have the front-end price impact that here is uncontested, the related back-end corrective disclosures are no longer in play.

And I'm just going to read the language from Chicago Bridge.  I keep talking about it, two sentences if you'll indulge me.  The Court says, and this is the District Court's opinion, and this is at internal Page 3, "However, for class certification purposes, when plaintiffs are able to show an alleged misrepresentation had a statistically significant front-end price impact, defendants are not entitled to rely on these additional back-end arguments to rebut the basic presumption."

So, these three back-end corrective disclosures plainly relate to defendant's alleged misrepresentations including those 26 misrepresentations during the first 18 months where price impact has been not contested, and because they do, defendants cannot try to sever the link by arguing no price impact under the law I just read to you.

And just to connect the dots that it's not just me saying it, the April 23, 2019, corrective disclosure, it

related to defendants' alleged misrepresentations that the play would be economically viable even at very low commodity prices. They say it on September 7, 2016; February 23, 2017; February 22, 2018. These are conceded, front-end misrepresentations with conceded price impact. It's going to work under very, very low gas and NGL and oil prices. That's one of the statements. Front-end price impact for these statements is not contested.

Lucy Allen just testified this information is related. The corrective disclosure about the deferrals is related to these statements. She said she just thought it wasn't corrective, but she admits it's related. October 25th, Keenan's resignation, it absolutely relates to prior misstatements as well, Your Honor. He's the chief of Alpine High and he's run it from the start. His analysis is credited with proving the economics of the play that Apache has touted for years. He's the man who had seen the job through and now he abruptly leaves, and that leaving sends a clear signal of significant change with further effects, and it further affects the market's expectations for how Alpine High will be capitalized going forward as analyst reports reflect. Even if they already knew some Alpine High changes and capital reallocations were potentially expected or were possible, Keenan leaving is a major step in that direction.

Ms. Allen just said Keenan resigning from Apache with

that -- the market didn't learn anything new about Alpine High. That is frankly an incredible statement. How about the leader of the whole enterprise has just been shown the door? Remember Alpine High was still being counted on, on October 25th, the second half at fourth quarter 2019 production for Apache. It was not defunct yet. It was defunct soon. The market didn't know that yet. This was one further step in that direction, Your Honor. That was still to come. Keenan's departure was one further step towards that outcome. It was a core asset of the company at the time that the market was still watching for production guidance, and now the leader suddenly leaves. That's news about Alpine High related to its performance, related to its prospects for driving cash flows and shareholder value for years to come. And you -- we all know that those are the statements in play, among others, and it -- and his departure plainly ties to these prior misrepresentations for which price impact is uncontested. These statements were first made on September 7, 2016, day one.

So, Your Honor, again, because both April 23rd and October 25th tied to all of these pre-focus-period misrepresentations that have uncontested price impact, there is really no basis to analyze them for back-end price impact as corrective disclosures at class certification. Price impact is shown.

Now, just one last point, I think, for her part, even

Ms. Allen admitted that both April and October were related to Alpine High, and things that defendants had said before that we alleged in the complaint. She just thought they weren't corrective based on her reading of analyst reports, but I mean, first of all, Pearlstein v. Blackberry, one of the cases in our reply brief, says analyst reports are not direct evidence of price impact. They can be indirect evidence, but they need to be coupled with quantitative empirical analysis of the sort that Ms. Allen just doesn't quite do.

Furthermore, related is what matters for the price impact analysis, and Judge Rosenthal said this in Cabot. For the price impact analysis, the question the Court needs to answer to find price impact is whether or not a corrective disclosure released information that was "related to" or "relevant to" an alleged misrepresentation. That Cabot, and in that, the judge, Judge Rosenthal, was quoting the (indiscernible) opinion from the 5th Circuit and the loss causation standard there.

So, in sum, Your Honor, because defendants don't prove that the uncontested front-end inflation had all left Apache stock price by February 22, 2018, they simply cannot prove that there was no price impact from the alleged fraud in the price during the focus period that starts the very next day. They can't prove it.

They do not and they cannot meet their burden here,

even in this artificial construct of a focus period that they created to kind of get Your Honor to look away from all this uncontested price impact in the front-end and these 26 misstatements and two corrective disclosures.

We submit that the total failure of proof on their part is dispositive here and the opposition should be rejected, and the class certified in whole.

THE COURT:  All right.  Thank you very much. Anything from the defense?

MS. HEFLEY:  Your Honor, I'll start and we'll kick it to Mr. Sterling, but I want to start where -- I guess where we started earlier this morning, which is Halliburton II and Basic, and what they say -- what the Supreme Court has said is that we are entitled to make any showing that severs the link between the alleged misrepresentations and the price received or paid by the plaintiff to rebut the presumption, and that is exactly what Ms. Allen established for the focus period.

