**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00575 |
| | District Judge George C. Hanks, Jr. |
| | Magistrate Judge Andrew M. Edison |
| | CLASS ACTION |

**PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S
MEMORANDUM AND RECOMMENDATION REGARDING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
<u>REPRESENTATIVES AND CLASS COUNSEL</u>**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

I.     STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ........................ 1

II.    STATEMENT OF THE ISSUE ............................................................... 1

III.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 1

IV.    STATEMENT OF FACTS ..................................................................... 4

V.     PROCEDURAL HISTORY ................................................................... 10

VI.    STANDARD OF REVIEW AND LEGAL STANDARD .................................... 10

VII.   ARGUMENT ................................................................................... 12

       A.     Judge Edison Erred In Determining, As A Matter of Law, That
              Keenan's Resignation Was Not A Corrective Disclosure ............................ 12

              1.     Finding That 100% of the Stock Price Decline Upon
                     Keenan's Resignation Was Unrelated To Alpine High Was
                     Clear Error ..................................................................... 12

              2.     Finding That The October 25, 2019 Disclosure Revealed No
                     New Information About Alpine High Was Clear Error ................... 14

       B.     Defendants' Focus Period Construct Is Inconsistent With *Basic's*
              Fraud-On-The-Market Doctrine And Plaintiffs' Sustained Theory Of
              Fraud, And Judge Edison Erred In Accepting It .......................................... 17

              1.     Defendants' Focus Period Eviscerates The Efficient Market
                     Hypothesis By Ignoring The Continuing Price Impact Caused
                     By Defendants' Misstatements At The Start Of The Class
                     Period ........................................................................... 18

              2.     Defendants' "Focus Period" Construct Arbitrarily Divides
                     Defendants' Fraud Into Two Separate Class Periods ..................... 22

VIII.  CONCLUSION ................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
    623 F. Supp. 3d 470 (E.D. Pa. 2022) ............................................................................ 16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .......................................................................................................... 11

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    2023 WL 5112157 (2d Cir. Aug. 10, 2023) ......................................................... 23, 24

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................................ 4, 18, 19

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    2023 WL 2932485 (D. Conn. Apr. 13, 2023) ......................................................... 11, 21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................... 21

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) ....................................................... 3, 14

*Edwards v. McDermott Int'l, Inc.*,
    2023 WL 6388552 (S.D. Tex. Sept. 29, 2023) ..................................................... 10, 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ........................................................................................................ 20

*Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113, 125-26 (2021) ...................................................................................... 11

*Hall v. Johnson & Johnson*,
    2023 WL 9017023 (D.N.J. Dec. 29, 2023) .................................................................. 11

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
    2023 WL 7285167 (E.D. Pa. Nov. 3, 2023) ................................................................ 14

*In re Allergan PLC Sec. Litig.*,
    2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ......................................................... 3, 14

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) ......................................................................................... 15

*In re Allstate Corp. Sec. Litig.*,
   2020 WL 7490280 (N.D. Ill. Dec. 21, 2020).................................................................. 15

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ...................................................... 4, 24, 25

*In re Mattel, Inc. Sec. Litig.*,
   2021 WL 4704578 (C.D. Cal. Oct. 6, 2021).................................................................. 24

*In re Reliant Sec. Litig.*,
   2005 WL 8152605 (S.D. Tex. Feb. 23, 2005) .............................................................. 17

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015)........................................................................................ 20

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001)........................................................................................ 20

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014)................................................................................. 11, 14

*Silverman v. Motorola, Inc.*,
   798 F. Supp. 2d 954 (N.D. Ill. 2011) ...................................................................... 3, 16

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)........................................................................................... 21

**STATUTES**

28 U.S.C. § 636(b)(1)(C)................................................................................................. 10

Lead Plaintiffs, Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (together, "Plaintiffs") file these Objections to Magistrate Judge Edison's Memorandum and Recommendation ("Report," Dkt. 158), which recommended that Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel ("Motion," Dkt. 101) be granted only with respect to the first 18 months of an alleged 42-month class period, and otherwise be denied. Plaintiffs request oral argument on these Objections.[1]

## I.      STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action, brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder, in which Plaintiffs seek to certify the Class (as defined below) pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Rules").

## II.     STATEMENT OF THE ISSUE

Whether to certify the proposed Class under Rules 23(a) and 23(b)(3) for a class period from September 7, 2016, through October 25, 2019, inclusive (the "Class Period").

## III.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

In the Report, Judge Edison committed clear error by finding that "Defendants have rebutted the *Basic* presumption" with respect to the October 25, 2019 disclosure that Apache's EVP for Worldwide Exploration, Steven Keenan, had unexpectedly resigned,

---

[1] Plaintiffs are not objecting herein to Judge Edison's findings with respect to the April 23, 2019, and March 16, 2020 alleged corrective disclosures, and thus argue that the Class Period should end on October 25, 2019. Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted. The Report is cited as "Rep." The transcript of the evidentiary hearing before Judge Edison is cited as "Hr'g Transcript" (Dkt. 156). "¶" refers to paragraphs in the Complaint (Dkt. 65).

which Judge Edison determined was not a corrective disclosure. Rep. at 15-18. In so holding, the Report incorrectly found that: (i) "Plaintiffs cannot point to any *new* information revealed by the news of Keenan's resignation" (emphasis in original); and (ii) "[m]ore importantly, Defendants have presented compelling evidence that the market reacted to the news of Keenan's departure for a reason wholly unrelated to Alpine High: Apache's work in Suriname." Rep. at 17-18. The Report is wrong on both counts, as these conclusions cannot be reconciled with the undisputed evidence and improperly resolves questions of fact reserved for the jury.

