**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00575 |
| | District Judge George C. Hanks, Jr. |
| | Magistrate Judge Andrew M. Edison |
| | <u>CLASS ACTION</u> |

**LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF SETTLEMENT AND PLAN OF ALLOCATION,**
**AND SUPPORTING MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS.................................................. 1

II.    STATEMENT OF ISSUES TO BE RULED UPON ................................................ 2

III.    SUMMARY OF THE ARGUMENT....................................................................... 2

IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL ...................................... 6

    A.    Lead Plaintiffs and Lead Counsel Have Adequately Represented the
Settlement Class in this Action ....................................................................... 7

    B.    The Settlement Was Negotiated at Arm's Length and There Was No
Fraud or Collusion.......................................................................................... 9

    C.    The Settlement Provides the Settlement Class Adequate Relief,
Considering the Costs, Risks, and Delay of Litigation and Other
Relevant Factors ........................................................................................... 10

        1.    The Complexity, Expense, and Likely Duration of the
Litigation ......................................................................................... 10

        2.    The Stage of the Proceedings and Discovery Completed ................ 12

        3.    The Probability of Lead Plaintiffs' Success on the Merits ............. 13

        4.    The Range of Possible Recovery ..................................................... 16

        5.    The Opinions of Lead Counsel, Lead Plaintiffs, and Absent
Settlement Class Members............................................................... 17

    D.    The Remaining Rule 23(e)(2) Factors Support Final Approval of the
Settlement..................................................................................................... 19

V.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION ............... 21

VI.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS...................... 23

VII.    NOTICE OF THE SETTLEMENT SATISFIED RULE 23, DUE
PROCESS, AND THE PSLRA................................................................................. 24

VIII.    CONCLUSION ......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*,
2019 WL 387409 (S.D. Tex. Jan. 30, 2019) ............................................................... 20

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd on other grounds sub
nom.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir.
2012) ........................................................................................................................... 12

*Berger v. Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ..................................................................................... 7-8

*Billitteri v. Sec. Am., Inc.*,
2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ............................................................... 9

*Blackmon v. Zachary Holdings, Inc.*,
2022 WL 2866411 (W.D. Tex. July 21, 2022) ........................................................... 20

*Buettgen v. Harless*,
2013 WL 12303143 (N.D. Tex. Nov. 13, 2013) .......................................................... 16

*Burnett v. CallCore Media, Inc.*,
2024 WL 3166453 (S.D. Tex. June 25, 2024) ............................................................ 25

*Celeste v. Intrusion Inc.*,
2022 WL 17736350 (E.D. Tex. Dec. 16, 2022) .......................................... 9, 11, 23, 25

*In re Chicken Antitrust Litig. Am. Poultry*,
669 F.2d 228 (5th Cir. 1982) ..................................................................................... 22

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v.
Pierson*, 607 F. App'x 72 (2d Cir. 2015) ................................................................... 18

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ....................................................................................... 6

*In re Dell Inc. Sec. Litig.*,
2010 WL 2371834 (W.D. Tex. June 11, 2010), *aff'd sub nom. Union
Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F. 3d 632 (5th Cir. 2012) ............... 11, 22

ii

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ................................................................................................... 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ................................................. 16, 17, 1

*Farrar v. Workhorse Grp., Inc.*,
   2023 WL 5505981 (C.D. Cal. July 24, 2023) .............................................................. 17

*In re Heartland Payment Sys., Inc. Cust. Data Sec. Breach Litig.*,
   851 F. Supp. 2d 1040 (S.D. Tex. 2012) ................................................................... 9, 11

*Hefler v. Wells Fargo & Co.*,
   2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ....................................................... 21, 22

*Howard v. Liquidity Servs. Inc.*,
   2018 WL 4853898 (D.D.C. Oct. 5, 2018) .................................................................. 17

*Jenkins v. Trustmark Nat. Bank*,
   300 F.R.D. 291 (S.D. Miss. 2014) ............................................................................... 6

*In re Katrina Canal Breaches Litig.*,
   628 F.3d 185 (5th Cir. 2010) ..................................................................................... 24

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) ...................................................................... 11

*Lea v. Tal Educ. Grp.*,
   2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ............................................................ 17

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg.,
   Sales Practices & Prods. Liab. Litig.*,
   952 F.3d 471 (4th Cir. 2020) ..................................................................................... 21

*Marcus v. J.C. Penney Co., Inc.*,
   2017 WL 6590976 (E.D. Tex. Dec. 18, 2017), *R&R adopted*, 2018 WL
   307024 (E.D. Tex. Jan 4, 2018) ......................................................................... 8, 9, 18

*Matson v. NIBCO Inc.*,
   2021 WL 4895915 (W.D. Tex. Oct. 20, 2021), *aff'd sub nom. Garcia v.
   Matson*, 2022 WL 6935303 (5th Cir. 2022) ............................................... 8, 12, 13, 16

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950) ................................................................................................... 24

*Netsky v. Capstead Mortg. Corp.*,
    2000 WL 964935 (N.D. Tex. July 12, 2000) ............................................................ 18

*Newby v. Enron Corp.*,
    394 F.3d 296 (5th Cir. 2004) ........................................................................................ 7

*O'Donnell v. Harris Cty., Tex.*,
    2019 WL 6219933 (S.D. Tex. Nov. 21, 2019) ............................................................. 7

*In re OCA, Inc. Sec. & Deriv. Litig.*,
    2009 WL 512081 (E.D. La. Mar. 2, 2009) ................................................................. 12

*In re Oil Spill by Oil Rig Deepwater Horizon*,
    295 F.R.D. 112 (E.D. La. 2013) ................................................................................. 18

