## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| IN RE APACHE CORP. SECURITIES LITIGATION | Case No. 4:21-cv-00575 |
|  | District Judge George C. Hanks, Jr. |
|  | Magistrate Judge Andrew M. Edison |
|  | <u>CLASS ACTION</u> |


**JOINT DECLARATION OF DAVID R. KAPLAN AND JOSHUA E. D'ANCONA IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 4

II.    BACKGROUND OF THE ACTION AND THE SETTLEMENT ........................ 8

       A.     Summary of the Settlement Class's Claims ................................. 8

       B.     Commencement of the Action and Lead Plaintiffs'
              Appointment ................................................................................. 11

       C.     Lead Plaintiffs' Initial Investigation, Continuing
              Investigation, and Filing of the Operative Complaint ................ 12

       D.     Defendants' Motion to Dismiss the Complaint and Answer ....... 14

       E.     The Parties' Extensive Discovery Efforts .................................... 17

              1.     Rule 26(f) Report, Initial Disclosures, and Protective
                     Order .................................................................................. 18

              2.     Lead Plaintiffs' Discovery Propounded on Defendants ..... 19

                     a.     Lead Plaintiffs' Document Requests .................... 19

                     b.     Lead Plaintiffs' Interrogatories ............................ 23

              3.     Non-Party Discovery .......................................................... 25

              4.     Implementation of Document Review Protocol and
                     Comprehensive Document Review and Analysis ............. 27

              5.     Defendants' Discovery Propounded on Lead Plaintiffs ..... 31

                     a.     Defendants' Document Requests .......................... 31

                     b.     Defendants' Interrogatories ................................... 32

                     c.     Depositions of Lead Plaintiffs ............................. 32

              6.     Fact Depositions ................................................................. 33

       F.     Lead Plaintiffs' Class Certification Motion and Related
              Expert Discovery ......................................................................... 38

       G.     Lead Counsel's Work with Experts ............................................. 41

       H.     Mediation and Preliminary Approval of the Settlement ............. 44

III.   RISKS OF CONTINUED LITIGATION ......................................................... 46

       A.     Risks of Establishing Falsity and Scienter at Trial .................... 48

       B.     Risks of Establishing Loss Causation and Damages at Trial ...... 50

       C.     Risks on Appeal ........................................................................... 53

IV.    COMPLIANCE   WITH   THE   COURT'S   PRELIMINARY
       APPROVAL ORDER AND REACTION OF THE SETTLEMENT
       CLASS TO DATE ........................................................................ 53

V.     THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND
       ADEQUATE ............................................................................... 56

VI.    LEAD COUNSEL'S FEE AND EXPENSE APPLICATION ............................. 60

       A.     Lead Counsel's Fee Request Is Fair and Reasonable and
              Warrants Approval ........................................................... 61

              1.     The Favorable Settlement Achieved ................................. 61

              2.     The Risks of Litigation and the Need to Ensure the
                     Availability of Competent Counsel in High-Risk
                     Contingent Cases ....................................................... 62

              3.     The Time and Labor Devoted by Plaintiffs' Counsel ..................... 65

              4.     The Quality of Plaintiffs' Counsel's Representation ..................... 68

              5.     Lead Plaintiffs' Endorsement of the Fee Application ..................... 68

       B.     Lead Counsel's Request for Litigation Expenses Warrants
              Approval ........................................................................ 69

              1.     Lead Counsel Seek Payment of Plaintiffs' Counsel's
                     Reasonable and Necessary Litigation Expenses from
                     the Settlement Fund ..................................................... 69

              2.     Reimbursement to Lead Plaintiffs Is Fair and
                     Reasonable ............................................................... 73

VII.   CONCLUSION ............................................................................. 74

We, DAVID R. KAPLAN and JOSHUA E. D'ANCONA, declare as follows:

1.      I, David R. Kaplan, am a Director at the law firm of Saxena White P.A. ("Saxena White"), counsel for Court-appointed Lead Plaintiff Plymouth County Retirement Association ("Plymouth County"), and co-Lead Counsel for the proposed Settlement Class in this securities class action lawsuit (the "Action").[1]

2.      I, Joshua E. D'Ancona, am a Partner at the law firm of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz," and together with Saxena White, "Lead Counsel"), counsel for Court-appointed Lead Plaintiff Trustees of the Teamsters Union No. 142 Pension Fund ("Teamsters No. 142," and together with Plymouth County, "Lead Plaintiffs"), and co-Lead Counsel for the proposed Settlement Class in the Action.

3.      We have personal knowledge of the matters set forth herein based on our active supervision of and participation in the prosecution and resolution of the Action and information provided by other Lead Counsel attorneys and professional support staff working under our supervision, and if called on to do so, we could and would testify competently thereto.

4.      We respectfully submit this Joint Declaration in support of Lead Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Rule(s)") for final approval of the proposed settlement with Defendants Apache Corp. and its successor APA

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated May 7, 2024 (Dkt. 162-2) (the "Stipulation" or "Stip."). Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

Corporation, a Delaware corporation listed on Nasdaq under the symbol APA ("Apache" or the "Company"), and John J. Christmann IV, Timothy J. Sullivan, and Stephen J. Riney (the "Individual Defendants," and collectively with Apache, "Defendants") for $65,000,000 in cash (the "Settlement"). If approved, the Settlement will resolve all claims that were or could have been asserted in the Action against Defendants on behalf of the proposed Settlement Class, consisting of all persons or entities who purchased or otherwise acquired Apache common stock from September 7, 2016, through March 13, 2020, inclusive, and were damaged thereby.[2] The Court preliminarily approved the Settlement and directed notice thereof to potential Settlement Class members by Order dated May 10, 2024 (Dkt. 163) (the "Preliminary Approval Order").

5.     We also respectfully submit this Joint Declaration in support of: (i) the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members (the "Plan of Allocation" or "Plan"); and (ii) Lead Counsel's motion, on behalf of Plaintiffs' Counsel,[3] for an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund; payment of Plaintiffs' Counsel's Litigation Expenses in the total amount

---

[2] Excluded from the Settlement Class are Defendants, the officers and directors of Apache, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest. Also excluded from the Settlement Class are any persons and entities who or which submit a request for exclusion from the Settlement Class that is accepted by the Court.

[3] "Plaintiffs' Counsel" refers collectively to Lead Counsel Saxena White and Kessler Topaz, Court-appointed Liaison Counsel Ajamie LLP ("Ajamie"), and additional counsel for Lead Plaintiffs Daniels & Tredennick PLLC ("Daniels & Tredennick") and Nix Patterson, LLP ("Nix Patterson").

of $1,555,388.49; and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), reimbursement of $7,234.22 to Plymouth County and $9,780.00 to Teamsters No. 142 for the costs they directly incurred in connection with representing the Settlement Class in the Action (the "Fee and Expense Application").

6.      For the reasons discussed below and in the accompanying memoranda,[4] we, on behalf of Plaintiffs' Counsel, respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects. Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Lead Plaintiffs— sophisticated institutional investors with billions of dollars in collective assets under management that have actively supervised the Action since its inception. *See* Declaration of Padraic P. Lydon, Esq., Executive Director of Plymouth County ("Lydon Decl."), attached hereto as Exhibit 1, at ¶¶ 3-16; Declaration of Jay Smith, Fund Manager for the Teamsters No. 142 Pension Fund ("Smith Decl."), attached hereto as Exhibit 2, at ¶¶ 2-11.

---

[4] In conjunction with this Joint Declaration, Lead Plaintiffs and Lead Counsel are submitting: (i) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and Supporting Memorandum of Law ("Settlement Memorandum"), and (ii) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, and Supporting Memorandum of Law ("Fee and Expense Memorandum").

## I.    INTRODUCTION

7.    Following over three years of hard-fought litigation and extensive arm's-length negotiations facilitated by an experienced and well-respected mediator, Lead Plaintiffs and Lead Counsel have obtained a recovery of $65,000,000 in cash (the "Settlement Amount") for the benefit of the Settlement Class.[5] As provided for in the Stipulation, in exchange for this consideration, the Settlement resolves all claims that were or could have been asserted in the Action (and related claims) by Lead Plaintiffs and the Settlement Class against Defendants and Defendant Releasees.[6]

8.    Until a resolution was reached in March 2024, this Action was vigorously litigated by the Parties. At the time of settlement, Lead Counsel had, among other things: (i) conducted an extensive investigation into the claims at issue, including interviewing over 50 former Apache employees (often multiple times), 24 of whom provided Lead Plaintiffs with detailed, substantive information that was critical to Lead Plaintiffs' allegations and included in the operative Consolidated Class Action Complaint dated December 17, 2021 (Dkt. 65) ("Complaint"); (ii) researched and prepared the highly-

---

[5] Pursuant to the terms of the Stipulation, the Settlement Amount has been fully funded and is currently being held in the interest-bearing Escrow Account.

[6] As defined in ¶ 1(o) of the Stipulation, "Defendant Releasees" are "Defendants, Defendants' respective former, present, or future parent companies, controlling shareholders, subsidiaries, business units, divisions, and affiliates and each and all of their respective present and former employees, members, managers, partners, principals, officers, directors, controlling shareholders, agents, attorneys, advisors, accountants, auditors, and insurers and reinsurers of each of them; and the predecessors, successors, estates, assigns, assignees, immediate family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them."

4

detailed 146-page Complaint; (iii) briefed and successfully opposed Defendants' motion to dismiss the Complaint; (iv) briefed Lead Plaintiffs' motion for class certification ("Class Certification Motion") and objections to Magistrate Judge Andrew M. Edison's Memorandum and Recommendation granting in part and denying in part the Class Certification Motion ("Class Certification Report"); (v) consulted with numerous economic experts and experts in the field of oil and gas exploration and production ("E&P"), including in the specialized field of hydraulic fracking; (vi) prepared for and participated in a lengthy evidentiary hearing on class certification, which included cross examination of the Parties' economic experts and oral argument; and (vii) engaged in comprehensive fact discovery—including reviewing over one million pages of documents produced by Defendants and dozens of nonparties, defending the depositions of Lead Plaintiffs' representatives and economic expert, taking the depositions of 16 fact witnesses and Defendants' economic expert, and litigating various discovery or case management disputes before Judge Edison. *See infra* § II. Further, the Settlement is the product of arm's-length negotiations, including a formal mediation session before a highly experienced mediator and special master in complex securities and shareholder litigation, Mr. Jed D. Melnick, Esq. ("Mr. Melnick") of JAMS.

9.      In deciding to settle the Action, Lead Plaintiffs and Lead Counsel carefully considered the significant risks associated with advancing their case through the completion of fact discovery, expert discovery, summary judgment, trial, and the inevitable post-trial appeals. Lead Plaintiffs and Lead Counsel also carefully considered the possibility that the Court would adopt Judge Edison's Class Certification Report over Lead

Plaintiffs' pending objections, eliminating three of the five corrective disclosures alleged in the case, shortening the Class Period by more than half, and significantly decreasing the Settlement Class's potential recoverable damages. Moreover, an adverse decision for Lead Plaintiffs later on, at summary judgment or on appeal, or by a jury at trial, could have precluded *any* recovery for the Settlement Class. *See infra* § III.

10.     Here, Lead Plaintiffs alleged Defendants made statements during the Class Period (*i.e.*, September 7, 2016, through March 13, 2020, inclusive) that misled investors regarding the production capabilities and commercial viability of Alpine High, a purported major oil and gas play in a sub-region of the Permian Basin in Texas. Had the Action continued, Defendants would likely assert at summary judgment and trial that the statements at issue were not false at the time they were made, and that Defendants genuinely believed them to be true. Defendants would also have argued that Lead Plaintiffs could not establish scienter on the part of any Defendant. Indeed, at the pleading stage, Judge Edison noted in his Memorandum and Recommendation on Defendants' motion to dismiss that the issue of scienter was a "very close call," and Lead Plaintiffs recognized that this issue (and others) could be decided differently by the Court at summary judgment or trial. *See* Dkt. 76 at 13 ("Turning to the inference of scienter in this case, I concede that this is a close call. A very close call. As I examined the scienter issue, I went back and forth as to whether Lead Plaintiffs' scienter allegations pass muster.").

11.     In addition to the risks associated with establishing the elements of falsity and scienter, Lead Plaintiffs faced substantial challenges in proving loss causation and the Settlement Class's full amount of damages had the Settlement not been reached.

Defendants would likely have asserted that Lead Plaintiffs would be unable to demonstrate that many (or all) of Defendants' alleged misrepresentations directly or proximately caused the economic losses incurred. In particular, Defendants would have continued to argue that the Class Period should be shortened by more than two years, citing Judge Edison's Class Certification Report recommending that the Court certify a significantly truncated Class Period ending on February 22, 2018. *See* Dkt. 158 at 25. Acceptance of any such arguments by the Court or a jury, in whole or in part, would have dramatically limited the potential recovery for the Settlement Class, or eliminated it altogether.

12.     Lead Counsel believe that the Settlement, particularly when viewed in the context of the risks and uncertainties of continued litigation, represents an excellent result for the Settlement Class. Notably, the Settlement represents approximately 4.4% to 12.5% of the Settlement Class's potential estimated damages of $1.48 billion (for the full Class Period) and $519 million (for a class period ending on February 22, 2018), providing a significant recovery for Settlement Class Members that is in-line with or significantly larger than typical securities class action recoveries.