So, you heard a lot about the alleged misrepresentations before the focus period and their claim that front-end price impact was shown for those statements, but there are 15 alleged misrepresentations during the focus period and there was no showing of a statistically significant price increase after any of those 15 statements.  Those are individual claims that the Court must individually analyze in deciding whether each of those claims can be part of this

certified class.  And so, that means the plaintiffs are arguing those are alleged misrepresentations during the focus period that -- so, those during the focus period the Court has to look at.  The plaintiffs say they are price maintenance statements, and the way to show price impact with respect to price maintenance statements is to look at the back end alleged corrective disclosures, so the Court has to do that analysis at a minimum for the 15 alleged misrepresentations during the focus period.  And when the Court does that, the Court will look at all three of those alleged corrective disclosures and see that what Ms. Allen did establish in her testimony and the evidence today was that there was no price impact shown by any of those three alleged corrective disclosures.

The one at the very end of the class period where we started the Seeking Alpha (indiscernible) Susquehanna, those were not corrective of any -- there was no new news in there about Alpine High as we heard earlier.  There -- everything has already been revealed on all of the alleged misrepresentations.  Same issues -- Ms. Allen laid that all out for all three of the alleged corrective disclosures leading up to that.

And so, that's why the Court at a minimum has to look at the back-end allegations of price impact that the plaintiffs have put in this case by claiming the 15 alleged misrepresentations during the focus period show price impact.  The Court has to look at that.

And then we think when you look at all of the evidence, there was no price impact from any of the alleged misrepresentations.  During that focus period, we did sever the link because of the lack of price impact shown by those three corrective disclosures.  So, it does apply to all of the alleged misrepresentations in the case.  (Indiscernible).

MR. STERLING:  You heard it all, Judge.  I've got nothing to add.

THE COURT:  Okay.  I know it's been long when I look behind Mr. Daniels and I think we started it in the dark and then mid-day he couldn't see because of the sun and now it's dark again.

So, I just have one question and that is -- and first of all, thank you all very much.  Excellent briefing as always, appreciate the argument, appreciate the testimony and sort of curious to hear sometimes how you all thought.  I actually -- I thought having the pre-packaged testimony turned out really helpful from my standpoint.  I think it made (indiscernible) I just thought it was much better, first, so thank you all very much.

I've got a lot to go over, but I have a -- I guess I'm really curious of one issue, and that is sort of the four-day window, right?  And you know, I asked earlier on, is there any case law that would support looking at a four-day window, and I know I sort of caught I think Mr. D'Ancona off guard this

morning, but the -- you referred me to the Carpenter case, and I took a look at it over lunch. I mean, it does not say anything about the four-day window. And as I understand it, you know, yes, there's some cases that talk about a two-day window, three-day window. But as Ms. Allen says, I think she's right, that those cases, when they look at a multi-day window, they do it when each day is statistically significant.

And I guess I'm just curious, are there any cases anywhere finding a price impact using, say, a three-plus-day window when no one day is statistically significant, right? Because otherwise, I -- I mean, (indiscernible) I'd be the first Court in America to do it, and that's sort of -- I'm just trying to see, is there any authority out there that supports -- that gives me, you know, assurances that this isn't something that's outlandish, absurd, ridiculous, and out on a ledge if that makes sense.

MR. STERLING: The answer is no, Your Honor, because it is outlandish and ridiculous, and it's fundamentally contrary to the notion of an efficient market, because as (indiscernible) says, at this own case shows, when Keenan's resignation hits the market, the stock is reacting within minutes (indiscernible) hours. Their theory as to the first corrective disclosure is the simple disclosure took four days to make -- to get a statistically significant reaction. There's no --

JUDGE:  No, and I understand the argument, right? Your position I understand is, hey, why would you need to look at a four-day window if there's an efficient market that should be able to digest and respond to important company news immediately, right?  I mean --

MR. STERLING:  It's more than that, Your Honor.  If it takes four days to react, the market's not efficient.  If it takes three days to react, the market is not efficient.

MR. D'ANCONA:  You know, Your Honor --

MR. STERLING:  If it takes two days to react, that's not efficient.

MR. D'ANCONA:  It may not surprise you to hear me kind of suggest a different tack on this one.  There are clearly cases, Your Honor, where the two pieces that you've asked for I think occur but not in combination, but there are clearly cases where a stock -- a significance level below 95 percent is found to be no impediment at all for a finding of price impact, and we'd be happy to put in a short letter giving you some case names.

But findings of statistical significance at 90 percent, even below 90 percent, is not an impediment to a finding of price impact, is simply almost on a sliding scale of -- and that's actually -- the Cabot opinion is one where Judge Rosenthal in -- there in Houston dealing with an opinion from Ms. Allen, where Ms. Allen actually insisted that 95 percent is

--

MS. ALLEN:  I -- this is wrong.