*First*, it is **undisputed** that just two hours into the trading day on October 25, 2019, Apache publicly confirmed that Keenan's resignation **had nothing to do with Suriname**, and that analysts repeated and fully credited the Company's confirmation. *Second*, after Apache assured the market that Keenan's resignation was **not** connected in any way to Suriname—leading to a partial rebound in the Company's stock price—Apache's stock **still closed down 5%** from the prior trading day, and all parties and their experts agree that this decline was statistically significant above the 99% confidence level. **Significantly, the Report does not mention this critical fact**. *Third*, numerous sophisticated analysts directly tied Keenan's resignation and the resulting decline in Apache's stock price to Alpine High. These analysts emphasized that: (i) "**[t]he geologist credited with the Alpine High resigned … sending shares and bonds plummeting**"; (ii) Apache's "**stock dropped [after Keenan's resignation] in part because Keenan was the Godfather of Alpine High**"; and (iii) the news "**signal[ed] a strategic shift away from Alpine High**." *Fourth*, given that Keenan was widely known as the Apache executive in charge of exploring, developing,

and running Alpine High, his unexpected resignation revealed that Alpine High's prospects were far worse than Defendants had previously portrayed to investors. Indeed, within months of Keenan's departure, Apache shuttered its Alpine High-focused offices and took a $3 billion write down on the play.

Despite this undisputed evidence, the Report improperly concluded, as a matter of law, that ***none*** of Apache's stock price drop on October 25, 2019, was related to Alpine High, and that ***all*** of the price decline was attributable to Suriname. The evidence, however, compels the opposite conclusion: "the record is inadequate to conclude that [Alpine High] did not ***at least contribute*** to the price drop." *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *12 (S.D. Tex. Sept. 27, 2023), *leave to appeal denied*, 2023 WL 8794620 (5th Cir. Nov. 17, 2023). Because Defendants failed to carry their burden to demonstrate that "other events" unrelated to Plaintiffs' allegations "***explain the entire price drop***," Judge Edison committed clear error in excising the October 25, 2019 corrective disclosure from the case. *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *10 (S.D.N.Y. Sept. 8, 2021). Nor is the mere fact that the market "already knew of shortcomings" regarding Alpine High sufficient to show, as a matter of law, that Keenan's resignation revealed ***no*** new information about Alpine High's prospects. *See Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 983 (N.D. Ill. 2011) (loss causation was fact question for the jury where there was genuine dispute whether a disclosure "revealed new information as to the extent and seriousness" of company's problems).

The Report also improperly disregarded undisputed evidence of ***front-end*** price impact—namely, a 14% stock price increase at the start of the Class Period that Defendants

and their expert, Lucy P. Allen, made no effort to show was removed from Apache's stock price at any point, and that Plaintiffs' expert, Zachary Nye, Ph.D., testified remained in Apache's stock price during Defendants' self-styled "Focus Period." Dkt. 143 at 29:13-30:2, 86:22-90:5. In so holding, the Report inappropriately accepted Defendants' Focus Period construct by analyzing the class period as alleging two separate frauds—an analysis that ignored the plain allegations of the Complaint and contravened Supreme Court precedent. Indeed, "*at the class certification stage, once the price impact has been shown at the front end by virtue of a positive rise in the stock price following the alleged misrepresentation, there is no need to analyze an alleged corrective disclosure*." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *20 (S.D.N.Y. Oct. 18, 2019), *report and rec. adopted in part*, *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) (applying *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and its progeny).

For these reasons, the Court should reject the Report and certify a Class Period ending on October 25, 2019.

## IV.   STATEMENT OF FACTS

On September 7, 2016, Apache publicly announced its Alpine High oil and gas play (the "Alpine High Announcement"), which it touted as a "transformational discovery" and "world class resource play" with immense production capabilities, including "conservative" estimates of over 3 billion barrels of oil and 75 trillion cubic feet of "really rich gas." ¶¶33-36, 191-94. Defendants supported their claims by highlighting putative examples of "strong well results" and "successful oil tests" that were purportedly

representative of Alpine High's "2,000 to more than 3,000 future drilling locations." ¶¶192, 202. When announcing Alpine High, Apache publicly credited the Company's "star" geologist, Steve Keenan, with discovering it. ¶¶26, 29, 37, 41-43.

The Alpine High Announcement caused Apache's stock price to soar by 14% over the next two days, reaching nearly $60 per share—its highest price in over a year. ¶39. Defendants do not dispute that their Alpine High Announcement positively impacted Apache's stock price; rather, the parties and their experts agree that these statements caused multi-day, statistically significant price increases between the 97-100% confidence level (Nye Reply (Dkts. 120-3 (redacted) and 121-2 (sealed)) at ¶13), and the Report itself recognized that "***the September 2016 front end price impact cannot be rebutted***." Rep. at 12. After the Alpine High Announcement, Defendants repeated verbatim many of the same false and misleading statements in numerous investor presentations, conference calls, press releases, and SEC filings. ¶¶190-281; Dkt. 143 at 26:6-30:9, 89:12-90:15.

On February 22, 2018, Apache issued a press release announcing disappointing guidance for Alpine High, including a lower-than-expected mix of oil and Natural Gas Liquids ("NGLs"), which caused Apache's stock price to decline approximately 6%. ¶¶79, 308-09. However, even as they announced this reduced guidance, Apache doubled down on its claim that Alpine High was a "world class resource play [. . .] that will change the course of Apache," with Defendant Christmann underscoring that Alpine High would "drive capital investment, and very soon, free cash flow for decades to come." ¶¶80, 254. And, in light of declining commodity prices at the time, during Apache's February 22, 2018 earnings call, Christmann further touted Alpine High as profitable even at "very, very

low gas and NGL and oil prices." ¶¶81, 256. Analysts credited Defendants' reassurances, reporting on February 22, 2018, that Apache's "Permian Oil Growth Guidance in 2018 is *Likely Conservative*" and Alpine High was still an "*investment opportunity*" given the vast amounts of gas that "*will be cheap to produce*." *Id.*

Apache continued to tout Alpine High's purportedly immense resources and highly favorable economics to investors throughout 2018 and 2019. ¶¶258-81. For example, in an August 8, 2018 earnings call, Christmann claimed that Alpine High was on a "tremendous growth path" due to its enormous oil and gas resources. ¶266. On the Company's May 2, 2019 first quarter earnings call, Defendants stated that Apache was "*poised to deliver attractive oil growth in a substantial cash flow uplift at Alpine High in the second half of the year*." ¶273. As late as August 1, 2019, Christmann unequivocally asserted during the Company's second quarter earnings call that Alpine High was "*a large resource as we've proven*" with "*tremendous rich-gas potential*." ¶279.