*Reed v. Gen. Motors Corp.*,
    703 F.2d 170 (5th Cir. 1983) ...................................................................... 6-7, 12, 13

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ............................................................ 14

*Shen v. Exela Techs., Inc.*,
    2023 WL 8527091 (N.D. Tex. Dec. 7, 2023) ............................................................ 25

*In re Waste Mgmt., Inc. Sec. Litig.*,
    2002 WL 35644013 (S.D. Tex. May 10, 2002), *amended on other
    grounds*, 2003 WL 27380802 (S.D. Tex. July 31, 2003) ........................................... 22

*Welsh v. Navy Fed. Credit Union*,
    2018 WL 7283639 (W.D. Tex. Aug. 20, 2018) .......................................................... 16

**Statutes**

28 U.S.C. § 1715 ............................................................................................................... 25

**Other Authorities**

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

4 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 13:49
    (6th ed. 2023) ............................................................................................................. 10

iv

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Rule(s)"), Court-appointed Lead Plaintiffs Plymouth County Retirement Association and the Trustees of the Teamsters Union No. 142 Pension Fund (together, "Lead Plaintiffs"), on behalf of themselves and the Settlement Class (defined below), hereby respectfully move for: (i) final approval of the proposed settlement of this securities class action ("Action") on the terms set forth in the Stipulation and Agreement of Settlement dated May 7, 2024 (Dkt. 162-2) ("Stipulation" or "Stip."); and (ii) approval of the proposed plan for allocating the net proceeds of the Settlement to the Settlement Class ("Plan of Allocation" or "Plan").[1]

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This Action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against Apache Corp. and its successor APA Corporation, a Delaware corporation listed on Nasdaq under the symbol APA ("Apache" or "Company") and John J. Christmann IV, Timothy J. Sullivan, and Stephen J. Riney ("Individual Defendants" and collectively with Apache, "Defendants") on behalf of an investor class who purchased or otherwise acquired Apache common stock from September 7, 2016, through March 13, 2020, inclusive, and were damaged thereby ("Settlement Class").

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Stipulation and in the Joint Declaration of David R. Kaplan and Joshua E. D'Ancona ("Joint Declaration" or "Joint Decl.") filed herewith. The Joint Declaration is an integral part of this submission and, for the sake of brevity herein, Lead Plaintiffs respectfully refer the Court to the Joint Declaration for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; and the risks of continued litigation. Citations to "¶ _" refer to paragraphs in the Joint Declaration and citations to "Ex. _" refer to exhibits to the Joint Declaration. All internal citations, quotation marks, and footnotes have been omitted and emphasis has been added unless otherwise indicated.

Subject to the Court's approval, Lead Plaintiffs have agreed to settle all claims in the Action in exchange for a non-reversionary, all-cash payment of $65 million for the benefit of the Settlement Class. The Court granted preliminary approval of the Settlement on May 13, 2024. *See* Dkt. 163. Lead Plaintiffs now move for final approval of the Settlement and approval of the Plan of Allocation.

## II.     STATEMENT OF ISSUES TO BE RULED UPON

1.      Whether the Court should approve the Settlement of this Action as fair, reasonable, and adequate under Rule 23(e)(2).

2.      Whether the Court should approve the Plan of Allocation as fair and reasonable.

3.      Whether the Court should finally certify the Settlement Class pursuant to Rules 23(a) and (b)(3) for the purpose of effectuating the Settlement.

## III.    SUMMARY OF THE ARGUMENT

Lead Plaintiffs respectfully submit that the proposed Settlement represents an excellent result for the Settlement Class and readily satisfies the standards for final approval under Rule 23(e)(2). As detailed in the Joint Declaration and summarized below, the Settlement: (i) is the culmination of three years of vigorous litigation efforts; (ii) results from formal mediation followed by continued arm's-length settlement negotiations under the guidance of an experienced class-action mediator; and (iii) represents a meaningful percentage of the Settlement Class's potentially recoverable damages.

At the time of settlement, the Action was at an advanced stage. The Parties had engaged in a comprehensive discovery process through which over one million pages of

2

documents were produced, numerous interrogatories had been served and answered, and fact depositions were well underway. ¶¶ 35-36. In addition to reviewing the documentary evidence, deposing 16 fact witnesses, and conducting extensive deposition preparation, Lead Plaintiffs and Lead Counsel also conducted a wide-ranging investigation into the Settlement Class's claims, prepared the detailed Complaint (and initial complaint), and opposed and defeated Defendants' motion to dismiss the Complaint. ¶¶ 24-34. The Parties had also engaged in contested class certification proceedings, including full briefing, related discovery, and a lengthy evidentiary hearing, which included cross examination of the Parties' economic experts. ¶¶ 77-84. As a result of these and other extensive litigation efforts, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the Settlement Class's claims when they agreed to resolve the Action.

While Lead Plaintiffs believe the Settlement Class's claims are meritorious and supported by Lead Counsel's investigative efforts and evidence developed during discovery, they also recognized that there were substantial risks to further litigation. Most notably, at the time of settlement, the Parties were awaiting District Judge George C. Hanks, Jr.'s ruling on Lead Plaintiffs' Class Certification Motion. Had the Court adopted Magistrate Judge Andrew M. Edison's Class Certification Report over Lead Plaintiffs' pending objections, three of the five alleged corrective disclosures would have been eliminated—shortening the Class Period by more than half and decreasing the Settlement Class's potential recoverable damages by roughly two thirds. ¶ 9.