13.     Lead Counsel have worked closely with the Court-authorized Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), to disseminate notice of the Settlement to the Settlement Class as directed in the Preliminary Approval Order. In this regard, A.B. Data has mailed 237,676 Postcard Notices and 4,944 Notice Packets (*i.e.*, the long-form Notice and Claim Form) to potential Settlement Class Members and nominees and has sent

notice to an additional 176,191 potential Settlement Class Members via email.[7] Additionally, A.B. Data has posted the Notice and Claim Form, along with other relevant documents, on the Settlement website: www.ApacheSecuritiesSettlement.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. *See* Walter Decl., ¶¶ 10, 12.

14.     Although the August 29, 2024 deadline for exclusions/objections has not yet passed, the reaction of the Settlement Class thus far has been wholly positive. To date, there have been no objections to any aspect of the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application, including reimbursement of costs to Lead Plaintiffs, and there have been only four requests for exclusion from the Settlement Class.[8]

## II.     BACKGROUND OF THE ACTION AND THE SETTLEMENT

### A.     Summary of the Settlement Class's Claims

15.     The Settlement Class's claims in the Action are fully set forth in the Complaint. The Complaint asserts claims under: (i) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), against all Defendants; and (ii) Section 20(a) of the Exchange Act against the Individual Defendants.

---

[7] *See* Declaration of Adam D. Walter Regarding: (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of the Summary Notice; (C) Establishment of Call Center Services and Settlement Website; and (D) Report on Requests for Exclusion Received to Date ("Walter Decl."), attached as Exhibit 3 hereto, at ¶ 9.

[8] *See* Walter Decl., ¶ 13. Requests for exclusion and/or objections received after the date of this submission will be addressed in Lead Plaintiffs' reply to be filed on September 12, 2024.

16.     Lead Plaintiffs allege that, during the Class Period, Defendants violated the federal securities laws by making numerous materially misleading statements and omissions about the content, production capabilities, and commercial viability of Alpine High. *See generally*, ¶¶ 32-43, 190-299.[9]

17.     More specifically, the Complaint alleges that beginning on the first day of the Class Period, Defendants touted Alpine High as a "significant" and "world class" new resource play that would yield enormous quantities of extremely high-quality natural gas liquids ("NGLs"), condensate-rich "wet gas," and crude oil. ¶¶ 32-33. Defendants claimed they had conducted more than two years of rigorous testing and analysis of Alpine High, and that their "conservative" models had "confirmed" and "proven" that the play held billions of barrels of oil and trillions of cubic feet of wet gas in 2,000 to 3,000 "repeatable, high-value drilling locations." ¶¶ 34-35, 191-194. Defendants assured investors that Alpine High was "an immense resource that [they] believe[d] [would] deliver significant value for [their] shareholders for many years" and was so prolific that it would be "highly economic" even at rock-bottom oil and gas prices. ¶¶ 32, 36. Defendants continued to make numerous similar statements throughout the Class Period that analysts and investors accepted and applauded. ¶¶ 36-43, 64-69, 71-84, 190-299.

18.     As the Complaint also alleges, however, unbeknownst to investors, rather than being a highly-prolific oil and wet-gas play, Alpine High was in reality virtually barren of recoverable oil or NGLs, and instead contained mostly low-value dry gas, such that the

---

[9] In this Section II.A., citations to "¶ _" refer to paragraphs in the Complaint.

play was not commercially viable. ¶¶ 44-63, 70, 85-101, 114-189. As such, Defendants' positive statements to investors lacked any reasonable factual basis.

19.     The Complaint further asserts that Defendants' allegedly false and misleading statements and omissions artificially inflated and/or maintained the price of Apache common stock during the Class Period. ¶¶ 190, 301-302. As a result, Settlement Class Members, including Lead Plaintiffs, who purchased Apache common stock during the Class Period suffered damages when that artificial inflation was removed from Apache's stock price following a series of partial corrective disclosures that revealed the relevant truth. ¶¶ 303-319.

20.     Specifically, the Complaint alleges that the artificial inflation in the price of Apache's stock was removed in direct response to information made public in the following partial corrective disclosures from October 9, 2017 through March 16, 2020:

- On October 9, 2017, Apache revealed for the first time that the Company was experiencing significant problems extracting oil from key areas of the Alpine High play (specifically, the Woodford and Barnett formations) due to deep-seated geologic faults that Apache had been aware of but chose not to share with investors. As a direct result of this disclosure, Apache's stock price declined by more than 7% in a single day, falling from a close of $45.85 per share on October 9, 2017 to a close of $42.46 per share on October 10, 2017. ¶¶ 304-306.

- On February 22, 2018, Apache announced lower than expected production guidance for Alpine High, coupled with an increasingly unfavorable gas/oil ratio and prolonged production ramp. As a result of this disclosure, Apache's stock price plummeted to its lowest point in nearly 15 years, falling from a close of $37.20 per share on February 21, 2018 to a close of $34.85 per share on February 22, 2018, a decline of more than 6%. ¶¶ 307-309.

- On April 23, 2019, Apache announced it was suspending its natural gas production at Alpine High due to low natural gas prices, even though Apache previously assured investors that Alpine High was so prolific in oil and wet gas that the play would be economically viable even if natural gas traded at rock-

10

bottom prices. As a result of this disclosure, Apache's stock price fell $0.66 per share, from a close of $37.09 per share on April 22, 2019 to a close of $36.43 per share on April 23, 2019. Apache common stock shares continued to decline over the next three trading days, closing at $33.06 per share on April 26, 2019— for a four-day decline of $4.03 per share, or nearly 11%. ¶¶ 310-312.

- On October 25, 2019, media outlets reported that Steven Keenan, the Company's "star" geologist who was credited with discovering Alpine High as a viable play, abruptly "resigned." This news caused Apache's stock price to plunge, with shares trading as low as $20.57 on October 25, 2019, an intra-day drop of approximately 11.5%, before rebounding to close the day at $22.07 per share, for a decline of approximately 5% from the prior day's closing price. ¶¶ 313-314.

- Finally, on March 16, 2020, the full truth about Defendants' fraud was revealed in a *Seeking Alpha* article explaining that Apache's failed Alpine High foray had severely constrained its financial position relative to its competitors, and analysts at Susquehanna Financial Group similarly highlighted Apache's lack of balance sheet flexibility and extremely high net leverage in downgrading its rating on Apache common stock shares. ¶ 315. As a result of these disclosures, Apache's stock price fell $3.61 per share over two trading days, or approximately 45%, from a close of $8.07 per share on March 13, 2020 to a close of $4.46 per share on March 17, 2020. ¶ 316.

21.    As the Complaint alleges, this drastic and continuing decline of Apache's stock price was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. When the truth was revealed by the partial corrective disclosures on October 9, 2017, February 22, 2018, April 23, 2019, October 25, 2019, and March 16, 2020, the price of Apache common stock declined substantially as the market absorbed this information, causing Lead Plaintiffs and the other Settlement Class Members to suffer economic losses. ¶¶ 317-319.

### B.    Commencement of the Action and Lead Plaintiffs' Appointment

22.    On February 23, 2021, after conducting a lengthy investigation into Apache's public statements to investors regarding Alpine High, Lead Plaintiff Plymouth County filed

a class action complaint in the United States District Court for the Southern District of Texas against Apache and certain of its senior executive officers, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Dkt. 1. A related complaint, styled *Brian Schwegel v. Apache Corporation, et al.*, No. 4:21-cv-00722, was filed with the Court on March 4, 2021.

23.     On April 26, 2021, Plymouth County and Teamsters No. 142 filed a motion seeking to consolidate the related actions, appoint them as Lead Plaintiffs, appoint Saxena White and Kessler Topaz as co-Lead Counsel, and appoint Ajamie as Liaison Counsel for the class. Dkt. 13. Similar motions were filed by two competing movants. Dkts. 11, 12. After opposition and reply briefs were filed (Dkts. 18-20, 22-23), on October 6, 2021, the Court: (i) appointed Plymouth County and Teamsters No. 142 as Lead Plaintiffs and approved their selection of Kessler Topaz and Saxena White as co-Lead Counsel and Ajamie as Liaison Counsel for the class; and (ii) consolidated the two related cases under the caption *In re Apache Corp. Securities Litigation*, No. 4:21-cv-00575. Dkt. 45.

### C.     Lead Plaintiffs' Initial Investigation, Continuing Investigation, and Filing of the Operative Complaint

24.     Prior to filing the initial complaint on February 23, 2021 and the appointment of Lead Plaintiffs, Lead Counsel began an exhaustive investigation into the facts underlying the Action. This investigation included a detailed review and analysis of: (i) Apache's public filings with the SEC; (ii) press releases and public statements issued by Apache, including during earnings calls and conference calls with analysts and investors and in investor slide presentations; (iii) research reports by securities and financial analysts;

(iv) publicly available news articles, press releases, documents, and other online and media reports regarding Defendants; (v) data and other information regarding Apache securities; and (vi) expert analyses.

25.     After the appointment of Lead Plaintiffs, Lead Counsel continued investigating the claims eventually alleged in the Complaint. For instance, Lead Counsel worked diligently with an industry expert to conduct a detailed forensic analysis of Apache's drilling and production data from Alpine High over the entire lifespan of the play. Through this forensic analysis of a massive amount of complex drilling and production-related data, Lead Counsel were able to confirm that "the total amount of oil produced by Apache across the entire Alpine High field during the entire Class Period amounted to approximately 2.9 million barrels—a miniscule 0.8% of the 455 million barrels total that Defendants represented that they conservatively expected to recover" and that numerous other alleged misstatements were false when made. Complaint, ¶¶ 116-133.

26.     Additionally, Lead Counsel dedicated substantial time and resources to locating, interviewing, and memorializing interviews with former Apache employees. In total, Lead Counsel, through their in-house investigators, contacted or attempted to contact over 150 former Apache employees and conducted interviews with over 50 of them (including numerous follow-up interviews), both telephonically and in person. Ultimately, Lead Counsel included detailed information provided by 24 of these former Apache employees in the Complaint. For example, based on the accounts of the former Apache employees, the Complaint describes in detail how Defendants lacked crucial data needed to support their claims about Alpine High's resources and production capabilities, and

13

repeatedly disregarded internal warnings and adverse facts about Alpine High that contradicted their representations to investors.

27.     In connection with their preparation of the Complaint, Lead Counsel also consulted extensively with experts on market efficiency, loss causation, and damages.

28.     Based upon Lead Counsel's thorough investigation and research, Lead Plaintiffs filed the 146-page Complaint on December 17, 2021.

### D.     Defendants' Motion to Dismiss the Complaint and Answer

29.     On February 15, 2022, Defendants moved to dismiss the Complaint. Dkt. 71. In their motion, Defendants argued that Lead Plaintiffs failed to adequately allege Defendants' statements were false or misleading, and specifically, that: (i) Lead Plaintiffs' allegations of falsity were premised on conclusory assertions that ignored Apache's disclosures and their contexts; (ii) many of the statements at issue were forward looking statements protected by the safe harbor provision of the PSLRA; and (iii) many of the statements at issue were non-actionable opinions. Defendants also argued that Lead Plaintiffs' allegations failed to establish the requisite strong inference of scienter, and specifically, that: (i) there was a more plausible competing, non-culpable inference regarding Defendants' motive; (ii) the allegations of the Complaint merely supported a generalized motive, which was insufficient to satisfy the pleading requirements of the PSLRA; and (iii) the circumstantial allegations of the Complaint did not support a cogent, compelling inference of scienter.

30.     On April 22, 2022, Lead Plaintiffs filed a 65-page opposition to Defendants' motion to dismiss. Dkt. 74. Specifically, with respect to the misstatements alleged in the

14

Complaint, Lead Plaintiffs argued that: (i) the Complaint adequately pled actionable misstatements that satisfied the exacting pleading requirements of the PSLRA; (ii) the PSLRA's safe harbor for certain "forward-looking" statements did not protect any of the alleged misstatements; and (iii) none of the alleged misstatements were inactionable statements of "opinion." Lead Plaintiffs also argued that the Complaint contained sufficient allegations of circumstantial evidence of scienter, including that: (i) Defendants regularly received reports and data that contradicted their statements about Alpine High; (ii) Defendants deliberately concealed the actual Alpine High data; (iii) the detailed accounts of former Apache employees and numerous other facts supported a strong inference of scienter; and (iv) Defendants failed to proffer a more compelling inference of non-fraudulent intent.

31.     Defendants filed their reply in support of their motion to dismiss the Complaint on June 9, 2022. Dkt. 75. On reply, Defendants reiterated their arguments that the Complaint failed to identify any actionable false or misleading statement and failed to raise a strong inference of scienter.

32.     Following full briefing on the motion, Judge Edison issued a Memorandum and Recommendation on September 15, 2022, recommending that Defendants' motion to dismiss be denied in its entirety. Dkt. 76. In so holding, Judge Edison specifically noted that Lead Plaintiffs' Complaint stood out among the "vast number of securities class action lawsuits" he "had the opportunity to review" throughout his career, "both as a lawyer and a judge," and highlighted the Complaint's "detailed discussion of the alleged misrepresentations at issue" and the fact that it "explains the reasons why Defendants

15

allegedly knew at the time they spoke publicly that those statements were materially false." *Id.* at 7. Judge Edison credited Lead Plaintiffs' allegations that Defendants had "data indicating that Apache would not encounter commercially productive oil and gas reservoirs," and that "Apache management disregarded [] explicit warnings and moved forward with a major public announcement and glowing reports on how Alpine High would drive shareholder value for years to come." *Id.* at 10, 13. And, while noting that it was a "very close call[,]" Judge Edison further found the Complaint's allegations of scienter—including that Defendants were desperate to announce a major U.S. shale oil discovery and Alpine High was a reckless gamble, a "Hail Mary pass to the endzone"—more compelling than Defendants' competing inference that it was "wholly illogical and irrational for Apache and its senior management to promote a play they knew, all along, would fail miserably[,]" which, he concluded, "goes a bit too far." *Id.* at 13, 15.