THE COURT:  Hold --

MR. D'ANCONA:  I'm sorry.

THE COURT:  Hold on.  I can hear -- I think I can hear what's happening in the (indiscernible) so.

MR. D'ANCONA:  Okay.  I couldn't tell if that --

THE COURT:  For what it's worth, we all can hear what's going on in the (indiscernible) so.

MR. D'ANCONA:  Can I continue, Your Honor?  Anyways, if I may, there was an argument in that case about whether 95 percent -- a rigid application of 95 percent was necessary to prove or disprove price impact, and the Court said, no, it wasn't.  It just said, you know, if a finding of 90 -- a lack of a 95 percent statistical significance would not disprove price impact.  And there are plenty of cases that have similar conversations and similar analyses where levels that fall below 95 percent are just taken as part of the evidence, and they're credited more or less depending on the strength of the statistical confidence.

And so, taking that proposition, if that's true and we can put in several cases to Your Honor where that is the truth, then putting together one or two days like that or two or three days like that in a row and evaluating whether Your Honor thinks that that amounts to statistical significance

would be no -- would sort of follow in the same way as an acceptable way to look at the question, but I think Your Honor is fair and I didn't mean to -- I was trying not to overstate the Carpenter v. Barclays opinion and I --

THE COURT: No, you were clear on that this morning, no. I totally (indiscernible) that. I guess here's what (indiscernible). I haven't found it yet, but if there is any cases you want me to take a look at where the Court approves a multi-window day similar to this, right, that's similar to this, multi-day window, none of the days are statistically significant, I'd like to have as close to four days as possible because that's what Dr. Nye is doing here, do me a favor. If you would just submit a letter. Today is Wednesday. So, let's say by the end of the day Friday, no argument, no discussion, simply, Dear Judge Edison and case name and citation, and I'll go read them -- print them up and read them myself.

MR. D'ANCONA: Judge --

THE COURT: (Indiscernible).

MR. D'ANCONA: Yeah. Judge, would it be worthwhile or not interesting if we got as close to that as we could get? In other words, if we found a number of cases where sub-95 percent statistical significance was acceptable and a number of cases where multi-day windows were acceptable, and we said we think you can combine these concepts appropriately or would you -- or are you already aware of that and you don't need to see

that?

THE COURT:  I want you to give me the cases you think I should look at.

MR. D'ANCONA:  Okay.  We'll take -- we'll give our best shot.

THE COURT: (Indiscernible) that I should look at. But I'm serious, no argument.  Just send me the cases.  We all know what we're looking for and what -- you know, so I -- you know, I'll take a look and read them.

MR. D'ANCONA:  Yes, sir.

MR. STERLING:  Can we respond to their letter, Your Honor?  It won't take long.

THE COURT:  With what?

MR. STERLING:  A short letter to the extent we want --

THE COURT:  There's no argument.  I just want to read the case.  I just want to read the -- I don't want -- because I just -- like a short --

MR. D'ANCONA:  I'm just listing cases, right, Judge? I'm not --

THE COURT:  You're just listing case.

MR. D'ANCONA:  Right.

THE COURT:  You're just --

MR. D'ANCONA:  Okay.

THE COURT:  Okay.  Let me read them, and I appreciate

that, Mr. Sterling.  I'll read them.  If -- let me put it this way.  If I read them and there's something I think I need to get argument from counsel, I'll -- I'm not afraid to reach out and do that, but I just -- let me just read the cases to start off.

MR. STERLING:  Yeah.  Fair enough.

THE COURT:  Okay.  Let me see.  And I just want to make sure I'm clear, Mr. Sterling.  You want -- you were looking to respond to them as opposed to giving me cases?

MR. STERLING:  Correct.  (Indiscernible) point out, for example, if they cite a case where the first day is statistically significant, I want to remind the Court that here the first day is nowhere near --

THE COURT:  (Indiscernible).  Okay.  I'm on board.  That's exactly what I'm trying to look at as well.  So, okay.  Anything else I've missed, forgotten to address?

Well, once again, I really appreciate everyone's help, guidance.  I will take the motion under consideration.  I look forward to those cases on Friday.  We will try to (indiscernible) try to get this as quickly as possible.  If I don't see you all before the holidays and the new year, best wishes for a great holiday season and happy, healthy, and prosperous New Year to all.  And we're off the record.

(Hearing adjourned at 5:34 P.M.)

*  *  *  *  *

C E R T I F I C A T I O N


     I, Sonya Ledanski Hyde, certified that the foregoing

transcript is a true and accurate record of the proceedings.


Sonya M. Ledanski Hyde


Sonya Ledanski Hyde


Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501


Date:   December 18, 2023