Notwithstanding these repeated reassurances, on October 25, 2019, shortly after market open, reports emerged that Steve Keenan, the Apache EVP credited with discovering and developing Alpine High, had suddenly and unexpectedly resigned. ¶¶313-14; Hr'g Transcript at 189:2-9 (Allen testimony). Before he resigned, Keenan was the public face of Alpine High. For example, Apache explicitly credited him in its Alpine High Announcement, and the *Houston Chronicle* ran a long-form feature article in January 2017, headlined "BIG RISK, BIGGER REWARD, OIL MAVERICK'S GAMBLE PAYS OFF FOR APACHE," reporting that "*[f]or Keenan, Alpine High was the culmination of a lifetime looking for gas and oil*." Nye Reply at ¶40. At the Company's 2017 Annual

Shareholders Meeting, Christmann awarded Keenan the Apache "President's Award" for his "significant discovery at Alpine High," stating, "***It's a field that will deliver incredible value to Apache and its shareholders for many, many years to come***." Nye Reply at ¶40; Dkt. 143 at 46:15-47:6; Hr'g Transcript at 189:25-191:3 (Allen Testimony).

The initial report of Keenan's resignation on the morning of October 25, 2019, did not provide a reason for his departure. Consequently, certain analysts initially speculated that the resignation might signal problems with Apache's new play in Suriname. However, Apache quickly refuted and dispelled that speculation. *First*, at 10:19 a.m.—just 35 minutes after Keenan's resignation was first reported at 9:44 a.m.—RBC Capital Markets reported that Apache had clarified that Keenan's resignation was in no way related to Suriname. Dkt. 143 at 49:16-51:5; Dkt. 142-6 at 121:6-122:3. Specifically, the RBC report, headlined "***APA – SVP Resignation Causing Stock Weakness; Company Indicating Not Related to Maka-1 Outcome***," explained that the resignation could not be related to Suriname because there were no results yet from Apache's efforts there. Dkt. 143 at 115:1-116:10. *Second*, Apache itself quickly confirmed that Keenan's resignation was not related to Suriname, as *Bloomberg* reported in a news blast at 11:21 a.m., explicitly stating: "***Apache Says SVP Keenan's Departure Not Connected to Suriname***." *Id.* at 49:16-51:5.

Shortly after the Company's and analysts' clarifications on the morning of October 25, 2019, that Keenan's departure was totally unrelated to Suriname, Apache's stock partially recovered from its initial 10% price decline. However, as depicted in the graph below, Apache's stock price still closed down 5% for the day. *Id.* at 49:16-51:5, 69:11-21, 112:18-113:11, 121:24-125:13. Significantly, it is undisputed that the close-to-close

decline from October 24 to October 25, 2019, was statistically significant well above the 95% confidence level. Dkt. 143 at 47:17-48:6.



Meanwhile, and significantly, analyst and media reports issued on October 25, 2019, explicitly tied Keenan's sudden departure and the ensuing decline in Apache's stock price to ***Defendants' prior misstatements about Alpine High***. For example, *Reuters* noted: "***Keenan is widely credited with the Alpine High find in West Texas in 2016. When Alpine High was discovered Apache's shares spiked as much as 14% with Chief Executive Officer John Christmann calling it a 'world class resource.'*** Dkt. 143 at 49:9-52:21; *see, e.g.*, ¶¶192, 229, 231, 239, 254 (alleging statements about Alpine High as a "world class resource" to be false and misleading). *Bloomberg* similarly reported: "Not long after [Keenan] joined Apache, the company announced its Alpine High discovery in a little-drilled corner of the Permian Basin in West Texas. ***At the time, the company said***

*the play held 3 billion barrels of crude and 75 trillion cubic feet of gas*." Nye Reply (Dkt. 120-3 at ¶39); *see, e.g.*, ¶¶192-93, 204, 212, 214, 231, 248, 266, 275 (alleging statements that Alpine High had 3 billion barrels of oil and 75 tcf of gas to be false and misleading). The next day, *Bloomberg* issued another article linking Keenan's departure and the continued decline in Apache's stock price explicitly to Alpine High, reporting that "*[t]he geologist credited with the Alpine High resigned last week, sending shares and bonds plummeting*." Dkt. 143 at 48:16-49:15, 113:19-114:24, 116:11-117:19; *see* ¶103.