In addition to class certification risks, Lead Plaintiffs would have faced risks in establishing Defendants' liability had the Action not resolved. For example, Defendants would continue to argue that the statements at issue concerning the Alpine High play were not false were made, and Defendants genuinely believed them to be true. ¶¶ 10, 97. Defendants would further contend that these alleged misstatements were not made with "scienter," or fraudulent intent, but were based on scientific data and tests, as well as current production results. ¶¶ 10, 98-99. Indeed, Judge Edison noted at the motion to dismiss stage that he found the issue of scienter to be a "very close call." *See* Dkt. 76, p. 13 ("… the inference of scienter in this case … is a close call. A very close call. As I examined the scienter issue, I went back and forth as to whether Lead Plaintiffs' scienter allegations pass muster."). Lead Plaintiffs faced the risk that the same "close call" on scienter would manifest again at summary judgment and/or trial.

Lead Plaintiffs also would have faced hurdles in establishing loss causation and damages. Defendants would assert that Lead Plaintiffs would be unable to demonstrate that the alleged misrepresentations proximately caused the economic losses claimed by the Settlement Class. ¶¶ 11, 101-104. In support, Defendants would attempt to show that the movements in Apache's stock price following the alleged corrective disclosures were driven primarily by market-wide declines in commodity prices and other non-fraud related factors, rather than by partial revelations of the alleged fraud. ¶ 102. Judge Edison accepted similar arguments by Defendants as reflected in the Class Certification Report.

Adverse determinations on these issues at class certification, summary judgment, trial, or in likely appeals could have reduced or potentially eliminated a recovery for the

Settlement Class. The $65 million Settlement avoids these risks—as well as the delay and expense of continued litigation—while providing a substantial and certain near-term benefit to the Settlement Class. Moreover, the Settlement is not "claims-made." Rather, all Settlement proceeds, after deducting Court-approved fees and expenses, will be distributed to Settlement Class Members who submit valid Claims.

In May 2024, the Court preliminarily approved the Settlement, finding that it would "likely be able to finally approve the Settlement." Dkt. 163, ¶ 4. Nothing has changed since then to alter the Court's conclusion. The Settlement has the full support of Lead Plaintiffs—sophisticated investors that took an active role in supervising the litigation, and the reaction of the Settlement Class to date has been positive. While the objection/exclusion deadline has not yet passed, following an extensive notice campaign, there have been no objections to the Settlement or Plan of Allocation, and only four requests for exclusion.[2]

Given the foregoing considerations and the factors addressed below, Lead Plaintiffs respectfully submit that: (i) the Settlement meets the standards for final approval under Rule 23, and is a fair, reasonable, and adequate result for the Settlement Class; (ii) the Plan is a fair and reasonable method for equitably allocating the Net Settlement Fund to Settlement Class Members who submit valid Claims; and (iii) the Court should finally certify the Settlement Class for purposes of effectuating the Settlement.

---

[2] Any objections and additional requests for exclusions received after this submission, will be addressed in Lead Plaintiffs' reply to be filed with the Court on September 12, 2024.

## IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e)(2) requires judicial approval of any class action settlement. A class action settlement should be approved if the court finds it to be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In making this finding, a court should be guided by this Circuit's judicial policy favoring settling class action lawsuits. *See In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (noting "overriding public interest in favor of settlement" in class action cases); *Jenkins v. Trustmark Nat. Bank*, 300 F.R.D. 291, 301 (S.D. Miss. 2014) (finding "Rule 23(e) analysis should be informed by the strong judicial policy favoring settlements").

Rule 23(e)(2) provides that, in determining whether a class action settlement is "fair, reasonable, and adequate," the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Consistent with this guidance, courts in the Fifth Circuit have long considered the following six factors in deciding whether to approve a class action settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6)

the opinions of the class counsel, class representatives, and absent class members.

*Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (the "*Reed* factors"); *see also Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).[3]

At the preliminary approval stage, this Court considered the Rule 23(e)(2) factors in assessing the Settlement, and found it to be "fair, reasonable, and adequate . . . , subject to further consideration at the Settlement Hearing." *See* Dkt. 163, ¶ 4. As noted above, nothing has changed to alter this finding, and the factors supporting the Court's determination to preliminarily approve the Settlement apply still. Accordingly, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate, and warrants final approval under the Rule 23(e)(2) factors and Fifth Circuit law.

### A.     Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class in this Action

The first Rule 23(e)(2) factor—whether Lead Plaintiffs and Lead Counsel "have adequately represented the class"—favors Settlement approval. This factor looks at: (1) "the zeal and competence of the representative[s'] counsel" and (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to

---

[3] The Advisory Committee Notes to the 2018 amendments to Rule 23 explain that the four Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Accordingly, Lead Plaintiffs discuss below the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four Rule 23(e)(2) factors, but also discuss the application of the non-duplicative factors articulated by the Fifth Circuit in *Reed*. *See O'Donnell v. Harris Cty., Tex.*, 2019 WL 6219933, at *9 (S.D. Tex. Nov. 21, 2019) (observing that "courts in this circuit often combine [the Rule 23 and *Reed* factors] in analyzing class settlements.").

protect the interests of absentees." *Berger v. Compaq Comput. Corp.,* 257 F.3d 475, 479 (5th Cir. 2001) (alterations in original).