33.     Defendants filed objections to Judge Edison's recommendation on October 13, 2022, claiming several errors. Dkt. 79. For example, Defendants argued that Judge Edison erred in finding a perceived "tie" on scienter by relying on deficient factual allegations, including allegations that were not properly sourced or were otherwise unreliable, and that the Complaint lacked any cognizable motive allegations. Lead Plaintiffs filed their response to those objections on November 10, 2022, addressing each of Defendants' arguments. Dkt. 80.

34.     On November 29, 2022, the Court adopted Judge Edison's recommendation and denied Defendants' motion to dismiss in its entirety. Dkt. 81. Accordingly, Defendants answered the Complaint on January 10, 2023. Dkt. 87.

### E.    The Parties' Extensive Discovery Efforts

35.    Promptly after the Court issued its ruling on Defendants' motion to dismiss, Lead Plaintiffs began aggressive discovery efforts. Given the length of the Class Period, the scope of Lead Plaintiffs' claims, and the complex subject matter at issue in this Action, fact discovery was significant. Among other things, Lead Plaintiffs served approximately 65 document requests and 27 interrogatories on Defendants, subpoenaed documents from numerous nonparties, including an investment firm that partnered with Apache on the spin-off of its midstream business in the Permian Basin, two of Apache's auditors (its independent financial auditor and petroleum reserves auditor), three of Apache's key vendors for performing analyses of Alpine High's resources, eight potential strategic business partners/investors in Alpine High, and more than 30 former Apache executives and other high ranking senior geologists, engineers, and vice presidents who led Apache's efforts at Alpine High. In addition, Lead Plaintiffs deposed 16 fact witnesses, and were preparing to depose additional high-ranking current and former Apache senior executives at the time of settlement.

36.    All told, Lead Plaintiffs' discovery efforts resulted in the production of over one million pages of documents from Defendants and nonparties. By employing a technology assisted review platform ("TAR") that prioritized review of the documents most relevant to Lead Plaintiffs' claims after applying human learning (which was frequently updated and optimized by Lead Counsel as discovery progressed), Lead Plaintiffs efficiently reviewed the overwhelming majority of the voluminous documents produced before the Settlement was reached, including all documents produced from the

17

custodial files of the Individual Defendants and numerous other key custodians and other non-custodial sources.

37.     These extensive discovery efforts provided Lead Plaintiffs with a thorough understanding of the strengths and weaknesses of their claims and assisted Lead Counsel in engaging in an informed mediation process with Defendants and evaluating the fairness of the Settlement.

38.     At the same time, Lead Plaintiffs and Lead Counsel fulfilled Lead Plaintiffs' obligations to produce discovery—producing thousands of pages of documents to Defendants, answering interrogatories, and providing deposition testimony pursuant to Rule 30(b)(6). As further detailed below, the amount of work done by Lead Plaintiffs during this time period is clear and compelling evidence of Lead Plaintiffs' vigorous prosecution of this Action.

### 1.     Rule 26(f) Report, Initial Disclosures, and Protective Order

39.     Within a month after the denial of Defendants' motion to dismiss, the Parties promptly met and conferred pursuant to Rule 26(f) on December 29, 2022. During these discussions, the Parties agreed on a pre-trial schedule, including deadlines for amending the pleadings as well as completing discovery, class certification briefing, expert discovery, and summary judgment briefing. The Parties also agreed to a deposition limit of 30 fact witnesses for each side, and a 40-interrogatory limit for each side. On December 19, 2022, Judge Edison entered the pre-trial scheduling order. Dkt. 86.

40.     Thereafter, the Parties filed a proposed Joint Discovery/Case Management Plan under Rule 26(f) on January 13, 2023. Dkt. 88. On that same date, the Parties also exchanged initial disclosures pursuant to Rule 26(a)(1).

41.     Over the ensuing months, the Parties negotiated a protective order to govern the confidentiality of discovery materials ("Protective Order"). The Parties exchanged multiple rounds of edits to the draft document and met and conferred to resolve their disputes on particular terms and provisions. On March 1, 2023, the Parties filed a joint motion for entry of the agreed-upon Protective Order and Judge Edison approved the Protective Order on that same date. Dkt. 95.

### 2.     Lead Plaintiffs' Discovery Propounded on Defendants

### a.     Lead Plaintiffs' Document Requests

42.     On December 29, 2022, Lead Plaintiffs served their First Set of Requests for Production of Documents on Defendants (the "First RFPs"). The First RFPs included 56 individual requests. In general, Lead Plaintiffs requested that Defendants produce documents concerning, among other things: (i) Apache's exploration and evaluation of Alpine High, including during the approximately four-year period leading up to the Class Period; (ii) Apache's drilling activity at Alpine High, including test wells and production wells in specific regions of the play; (iii) the basis for Apache's projections about the amount of oil and gas resources at Alpine High; (iv) the production data Apache disclosed on certain dates; (v) "Project Phoenix" and other efforts to improve well performance at Alpine High; (vi) Apache's internal review of Alpine High conducted in the second half of 2019; (vii) the Company's $3 billion impairment concerning Alpine High announced on

February 26, 2020; (viii) Apache's regulatory filings with the Texas Railroad Commission ("RRC") regarding Alpine High; and (ix) employee resignations and departures. Defendants served their responses and objections to Lead Plaintiffs' First RFPs on January 30, 2023.

43.     On November 17, 2023, Lead Plaintiffs served their Second Set of Requests for Production of Documents on Defendants (the "Second RFPs"). The Second RFPs consisted of nine additional requests, which generally sought documents concerning: (i) database files for wells drilled at Alpine High; (ii) rate transient analyses for wells drilled at Alpine High; (iii) Apache's attempts to solicit investors or business partners for Alpine High; and (iv) Apache's repeated statements to investors about the "Typical Well" at Alpine High. Defendants served their responses and objections to Lead Plaintiffs' Second RFPs on December 18, 2023.

44.     In the weeks and months after these RFPs were served, Lead Counsel engaged in numerous meet-and-confers and extensive negotiations with Defendants' Counsel over the adequacy of Defendants' discovery responses and the appropriate scope of their forthcoming document production, including undertaking lengthy efforts to reach agreement on search terms to be employed, custodians whose documents would be searched, the applicable timeframe, and the search and production of documents from numerous non-custodial sources (*e.g.*, software platforms used for specific aspects of the play and servers for specific Apache offices).

45.     In connection with these and other discovery negotiations, the Parties had several significant discovery disputes—two of which resulted in motion practice and orders from the Court.

46.     The Parties' first discovery dispute resulting in motion practice arose before the production of any documents, and concerned the methodology for Defendants' search and production. On March 1, 2023, months after Lead Plaintiffs served their First RFPs, the Parties submitted a joint status report, advising Judge Edison that they had yet to reach agreement on: (i) the search terms to be applied to emails and certain non-custodial sources; (ii) the custodial and non-custodial data sources Defendants would search; and (iii) the terms of an order to govern the production of electronically stored information ("ESI Protocol"). *See* Dkt. 94. In their joint status report, the Parties requested an extension to continue their discussions until March 21, 2023. *Id.* Judge Edison granted the requested extension and issued a minute order encouraging the Parties to continue to work together regarding the issues in dispute. Thereafter, the Parties continued their negotiations, but were unable to reach agreement on all disputed issues by the March 21, 2023 deadline. Accordingly, on March 21, 2023, the Parties filed another joint status report, advising Judge Edison that there was still no agreement on a search protocol pertaining to Defendants' document production and requesting additional time to attempt to reach agreement. *See* Dkt. 98.

47.     Despite exchanging additional rounds of correspondence and frequently conferring, the Parties still could not reach agreement on certain core discovery issues. To that end, on March 31, 2023, the Parties filed a third joint status report presenting the

21

outstanding issues (Dkt. 99), and Judge Edison ordered the Parties to submit briefing. On April 4, 2023, Lead Plaintiffs submitted a letter brief detailing the Parties' months-long disputes over the process governing Defendants' search, collection, review, and production of documents, including Defendants' proposed use of the Purview search tool and its limitations. Dkt. 100. On April 7, 2023, Defendants filed a letter in response, arguing, among other things, that their proposed search procedures (including use of the Purview tool) were reasonable and Lead Plaintiffs' requests to the Court were premature and improper. Dkt. 102. On April 10, 2023, Judge Edison issued an order encouraging the Parties to continue trying to reach agreement on an acceptable search protocol and produce such documents promptly. Dkt. 103. Months later, after several additional rounds of correspondence and meet-and-confers, the Parties finally reached agreement on Defendants' search protocol. On June 28, 2023, the Parties filed a joint letter advising Judge Edison that they resolved this dispute. Dkt. 118.

48.     Once the Parties resolved these threshold issues concerning the procedures for Defendants' search and production of documents and ESI, Defendants began making regular, voluminous document productions. Between July 2023 and February 2024, Defendants made 32 rolling document productions—plus an additional 18 overlay productions—producing a total of approximately 226,000 documents or nearly one million pages in response to Lead Plaintiffs' RFPs. Moreover, at the time of settlement, Lead Plaintiffs were continuing to request and receive documents from Defendants, as several key depositions approached. As Lead Counsel received Defendants' documents, they reviewed and analyzed those documents through weekly team meetings, running targeted

searches aimed at locating the most relevant documents, analyzing the document trail on several key issues, and creating timelines of events and memoranda concerning key themes germane to the case. The magnitude and complexity of the documents Defendants produced was substantial, and included, among other things, emails, text messages, presentations, spreadsheets and database files of production data, geological analyses, lab reports concerning oil and gas samples, highly technical documents concerning drilling and extraction techniques, internal analyses and modeling for measuring reserves and projecting economic viability, drafts of Apache's Class Period public statements, regulatory documents, and board materials.

### b.    Lead Plaintiffs' Interrogatories

49.    Lead Plaintiffs also served four sets of interrogatories on Defendants. On April 21, 2023, Lead Plaintiffs served their first set of interrogatories (the "First Interrogatories"). The First Interrogatories sought information concerning, among other things: (i) the third-party vendors who provided services in connection with Apache's exploration and development of Alpine High; (ii) the results of Apache's testing and drilling activities at Alpine High; (iii) the digital technology used at Alpine High; (iv) the natural resources produced at Alpine High; and (v) Apache's customers and sales of resources produced at Alpine High. On May 22, 2023, Defendants served written responses and objections to the First Interrogatories. Lead Counsel carefully reviewed each of Defendants' responses and objections. Thereafter, the Parties exchanged extensive correspondence regarding certain disputes arising over Defendants' responses and objections, and met and conferred throughout the remainder of 2023 in an attempt to

resolve their disputes. Defendants served supplemental responses to certain of the First Interrogatories on January 4, 2024 and February 13, 2024.

50. Lead Plaintiffs served their second set of interrogatories (the "Second Interrogatories") on September 8, 2023. The Second Interrogatories sought information concerning: (i) Alpine High production data; (ii) Apache's attempts to solicit investors or business partners for Alpine High; (iii) Apache's public statements to investors, including statements concerning the "Typical Well" at Alpine High; and (iv) "Project Neptune" (Apache's internal investigation into the productivity of the wells in Alpine High). On October 10, 2023, Defendants served written and verified responses and objections to the Second Interrogatories. Defendants later supplemented their responses to certain of the Second Interrogatories on November 6, 2023, January 26, 2024, and February 21, 2024.

51. On November 21, 2023, Lead Plaintiffs served their third set of interrogatories (the "Third Interrogatories"), requesting information concerning topics such as: (i) Apache's Alpine High type curves; (ii) Apache's Alpine High lease agreements; (iii) Apache's classification of wells at Alpine High; and (iv) Apache's reporting to the RRC. On December 21, 2023, Defendants served written responses and objections to the Third Interrogatories. Defendants supplemented their responses to certain of the Third Interrogatories on February 2, 2024.

52. Lead Plaintiffs served their fourth set of interrogatories (the "Fourth Interrogatories") on February 5, 2024. The Fourth Interrogatories were largely contention interrogatories seeking information regarding, among other things: (i) Defendants' bases for the alleged false or misleading statements; (ii) Apache's pre- and post-announcement

exploration of Alpine High; and (iii) the affirmative defenses Defendants asserted in their answer. Defendants did not answer the Fourth Interrogatories because the Parties entered into a standstill agreement while negotiating the Settlement.

### 3.  Non-Party Discovery

53.    While pursuing discovery from Defendants, Lead Plaintiffs also served document subpoenas on more than 50 nonparties, including: (i) Altus Midstream Company, Apache's former midstream business in the Permian Basin, which holds equity ownership in four Permian-to-Gulf Coast oil pipelines utilized at Alpine High, and in which Apache retained a majority interest following its spin-off as an independent publicly-traded company; (ii) Ryder Scott Company, Apache's petroleum reserves auditor; (iii) Ernst & Young LLP, Apache's outside accountant and auditor; (iv) Kayne Anderson, an investment management firm and Apache's business partner in the Altus Midstream spin-off; (v) Core Labs, Weatherford Labs, and Stratum Reservoir, each of which provided laboratory testing and analyses for Apache's development of Alpine High; (vi) potential joint venture/strategic business partners in Alpine High, Chevron Corporation, Dow Hydrocarbon and Resources LLC, Ecopetrol USA Inc., JERA Americas, Mitsubishi Corporation (Americas), Sinopec, Sumitomo Corporation of Americas, and Southern Petroleum Laboratories, Inc.; and (vii) more than 30 former Apache executives and employees.