These media and analyst reports were correct. As Apache's own internal documents confirm,[2] Keenan's resignation was, in fact, due to Alpine High's "material underperform[ance]"—which was far worse than the Company had previously revealed— and foreshadowed the impending cessation of most operations and all future development of the play. Indeed, within a few months of Keenan's resignation, Apache announced it was shuttering its San Antonio office, winding down operations at Alpine High, and ceasing all future development of the play. ¶105. In February 2020, Apache announced a

---

[2] Directly conflicting with *Goldman*'s instruction that courts should consider "all probative evidence" when evaluating price impact, *Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 122 (2021), Judge Edison also erred by imposing a bright line rule that "nonpublic documents are simply not relevant evidence in assessing price impact." Rep. at 10-11 n.1. Based upon that departure from an on-point Supreme Court directive, Judge Edison refused to consider *any* of Plaintiffs' evidence showing Apache's real-time communications with market participants concerning Keenan's resignation, as well as Apache's assessment of investor concerns regarding Keenan's resignation based upon investor feedback received during the October 25, 2019 trading day. For example, Exhibit 26 to Dr. Nye's direct testimony is an Apache email with a hedge fund representative, who informed Apache investor relations personnel that he was "[g]etting the news out" on Apache's behalf that Keenan's resignation was unrelated to Suriname, referencing emails with an analyst at Bank of America. Dkt. 147-3; *see also* Dkt. 147-2 (Exhibit 25 to Dr. Nye's direct testimony; Apache email involving, among others, investor relations personnel, stating that one of "[t]he more durable questions that we need to address" from several investors following news of Keenan resignation was "What is the implication for Alpine High?"); Dkt. 143 at 123:19-127:6 (Nye testimony regarding these exhibits).

$3 billion write-down related to Alpine High. ¶106. Following this news, *Bloomberg* issued a scathing article noting that these developments stood "in stark contrast" with Defendants' repeated statements during the Class Period "***vehemently defending the play's prospects for about three years***," and noting that Apache had as "***recently*** *as May 2019 still touted*" "***the potential cash flow generation from the liquids play at Alpine High***." ¶107. A February 2020 *Seeking Alpha* article again specifically linked Keenan's departure to Alpine High, noting: "The departure of Steve Keenan, Apache's SVP of World Wide Exploration did not pass without notice last fall. ***The stock dropped [after he resigned] in part because Keenan was the Godfather of Alpine High***." Nye Reply (Dkt. 120-3 at ¶40) (redacted).

## V.    PROCEDURAL HISTORY

On April 7, 2023, Plaintiffs moved to certify a class of investors who purchased or otherwise acquired Apache common stock from September 7, 2016, through March 13, 2020, inclusive, and were damaged thereby (the "Class"). Dkt. 101. On June 16, 2023, Defendants opposed Plaintiffs' Motion (Dkt. 117), and briefing on the Motion was complete on September 8, 2023. Dkts. 120 (Plaintiffs' redacted reply), 121-1 (Plaintiffs' sealed reply), 126 (Defendants' surreply).

On December 6, 2023, Judge Edison held an evidentiary hearing on the Motion. Dkt. 151. Per Judge Edison's instructions (Dkt. 135), the parties submitted written direct testimony from their experts, on November 29, 2023. On February 9, 2024, Judge Edison issued the Report. Dkt. 158.

## VI.   STANDARD OF REVIEW AND LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1)(C), this Court is required to "make a de novo

determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection [has been] made." *Edwards v. McDermott Int'l, Inc.*, 2023 WL 6388552, at *1 (S.D. Tex. Sept. 29, 2023). After conducting this de novo review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Pertinent to these Objections, to rebut *Basic*'s presumption of reliance and defeat class certification, Defendants must prove a "***complete*** lack of price impact" by a "preponderance of the evidence." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *11-12 (D. Conn. Apr. 13, 2023). "To satisfy this burden, Defendants must do more than produce evidence that is relevant to price impact; Defendants must '***sever the link***' between the disclosure and the stock price decline." *Hall v. Johnson & Johnson*, 2023 WL 9017023, at *15 (D.N.J. Dec. 29, 2023) (quoting *Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 125-26 (2021)).

As Judge Edison recognized, in assessing price impact, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Rep. at 4 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)). Thus, while the "question of whether Defendants have rebutted the *Basic* presumption with a preponderance of evidence of no price impact overlaps with merits questions like materiality and loss causation," the court must nonetheless "resist[] the temptation" to draw merits conclusions. Rep. at 6 (quoting *Goldman*, 594 U.S. at 122 & n.2). To the extent that price impact and loss causation "overlap," the Fifth Circuit has clarified that establishing loss causation requires only that a disclosure reveal information "related to" the fraud, and

need not be a "mirror image" of a prior false statement. Rep. at 6 (citing *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014)).

## VII.   ARGUMENT

### A.   Judge Edison Erred In Determining, As A Matter Of Law, That Keenan's Resignation Was Not A Corrective Disclosure

#### 1.   Finding That 100% Of The Stock Price Decline Upon Keenan's Resignation Was Unrelated To Alpine High Was Clear Error

In the Report, Judge Edison primarily based his recommendation that the October 25, 2019 alleged corrective disclosure be excluded from the Class Period on the notion that the stock price decline following news of Keenan's resignation could not be linked to Alpine High, but was instead 100% attributable to market concern about Apache's exploration in Suriname. Rep. at 15-18. Specifically, Judge Edison stated, "[m]ore importantly, Defendants have presented compelling evidence that the market reacted to the news of Keenan's departure for a reason wholly unrelated to Alpine High: Apache's work in Suriname." Rep. at 17. This finding was clear error, as Judge Edison ignored indisputable evidence that fundamentally undermined it.