Here, Lead Plaintiffs vigorously litigated the Action on behalf of the Settlement Class for three years. Lead Plaintiffs' efforts included, *inter alia*, filing the initial and operative complaints; communicating regularly with Lead Counsel about case developments and strategy; reviewing court filings and other material documents; responding to Defendants' discovery requests, including by reviewing and verifying interrogatory responses and searching for and producing potentially relevant documents; preparing for and providing testimony at their depositions, and keeping abreast of the Parties' settlement discussions. *See* Ex. 1, ¶¶ 7-8; Ex. 2, ¶¶ 5-7. Moreover, Lead Plaintiffs have no interests antagonistic to the Settlement Class and share common claims. *See Matson v. NIBCO Inc.*, 2021 WL 4895915, at *5 (W.D. Tex. Oct. 20, 2021) (noting in adequacy analysis that "named Plaintiffs' legal and remedial theories are substantially similar to those of other members of the Class, and they are further united in asserting a common right, such as achieving the maximum possible recovery for the class"), *aff'd sub nom. Garcia v. Matson*, 2022 WL 6935303 (5th Cir. 2022).

Likewise, Lead Plaintiffs retained counsel who are highly experienced in complex securities and shareholder litigation. *See* Ex. 4-D; 5-C. Lead Counsel actively pursued the Settlement Class's claims against seasoned and well-regarded defense counsel, and ultimately negotiated a favorable Settlement on behalf of the Settlement Class. *See Marcus v. J.C. Penney Co., Inc.*, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("Significant

weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class[.]"), *R&R adopted*, 2018 WL 307024 (E.D. Tex. Jan 4, 2018).

### B. The Settlement Was Negotiated at Arm's Length and There Was No Fraud or Collusion

Rule 23(e)(2)(B) and the first *Reed* factor also support final approval because the Settlement was negotiated at arm's length after substantial discovery and there is no evidence of fraud or collusion. *See In re Heartland Payment Sys., Inc. Cust. Data Sec. Breach Litig.,* 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."). Indeed, the Settlement was reached only after a full-day mediation session followed by two months of negotiations with the assistance of an experienced mediator, Mr. Jed D. Melnick, Esq. of JAMS, and the exchange of detailed mediation statements. ¶¶ 88-89. *See Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) (finding no fraud or collusion in settlement reached through arm's length negotiations before neutral mediator); *see also Celeste v. Intrusion Inc.,* 2022 WL 17736350, at *4 (E.D. Tex. Dec. 16, 2022) ("Jed D. Melnick, had substantial experience mediating complex securities actions, lending further support to the agreement's legitimacy.").

Further, Lead Plaintiffs and their counsel possessed a deep understanding of the strengths and weaknesses of the case before reaching the Settlement. As detailed in the Joint Declaration, Lead Counsel conducted a thorough investigation, including interviews of over 50 former Apache employees and consultation with industry experts, prepared the

detailed Complaint, successfully opposed Defendants' motion to dismiss the Complaint (before both Judge Edison and Judge Hanks), participated in substantial discovery efforts (including the review of over one million pages of documents and taking/defending 20 fact and expert depositions), briefed Lead Plaintiffs' Class Certification Motion and objections to the Class Certification Report, prepared and participated in an evidentiary hearing on class certification, and consulted with additional experts as the case proceeded to trial. ¶¶ 8, 22-87. As a result, Lead Plaintiffs and Lead Counsel were well informed of the strengths and risks of the case when they agreed to settle the Action. *See* 4 William B. Rubenstein, *Newberg & Rubenstein on Class Actions* § 13:49 (6th ed. 2023) (approval warranted "[w]here a court can conclude that the parties had sufficient information to make an informed decision about settlement").

### C.   The Settlement Provides the Settlement Class Adequate Relief, Considering the Costs, Risks, and Delay of Litigation and Other Relevant Factors

Rule 23(e)(2)(C) and many of the remaining *Reed* factors entail "a substantive review of the terms of the proposed settlement" and the "relief that the settlement is expected to provide to" the Settlement Class, and weigh strongly in favor of the Settlement. *See* Fed. R. Civ. P. 23(e)(2) (C) & (D) advisory committee's note to 2018 amendment.

### 1.   The Complexity, Expense, and Likely Duration of the Litigation

Rule 23(e)(2)(C)(i) and the second *Reed* factor support approval of the Settlement as continued litigation would involve complex pre-trial, trial, and post-trial proceedings that would delay the ultimate resolution of the Action without any guarantee of recovery.

As here, when "ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010); *see also Heartland Payment Sys.*, 851 F. Supp. 2d at 1064 (approving settlement and noting that litigating case to trial would be "time consuming, and inevitable appeals would likely prolong the litigation, and any recovery by class members, for years") (alteration omitted).

Courts consistently recognize that securities class actions are "notoriously difficult and unpredictable," *see In re Dell Inc. Sec. Litig.*, 2010 WL 2371834, at *7 (W.D. Tex. June 11, 2010), *aff'd sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F. 3d 632 (5th Cir. 2012), and this case was no exception.[4] In addition to the complexities involved in securities class actions generally, this Action involved highly technical concepts as well as customs and practices unique to the oil and gas industry, necessitating regular consultation with industry experts, including specialists in petroleum reservoir engineering, geology, petrophysics and accounting. ¶¶ 85-87. Further, as discussed in the Joint Declaration and below, Lead Plaintiffs' ability to establish liability and damages was also far from certain. ¶¶ 93-104. Moreover, continuing to prosecute the Action through the completion of fact discovery, expert discovery, summary judgment, and trial would have

---

[4] *See also Celeste*, 2022 WL 17736350, at *4 ("Securities claims are particularly difficult to prove because of the high bar for establishing falsity and scienter.").

required substantial additional time and expense.[5] In contrast, the Settlement avoids the risk, expense, and delay of continued litigation while providing a substantial, near-term recovery for the Settlement Class, underscoring the Settlement's fairness.

### 2.     The Stage of the Proceedings and Discovery Completed

Courts in this Circuit also look to "the stage of the proceedings and the amount of discovery completed" when determining the adequacy of a class action settlement. *See Reed*, 703 F.2d at 172. Under the third *Reed* factor, courts consider "whether the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *See Matson*, 2021 WL 4895915, at *10.