54.    Lead Plaintiffs met and conferred with many of these nonparties to negotiate, among other things, the scope of the subpoenas, categories of responsive documents, search

protocols, and claims of privilege asserted by the nonparty or Defendants over certain of the requested documents.

55.     Certain of Lead Plaintiffs' non-party subpoenas were also subject to disputes which resulted in motion practice, including, in particular, Lead Plaintiffs' subpoenas to former Apache employees. After learning from Defendants' Counsel that Apache had maintained a "Bring Your Own Device" policy, including throughout the Class Period, under which employees could use personal mobile devices for work purposes, Lead Plaintiffs investigated the matter further and confirmed that highly relevant communications concerning Alpine High often occurred via text message, including among operations- and management-level personnel. As a result, Lead Plaintiffs served document subpoenas on dozens of former Apache employees spanning a variety of different levels of seniority and departments within the Company, including key personnel in the San Antonio office, key personnel in Apache's Houston headquarters, and regulatory and compliance personnel. After receiving notice of the subpoenas, Defendants expressed concern that certain former employees who were not represented by counsel might respond by producing privileged and confidential material (as well as irrelevant information), and insisted that Apache was entitled to conduct a pre-production privilege review. Lead Plaintiffs disagreed that such a review was necessary, and after extensive efforts by the Parties to resolve the dispute, the Parties submitted a joint letter to Judge Edison on September 26, 2023 requesting the Court's intervention. Dkt. 129. On September 29, 2023, the Parties presented oral argument before Judge Edison. Following the hearing, Judge Edison issued an Order requiring the Parties to jointly inform any unrepresented former

employees that they should produce documents responsive to Lead Plaintiffs' subpoenas directly to Defendants' Counsel, who would then review the documents for privilege but not for responsiveness and produce all non-privileged documents to Lead Plaintiffs within five business days, as well as a privilege log, if necessary. Dkt. 132.

56.     Ultimately, after the Court resolved this issue and after months of meet-and-confers and rounds of written correspondence between Lead Counsel and the subpoenaed nonparties, Lead Plaintiffs obtained over 25,000 non-party documents, which consisted of over 144,000 pages. These documents proved highly relevant to Lead Plaintiffs' claims. For example, text messages produced in response to Lead Plaintiffs' subpoenas to former Apache employees helped bolster evidence supporting their falsity and scienter allegations.

**4.      Implementation of Document Review Protocol and Comprehensive Document Review and Analysis**

57.     Lead Counsel devoted substantial time to reviewing and analyzing the hundreds of thousands of documents collectively produced by Defendants and nonparties, generating an effective and efficient discovery plan and taking significant steps designed to efficiently identify the custodians and documents most important to uncovering the facts at the heart of the Action. The extensive, technical, and well-planned discovery conducted by Lead Counsel was critical to achieving the highly favorable recovery for the Settlement Class.

58.     *First*, Lead Counsel solicited bids from database vendors for a document-management system that could accommodate the large anticipated size of the productions, enable the review of documents housed on the database by multiple users, and offer the

27

latest coding, review, and search capabilities for efficient electronic discovery management. Ultimately, Lead Counsel negotiated a favorable pricing arrangement with the third-party vendor KLDiscovery Ontrack, LLC ("KLDiscovery"). to host a significant volume of information on its sophisticated electronic database and litigation support platform. Lead Counsel used this electronic database to organize and search the large volume of documents produced, allowing the attorneys performing document review to categorize documents by issues and level of relevance and to identify critical documents supporting the Settlement Class's claims. Lead Counsel also retained Gemean Corporation, a company specializing in compliance, cybersecurity, data analytics, electronic discovery, and forensic investigations, to provide digital forensic services in connection with the collection and processing of data from mobile devices, in particular, those used by former Apache employees under the Company's BYOD policy.

59. *Second*, once the documents were loaded into the database, Lead Counsel utilized an algorithm-based TAR model that learns from each coding decision fed into it, to rank documents by relevance and predicted priority. This allowed Lead Counsel to focus their review on the most relevant documents first, and move potentially irrelevant or duplicative material to the later part of the review. Lead Counsel meticulously monitored and continually refined the TAR process as discovery progressed to ensure it was functioning effectively and efficiently.

60. *Third*, to conduct first-level substantive document review, Lead Counsel engaged a dedicated team of full-time staff and contract attorneys with substantial experience in e-discovery and deposition preparation. Attorneys on the litigation team

prepared and frequently updated a highly detailed instruction manual and protocol to guide this document review. Document reviewers were trained to code documents for their level of responsiveness or importance to the case (*e.g.*, "Hot," "Warm," "Relevant," "Non-Relevant"), for principal case-related factual and legal issues (for example, Apache's financial performance/reporting, production data, and scienter), for review by experts, and for potential use with particular deponents, and were instructed how to use the algorithm-based model to make the review more efficient. Lead Counsel also developed and continuously updated reference resources to aid members of the document review team, including: (i) chronologies of significant events; (ii) lists of key players; (iii) a glossary of technical terms and acronyms used in the oil and gas industry; and (iv) webinars regarding the E&P industry, hydraulic fracking, and Alpine High prepared by Lead Counsel's scientific experts.

61.     Throughout document discovery, senior attorneys monitored the efficiency and quality of the document review, holding weekly meetings with staff and contract attorneys to ensure their understanding of the case, sharing insights gleaned from Lead Counsel's experts and consultants, and discussing key facts uncovered by the review. The weekly meetings ensured that the reviewing attorneys were aware of: (i) the issues underlying the Settlement Class's claims; (ii) the key facts, individuals, and timelines; (iii) why certain documents were high value; and (iv) how such documents were informing Lead Plaintiffs' theories of liability.

62.     *Fourth*, the review team completed several targeted discovery projects and produced written memoranda summarizing their findings on specific issues and witnesses.

These projects included, for example: (i) an analysis of the documents produced by certain nonparties concerning the services they provided for Apache at Alpine High, including hydrocarbon samples extraction, hydrocarbon chemistry services, "PVT" (pressure, volume, and temperature) reports or "lab" reporting, core analysis reporting, natural gas, NGL, and crude oil analysis reporting, evaluations of reservoir and fluid characterization, production and reserves, and certification services, all of which were highly relevant to Defendants' claims about the productive capacity and viability of Alpine High; (ii) a spreadsheet tracking Apache Board and committee meetings, summarizing the dates, types of meetings, the attendees, and the agendas/topics discussed and documents referenced; (iii) a chronology of Apache's implementation of certain special projects to attempt to enhance the productivity of wells at Alpine High; and (iv) memoranda to assist in taking the depositions of fact witnesses.

63.    *Finally*, many of the documents were highly scientific, complex, and laden with technical terminology specific to the oil and gas industry, and required expert analysis. Throughout the course of discovery, Lead Counsel regularly consulted with multiple consulting experts and disclosed and undisclosed testifying experts, including specialists in petroleum engineering, geology, and petrophysics, for assistance in understanding these highly technical concepts and unique industry customs and practices. As noted above, the analyses and insights from these experts were shared with the attorneys prosecuting the case on a day-to-day basis, along with the dedicated document review team.

### 5.     Defendants' Discovery Propounded on Lead Plaintiffs

### a.     Defendants' Document Requests

64.     On March 1, 2023, Defendants served 35 unique requests for the production of documents on Lead Plaintiffs (the "Defendants' RFPs"). Defendants' RFPs covered a wide range of subjects including: (i) Lead Plaintiffs' investments in Apache securities; (ii) Lead Plaintiffs' investment strategies and records; (iii) Lead Plaintiffs' third-party service providers; (iv) Lead Plaintiffs' participation in the prosecution of this Action, and (v) prior lawsuits in which Lead Plaintiffs participated. After Lead Counsel's review and analysis of Defendants' RFPs, Lead Plaintiffs served their responses and objections on March 31, 2023.

65.     Prior to being served with Defendants' RFPs, Lead Plaintiffs, with the assistance of Lead Counsel, began gathering potentially relevant and responsive materials. Lead Counsel worked closely with Lead Plaintiffs and their data vendors to coordinate the collection, housing, and review of documents in compliance with applicable laws and regulations. Lead Counsel also developed a coding protocol for the documents identified as potentially responsive and undertook a thorough review to ensure those documents were relevant, responsive, and not privileged. As a result of these efforts, Lead Plaintiffs collectively produced 196 documents (totaling 4,822 pages) to Defendants. Lead Plaintiffs' outside investment managers responsible for making the transactions in Apache common stock underlying Lead Plaintiffs' claims also collectively produced over 1,300 documents in response to document subpoenas issued by Defendants.

31

### b.      Defendants' Interrogatories

66.      Defendants also served a set of 20 interrogatories on Lead Plaintiffs on March 11, 2023. Defendants' interrogatories sought information regarding Lead Plaintiffs' investigation of the Settlement Class's claims, including: (i) the identities of the confidential witnesses referenced in the Complaint, Lead Plaintiffs' investment advisors, and Lead Plaintiffs' employees involved in the initiation of the Action; (ii) Lead Plaintiffs' participation in other securities litigations; (iii) Lead Plaintiffs' investments in Apache common stock; and (iv) Lead Plaintiffs' experts. Lead Counsel carefully reviewed and analyzed the interrogatories and served Defendants with written and verified responses and objections on March 31, 2023. Lead Plaintiffs supplemented their responses to certain interrogatories on May 23, 2023.

### c.      Depositions of Lead Plaintiffs

67.      On April 25, 2023, Defendants noticed the deposition of Lead Plaintiff Plymouth County pursuant to Rule 30(b)(6), seeking the testimony of a corporate representative regarding a list of 25 topics. On May 15, 2023, Plymouth County served written responses and objections to Defendants' noticed topics.

68.      On May 25, 2023, Defendants took the deposition of David Sullivan, Plymouth County's former Executive Director. To prepare for his deposition, Mr. Sullivan reviewed certain case materials and met for several hours with Lead Counsel. Additionally, following his deposition, Mr. Sullivan was provided with a copy of the deposition transcript for review, after which he prepared an errata sheet concerning his testimony.

69.     On April 25, 2023, Defendants noticed the deposition of Lead Plaintiff Teamsters No. 142 pursuant to Rule 30(b)(6), seeking the testimony of a corporate representative regarding a list of 25 topics. On May 15, 2023, Teamsters No. 142 served written responses and objections to Defendants' noticed topics.

70.     On June 6, 2023, Defendants took the deposition of Jay Smith, the Fund Manager for Teamsters No. 142's Pension Fund. To prepare for his deposition, Mr. Smith reviewed certain case materials and met with Lead Counsel for several hours. Additionally, following his deposition, Mr. Smith was provided with a copy of the deposition transcript for review, after which Mr. Smith prepared an errata sheet concerning his testimony.

### 6.     Fact Depositions

71.     Early in discovery, the Parties agreed to a deposition limit of 30 fact witnesses per side. Considering the complexity of the Settlement Class's claims, Lead Counsel deemed each deposition a potentially critical part of developing the necessary proof for trial. Accordingly, Lead Counsel developed a detailed deposition strategy and process.

72.     *First*, Lead Counsel developed a master list of potential deponents, organized by topic area and priority. This list relied on thousands of hours of document review and analysis and was continuously evolving as Lead Counsel's document review team and litigating attorneys further analyzed Defendants' ongoing productions and other information.

73.     *Second*, Lead Counsel managed a highly efficient process in preparing for depositions. Partners, senior associates, and other attorneys were divided into small groups

and each group was assigned a list of potential deponents. The document review team worked directly under the instruction and supervision of partners and senior associates intending to take fact witness depositions to review the custodial files of potential deponents and develop goals for each deposition. First-tier document review was conducted primarily by attorneys on the document review team who worked to identify documents most likely to contain useful information for a given deponent. Often, this involved a meticulous linear review of all documents in a deponent's custodial file or documents that mentioned the deponent as well as targeted issue searches across multiple custodians. Following this work, the document review attorneys produced memoranda for the deponent that summarized key documents regarding various relevant issues and events and provided additional information regarding the deponent, including facts uncovered from publicly available sources. As deposition transcripts for other witnesses in the case became available, these were reviewed as well, and extensively analyzed for use in subsequent depositions, expert reports, summary judgment briefing, and potentially trial. The partners and senior associates assigned to take the deposition studied these materials and regularly provided feedback and guidance on further areas of review.

74. *Third*, in order to prepare for and take fact witness depositions, Lead Counsel were required to become well-versed in, among other topics: (i) the process of oil and gas exploration, including the search for oil and gas and geological techniques and processes used to estimate reservoir dimensions and determine drilling locations; (ii) the process of oil and gas production, including well construction, drilling, and extraction; (iii) strategies and methods used to increase production of oil and gas; (iv) trends and technologies used

34

in the E&P industry, including methods of hydraulic fracking; (v) the interpretation of industry-specific data and analyses, including type curves and decline curves created by reservoir engineers, reserve reports and estimates, PVT reports, and data regarding well pad development; (vi) the prior exploration and efforts to extract oil and gas resources from the Alpine High area; (vii) the geology of Alpine High; (viii) the regulatory reporting requirements and the various regulatory events relating to Alpine High that occurred in and around the Class Period; and (ix) the intricacies of Apache's internal data tracking systems. Lead Counsel regularly consulted with their experts as they prepared to take depositions in order to understand these technical subjects and effectively depose current and former Apache employees who are highly trained experts in the field.

75. *Finally*, before taking any fact depositions, Lead Counsel interviewed and solicited bids from several deposition vendors. This allowed Lead Counsel to ultimately negotiate highly favorable pricing, including for, among other things, a remote deposition platform, videographers, and court reporters. Lead Counsel also negotiated a remote deposition protocol with Defendants to allow depositions to be taken remotely and discovery to move forward efficiently.