For example, Judge Edison noted how several analysts speculated that Keenan's resignation might be due to undisclosed problems with Apache's Suriname project. However, barely two hours into the trading day, ***Apache itself confirmed to the market that this speculation was baseless***, explicitly clarifying that Keenan's "resignation was related to other matters," that the Suriname exploratory well had not even yet reached its target formation, and that an entirely different Apache executive, ***not*** Keenan, was responsible for the Suriname project. The market credited Apache's clarification, with

*Bloomberg* reporting "Apache Says SVP Keenan's Departure Not Connected to Suriname," and RBC noting "SVP Resignation Causing Stock Weakness; Company Indicating Not Related to [Suriname]." *Supra* § IV. Further, numerous analysts directly attributed the stock price decline accompanying Keenan's resignation to Alpine High (and not to Suriname), reporting that "***[t]he geologist credited with the Alpine High resigned…sending shares and bonds plummeting***," and "[t]he departure of ***Steve Keenan***, Apache's SVP of World Wide Exploration did not pass without notice…***The stock dropped [after he resigned] in part because Keenan was the Godfather of Alpine High***." *Id.*

While the news of Keenan's resignation initially caused a 10% intra-day drop in Apache's stock price, the Company's clarification that the resignation had nothing to do with Suriname prompted a 5% rebound in its stock price, a fact that fundamentally underpins Judge Edison's finding: "The price rebound following confirmation that Keenan's resignation was unrelated to Suriname shows that it is more likely than not that concerns about Suriname are what moved the market." Rep. at 18. However, Judge Edison ignored the indisputable evidence that even after Apache emphatically rejected the notion that Keenan's resignation was related to its Suriname project, ***the Company's stock price remained down, resulting in a statistically-significant 5% drop at the close of trading***— a decline that necessarily ***cannot*** be attributed exclusively to Suriname concerns given the Company's own prior clarification and the market's prior acceptance of it. Remarkably, Judge Edison ***does not even mention the residual 5% price decline*** in his analysis of the October 25, 2019 corrective disclosure.

Given this undisputed evidence, Defendants did not prove by a preponderance of

the evidence that investor concerns over Alpine High did not contribute to the 5% stock price decline on October 25, 2019. Thus, Defendants have failed to meet their burden to "sever the link" between Plaintiffs' allegations and the stock price decline following Keenan's resignation. *Goldman*, 594 U.S. at 125-26 ("The defendant must in fact sever the link between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of *some* evidence relevant to price impact would rarely accomplish that feat.") (emphasis in original); *see also Allergan*, 2021 WL 4077942, at *10 ("to erase the inference that [a] corrective disclosure had price impact . . . [Defendants] must demonstrate . . . that [] ***other events explain the entire price drop***"). At best, Defendants presented evidence "that the price drop was caused ***in part*** by [concerns about Suriname]; [they have] not excluded [Alpine High] as a ***contributor*** to the price drop." *Cabot*, 2023 WL 6300569, at *12 ("the record is inadequate to conclude that [Alpine High] did not at least ***contribute*** to the price drop"); *see Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2023 WL 7285167, at *23 (E.D. Pa. Nov. 3, 2023) ("Plaintiffs are not required . . . to demonstrate that any price impact was due to the prior misrepresentation ***alone***.").[3]

## 2. Finding That The October 25, 2019 Disclosure Revealed No New Information About Alpine High Was Clear Error

Judge Edison's finding that "Plaintiffs cannot point to any *new* information revealed by the news of Keenan's resignation" (Rep. at 17 (emphasis in original)) is likewise belied by the evidence. The fact that Apache's 5% stock price decline was statistically significant

---

[3] Even with respect to the merits issue of loss causation, it is sufficient to show that a disclosure "caused at least a ***substantial amount*** of [a] price drop"—Plaintiffs are not required to prove the drop was ***entirely*** caused by the alleged fraud. *Amedisys*, 769 F.3d at 321.

above the 99% level, even after Suriname concerns were dispelled from the market, is itself compelling evidence that new information about Alpine High entered the market on October 25, 2019. *See, e.g.*, *In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at \*5 (N.D. Ill. Dec. 21, 2020) (the "conclusion" that a disclosure "revealed no new information to the market" was "difficult […] to square with the […] price drop" after the disclosure) (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 (7th Cir. 2020).

Furthermore, the evidentiary record demonstrates that Keenan's resignation revealed to the market that Alpine High's performance was materially worse than Defendants had publicly portrayed, and its prospects of being a successful, long-term play were likely doomed. Specifically, while Alpine High's performance in the first half of 2019 was declining, Defendants assured investors that any problems were only temporary, and performance would improve as Apache further developed the play. Indeed, Defendants had recently repeated their false statements from the Alpine High Announcement (*see supra* § IV), and had also assured investors as recently as May 2019—just ***five months*** before Keenan's resignation—that Apache was "***poised to deliver attractive oil growth and a substantial cash flow uplift at Alpine High in the second half of the year***." ¶273.

Rather than "repeating old news" (Rep. at 17), Keenan's sudden resignation without any named successor directly undermined these representations. Indeed, analyst reports issued on October 25, 2019, noted that "***Apache will soon signal a strategic shift away from Alpine High***" and "***we expect that APA could allocate activity away from Alpine [H]igh***." Dkt. 143 at 51:9-52:8. Moreover, multiple major news outlets, including *Reuters* and *Bloomberg*, expressly construed Keenan's departure as a repudiation of Defendants'

alleged misstatements, including that Alpine High was a "world class resource" that "held 3 billion barrels of crude and 75 trillion cubic feet of gas." *Supra* § IV. And, as Judge Edison recognized, Apache took a "$3 billion write down and ceased all exploration and funding of Alpine High" just months after Keenan's "resignation." Rep. at 15.