In the months leading up to the commencement of this Action in February 2021 through its resolution in March 2024, Lead Plaintiffs and Lead Counsel spent substantial time and resources researching, evaluating, and litigating the factual and legal issues in play. As noted above, Lead Plaintiffs through Lead Counsel conducted a thorough investigation of the claims and, before reaching the Settlement, engaged in substantial fact discovery—including serving numerous discovery requests and subpoenas on Defendants and dozens of relevant nonparties, analyzing over one million pages of documents

---

[5] Additionally, even if Lead Plaintiffs prevailed at trial, Defendants surely would have appealed the verdict. Post-trial motions and appellate proceedings would have added significantly to the expense of this Action and delayed, potentially for years, any recovery to the Settlement Class (with no assurance that Lead Plaintiffs would ultimately prevail or recover more than the Settlement Amount). *See In re OCA, Inc. Sec. & Deriv. Litig.*, 2009 WL 512081, at *11 (E.D. La. Mar. 2, 2009) ("After trial, the parties could still expect years of appeals."); *see also, e.g., In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law on the basis of loss causation and overturning jury verdict and award in plaintiff's favor), *aff'd on other grounds sub nom.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).

produced in response thereto; conferring with Defendants and nonparties on discovery disputes (certain of which resulted in motion practice and argument); preparing and exchanging class certification expert reports; and taking/defending 20 depositions and preparing to take at least seven more, including the Company's current and former senior executives. ¶¶ 24-25, 35-76. Lead Counsel also successfully opposed Defendants' motion to dismiss and moved for, fully briefed, and argued class certification. ¶¶ 29-34, 77-84. In addition, Lead Counsel prepared a detailed mediation statement, and participated in painstaking settlement negotiations, including a full-day mediation with Mr. Melnick. ¶¶ 88-89. This substantial record demonstrates that, when the Settlement was reached, Lead Plaintiffs and Lead Counsel had ample information to make an informed decision about settlement.

### 3.    The Probability of Lead Plaintiffs' Success on the Merits

The fourth *Reed* factor looks at the risks of continued litigation and the probability of the plaintiff's success on the merits. *See Matson*, 2021 WL 4895915, at \*11-12. In evaluating the likelihood of success, a court "must compare [the settlement's] terms with the likely rewards the class would have received following a successful trial of the case." *Reed*, 703 F.2d at 172. Lead Plaintiffs recognize that, although they believed that substantial evidence supported their claims, there were significant risks to continued litigation, including challenging arguments by Defendants on all core claim elements and with respect to certification of the full Class Period. Weighing these risks (as discussed herein and in the Joint Declaration) against the certain and substantial recovery obtained for the Settlement Class demonstrates that the Settlement is fair, reasonable, and adequate and this

factor favors approval. *See, e.g., Schwartz v. TXU Corp.*, 2005 WL 3148350, at *18 (N.D. Tex. Nov. 8, 2005) ("plaintiffs' uncertain prospects of success through continued litigation" supported approval of securities class action settlement).

*First*, and most immediately, Lead Plaintiffs faced the risk of an adverse ruling on their Class Certification Motion. As noted above, Judge Edison's Class Certification Report (pending at the time of settlement), recommended a significantly truncated class period—ending on February 22, 2018 (instead of March 13, 2020) which, if adopted by the Court, would eliminate three of the five alleged corrective disclosures and substantially decrease the Settlement Class's potentially recoverable damages. ¶¶ 11, 104.[6] If, however, the Court declined to adopt the Report, Defendants likely would have responded with a Rule 23(f) petition and the Parties may have continued to litigate these issues on appeal—and possibly again, at trial, facing an uncertain outcome on this issue.

*Second*, Lead Plaintiffs would have faced challenges to proving falsity. If the Action continued, Defendants would assert, as they did in their motion to dismiss and during mediation, that the alleged misstatements regarding Alpine High were not materially false or misleading when made, but rather were genuinely held opinions about a prospective oil and gas fracking play in the petroleum rich Permian Basin. ¶ 97. To that end, Defendants would argue that: (i) their statements were factually true and honestly believed when made based on available data at the time; (ii) the allegations of falsity ignored the fact that it is

---

[6] Specifically, Judge Edison found that Defendants had rebutted the *Basic* presumption for the time period of February 23, 2018 through March 13, 2020. Dkt. 158 at 25; ¶ 104.

normal for oil and gas plays to be less productive during the exploration and development phase, and projecting estimates of total amounts of hydrocarbons in place and recoverable through fracking operations is a highly technical matter requiring numerous assumptions; and (iii) many of the statements at issue were either protected by the safe harbor provision of the PSLRA or non-actionable opinions. *Id.*

*Third*, Lead Plaintiffs faced substantial risks to establishing the element of scienter—*i.e.*, that Defendants acted intentionally or recklessly when making each of the alleged misstatements regarding Alpine High. In support of their position, Defendants would argue that: (i) the Individual Defendants honestly believed their statements and opinions about Alpine High were true when made; (ii) Apache would not have continued to invest billions of dollars in Alpine High over a multi-year period if it did not believe in the play's commercial viability; (iii) the Individual Defendants did not engage in suspicious insider trading or possess other personal financial motives to commit fraud; and (iv) Apache continued to believe Alpine High could be viable years after the end of the Class Period, operating wells at select locations based on prevailing commodity prices. ¶ 98. Further, as noted above, Judge Edison already recognized the challenges to proving Defendants' scienter, noting in his recommendation on Defendants' motion to dismiss that this presented a "very close call." *See* Dkt. 76 at 13.[7]