76. At the time of settlement, Lead Plaintiffs had undertaken significant work in deposing 16 fact witnesses, and in preparing to depose at least seven additional, noticed fact witnesses, as provided in the chart below:

| Deponent Name | Title/Position | Date Taken/Scheduled to be Taken | Taken? |
|---|---|---|---|
| Belinda Wolf | Senior Regulatory Advisor, Apache | 11/30/2023 | Yes |

| Deponent Name | Title/Position | Date Taken/Scheduled to be Taken | Taken? |
|---|---|---|---|
| Tad Smith | Former Director of Exploration and Production Technology Geoscience, Apache (June 2015 – September 2018) | 12/8/2023 | Yes |
| Braden Bowie | Reservoir Lead, Apache | 12/14/2023 | Yes |
| Cameron Snow | Former Apache employee (August 2006 – January 2009; July 2012 - August 2015); last position: Manager of North America New Ventures | 12/15/2023 | Yes |
| Maxwell Grove | Former Apache employee (July 2012 – February 2020); last position: Planning Analyst, Strategic Planning | 12/18/2023 | Yes |
| Stephane Aka | Planning Director (Suriname), Apache | 1/11/2024 | Yes |
| Gary Clark | President of Investor Relations, Apache | 1/16/2024 | Yes |
| W. Kregg Olson | Former Apache employee (1992 – August 2018); last position: Executive VP of Corporate Reservoir Engineering | 1/18/2024 | Yes |
| Lucian Wray | Former Apache employee (March 2001 – September 2018); last position: VP of Engineering Technical Services | 1/30/2024 | Yes |
| Eric Vosburgh | Former Apache employee (January 2011 – June 2023); last position: VP of Exploration/Portfolio and Business Strategy | 1/31/2024 | Yes |
| Michael Barber | Former Apache employee (May 2009 – February 2022); last position: Completion Engineer III | 2/2/2024 | Yes |
| Navneet Behl | Former Apache VP of Operations, Delaware Basin and North America Unconventional | 2/6/2024 | Yes |

36

| Deponent Name | Title/Position | Date Taken/Scheduled to be Taken | Taken? |
|---|---|---|---|
| | Resources (April 2014 – March 2019) | | |
| Brian Jansen | Former Apache employee (April 2017 - March 2020); last position: Senior Reservoir Engineer | 2/8/2024 | No |
| Richard Williams | Former Apache employee (April 2014 – March 2020); last position: Regional VP | 2/9/2024 | Yes |
| W. Mark Meyer | Former Apache Executive VP/SVP, Energy Tech, Data Analytics & Commercial Intel (March 2018 – July 2020) | 2/13/2024 | Yes |
| Tim Cook | Current Reservoir Engineering Manager (Suriname) at Apache (Apache employee since March 2008) | 2/13/2024 | Yes |
| Chester Pieprzica | Former Apache Chief Reservoir Engineer, Worldwide Exploration (March 2019 – January 2020) and Unconventional Resources (May 2014 – January 2020) | 2/21/2024 | No; Postponed pursuant to standstill agreement |
| David Pursell | Former Apache EVP of Development (April 2018 – April 2024) | 2/23/2024 | Yes |
| Tim Sullivan | Individual Defendant; Former Apache Executive VP of Operations Support (July 2015 - 2020) | 2/27/2024 | No; Postponed pursuant to standstill agreement |
| Steve Riney | Individual Defendant; Current EVP and CFO of Apache (Apache employee since January 2015) | 2/29/2024 | No; Postponed pursuant to standstill agreement |
| Stephen Keenan | Former Apache Head Geologist (April 2014 - October 2019) | 3/4/2024 | No; Postponed |

| Deponent Name | Title/Position | Date Taken/Scheduled to be Taken | Taken? |
|---|---|---|---|
| | | | pursuant to standstill agreement |
| John Christmann, IV | Individual Defendant; Current CEO, President, and Board Member of Apache (Apache employee since 1997) | 3/6/2024 | No; Postponed pursuant to standstill agreement |
| Natalie Jansen | Former Apache employee (January 2014 – March 2020); last position: Manager of Strategic Planning | 3/7/2024 | No |

### F. Lead Plaintiffs' Class Certification Motion and Related Expert Discovery

77.     While discovery was ongoing, Lead Plaintiffs filed a motion to certify the class (*i.e.*, the Class Certification Motion) on April 7, 2023. Dkt. 101. In the filing, Lead Plaintiffs sought: (i) certification of a class comprised of all persons and entities who purchased or otherwise acquired Apache common stock from September 7, 2016, through March 13, 2020, inclusive, and were damaged thereby; (ii) appointment of Plymouth County and Teamsters No. 142 as class representatives; and (iii) appointment of Kessler Topaz and Saxena White as class counsel and Ajamie as liaison class counsel. The Class Certification Motion was accompanied by a number of related exhibits, demonstrating that Lead Plaintiffs and the proposed class met all of the requirements of Rules 23(a) and 23(b)(3). Also filed with the Class Certification Motion was an expert report from Zachary Nye, Ph.D., a financial economist and experienced testifying expert, who is Vice President of Stanford Consulting Group, Inc. ("Stanford Consulting"), opining that the market for

Apache common stock was efficient throughout the Class Period, and that damages could be calculated using a common class-wide methodology. Dkt. 101-3.

78.     In connection with the Class Certification Motion, Defendants deposed corporate representatives from Lead Plaintiffs Plymouth County and Teamsters No. 142 on May 25, 2023 and June 6, 2023, respectively.

79.     On June 16, 2023, Defendants filed their opposition to the Class Certification Motion, along with an expert rebuttal report from Lucy P. Allen of National Economic Research Associates, Inc. ("NERA"). Dkts. 117, 117-2. In their opposition, Defendants did not contest, and therefore effectively conceded, that the class should be certified for the portion of the Class Period beginning September 7, 2016 and running through February 22, 2018. However, Defendants did oppose certification for the remaining, approximately two-year portion of the Class Period (*i.e.*, February 23, 2018 to March 13, 2020 (the "Focus Period")). Specifically, Ms. Allen opined that there was no price impact (or legally cognizable link between alleged misrepresentations and alleged corrective disclosures) with respect to the numerous misstatements or the three alleged corrective disclosures that occurred in the Focus Period—specifically: (i) Apache's April 23, 2019 press release announcing it was deferring gas production from Alpine High, (ii) the October 25, 2019 resignation of Steven Keenan, the geologist who led the Alpine High project, and (iii) the March 16, 2020 *Seeking Alpha* article describing how Alpine High had left Apache highly leveraged and competitively challenged amongst its E&P peers. On July 27, 2023, Lead Counsel deposed Ms. Allen regarding the methodology and findings in her rebuttal report, including with respect to the Focus Period.

80.     On August 11, 2023, Lead Plaintiffs filed a reply in further support of the Class Certification Motion, along with an expert report prepared by Dr. Nye rebutting Ms. Allen's opinion that there was no price impact during the Focus Period, and otherwise rebutting the validity of Ms. Allen's Focus Period construct. Dkts. 120, 120-3.

81.     On September 8, 2023, Defendants filed a sur-reply on class certification, which attached a sur-reply report prepared by Ms. Allen. Dkts. 126, 126-2. Ms. Allen asserted that Dr. Nye's reply report failed to show any evidence of price impact during the Focus Period, and that Dr. Nye's use of a multiday reaction window was improper. On November 8, 2023, Defendants deposed Dr. Nye regarding the methodology and findings in his reports and his responses to certain conclusions made by Ms. Allen in her reports.

82.     On October 2, 2023, after ordering a hearing on the Class Certification Motion, Judge Edison issued an order for the Parties to each file a written direct examination of their expert, together with any accompanying exhibits, one week *before* the hearing (*i.e.*, in lieu of live direct examination). Dkt. 135. In accordance with this order, on November 29, 2023, Lead Plaintiffs filed the 140-page Direct Testimony of Zachary Nye., Ph.D., which attached 28 exhibits. Dkt. 143. The same day, Defendants filed the 87-page Direct Testimony of Lucy P. Allen, which attached 73 exhibits totaling thousands of pages. Dkt. 142-1. Lead Counsel worked throughout this process to prepare for the hearing and argument, including by reviewing issues and evidence with Dr. Nye. Lead Counsel also reviewed and analyzed the direct testimony of Ms. Allen and exhibits and prepared for their live cross-examination of Ms. Allen.

83.     On December 6, 2023, Judge Edison conducted a full evidentiary hearing and argument on the Class Certification Motion. The hearing lasted over eight and a half hours, and included oral argument from counsel as well as live cross-examinations of Dr. Nye and Ms. Allen. At the conclusion of the hearing, Judge Edison took the matter under submission and directed Lead Plaintiffs to submit a letter identifying cases in which a court certified a class proceeding under the fraud-on-the-market theory of reliance where the price response of an alleged corrective disclosure was measured over a multiple-day period, where one or more of the days lacked a statistically significant price reaction. Dkt. 151. Lead Plaintiffs submitted supplemental case law to the Court on December 8, 2023. Dkt. 155.

84.     On February 9, 2024, Judge Edison issued his Class Certification Report, which recommended that the Court grant in part and deny in part the Class Certification Motion. Dkt. 158. Specifically, Judge Edison recommended that the Court appoint Lead Plaintiffs as class representatives and Lead Counsel as class counsel and certify a class of Apache common stock purchasers for a truncated class period (*i.e.*, September 7, 2016, through February 22, 2018), who were damaged thereby. Lead Plaintiffs filed objections to the Class Certification Report on February 23, 2024 (Dkt. 159), and Defendants filed their responses to Lead Plaintiffs' objections on March 8, 2024 (Dkt. 161). The Parties were awaiting the Court's ruling on class certification when the Settlement was reached.

### G.    Lead Counsel's Work with Experts

85.     Given the complexity of the issues in this Action, in addition to retaining Dr. Nye and his team of professional staff at Stanford Consulting, Lead Counsel consulted with

several other experts in connection with their investigation, discovery, and overall case prosecution. Lead Counsel worked with these experts closely to analyze the strengths and weaknesses of the case and to better understand the complexities of the E&P industry, hydraulic fracking in the Permian Basin, and of Apache's Alpine High play specifically. This process involved, *inter alia*: (i) careful analysis of Defendants' public statements to investors; (ii) careful analysis of highly relevant documents produced by Defendants and nonparties in response to Lead Plaintiffs' discovery requests; (iii) a technical forensic analysis of well production and drilling data reported in Apache's regulatory filings and a comparison against Apache's internal records; (iv) crafting targeted discovery requests to Defendants and nonparties; and (v) critical and strategic thinking about how best to use the evidence gathered throughout discovery to survive summary judgment and prove Lead Plaintiffs' claims at trial. Lead Counsel also consulted with these experts extensively before serving written discovery (and for certain experts, before the case was filed) and to assist in the analysis of discovery that was received. Lead Plaintiffs, through Lead Counsel, also regularly consulted with their experts as they began preparation of their substantive expert reports.

86.     As for potential testifying experts, soon after discovery commenced, Lead Plaintiffs retained Ammonite Resources Company ("Ammonite"), an organization with broad technical, operational, scientific, and legal experience in the petroleum and mineral industries, as both expert consultants and potential testifying experts. Lead Counsel worked closely with experts from Ammonite with various areas of expertise, including Dr. Robert Merrill, a senior exploration advisor at Ammonite with over 30 years of experience in

worldwide petroleum and production, who provided Lead Counsel with background on the complex paleo history of the Alpine High region and its impact on the viability of Alpine High. Lead Plaintiffs also worked closely with Paul Dudenas, P.E., an Ammonite senior consultant for operations and reservoir engineering, with more than 46 years of experience in reservoir engineering, to understand Defendants' estimates of hydrocarbon reserves and production forecasts for Alpine High. In addition to assisting with deposition preparation and analyzing documents, Mr. Dudenas and Dr. Merrill also each presented a multi-hour web tutorial for the entire litigation team regarding key industry concepts within their respective areas of expertise and their application to Alpine High. At the time of settlement, Dr. Merrill was in the process of preparing an expert report concerning the geoscience issues raised in the Action and Mr. Dudenas was in the process of preparing an expert report regarding the petroleum engineering and reserves issues raised in the Action. Lead Plaintiffs also retained Jane Kidd of Energy Litigation Services Group, an economic expert in the petroleum, natural gas, and electric power markets, to provide analysis, guidance, and testimony relating to the economic viability and valuation of the Alpine High play. Under the operative case schedule in place at the time of settlement, expert reports were due to be filed on April 12, 2024.

87.     In addition to the foregoing experts, Lead Plaintiffs also retained other highly experienced industry experts and consultants to assist Lead Counsel in understanding Apache's regulatory filings, public statements throughout the Class Period, and highly technical internal documents, as well as documents produced by nonparties.

### H.     Mediation and Preliminary Approval of the Settlement

88.     While fact discovery was ongoing and Lead Plaintiffs' objections to the Class Certification Report pending, the Parties began discussing the possibility of resolving the Action through settlement, and engaged Mr. Melnick to assist in those efforts. In advance of the mediation session held on January 10, 2024, the Parties prepared and exchanged detailed mediation statements, which were accompanied by voluminous evidentiary materials adduced in discovery. At the full-day mediation session, the Parties shared further information and argument addressing their views on liability and damages and engaged in vigorous settlement discussions.