The mere fact that Alpine High had previously underperformed expectations is insufficient to conclude, as a matter of law, that Keenan's resignation revealed no new value-relevant news about Alpine High, particularly given Defendants' ongoing reassurances about the play. Indeed, "[t]he statistically significant decline in [Apache]'s share price after [Keenan's resignation] … is evidence of new information," and, "[a]lthough it is true that the market already knew of shortcomings [at Alpine High]," Plaintiffs have presented extensive evidence that the disclosure "revealed new information as to the extent and seriousness of those shortcomings." *Motorola*, 798 F. Supp. 2d at 983; *see also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 508 (E.D. Pa. 2022) (announcement of investigation constituted corrective disclosure "even if some of the underlying contentions were already known to the market").[4]

In sum, Judge Edison failed to "resist[] the temptation to draw merits conclusions" in assessing price impact (Rep. at 6), but rather reached intensely factual conclusions regarding a loss causation issue that is for the jury to decide. *See Motorola*, 798 F. Supp. at 983 (collecting cases and finding that loss causation for partial disclosure was an issue

---

[4] Moreover, neither Defendants nor the Report identified any "new" information about ***Suriname*** that was revealed by the news of Keenan's resignation—nor could they, given that Apache itself made clear that the resignation was ***unrelated*** to Suriname and that the project had not advanced to a point where Apache had ***any*** Suriname news to share.

of fact for the jury). In doing so, Judge Edison not only ignored extensive record evidence contradicting his findings, but improperly drew inferences in ***Defendants'*** favor. *See, e.g.*, *In re Reliant Sec. Litig.*, 2005 WL 8152605, at *3 (S.D. Tex. Feb. 23, 2005) ("[i]n securities fraud cases . . . the court should err in favor of allowing the class to go forward"). This is precisely the opposite of the standard before Judge Edison, which placed the burden on Defendants to demonstrate a complete lack of price impact.

> **B. Defendants' Focus Period Construct Is Inconsistent With *Basic's* Fraud-On-The Market Doctrine And Plaintiffs' Sustained Theory Of Fraud, And Judge Edison Erred In Accepting It**

Defendants did not challenge price impact for the entire class period. Rather, they ***conceded*** price impact for all alleged misstatements from the Alpine High Announcement on the first day of the class period (September 7, 2016) through the second (of five) alleged corrective disclosures (February 22, 2018). Indeed, the Alpine High Announcement caused a 14% price increase in Apache's stock price—undisputed price impact—over the ensuing three trading days. *See* Dkt. 120 at 9; Dkt. 143 at 23:10-19, 87:21-88:1 (experts agreed these increases were statistically significant at confidence levels between 97.5-99.9%).

Having conceded price impact for the class period that Plaintiffs actually pled in the Complaint, Defendants cleaved the class period in half in an improper attempt to prove a complete lack of price impact. Specifically, Defendants directed their challenge to a fabricated "Focus Period" of February 23, 2018 to March 13, 2020. In doing so, Defendants pretended that their "Pre-Focus Period," running from September 7, 2016 through February 22, 2018, was wholly irrelevant, challenging only, and in isolation, the fifteen misstatements and three corrective disclosures that occurred in their Focus Period.

17

With this artifice in place, Defendants argued that because no Focus Period misstatements had front-end price impact, the Court should engage in *Goldman*'s mismatch analysis for the three Focus Period corrective disclosures. *See* 594 U.S. 113. However, *Goldman*'s framework is expressly intended for pure "price maintenance" cases where the court is left to "infer" front-end price impact from an alleged corrective disclosure, and ***not*** for cases such as this one, where front-end price impact has been established and conceded. *See* Dkt. 117. Defendants' Focus Period has no basis in law, fact, or common sense.

The Report fully accepted Defendants' Focus Period construct. As explained below, doing so was error, as the Focus Period is antithetical to the efficient market hypothesis and the fraud-on-the-market theory adopted in *Basic*, 485 U.S. 224. Defendants' Focus Period also ignores Plaintiffs' sustained theory of fraud and the evidence in this case, and runs counter to applicable post-*Basic* case law, post-*Goldman* case law, and Fifth Circuit authority, and thus lacks any sound legal or economic basis.

> **1. Defendants' Focus Period Eviscerates The Efficient Market Hypothesis By Ignoring The Continuing Price Impact Caused By Defendants' Misstatements At The Start Of The Class Period**

Defendants made no attempt to show that the three days of statistically significant increases in Apache's common stock price that the September 7, 2016 Alpine High Announcement induced was removed from Apache's stock price by either of the two Pre-Focus Period corrective disclosures. Judge Edison acknowledged this fact in the Report, but nevertheless found that "the fact that ***the September 2016 front-end price impact cannot be rebutted*** does not require Defendants to affirmatively demonstrate total dissipation of that price impact before they may contest the impact (if any) of the 15

misrepresentations that Plaintiffs allege Defendants made 18-40 months later." Rep. at 12. Instead, the Report ignored this critical failure of proof by effectively finding whether the front-end price impact had fully dissipated before the Focus Period was irrelevant. *See id.* at 13 n.2 ("[m]aybe revelation of the truth removes any price impact; maybe it doesn't").[5] This was a fundamental error.

*First*, Defendants' Focus Period is premised upon an assumption that Apache's common stock price was a "blank slate on the first day of [the] Focus Period," *i.e.*, February 23, 2018. Dkt. 143 at 85:14-24. The notion that the price of a security trading in an efficient market[6] can be frozen in time and severed from the price impact of prior public statements and disclosures is completely inconsistent with the efficient market hypothesis upon which *Basic*'s fraud-on-the-market theory of reliance is based. This is particularly true where, as here, false statements with indisputable front-end price impact are routinely repeated over the course of a full class period. As the Supreme Court held thirty-five years ago, "the market price of shares traded on well-developed markets reflects ***all publicly available information***," which, here, includes the undisputed price impact caused by the Alpine High Announcement. *See Basic*, 485 U.S. at 246.

This core premise has been reiterated time and again by the Supreme Court, the Fifth Circuit, and even Judge Edison in the Report. *See Erica P. John Fund, Inc. v.*

---

[5] Instead, the Report stated, without citing any authority, that the "question is when the market learned the truth about Alpine High, not when the September 2016 front-end price impact fully dissipated." Rep. at 13 n.2. However, that is a loss causation question. While the Court can consider arguments that ***overlap*** with loss causation, *Goldman*, 594 U.S. at 124, it cannot make a loss causation finding while ignoring evidence of front-end price impact, effectively resolving an issue of fact typically left to a jury.