*Finally*, Lead Plaintiffs also faced challenges in establishing loss causation and

---

[7] Relatedly, if Defendants were able to successfully convince a jury that Defendants' statements were factually true or that Defendants did not act with the requisite scienter, Lead Plaintiffs' Section 20(a) claim against the Individual Defendants would have been foreclosed as well, as this claim requires Lead Plaintiffs to prove a primary violation of the Exchange Act. ¶ 100.

damages. Had the Action continued, Defendants would assert that Lead Plaintiffs would be unable to demonstrate that many (or all) of Defendants' alleged misrepresentations proximately caused the economic losses incurred. ¶¶ 11, 101-104. Also, as they did at the class certification stage, Defendants likely would have challenged Lead Plaintiffs' expert's loss causation/damages analysis, contending that it included multi-day windows with individual dates that lacked any statistically significant price declines. ¶ 103.[8] Ultimately, resolution of these issues would come down to an uncertain "battle of experts." *See Buettgen v. Harless*, 2013 WL 12303143, at *8 (N.D. Tex. Nov. 13, 2013) ("One cannot predict which expert's testimony or methodology a jury would find reliable.").

### 4. The Range of Possible Recovery

The fifth *Reed* factor requires a court to determine the "value of the settlement in light of the potential for recovery." *Welsh v. Navy Fed. Credit Union,* 2018 WL 7283639, at *13 (W.D. Tex. Aug. 20, 2018). In making this determination, courts compare "the settlement amount to the relief the class could expect to recover at trial, i.e., the strength of the plaintiffs' case." *Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018). In doing so, "a court should keep in mind that compromise is the essence of settlement." *Matson*, 2021 WL 4895915, at *12.

For the full alleged Class Period, Lead Plaintiffs' damages expert estimates class-wide damages to be approximately $1.48 billion. ¶¶ 12, 105. For a class period ending on

---

[8] And, for dates with statistically significant price declines, Defendants would argue that the "news" disclosed on such dates was either unrelated to the alleged fraud, already known by the market, and/or that the price declines must be "disaggregated" to account for non-fraud related disclosures. *Id.*

February 22, 2018 (as recommended in Judge Edison's Class Certification Report), Lead Plaintiffs' damages expert estimates damages to be approximately $519 million. *Id*. Accordingly, the $65 million Settlement represents between 4.4% to 12.5% of the Settlement Class's potential estimated damages depending on the number of recognized corrective disclosures. This result provides a significant recovery which is in-line with or exceeds damages recoveries in similar cases. ¶ 123.[9] Notably, however, had Defendants prevailed on even one of their core arguments, recoverable damages would be lowered or potentially eliminated altogether. *Id*. Thus, the Settlement provides a substantial recovery given the risks of further litigation noted already herein, and this supports approval.

### 5.    The Opinions of Lead Counsel, Lead Plaintiffs, and Absent Settlement Class Members

Lead Counsel, Lead Plaintiffs, and Settlement Class Members all support final approval of the Settlement, thereby satisfying the sixth *Reed* factor. Lead Counsel conducted a thorough investigation into the claims against Defendants and, after three years of intense litigation and inch-by-inch settlement negotiations, have a firm understanding of the strengths and risks attendant to these claims. Based on this understanding, as well as

---

[9] While each case reflects its own unique risks, the proposed Settlement compares favorably to recoveries achieved in other securities cases and approved by courts. *See, e.g., Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at *7 (C.D. Cal. July 24, 2023) (approving securities class action settlement where recovery represented 3% of estimated damages); *Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *10 (S.D.N.Y. Nov. 30, 2021) (approving securities class action settlement where recovery represented "5.3% of the Settlement's Class's maximum estimated damages"); *Howard v. Liquidity Servs. Inc.*, 2018 WL 4853898, at *5 (D.D.C. Oct. 5, 2018) (approving securities class action settlement "constitut[ing] approximately 4% of the *maximum* realistic recoverable damages") (emphasis in original). *See also Halliburton*, 2018 WL 1942227, at *5 (observing that courts frequently approve class action settlements when settlement amount is small fraction of what class could recover at trial).

their substantial experience litigating complex securities class actions like this one, Lead Counsel have concluded that the Settlement is fair, reasonable, and adequate. *See Marcus*, 2017 WL 6590976, at *3 ("Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class"); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 150 (E.D. La. 2013) ("In evaluating a settlement, the Court should rely on counsel who know the strengths and weaknesses of their cases.").

Likewise, Lead Plaintiffs—sophisticated institutional investors with billions of dollars in collective assets under management and precisely the type of fiduciaries envisioned by Congress when enacting the PSLRA, also strongly endorse the Settlement. *See* Ex. 1, ¶¶ 3, 10-12; Ex. 2, ¶¶ 2, 8.[10] Lead Plaintiffs actively supervised Lead Counsel during the Action, and were kept apprised of the contentious settlement negotiations with Defendants as well as developments in the underlying litigation. Lead Plaintiffs' support for the Settlement further demonstrates its fairness. *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014) ("[T]he recommendation of Lead Plaintiff, a sophisticated institutional investor, also supports the fairness of the Settlement."), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 72 (2d Cir. 2015).

The positive response of the Settlement Class to date also supports final approval. The Court-authorized Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), has mailed 237,676 Postcard Notices and 4,944 Notice Packets to potential Settlement Class Members

---

[10] *See Netsky v. Capstead Mortg. Corp.*, 2000 WL 964935, at *5 (N.D. Tex. July 12, 2000) ("Congress has expressed its preference for securities fraud litigation to be directed by large institutional investors").