89.     Although the Parties were unable to reach agreement at the mediation, they continued to negotiate with Mr. Melnick's assistance for approximately two months, and ultimately reached an agreement in principle to resolve the Action on March 7, 2024. The next day, the Parties notified the Court regarding their agreement. Dkt. 160. The Parties executed a Term Sheet on March 15, 2024.

90.     Thereafter, the Parties engaged in further negotiations over the specific terms of their agreement and executed the Stipulation on May 7, 2024.[10] The Settlement is not claims-made and is non-reversionary. Accordingly, if approved, the Settlement Class will receive the full benefit of the $65 million Settlement Amount, plus interest, after deducting

-----

[10] On the same day, Lead Plaintiffs and Defendants also entered into a confidential Supplemental Agreement, under which Defendants can exercise a right to withdraw from the Settlement in the event that requests for exclusion from the Settlement Class exceed certain agreed-upon conditions. Pursuant to its terms, the Supplemental Agreement is not being made public but may be submitted to the Court *in camera* or under seal.

Court-approved attorneys' fees, expenses and costs ("Net Settlement Fund"), without regard to the number of Claims submitted. After the Settlement becomes Final, the Net Settlement Fund will be distributed among eligible Settlement Class Members who submit valid Claims in accordance with a Court-approved plan of allocation and none of the Settlement Amount will revert to Defendants. *See* Stip., ¶¶ 13, 21, 27. Further, for settlement purposes only, the Parties have agreed to certification of the Settlement Class. *See* Stip., ¶¶ 1(qq), 2.

91.     While negotiating the terms of the Stipulation, Lead Counsel began working on various documents to be submitted with Lead Plaintiffs' motion for preliminary approval of the Settlement. During this time, Lead Counsel also requested and reviewed detailed bids obtained from several organizations specializing in class action notice and claims administration, and conducted follow-up communications with certain of these firms. As a result of this bidding process, Lead Counsel selected A.B. Data to serve as the Claims Administrator for the Settlement. Lead Counsel also worked closely with Lead Plaintiffs' economic expert, Dr. Nye and his professional staff at Stanford Consulting, to develop the proposed Plan of Allocation. *See infra* § V.

92.     On May 8, 2024, Lead Plaintiffs filed the Stipulation (and related exhibits) along with their Unopposed Motion for an Order Preliminarily Approving Proposed Settlement and Authorizing Dissemination of Notice to the Settlement Class, and Supporting Memorandum of Law. Dkt. 162. On May 13, 2024, the Court entered the Preliminary Approval Order finding that: (i) "it will likely be able to certify a settlement class consisting of all persons or entities who purchased or otherwise acquired Apache

common stock from September 7, 2016, through March 13, 2020, inclusive, and were damaged thereby" (Dkt. 163, ¶ 1); (ii) "it will likely be able to certify the Settlement Class for purposes of the proposed Settlement" (*id*. at ¶ 2); (iii) "it will likely be able to certify Lead Plaintiffs as Class Representatives for the Settlement Class and appoint Lead Counsel Kessler Topaz and Saxena White as Class Counsel for the Settlement Class" (*id*. at ¶ 3); and (iv) "it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Settlement Class, subject to further consideration at the Settlement Hearing []" (*id*. at ¶ 4). The Court set the Settlement Hearing for September 19, 2024, at 10:00 a.m. (*id*. at ¶ 5).

## III.    RISKS OF CONTINUED LITIGATION

93.    As detailed above, when the Settlement was reached, the Parties were deep into fact discovery and had ample information and materials with which to evaluate the strengths and weaknesses of Lead Plaintiffs' claims and Defendants' defenses. Lead Counsel had conducted a thorough analysis of the over one million pages of documents produced by Defendants and nonparties. In addition, Lead Counsel had already deposed 16 fact witnesses, including former Apache employees, who played critical roles in: (i) Apache's identification, exploration, acquisition, and development of the Alpine High play; (ii) Apache's estimation, review, and auditing of Alpine High reserves and preparation of financial reports; (iii) managing Apache's business, including its execution of the Alpine High play; (iv) managing Apache's relationships with analysts and investors; (v) drafting and disseminating Apache's allegedly false and misleading public statements and omissions; and (vi) conducting the 2019 retrospective internal review of Alpine High,

46

and were actively preparing to depose another seven fact witnesses, including each of the Individual Defendants. The Parties had fully briefed and argued Lead Plaintiffs' Class Certification Motion and engaged in related discovery, Judge Edison had issued his recommendation on the motion to the Court, and Lead Plaintiffs' objections to that recommendation were pending. Furthermore, as part of the mediation process, the Parties extensively analyzed evidence both in support of, and in opposition to, their respective positions, exchanged detailed mediation statements, and presented their liability and damages analyses, which included input from economic experts.

94.   Lead Plaintiffs' extensive efforts in prosecuting the Settlement Class's claims over the last three years, including through formal and informal discovery and comprehensive legal and expert analysis, ensured that Lead Plaintiffs and Lead Counsel were fully informed of the risks of continued litigation.

95.   While Lead Plaintiffs firmly believe their case had significant merit, there were a number of factors that made the outcome of continued litigation highly uncertain. Defendants have forcefully denied any culpability throughout the Action and vigorously opposed Lead Plaintiffs' Class Certification Motion, successfully persuading Judge Edison to recommend shortening the Class Period by over two years. Defendants were likely prepared to mount similarly aggressive defenses at summary judgment, and, if necessary, at trial. If successful, Defendants' anticipated summary judgment motion(s) could have narrowed the Settlement Class's claims, leading to a recovery well below the Settlement Amount, or no recovery at all. Likewise, if a jury at trial ruled against Lead Plaintiffs on any of the elements required to establish an Exchange Act claim, a recovery for the

Settlement Class would be foreclosed. Moreover, even if Lead Plaintiffs prevailed at summary judgment and trial, Defendants likely would have pursued opportunities for appeal, risking eventual loss for the Settlement Class, or at a minimum, significant delay and additional costs. Notably, Defendants were zealously represented by a team of highly experienced attorneys at Baker Botts L.L.P., a leading global law firm founded in Houston with deep roots in the energy industry, with their litigation team led by the firm's former Litigation Department Chair and former head of its Securities and Shareholder Litigation Group.

96.     Several of the most serious risks of an adverse outcome faced by the Settlement Class are discussed in the following paragraphs. After careful evaluation, Lead Plaintiffs determined that the Settlement represents an excellent result for the Settlement Class when the risks of continued litigation are weighed against, among other things, the near-term cash benefit to Settlement Class Members.

### A.    Risks of Establishing Falsity and Scienter at Trial

97.     *First*, had the Action continued, Defendants would have continued to forcefully assert at summary judgment or trial that the alleged materially false and misleading statements regarding Alpine High were not materially false or misleading when made. To that end, Defendants would have argued, among other things, that: (i) their statements were factually true and honestly believed when made; (ii) the allegations of falsity ignored the fact that it is normal for oil and gas plays to be less productive during the exploration and development phase; and (iii) many of the statements at issue were either protected by the safe harbor provision of the PSLRA or non-actionable opinions.

98. *Second*, Defendants would likely have argued at summary judgment and trial, as they did at the motion to dismiss stage, that Lead Plaintiffs could not establish the element of scienter. To establish scienter, Lead Plaintiffs would need to prove that Defendants acted intentionally or recklessly when making each of the alleged misstatements regarding Alpine High. However, Defendants likely would have argued, among other things, that: (i) the Individual Defendants honestly believed their statements and opinions about Alpine High were true when made; (ii) Apache would not have continued to invest billions of dollars in Alpine High over a multi-year period if it did not believe in the play's commercial viability; (iii) the Individual Defendants did not engage in suspicious insider trading or possess other financial motives to commit fraud; and (iv) Apache continued to believe Alpine High wells could be viable years after the end of the Class Period, operating wells at select locations based on prevailing commodity prices.

99. While Lead Plaintiffs believe they had strong counterarguments supported by evidence obtained through discovery, there was a significant risk that the Court or a factfinder could have credited Defendants' positions either at summary judgment or trial. Indeed, Judge Edison already recognized that proving Defendants' scienter could be challenging for Lead Plaintiffs, noting in his Memorandum and Recommendation on Defendants' motion to dismiss that he "went back and forth" on the "very close call" of whether to dismiss for lack of a strong inference of scienter. *See* Dkt. 76 at 13. Notably, certain of Lead Plaintiffs' alleged scienter facts would not have been changed by further discovery, such as the absence of any substantial and suspicious insider trading.

100. Moreover, if Defendants were able to successfully convince a jury either that Defendants' statements were factually true or that Defendants did not act with the requisite scienter, Lead Plaintiffs' Section 20(a) claim against the Individual Defendants would have been foreclosed as well, as this claim requires Lead Plaintiffs to prove a primary violation of the Exchange Act.

**B.     Risks of Establishing Loss Causation and Damages at Trial**

101. Lead Plaintiffs also faced significant risks in establishing loss causation and damages. Lead Plaintiffs would have the burden to prove at trial through complex expert testimony that the alleged partial disclosures of the fraud proximately caused the substantial declines in the price of Apache common stock at issue. At trial, Defendants would have likely made numerous arguments that, if accepted by jurors, could have materially reduced, or in a worst-case scenario, outright precluded any recovery for the Settlement Class.

102. *First*, even if the Court declined to adopt Judge Edison's Class Certification Report and certified the full Class Period, Defendants likely would have continued to argue at trial that the alleged false statements made during Defendants' proffered "Focus Period" from February 23, 2018 through March 13, 2020 did not cause shareholders' losses. For example, Defendants would likely have argued that the movements in the price of Apache common stock following the alleged corrective disclosures were driven primarily by market-wide declines in commodity prices and other non-fraud related factors, rather than by partial revelations of Defendants' alleged fraud.

103.   As they did at the class certification stage, Defendants also would have challenged Lead Plaintiffs' expert, Dr. Nye's loss causation/damages analysis, contending that it included multi-day windows with individual dates that lacked any statistically significant price declines and that the method employed by their expert, Ms. Allen, was the correct one.

104.   *Second*, consistent with Judge Edison's Class Certification Report, Defendants would continue to argue at summary judgment or trial that the Class Period should *at least* be shortened, substantially reducing the amount of potentially recoverable damages for the Settlement Class. Defendants would have reiterated to a jury that the alleged corrective disclosures on April 23, 2019, October 25, 2019, and March 16, 2020 did not disclose any new, fraud-related information to the market. At the class certification stage, Defendants' argument convinced Judge Edison to recommend a significantly truncated class period—ending on February 22, 2018 (instead of March 13, 2020). Dkt. 158 at 25. Specifically, Judge Edison found that: (i) Defendants had rebutted the *Basic* presumption for the time period of February 23, 2018 through March 13, 2020 (*i.e.*, the Focus Period examined by Ms. Allen) (*id.*); (ii) the 15 misrepresentations alleged during the Focus Period did not cause any front-end price impact (*id.*); (iii) the March 16, 2020 post on *Seeking Alpha* did not reveal any new information to the market (*id.* at 14-15); (iv) the announcement of Steve Keenan's resignation from Apache on October 25, 2019 did not reveal new information about Alpine High, and the market reacted to Mr. Keenan's departure based on the anticipated impact on Apache's prospects in an unrelated international oil and gas play (*id.* at 15-18); and (v) there were no statistically significant

price declines in Apache common stock on any of the four days following the April 23, 2019 corrective disclosure (*id*. at 19-25), the disclosure did not reveal anything new about Alpine High (*id*. at 25), and the decline in Apache's stock price was more likely than not due to the uncertainty about the historically low Waha Hub gas prices (*id*.). Even if the Court declined in full or in part to adopt Judge Edison's Class Certification Report, Defendants would have pressed certain or all of these arguments again at summary judgment or trial.

105.    Based on Lead Plaintiffs' expert's analysis, the Settlement Class's maximum potential damages were estimated to be between approximately $1.48 billion (for the Class Period as pled) and $519 million (for a truncated class period ending on February 22, 2018). If the Court or a jury accepted any of Defendants' foregoing arguments, the maximum damages could have been materially reduced, or eliminated altogether.

106.    Given the complexity of determining loss causation and measuring damages in the context of a securities fraud class action, these issues would have resulted in a "battle of the experts" involving technical testimony by Dr. Nye and Ms. Allen. For example, a jury could ultimately find that any or all of the alleged partial corrective disclosures did not contain any new information and/or were not corrective of any of the alleged false statements made during the Class Period. Further, while Lead Plaintiffs strongly believed that Defendants' arguments at the class certification stage regarding the proposed damages methodology were faulty, and would be found to be so at summary judgment and trial, there is no guarantee that the Court or a jury would agree. If the Court or a jury found Defendants' expert testimony on loss causation and damages more credible, it is likely that

the Settlement Class's damages could be significantly lower than expected or rejected altogether.

### C.    Risks on Appeal

107.    If Lead Plaintiffs were successful in proving liability and damages at summary judgment and trial, they would face inevitable post-trial appeals which, even if unsuccessful, would be costly and time-consuming. On appeal, Defendants would renew various arguments as to why Lead Plaintiffs failed to establish liability, loss causation, and damages, thereby exposing Lead Plaintiffs and the Settlement Class to the risk of having any favorable judgment reversed or reduced below the Settlement Amount after years of litigation. These risks were not hypothetical, particularly given the resources and capabilities of Defendants' attorneys.