[6] Defendants did not challenge Plaintiffs' demonstration that the market for Apache common stock was efficient during the Class Period. *See* Dkt. 120 at 1; Rep. at 9-10.

*Halliburton Co.*, 563 U.S. 804, 811 (2011) (quoting this point from *Basic*); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681 (5th Cir. 2015) (same); Rep. at 5 ("Under *Basic*, district courts presume that stock trading in an efficient market incorporates into its price all public, material information . . . ."). The Focus Period is thus at direct odds with decades of case law across the country because it improperly ignores the price impact that already existed in Apache's stock dating back to the start of the Class Period that Defendants never even attempted to show was removed from the stock. As such, it was erroneous for Judge Edison to wholly ignore the Pre-Focus Period in analyzing price impact.

*Second*, Plaintiffs alleged and provided evidence from their expert that many of Defendants' Focus Period misrepresentations were **confirmatory** of ones made during the Pre-Focus Period, and many were **verbatim** to those made in the Alpine High Announcement on the first day of the Class Period. *See* Dkt. 143 at 26:6-30:9, 89:12-90:15;[7] *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (confirmatory statements actionable where they prevent stock price from declining to level it would have had truth been disclosed). As Plaintiffs' expert testified:

> Both Ms. Allen and I agree that confirmatory misstatements, which are ones that repeat or confirm the substance of an earlier misstatement, will not affect the price of a security that trades in an efficient market. So, it's my opinion that, under Plaintiffs' theory of liability, the statements Defendants made during the Class Period, including the Focus Period, which repeated or confirmed Defendants' September 7, 2016 misstatements, *served to maintain the positive price impact*, or artificial inflation, that Defendants' September 7, 2016 misstatements created.

---

[7] During the Focus Period, Defendants also directed investors to certain of the prior alleged misstatements that they made about Alpine High during the Pre-Focus Period. Dkt. 143 at 28:21-29:12.

Dkt. 143 at 29:13-30:2. Judge Edison overlooked this undisputed evidence explaining why these same misstatements did not induce positive price impact at the times when they were *repeated* during the artificial Focus Period, and the fact that these confirmatory misstatements maintained the positive price impact that the Pre-Focus Period misstatements had created. *See Alexion*, 2023 WL 2932485, at *12 (plaintiffs can "show price impact through 'statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation'") (quoting *Waggoner v. Barclays PLC*, 875 F.3d 79, 104 (2d Cir. 2017)). The conceded Pre-Focus Period price impact continued to exist in the Focus Period unless Defendants demonstrated that it fully dissipated beforehand—a showing they did not attempt to make. *See* Dkt. 143 at 88:6-18; Rep. at 12. Thus, the Report disregarded indisputable evidence of price impact.

Remarkably, Judge Edison himself implicitly acknowledged that inflation must be dissipated for there to be no remaining price impact, recognizing that "[i]n the case of a securities fraud class action, . . . *a class period ends when the truth has been disseminated to the market*." Rep. at 12 (emphasis and ellipsis in original) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015)). Yet, in Judge Edison's own estimation, the full truth about Defendants' alleged fraud did not emerge until February 2020—months *after* Keenan resigned—when Apache took a $3 billion write-down on Alpine High. Rep. at 14-15 (finding that as of March 16, 2020, "the market had known *for weeks* that [Defendants'] statements were false because Apache had already taken a $3 billion write down and ceased all exploration and funding of Alpine High"). Judge Edison's observation that Defendants' statements were not fully revealed to be false

until February 2020 underscores that there is no legal or factual basis to end the Class Period a full two years earlier in February 2018.

### 2. Defendants' "Focus Period" Construct Arbitrarily Divides Defendants' Fraud Into Two Separate Class Periods

Defendants' Focus Period construct also cannot be squared with Plaintiffs' sustained allegations. Plaintiffs alleged a single, unitary fraud; not two separate frauds that might enable the Class Period to be bifurcated and analyzed separately and in isolation. As explained above, Plaintiffs allege that Defendants made numerous statements lauding Alpine High's attributes, commercial viability, and long-term prospects on day one of the Class Period, leading to three days of statistically significant increases in Apache's stock price. *See Supra* § IV. Throughout the rest of the Class Period, including the Focus Period, Defendants made the ***same*** and ***substantively similar*** statements about Alpine High, repeating and reaffirming what they told the market during the Alpine High Announcement. Dkt. 143 at 26:6-30:9, 89:12-90:15; ¶¶301, 303, 319. Thus, there are no allegations in this case (much less any cited by Defendants or in the Report) that support splitting the Class Period into two, and then limiting the price impact analysis to one part. Indeed, neither Defendants nor the Report cite a ***single*** case involving a unitary theory of alleged fraud where the court split a proposed class period into subparts and limited its price impact analysis to just one part, while ignoring the other.

Despite lacking an economic, factual, or legal basis to do so, the Report embraced Defendants' Focus Period construct. As a result of this error, the Report treated Plaintiffs' ***entire case*** as involving only price-maintenance. *See* Rep. at 6 ("When plaintiffs' theory is

22

that defendants' misrepresentations or omissions kept their stock artificially inflated, price impact may be shown on the back end."). In doing so, Judge Edison erroneously ignored the undisputed positive price impact created by the Alpine High Announcement. *See* Rep. at 10-11 (citing record evidence); *see also* Dkt. 143 at 21:4-22:7, 85:14-86:10.