18

and nominees. *See* Ex. 3, at ¶ 9. In addition, 176,191 potential Settlement Class Members received notice via email. *Id*. The notices describe the essential terms of the Settlement and inform Settlement Class Members of their rights in connection therewith. While the August 29, 2024 deadline for Settlement Class Members to request exclusion or object has not yet passed, to date, there have been no objections and only four requests for exclusion from the Settlement Class. ¶ 14; Ex. 3, ¶ 13.[11]

### D. The Remaining Rule 23(e)(2) Factors Support Final Approval of the Settlement

In evaluating the Settlement, Rule 23(e)(2) instructs courts to also consider: (i) "the effectiveness of [the] proposed method of distributing the relief provided to the class, including the method of processing class member claims;" (ii) "the terms of any proposed award of attorney's fees, including timing of payment;" (iii) any other agreement made in connection with the proposed settlement; and (iv) whether class members are treated "equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv) & (e)(2)(D). These factors also support final approval.

*First*, the proposed method of distribution and claims processing ensures equitable treatment of Settlement Class Members. Settlement Class Members' Claims will be processed and the Net Settlement Fund distributed pursuant to a standard method routinely approved in securities class actions. The Claims Administrator, A.B. Data, will review and process all Claims received, provide each Claimant with an opportunity to cure any deficiency in their Claim or request judicial review of the denial of their Claim, if

---

[11] Lead Plaintiffs will address any such requests or objections in their September 12, 2024 reply.

applicable, and will ultimately mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund, as calculated under the Plan of Allocation. *See infra* § V; ¶¶ 114-120. Importantly, none of the Settlement proceeds will revert to Defendants. *See* Stip., ¶ 13.

*Second*, the relief provided by the Settlement remains adequate upon consideration of "the terms of the proposed award of attorneys' fees" and Litigation Expenses incurred in prosecuting this Action, including the timing of any such Court-approved payments. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). As shown in the Fee and Expense Memorandum, the requested attorneys' fees of 33⅓% of the Settlement Fund, to be paid upon the Court's approval, are reasonable in light of Lead Counsel's efforts over the past three years and the $65 million cash recovery, as well as the significant risks shouldered by Lead Counsel.[12] Additionally, the request is fully supported by Fifth Circuit case law. *See Blackmon v. Zachary Holdings, Inc.*, 2022 WL 2866411, at *4 (W.D. Tex. July 21, 2022) (noting "proposed award of 33 1/3% of the total settlement is reasonable and consistent with awards made by other district courts in this Circuit under the percentage method"); *Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, 2019 WL 387409, at *4 (S.D. Tex. Jan. 30, 2019) (a fee of one-third "is an oft-awarded percentage in common fund class action settlements in this Circuit"); *Halliburton*, 2018 WL 1942227, at *12 (granting one-third fee). Additionally, the proposal that any Court-awarded fee be paid upon issuance of such

---

[12] Lead Counsel also seek payment from the Settlement Fund of Plaintiffs' Counsel's expenses in the total amount of $1,555,388.49 and a request for reimbursement to Lead Plaintiffs in the aggregate amount of $17,014.22. ¶¶ 138, 148.

a ruling is reasonable and consistent with common practice in similar cases, as the Stipulation dictates that if the Settlement were terminated or any fee award subsequently modified, Lead Counsel must repay the subject amount with interest. Stip., ¶ 16.[13]

*Lastly*, as previously disclosed, the only agreement the Parties entered into beyond the Term Sheet and Stipulation was a confidential Supplemental Agreement regarding requests for exclusion. *See* Stip., ¶ 36; *see also* Fed. R. Civ. P. 23(e)(2)(C)(iv). The Supplemental Agreement provides Defendants with the right to terminate the Settlement in the event that Settlement Class Members who timely and validly request exclusion meet certain conditions. Stip., ¶ 36. This type of agreement is standard in securities class actions and does not undermine the fairness of the Settlement. *See, e.g., Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

For the reasons set forth above and in the Joint Declaration, the Settlement is fair, reasonable, and adequate under applicable standards, supporting final approval.

## V.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

A plan for allocating settlement proceeds under Rule 23 is evaluated under the same standard as the settlement—the plan must be "fair, adequate, and reasonable." *In re*

---

[13] Such provisions in class action settlements, sometimes referred to as "quick-pay" provisions, "have generally been approved by other federal courts." *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 952 F.3d 471, 487 (4th Cir. 2020) (finding objection to "quick-pay provision[]" "border[ed] on frivolous" as there was "no reason to buck [the] trend" of other federal courts approving such provisions).

*Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). A plan of allocation need not be perfect—to be fair, reasonable, and adequate, "[t]he allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Dell*, 2010 WL 2371834, at *10; *see also In re Waste Mgmt., Inc. Sec. Litig.*, 2002 WL 35644013, at *20 (S.D. Tex. May 10, 2002) (approving plan where class received proceeds "based on the size and strength of their claims"), *amended on other grounds*, 2003 WL 27380802 (S.D. Tex. July 31, 2003).

Here, the Plan (Appendix A to the Notice) was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, Zachary Nye, Ph.D., and his team at Stanford Consulting Group, Inc. ¶ 116. The Plan will equitably distribute the Net Settlement Fund to Settlement Class Members who timely submit valid Claims demonstrating they suffered economic losses as a result of Defendants' alleged violations of the federal securities laws set forth in the Complaint, as opposed to economic losses attributable to market and/or industry factors. *Id*.