## IV.    COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

108.    In its Preliminary Approval Order, the Court authorized Lead Counsel to retain A.B. Data as the Claims Administrator "to supervise and administer the notice procedure in connection with the proposed Settlement as well as the processing of Claims[.]" Dkt. 163, ¶ 7. In accordance with the Preliminary Approval Order, A.B. Data, working in conjunction with Lead Counsel, engaged in a robust direct and publication notice program, including: (i) mailing the Postcard Notice to potential Settlement Class Members at the addresses set forth in the records provided by Defendants; (ii) mailing/emailing the Postcard Notice  to potential Settlement Class Members who could be identified through brokerage firms, banks, institutions, and other nominees (collectively,

"Nominees") holding Apache common stock in street name; (iii) mailing the Notice Packet to the thousands of Nominees contained in A.B. Data's Nominee database and to potential Settlement Class Members upon request; (iv) publishing the Summary Notice in *The Wall Street Journal* and transmitting the same over *PR Newswire*; and (v) developing the Settlement website, www.ApacheSecuritiesSettlement.com, from which copies of the Notice and Claim Form can be downloaded. Walter Decl., ¶¶ 3-10, 12. Additionally, even though not required by the Preliminary Approval Order, Lead Counsel also provided information about the Action and Settlement on their respective firm websites, including downloadable copies of the Notice and Claim Form.

109. The Postcard Notice contains important information concerning the Settlement and, along with the Summary Notice, directs recipients to the Settlement website for additional information regarding the Settlement (and the Action), including the long form Notice, which includes, among other things, details about the Settlement and a copy of the Plan of Allocation.

110. Collectively, the notices provide the Settlement Class definition, a description of the Settlement, information regarding the claims asserted in the Action and information to enable Settlement Class Members to determine whether to: (i) participate in the Settlement by completing and submitting a Claim; (ii) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (iii) submit a request to be excluded from the Settlement Class. The notices also inform prospective Settlement Class Members of Lead Counsel's intent to: (i) apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund; and (ii) request payment of

54

Litigation Expenses in connection with the institution, prosecution, and resolution of the Action in an amount not to exceed $1.9 million, plus interest, which amount may include a request for reimbursement of the reasonable costs incurred by the Lead Plaintiffs directly related to their representation of the Settlement Class in the Action in accordance with 15 U.S.C. § 78u-4(a)(4). *See* Walter Decl., Exs. A-C.

111.   In accordance with the Preliminary Approval Order, A.B. Data began disseminating Postcard Notices to potential Settlement Class Members and Notice Packets to Nominees on June 11, 2024. Walter Decl., ¶¶ 3-5. To date, A.B. Data has mailed 237,676 Postcard Notices and 4,944 Notice Packets to potential Settlement Class Members and Nominees. *Id*. at ¶ 9. A link to the Notice and Claim Form was provided to an additional 176,191 potential Settlement Class Members via email. *Id*. In addition, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on June 26, 2024. *Id*. at ¶ 10.[11]

112.   A.B. Data also developed and currently maintains the Settlement website to provide Settlement Class Members and other interested parties with information concerning the Settlement and important dates and deadlines in connection therewith, as well as downloadable copies of the Notice, Claim Form, Stipulation, Preliminary Approval Order, and Complaint. Walter Decl., ¶ 12. Additionally, A.B. Data maintains a toll-free telephone number to respond to inquiries regarding the Settlement. *Id*. at ¶ 11. Settlement

---

[11] Defendants have informed Lead Counsel that they issued notice of the Settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 on May 14, 2024.

Class Members with questions can also contact A.B. Data by email at info@ApacheSecuritiesSettlement.com.

113. As noted above, and as set forth in the notices, the deadline for Settlement Class Members to request exclusion from the Settlement Class or to submit an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application is August 29, 2024. To date, there have been no objections to any aspect of the Settlement and only four requests for exclusion. Walter Decl., ¶ 13. Lead Plaintiffs and Lead Counsel will address all requests for exclusion and objections that may be received in their reply submission to be filed on September 12, 2024.

## V. THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

114. In accordance with the Preliminary Approval Order, and as explained in the notices, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator, A.B. Data, postmarked (if mailed), or online through the website, www.ApacheSecuritiesSettlement.com, no later than October 9, 2024. As provided in the Notice, the Net Settlement Fund will be distributed to Authorized Claimants[12] in

---

[12] As defined in ¶ 1(d) of the Stipulation, an "Authorized Claimant" is a "Settlement Class Member who submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund."

accordance with the plan for allocating the Net Settlement Fund among Authorized Claimants approved by the Court.

115.   The Plan of Allocation proposed by Lead Plaintiffs is attached as Appendix A to the Notice. *See* Walter Decl., Ex. B. The Plan is designed to achieve an equitable and rational distribution of the Net Settlement Fund. However, the Plan is not a formal damages analysis, and the calculations made pursuant to it are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after trial.

116.   Lead Counsel developed the Plan in consultation with Lead Plaintiffs' damages expert, Dr. Nye and his team of professionals at Stanford Consulting. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of the alleged violations of the federal securities laws set forth in the Complaint, as opposed to economic losses attributable to market and/or industry forces. To that end, Dr. Nye and his team calculated the estimated amount of alleged artificial inflation in the per-share closing prices of Apache common stock that allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period.  As set forth in the Plan, the estimated alleged artificial inflation in Apache common stock at the start of the Class Period was approximately $12.14 per share, and gradually declined to $0 as the relevant truth was revealed to the market through five partial corrective disclosures. Table 1 of the Plan sets forth the estimated alleged artificial inflation in Apache common stock during ten discrete date ranges during the Class Period that coincide with the alleged

partial corrective disclosures dates. This table, along with Table 2 (values for shares sold or held through the "90-Day Look-Back" period) will be utilized by A.B. Data in calculating a Claimant's Recognized Loss Amounts, and ultimately their overall Recognized Claim, in Apache common stock.[13]

117.   As set forth in the Plan, a Claimant's Recognized Loss Amount(s) will depend upon several factors, including when and the price at which they purchased/acquired/sold their Apache common stock during the Class Period.[14] In order to have a Recognized Claim under the Plan, a Claimant must have suffered damages proximately caused by the disclosure of the relevant truth concealed by Defendants' alleged fraud. Specifically, a Claimant must have held Apache common stock purchased/acquired during the Class Period through at least one of the dates when the disclosure of alleged corrective information partially removed the alleged artificial inflation from the price of the stock.

118.   A.B. Data, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (*i.e.*, the sum of the Claimant's Recognized Loss Amounts as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants,

---

[13] Pursuant to Appendix A, ¶ 2 of the Notice, "a 'Recognized Loss Amount' will be calculated for each purchase or acquisition of Apache common stock during the Class Period that is listed on the Claim Form and for which adequate documentation is provided." Pursuant to Appendix A, ¶ 2 of the Notice, a Claimant's "'Recognized Claim' will be the sum of his, her, or its Recognized Loss Amounts."

[14] The calculation of Recognized Loss Amounts for Apache common stock also takes into account the PSLRA's statutory limitation on recoverable damages. *See* § 21D(e)(1) of the Exchange Act.

multiplied by the total amount in the Net Settlement Fund. Notice, ¶ 11. Lead Plaintiffs' losses will be calculated in the same manner.

119.   Once A.B. Data has processed all submitted Claims and provided Claimants with an opportunity to cure any deficiencies in their Claims or challenge the rejection of their Claims, Lead Counsel will file with the Court a motion for approval of A.B. Data's determinations with respect to all submitted Claims and authorization to distribute the Net Settlement Fund to Authorized Claimants. As set forth in the Plan, if there is a balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise) following the distribution, no less than nine months after the distribution and if it is cost-effective to do so, Lead Counsel will conduct another distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such distribution, to Authorized Claimants who have cashed their initial distribution checks and would receive at least $10.00 from such re-distribution. *See* Notice, ¶ 12. Additional re-distributions to Authorized Claimants will be repeated until it is determined that additional distribution of the funds remaining in the Net Settlement Fund is no longer cost effective. *Id*. Thereafter, any balance remaining in the Net Settlement Fund will be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s), to be recommended by Lead Counsel and approved by the Court. *Id*.

120.   The structure of the Plan is similar to the structure of plans of allocation that have been used to apportion settlement proceeds in numerous other securities class actions in this District, elsewhere in the Fifth Circuit, and in federal courts nationwide. To date, there have been no objections to the Plan. In sum, Lead Counsel believe that the Plan

provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants, and respectfully submit that the Plan should be approved by the Court.

## VI. LEAD COUNSEL'S FEE AND EXPENSE APPLICATION

121.   In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel are applying for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action. Specifically, Lead Counsel are applying for attorneys' fees in the amount of 33⅓% of the Settlement Fund and for Litigation Expenses in the total amount of $1,572,402.71.[15] This total amount includes a request for reimbursement in the aggregate amount of $17,014.22 for the costs incurred by Lead Plaintiffs in representing the Settlement Class in the Action, as permitted by 15 U.S.C. § 78u-4(a)(4). *See* Lydon Decl., ¶¶ 17-18; Smith Decl., ¶¶ 12-14. As noted above, Lead Counsel's Fee and Expense Application is consistent with the maximum fee and expense amounts set forth in the notices and, as set forth in Lead Plaintiffs' declarations (*see* Lydon Decl., ¶¶ 13-16 and Smith Decl., ¶¶ 9-11), is supported by Lead Plaintiffs who

---

[15] The individual firm lodestar and expense submissions of: (i) Joshua E. D'Ancona, on behalf of Kessler Topaz ("Kessler Topaz Fee and Expense Decl."); (ii) David R. Kaplan, on behalf of Saxena White ("Saxena White Fee and Expense Decl."); (iii) John S. Edwards, Jr, on behalf of Ajamie ("Ajamie Fee and Expense Decl."); Douglas A. Daniels on behalf of Daniels & Tredennick ("Daniels & Tredennick Fee and Expense Decl."); and Jeffrey J. Angelovich on behalf of Nix Patterson ("Nix Patterson Fee and Expense Decl.") (together, the "Fee and Expense Declarations"), are attached hereto as Exhibits 4 through 8. The Fee and Expense Declarations set forth the names of the attorneys and professional support staff employees who worked on the Action and their respective hourly rates, the lodestar value of the time expended by each such attorney and professional support staff employee, and the expenses incurred by each firm.

carefully considered the appropriateness of Lead Counsel's request. To date, no objections to the Fee and Expense Application have been received.[16]

122.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. A full analysis of the factors considered by courts in the Fifth Circuit when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.[17]

## A.    Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

### 1.    The Favorable Settlement Achieved

123.    Courts have consistently recognized that the result achieved is a key factor to be considered in making a fee award. *See* Fee and Expense Memorandum, § IV.D.3. As described above, the $65 million Settlement is a favorable result, representing between 4.4% to 12.5% of the Settlement Class's potential estimated damages based on analyses by Lead Plaintiffs' damages expert. This result—reflecting the informed assessment by Lead Counsel and Lead Plaintiffs of the strengths of the Settlement Class's claims and risks of

---

[16] Lead Counsel will address any objections received after this submission in their reply to be filed on September 12, 2024.

[17] The Fifth Circuit has noted that a district court should consider the following factors, among others, in determining a fee award: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *See also* Fee and Expense Memorandum, § IV.D.

litigating this complex Action through a ruling by the Court on class certification, the remainder of discovery, trial, and appeals—provides a significant recovery for the Settlement Class which is in-line with or exceeds damages recoveries in similar cases.

124.   In addition to representing a meaningful percentage of estimated damages, the Settlement is also favorable when considered in view of the substantial risks and obstacles to obtaining a larger recovery (or any recovery) were the Action to continue. *See* § III, *supra*. Here, the Settlement avoids the substantial risks to recovery in the absence of settlement and, as a result, numerous Settlement Class Members will benefit and receive compensation for their losses.

### 2.       The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

125.   The risks faced by Lead Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement. Here, Defendants adamantly deny any wrongdoing and, if the Action had continued, would have aggressively litigated their defenses through summary judgment, trial, and the appeals that would likely follow. As detailed in § III above, Lead Counsel and Lead Plaintiffs faced significant risks to proving Defendants' liability, loss causation, and damages if the Action continued.

126.   These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that the Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and was undertaken on a contingent-fee basis. From the outset, Lead Counsel understood that this

would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for federal securities cases like this one to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Lead Counsel alone have dedicated over 46,000 hours in prosecuting this Action for the benefit of the Settlement Class, yet have received no compensation for their efforts. Lead Counsel also advanced well in excess of $1 million in litigation expenses without any guarantee of reimbursement.

127.    Here, Lead Counsel also bore the risk that no recovery would be achieved— a risk that was heightened following Judge Edison's Class Certification Report recommending that the Class Period be significantly shortened before being certified. Indeed, Lead Counsel know from experience that the commencement and ongoing prosecution of a class action does not guarantee a settlement.[18] To the contrary, it takes

---

[18] For example, there are many appellate decisions affirming summary judgment and directed verdicts for defendants, showing that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g., In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd on other grounds sub nom. Hubbard v. BankAtlantic Bancorp, Inc*., 688 F.3d 713 (11th Cir. 2012) (granting judgment as a matter of law following plaintiff's jury verdict); *Robbins v. Koger*

sustained and diligent work by skilled counsel to develop the facts and legal arguments needed to survive a motion to dismiss or win at class certification, summary judgment, and trial, or on appeal, or to cause sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

128.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can occur only if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

129.    Lead Counsel's efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class, as described above.

---

*Props. Inc.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against accounting firm reversed on appeal); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning securities class action jury verdict for plaintiffs' in case filed in 1973 and tried in 1988); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom.*, *Herman v. Legent Co.*, 50 F.3d 6 (4th Cir. 1995) (judgment as a matter of law after plaintiffs' presentation of their case to the jury); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (after jury verdict for plaintiffs following an extended trial, the court overturned the verdict); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (after eleven years of litigation, and following a jury verdict for plaintiffs and an affirmance by a First Circuit panel, plaintiffs' claims were dismissed by an *en banc* decision and plaintiffs recovered nothing).