From that mistaken determination, the Report improperly applied *Goldman*'s "mismatch" test. *See* Rep. at 11, 13 ("I will consider . . . whether Defendants have rebutted the *Basic* presumption by demonstrating mismatch or lack of back-end price impact for the three corrective disclosures alleged during the Focus Period."). However, *Goldman* was a ***pure*** price maintenance case; it did not involve undisputed evidence of positive front-end price impact. *See Goldman*, 594 U.S. at 119. Instead, the price impact challenge there was limited to back-end price impact, and, moreover, involved highly generic alleged misstatements about the company's business principles, such as "[o]ur clients' interests always come first" (*id.* at 120), which the parties agreed caused ***zero*** front-end price impact. Thus, *Goldman* concerned "inferring" price impact from highly generic misstatements by analyzing subsequent price declines. *Id.*; *see Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 2023 WL 5112157, at *9, 11, 13, 18-19, 22 (2d Cir. Aug. 10, 2023) (on remand, repeatedly explaining that in pure price-maintenance cases with generic misstatements, "courts generally look to the back-end price drop ***as a proxy*** for front end price impact").

In this case, there is no need to "infer" price impact "by proxy" through a back-end price impact analysis given the indisputable ***direct*** evidence of front-end price impact. Nor, as Judge Edison previously held, does this case involve generic misstatements anything like those at issue in *Goldman.* Dkt. 76 at 11 (Defendants' misstatements were "***highly***

*specific and authoritative*"); *see also In re Mattel, Inc. Sec. Litig.*, 2021 WL 4704578, at *5 (C.D. Cal. Oct. 6, 2021) ("The generic representations in *Goldman*—e.g., 'Integrity and honesty are at the heart of our business'—are nothing like highly specific financial statements."). Under the factual allegations and evidence here, *Goldman*'s mismatch inquiry simply does not apply. Accordingly, it is not Plaintiffs' arguments that "render *Goldman* essentially meaningless." Rep. at 11. Rather, *Goldman*'s framework is wholly inapplicable to the evidence and factual allegations presented here.[8]

The proper framework to analyze price impact in a case like this one presenting undisputed evidence of front-end price impact followed by confirmatory misstatements is *In re Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019 WL 5287980. There, (former) Judge Scheindlin explained that, "[w]here plaintiffs allege affirmative misrepresentations, it is necessary to evaluate whether those misrepresentations caused a statistically significant stock price increase," but "at the class certification stage, once the price impact has been shown at the front end by virtue of a positive rise in the stock price following the alleged misrepresentation, *there is no need to analyze an alleged corrective disclosure*." *Id.* at *20. Accordingly, for seven alleged statements in *Chicago Bridge* that the parties agreed had front-end price impact, the court explained it would "not consider Defendants' evidence of the absence of price impact as to the potential corrective disclosures relating to those seven misrepresentations as *an absence of back-end price*

---

[8] By the same token, *Goldman* also does not support Defendants' Focus Period approach. Judge Edison applied the *Goldman* mismatch analysis only *after* accepting the Focus Period and, like Defendants, improperly treating the Pre-Focus Period as nonexistent.

*impact does not rebut a statistically significant front-end response to the alleged misrepresentation*." *Id.* at \*24 (certifying full class period).[9]

In other words, *Chicago Bridge* stands for the common-sense proposition that, where an alleged misstatement causes front-end price impact, a defendant cannot try to eliminate a corrective disclosure that relates to that alleged misstatement based on back-end price impact arguments. Here, Judge Edison ignored that the Focus Period misstatements **were confirmatory** of the Pre-Focus Period misstatements that caused undisputed positive price impact, treated them as if they were made for the first time during the Focus Period, and then evaluated and excluded the final three corrective disclosures—including, in pertinent part, the October 25, 2019 disclosure of Keenan's resignation—without analyzing whether any of these disclosures related to the Pre-Focus Period misstatements that Defendants concede caused front-end price impact. In doing so, Judge Edison erred in finding that Defendants demonstrated a lack of price impact and thus rebutted the fraud-on-the-market presumption of reliance.

## VIII.   CONCLUSION

Plaintiffs respectfully request that the Court reject the Report, and certify a Class Period of September 7, 2016, through October 25, 2019, inclusive.

---

[9] Judge Edison's statement that *Chicago Bridge* stands only for the proposition that "Defendants are not entitled to rely on back-end arguments to rebut the *Basic* presumption for the misrepresentations that Plaintiffs have shown had a statistically significant front-end price impact" (Rep. at 12) ignores that Defendants' Focus Period misrepresentations maintained inflation by *repeating the same or substantially similar misrepresentations as those at the Class Period start*. Dkt. 143 at 29:13-30:2. As such, it is illogical to divorce the indisputable front-end price impact at the Class Period start from disclosures correcting those same misstatements merely because some statements and disclosures occurred after February 22, 2018.

Dated: February 23, 2024           Respectfully submitted,

**AJAMIE LLP**

*s/ Thomas R. Ajamie*
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice*)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Richard A. Russo, Jr. (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
Austin W. Manning (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jwhitman@ktmc.com
jdancona@ktmc.com
rrusso@ktmc.com
ehoey@ktmc.com
amanning@ktmc.com

**SAXENA WHITE P.A.**
David R. Kaplan (admitted *pro hac vice*)

26

Wolfram T. Worms (admitted *pro hac vice*)
Emily R. Bishop (admitted *pro hac vice*)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
wworms@saxenawhite.com
ebishop@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
Sara DiLeo (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com
sdileo@saxenawhite.com

-and-

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Co- Lead Counsel for Lead Plaintiffs*

**DANIELS & TREDENNICK PLLC**
Douglas A. Daniels
Texas State Bar No. 00793579
6363 Woodway, Suite 700
Houston, TX 77057

27

Telephone: (713) 917-0024
Facsimile: (713) 917-0026
Doug.Daniels@DTLawyers.com

*Additional Counsel for Lead Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 23, 2024, I caused a true and correct copy of the foregoing to be electrically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Thomas R. Ajamie*
Thomas R. Ajamie