The Plan is based upon the estimated amount of artificial inflation in the price of Apache common stock during each day of the Class Period. *Id*. To have a loss, a Claimant must have purchased and/or acquired shares of Apache common stock during the Class Period and held these shares through at least one of the dates when the disclosure of alleged

corrective information partially removed the alleged artificial inflation from the price of Apache common stock. ¶ 117.[14]

Further, a Claimant's loss will depend upon several factors, including the date(s) when the Claimant purchased/acquired/sold their Apache common stock during the Class Period and at what price(s), taking into account the PSLRA's statutory limitation on recoverable damages. *Id*. Authorized Claimants will recover their proportional "*pro rata*" amount of the Net Settlement Fund based on their calculated loss. ¶ 118. *See Celeste*, 2022 WL 17736350, at *5 (approving plan of allocation in which each class member would receive a pro rata share of recognized loss). Lead Plaintiffs' trading activity is treated in the same manner as that of all other Settlement Class Members.

The Plan will result in a fair and equitable distribution of the Settlement proceeds among Settlement Class Members who suffered losses as a result of Defendants' alleged conduct. The Plan was fully disclosed in the Notice and, to date, there have been no objections to the Plan. ¶ 120. For these reasons, the Plan should be approved.

## VI.   THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

As set forth in Lead Plaintiffs' motion for preliminary approval of the Settlement, the Settlement Class satisfies all of the requirements of Rules 23(a) and (b)(3). *See* Dkt. 162 at 18-23; Dkt. 163, ¶¶ 1-3 (finding the Court will likely be able to certify Settlement

---

[14] Lead Plaintiffs allege artificial inflation was removed from the price of Apache common stock on the following nine dates: October 10, 2017; February 22, 2018; April 23, 2019; April 24, 2019; April 25, 2019; April 26, 2019; October 25, 2019; and March 16 and 17, 2020. Ex. B to Ex. 3, p.11.

Class in connection with final approval). None of the facts supporting certification of the Settlement Class have changed since Lead Plaintiffs submitted their preliminary approval motion. Accordingly, Lead Plaintiffs respectfully request that the Court certify the Settlement Class under Rules 23(a) and (b)(3) for purposes of effectuating the Settlement.

## VII.   NOTICE OF THE SETTLEMENT SATISFIED RULE 23, DUE PROCESS, AND THE PSLRA

Lead Plaintiffs have provided the Settlement Class with adequate notice of the Settlement. Notice satisfied both: (i) Rule 23, as it was "the best notice . . . practicable under the circumstances" and directed "in a reasonable manner to all class members who would be bound by the" Settlement (Fed. R. Civ. P. 23(c)(2)(B) & (e)(1)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974)); and (ii) due process, as it was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see also In re Katrina Canal Breaches Litig.,* 628 F.3d 185, 197 (5th Cir. 2010) (notice must provide class members with "information reasonably necessary for them to make a decision whether to object to the settlement"). Collectively, the notices to the Settlement Class provide all information specifically required by Rule 23 and the PSLRA. *See* Dkt. 163, ¶ 8; Exs. A-C to Ex. 3.

A.B. Data has mailed or emailed over 418,000 notices to potential Settlement Class Members and nominees through August 14, 2024. *See* Ex. 3, ¶ 9. In addition, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on June 26, 2024, and maintains a dedicated website,

24

www.ApacheSecuritiesSettlement.com, to provide information about the Settlement and access to downloadable copies of the Notice and Claim Form and other Settlement-related documents. *Id*., ¶¶ 10, 12. Similar information is provided on Lead Counsel's respective firm websites. ¶ 108. Defendants also issued notice pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. ¶ 111, fn. 11.

In sum, the notice campaign here provides sufficient information for Settlement Class Members to make informed decisions regarding the Settlement, fairly apprises them of their rights, represents the best notice practicable under the circumstances, and complies with the Preliminary Approval Order, Rule 23, the PSLRA, and due process.[15]

## VIII.  CONCLUSION

For the reasons herein, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and approve the Plan of Allocation.

Dated: August 15, 2024          Respectfully Submitted,

**AJAMIE LLP**

*s/ Thomas R. Ajamie*
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095
Pennzoil Place – South Tower
711 Louisiana, Suite 2150

---

[15] Comparable notice programs are routinely approved. *See, e.g.*, *Burnett v. CallCore Media, Inc.*, 2024 WL 3166453, at *3 (S.D. Tex. June 25, 2024); *Shen v. Exela Techs., Inc.*, 2023 WL 8527091, at *2 (N.D. Tex. Dec. 7, 2023); *Celeste*, 2022 WL 17736350, at *8.

Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiffs*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice*)
Johnston de F. Whitman, Jr. (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Richard A. Russo, Jr. (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
Austin W. Manning (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jwhitman@ktmc.com
jdancona@ktmc.com
rrusso@ktmc.com
ehoey@ktmc.com
amanning@ktmc.com

**SAXENA WHITE P.A.**
David R. Kaplan (admitted *pro hac vice*)
Wolfram T. Worms (admitted *pro hac vice*)
Emily R. Bishop (admitted *pro hac vice*)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
wworms@saxenawhite.com
ebishop@saxenawhite.com

-and-

26

Steven B. Singer (*pro hac vice* forthcoming)
Joshua H. Saltzman (admitted *pro hac vice*)
Sara DiLeo (admitted *pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com
sdileo@saxenawhite.com

-and-

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs*

**DANIELS & TREDENNICK PLLC**
Douglas A. Daniels
Texas State Bar No. 00793579
6363 Woodway, Suite 700
Houston, TX 77057
Telephone: (713) 917-0024
Facsimile: (713) 917-0026
Doug.Daniels@DTLawyers.com

*Additional Counsel for Lead Plaintiffs*

27

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 15, 2024, I caused a true and correct copy of the foregoing to be electrically filed with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/ Thomas R. Ajamie*

Thomas R. Ajamie