In circumstances such as these, and in consideration of the hard work and excellent result achieved, Lead Counsel believe the requested fee is reasonable and should be approved.

### 3.     The Time and Labor Devoted by Plaintiffs' Counsel

130.    Over the course of more than three years, Plaintiffs' Counsel devoted substantial time to the investigation, prosecution, and resolution of the Action. As more fully described above, Lead Counsel's efforts included:

- conducting a thorough investigation into the Settlement Class's claims, which involved a detailed review of publicly available information, interviews with dozens of former Apache employees, consultation with interdisciplinary experts and consultants, and extensive legal research to confirm the theories of liability Lead Plaintiffs could pursue on behalf of the Settlement Class and satisfy the applicable pleading standards;

- drafting the detailed Complaint based on this investigation, as well as the initial complaint that commenced the Action;

- successfully briefing and opposing Defendants' motion to dismiss the Complaint;

- engaging in extensive discovery efforts, including the review of over one million pages of documents, participation in numerous meet and confer sessions with Defendants and various nonparties regarding discovery disputes (two of which required the Court's intervention), and deposing 16 fact witnesses and preparing to depose at least seven more, including many of the Company's current and former senior-most executives;

- fully briefing and arguing the Class Certification Motion, including a lengthy evidentiary hearing, which included cross examination of the parties' economic experts, preparing for and defending the deposition of Lead Plaintiffs' corporate representatives and expert and preparing for and taking the deposition of Defendants' expert;

- preparing objections to Judge Edison's Class Certification Report; and

- engaging in vigorous arm's-length negotiations (including one full-day, in-person mediation session with Mr. Melnick and the preparation of detailed mediation statement) to achieve the Settlement.

At all times throughout the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible.

131.    Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. As two of the lead attorneys on the case, we personally monitored and maintained control of the work performed by other lawyers at Kessler Topaz and Saxena White and closely coordinated the work of the additional Plaintiffs' Counsel firms throughout the litigation. Other experienced attorneys were also involved in the drafting of pleadings, motion papers, and in the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

132.    All of the attorneys and support personnel that worked on this case are highly qualified in the area of securities class action litigation and greatly assisted in the prosecution and resolution of this Action. *See* firm resumes (Kessler Topaz Fee and Expense Decl., Ex. 4-D; Saxena White Fee and Expense Decl., Ex. 5-C; Ajamie Fee and Expense Decl., Ex. 6-C; Daniels & Tredennick Fee and Expense Decl., Ex. 7-C; Nix Patterson Fee and Expense Decl., Ex. 8-C).

133.    The time devoted to this Action by Plaintiffs' Counsel is set forth in the Fee and Expense Declarations attached hereto as Exhibits 4 through 8. Included with the Fee and Expense Declarations are schedules that summarize the time expended by the attorneys and professional support staff employees at Plaintiffs' Counsel, as well as the expenses

incurred by each firm. Plaintiffs' Counsel's Fee and Expense Declarations report on the amount of time spent by each attorney and professional support staff employee who worked on the Action and their resulting "lodestar," *i.e.*, hours multiplied by hourly rates.[19]

134.    In total, from the inception of this Action through August 9, 2024, Lead Counsel *alone* have expended a total of 46,552 hours on the investigation, prosecution, and resolution of the claims against Defendants for a total lodestar of $27,157,676.00.[20] Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 33⅓% of the Settlement Fund (or, $21,666,666 plus interest), if awarded, would yield a *negative* (or fractional) multiplier of approximately 0.80 on Lead Counsel's lodestar—falling below the range of positive fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere. *See* Fee and Expense Memorandum, § IV.E.[21]

---

[19] The hourly rates of Lead Counsel here range from $825 to $1,195 per hour for partners/directors, $400 to $795 per hour for counsel/associates, $325 to $460 per hour for other attorneys, $300 to $405 per hour for paralegals, and $300 to $660 per hour for in-house investigators.  *See* Kessler Topaz Fee and Expense Decl., Ex. 4-A; Saxena White Fee and Expense Decl., Ex. 5-A; Ajamie Fee and Expense Decl., Ex. 6-A; Daniels & Tredennick Fee and Expense Decl., Ex. 7-A; and Nix Patterson Fee and Expense Decl., Ex. 8-A. These hourly rates are reasonable for this type of complex litigation. *See* Fee and Expense Memorandum, § IV.E.

[20] Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Settlement Class Members with their Claims and related inquiries and working with the Claims Administrator, A.B. Data, to ensure the smooth progression of claims processing. ***No additional legal fees will be sought for this work***.

[21] Additional Plaintiffs' Counsel have spent an additional 695 hours in connection with the Action. These hours have not been factored into the lodestar calculation.

### 4.      The Quality of Plaintiffs' Counsel's Representation

135.    The skill and diligence of Plaintiffs' Counsel also support the requested fee. As demonstrated by their firm résumés (*see* Exhibits 4-D and 5-C hereto), Lead Counsel are highly experienced in the securities litigation field, with long and successful track records representing investors in such cases, and are consistently ranked among the top plaintiffs' firms in the country. Liaison Counsel, Ajamie, and the other Plaintiffs' Counsel firms are also highly experienced in complex litigation. The substantial result achieved for the Settlement Class here reflects the superior quality of this representation.

136.    The quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. As discussed above, Defendants in this case were represented by highly experienced and able attorneys from the Houston office of the international litigation firm Baker Botts L.L.P. These attorneys, who have substantial relevant experience in securities litigation and representing companies in the E&P industry, vigorously defended the Action for three years. Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### 5.      Lead Plaintiffs' Endorsement of the Fee Application

137.    Lead Plaintiffs are sophisticated institutional investors that have closely supervised and actively participated in the prosecution and settlement of the Action. Lead Plaintiffs have evaluated and fully support Lead Counsel's 33⅓% fee request. *See* Lydon Decl., ¶ 13; Smith Decl., ¶ 9. Further, as set forth in the declarations submitted on their

behalf, Lead Plaintiffs have concluded that the requested fee has been earned based on the efforts of Plaintiffs' Counsel across more than three years and the favorable recovery obtained for the Settlement Class in a case that involved serious risk. *Id*. Accordingly, Lead Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

**B.      Lead Counsel's Request for Litigation Expenses Warrants Approval**

**1.      Lead Counsel Seek Payment of Plaintiffs' Counsel's Reasonable and Necessary Litigation Expenses from the Settlement Fund**

138.      Lead Counsel also seek payment from the Settlement Fund of $1,555,388.49 for expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in prosecuting and resolving the Action. The notices inform the Settlement Class that Lead Counsel will apply for Litigation Expenses in an amount not to exceed $1.9 million, which amount may include a request for reimbursement of the reasonable costs incurred by Lead Plaintiffs directly related to their representation of the Settlement Class in accordance with 15 U.S.C. § 78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the total amount requested by Lead Plaintiffs (*i.e.*, $17,014.22), is below the expense cap set forth in the notices. To date, there have been no objections to the maximum amount of Litigation Expenses set forth in the notices.

139.      From the beginning of the Action, Lead Counsel were aware that they might not recover any of the expenses they incurred in prosecuting the claims against Defendants and, at the very least, would not recover any of their out-of-pocket expenses until the

Action was successfully resolved. Lead Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to litigate the Settlement Class's claims against Defendants. Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

140.   As set forth in the accompanying Fee and Expense Declarations, Plaintiffs' Counsel's expenses include charges for, among other things: (i) consultants and experts utilized in connection with various stages of the litigation; (ii) a database to house, manage and permit sophistical electronic review of the voluminous amount of documents produced in discovery; (iii) online factual and legal research; (iv) mediation and settlement negotiations with Mr. Melnick; and (v) document reproduction.[22] Courts have consistently found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.

141.   The largest component of Plaintiffs' Counsel's expenses ($1,179,914.10, or approximately 76% of their total expenses) was incurred to pay experts and consultants. This includes payments to Dr. Nye and his team at Stanford Consulting for economic work

---

[22] These expenses are reflected in Plaintiffs' Counsel's books and records, which are prepared in the normal course of business and are an accurate record of the expenses incurred in the prosecution of this matter. These expense items are billed separately by Plaintiffs' Counsel and are not duplicated in Plaintiffs' Counsel's hourly rates.  Kessler Topaz Fee and Expense Decl., Ex. 4-B & C; Saxena White Fee and Expense Decl., Ex. 5-B; Ajamie Fee and Expense Decl., Ex. 6-B; Nix Patterson Fee and Expense Decl., Ex. 8-B.

regarding issues related to market efficiency, loss causation, and damages. The retention of this expert was necessary and reasonable in order to prove Lead Plaintiffs' claims and to meet the considerable challenges posed by Defendants' well-credentialed expert at the class certification stage. *See supra* ¶¶ 85-87. In addition to consulting with Lead Counsel in developing the case, Dr. Nye produced two expert reports and was deposed by Defendants' Counsel in connection with the Class Certification Motion. Dr. Nye also assisted Lead Counsel in their mediation efforts and in developing the proposed Plan of Allocation after the Settlement was reached. *Id*. at ¶¶ 85-87, 116.

142.   In addition to Dr. Nye, Lead Counsel made payments to other industry and financial experts and consultants, including Ammonite, with whom Lead Counsel worked closely in understanding the various technical, operational, and scientific aspects of the Alpine High play. Ammonite's retention was required to understand the complex factual context of this case, including the highly technical field of shale fracking, and the reasonableness and truthfulness of Defendants' estimates regarding the recoverable amounts of natural resources at Alpine High and the play's economic viability.

143.   Another substantial component of Plaintiffs' Counsel's expenses (*i.e.*, $— $151,873.88, or approximately 10% of their expenses) was incurred in connection with document review and production. As noted in ¶ 58 above, Lead Counsel retained KLDiscovery to host a sophisticated discovery platform to, among other things: (i) maintain the electronic database through which over one million pages of documents produced by Defendants and nonparties were reviewed; and (ii) process documents so they would be in a searchable format. Lead Counsel also utilized this outside document

management vendor to prepare and produce Lead Plaintiffs' documents to Defendants in response to their discovery requests.

144. Another large component of Plaintiffs' Counsel's expenses was incurred for online legal and factual research. This amount represents charges for computerized research services such as Lexis, Westlaw, and PACER. It is standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class. Here, online research was necessary to conduct the factual investigation and identify potential witnesses, prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss, support the Class Certification Motion, and conduct research in connection with certain discovery-related issues and the Parties' settlement negotiations. Plaintiffs' Counsel have incurred a total of $75,544.62 for online research charges, representing approximately 5% of Plaintiff's Counsel's total expenses.

145. In addition, Lead Counsel incurred $21,800.00 for Lead Plaintiffs' portion of the charges related to the mediation session with Mr. Melnick and the settlement negotiations that followed with his assistance.

146. Another large component of expenses, $54,098.60, or approximately 3.5% of total expenses, was expended on obtaining transcripts and video recordings of the 20 depositions that took place in connection with this Action, as well as certain Court hearings.

147. The remaining expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients

billed by the hour. These expenses include, among others, travel costs (*e.g.*, lodging, airfare, meals), process servers, court fees, copying, and delivery expenses. All expenses incurred by Plaintiffs' Counsel were necessary to the successful litigation of the Action, and have been approved by Lead Plaintiffs. *See* Lydon Decl., ¶ 16; Smith Decl., ¶ 10.

### 2.     Reimbursement to Lead Plaintiffs Is Fair and Reasonable

148.    In addition, Lead Plaintiffs seek reimbursement of the reasonable costs they incurred directly in connection with their representation of the Settlement Class in the Action. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee and Expense Memorandum at § VII.[23] Specifically, Lead Plaintiff Plymouth County seeks reimbursement in the amount of $7,234.22 for the time its employees expended in connection with the Action. Lydon Decl., ¶ 18. Lead Plaintiff Teamsters No. 142 seeks reimbursement in the amount of $9,780.00 for the time its employees expended in connection with the Action. Smith Decl., ¶ 14.

149.    The substantial amount of time and effort devoted to this Action by Lead Plaintiffs' employees is detailed in their accompanying declarations, attached as Exhibits 1 and 2 hereto. As discussed therein, Lead Plaintiffs have been fully committed to pursuing the Settlement Class's claims since they became involved in the Action and have provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. Lead Plaintiffs' efforts during the course of the Action included regular communications

---

[23] The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

with Lead Counsel concerning significant developments in the litigation and case strategy, reviewing and approving significant pleadings and briefs filed in the Action, responding to Defendants' discovery requests and searching for and producing potentially relevant documents in a process supported by multiple meetings with counsel and internal personnel regarding the document search and collection efforts, preparing and sitting for depositions, and overseeing the settlement negotiations. *See* Lydon Decl., ¶¶ 7-8; Smith Decl., ¶¶ 5-7. These are precisely the types of activities courts have found to support reimbursement of representative parties, and fully support Lead Plaintiffs' request for reimbursement here.

## VII.  CONCLUSION

150.   For the reasons set forth above, Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested attorneys' fees in the amount of 33⅓% of the Settlement Fund should be approved as fair and reasonable, and the request for Plaintiffs' Counsel's Litigation Expenses in the amount of $1,555,388.49, and Lead Plaintiffs' costs in the aggregate amount of $17,014.22 should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

Executed in Solana Beach, California this 15th day of August 2024.

_____
DAVID R. KAPLAN

Executed in Radnor, Pennsylvania this 15th day of August 2024.

_____
JOSHUA E. D'ANCONA

75